# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WALTER J. ROSALES, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, P.O. Box 85, Jamul, California, 91935 | ) ) ) ) ) | **CASE NUMBER:** 1:07-cv-00162 |
| KAREN TOGGERY, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TOGGERY, P.O. Box 375, Jamul, California, 91935 | ) ) ) ) ) | **JUDGE:** Judge Rosemary M. Collyer **DECK TYPE:** Tribal Rights **DATE STAMP:** |
| JAMUL INDIAN VILLAGE, a federally recognized Indian tribe, P.O. Box 612 Jamul, California, 91935 | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, by and through DIRK KEMPTHORNE, in his official capacity, | ) ) ) ) ) | |
| BUREAU OF INDIAN AFFAIRS, by and through Assistant Secretary of Indian Affairs, JAMES E. CASON. | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

REGULATORY BACKGROUND
    The Native American Graves Protection and Repatriation Act . . . . . . . . . . . . . . . . . . . . 5

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.      PLAINTIFFS FAIL TO SHOW A LIKELIHOOD OF SUCCESS ON
      THE MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.      Plaintiffs have Failed to Establish a Waiver of Sovereign Immunity
              Under California State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.      Plaintiffs Cannot Succeed On the Merits of Their NAGPRA Claims . . . . . . . . . 13

              1.      Plaintiffs Cannot Succeed On the Merits of Their NAGPRA Claims
                      Pursuant for Parcel 06 Because It Is Privately
                      Held Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

              2.      Plaintiffs Cannot Succeed on the Merits of Their Claims
                      for Parcels 04 and 05 Because They Fail to Identify
                      Any Obligation or Requirement for Defendants to Act Under
                      NAGPRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                      a.      Plaintiffs Cannot Succeed on the Merits of Their Claims
                              Under NAGPRA Because They Can Point to No Planned
                              Archaeological Removal by the Tribe or Any Inadvertent
                              Discovery of Human Remains or Other Cultural Items . . . . . . . . 16

                      b.      In the Event of an Unanticipated Discovery or Intentional
                              Excavation, Plaintiffs Are Not Entitled to the Relief They
                              Have Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      C.      Plaintiffs Cannot Succeed On Their Claims of Beneficial Ownership
              of Parcel 04 In the Absence of the Tribe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

              1.      Plaintiffs are Precluded From Establishing Beneficial Ownership
                      In the Absence of the Tribe - A Necessary and Indispensable Party . . . . 23

2. Plaintiffs Cannot Succeed On Their Beneficial Ownership Claims Because They Have Not Exhausted Their Tribal Court Remedy  . . . . . . 25

D. Plaintiffs Are Not the Beneficial Owners of Parcel 04  . . . . . . . . . . . . . . . . . . . . 27

E. The United States is Not Obligated to Prevent an Action in Trespass  . . . . . . . . 30

1. Plaintiffs Lack Standing To Assert the Claims Alleged In the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2. Plaintiffs' Trespass Claim Cannot Succeed Because No Such Liability Has Been Created by Congress. . . . . . . . . . . . . . . . . . . . . . . . . . 32

II. PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY AND THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVORS DENYING PRELIMINARY INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . 35

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## INTRODUCTION

Defendants United States of America, Department of the Interior, Dirk Kempthorne, Secretary, Department of Interior, Bureau of Indian affairs, and James E. Cason,[1] respectfully submit this opposition to Plaintiffs' Motion for Preliminary Injunction.[2]  (Doc. 4).  This lawsuit arises from a series of longstanding internal disputes among members and purported members of the Jamul Indian Village (the "Tribe").[3]  Since the mid 1990s, Plaintiffs have filed several federal court suits to attempt to challenge tribal elections and a variety of tribal leadership decisions, including decisions to engage in gaming activities.  This action is the latest in a series of attempts by Plaintiffs to circumvent the normal channels of administrative review of leadership and gaming issues.[4]

---

[1] James E. Cason is not the Assistant Secretary of Indian Affairs.  Rather, he is the Associate Deputy Secretary of the U.S. Department of the Interior ("DOI").

[2] In addition to the Defendants named in the caption of the case, Plaintiffs also allege that DOES 1-20, who are unknown to Plaintiffs at this time, "are responsible in some measure for the actions, events and happenings" alleged in the Complaint.  *See* Complaint ("Compl.") ¶¶ 5-6. (Doc. 1).  However, as they are unnamed and not included in the caption, references to "Defendants" are limited to the named defendants.

[3] Plaintiffs allege that they are enrolled members and lawfully elected officers of the Tribe and are duly authorized to file this action on behalf of the Tribe.  *See* Compl. ¶ 1.  However, the Bureau of Indian Affairs ("BIA") has recognized Leon Acebedo as Chairman of the Tribe through June 16, 2007.  *See* August 9, 2005 Letter from James J. Fletcher, Acting Superintendent, Bureau of Indian Affairs, Southern California Agency to Mr. Leon Acebedo, Chairman, Jamul Indian Village (Exhibit A).  Chairman Acebedo has stated that Plaintiffs are not authorized to bring this action on behalf of the Tribe, and further are not members of the Tribe, nor have they applied for membership.  *See* Declaration of Lee Acebedo ("Acebedo Decl.") at ¶¶ 13-15.  References to "Plaintiffs" are therefore limited to the individual plaintiffs named in this action and references to the "Tribe" refer to the Tribe, as led by recognized tribal leadership.

[4] Plaintiffs' claim to beneficial ownership was rejected by the United States District Court for the Southern District of California.  *See Rosales v. United States*, February 14, 2002 Order (1)

Plaintiffs' instant action seeks declaratory and injunctive relief against Defendants related to proposed grading and construction activities by the Jamul Indian Village for a casino and hotel on land held in trust for the Tribe. Plaintiffs do not allege that Defendants have any plans to engage in any grading or construction activity on the land in question. Nor do Plaintiffs have any support for the proposition that Defendants have the authority or obligation to prevent such activities by the Tribe. Yet Plaintiffs ask this Court to issue a mandatory injunction enjoining Defendants from engaging in or allowing such activities to occur. Plaintiffs have also requested a mandatory injunction to enjoin Defendants from failing to preserve human remains and associated objects "in place" without pointing to any Federal statute or regulation empowering Defendants to demand the Tribe take such action. Because Plaintiffs cannot succeed on the merits of these claims, Plaintiffs' motion should be denied.

Plaintiffs premise their request for preliminary injunctive relief on alleged violations of California state laws and the Federal Native American Grave Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. §§ 3001, et. seq. But because there has been no express waiver of sovereign immunity by the United States under the California state laws cited, Plaintiffs cannot succeed on the merits of any claims made pursuant to such laws. Further, as explained below, the requirements of NAGPRA do not apply to the facts of this case, as there has been no

---

Granting Defendants' Motion for Summary Judgment; and (2) Denying Defendants' Motion to Dismiss or for Judgment on the Pleadings at 13-14 (Exhibit B). This decision was affirmed by the Ninth Circuit. *Rosales v. United States*, 73 Fed. Appx. 913, 914-15, 2003 WL 21920015 (unpublished), (Exhibit C). *See also*, *Jamul Indian Village, et. al. v. Hunter, et. al*, 95cv0131 (S.D. Cal.), (Exhibit D); *Rosales v. United States*, No. 97cv769 (S.D. Cal.) (Exhibit E) and (Exhibit F) (noting that Plaintiffs' counsel attempted to litigate the same action in the Central District of California, but declining to impose sanctions); *Rosales v. United States*, 98-869L (Court of Federal Claims) (Exhibit G).

inadvertent discovery of human remains or other cultural items and the Tribe's construction activities do not qualify as an intentional excavation and additionally, one of the parcels of land is privately held land and thus not subject to the requirements of NAGPRA. Thus Plaintiffs cannot succeed on the merits of any claims brought pursuant to NAGPRA.

Plaintiffs also ask this Court to require Defendants to prevent what Plaintiffs refer to as "trespass." This claim is premised on Plaintiffs' assertion that they are the beneficial owners of the land in question and must fail for several reasons. First, because the federally recognized Tribe also claims to be the beneficial owner, it is an indispensable party, and Plaintiffs claims cannot proceed in their absence. In fact, Plaintiffs, under the doctrine of issue preclusion, are barred from attempting to establish beneficial ownership of the parcel in the absence of the Tribe, or asserting that they are the Tribe and that the federally recognized Tribe need not be present. This is because the Ninth Circuit, in an action brought by the same individual plaintiffs claiming to be the beneficial owners of the same land, affirmed the dismissal of the action for failure to join the Tribe as a necessary and indispensable party. The Ninth Circuit held that the individual plaintiffs were not the Tribe, and claims regarding beneficial ownership could not be decided in the absence of the Tribe. *See Rosales*, 73 Fed. Appx. at 914-15, 2003 WL 21920015 (Exhibit C).

Second, Plaintiffs' trespass claim must fail because they are in the midst of a tribal court remedy which they have not exhausted. A related action is pending in intertribal court in California, where the Plaintiffs are involved in an eviction proceeding that relates to the same issue underlying Plaintiffs' trespass claim – beneficial ownership of the land in question. A trial in that action is scheduled for February 23, 2007. Under well-established law, Plaintiffs are

3

required to exhaust their remedies in the intertribal court before this Court can retain jurisdiction.

Because the BIA has recognized Lee Acebedo as Chairman of the Tribe, Plaintiffs, who are not even members of the Tribe, are not authorized to bring any action on behalf of the Tribe, and therefore lack standing to assert a trespass claim.  Further, a California District Court, when presented with nearly identical claims regarding beneficial ownership by the same individual plaintiffs, found that the land in question is held in trust for the beneficial use of the Tribe, and not for any individuals, including Plaintiffs.  *See* February 14, 2002 Order (1) Granting Defendants' Motion for Summary Judgment; and (2) Denying Defendants' Motion to Dismiss or for Judgment on the Pleadings at 13-14 (Exhibit B), *judgment aff'd*, *Rosales*, 73 Fed. Appx. at 915 (affirming judgment of dismissal on grounds of indispensable party).

Finally, even if Plaintiffs could show that they were the beneficial owners of the land, they still could not succeed on their trespass claim, as they would be asking this Court to command Defendants to prevent actions taken by a third party.  Yet they have failed to identify a source of law that gives Defendants authority or requires Defendants to prevent such actions.

Plaintiffs' motion for mandatory injunctive relief must fail because Plaintiffs cannot meet their burden of demonstrating their entitlement to this extraordinary remedy.  They have not, and cannot, demonstrate a likelihood of success on the merits.  Additionally, Plaintiffs have not shown irreparable injury, that there would not be unfair hardships to other parties, or that an injunction would be in the public interest.  Accordingly, there is no basis for a preliminary injunction and the Court should deny Plaintiffs' motion.

# REGULATORY BACKGROUND

## The Native American Graves Protection and Repatriation Act

NAGPRA concerns the rights and duties of Indian Tribes, lineal descendants, museums, and federal Agencies with regard to the ownership and control of Native American cultural items, which are defined as: (1) human remains, (2) associated funerary objects,  (3) unassociated funerary objects,  (4) sacred objects, and (5) objects of cultural patrimony.

Section 3 of NAGPRA sets out a detailed hierarchy which addresses the "ownership and control of Native American cultural items which are excavated or discovered on Federal or tribal lands after November 16th, 1990." 25 U.S.C. § 3002(a).   With respect to human remains and associated funerary objects, Section 3 vests lineal descendants with a paramount right of control over those items once excavated or discovered.  Unlike human remains and associated funerary objects, the ownership and control of unassociated funerary objects, sacred objects, and objects of cultural patrimony rests, in the first instance, with "the Indian tribe or Native Hawaiian organization on whose tribal land such objects or remains were discovered."  25 U.S.C. § 3002(a)(2)(a).

In addition to establishing the ownership or control of cultural items discovered on Federal or tribal lands, NAGPRA also sets forth the conditions and duties related to the intentional excavation and inadvertent discovery of such items.  *See* 25 U.S.C. §§ 3002(c), (d). NAGPRA prohibits the intentional excavation or removal of Native American human remains and objects from federal lands unless certain conditions are met, such as obtaining a permit pursuant to the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C. §§ 470aa-470mm.  *See* 25 U.S.C. § 3002(c)(1); 43 C.F.R. § 10.3.  Intentional discovery is defined

5

as "the planned archaeological removal of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on the surface of Federal or tribal lands pursuant to [25 U.S.C. § 3002(c).]"  40 C.F.R. § 10.2(g)(3).   The "ownership and right of control of the disposition" of cultural items is determined by 25 U.S.C. § 3002(a) and (b).  25 U.S.C. § 3002(c)(3).

NAGPRA also imposes requirements following any "inadvertent discovery" of Native American cultural items on Federal or tribal lands.  25 U.S.C. § 3002(d)(1); 43 C.F.R. § 10.4. Inadvertent discovery is defined as "the unanticipated encounter or detection of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on the surface of Federal or tribal lands pursuant to [25 U.S.C. § 3002(d).]"  40 C.F.R. § 10.2(g)(3).  Persons making inadvertent discoveries of cultural items have several obligations after the discovery, including a requirement to notify the Federal land manager if the discovery occurs on Federal land or the responsible Indian official if the discovery occurs on tribal lands.  In the event of an inadvertent discovery that occurs in connection with an activity such as construction, the person is required to cease all activity in the area of discovery and make a reasonable effort to protect the items discovered before resuming the activity.  25 U.S.C. § 3002(d)(1); 43 C.F.R. § 10.4. The activity may resume after 30 days.  25 U.S.C. § 3002(d)(1).  The "disposition of and control over any cultural items excavated or removed" as the result of an inadvertent discovery is determined by 25 U.S.C. § 3002(a) and (b).  25 U.S.C. § 3002(d)(2).

The regulations implementing NAGPRA are found at 43 CFR Part 10.  DOI has also promulgated regulations at 43 C.F.R. Part 7 governing the issuance of ARPA permits for archaeological excavations on both public and Indian lands.

Further definition of NAGPRA terms are contained in the Statutory and Regulatory Addendum to this memorandum of law.  *See* Exhibit H.

## **FACTUAL BACKGROUND**

Plaintiff's claims focus on three parcels of land in the County of San Diego.  The first parcel, referred to in the Complaint as both Parcel 597-080-01 and Parcel 597-080-04 ("Parcel 04"), is a 4.66 acre portion of Rancho Jamul, conveyed by Donald and Lawrence Daley to the United States in trust on December 12, 1978.  *See* Compl. ¶ 14, Exhibit D.  This parcel was conveyed to the "United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate," and was accepted by the United States on December 21, 1978.  *See* Compl., Exhibit D.

The remaining two parcels originally formed a single 2.21 acre portion of Rancho Jamul, title to which was held by the Roman Catholic Bishop of San Diego, and referred to collectively by Plaintiffs as 597-080-02.  *See* Compl. ¶ 21.   A 1.372 acre portion of the 2.21 acre parcel was conveyed "to the United States of America in trust for the Jamul Indian Village" on May 25, 1982, and was accepted by the United States on July 2, 1982.  *See* Compl. ¶ 21, Exhibit G.  The 1982 Grant Deed from the Roman Catholic Bishop of San Diego excepted 0.838 acres of the original 2.21 acre portion of Rancho Jamul from conveyance, which remains the property of the Roman Catholic Bishop of San Diego.  *See id.*  The 1.372 acre portion conveyed by the Roman Catholic Bishop of San Diego to the United States in trust is referred to by Plaintiffs as Parcel 597-080-05 ("Parcel 05"), and the 0.838 acre portion excepted from conveyance in the 1982 Grant Deed is referred to by Plaintiffs as 597-080-06 ("Parcel 06").  *See id.*  Plaintiffs' numerical references for these three parcels apparently correspond to California State or San Diego County

Tax Roll Parcel Numbers.

The Tribe has plans to build a casino and hotel project on Parcels 04 and 05.  Acebedo

Decl. ¶ 7.  The casino plans do not include any construction on Parcel 06.  *Id.* ¶¶ 9-10.  The

Tribe has stated that it does not plan to conduct any significant construction work on the casino

project prior to March 7, 2007, although it plans to begin constructing a perimeter fence around

Parcels 04 and 05 before that date.  This work will involve surveying the property line and

inserting stakes around the property line at fifty foot intervals.  The Tribe also plans to begin

removing some structures, abandoned vehicles, and debris from Parcels 04 and 05.  *Id.* ¶ 22.

Plaintiffs' request for a preliminary injunction was precipitated by eviction proceedings

against Plaintiffs brought by the Tribe.  *See* Declaration of Patrick B. Webb in Support of

Plaintiffs Motion for a Preliminary Injunction ¶ 2.  (Doc. 4).   On January 18, 2007, Plaintiffs,

who currently reside on Parcel 04, *see* Compl. ¶ 9, were served with a Notice of Eviction and

Exclusion pursuant to the Tribe's Eviction and Exclusion Ordinance.  *See* Acebedo Decl. ¶¶ 16,

19, Exhibits F, G.  The Eviction Notices stated that the reasons for the eviction and exclusion

include, but are not limited to, the following: (i) the recipients are not members of the Tribe; (ii)

they are in possession of the Tribe's property without the consent of the Tribe evidenced by

lease, assignment or license authorized by the General Council of the Tribe; (iv) the recipients

have no rights to the use of the property; and (v) the Tribe's General Council has authorized the

recipients eviction and exclusion from the Tribe's property.  *Id.*, Exhibits F, G.

The eviction notices designate the Intertribal Court of Southern California as the Jamul

Tribal Court for purposes of hearing eviction and exclusion proceedings, as well as challenges

concerning the validity of the Eviction and Exclusion Ordinance or any actions taken by the

Tribe pursuant to the Ordinance.  *Id*.  On February 2, the Intertribal Court held a hearing and found that it had jurisdiction over the eviction proceeding.  *Id.*, Exhibit E at 3-4, 6.  The Intertribal Court stated that it recognized the current leadership as "the only legitimate Tribal governmental authority as recognized by the Federal Government and pursuant to the Tribal Constitution."  *Id.* at 4-5.  Further, the Intertribal Court found that Plaintiffs are not the beneficial owners of Parcel 04.[5/]  *Id.* at 3-4.   The Intertribal Court has set a trial date on the eviction and exclusion proceedings for February 23, 2007.  *Id.* at 6.

## **STANDARD OF REVIEW**

A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief carries its burden of persuasion by a clear showing. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Tanner v. Federal Bureau of Prisons*, 433 F. Supp. 2d 117, 121 (D.D.C. 2006) ("not a form of relief granted lightly," and "carefully circumscribed . . ."].   "The power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'"  *Dorfmann v. Boozer*,  414 F.2d 1168, 1173, (D.C. Cir. 1969).

> In considering whether to grant preliminary injunctive relief, the court must consider whether: (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest.

*CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005).  The D.C. Circuit uses a flexible test, meaning that "[i]f the arguments for one factor are particularly strong, an injunction

---

[5/] That is not the first time a court has found this to be the case.  *See Rosales* February 14, 2002 Order (1) Granting Defendants' Motion for Summary Judgment; and (2) Denying Defendants' Motion to Dismiss or for Judgment on the Pleadings at 13-14 (Exhibit B); *Rosales*, 73 Fed. Appx. at 914-15, 2003 WL 21920015 (unpublished), (Exhibit C).

may issue even if the arguments in other areas are rather weak." *Sorono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir.1995)); *CSX Transp., Inc. v. Williams*, 406 F.3d at 670 (same).  Notwithstanding that "sliding scale," however, courts in the D.C. Circuit have emphasized that "[i]t is particularly important for the movant to demonstrate a *substantial likelihood of success on the merits*, *Tanner*, 433 F. Supp. 2d 117, 121 (emphasis supplied), and that the proponent of the injunction *must* "demonstrate at least 'some injury,'" *id.*, because "'the basis for injunctive relief in the federal courts has always been irreparable harm.'" *CityFed*, 58 F.3d at 747.

Finally, even under the sliding scale, the burden remains on the plaintiff to demonstrate that all four factors are met.  *Mova Pharm. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *CityFed Financial Corp.,* 58 F.3d at 746; *Thomas v. Network Solutions, Inc.*, 2 F. Supp. 2d 22, 33 (D.D.C. 1998) (Hogan, J.) (stating that the party moving for a preliminary injunction must demonstrate the four factors weigh in its favor), *vacated on other grounds*, No. 97-2412 TFH, 1998 WL 1738180 (D.D.C. Aug. 28, 1998); *cf., Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (burden of establishing the propriety of an injunction is on the movant).

The traditional purpose for preliminary injunctive relief is to preserve the status quo until a trial on the merits may be had.  *See Otero Sav. and Loan Ass'n*, 665 F.2d 275, 277 (10th Cir. 1981).  "[W]hen granting mandatory injunctive relief, i.e., an injunction that would alter, rather than preserve, the status quo by commanding some positive act--the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *National*

10

*Conference On Ministry To Armed Forces v. James*, 278 F.Supp.2d 37, *43 (D.D.C. 2003) (internal quotation marks omitted), quoting *Columbia Hosp. for Women Foundation, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F.Supp.2d 1, 4 (D.D.C. 1997), *aff'd*, 159 F.3d 636, 1998 WL 203110 (D.C. Cir.1998). Such relief may not granted unless "extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1980), citing *Clune v. Publishers' Ass'n of New York City*, 214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd per curium*, 314 F.2d 343 (2d Cir. 1963)).

## ARGUMENT

## I.    PLAINTIFFS FAIL TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs ask this Court to issue a mandatory injunction to prevent Defendants from engaging or allowing construction by the Tribe on the Tribe's land.[6] They also request a mandatory injunction to prevent Defendants from failing to preserve "in place" human remains and other cultural objects, as defined under NAGPRA and California state law. But Plaintiffs cannot succeed on the merits of their claims that Defendants are required to prevent construction activities by the Tribe on its own land or preserve human remains and cultural items "in place" on the Tribe's land. First, Plaintiffs have failed to establish a waiver of sovereign immunity by Defendants on claims brought pursuant to California state law. Second, any claims made pursuant to NAGPRA with regard to Parcel 06 must be dismissed as that land is not Federal or tribal land, and with regard to all of the parcels because the requirements of NAGPRA do not

---

[6] Plaintiffs Motion for a Preliminary Injunction (Doc. 4) actually requests injunctive relief as to both "Defendants" and the "United States." *See* ¶ 1, 2.

apply here as there has been no inadvertent discovery and the Tribe has not applied for a permit to conduct intentional excavation.

Nor can Plaintiffs succeed on the merits of their claims that Defendants are required to prevent the Tribe from "trespassing" on its own land.   Plaintiffs are barred by issue preclusion from adjudicating a claim to the beneficial ownership of the land that comprises the Indian village in the absence of the Tribe, which is a necessary and indispensable party.  Even if Plaintiffs could overcome that hurdle, their claim of trespass is based on the premise that they, as individuals, are the beneficial owners of the land, a premise that has previously been decided against them by the Federal District Court of the Southern District of California.   Finally, even if Plaintiffs were the proper parties to bring this action on behalf of the Tribe, they could not succeed on their trespass claim.  Plaintiffs are not alleging that the trespass will be committed by the United States and have failed to show that Defendants have the authority or obligation to prevent an alleged "trespass" by third parties.

### A.    Plaintiffs have Failed to Establish a Waiver of Sovereign Immunity Under California State Law

As a sovereign, the United States is immune from suit except when it consents to be sued. *See Lehman v. Nakshian*, 453 U.S. 156 (1981); *United States v. Testan*, 424 U.S. 392 (1976); *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  Consent of the United States to be sued must be found in a clear, unequivocal, specific jurisdictional statement found in a statute enacted by Congress.  *Testan*, at 399.  This waiver of sovereign immunity "'cannot be implied but must be unequivocally expressed.'"  *Army and Air Force Exchange v. Sheehan*, 456 U.S. 728, 734 (1982), quoting *Testan*, 424 U.S. at 399.  "[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be

implied." *Soriano v. United States*, 352 U.S. 270, 276 (1957).

Plaintiffs make numerous allegations in their motion pursuant to California state law. *See, e.g.,* Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("Pl. Mem.") at 15-21. Additionally, Plaintiffs' First Cause of Action in the Complaint is brought pursuant exclusively to California state law. *See* Compl. ¶¶ 35-47.[7] However, Plaintiffs fail to point to any waiver of sovereign immunity unequivocally expressed in the state laws cited, and therefore, Plaintiffs cannot succeed on the merits of any claims made pursuant to state law.

**B.    Plaintiffs Cannot Succeed On the Merits of Their NAGPRA Claims**

**1.    Plaintiffs Cannot Succeed On the Merits of Their NAGPRA Claims for Parcel 06 Because It Is Privately Held Land**

Plaintiffs assert, incorrectly, that NAGPRA provides the right for declaratory and injunctive relief for actions that take place "both on and off publicly held property." Pl. Mem. at 14.[8] However, the cases relied upon by Plaintiffs do not state such a proposition, as two of those cases involved discoveries or activities on federal land, *see Bonnichsen v. United States*, 367 F.3d 864, 869 (9th Cir. 2004), and *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 866-67 (D. Ariz. 2003), and the third case, *Pueblo of San Ildefonso v. Ridlon*, 103 F.3d 936 (10th Cir. 1996), was not brought under Section 3 of NAGPRA, but rather involved a claim for repatriation against a federally funded museum under Section 7 of NAGPRA. *See* 103 F.3d at

---

[7] While the First Cause of Action does reference 25 U.S.C. § 3001 for definitional purposes, all alleged violations of law are pled pursuant to California state law.

[8] In the preceding paragraph, Plaintiffs, however, do acknowledge that NAGPRA is limited to "federally held lands." *See* Pl. Mem. at 14.

937-38.   Instead, as the D.C. Circuit has found, NAGPRA, "by its own terms, applies only to

federal lands . . . ."  *Crow Creek Sioux Tribe v. Brownlee*,  331 F.3d 912, 916, (D.C. Cir. 2003),

citing 25 U.S.C. § 3002(a) (providing that NAGPRA covers cultural items discovered on

"Federal lands"); *see also Castro Romero v. Becken*, 256 F.3d 349, 354 (5th Cir. 2001) ("[b]y its

plain terms, the reach of the NAGPRA is limited to 'federal or tribal lands'") (citing 25 U.S.C. §

3002(a)).

Plaintiffs acknowledge that Parcel 06 is owned by the Roman Catholic Bishop of San

Diego.  *See* Pl. Mem. at 10.   Thus, by its very terms, NAGPRA cannot apply to any claims with

respect to Parcel 06.  Further, as the Tribe has represented, construction of the proposed casino is

planned only for Parcels 04 and 05.  *See* Acebedo Decl. ¶ 10.  Therefore, Plaintiffs cannot

succeed on any claims regarding Parcel 06 under NAGPRA.

## 2.    Plaintiffs Cannot Succeed on the Merits of Their Claims for Parcels 04 and 05 Because They Fail to Identify Any Obligation or Requirement for Defendants to Act Under NAGPRA

Plaintiffs have requested a mandatory injunction, that is, an injunction which orders a

defendant to perform some positive act.  Such an injunction should only be issued in exceptional

circumstances and where the rights of the parties are entirely clear.  *See Jordan v. Wolke*, 593

F.2d 772, 774 (7th Cir. 1979).  The question before this Court is whether it has the authority to

force the United States to act as Plaintiffs have requested.  In *Shoshone-Bannock Tribes v. Reno*,

56 F.3d 1476 (D.C. Cir. 1995), the D.C. Circuit stated that while it was true that the United

States acts in a fiduciary capacity in its dealings with Indian tribal property, "it is also true that

the government's fiduciary responsibilities necessarily depend on the substantive laws creating

those obligations."  *Shoshone-Bannock*, 56 F.3d at 1482 (internal citations omitted).  Thus, "an

14

Indian tribe cannot force the government to take a specific action *unless a treaty, statute or agreement imposes, expressly or by implication, that duty*." *Id.* (emphasis supplied). Here, Plaintiffs, who are not even authorized to bring an action on behalf of the Tribe, have asserted, incorrectly they have the right to request the Court to command Defendants to take specific action. However, they have failed to point to any language in NAGPRA creating such an obligation.

The Court could also treat Plaintiffs' request as an action in mandamus, as Plaintiffs have asserted jurisdiction pursuant to 28 U.S.C. § 1361. *See* Compl. ¶ 8.[9] However, [a] court may only issue a writ of mandamus if "the duty to be performed is ministerial and the obligation to

_____

[9] In addition to jurisdiction pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, NAGPRA and 28 U.S.C. § 1361, Plaintiffs assert this Court has jurisdiction under multiple federal statutes. *See* Compl. ¶ 8. However, 28 U.S.C. § 2201 is not a jurisdictional statute. *See Fiedler v. Clark*, 714 F.2d 77, 79 (9th Cir. 1983). Nor do 28 U.S.C. §§ 1331, 1337 and 1343 provide a waiver of sovereign immunity. *See Nebraska Public Power Dist. v. United States*, 73 Fed.Cl. 650, 667, n.17 (Fed. Cl. 2006). Further, because Plaintiffs cannot seek an allotment right, they have no jurisdictional basis for their claim under any of the purported jurisdictional statutes involving allotments. 28 U.S.C. § 1353 and 25 U.S.C. §§ 345, 335, and 348 are applicable only to those claiming allotment of rights accruing before 1934, which is not the case here. *See* Compl. ¶ 14. 25 U.S.C. § 465, part of the 1934 Indian Reorganization Act that abolished future allotments, by its very terms, serves to permit the government to purchase existing allotments and put them into trust for tribes as an antidote for tribes whose land was lost during the allotment period of the Dawes Act. 25 U.S.C. § 81 voids contracts with tribes that encumber Indian lands for more than seven years if the contracts have not been approved by the Secretary of the Interior. Plaintiffs do not allege that contracts are involved herein. 28 U.S.C. § 1346 provides jurisdiction for money damages claims against the government if, and only if, a separate statute provides for a damage remedy. *James v. Caldera*, 159 F.3d 573. Additionally, 28 U.S.C. § 1346(a) grants district courts original jurisdiction in actions brought against the United States for money damages not exceeding $10,000. *See Warner v. United States Dep't of Interior*, 581 F.2d 168, 171 (8th Cir. 1978); *Martyniuk v. Pa.*, 282 F. Supp. 252 (E.D. Pa. 1968). Plaintiffs' claims fail under this provision, however, because they have not alleged the requisite jurisdictional amount (less than $10,000). *See Pence v. Morton*, 391 F. Supp. 1021, 1024 (D. Alaska 1975), rev'd on other grounds, *Pence v. Kleppe*, 529 F.3d 135 (9th Cir. 1976). 28 U.S.C. § 1346. Finally, 18 U.S.C. § 1151 provided a definition for "Indian Country," but does not provide any waiver of sovereign immunity.

act peremptory and clearly defined. The law must not only authorize the demanded action, but require; the duty must be clear and understandable." *Shoshone-Bannock Tribes*, 56 F.3d at 1480, quoting *13ᵗʰ Regional Corp. v. Department of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980). "[W]here the effect of a mandatory injunction is equivalent to the issuance of mandamus, it must be governed by similar considerations." *Sierra Club v. United States Dep't of Transp.*, 664 F.Supp. 1324, 1341, n. 10 (9th Cir. 1987) (internal citations omitted); *see also Standberry v. Coler*, 1987 WL 10963, *13 (N.D. Ill.) ("A mandatory injunction is similar to a mandamus in all essential respects; it compels performance of some positive act by a person to whom issued.."). As discussed below, it is clear that Plaintiffs have failed to show any violation by Defendants of a clear and nondiscretionary duty imposed by NAGPRA and thus Plaintiffs cannot succeed on the merits of their claims.

   a.  **Plaintiffs Cannot Succeed on the Merits of Their Claims Under NAGPRA Because They Can Point to No Planned Archaeological Removal by the Tribe or Any Inadvertent Discovery of Human Remains or Other Cultural Items**

   Plaintiffs request for injunctive relief is premised, in part, on alleged violations of NAGPRA. While NAGPRA does contain two sections that speak to the excavation or discovery of cultural items on Federal or tribal lands, as explained below, neither applies and therefore Plaintiffs cannot succeed on the merits of their NAGPRA claims. The first, 25 U.S.C. § 3002(c) permits the intentional removal from or excavation of cultural items if certain steps are taken, including obtaining a permit under ARPA. Intentional excavation is defined as "the planned archaeological removal" of cultural items found "under or on the surface of Federal or tribal lands." 43 C.F.R. § 10.2(g)(3). As at least two district courts have found, activities which are entirely undertaken for purposes other than the excavation or removal of archaeological

resources are not intentional excavations for the purposes of NAGPRA. *See San Carlos Apache Tribe*, 272 F. Supp. 2d at 888 (finding that the drawdown of a lake by the U.S. Army Corps of Engineers ("Corps") was not an intentional excavation or removal under NAGPRA that necessitated an ARPA permit); *Yanton Sioux Tribe v. U.S. Army Corps of Engineers*, 83 F. Supp. 2d 1047, 1056 (D.S.D. 2000) (finding that even if the Corps had anticipated additional exposure of remains through the regulation of a lake's water level, such activity does not fit the definition of intentional excavation); *see also* 43 C.F.R. § 7.5(b)(1) (no ARPA permits are required when the proposed "activities are exclusively for purposes other than the excavation and/or removal of archaeological resources, even though those activities might incidentally result in the disturbance of archaeological resources . . . [g]eneral earth-moving excavation conducted under a permit or other authorization shall not be construed to mean excavation and/or removal as used in this part."). Thus, construction by the Tribe is not an activity that constitutes an "intentional excavation" under NAGPRA.[10]

Nor has there been an inadvertent discovery under 25 U.S.C. § 3002(d). Inadvertent discovery is defined as "the unanticipated encounter or detection of human remains, funerary objects, sacred objects or objects of cultural patrimony found under or on the surface of Federal or tribal lands." 43 C.F.R. § 10.2(g)(4). Plaintiffs do not allege that there have been any inadvertent discoveries. Nor could Plaintiffs have so alleged, because the construction will not

---

[10] Plaintiffs assert that they have personal knowledge of the existence of human remains and other cultural objects on all three parcels of land. The Tribe has stated that it is not aware of any human remains or other significant cultural artifacts on Parcels 04 or 05, based on a 1998 cultural resources survey on this site. *See* Acebedo Decl. ¶ 11. Thus, the Tribe does not intend to excavate cultural resources, nor have they applied for a permit to do so.

take place until March.[11/]

As no cultural items have been excavated or discovered, and the Tribe does not currently

have plans to intentionally excavate cultural items, the provisions of NAGPRA simply do not

apply.  There is nothing in the language of NAGPRA which would permit the statute to be

applied prospectively to prevent construction by the Tribe.  *See Castro Romero*, 256 F.3d at 354

(NAGPRA "protects human remains and cultural items *found* in federal public lands and tribal

lands") (emphasis supplied); *Hawk v. Danforth*, 2006 U.S. Dist. LEXIS 58104 at *4 (E.D. Wis.

2006) (NAGPRA "applies only to remains or artifacts that are 'excavated or discovered'– not

remains that may be still buried"), citing 25 U.S.C. § 3002(a); *San Carlos Apache Tribe*, 272 F.

Supp. 2d at 889 ("NAGPRA is not prospective and is triggered only after a person has made an

inadvertent discovery"); *Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234, 252 (D. Vt.

1992) (finding that even though the possibility of the existence of cultural items was extremely

high, because NAGPRA applies only to cultural and funerary objects "discovered or excavated,"

a claim under NAGPRA prior to discovery or excavation was premature).  Indeed, the plain and

unambiguous language of NAGPRA clearly indicates that any duties assigned to Defendants

would be cabined by the time and place of discovered cultural objects.  The statute and

regulations speak only of items which are "excavated" or "discovered" or "removed."  *See, e.g.,*

*in relevant part*, 25 U.S.C. §§ 3002(a); 3002(a)(2)(C); 3002(a)(2)(C)(1); 3002(c)(1) and (2); §

3002(d)(1)(2); 43 C.F.R.  §§10.1(b)(iii); 10.2(a)(5); 10.2(f) and (g)(3), (4); and 10.3-10.6.  As

---

[11/] The Tribe has stated it is in the process of adopting an inadvertent discovery plan pursuant to
NAGRPA and ARPA for the disposition of any cultural items in the event such items are
discovered during the course of construction.  *See* Acebedo Decl. ¶ 12.

18

NAGPRA does not apply, Plaintiffs cannot succeed on the merits of their claims of any violations of NAGPRA by Defendants.

        **b.**      **In the Event of an Unanticipated Discovery or Intentional Excavation, Plaintiffs Are Not Entitled to the Relief They Have Requested**

In the event that there is an intentional excavation (which is not planned here) or inadvertent discovery *and* Plaintiffs are established as the lineal descendants of any human remains and associated funerary objects, they would be entitled under NAGPRA only to the ownership and control of the human remains or associated funerary objects, and not to the land in which they were discovered.[12]  Plaintiffs fail to point to any language in NAGPRA that would require or empower Defendants to permanently prevent the Tribe from engaging in construction activities or that would empower Defendants to require any human remains and cultural items be preserved "in place."[13]  Instead, Plaintiffs point to several California state laws which have no force or effect as against the United States in this litigation.  *See* Pl. Mem. at 15-21.

Intentional excavation, by its very nature, anticipates the cultural items will be removed. Further, the language of NAGPRA indicates that items inadvertently discovered may also be

---

[12] Further, as NAGPRA makes clear, lineal descendants are giving first priority only with reference to human remains and associated funerary object.  *See* 25 U.S.C. § 3002(a)(1).  Lineal descendants do not have any statutorily enumerated rights to ownership and control of unassociated funerary objects, sacred objects or objects of cultural patrimony.  *See* 25 U.S.C. § 3002(a)(2).

[13] While a party may arguably be entitled to some form of preliminary injunctive relief against the party excavating in the event of a violation of NAGPRA following an inadvertent discovery or during an intentional excavation (which is not the case here), NAGPRA does not provide for the permanent injunctive relief against the Federal Defendants that Plaintiffs are ultimately seeking.  *See* Compl. Prayer for Relief ¶¶ 1, 2 (requesting temporary, preliminary and permanent injunctive relief preventing any construction activities and from failing to preserve cultural items "in place")

19

removed.  Specifically, 25 U.S.C. § 3002(d)(2) speaks of the "disposition of and control over any

cultural items *excavated or removed.*"  25 U.S.C. § 3002(d)(2); *see Pueblo of San Ildefonso*, 103

F. 3d at 938 ("NAGPRA has two distinct schemes *governing the return* of Native American

cultural items") (emphasis supplied); *see also* 43 C.F.R. §§ 10.4(d)(1)(v), 10.4(e)(1)(iii) (ARPA

regulations which state that where cultural items "must be excavated or removed," the excavator

must follow the requirements and procedures in 43 C.F.R. § 10.3(b)).  While lineal descendents

have standing, it is only standing to enforce the rights enumerated in the statute.[14]  For example,

in *Hawk*, a district court found a lineal descendent did not have the right under NAGPRA to

demand that a tribe excavate a parking lot to find remains that the plaintiff asserted were there

---

[14] Plaintiffs appear to assert their NAGPRA claims based on their alleged status as both lineal
descendants and as the individual beneficial owners of Parcel 04.  *See, e.g.,* Pl. Mem. at 18.
However, as Plaintiffs themselves recognize, any rights that they have asserted pursuant to their
alleged beneficial ownership is based entirely upon California state law.   As Plaintiffs state in
their memorandum of law, the "California NAGPRA is one of the few statutes that extends the
protection of human remains . . . to beneficially owned lands." Pl. Mem. at 15.  There has been
no waiver of sovereign immunity under that California state law, however, and Plaintiffs do not
point to any similar language in NAGPRA, and indeed they cannot, as NAGPRA applies only to
federal and tribal lands, and further does not provide any special status over the ownership and
control of cultural items for individual beneficial owners.  *See* 25 U.S.C. § 3002 (setting forth the
hierarchy for determining ownership and control of cultural items, which makes no mention of
individual beneficial owners as a category).  As such, Plaintiffs cannot succeed on the merits of
claims with regard to the Native American remains and objects under NAGPRA based on their
alleged beneficial ownership of Parcel 04.  Further, as explained below in Section C, Parcel 04 is
held in trust for the beneficial ownership of the Tribe, and not Plaintiffs as individuals.  Thus,
even if NAGPRA did extend to beneficially owned lands or include beneficial owners as a class
entitled to ownership and control, such claims could not succeed.

Plaintiffs assert, without explanation, that they are also the beneficial owners of Parcels
05 and 06.  *See* Pl. Mem. at 18, 21-22.   As explained above, title to Parcel 06 is held by the
Roman Catholic Bishop of San Diego.  Parcel 05 is held in trust for the Tribe, and as explained
by Chairman Acebedo, the recognized leader of the Tribe, Plaintiffs are not even members of the
Tribe, much less authorized to bring an action on behalf of the Tribe.  *See* Acebedo Decl. ¶¶ 13-
15.

because NAGPRA only applied to remains that have already been discovered or excavated. Similarly, Plaintiffs here are demanding rights not enumerated in the statute.

Plaintiffs' reliance on *Yankton Sioux Tribe*, 83 F. Supp. 2d 1047, is misplaced, as that case does not stand for the proposition that cultural items must be preserved "in place."[15] In *Yankton Sioux*, the tribe sought a preliminary injunction to prevent an increase in water levels of a lake by the Corps, which would once again flood an area where a cemetery was located. The alternate flooding and drying of the site had resulted in the inadvertent discovery of human remains and the tribe requested the injunction so that they would have time to perform ceremonies, decide what to do with the human remains and, ultimately, *remove the remains from the site*, prior to the next flooding. 83 F. Supp. 2d at 1053. The court, while recognizing that it would be best if the tribe were given an indefinite period of time to perform ceremonies and gather their dead, found that because this was an inadvertent discovery (and no inadvertent discovery plan was in place), the Corps was required under NAGPRA to cease activities only for 30 days.[16] *Id*. at 1058. The court issued a preliminary injunction only for as long as it took to remove the loose remains for protective purposes (which the Corps had asserted would take only two days). *Id*. at 1059. Tellingly, the court, while recognizing the Corps should be sensitive to

---

[15] Plaintiffs state that they rely on the "*Yankton* trilogy," which Plaintiffs assert concern the graves at White Swan Church. *See* Pl. Mem. at 22. However, Plaintiffs merely cite to two of the cases, providing no legal analysis, and in any event those two cases concern an area known as the North Point Public Recreation Area, not the cemetery at White Swan Church. *See Yankton Sioux Tribe v. United States Army Corps of Engineers*, 258 F. Supp. 2d 1027, 1028 (D.S.D. 2003); *Yankton Sioux Tribe v. United States Army Corps of Engineers*, 209 F. Supp. 2d 1008, 1009 (D.S.D. 2002).

[16] The court found that the discovery of bones was inadvertent because even if the Corps had anticipated some additional exposure of bones, any uncovering of remains due to changes in the water level was not "intentional excavation." *Id.* at 1056.

the tribe's requests, also found that NAGPRA "does not require that the tribe to collect the remains itself or that the Corps store the remains in any particular way . . . until final custody of the remains can be determined."  *Id.*

The Yankton Sioux Tribe also asserted a right to an indefinite injunction to protect the scattered remains that could not be safely removed from the frozen ground, remains or cultural items within caskets and the caskets themselves.  The court found that "such an injunction would contradict the Act's limited thirty-day period of cessation of activity, and is not necessary to satisfy the Act's protection provisions" because covering the remains with water from the planned increases in water levels would protect the remains from the weather.[17]  *Id.* at 1059-60. Similarly, Plaintiffs request permanent injunctive relief as their ultimate remedy, namely that the casino construction be permanently enjoined and at the cultural items forever be preserved "in place."  NAGPRA, which at most stops activities that result in inadvertent discoveries for 30 days, *see* 25 U.S.C. § 3002(d)(1), simply does not provide for such an ultimate remedy. NAGRPRA's ownership and control provisions, which apply only as to custody following excavation or discovery, provide the right to control over the cultural items only.  NAGPRA does not give Plaintiffs the right to control the land itself.  As there is no reddressability under NAGPRA, Plaintiffs' claims cannot succeed.

---

[17] The court reserved final judgment on this request for the purposes of giving the Corps and the tribe time to coordinate a recovery effort for the embedded objects.  *Id.* at 1060.

**C.    Plaintiffs Cannot Succeed on Their Claims of Beneficial Ownership of Parcel 04 In the Absence of the Tribe**

**1.    Plaintiffs are Precluded from Establishing Beneficial Ownership In the Absence of the Tribe - A Necessary and Indispensable Party**

The Ninth Circuit affirmed the dismissal of a case brought by these same individual Plaintiffs on claims related to the ownership of Parcel 04 for the reason that these same plaintiffs failed to join the Tribe. *See Rosales*, 73 Fed. Appx. at 914-15, 2003 WL 21920015 (unpublished), (Exhibit C). The res judicata principle of issue preclusion (also known as collateral estoppel) bars Plaintiffs from establishing beneficial ownership of the this land in the absence of the Tribe.

> Under issue preclusion or collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C.Cir. 1992 (quoting Allen, 449 U.S. at 94). In short, "claim preclusion forecloses all that which might have been litigated previously," while issue preclusion "prevents the relitigation of any issue that was raised and decided in a prior action." [Citations omitted.]

*Elliott v. F.D.I.C.* 305 F. Supp. 2d 79, 83 (D.D.C. 2004).

Under Rule 19, a court undertakes a three-step analysis to determine if a party is indispensable. First, the court determines if a party is needed for the litigation under Rule 19(a). *See* Fed R. Civ. P. 19(a); *Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.,* 276 F. 3d 1150, 1155 (9th Cir. 2002). If a party is necessary to the litigation, the court then determines if joinder of the party is feasible. If joinder is not feasible, the court applies the factors in Rule 19(b) to determine whether "in equity and good conscience" the litigation can proceed without the necessary party. *See* Fed. R. Civ. P. 19(b). If the court determines the litigation cannot proceed, the party is "indispensable" and the case must be dismissed.

23

*Dawavendewa*, 276 F. 3d at 1155.  Because the Ninth Circuit determined that each step of the analysis is satisfied here, Plaintiffs' Complaint cannot succeed.

Federal Rule of Civil Procedure 19(a)(2)(i) provides that:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may . . . as a practical matter *impair or impede the person's ability to protect that interest*.

(Emphasis added).  Plaintiffs ask this Court to declare them the beneficial owners of Parcel 04.  Compl. ¶ 15, Prayer ¶ 3.  But because the Tribe has also claimed jurisdiction over this same parcel, the Tribe's interest would necessarily be impaired by such a finding.  The Tribe is therefore a necessary party under Rule 19(a)(2)(i).  *See Wichita and Affiliated Tribes of Okla. v. Hodel*, 788 F. 2d 765, 774 (D.C. Cir. 1986) (tribe's beneficiary interest in trust makes it necessary party to action by minority tribe seeking to obtain redistributions of future income).

Specifically, the Ninth Circuit found that the Tribe was a necessary party because it "has claimed jurisdiction over the parcel of land at issue in this action since at least 1981.  This interest would be impaired if Appellants were declared to be the beneficial owners of the land." *Id*. at 914.  The court went on to find that the Tribe enjoyed sovereign immunity from the suit and could not be forced to join this action without its consent, and further that "the United States is not an adequate representative of the [Tribe's] interests in this action because the United States cannot adequately represent the interests of one tribe in an intertribal dispute." *Id.  See also Kickapoo Tribe of Oklahoma v. Lujan*, 728 F. Supp. 791, 796 (D.D.C. 1990) (case dismissed where indispensable party cannot be joined due to its tribal immunity).

The Ninth Circuit also found that the tribe was an indispensable party pursuant to Fed. R.

24

Civ. P. 19(b), which:

> requires the court to examine the following factors in order to determine whether this action should be dismissed: (1) prejudice to the absent party or those already parties; (2) the extent to which relief could be shaped to avoid prejudice; (3) adequacy of the judgment rendered without the absent party; and (4) whether plaintiff has another adequate remedy.

After examining those factors, the court found that the Tribe "would be prejudiced if Appellants were granted beneficial ownership of the parcel of land, and relief cannot be shaped to avoid this prejudice. While Appellants do not appear to have another adequate remedy, 'the tribe['] interests in maintaining [its] sovereign immunity outweighs the plaintiffs interest in litigating their claims.'" *Id.* at 915 (internal citations omitted). Plaintiffs' present claim for beneficial ownership presents the same question as that considered by the Ninth Circuit – and it must fail for the same reasons.[18] Moreover, Plaintiffs are barred by issue preclusion from seeking to establish beneficial ownership in the absence of the Tribe after having lost on that very issue in the Ninth Circuit.

### 2.    Plaintiffs Cannot Succeed on Their Beneficial Ownership Claims Because They Have Not Exhausted Their Tribal Court Remedy

Plaintiffs have not exhausted their tribal administrative remedies with respect to ownership of the land. As explained above, on January 18, 2007, Plaintiffs, who currently reside on Parcel 04, see Compl. ¶ 9, were served with a Notice of Eviction and Exclusion pursuant to the Tribe's Eviction and Exclusion Ordinance. *See* Acebedo Decl. ¶¶ 16, 19, Exhibits F, G. The Eviction Notices stated that the reasons for the eviction and exclusion

---

[18]Plaintiffs cannot use this action as a means to avoid the problems posed by the Tribe's sovereign immunity. *See Lewis v. Norton*, 424 F.3d 959, 963 (9th Cir. 2005) (holding that plaintiffs could not "do an end run around tribal immunity . . . by bringing suit against the government, rather than the tribe itself").

include, but are not limited to, the following: (i) the recipients are not members of the Tribe; (ii) they are in possession of the Tribe's property without the consent of the Tribe evidenced by lease, assignment or license authorized by the General Council of the Tribe; (iii) the recipients have no rights to the use of the property; and (iv) the Tribe's General Council has authorized the Defendants' eviction and exclusion from the Tribe's property. On February 2, the Intertribal Court held a hearing and found that it had jurisdiction over the eviction proceeding. Acebedo Decl., Exhibit E at at 3-4, 6. The Intertribal Court stated that it recognized the current leadership as "the only legitimate Tribal governmental authority as recognized by the Federal Government and pursuant to the Tribal Constitution." *Id.* at 4-5. Further, the Intertribal Court found that Plaintiffs are not the beneficial owners of Parcel 04. *Id.* at 3-4. The Intertribal Court has set a trial date on the eviction and exclusion proceedings for February 23, 2007. *Id.* at 6.

The tribal court exhaustion doctrine dictates that a federal court should abstain until tribal court proceedings concerning the same underlying dispute have been exhausted. *See Ford Motor Company v. Todecheene*, --- F.3d ----, 2007 WL 270120 (9th Cir. Feb 1, 2007) (remanding with instructions that "district court stay proceedings . . . pending exhaustion of available proceedings in the tribal courts, including appellate review"). In *Selam v. Warm Springs Tribal Corr. Facility*, 134 F.3d 948, 953 (9th Cir. 1998), the Ninth Circuit explained that considerations of tribal self-government, principles of comity between sovereigns, and concerns for judicial economy, underlie the development of the tribal court exhaustion doctrine:

> The Supreme Court's policy of nurturing tribal self-government strongly discourages federal courts from assuming jurisdiction over unexhausted claims. [Citations omitted]. Additionally, "[a] federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of tribal courts." [LaPlante, 480 U.S. at 15]. Considerations of comity, along with the desire to avoid procedural nightmares, have prompted the Supreme Court to insist that "the

26

federal court stay[ ] its hand until after the Tribal Court has had a full opportunity . . . to rectify any errors it may have made." *National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 857 (1985).

*See also Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987) ("the federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a full opportunity to determine its own jurisdiction.") (internal citations omitted).

Plaintiffs' Complaint raises some of the same issues and involves the same underlying dispute as the action before the tribal court – including who are the beneficial owners of Parcel 04 and who has the right to use Parcel 04. Compl. ¶ 17. Accordingly, Plaintiffs' Complaint cannot succeed because Plaintiffs must first exhaust their remedies in the tribal court before seeking relief in this Court.[19]

## D.    Plaintiffs Are Not the Beneficial Owners of Parcel 04

Plaintiffs assert that Parcel 04 was taken into trust for the benefit of the individual Indian Plaintiffs and not the federally recognized Tribe. *See* Pl. Mem. at 8-10*;* Compl. ¶ 17. Plaintiffs assert that the Secretary located Plaintiffs on the parcel, acquiesced in their continued presence on the parcel, built Plaintiffs houses and provided Plaintiffs with services. Pl. Mem. at 8. Relying heavily on *Coast Indian Community v. United States*, 550 F.2d 639 (Ct. Cl. 1977), Plaintiffs assert that these actions by the Secretary served to designate Plaintiffs as the beneficial owners. Pl. Mem. at 8-10.

Plaintiffs' reliance on *Coast Indian Community* is misplaced. *Coast Indian Community* was not an intertribal dispute. Rather, the issue was whether the community as a whole – not

---

[19] It should be stressed that to the extent this amounts to an intertribal dispute, the Court would have no jurisdiction.

individuals – had a compensable interest in certain property such that they could assert a takings claim.  *Id.* at 642.  In *Coast Indian Community,* a parcel of land was conveyed by deed to the United States in trust for certain Indians to be "designated by the Secretary of the Interior," but "no specific procedures for accomplishing such designation were prescribed."  *Id.* at 642-43.  "Thus, in the absence of specifically prescribed designation procedures," the court looked to "the conduct of the BIA" and such designation was "inferred by law."  *Id.* at 643-644.  In the present case, the Court is not addressing whether there is a beneficial interest at all in Parcel 04, but Plaintiffs' assertions that they hold such interest as individuals – as opposed to the federally recognized Tribe.  Compl. ¶ 17.  *Coast Indian Community* is therefore not relevant to the present case.

In addition, unlike *Coast Indian Community,* the deed here is not silent, and the designation procedures are not absent.  In fact, the 1978 deed at issue in the present case conveyed Parcel 04 in trust for the benefit of the Jamul Tribe as a whole.  *See* Compl., Ex. D (conveying Parcel 04 to "[t]he United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate").  And a 1978 letter from the Department of Interior shows that the Parcel was taken into trust for the benefit of the Jamul Tribe as a whole.  *See Rosales v. United States***,** Ex. B at 14 (noting receipt of "eleven signatures out of the thirteen ½ bloods for the Bureau of Indian Affairs to proceed with the proposed acquisition through a donation to establish the Jamul Indian Reservation").  Thus, contrary to Plaintiffs' assertions, *Coast Indian Community* was not decided on "nearly identical facts" to the present case.  Nor was the court addressing a similar issue – an intertribal dispute as to whether land was conveyed for the benefit of the Tribe as a whole or for individuals.

28

Plaintiffs' reliance on *Coast Indian Community* is therefore unavailing. Where, as here, the 1978 deed and the 1978 letter from Interior make clear that the land was placed in trust for the benefit of the Tribe and not individuals, there is no need for the Court to try and infer otherwise. Plaintiffs have not and cannot cite any authority that supports their arguments that the individual Plaintiffs – as opposed to the federally recognized Tribe – are the beneficial owners of Parcel 04.[20]

 In fact, Plaintiffs' arguments regarding beneficial ownership of Parcel 04 were previously addressed by the District Court for the Southern District of California, when presented with a claim of ownership *by the same individual Plaintiffs*. That court found that Parcel 04 was held in trust by the United States for the benefit of the Tribe, and not any individuals. As the court stated:

> [P]laintiffs cannot claim rights in [Parcel 04] separately from those of the Jumal

---

[20]Plaintiffs' reliance on *United States v. Assiniboine Tribe*, 428 F.2d 1324, 1329-30 (Ct. Cl. 1970) and *Opinions of the Solicitor Department Of The Interior Relating to Indian Affairs 1917-1947* at 668, 724, 747 and 1479 is equally unavailing. *Assiniboine Tribe* was not an intertribal dispute, but addressed, *inter alia,* whether the government's award of certain land to that tribe was gratuitous. *Id.* at 1330. In finding that it was not, the court determined that the tribe's interest was created by Congress and was evidenced by the tribe's signing the Act creating the land and receiving compensation. In *Assiniboine*, it was undisputed that the interest in land was held by the tribe itself. *Id.* Plaintiffs do not explain how the various *Opinions of the Solicitor, Department of Interior* support their position on beneficial ownership. Pl. Mem. at 8-10. These opinions do not address intertribal disputes, such as the present case, and do not support Plaintiffs' assertions that the 1978 deed created a beneficial interest for Plaintiffs as individuals, as opposed to the Tribe.

Plaintiffs also rely on a letter from Governor Schwarzenegger's Legal Affairs Secretary for the proposition that they are the beneficial owners of the land. Pl. Mem. at 9-10. But the letter does not address the issue of beneficial ownership. Indeed, the letter, which concerns potential responsibilities related to the proposed casino project and potential violations of the Tribe's gaming compact, is addressed to Chairman Acebedo, the leader of the Tribe, and not to Plaintiffs. *See* Compl. ¶ 14, Exhibit F.

> Tribe.  First, considering the language of the 1978 deed, it is clear that [Parcel 04]
> was not conveyed in trust the United States solely for the benefit of the individual
> plaintiffs but rather for the Jamul Tribe as a whole . . . . In addition to the 1978
> deed, [a] 1978 letter from the United States Department of Interior . . . also shows
> that [Parcel 597-080-04] was taken into trust for the benefit of the Jamul Tribe,
> rather than for the individual plaintiffs . . . . Thus, plaintiffs cannot claim an
> individual right, allotment or otherwise to [Parcel 04].  Rather, the parcel is held
> by the United States in trust for the benefit of the Jamul Tribe.  *See* F. Cohen,
> *Handbook of Federal Indian Law*, at 472 (1982 ed.) ("The manner in which a
> tribe chooses to use its property can be controlled by individual tribe members
> only to the extent that the members participate in the governmental processes of
> the tribe.").

Exhibit B at 13-14.  Thus, even if Plaintiffs were able to surmount the jurisdictional hurdle of

failure to join a necessary and indispensable party, they cannot succeed on their claims that

Parcel 04 should be held in trust for them as individuals.[21/]

**E.      The United States is Not Obligated to Prevent an Action in Trespass**

      **1.      Plaintiffs Lack Standing to Assert the Claims Alleged in the Complaint**

Plaintiffs – who are not the beneficial owners of Parcel 04, and are not the recognized

leaders of the Tribe –  have no standing to claim any enforceable rights owed to the Tribe related

to actions taken on its property.  Tribal property interests and governmental authority flow from

reserved treaty rights and are secured to recognized Indian tribes as distinguished from

individual Indians.  *Washington v. Washington State Commercial Passenger Fishing Vessel*

*Ass'n*, 443 U.S. 658, 679 (1979); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 665 (1979); *see*

*also Whitefoot v. United States*, 293 F.2d 658 (Ct. Cl. 1961), *cert. denied*, 369 U.S. 818 (1962).

As explained in *Short v. United States*:

> An individual Indian's rights in tribal or unallotted property arises only upon

_____

[21/] Plaintiffs do not seek to have this court declare them the beneficial owners of Parcels 05 or 06.
*See* Compl. Prayer for Relief ¶ 3.

individualization; individual Indians do not hold vested severable interests in unallotted tribal lands and monies as tenants in common.

12 Cl. Ct. 36, 42 (Cl. Ct. 1987), citing *United States v. Jim*, 409 U.S. 80, 82-83 (1972); *Gritts v. Fisher*, 224 U.S. 640, 642 (1912) (additional citations omitted); *see also Seneca Constitutional Rights Foundation v. George*, 348 F. Supp. 51, 59 (W.D. N.Y. 1972) ("it is established that a tribe has full authority to use and dispose of tribal property and that no individual Indian has an enforceable right in the property"), citing *United States v. Chase*, 245 U.S. 89, 92 (1917); *McDougal v. McKay*, 237 U.S. 372 (1915) (additional citations omitted).

The BIA has recognized Leon Acebedo as Chairman of the Tribe, through June 16, 2007. *See* Exhibit A. As the Supreme Court has held, this recognition by the executive branch requires courts to do the same. *See United States v. Holliday*, 70 U.S. 407, 419 (1865) ("[I]t is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.") (*cited with approval* in *United States v. Sandoval*, 231 U.S. 28, 47 (1913)). The D.C. Circuit has also recognized that the Department of Interior (and hence, the BIA) has special expertise in the determination of acknowledgment of Indian tribes. *James v. U.S. Department of Health and Human Services*, 824 F.2d 1132, 1138-1139 (D.C. Cir. 1987).[22] As set forth above, Plaintiffs are not the beneficial owners of Parcel 04. And because

---

[22]As discussed above, Plaintiffs' Complaint discusses three separate parcels of land, Parcels 04, 05 and 06, and their requests for relief vary according to the parcel. Plaintiffs have requested injunctive relief for all three parcels with regard to their request that Defendants be enjoined from allowing grading and construction activities and from failing to preserve in-place Native American human remains and associated items. *See* Compl., Prayer For Relief ¶¶ 1- 2. In contrast, Plaintiffs' request for relief with regard to beneficial ownership and the requirement that Defendants be enjoined from taking any activities without the written agreement of

Plaintiffs are not the recognized leaders of the Tribe, Plaintiffs' trespass claim must fail for lack of standing.

### 2.    Plaintiffs' trespass claim cannot succeed because no such liability has been created by Congress

Plaintiffs ask this Court to issue an injunction to "prevent trespass on Plaintiffs' beneficial ownership interests."  Pl. Mem. at 24-27.  This argument – and all authority upon which Plaintiffs rely – is premised on the assertion that Plaintiffs are the beneficial owners of Parcel 04.  *Id.*  As set forth above, Plaintiffs cannot succeed on their beneficial ownership claim and therefore Plaintiffs' trespass claim must fail as well.  But even if Plaintiffs were authorized to bring this action on behalf of the Tribe or were found to be the beneficial owners of the land, the trespass claim would still fail.

Plaintiffs do not assert that the alleged trespass will be committed by the United States. Plaintiffs are therefore asking this Court to find that the United States is liable for trespass or other land deprivation wrongs committed by third parties.  This, despite the fact that the Tribes have the power to bring actions on their own.  To so find would make Defendants a guarantor and insurer on behalf of the Tribe.  Plaintiffs do not cite any authority for this proposition.  And the Supreme Court has repeatedly refused to imply such an obligation in this context.  Indeed, the Supreme Court has stressed:

> That the government did not mean to assume an insurer's responsibility for the

_____

Plaintiffs has been made only with respect to Parcel 04.  *See id.* at ¶¶ 3-4.  It would appear that the varying requests are the result of Plaintiffs' awareness that Parcel 06 is held in fee by others who are not a party to the action.  Compl. ¶ 21, Ex. G.  Plaintiffs do not appear to allege that Parcel 597-080-05, which is held in trust by the Tribe, was even intended for them as individuals.  Nor do they explain how they are the beneficial owners of Parcel 05 and 06 in their Complaint or their motion for a preliminary injunction.

payment of sums claimed by the Indians against the railroads *is further shown by the fact that the Indians retained their own independent remedy for wrongs done them. The tribes have not yet been dissolved, and they have had, both as a general legal right and by virtue of the very section of the 1906 Act under discussion here, the power to bring actions on their own behalf. That the United States also had a right to sue did not necessarily preclude the tribes from bring their own actions.* [Footnotes omitted]

We are asked here to impose a liability on the government to these Indians for wrongs allegedly committed against the Indians by others. Appreciating the desire of Congress to recognize the "full obligation of this nation to protect the interests of a dependent people," *Tulee v. Washington*, 315 U.S. 681, 685, *we are unable to find in the words of the treaties or statutes upon which this action rests any such prodigal assumption by the government of other people's liabilities as that for which the petitioners contend here.*

*Creek Nation v. United States*, 318 U.S. 629, 640 (1943) (emphasis supplied).

Such a "prodigal assumption" of liability cannot be assumed, especially where the power existed in the Tribe to bring suit independently. Plaintiffs have not shown and cannot show a Congressional intent to assume this obligation, expressly or impliedly. "Certainly there was not expressly assumed an obligation to respond in damages" if the protection claimed by Plaintiffs' alleged duties was inadequate. "[N]or will such an obligation be implied unless such implication is inescapable." *Nez Perce v. United States*, 95 Ct. Cl. 1, 7 (1941).

*Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, is also instructive. In *Shoshone-Bannock*, the Tribes sought to compel the United States take action on their behalf, specifically to sue others on behalf of the tribe regarding water rights claims. 56 F.3d at 1480. The D.C. Circuit, citing *Heckler v. Chaney*, 470 U.S. 821 (1985), found that the Attorney General's refusal to assert the Tribes' claims "was presumptively within her discretion." *Id.* at 1481. The Circuit also addressed the question of the United States' fiduciary responsibility to the Tribes, holding that "an Indian tribe cannot force the government take specific action unless a treaty, statute or

agreement imposes, expressly or by implication, that duty. 'Without an unambiguous position by Congress that clearly outlines a federal trust responsibility, courts must appreciate that would ever fiduciary obligation otherwise exists, is a limited one only.'" *Id*. at 1482 (internal citations omitted).

Nor can Plaintiffs show that the United States has such an obligation based on the government's general trust relationship with Indian tribes. Enforceable governmental trust obligations must be anchored by statute or regulation. *See United States v. Mitchell*, 445 U.S. 535 (1980) (*Mitchell I*) and *United States v. Mitchell*, 463 U.S. 206, 217-18 (1983) (*Mitchell II*), (General Allotment Act created a "bare trust", i.e., a limited trust relationship which did not impose on the government any fiduciary management duties). The Court in *Mitchell II* stressed that any other statutes or regulations that might establish a fiduciary relationship would "define the contours of the United States' fiduciary responsibility." 463 U.S. at 224

*Creek Nation,* 318 U.S. at 638-640 is also instructive. There, the Supreme Court refused to hold the United States liable for the failure to file suits that would have protected tribal property interests. Rather than a mandatory duty, the Court found the decision as to "when to institute legal proceedings" as one "in which [wide] discretion would seldom be more necessary." *Id.* at 639. The argument that the general trust relationship and general language in treaties, under even generous rules of construction, can premise a mandatory duty to assert claims rejected by the Supreme Court. *Id.* Thus, even if Plaintiffs were found to be the beneficial owners of Parcel 04, or authorized to bring this action on behalf of the Tribe, they could not show that the United States has an obligation to prevent trespass by third parties. Accordingly, Plaintiffs cannot succeed on their trespass claim.

## II.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY AND THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVORS DENYING PRELIMINARY INJUNCTIVE RELIEF

Proof of irreparable injury is an essential prerequisite to obtaining injunctive relief.

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).  Plaintiffs cannot show any

irreparable injury for Parcel 06 because the Tribe has represented that they have not planned any

construction on that parcel.  *See* Acebedo Decl. ¶¶ 9-10.  Further, none of the parcels are being

held in trust for the beneficial use of Plaintiffs, and therefore they have no legally cognizable

injury to be damaged.  Additionally, Plaintiffs include in their Prayer for Relief a claim for

money damages, and any claim of injury that can be made whole by money damages is by

definition not irreparable injury.  *See CSX Transp., Inc. v. Williams*,  406 F.3d 667, 674, n.7

(D.C. Cir. 2005) (recognizing "the general rule that injury that 'can be remedied with money

damages' is not irreparable").   Nor are Plaintiffs able to show any injury based on alleged

violations of NAGPRA, as NAGPRA does not apply in the absence of an inadvertent discovery

or intentional excavation of cultural items, including human remains.  Finally, Plaintiffs cannot

assert any injury against Defendants based on claims asserted pursuant to California state law.[23]

Plaintiffs must also demonstrate that a preliminary injunction will not substantially injure

another party.  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317 (D.C. Cir. 1998).  This is a

---

[23] Plaintiffs also allege, without proof or legal analysis, that if Defendants are not enjoined, irreparable damage will be caused, that their right to free expression and exercised their religious beliefs will be interfered with, Pl. Mem. at 17-18, severe emotional stressful be caused, *id.* at 18, their rights to due process and equal protection of the law will be infringed, *id.*, and there will be bodily injury and property damage.  *Id.*  Such a generalized claims, without more, are not enough to prove the likelihood of success on the merits of such claims or show irreparable injury.  Further, to the extent that such claims are based on rights provided in California state law, the United States has not expressly waived its sovereign immunity.

reflection of the fact that the Court is balancing the relative hardships of different parties in determining whether to issue a preliminary injunction. *National Wildlife Fed'n v. Burford*, 835 F.2d 305, 318–19 (D.C. Cir. 1987). In addition, Plaintiffs must demonstrate that a preliminary injunction would be in the public interest. *Village of Gambell*, 480 U.S. at 545*; Serono Labs.*, 158 F.3d at 1317–18. When injunctive relief would harm the public interest, the Court may withhold the relief, even if doing so would burden or cause irreparable injury to the movant. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982); *Endangered Species Comm. v. Babbitt*, 852 F. Supp 32, 42 (D.D.C. 1994); *Yakus v. United States*, 321 U.S. 414, 440 (1944). The balance of the injuries in this case tips in favor of Defendants and an injunction would harm the public interest. Plaintiffs, who are not members of the Tribe, are attempting to second-guess what is in the interest of the Tribe, who apparently have decided that building a casino on their land is in their best interest, economically and socially. Indeed, one of the purposes of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Thus, Plaintiffs' request for preliminary injunctive relief should be denied.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

February 15, 2007.

Respectfully submitted,

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
SAMANTHA KLEIN

36

ALEX KRIEGSMAN
Trial Attorneys
United States Department of Justice
Environment and Natural Resources Division

By: _/s/ Samantha Klein_____
   Samantha Klein
   Trial Attorney
   United States Department of Justice
   Natural Resources Section
   P.O. Box 663
   Washington, D.C.  20044-0663
   Tel: (202) 305-0474
   Facsimile: (202) 305-0506

By: _/s/ Alex Kriegsman_____
   Alex Kriegsman
   Trial Attorney
   United States Department of Justice
   Natural Resources Section
   P.O. Box 663
   Washington, D.C.  20044-0663
   Tel: (202) 305-3022
   Facsimile: (202) 305-0506


   Of Counsel:
   Tobias Halvarson, Attorney-Advisor
   U.S. Department of the Interior
   1849 C Street, N.W.
   Washington, D.C.  20240
   Tel: (202) 208-6930
   Facsimile: (202) 219-1791

   ATTORNEYS FOR DEFENDANTS

Exhibit A

BUREAU OF INDIAN AFFAIRS
SOUTHERN CALIFORNIA AGENCY
1451 Research Park Dr., Ste. 100
Riverside, CA 92507-2471

Tribal Operations
Jamul – Elections

AUG 9 - 2005

Mr. Leon Acebedo, Chairman
JAMUL INDIAN VILLAGE
P.O. Box 612
Jamul, CA 91935

Dear Chairman Acebedo:

We thank Ms. Julia Lotta, Jamul Secretary/Treasurer for providing the final results from the tribal election and the run off election. Via facsimile Agency received the documents August 2, 2005.

CONGRATULATIONS to you and the other members on returning to the Executive Committee. We welcome Robert W. Mesa and Eleanor Miller for their first terms to the Committee, a copy of this letter will be provided each elected official.

From the "Report of Tribal Election", term is set for two (2) years beginning June 18, 2005 and ending June 16, 2007.

If there are any questions or issues you would like to discuss, please feel free to contact our office at (951) 276-6624.

Sincerely,

James J. Fletcher
ACTINGSuperintendent

cc: Carlene Chamberlain, Vice-Chairperson
    Julia Lotta, Secretary/Treasurer
    Erica Pinto, Committee Member
    Robert W. Mesa, Committee Member
    Eleanor Miller, Committee Member
    Tribal Operations/Pacific Region w/reports
    Tribal Government/Central Office w/reports

Exhibit B

1

2

3

4

5

6

7

FILED

02 FEB 14 AM 9:34

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER ROSALES, MARIE TOGGERY, and KAREN TOGGERY, | CASE NO. 01-951-IEG (JAH) |
| Plaintiffs, | **ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; and (2) DENYING DEFENDANTS' MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS** |
| vs. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | [Doc. No. 17] |

Presently before the Court is defendants United States, Department of the Interior, Bureau of Indian Affairs, and National Indian Gaming Commission's (collectively referred to as "defendants") motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h) or, in the alternative, for judgment on the pleadings under Rule 12(c) or summary judgment under Rule 56. For the reasons discussed below, the Court grants defendants' motion for summary judgment.

### BACKGROUND

On May 30, 2001, plaintiffs Walter Rosales, Marie Toggery, and Karen Toggery ("plaintiffs") filed a complaint for declaratory and injunctive relief pursuant to the Indian Reorganization Act of 1934. In their complaint, plaintiffs seek (1) a declaration of plaintiffs' entitlement to the allotment of parcel number 597-080-01; (2) to compel defendants to issue to



-1-



ENTERED ON 2/19/02   01cv0951

1   plaintiffs a trust patent for the above-mentioned parcel; (3) to enjoin defendants from further

2   denying plaintiffs' entitlement to the parcel; (4) money damages for deprivation of the use and

3   benefit of their parcel; and (5) reasonable attorneys' fees, costs, and expenses.  In their complaint,

4   plaintiffs allege that "on February 5, 2001, the United States took action, and first published notice,

5   denying plaintiffs' entitlement and excluding them from their allotment of land in parcel 597-080-

6   01."  (Compl. at 6 ¶ 18.)  This notice, attached to defendants' motion as Exhibit A, was issued by

7   the Bureau of Indian Land Affairs pursuant to 25 C.F.R. §§ 151.10 and 151.11 and invited the

8   public to comment on the pending application by the Jamul Indian Village Reservation for the

9   United States to take certain parcels into trust for the benefit of the Reservation.  The pending

10  application does not include the parcel to which plaintiffs claim allotment rights, but plaintiffs

11  allege that the publication of the notice apprised them of the government's failure to issue a patent

12  to plaintiffs for an allotment to parcel 597-080-01.  The leadership of the Jamul Reservation has

13  been pursuing the trust application in an effort to commence gaming activities on tribal land.

14  However, plaintiffs contend that they do not challenge the pending application for trust status of

15  the potential gaming property but rather the government's failure to issue a patent to plaintiffs for

16  an allotment on a separate piece of land, parcel 597-080-01.

17          On August 10, 2001, defendants filed a motion to dismiss pursuant to Federal Rules of

18  Civil Procedure 4(i), 8(a), 12(b)(2), and 12(b)(6), for failure to comply with minimum federal

19  pleading requirements, lack of personal jurisdiction, insufficient service of process, and failure to

20  state a claim upon which relief may be granted.  In their motion to dismiss, defendants also

21  contended that the Doe defendants named by plaintiffs in their complaint are improper and should

22  be dismissed.  Plaintiffs filed an opposition to the motion on October 1, 2001.  Defendants filed

23  their reply on October 15, 2001.  In their reply, defendants withdrew the portion of their motion to

24  dismiss based on lack of personal jurisdiction and insufficient service of process under Rules 4(i),

25  12(b)(2), and 12(b)(5), in light of the additional information regarding service of the summons and

26  complaint that plaintiffs attached to their opposition to defendants' motion.  On October 16, 2001,

27  the Court denied defendants' motion.

28          On November 9, 2001, defendants filed the instant motion to dismiss or, in the alternative,

1  for judgment on the pleadings or summary judgment. In their motion, defendants contend that they

2  are entitled to dismissal, judgment on the pleadings, or summary judgment on the basis that (1) the

3  case is not ripe for adjudication; (2) plaintiffs lack standing; and (3) plaintiffs have not exhausted

4  their administrative remedies. Defendants further contend in their motion that plaintiffs cannot

5  claim allotment rights to parcel number 597-080-01 because such ownership was abolished in

6  1934. Finally, defendants argue in their motion that defendant National Indian Gaming

7  Commission ("NIGC") is also entitled to dismissal, judgment on the pleadings or summary

8  judgment because it does not play a role in determining whether land should be acquired by the

9  United States in trust. In their opposition, plaintiffs contend that defendants mischaracterized the

10  nature of their claims. Plaintiffs emphasize that they are not challenging the application for trust

11  status currently pending before the Bureau of Indian Affairs. Rather, plaintiffs contend that the

12  gravamen of their complaint is that the government failed to issue them a patent for an allotment to

13  parcel number 597-080-01, which was conveyed to the United States in trust in 1978. In support

14  of plaintiffs' claim to this allotment, plaintiffs attach to their complaint the 1978 deed by which

15  parcel number 597-080-01 was conveyed to the United States "in trust for such Jamul Indians of

16  one-half degree or more Indian blood as the Secretary of the Interior may designate." (See Compl.,

17  Ex. B.)

18      Responding to plaintiffs' recharacterization of their claim, defendants contend in their reply

19  that plaintiffs' argument that they are entitled to a patent for their allotment to parcel number 597-

20  080-01 lacks merit because Congress abolished the allotment form of ownership in 1934. Here,

21  the United States took parcel number 597-080-01 into trust pursuant to 25 U.S.C. § 465. (See

22  Compl., Ex. B.) Defendants emphasize that, unlike land that was allotted prior to 1934 under the

23  General Allotment Act, land held in trust pursuant to § 465 does not become allotted land but

24  rather land owned by the United States for the benefit of tribes. Defendants also contend that no

25  other allotment statute applies to the facts of this case. Thus, plaintiffs are not entitled to the

26  issuance of a patent for parcel number 597-080-01 because the land was taken into trust by the

27  United States for the benefit of the Jamul Tribe, rather than for the individual plaintiffs.

28  ////

01cv0951

## DISCUSSION

I.    **Legal Standards**

    A.    **Motion to Dismiss under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction**

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows for dismissal where there is a "lack of jurisdiction over the subject matter." See Fed. R. Civ. P. 12(b)(1). In ruling on defendant's motion, the Court is guided by well-established principles:

> Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994).

Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in doing so rely on affidavits or any other evidence properly before the court." St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989). Thus, the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims. Id. Because the plaintiff bears the burden of establishing subject matter jurisdiction, no presumption of truthfulness attaches to the allegations of the plaintiff's complaint, and the Court must presume that it lacks jurisdiction until the plaintiff establishes jurisdiction. Stock West, Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989).

Whether a claim is ripe for adjudication is an issue of subject matter jurisdiction under the case or controversy clause of Article III of the federal Constitution. St. Clair, 880 F.2d at 201. As any other challenge to a Court's jurisdiction over the subject matter of a case, motions raising ripeness as an issue are properly brought under Rule 12(b)(1). Id. Once a party raises this issue, "[i]t then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." Id. In deciding whether the case is ripe, the Court may look to this "extra-pleading material in deciding the issue, even if it becomes necessary to resolve factual

1   disputes." Id. Similarly, issues of standing go to the Court's jurisdiction over the subject matter of

2   the case and are properly raised in a motion to dismiss under Rule 12(b)(1). White v. Lee, 227

3   F.3d 1214, 1242 (9th Cir. 2000).

4        Pursuant to Rule 12(h), the Court must dismiss the action "[w]henever it appears by

5   suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter." Fed.

6   R. Civ. P. 12(h). Thus, although defendants previously filed a motion to dismiss based upon Rules

7   8(a) and 12(b)(6) and subsequently filed an answer to the complaint on November 1, 2001, the

8   instant motion is nonetheless properly before the Court. Furthermore, because lack of subject

9   matter jurisdiction is a matter in abatement, the Court may not rule on a summary judgment motion

10  "or any other matter going to the merits" where the Court determines that it lacks jurisdiction over

11  the subject matter. Capitol Indus.-EMI, Inc. v. Bennett, 681 F.2d 1107, 1118 (9th Cir. 1982).

12  **B.    Motion for Judgment on the Pleadings pursuant to Rule 12(c)**

13       Federal Rule of Civil Procedure 12(c) allows a motion for judgment on the pleadings to be

14  filed "after the pleadings are closed." Fed. R. Civ. P. 12(c). The motion may be brought by either

15  party "when all material allegations of fact are admitted in the pleadings and only questions of law

16  remain." Wright & Miller, 5A Federal Practice and Procedure § 1367, at 510-511; see also

17  Doleman v. Meiji Mut. Life Ins. Co., 727 F.2d 1480, 1482 (9th Cir. 1984) (quoting an earlier

18  version of Wright & Miller for the proposition that a 12(c) motion should only be granted where

19  "the movant clearly establishes that no material issue of fact remains to be resolved and that he is

20  entitled to judgment as a matter of law."); accord Vashistha v. Allstate Ins. Co., 989 F. Supp. 1029,

21  1031 (C.D. Cal. 1997). In ruling on a Rule 12(c) motion, the courts must accept all well-pleaded

22  factual allegations as true and determine whether the moving party is entitled to judgment under

23  those facts. See General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist

24  Cong. Church, 887 F.2d 228, 230 (9th Cir. 1989), cert. denied, 493 U.S. 1079 (1990). Judgment

25  on the pleadings is proper when the moving party clearly establishes on the face of the pleadings

26  that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of

27  law. Doleman, 727 F.2d at 1482.

28       If "matters outside the pleadings are presented to and not excluded by the court, the motion

- 5 -

1  shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R.

2  Civ. P. 12(c); see also Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542,

3  1550 (9th Cir. 1990) ("[J]udgment on the pleadings is improper when the district court goes

4  beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion

5  for summary judgment.") (internal citations omitted).

6      **C.**    **Summary Judgment pursuant to Rule 56**

7      Summary judgment is proper where "there is no genuine issue as to any material fact

8  and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A

9  material issue of fact is present when a factual determination must be made by a jury to determine

10  the rights of the parties under the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

11  248 (1986); Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993). A dispute is only

12  "genuine"when "the evidence presented is such that a jury applying that evidentiary standard could

13  reasonably find for either the plaintiff or the defendant." Anderson, 477 U.S. at 255.   In deciding a

14  motion for summary judgment, the Court must examine all the evidence in a light most favorable

15  to the non-moving party.  See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

16      A moving party who bears the burden of proof at trial is entitled to summary judgment

17  only when the evidence indicates that no genuine issue of material facts exists. Fed. R. Civ. P.

18  56(c); Celotex, 477 U.S. at 325.  If the moving party does not bear the burden of proof at trial, he

19  may discharge his burden of showing that no genuine issue of material fact remains by

20  demonstrating that "there is an absence of evidence to support the non-moving party's case."

21  Celotex, 477 U.S. at 325.  The moving party is not required to produce evidence showing the

22  absence of genuine issue of material fact on such issues, nor must the moving party support its

23  motion with evidence negating the nonmoving party's claim.  Lujan v. National Wildlife Fed'n,

24  497 U.S. 871, 885 (1990); United Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th

25  Cir.), cert. denied, 493 U.S. 809 (1989).  Instead, "the motion may, and should, be granted so long

26  as whatever is before the District Court demonstrates that the standard for the entry of judgment, as

27  set forth in Rule 56(c), is satisfied." Lujan, 497 U.S. at 885 (quoting Celotex, 477 U.S. at 323).

28      Once the moving party meets the requirement of Rule 56 by either showing that no genuine

1   issue of material fact remains or that there is an absence of evidence to support the non-moving

2   party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts

3   showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

4   (1986). It is not enough for the party opposing a properly supported motion for summary judgment

5   to "rest on mere allegations or denials of his pleadings." Id. Genuine factual issues must exist that

6   "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

7   party." Id. at 250. To make such a showing, the nonmoving party must go beyond the pleadings to

8   designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 325.

9   Such evidence need not be in a form admissible at trial to avoid summary judgment. Id. The

10   moving party is entitled to judgment as a matter of law if the nonmovant fails to make a sufficient

11   showing of an element of its case with respect to which it has the burden of proof. Id.

12   Standing

13   **II.    Analysis**

14           **A.    Motion to Dismiss under Rule 12(b)(1) for Lack of Subject Matter
                    Jurisdiction**

15

16                  **1.    Ripeness**

17           Defendants first contend that plaintiffs' claim should be dismissed for lack of subject

18   matter jurisdiction because the notice published by the Bureau of Indian Affairs indicates that no

19   action has been taken on the pending application for trust status referred to by the notice. Absent a

20   final agency decision on the matter referred to by the notice, defendants contend, plaintiffs may not

21   allege a claim arising from the defendants' publishing of a notice "denying plaintiffs' entitlement

22   and excluding them from their allotment of land in parcel 597-080-01." In their opposition,

23   plaintiffs clarify that their claim is not based on the pending application for trust status but rather

24   on the government's failure to issue a patent to parcel 597-080-01 when it accepted the parcel into

25   trust in 1978. The publishing of the notice, plaintiffs emphasize, does not form the gravamen of

26   their complaint. Rather, it merely put them on notice that no patent had issued from the

27   government's acceptance of the parcel into trust. In light of plaintiffs' clarification of the nature of

28   their claim in their opposition, it is clear that dismissal based on the ripeness doctrine is

1   inappropriate.  Because plaintiffs are challenging the government's failure to issue a patent to

2   parcel 597-080-01, rather than the pending application by the Jamul Tribe for trust status for

3   parcels 597-060-04-00, 597-060-05-00, and 597-042-13-00 (see Defs.' Ex. A), ripeness is not a

4   basis upon which the Court may grant dismissal.

5           **2.      Standing**

6           Defendants next contend that the Court lacks subject matter jurisdiction over plaintiffs'

7   action because plaintiffs lack standing.  Defendants' standing argument is similar to its ripeness

8   argument in that defendants contend plaintiffs have not been injured because there has been no

9   final agency decision on the proposed trust acquisition of parcels 597-060-04-00, 597-060-05-00,

10  and 597-042-13-00.  Absent a final agency decision on the pending application, defendants

11  contend, plaintiffs cannot show that they have suffered an injury in fact.  Plaintiffs' opposition to

12  this basis for dismissal parallels their opposition to defendants' ripeness argument.  Plaintiffs

13  emphasize that they are not challenging the pending application for trust status for parcels 597-

14  060-04-00, 597-060-05-00, and 597-042-13-00.  Rather, plaintiffs assert, the notice of the pending

15  trust application posted on February 5, 2001 merely informed them that the Jamul Tribe planned to

16  relocate plaintiffs' home sites onto the newly acquired trust land in order to construct gaming

17  facilities on the site of plaintiffs' alleged allotment.  (See Defs.' Ex. A at 3) (stating that the

18  proposed construction of gaming facilities "will result in the relocation of our tribal headquarters

19  and current home sites onto the proposed new trust lands").

20          Article III of the Constitution limits the jurisdiction of the federal courts to actual cases or

21  controversies.  U.S. Const. art III, § 2, cl. 1.  In order to meet the requirement for a justiciable case

22  or controversy, plaintiffs must have standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560

23  (1992) ("[T]he core component of standing is an essential and unchanging part of the

24  case-or-controversy requirement of Article III.").  The "irreducible constitutional minimum" of

25  standing requires that:  (1) plaintiff has suffered an "injury in fact;" (2) the injury is "fairly

26  traceable" to the challenged conduct of the defendant, and not the result of the independent action

27  of some third party; and (3) it is likely, as opposed to merely speculative, that the injury will be

28  redressed by a favorable decision.  Medina v. Clinton, 86 F.3d 155, 157 (9th Cir. 1996) (citing

                                             - 8 -

1 | Lujan, 504 U.S. at 560-61). At the pleading stage, general factual allegations of injury resulting

2 | from the defendant's conduct may suffice to meet the plaintiffs' burden of proof as the party

3 | invoking federal jurisdiction. See Lujan, 504 U.S. at 561.

4 | Given plaintiffs' recharacterization of their claim in their opposition, the Court finds that

5 | plaintiffs meet the three requirements for standing. Assuming plaintiffs' allegation that the United

6 | States holds land in trust for them individually to be true, plaintiffs have suffered an injury in fact

7 | by the government's failure to issue a patent to plaintiffs for parcel number 597-080-01. If the

8 | government indeed accepted parcel number 597-080-01 into trust for the benefit of the individual

9 | plaintiffs, interference with plaintiffs' use of the land may be fairly traceable to the government's

10 | alleged failure to generate the requisite patents to plaintiffs for the parcel. Finally, declaratory

11 | relief from the Court regarding plaintiffs' rights in the parcel may redress plaintiffs' injury in this

12 | case. To the extent that there exists a factual dispute regarding whether parcel number 597-080-01

13 | was taken into trust for the benefit of plaintiffs or for the Jamul Tribe, this issue may be resolved

14 | considering the evidence presented by defendants in support of their motion for summary

15 | judgment.

16 | **3. Failure to Exhaust Administrative Remedies**

17 | Finally, defendants argue that plaintiffs cannot pursue the instant action until they have

18 | exhausted their administrative remedies with respect to the proposed trust application for parcels

19 | 597-060-04-00, 597-060-05-00, and 597-042-13-00. As defendants note, the Jamul Tribe's

20 | application for the United States to take the above parcels into trust is still pending before the

21 | Secretary of the Interior. The February 5, 2001 notice referred to by plaintiffs in their complaint is

22 | merely one step in the process for trust applications with the Secretary of the Interior, defendants

23 | emphasize. Even after the Secretary issues a final decision regarding the trust status of the

24 | pertinent land, the decision can then be appealed to the Interior Board of Indian Appeals. (See

25 | Defs.' Mem. P. & A. at 9-10.) Only after the decision regarding trust status cannot be appealed to

26 | a superior authority in the Department of the Interior can the decision be considered a final

27 | decision subject to judicial review under the Administrative Procedure Act ("APA"). Defendants

28 | contend that because the Secretary of the Interior has not rendered a final decision regarding the

1    application for trust status for parcels 597-060-04-00, 597-060-05-00, and 597-042-13-00, the

2    Court may not adjudicate a challenge to the Secretary's decision at this time.

3        While defendants' analysis would be sound if plaintiffs' claim arose directly from the

4    pending trust application, plaintiffs' opposition clarifies their position and establishes that their

5    claim does not arise from the pending trust application but rather from the United States'

6    acceptance of parcel number 597-080-01 into trust in 1978. Consequently, plaintiffs' failure to

7    wait for a final agency decision with respect to the application for trust status for parcels 597-060-

8    04-00, 597-060-05-00, and 597-042-13-00 is not a basis upon which dismissal of the instant case is

9    warranted. Because plaintiffs' claim does not arise from the pending application for trust status,

10    defendants' argument based upon administrative exhaustion does not provide grounds for

11    dismissal, judgment on the pleadings, or summary judgment.

12    **B.     Plaintiffs' Entitlement to Allotment**

13        Defendants argue that even if the case were ripe and plaintiffs had standing and had

14    exhausted their administrative remedies, dismissal, judgment on the pleadings, or summary

15    judgment is appropriate because plaintiffs cannot claim allotment[1] rights in parcel number 597-

16    080-01. Defendants contend that allotment as a form of ownership was abolished in 1934 and thus

17    the conveyance of parcel number 597-080-01 in 1978 could not have vested plaintiffs with

18    allotment rights entitling them to the issuance of a fee patent. In their opposition, plaintiffs argue

19    that Section 461 of the Indian Reorganization Act of 1934 ended the United States' policy of

20    granting allotments *of Indian land* to individual Indians, but the United States has continued to

21    hold land in trust for both tribes and individual Indians subsequent to 1934. In particular, 25

22    U.S.C. § 465 contemplates that the United States may hold land in trust for individual Indians. 25

23    U.S.C. § 465 ("Title to any lands or rights acquired pursuant to sections 461, 462, 463, 464, 465,

24    466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be taken in the name of the

25    United States in trust for the Indian tribe or individual Indian for which the land is acquired, and

26

27

28      [1]As explained by the Supreme Court in <u>Affiliated Ute Citizens of Utah v. United States</u>, "Allotment is a term of art in Indian law. It means a selection of specific land awarded to an individual allottee from a common holding." 406 U.S. 128, 142-43 (1972).

1   such lands or rights shall be exempt from State and local taxation.")  Plaintiffs contend that the

2   1978 deed of parcel number 597-080-01 indicates that the United States took this property into

3   trust for them and, thus, they seek a declaration of their rights in the parcel and the issuance of a

4   patent to the parcel.

5        In order to determine (1) whether plaintiffs are entitled to an allotment and (2) whether the

6   land was accepted into trust for the benefit of the individual plaintiffs, it is necessary to distinguish

7   among the various forms of ownership of Indian land contemplated by federal law as of the year in

8   which the United States accepted parcel number 597-080-01 into trust.  Prior to 1934, the United

9   States pursued a policy by which communal Indian property was divided and granted to individual

10  tribal members.  See Babbitt v. Youpee, 519 U.S. 234, 237 (1997).  As noted by the Supreme

11  Court in Babbitt, such "allotted lands were held in trust by the United States or owned by the

12  allottee subject to restrictions on alienation."  Id.  Under the General Allotment Act of 1887, the

13  United States would hold the land in trust for twenty-five years and then convey the land to the

14  Indian or his heirs in fee discharged of the trust.  See 25 U.S.C. § 348; Atkinson Trading Co., Inc.

15  v. Shirley, 121 S. Ct. 1825, 1830 n.1 (2001) (noting that the General Allotment Act, 25 U.S.C. §

16  331 et seq., "authorized the issuance of patents in fee to individual Indian allottees who, after

17  holding the patent for 25 years, could then transfer the land to non-Indians").

18       This policy failed, as Indian land ownership became increasingly fractionalized, and

19  individual owners were unable to productively use their small interests.  See id. at 238.  Thus,

20  "Congress ended further allotment in 1934," id., and "extended indefinitely the existing periods of

21  trust applicable to already allotted (but not yet fee patented) Indian lands," County of Yakima v.

22  Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251, 255 (1992) (citing 25

23  U.S.C. §§ 461, 462).  The new Indian Reorganization Act of 1934 "reflected a new federal policy

24  of halting the loss of Indian lands which had occurred under statutes that allotted tribal lands to

25  individual Indians."  Chase v. McMasters, 573 F.2d 1011, 1015 (8th Cir. 1978); see also McAlpine

26  v. United States, 112 F.3d 1429, 1431 (10th Cir. 1997) (noting that "the IRA, among other things,

27  prohibited any further transfer of Indian lands outside of the tribes and provided the Secretary

28  authority to replace lands in lieu of those already allotted").

- 11 -

01cv0951

1    As shown by the above cases, plaintiffs' claim is, at best, a claim that is not yet ripe for

2    adjudication. Even if the General Allotment Act remained unaffected by the Indian Reorganization

3    Act of 1934, plaintiffs would have no right to a fee patent for at least 25 years after the land was

4    taken into trust by the United States. Given that parcel number 597-080-01 was accepted into trust

5    no earlier than 1978, (see Compl., Ex. B), plaintiffs would not be able to obtain a fee patent until at

6    least 2003. Furthermore, as indicated by Yakima, when Congress passed the Indian

7    Reorganization Act of 1934, it "extended indefinitely the existing periods of trust applicable to

8    already allotted (but not yet fee patented) Indian lands." Yakima, 502 U.S. at 255. Thus, even if

9    plaintiffs had received an allotment under the General Allotment Act, the trust period was

10   extended indefinitely by the IRA, and plaintiffs would have no right to compel issuance of a fee

11   patent for the parcel. See id.

12   Furthermore, it is clear from the 1978 deed that the pertinent statute under which parcel

13   number 597-080-01 was accepted into trust by the United States, 25 U.S.C. § 465,[2] does not

14   provide for the issuance of fee patents to beneficiaries of the land. Although 25 U.S.C. § 348

15   contemplates a twenty-five year trust period after which a fee patent would be issued to the

16   beneficiary of the trust, section 348 is a part of the General Allotment Act of 1887 and is limited in

17   its application to "allotments provided for in *this* Act." See 25 U.S.C. § 348 (emphasis added). In

18   contrast, section 465, which sets forth the conditions under which parcel number 597-080-01 was

19   accepted into trust by the United States, does not contemplate a point at which the United States

20   will cease holding the land in trust and issue a fee patent to the beneficiaries of the land. Rather,

21   section 465 merely states,

22       The Secretary of the Interior is hereby authorized, in his discretion,
         to acquire, through purchase, relinquishment, gift, exchange, or
23       assignment, any interest in lands, water rights, or surface rights
         to lands, within or without existing reservations, including trust
24       or otherwise restricted allotments, whether the allottee be living

25

26       [2]Significantly, 25 U.S.C. § 465 contemplates the United States taking land into trust for the
         benefit of tribes *or* individual Indians. See 25 U.S.C. § 465 (stating that "title shall be taken in the
27       name of the United States in trust for the Indian tribe or individual Indian for which the land is
         acquired . . ."); see also Chase v. McMasters, 573 F.2d 1011, 1015 (8th Cir. 1978) (rejecting party's
28       contention that section 465 does not authorize the Secretary of the Interior to acceptance conveyance
         of title to land already owned in fee by an individual Indian for his benefit).

01cv0951

1   or deceased, for the purpose of providing land for Indians.

2
3   25 U.S.C. § 465.  Plaintiffs point to no section *within the 1934 Act* providing for the issuance of a
    fee patent to Indians for whose benefit the United States holds land in trust under § 465.[3]  Nor is
4
5   the Court aware of any such provision.  To the contrary, section 465 "set[s] forth a procedure by
    which lands held by Indian tribes may become tax exempt."  Cass County v. Leech Lake Band of
6
7   Chippewa Indians, 524 U.S. 103, 114 (1998).  Under section 5 of the pre-1934 General Allotment
    Act, 25 U.S.C. § 348, land upon which a fee patent is issued not only becomes alienable and
8
9   encumberable upon the issuance of the fee patent, but it also becomes subject to taxation.  See
    Yakima, 502 U.S. at 263 and n.1.  The issuance of a fee patent for land taken into trust under
10
11  section 465 would directly contradict section 465's policy of providing tax exempt land for Indians
    and Indian tribes.  See Cass County, 524 U.S. at 114-15.  Thus, plaintiffs are not entitled to
12
13  governmental issuance of a fee patent to parcel number 597-080-01, property taken into trust by
    the United States under section 465.
14
15          Finally, considering the evidence presented by defendants in their motion, plaintiffs cannot
    claim rights in parcel number 597-080-01 separately from those of the Jamul Tribe.  First,
16
17  considering the language of the 1978 deed, it is clear that parcel number 597-080-01 was not
    conveyed in trust to the United States solely for the benefit of the individual plaintiffs but rather for
18
19  the Jamul Tribe as a whole.  The 1978 deed conveys this parcel to "[t]he United States of America
    in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the
20
21  Interior may designate."  (Compl., Ex. B.)  Simply because plaintiffs are by birth one-half degree
    or more Jamul Indian blood and have had continuous possession of the land does not result in the
22
23  conclusion that they alone are entitled to control over the parcel.  Rather, the language in the 1978

24
25          [3]It is unclear from plaintiffs' complaint and briefs whether they seek to compel the government
    to issue a fee patent or a trust patent.  At one point in their complaint, plaintiffs state that they are
26  seeking issuance of a trust patent. (See Compl. at 8, ¶ 2.)  However, plaintiffs cite to 25 U.S.C. § 348,
    which provides for the issuance of a fee patent after the expiration of a twenty-five year trust period.
27  (See id. at 4, ¶ 9.)  Furthermore, plaintiffs cite in their briefs to case law pertaining to the issuance of
    fee patents. (See Pls.' Opp'n to Mot. Summary Judgment at 4.)  Regardless of whether plaintiffs seek
28  to compel the issuance of a fee or trust patent, it is clear that plaintiffs' claim fails on either basis in
    light of the 1978 deed's language designating the Tribe, rather than the individual plaintiffs, as the
    beneficiaries of parcel number 597-080-01.

1  trust conveyance deed clearly refers to the Jamul Tribe, especially in light of the fact that the 1978

2  deed also references 25 U.S.C. § 479, which defines "Indian[s]" as "all persons of Indian descent

3  who are members of any recognized Indian tribe." 25 U.S.C. § 479. Section 479a further provides

4  that the Secretary of the Interior is vested with the authority to recognize Indian tribes. 25 U.S.C. §

5  479a(2). Thus, the 1978 deed's reference to "such Jamul Indians of one-half degree or more Indian

6  blood as the Secretary of the Interior may designate" is a reference to the *tribe*, rather than to the

7  individual half-blooded Jamul Indians then residing on the land.

8      In addition to the 1978 deed, the 1978 letter from the United States Department of the

9  Interior, attached to defendants' reply as Exhibit L, also shows that parcel number 597-080-01 was

10  taken into trust for the benefit of the Jamul Tribe, rather than for the individual plaintiffs. This

11  letter notes that, as of March 15, 1978, the Department of the Interior "ha[d] received eleven

12  signatures out of the thirteen ½ bloods for the Bureau of Indian Affairs to proceed with the

13  proposed acquisition through a donation to establish the Jamul Indian Reservation." (Defs.' Ex.

14  L.) Thus, plaintiffs cannot claim an individual right, allotment or otherwise, to parcel 597-080-01.

15  Rather, the parcel is held by the United States in trust for the benefit of the Jamul Tribe.[4] See F.

16  Cohen, Handbook of Federal Indian Law, at 472 (1982 ed.) ("The manner in which a tribe chooses

17  to use its property can be controlled by individual tribe members only to the extent that the

18  members participate in the governmental processes of the tribe."). Because there is no genuine

19  issue of material fact with respect to plaintiffs' rights in parcel number 597-080-01 and defendants

20  are entitled to judgment as a matter of law, summary judgment is appropriate in this case.[5]

21  ////

22

23      [4]To the extent that plaintiffs challenge the identity of the Jamul Tribe members and their
leadership, this Court is not the proper forum for such a challenge. Rather, plaintiffs should continue
24  to attempt to resolve their dispute regarding tribal leadership in the pending proceedings before the
Interior Board of Indian Appeals. (See Pls.' Ex. D.)
25

26      [5]Because the Court finds that plaintiffs have raised no genuine issue of fact with respect to their
entitlement to an allotment of parcel number 597-080-01, the Court does not address defendants'
27  additional argument that the National Indian Gaming Commission is separately entitled to judgment
on the pleadings. Even if plaintiffs could establish allotment rights in parcel number 597-080-01,
28  plaintiffs have not shown that their claim is ripe for judicial review given that the NIGC has not issued
a final decision regarding the proposed gaming contract that is reviewable under Sections 701 through
706 of the Administrative Procedure Act.

- 14 -

**CONCLUSION**

Accordingly, for the reasons stated above, the Court **GRANTS** defendants' motion for summary judgment. The Court **DENIES** defendants' motion to dismiss, or in the alternative, for judgment on the pleadings.

**IT IS SO ORDERED.**

Dated:  *Feb. 13, 2002*

IRMA E. GONZALEZ
United States District Judge

cc:    Magistrate Judge Houston
       all parties

- 15 -

01cv0951

Exhibit C

Westlaw.

73 Fed.Appx. 913

Page 1

73 Fed.Appx. 913, 2003 WL 21920015 (C.A.9 (Cal.))
**(Cite as: 73 Fed.Appx. 913)**

**H**
Briefs and Other Related Documents
Rosales v. U.S.C.A.9 (Cal.),2003.This case was not selected for publication in the Federal Reporter.Please use FIND to look at the applicable circuit court rule before citing this opinion. (FIND CTA9 Rule 36-3.)

United States Court of Appeals,Ninth Circuit.
Walter ROSALES; et al., Plaintiffs-Appellants,
v.
UNITED STATES of America; et al., Defendants-Appellees.
**No. 02-55800.**
**D.C. No. CV-01-00951-IEG.**

Argued and Submitted July 8, 2003.
Decided Aug. 11, 2003.

Plaintiffs appealed dismissal, by the United States District Court for the Southern District of California, Irma E. Gonzalez, J., of their action in land dispute involving an Indian tribe. The Court of Appeals held that tribe was a necessary and indispensable party and could not be forced to appear.

Affirmed.
West Headnotes
**[1] Indians 209 ☞27(5)**

209 Indians
    209k27 Actions
        209k27(5) k. Parties and Process. Most Cited Cases
Dismissal of lawsuit in land dispute was required where absent Indian tribe was a necessary and indispensable party; tribe claimed jurisdiction over parcel of land at issue, that interest would be impaired if plaintiffs were declared to be the beneficial owners of the land, tribe had sovereign immunity and could not be forced to join the action without its consent, and United States could not be an adequate representative of the tribe's interest inasmuch as government could not represent the

interests of one tribe in an intertribal dispute. Fed.Rules Civ.Proc.Rule 19(a)(2)(i), 28 U.S.C.A.

**[2] Indians 209 ☞27(5)**

209 Indians
    209k27 Actions
        209k27(5) k. Parties and Process. Most Cited Cases
Dismissal of lawsuit in land dispute was required where absent Indian tribe was a necessary and indispensable party, even though plaintiffs appeared to have no other remedy; tribe would be prejudiced if plaintiffs were declared to be the beneficial owners of the land, relief could not be shaped to avoid that prejudice, and tribe's interest in maintaining its sovereign immunity outweighed plaintiffs' interest in litigating their claims. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

**\*914** Appeal from the United States District Court for the Southern District of California, Irma E. Gonzalez, District Judge, Presiding.

Before SILVERMAN, W. FLETCHER, and RAWLINSON, Circuit Judges.

MEMORANDUM [FN*]

FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

**\*\*1** Plaintiffs-Appellants Walter Rosales et al., appeal from an order of the district court granting the United States' motion for summary judgment and dismissing their claims. Because we find that the Jamul Indian Village (the "Village") is a necessary and indispensable party pursuant to Fed.R.Civ.P. 19, we affirm the district court's order dismissing this action. Although the district court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73 Fed.Appx. 913                                                                                          Page 2

73 Fed.Appx. 913, 2003 WL 21920015 (C.A.9 (Cal.))
**(Cite as: 73 Fed.Appx. 913)**

did not address whether the Village was a necessary and indispensable party, we have authority to address the issue on appeal. *See Pit River Home and Agric. Coop. Assoc. v. United States,* 30 F.3d 1088, 1099 (9th Cir.1994).

[1] The Village is a necessary party pursuant to Rule 19(a)(2)(i), which provides that an absent party is necessary if "the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect that interest[.]" Fed.R.Civ.P. 19(a)(2)(i). The Village has claimed jurisdiction over the parcel of land at issue in this action since at least 1981. This interest would be impaired if Appellants were declared to be the beneficial owners of the land.

The Village enjoys sovereign immunity from suit and cannot be forced to join this action without its consent. *See Clinton v. Babbitt,* 180 F.3d 1081, 1090 (9th Cir.1999). Furthermore, the United States is not an adequate representative of the Village's interests in this action because the United States cannot adequately represent the interests of one tribe in an intertribal dispute. *See Pit River,* 30 F.3d at 1101.

[2] The Village is also an indispensable party pursuant to Rule 19(b), which requires the court to examine the following factors in order to determine whether this action should be dismissed: (1) prejudice to the absent party or those already parties; (2) the extent to which relief could be **\*915** shaped to avoid prejudice; (3) adequacy of the judgment rendered without the absent party; and (4) whether plaintiff has another adequate remedy. *See* Fed.R.Civ.P. 19(b). The Village would be prejudiced if Appellants were granted beneficial ownership of the parcel of land, and relief cannot be shaped to avoid this prejudice. While Appellants do not appear to have another adequate remedy, "the tribe['s] interest in maintaining [its] sovereign immunity outweighs the plaintiffs' interest in litigating their claims." *See American Greyhound Racing, Inc. v. Hull,* 305 F.3d 1015, 1025 (9th Cir.2002) (citations omitted). For these reasons, the Village is a necessary and indispensable party,

without whom this action cannot proceed.

AFFIRMED.

C.A.9 (Cal.),2003.
Rosales v. U.S.
73 Fed.Appx. 913, 2003 WL 21920015 (C.A.9 (Cal.))

Briefs and Other Related Documents (Back to top)

• 2003 WL 22025321 (Appellate Brief) Appellants' Reply Brief (Feb. 10, 2003) Original Image of this Document (PDF)
• 2003 WL 22025320 (Appellate Brief) Answering Brief of the Federal Appellees (Jan. 08, 2003) Original Image of this Document (PDF)
• 2002 WL 32155672 (Appellate Brief) Appellants' Opening Brief (Sep. 30, 2002) Original Image of this Document with Appendix (PDF)
• 02-55800 (Docket) (May. 16, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D

```
1
2
3
4
```

FILED

JUN 2 2 1995

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

```
5
6
7
8
9
10
11
12
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAMUL INDIAN VILLAGE, et al., )        CIVIL NO. 95-0131-R (BTM)
                              )
            Plaintiffs,       )
                              )        ORDER GRANTING IN PART AND
      v.                      )        DENYING IN PART DEFENDANTS'
                              )        MOTION TO DISMISS
RAYMOND HUNTER, et al.,       )
                              )
            Defendants.       )
_____)

```
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

This matter is before this Court on Defendants' motion to dismiss or, in the alternative, for summary judgment. The parties appeared for oral argument at 10:30 a.m. on June 5, 1995. Patrick Webb appeared for Plaintiff, Eugene Madrigal appeared for Tribal Defendants, and Paul Beckhart appeared for Federal Defendants. In support of their motions to dismiss, Defendants contend that this Court lacks jurisdiction over this dispute. For the reasons given below, Defendants' motions to dismiss are GRANTED IN PART AND DENIED IN PART.

I.   PARTIES

The Amended Complaint lists two Plaintiffs, Jane Dumas and the Jamul Indian Village (the "Tribe"). Dumas purports to sue on behalf of herself and all other similarly situated members of

**EXHIBIT C**

1   the Tribe.  This Court recognizes Dumas as the only Plaintiff.

2   To say that this action has been brought on behalf of the Tribe

3   assumes a result very much in dispute; namely, whether the

4   appropriate Executive Committee or the appropriate General

5   Council of the Tribe has authorized suit on behalf of the Tribe.

6       The "Federal Defendants" include the United States, the

7   U.S. Department of the Interior, the Bureau of Indian Affairs,

8   and an individual federal employee, Virgil Townsend, Superinten-

9   dent Southern California Agency.  The "Tribal Defendants"

10   include members of a rival faction of the Tribe: Raymond Hunter,

11   Marcia Goring-Gomez, Mary Alvarez, Lee Shaw-Conway, Eleanor

12   Miller, and James Alvarez.  Also named as one of the Tribal

13   Defendants is Eugene R. Madrigal, the attorney for the Tribe.

14   Each of the defendants has filed a motion to dismiss except

15   Defendant Virgil Townsend.[1]

16

17   II.  BACKGROUND

18       Dumas filed this action on January 31, 1995 alleging a

19   conflict between rival factions within the Jamul Indian Village

20   seeking injunctive relief and unspecified damages.  Dumas

21   alleges that on September 3, 1994 Defendants Raymond Hunter,

22   Marcia Goring-Gomez, Mary Alvarez, and Lee Shaw-Conway were

23   recalled from their positions on the Tribe's executive committee

24

25       [1]  There is a dispute as to whether Townsend has been adequately served in accordance with Fed.R.Civ.P. 4.  At this
26   time, this Court does not address whether service was proper.  As discussed below, the claims which are dismissed as to Federal
27   Defendants are also dismissed with respect to Townsend.

28

by the tribe's general council[2] but nevertheless have refused to obey the recall, vacate their offices, turn over tribal records, and acknowledge their lack of authority.  Dumas alleges that shortly after the recall elections on September 3, 1994, the general council elected a new executive committee, with Dumas as its chairperson.

Dumas sought a temporary restraining order ("TRO") to block what they characterize as the renegade executive committee's attempt to raze the Tribal Hall.  Dumas alleged in her ex parte application for TRO that if this Court did not issue a TRO, Tribal Defendants (or some of them) would begin bulldozing the Tribal Hall at 7:30 a.m. on February 1, 1995.  In order to prevent Tribal Defendants from demolishing what Dumas describes as an historic and "long respected cultural asset of the Tribe" without an opportunity to first develop the facts, this Court granted Dumas' request for TRO.  On February 2, 1995, this Court issued a preliminary injunction on the ground that the balance of equities tipped sharply in favor of Dumas.  This Court reasoned that Dumas demonstrated irreparable harm if the Tribal Hall was demolished.  Dumas filed a First Amended Complaint on March 17, 1995, which raises twenty-one separate claims.  Defendants now move to dismiss.

//

//

---

[2]  According to Dumas, the Tribe's general council is made up of all qualified voters who are eighteen years old or older.

3

# III. DISCUSSION

## A.   Claims Against Federal Defendants

### 1.   Administrative review

Dumas' allegations against Federal Defendants center on the BIA's failure to recognize her faction as the legitimate tribal government.   Insofar as her complaint is premised on an adverse decision by the BIA, however, Dumas' complaint is not properly before this Court.   Dumas has not exhausted her administrative remedies.

In <u>Runs After v. United States</u>, 766 F.2d 347, 352 (8th Cir. 1985), the Eighth Circuit found that the district court "acted within its discretion in requiring appellants to exhaust administrative remedies."   Indeed, the Eighth Circuit found that the governmental interests in requiring exhaustion of administrative remedies were particularly strong in <u>Runs After</u> because of the BIA's "expertise and extensive experience in dealing with Indian affairs":

> The interest of the BIA and its parent Department of Interior in administrative autonomy also supports requiring exhaustion of administrative remedies. . . . [T]he somewhat anomalous and complex relationship between the quasi-sovereign Indian tribes and the federal government also supports, in general, requiring appellants to initially seek an administrative solution through the BIA and the Department of Interior.

<u>Id</u>; <u>see also</u> <u>Goodface v. Grassrope</u>, 708 F.2d 335, 339 (8th Cir. 1983) (district court erred in reaching merits of election dispute where BIA declined to recognize either of competing tribal factions); <u>Milam v. United States Dep't of Interior</u>, 10 Indian L. Rep. 3013, 3017 (D.D.C. Dec. 23, 1982) (reviewing,

4

under arbitrary and capricious standard, Secretary of the Interior's final decision to recognize "dissidents'" removal of plaintiffs from office).

In _James v. United States Dep't of Health & Human Servs._, 824 F.2d 1132, 1135 (D.C. Cir. 1987), plaintiffs sued the Department of the Interior on the grounds that its failure to recognize their tribe on the "list of federally recognized Indian tribes was arbitrary, capricious, an abuse of discretion, a breach of the United States' trust responsibility to American Indians and contrary to applicable law." The D.C. Circuit affirmed the district court's dismissal of plaintiffs' complaint against the Department of Interior for failure to exhaust administrative remedies. _Id._

The _James_ court noted four reasons why courts require exhaustion of administrative remedies:

> "First, it carries out the congressional purpose in granting authority to the agency by discouraging the frequent and deliberate flouting of administrative processes [that] could . . . encourage[e] people to ignore its procedures. Second, it protects agency autonomy by allowing the agency the opportunity in the first instance to apply its expertise, exercise whatever discretion it may have been granted, and correct its own errors. Third, it aids judicial review by allowing the parties and the agency to develop the facts of the case in the administrative proceeding. Fourth, it promotes judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency."

_Id._ at 1137-38 (quoting _Andrade v. Lauer_, 729 F.2d 1475, 1484 (D.C. Cir. 1984)) (brackets and ellipses in original).

5

None of the four factors can be discounted in this case. First, if this Court assumed jurisdiction over Dumas' suit at the present time, this Court would run the risk of encouraging people unhappy with a BIA decision to skip the administrative appeal process and go straight to federal court. Second, by asserting jurisdiction, this Court would eliminate any chance that the BIA might correct any mistake it might have made and would deprive this Court, and even Dumas, of the benefit of the BIA's expertise. Third, further proceedings certainly would develop the facts of this case. No one, not even Dumas, appears to have settled on a set of operative facts. Fourth, following an administrative appeal, this Court may rely on administrative factfinding, thus conserving judicial resources.

In support of her argument that this Court has jurisdiction over Federal Defendants, Dumas cites cases that actually support Federal Defendants' positions. In at least two of the cases Dumas cites, the plaintiffs exhausted all administrative remedies before the district courts issued their rulings. See, e.g., Goodface, 708 F.2d at 337 (district court had authority to review, pursuant to the APA, the BIA's final decision to refuse to recognize either of two competing tribal councils); Milam, 10 Indian L. Rep. at 3014 (noting that plaintiffs sought review of final agency decision of the Department of Interior).

In Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496, 499 (9th Cir. 1980), the Ninth Circuit noted four exceptions to the rule requiring exhaustion of administrative remedies: 1)

6

1  administrative remedies would be inadequate or not efficacious;

2  2) pursuit of administrative remedies would be futile; 3)

3  irreparable injury will result; or 4) where the administrative

4  proceeding would be void.  Despite Dumas' arguments to the

5  contrary, her case does not fit any of the exceptions.

6      First, Dumas has not shown that administrative remedies

7  would be inadequate.  If Dumas succeeds on administrative

8  appeal, the BIA will recognize her faction as the controlling

9  faction and deal with the Tribe only through her faction.

10 Recognition by the BIA would confer substantial economic power

11 on plaintiff's group, making Tribal Defendants' assertion of

12 control virtually meaningless.

13     Second, Dumas has not shown that relief would be futile.

14 According to Dumas, "That the BIA is biased here, [sic] can be

15 gleaned from its repeatedly stubborn failure to correct its

16 errors when they have been pointed out."  (Pl.'s Opp. at 12.)

17 Dumas, however, has not pointed to any evidence suggesting any

18 institutional bias against her faction.  One BIA official has

19 refused to recognize the validity of one recall election.  Dumas

20 has not attempted to seek further review by the BIA or the

21 Department of Interior.

22     Third, Dumas has not shown that irreparable injury will

23 result if she must pursue administrative appeals.  Rather than

24 point to any specific threat of irreparable injury arising out

25 of the requirement that she take an administrative appeal, Dumas

26 faults Federal Defendants for failing to disprove her vague

27

28

7

1  allegations of irreparable harm. Dumas appears to ask this

2  Court to assume that the Tribal Hall will be destroyed if she

3  has to take an administrative appeal. Dumas, however, has not

4  explained the connection between the BIA's actions and the

5  survival of the Tribal Hall. In any event, counsel for Tribal

6  Defendants informed this Court at oral argument that Tribal

7  Defendants have no plans to tear down the Tribal Hall. Dumas

8  also suggests that she will suffer irreparable harm by virtue of

9  the BIA's actions because the Tribe will be unable to self-

10 govern. Other than her conclusion, Dumas provides no authority

11 or evidence as to why her contention constitutes irreparable

12 harm excusing the exhaustion requirement.

13      Finally, Dumas has not even suggested that further

14 administrative proceedings would be void.

15      Dumas also cites Aleknagik for the proposition that the BIA

16 and the Department of Interior have little interest in hearing

17 appeals from Townsend's decisions. Her argument is without

18 merit. In Aleknagik, the Ninth Circuit found that the

19 plaintiffs' claim involving the meaning of two federal statutes

20 was "particularly within the judiciary's competence." Id. at

21 501. In the case at hand, by contrast, Dumas' complaint centers

22 on the BIA's interpretation of the Jamul Constitution and its

23 review of disputed facts concerning a recall election.

24 Townsend's decision implicates the BIA's expertise in construing

25 Indian constitutions and its familiarity with the disputes

26 between rival factions in the Jamul Tribe.

27

28                              8

1    In addition, Dumas contends that her complaint is based, at

2    least in part, on "unrequested" actions by the BIA. According

3    to Dumas, the BIA and the Department of Interior breached their

4    affirmative trust duties to ensure tribal self-government.

5    Since the BIA's failure to intervene cannot be viewed as a

6    single act or omission, Dumas argues, there was nothing to

7    appeal.

8    Dumas has cited no authority for the proposition that she

9    need not pursue administrative remedies for "unrequested

10   actions."  Indeed, in at least one of the cases she cites in

11   support of her analysis, the plaintiffs brought suit only after

12   exhausting all administrative remedies.  See Milam, 10 Indian L.

13   Rep. at 3014.  This Court is unprepared to find that the BIA's

14   trust duty requires that agency to interfere with tribal self-

15   government.  If Dumas had her way, the BIA could avoid liability

16   only by involving itself in the adoption of enrollment

17   ordinances, the determination of election eligibility, and

18   electoral procedures even if no one asked for the BIA's input.

19   Such liability is inconsistent with the presumption that tribes

20   should determine their own membership and select their own

21   leaders.  Santa Clara Pueblo v. Martinez, 436 U.S. 49, 72 n.36

22   (1978) ("A tribe's right to define its own membership for tribal

23   purposes has long been recognized as central to its existence as

24   an independent political community."); Wheeler v. Swimmer, 835

25   F.2d 259 (10th Cir. 1987) ("The right to conduct an election

26   without federal interference is essential to the exercise of the

27

28                                    9

[tribe's] right to self-government."). In short, Dumas' "unrequested action" theory does not help her avoid the requirement that she exhaust administrative remedies.

Finally, Dumas argues that the BIA has failed to comply with its own procedures in failing to give proper notice about how to take an administrative appeal. On March 22, 1995, however, Townsend explained to Dumas that she could file a written appeal within thirty days. Townsend instructed her that she could "appeal under 25 CFR Part 2" and enclosed a copy of the relevant part of the C.F.R. The section Townsend supplied indicates the official to whom an appeal may be taken and the procedures for an appellant to follow. Although Townsend did not attach the instructions regarding appeal to his original letter, his failure does not bind this Court to hear Dumas' complaint against Federal Defendants at this time. Instead, Townsend's delay in forwarding the information merely tolled the thirty-day limit on bringing an administrative appeal.

Since Dumas already had filed suit when the BIA informed her of her right to file an administrative appeal, this Court finds that the BIA's thirty-day limit for filing an appeal has been equitably tolled pending this Court's decision on the exhaustion of administrative remedies issue. See Miles v. Department of the Army, 881 F.2d 777, 780 (9th Cir. 1989) ("The thirty-day time limit is treated as a statute of limitations for filing suit and is subject to waiver, equitable tolling, and estoppel."); cf. Appalachian Ins. Co. v. McDonnell Douglas

10

1 Corp., 214 Cal. App. 3d 1, 41 (1989) (holding statute of

2 limitations for state court action was equitably tolled where

3 the defendant had removed the earlier state court action to

4 federal court). Dumas must file her administrative appeal, if

5 she seeks to continue her litigation, within thirty days of the

6 filing of this Order.[3]

7     2. Claims under Federal Statutes

8     Any claim for damages against the United States or a

9 federal agency is barred by sovereign immunity unless Congress

10 has consented to suit. Blackmar v. Guerre, 342 U.S. 512, 515

11 (1952); Midwest Growers Co-op. Corp. v. Kirkemo, 533 F.2d 455,

12 465 (9th Cir. 1976); Gilbert v. Da Grossa, 756 F.2d 1455, 1460

13 n.6 (9th Cir. 1985). Congress may authorize suit only by

14 "explicit language." Blackmar, 342 U.S. at 515; Midwest

15 Growers, 533 F.2d at 465.

16     Dumas purports to have alleged claims against Federal

17 Defendants for violations of the following: (1) the Indian

18 Reorganization Act of 1934, 25 U.S.C. §§ 461-79; (2) the

19 National Historical Preservation Act, 16 U.S.C. § 470; (3) the

20 National Environmental Policy Act, 42 U.S.C. § 4321-61; (4) the

21 National Indian Gaming Regulatory Act, 25 U.S.C. § 2701-21; (5)

22

23     [3] At oral argument, counsel for Dumas contended that the
administrative process did not require appeal but permitted appeal

24 and, therefore, she was not required to exhaust her administrative
remedy before pursuing relief in this Court. Even if this is

25 true, this Court exercises its discretion to require Dumas to
first exhaust her administrative remedies. Rodrigues v. Donovan,

26 769 F.2d 1344, 1349 n.4 (9th Cir. 1985) ("The district court may
decide to require exhaustion, or it may decide to exercise its

27 jurisdiction and allow the action to proceed.").

28

    11

the Civil Rights Act, 42 U.S.C. § 1981, 1981, 1985, 1986; (6)

Administrative Procedures Act, 5 U.S.C. § 701-06; (7) the Tucker

Act, 28 U.S.C. §§ 1491, 1505; and (8) the government's trust

relationship with Indians.

Dumas has pointed to no "explicit language" permitting suit

for damages against the United States in any of the first five

Acts listed above. In fact, the Supreme Court and the Ninth

Circuit have held that Congress has not waived sovereign

immunity as to Bivens claims, see Arnsberg v. United States, 757

F.2d 971, 980 (9th Cir. 1985), and 42 U.S.C. §§ 1985(3) and

1986. See United States v. Testan, 424 U.S. 392, 400-01 (1976).

Of all her purported federal claims, only two of the

statutes to which Dumas points contain language permitting suit

against Federal Defendants. First, the Administrative Procedure

Act waives sovereign immunity and provides for judicial review

of agency action where there is law limiting agency discretion.

See 5 U.S.C. § 702. Dumas' failure to exhaust her

administrative remedies, however, precludes her from seeking

relief in this court under the Administrative Procedure Act.

See, e.g., 5 U.S.C. § 704; Eveland v. Director of CIA, 843 F.2d

46, 50 (1st Cir. 1988). Accordingly, this Court declines to

judicially review the decision of the BIA until Dumas exhausts

her administrative remedy.

Dumas also purports to invoke jurisdiction under the Tucker

Act, 28 U.S.C. § 1491, and its counterpart for claims brought by

Indian tribes, 28 U.S.C. § 1505, known as the "Indian Tucker

12

1   Act."  United States v. Mitchell, 463 U.S. 206, 212 (1983).  The

2   Tucker Act is merely a jurisdictional statute and "does not

3   create any substantive right enforceable against the United

4   States."  Mitchell, 463 U.S. at 216.  Since the Tucker Act only

5   provides a key to the courtroom door, a substantive right must

6   be found in some other source of law "founded either upon the

7   Constitution, or any Act of Congress or any regulation of an

8   executive department, or upon any express or implied contract

9   with the United States."  28 U.S.C. § 1491.  Moreover, 28 U.S.C.

10  §§ 1491 & 1505 authorize suits against the United States in the

11  United States Court of Federal Claims.

12      Jurisdiction in the District Court must be premised on 28

13  U.S.C. § 1346(a)(2) or the "Little Tucker Act."

14          The Little Tucker Act authorizes the district court to hear
15          monetary claims against the United States, so long as they
            do not exceed $10,000.  The Act does not, however,
16          authorize the district courts to grant declaratory or
            equitable relief against the United States.  This is true
17          even when such relief is requested in an action brought
            pursuant to section 702 of the Administrative Procedure
18          Act.

19  Price v. U.S. General Services Admin., 894 F.2d 323, 324 (9th

20  Cir. 1990).

21      In this case, Dumas seeks injunctive relief, declaratory

22  relief, general damages, and punitive damages.  Since any

23  jurisdiction in this Court is premised on the Tucker Act, Dumas'

24  claims against Federal Defendants for injunctive or declaratory

25  relief are dismissed for lack of jurisdiction.  Moreover, if

26  Dumas continues to pursue relief in this Court, she must waive

27  any claim for damage on her substantive claims in excess of

28                              13

$10,000.  See United States v. Lockheed L-188 Aircraft, 656 F.2d
390, 393 n.6 (9th Cir. 1979).[4]  Thus, Dumas' claims which seek
damages are dismissed insofar as she seeks money damages in
excess of $10,000.[5]

B.  This Court Lacks Jurisdiction Over Claims Asserted
    Against Tribal Defendants

Indian tribes possess the inherent powers of sovereign
nations to govern both their members and their territory.  As
explained by the Supreme Court:

> Indian tribes are distinct, independent political
> communities, retaining their original natural rights in
> matters of local self-government.  Although no longer
> possessed of the full attributes of sovereignty, they
> remain a separate people, with the power of regulating
> their internal and social relations.  They have power to
> make their own substantive law in internal matters, and to
> enforce that law in their own forums.

Santa Clara Pueblo, 436 U.S. at 55-56 (citations and quotations
omitted).

All of Dumas' claims against Tribal Defendants turn on the
validity of the recall election on September 3, 1994.  According
to Dumas, if the recall elections did not violate the terms of

_____

[4]  If Dumas wishes to preserve her right to damages in
excess of $10,000, she must bring this action in the United States
Court of Federal Claims under 28 U.S.C. § 1491.

[5]  It is true that "[n]ot every claim invoking the
Constitution, a federal statute, or a regulation is cognizable
under the Tucker Act."  Mitchell, 463 U.S. at 217.  Thus, the
Court's ruling is made without prejudice to Federal Defendants to
file further briefing as to why Dumas' claims do not give rise to
jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346(a)(2),
or as to whether Dumas' failure to exhaust administrative remedies
should preclude her assertion of jurisdiction under the Tucker
Act.

14

the Tribe's constitution, Tribal Defendants improperly have exercised powers they do not possess and have no right to remain in office. The dispute centers on the application of one sentence in the recall provision in the Tribe's constitution: "Upon receipt of a petition signed by at least thirty percent (30%) of the qualified voters requesting the recall of any member of the executive committee, the executive committee shall call a special general council within ten (10) days of receipt of the petition."

Dumas' counsel purported at oral argument that this case is not a dispute over an election or about membership. He conceded, however, that adjudicating Dumas' complaint would require this Court to decide who is an Indian as defined by the Tribe's constitution and who is a member of the Tribe. This Court will not usurp the Tribe's authority to determine who is an Indian and who is a member of the Tribe.[6] One of a tribe's most fundamental powers is the power to determine its own membership and is "central to its existence as an independent political community." Santa Clara Pueblo, 436 U.S. at 72 n.32; see also United States v. Wheeler, 435 U.S. 313, 322 n.18 (1978); Wheeler v. Swimmer, 835 F.2d 259, 262 (10th Cir. 1987) ("The right to conduct an election without federal interference

---

[6]    Dumas purports to bring this action on behalf of herself and all other similarly situated members of the Jamul Indian Village. At oral argument Dumas' counsel indicated that this case is not a class action. However Dumas purports to bring this action, it still involves an intra-tribal dispute revolving around the recall election and membership under the Tribe's Constitution.

15

is essential to the exercise of the [tribe's] right to self-government."); Runs After, 766 F.2d at 352 ("We believe the district court correctly held that resolution of such disputes involving questions of interpretation of the tribal constitution and tribal law is not within the jurisdiction of the district court.").

Since the Tribe is comprised of a relatively small number of members,[7] a determination as to who is an Indian is particularly important in this case. The outcome of a Tribal election could turn on whether one or two persons is considered a "qualified voter" as a member of the Tribe. A ruling on who is in an Indian and member of the Tribe would therefore have a tremendous impact on the outcome of the Tribe's elections. For the reasons that this Court refuses to determine who is an Indian under the Tribe's constitution, it will not assume the validity of the recall election which is the center piece of Dumas' complaint. Accordingly, this Court declines to hear Dumas' complaint and intrude into the internal affairs of a sovereign nation.[8]

---

[7]   Although the precise number is in dispute, the parties have indicated that the Tribe is made up of less than thirty-five members.

[8]   Although this Court asserted jurisdiction to grant the preliminary injunction, after further consideration of the merits it now declines to exercise jurisdiction. Moreover, the fact that the Tribe lacks its own tribal court is not determinative of whether the Court has jurisdiction over Dumas' complaint. Indeed, a fair reading of the lower court's decision in Santa Clara Pueblo indicates that there was no tribal court available to the plaintiff there. See Martinez, v. Santa Clara Pueblo, 402 F. Supp. 5, 11 (D.N.M. 1975). The Court declines to interfere with

16

IV.  CONCLUSION

For the reasons given above, Federal Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART as follows:

(1)  claims for declaratory or injunctive relief against Federal Defendants are dismissed;

(2)  claims for money damages against Federal Defendants are dismissed insofar as Dumas seeks damages in excess of $10,000.

For the reasons given above, Tribal Defendants' motion to dismiss is GRANTED.[9]

IT IS SO ORDERED:

Date: 6/21/95

John S. Rhoades, Sr.
United States District Judge

Copies to:

All Parties

_____

the internal affairs of a sovereign nation merely because that nation does not possess a judicial forum.

[9]  The Court wishes to make clear that this ruling also applies to the professional negligence claim against Tribal Defendant Madrigal.  The Court declines to exercise supplemental jurisdiction over the claims against Madrigal on the grounds that (1) the professional negligence claim substantially predominates over the claims retained by this court, and (2) this Court concludes that the dismissal of all claims against Tribal Defendants is a compelling reason to decline jurisdiction over the claims against Madrigal.  See 28 U.S.C. 1367(c)(2) & (4).

17

Exhibit E

1   Patrick D. Webb, Esq., State Bar No. 82857
   **WEBB & CAREY**
2   401 B Street, Suite 306
   San Diego, Calif. 92101
3   (619) 236-1200

4   Attorneys for JAMUL INDIAN VILLAGE,
   INDIVIDUAL PLAINTIFFS

   CALENDAR:
5   DOCKETS
6   SECY.
   ATTY.
7

          **UNITED STATES DISTRICT COURT**

8     **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

9   WALTER    ROSALES,    SARAH )  Case No. 97 CV 769 R (LSP)
   ALDAMAS, VAL MESA, ADOLPH )
10  THING, JOE COMACHO, BERNICE )
   MESA, VIVIAN FLORES, MARIE )  **NOTICE OF VOLUNTARY**
11  TOGGERY and the JAMUL INDIAN )  **DISMISSAL WITHOUT**
   VILLAGE,                 )  **PREJUDICE**
12                       )
          Plaintiffs,     )
13                       )
14  vs.                   )
                      )
15  VIRGIL   TOWNSEND, Superintendent )
   Southern California Agency of the B.I.A., )
16  UNITED    STATES    OF    AMERICA, )
   DEPARTMENT OF INTERIOR, BUREAU )
17  OF INDIAN AFFAIRS, and DOES 1-20, )
                     )
18          Defendants.    )
   _____ )

19

20       NOTICE IS HEREBY GIVEN that since: (1) no answer has been filed in this action, (2) the

21  Interior Board of Indian Appeals has yet to rule upon the plaintiffs' third and fourth appeals in

22  Docket Nos. 98-9-A, and one as yet un-assigned number, (3) no ruling has been made upon the

23  defendants' motions to dismiss in this action, and (4) the fact that the plaintiffs have filed a

24  companion action in the United States Court of Federal Claims, in Washington D.C., which includes

25  the claims raised herein, pursuant to F.R.C.P. Rule 41(a) and the decision in Moore v. Davis

26  //

27  //

28  //

                        **EXHIBIT E**

1   (M.D.N.C. 1976) 72 F.R.D. 96, the plaintiffs hereby dismiss the above-captioned action without

2   prejudice.

3   Dated: November 12, 1998          **WEBB & CAREY**

4

5                                      _____

6                                      Patrick D. Webb, Attorneys for
                                       Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

1

2     I, the undersigned, declare:

3     I am a citizen of the United States, a resident of the County of San Diego, State of

4     California, over the age of eighteen years, and not a party to the within action; that my business

5     address is 401 B Street, Suite 306, San Diego, California 92101.

6     On the date entered below, I served the within:

7     **NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE**

8     upon the parties interested in said action by delivering a true copy thereof, to the attorney

9     addressed as follows:

10    Paul E. Beckhart, Esq.
11    Asst. U.S. Attorney
      880 Front Street, Room 6293
12    San Diego, Calif. 92101-8893
      fax 557-5004
13

14    I declare under penalty of perjury under the laws of the State of California that the
15
      foregoing is true and correct. Executed on November 13, 1998, at San Diego, California.
16

17

18

19                                          Patrick D. Webb

20

21

22

23

24

25

26

27

28

Exhibit F

FILED

99 JAN 28 PM 12:06

CALENDAR
DOCKETS
SECY.
ATTY.

BY: L. Mitchell

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Walter Rosales, et al.          )     CIVIL NO. 97-0769-R
                                )
            Plaintiffs,         )     ORDER DECLINING TO IMPOSE
                                )     SANCTIONS PURSUANT TO RULE 11
      v.                        )
                                )
Virgil Townsend, et al.         )
                                )
            Defendants.         )
_____)

I. Overview.

     On November 25, 1998, this Court issued an order to the
parties to show cause why it should, or should not, impose
sanctions against attorney Patrick D. Webb for his actions in
litigating the current action.  On January 11, 1999, the Court
held a hearing on its motion.  For the reasons stated below, the
Court declines to levy Rule 11 sanctions against attorney Webb.

II. Background.

     This matter was before the Court on federal Defendants'
motion to set aside the entry of default and to dismiss the
complaint or, in the alternative, for summary judgment.  In

**Exhibit F**        65

 1 │ addition, Plaintiffs filed a motion to lift the stay on discovery.
 2 │ The Court scheduled oral argument for these motions for November
 3 │ 16, 1998.  On November 13, 1998, Plaintiffs submitted a notice of
 4 │ voluntary dismissal without prejudice, which this Court granted on
 5 │ November 19, 1998.
 6 │      This is a case with which the Court is very familiar.  On
 7 │ January 31, 1995, Plaintiffs' attorney Patrick Webb filed a
 8 │ complaint with this Court on behalf of a related, but different,
 9 │ group of plaintiffs.  While the plaintiffs differed in name from
10 │ those in the present action, their claims were very similar to
11 │ those alleged in the present case, contending that certain members
12 │ of the Jamul tribe had been recalled from office but had
13 │ wrongfully failed to surrender possession, and that federal
14 │ officials had violated statutory and common law duties by
15 │ continuing to deal with this ousted faction.  In managing this
16 │ previous case, the Court issued two comprehensive orders, the
17 │ first on June 22, 1995, and the second on September 9, 1996.
18 │ However, rather than amend their claims in light of the Court's
19 │ decisions or appeal the Court's decisions, the prior plaintiffs
20 │ voluntarily dismissed their claims without prejudice on September
21 │ 30, 1996.
22 │      On the same day, attorney Webb filed the present cause of
23 │ action in the Central District of California.  As stated, the
24 │ present complaint is very similar to the one originally filed in
25 │ this district in January 1995.  The Central District later
26 │ transferred the case back to the Southern District on April 21,
27 │ 1997.  Thus, by dismissing the original action filed in the
28 │                              -2-

1  Southern District and filing a nearly identical action in the
2  Central District, attorney Webb presented this Court with a case
3  very similar to the one with which it had already rendered
4  comprehensive decisions.

5      Because of the similarity between the complaints, Defendants
6  filed motions to dismiss, premised on the same legal theories
7  relied upon in the first action.  After the Court devoted
8  substantial time and effort in preparing for the hearing on these
9  motions, Plaintiffs again sought to voluntarily dismiss their case
10 without prejudice, this time doing so on the Friday before the
11 Court's scheduled Monday hearing.

12     As stated, on November 25, 1998, this Court issued an order
13 to the parties to show cause why it should, or should not, impose
14 sanctions against attorney Webb for his actions in litigating the
15 current action.  On January 11, 1999, the Court held a hearing on
16 its motion.[1]

17

18 **III. Discussion.**

19     At this time, the Court declines to levy Rule 11 sanctions
20 against attorney Webb.  Rule 11 allows a district court to levy
21 monetary sanctions against a litigant who has used the legal
22 processes for an "improper purpose, such as to harass or to cause
23 unnecessary delay."  Fed. R. Civ. P. 11(b)(1); see Warren v.

24

25     [1] Appearing at the hearing were attorney Patrick Webb,
   representing the current Plaintiffs; Assistant U.S. Attorney Paul
26 Beckhart, representing the federal Defendants; and attorney Eugene
   Madrigal, who represented the Jamul Indian Village and Raymond
27 Hunter in the prior lawsuit.

28                                  -3-

1  Guelker, 29 F.3d 1386, 1388 (9th Cir. 1994).  While sanctions are

2  normally awarded on the motion of a party, Rule 11 permits a

3  district court to impose sanctions "on its own initiative."  Fed.

4  R. Civ. P. 11(c)(1)(B); see also In re Itel Sec. Litig., 791 F.2d

5  672, 679 (9th Cir. 1986).

6       However, a district court may not impose monetary sanctions

7  on its own motion if the attorney against whom sanctions are being

8  sought voluntarily dismissed his client's action before the Court

9  issues its order to show cause.  See Fed. R. Civ. P. 11(c)(2)(B)[2];

10 William W. Schwarzer, et al., Federal Civil Procedure Before Trial

11 17-21 (1998) (citing Committee Notes of Amendments to Federal

12 Rules of Civil Procedure, 146 F.R.D. 401, 502 (1993)).  The

13 justification underlying this rule is that the "[p]arties settling

14 a case should not be subsequently faced with an unexpected order

15 from the court leading to monetary sanctions that might have

16 affected their willingness to settle or voluntarily dismiss a

17 case." See Committee Notes, 146 F.R.D. at 502.

18      In the present case, attorney Webb requested that the

19 complaint be voluntarily dismissed without prejudice, which this

20 Court granted on November 19, 1998.  Thereafter, on November 25,

21 1998, this Court issued its order to show cause why it should, or

22 _____

23      [2] This Rule provides in relevant part:

24      Monetary sanctions may not be awarded on the court's
        initiative unless the court issues its order to show
25      cause before a voluntary dismissal or settlement of the
        claims made by or against the party which is, or whose
26      attorneys are, to be sanctioned.

27 Fed. R. Civ. P. 16(c)(2)(B).

28                              -4-

1  should not, levy Rule 11 sanctions against attorney Webb.  Because

2  the Court issued its order to show cause after Plaintiffs

3  voluntarily dismissed their action, this Court cannot impose Rule

4  11 sanctions against attorney Webb on its own motion.[3]

5       Although it may not impose Rule 11 sanctions, however, this

6  Court notes that it enjoys significant, inherent powers to

7  sanction attorneys for misconduct.  Such inherent powers are

8  "governed not by rule or statute but by the control necessarily

9  vested in courts to manage their own affairs so as to achieve the

10  orderly and expeditious disposition of cases."  Chambers v. NASCO,

11  Inc., 501 U.S. 32, 43 (1991).  A court's inherent powers, however,

12  are not limitless; acting pursuant to this inherent authority, a

13  district court may only assess attorney's fees against a party who

14  has "acted in bad faith, vexatiously, wantonly, or for oppressive

15  _____

16       [3] At the hearing, the Court suggested that attorneys Beckhart
     and Madrigal could file their own motions for Rule 11 sanctions.
17  Neither party formally requested Rule 11 sanctions at that
     hearing.
18
          The Court does note, however, that on January 30, 1998,
19  Attorney Madrigal filed a motion for Rule 11 sanctions with
     Magistrate Judge Papas, on which Judge Papas deferred ruling.  In
20  responding to the Court's present order to show cause, attorney
     Madrigal asked to "renew their request for FRCP 11 sanctions."
21  (See Madrigal Request for Sanctions at 4.)

22       At this time, however, the Court declines to award Rule 11
     sanctions on attorney Madrigal's motion either.  At the hearing,
23  attorney Madrigal suggested that he would seek $1000 for time
     spent responding to discovery in the present case.  However, the
24  Court concludes that while attorney Webb's actions were
     questionable in litigating the present case, they were not so
25  egregious so as to justify the imposition of sanctions.
     Furthermore, the Court suggests that, rather than fighting over
26  this $1000 in fees, the parties' time and energy would be better
     spent preparing for the impending proceedings before the U.S.
27  Court of Federal Claims and the Interior Board of Indian Appeals.

28                                -5-

1  reasons." Id. at 45-46 (citations omitted); see also Ford v.

2  Temple Hosp., 790 F.2d 342, 347 (3d Cir. 1986).

3        Given these narrow confines, the Court declines to levy

4  sanctions under its inherent powers as well.  While attorney

5  Webb's actions suggest that he was engaging in a kind of "forum

6  shopping," the Court concludes that his actions were not so

7  egregious so as to permit this Court to assess attorney's fees

8  under its inherent powers.

9        Therefore, at this time, the Court declines to levy sanctions

10 against attorney Webb for his action in litigating the present

11 action.[4]  The Court notes, however, that should this case come

12 again before this Court due to attorney Webb's procedural tactics

13 and maneuvering that this Court will not be reluctant to impose

14 appropriate sanctions at that time, including monetary fines and

15 possible dismissal of the action.

16

17

18

19

20        [4] In responding to the Court's order to show cause, the
21 Government suggested that the Court might sanction attorney Webb
   under 28 U.S.C. § 1927, which permits a Court to sanction any
22 attorney who "multiplies the proceedings in any case unreasonably
   and vexatiously."  28 U.S.C. § 1927.  However, section 1927
23 permits such sanctions only where the attorney has demonstrated
   subjective bad faith, meaning that he has "knowingly or recklessly
24 raise[d] a frivolous argument or argue[d] a meritorious claim for
   the purpose of harassing an opponent."  New Alaska Dev. Corp. v.
25 Guetschow, 869 F.2d 1298, 1306 (9th Cir. 1989) (quotation
   omitted).  As discussed, the Court concludes that attorney Webb's
26 conduct was not so egregious so as to support a finding of bad
   faith.  Thus, the Court declines to levy sanctions under section
27 1927.

28                              -6-

1  IV.  **Conclusion.**

2       For the reasons stated, the Court declines to levy sanctions

3  against attorney Webb pursuant to Rule 11.

4

5  IT IS SO ORDERED:

6

7

8

9

10  Date: 1/27/99

11                                    John S. Rhoades, Sr.

12                                    United States District Judge

13

14

15

16  Copies to:

17

18  All Parties

19  Magistrate Judge

20

21

22

23

24

25

26

27

28                        -7-

# Exhibit G

# In the United States Court of Federal Claims

### No. 98-860L

### (Filed April 19, 2000)

```
************************************
WALTER ROSALES et al.,              *
                                    *
            Plaintiff,              *
                                    *
    v.                              *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
************************************
```

00 APR 20 PM 1:50

## Order

On March 15, 2000, the court ordered supplemental briefing. On March 29, 2000, defendant moved to stay consideration of this case pending the outcome of a related case before the Interior Board of Indian Appeals (IBIA). **Rosales v. Pacific Reg'l Dir., Bureau of Indian Affairs**, (I.B.I.A. pre-docketing notice and order Dec. 7, 1999). On April 14, 2000, plaintiff indicated that it did not oppose defendant's request. Therefore, this case is stayed pending disposition of the IBIA case. The parties shall file a joint status report within 30 days after the conclusion of the IBIA case indicating its effect, if any, on this case and proposing a schedule for further proceedings.

DIANE GILBERT WEINSTEIN
Judge, U.S. Court of Federal Claims

**EXHIBIT B**

Exhibit H

# STATUTORY AND REGULATORY ADDENDUM

# Native American Graves Protection and Repatriation Act
## AS AMENDED

This Act became law on November 16, 1990 (Public Law 101-601; 25 U.S.C. 3001 et seq.) and has been amended twice. This description of the Act, as amended, tracks the language of the United States Code except that (following common usage) we refer to the "Act" (meaning the Act, as amended) rather than to the "subchapter" or the "title" of the Code.

25 U.S.C. 3001,
Definitions

## Section 2

For purposes of this Act, the term—

(1) **"burial site"** means any natural or prepared physical location, whether originally below, on, or above the surface of the earth, into which as a part of the death rite or ceremony of a culture, individual human remains are deposited.

(2) **"cultural affiliation"** means that there is a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe or Native Hawaiian organization and an identifiable earlier group.

(3) **"cultural items"** means human remains and—

(A) **"associated funerary objects"** which shall mean objects that, as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later, and both the human remains and associated funerary objects are presently in the possession or control of a Federal agency or museum, except that other items exclusively made for burial purposes or to contain human remains shall be considered as associated funerary objects.

(B) **"unassociated funerary objects"** which shall mean objects that, as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later, where the remains are not in the possession or control of the Federal agency or museum and the objects can be identified by a preponderance of the evidence as related to specific individuals or families or to known human remains or, by a preponderance of the evidence, as having been removed from a specific burial site of an individual culturally affiliated with a particular Indian tribe,

# Native American Graves Protection and Repatriation Act

(C) "**sacred objects**" which shall mean specific ceremonial objects which are needed by traditional Native American religious leaders for the practice of traditional Native American religions by their present day adherents, and

(D) "**cultural patrimony**" which shall mean an object having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual regardless of whether or not the individual is a member of the Indian tribe or Native Hawaiian organization and such object shall have been considered inalienable by such Native American group at the time the object was separated from such group.

(4) "**Federal agency**" means any department, agency, or instrumentality of the United States. Such term does not include the Smithsonian Institution.

(5) "**Federal lands**" means any land other than tribal lands which are controlled or owned by the United States, including lands selected by but not yet conveyed to Alaska Native Corporations and groups organized pursuant to the Alaska Native Claims Settlement Act of 1971 [43 U.S.C. 1601 et seq.].

(6) "**Hui Malama I Na Kupuna O Hawai'i Nei**" means the nonprofit, Native Hawaiian organization incorporated under the laws of the State of Hawaii by that name on April 17, 1989, for the purpose of providing guidance and expertise in decisions dealing with Native Hawaiian cultural issues, particularly burial issues.

(7) "**Indian tribe**" means any tribe, band, nation, or other organized group or community of Indians, including any Alaska Native village (as defined in, or established pursuant to, the Alaska Native Claims Settlement Act) [43 U.S.C. 1601 et seq.], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

# Native American Graves Protection and Repatriation Act

(8) "**museum**" means any institution or State or local government agency (including any institution of higher learning) that receives Federal funds and has possession of, or control over, Native American cultural items. Such term does not include the Smithsonian Institution or any other Federal agency.

(9) "**Native American**" means of, or relating to, a tribe, people, or culture that is indigenous to the United States.

(10) "**Native Hawaiian**" means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii.

(11) "**Native Hawaiian organization**" means any organization which—

(A) serves and represents the interests of Native Hawaiians,

(B) has as a primary and stated purpose the provision of services to Native Hawaiians, and

(C) has expertise in Native Hawaiian Affairs, and

shall include the Office of Hawaiian Affairs and Hui Malama I Na Kupuna O Hawai'i Nei.

(12) "**Office of Hawaiian Affairs**" means the Office of Hawaiian Affairs established by the constitution of the State of Hawaii.

(13) "**right of possession**" means possession obtained with the voluntary consent of an individual or group that had authority of alienation. The original acquisition of a Native American unassociated funerary object, sacred object or object of cultural patrimony from an Indian tribe or Native Hawaiian organization with the voluntary consent of an individual or group with authority to alienate such object is deemed to give right of possession of that object, unless the phrase so defined would, as applied in section 7(c) of this Act [25 U.S.C. 3005(c)], result in a Fifth Amendment taking by the United States as determined by the United States Court of Federal Claims pursuant to

# Native American Graves Protection and Repatriation Act

28 U.S.C. 1491 in which event the "right of possession" shall be as provided under otherwise applicable property law. The original acquisition of Native American human remains and associated funerary objects which were excavated, exhumed, or otherwise obtained with full knowledge and consent of the next of kin or the official governing body of the appropriate culturally affiliated Indian tribe or Native Hawaiian organization is deemed to give right of possession to those remains.

(14) **"Secretary"** means the Secretary of the Interior.

(15) **"tribal land"** means—

(A) all lands within the exterior boundaries of any Indian reservation;

(B) all dependent Indian communities;

(C) any lands administered for the benefit of Native Hawaiians pursuant to the Hawaiian Homes Commission Act, 1920 [42 Stat. 108], and section 4 of Public Law 86-3 [note preceding 48 U.S.C. 491].

25 U.S.C. 3002, Ownership

25 U.S.C. 3002(a), Native American human remains and objects

## Section 3

(a) The ownership or control of Native American cultural items which are excavated or discovered on Federal or tribal lands after November 16, 1990, shall be (with priority given in the order listed)—

(1) in the case of Native American human remains and associated funerary objects, in the lineal descendants of the Native American; or

(2) in any case in which such lineal descendants cannot be ascertained, and in the case of unassociated funerary objects, sacred objects, and objects of cultural patrimony—

(A) in the Indian tribe or Native Hawaiian organization on whose tribal land such objects or remains were discovered;

(B) in the Indian tribe or Native Hawaiian organization which has the closest cultural affiliation with such remains or objects and which, upon notice, states a claim for such remains or objects; or

# Native American Graves Protection and Repatriation Act

(C) if the cultural affiliation of the objects cannot be reasonably ascertained and if the objects were discovered on Federal land that is recognized by a final judgment of the Indian Claims Commission or the United States Court of Claims as the aboriginal land of some Indian tribe—

(1) [sic] in the Indian tribe that is recognized as aboriginally occupying the area in which the objects were discovered, if upon notice, such tribe states a claim for such remains or objects, or

(2) [sic] if it can be shown by a preponderance of the evidence that a different tribe has a stronger cultural relationship with the remains or objects than the tribe or organization specified in paragraph (1), in the Indian tribe that has the strongest demonstrated relationship, if upon notice, such tribe states a claim for such remains or objects.

**25 U.S.C. 3002(b), Unclaimed Native American remains and objects**

(b) Native American cultural items not claimed under subsection (a) of this section shall be disposed of in accordance with regulations promulgated by the Secretary in consultation with the review committee established under section 8 of this Act [25 U.S.C. 3006], Native American groups, representatives of museums and the scientific community.

**25 U.S.C. 3002(c), Intentional excavation and removal of Native American human remains and objects**

(c) The intentional removal from or excavation of Native American cultural items from Federal or tribal lands for purposes of discovery, study, or removal of such items is permitted only if—

(1) such items are excavated or removed pursuant to a permit issued under section 4 of the Archaeological Resources Protection Act of 1979, as amended, [16 U.S.C. 470cc] which shall be consistent with this Act;

(2) such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate (if any) Indian tribe or Native Hawaiian organization;

(3) the ownership and right of control of the disposition of such items shall be as provided in subsections (a) and (b) of this section; and

(4) proof of consultation or consent under paragraph (2) is shown.

# Native American Graves Protection and Repatriation Act

25 U.S.C. 3002(d),
Inadvertent discovery
of Native American
remains and objects

(d)(1) Any person who knows, or has reason to know, that such person has discovered Native American cultural items on Federal or tribal lands after November 16, 1990, shall notify, in writing, the Secretary of the Department, or head of any other agency or instrumentality of the United States, having primary management authority with respect to Federal lands and the appropriate Indian tribe or Native Hawaiian organization with respect to tribal lands, if known or readily ascertainable, and, in the case of lands that have been selected by an Alaska Native Corporation or group organized pursuant to the Alaska Native Claims Settlement Act of 1971 [43 U.S.C. 1601 et seq.], the appropriate corporation or group. If the discovery occurred in connection with an activity, including (but not limited to) construction, mining, logging, and agriculture, the person shall cease the activity in the area of the discovery, make a reasonable effort to protect the items discovered before resuming such activity, and provide notice under this subsection. Following the notification under this subsection, and upon certification by the Secretary of the department or the head of any agency or instrumentality of the United States or the appropriate Indian tribe or Native Hawaiian organization that notification has been received, the activity may resume after 30 days of such certification.

(2) The disposition of and control over any cultural items excavated or removed under this subsection shall be determined as provided for in this section.

(3) If the Secretary of the Interior consents, the responsibilities (in whole or in part) under paragraphs (1) and (2) of the Secretary of any department (other than the Department of the Interior) or the head of any other agency or instrumentality may be delegated to the Secretary with respect to any land managed by such other Secretary or agency head.

25 U.S.C. 3002(e),
Relinquishment

(e) Nothing in this section shall prevent the governing body of an Indian tribe or Native Hawaiian organization from expressly relinquishing control over any Native American human remains, or title to or control over any funerary object, or sacred object.



# 43

**Parts 1 to 999**
Revised as of October 1, 2005

## Public Lands:
## Interior

Code of Federal Regulations

ommendation to the
ugh a single point of

a state simplify, con-
ubstitute federally re-
lans?

his section:

ans that a state may
ormat, choose its own
and select the plan-
state plan.

means that a state
ory and regulatory re-
ombining two or more
ocument and that the
he format, submission
ng period for the con-

eans that a state may
her document that it
r its own purposes to
uirements.

onsistent with law, a
e to try to simplify,
ubstitute Federally re-
ns without prior ap-
retary.

ry reviews each state
e has simplified, con-
ostituted and accepts
ts contents meet Fed-
s.

Secretary waive any
hese regulations?

ty, the Secretary may
sion of these regula-

ATIVE   AMERICAN
OTECTION AND RE-
REGULATIONS

—Introduction

pplicability.

Remains, Funerary Ob-
Objects, or Objects of
nony From Federal or

chaeological excavations.
scoveries.

f unclaimed human re-
y objects, sacred objects,

---

or objects of cultural patrimony. [Re-
served]

**Subpart C—Human Remains, Funerary Objects, Sacred Objects, or Objects of Cultural Patrimony in Museums and Federal Collections**

10.8   Summaries.
10.9   Inventories.
10.10  Repatriation.
10.11  Disposition of culturally unidentifiable human remains. [Reserved]
10.12  Civil penalties.
10.13  Future applicability. [Reserved]

**Subpart D—General**

10.14  Lineal descent and cultural affiliation.
10.15  Limitations and remedies.
10.16  Review committee.
10.17  Dispute resolution.

APPENDIX A TO PART 10—SAMPLE SUMMARY.
APPENDIX B TO PART 10—SAMPLE NOTICE OF INVENTORY COMPLETION.

AUTHORITY: 25 U.S.C. 3001 et seq.

SOURCE: 60 FR 62158, Dec. 4, 1995, unless otherwise noted.

**Subpart A—Introduction**

**§ 10.1  Purpose and applicability.**

(a) *Purpose.* These regulations carry out provisions of the Native American Graves Protection and Repatriation Act of 1990 (Pub.L. 101–601; 25 U.S.C. 3001–3013;104 Stat. 3048–3058). These regulations develop a systematic process for determining the rights of lineal descendants and Indian tribes and Native Hawaiian organizations to certain Native American human remains, funerary objects, sacred objects, or objects of cultural patrimony with which they are affiliated.

(b) *Applicability.* (1) These regulations pertain to the identification and appropriate disposition of human remains, funerary objects, sacred objects, or objects of cultural patrimony that are:

(i) In Federal possession or control; or

(ii) In the possession or control of any institution or State or local government receiving Federal funds; or

(iii) Excavated intentionally or discovered inadvertently on Federal or tribal lands.

(2) These regulations apply to human remains, funerary objects, sacred objects, or objects of cultural patrimony

---

which are indigenous to Alaska, Hawaii, and the continental United States, but not to territories of the United States.

(3) Throughout these regulations are decision points which determine their applicability in particular circumstances, e.g., a decision as to whether a museum "controls" human remains and cultural objects within the meaning of the regulations, or, a decision as to whether an object is a "human remain," "funerary object," "sacred object," or "object of cultural patrimony" within the meaning of the regulations. Any final determination making the Act or these regulations inapplicable is subject to review pursuant to section 15 of the Act.

[60 FR 62158, Dec. 4, 1995, as amended at 62 FR 41293, Aug. 1, 1997]

**§ 10.2  Definitions.**

In addition to the term *Act*, which means the Native American Graves Protection and Repatriation Act as described above, definitions used in these regulations are grouped in seven classes: Parties required to comply with these regulations; Parties with standing to make claims under these regulations; Parties responsible for implementing these regulations; Objects covered by these regulations; Cultural affiliation; Types of land covered by these regulations; and Procedures required by these regulations.

(a) *Who must comply with these regulations?* (1) *Federal agency* means any department, agency, or instrumentality of the United States. Such term does not include the Smithsonian Institution as specified in section 2 (4) of the Act.

(2) *Federal agency official* means any individual authorized by delegation of authority within a Federal agency to perform the duties relating to these regulations.

(3) *Museum* means any institution or State or local government agency (including any institution of higher learning) that has possession of, or control over, human remains, funerary objects, sacred objects, or objects of cultural patrimony and receives Federal funds.

(i) The term "*possession*" means having physical custody of human remains, funerary objects, sacred objects,

221

or objects of cultural patrimony with a sufficient legal interest to lawfully treat the objects as part of its collection for purposes of these regulations. Generally, a museum or Federal agency would not be considered to have possession of human remains, funerary objects, sacred objects, or objects of cultural patrimony on loan from another individual, museum, or Federal agency.

(ii) The term "*control*" means having a legal interest in human remains, funerary objects, sacred objects, or objects of cultural patrimony sufficient to lawfully permit the museum or Federal agency to treat the objects as part of its collection for purposes of these regulations whether or not the human remains, funerary objects, sacred objects or objects of cultural patrimony are in the physical custody of the museum or Federal agency. Generally, a museum or Federal agency that has loaned human remains, funerary objects, sacred objects, or objects of cultural patrimony to another individual, museum, or Federal agency is considered to retain control of those human remains, funerary objects, sacred objects, or objects of cultural patrimony for purposes of these regulations.

(iii) The phrase "*receives Federal funds*" means the receipt of funds by a museum after November 16, 1990, from a Federal agency through any grant, loan, contract (other than a procurement contract), or other arrangement by which a Federal agency makes or made available to a museum aid in the form of funds. Federal funds provided for any purpose that are received by a larger entity of which the museum is a part are considered Federal funds for the purposes of these regulations. For example, if a museum is a part of a State or local government or a private university and the State or local government or private university receives Federal funds for any purpose, the museum is considered to receive Federal funds for the purpose of these regulations.

(4) *Museum official* means the individual within a museum designated as being responsible for matters relating to these regulations.

(5) *Person* means an individual, partnership, corporation, trust, institution, association, or any other private enti-

ty, or, any official, employee, agent, department, or instrumentality of the United States, or of any Indian tribe or Native Hawaiian organization, or of any State or political subdivision thereof that discovers or discovered human remains, funerary objects, sacred objects or objects of cultural patrimony on Federal or tribal lands after November 16, 1990.

(b) *Who has standing to make a claim under these regulations?* (1) *Lineal descendant* means an individual tracing his or her ancestry directly and without interruption by means of the traditional kinship system of the appropriate Indian tribe or Native Hawaiian organization or by the common law system of descendance to a known Native American individual whose remains, funerary objects, or sacred objects are being claimed under these regulations.

(2) *Indian tribe* means any tribe, band, nation, or other organized Indian group or community of Indians, including any Alaska Native village or corporation as defined in or established by the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians. The Secretary will make available a list of Indian tribes and Indian tribal officials for the purposes of carrying out this statute through the Manager, National NAGPRA Program.

(3)(i) *Native Hawaiian organization* means any organization that:

(A) Serves and represents the interests of Native Hawaiians;

(B) Has as a primary and stated purpose the provision of services to Native Hawaiians; and

(C) Has expertise in Native Hawaiian affairs.

(ii) The term *Native Hawaiian* means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii. Such organizations must include the Office of Hawaiian Affairs and *Hui Mālama I Nā Kūpuna 'O Hawai'i Nei*.

(4) *Indian tribe official* r cipal leader of an India tive Hawaiian organizati vidual officially designat erning body of an India tive Hawaiian organizati wise provided by tribal c established procedure a for matters relating to tions.

(c) *Who is responsible f these regulations?* (1) Se the Secretary of the Inte

(2) *Review Committee* m sory committee establi to section 8 of the Act.

(3) *Manager, National gram* means the official ment of the Interior des: Secretary as responsible tration of matters relatii Communications to the tional NAGPRA Progra addressed to: Manag NAGPRA Program, N Service (MS 2253 MIB), NW., Washington, DC 202

. (d) *What objects are co regulations?* The Act cov of Native American obje *Native American* means to, a tribe, people, or c nous to the United Sta Alaska and Hawaii.

(1) *Human remains* mear remains of the body of a tive American ancestry. not include remains or j mains that may reasona mined to have been freely urally shed by the ind whose body they were obt hair made into ropes or purposes of determining ation, human remains into a funerary object, sa object of cultural patri fined below, must be cons of that item.

(2) *Funerary objects* mea as part of the death rite c a culture, are reasonabl have been placed intenti time of death or later wi dividual human remains. jects must be identified b ance of the evidence as h moved from a specific bu individual affiliated with

r official, employee, agent, ;, or instrumentality of the tes, or of any Indian tribe or waiian organization, or of or or political subdivision at discovers or discovered nains, funerary objects, sa- s or objects of cultural pat- Federal or tribal lands after .6, 1990.

*ias standing to make a claim : regulations?* (1) *Lineal de- .eans* an individual tracing ancestry directly and with- ption by means of the tradi- ship system of the appro- an tribe or Native Hawaiian n or by the common law lescendance to a known Na- ican individual whose re- :rary objects, or sacred ob- being claimed under these

tribe means any tribe, band, ther organized Indian group nity of Indians, including . Native village or corpora- ned in or established by the ive Claims Settlement Act 601 et seq.), which is recog- ligible for the special pro- services provided by the .tes to Indians because of s as Indians. The Secretary available a list of Indian ndian tribal officials for the f carrying out this statute the Manager, National rogram.

*tive Hawaiian organization* organization that:

:s and represents the inter- ve Hawaiians;

:s a primary and stated pur- ovision of services to Native and

xpertise in Native Hawaiian

*erm Native Hawaiian* means .ual who is a descendant of inal people who, prior to pied and exercised sov- 1 the area that now con- e State of Hawaii. Such or- must include the Office of ffairs and *Hui Mālama I Nā Hawai'i Nei.*

(4) *Indian tribe official* means the principal leader of an Indian tribe or Native Hawaiian organization or the individual officially designated by the governing body of an Indian tribe or Native Hawaiian organization or as otherwise provided by tribal code, policy, or established procedure as responsible for matters relating to these regulations.

(c) *Who is responsible for carrying out these regulations?* (1) *Secretary* means the Secretary of the Interior.

(2) *Review Committee* means the advisory committee established pursuant to section 8 of the Act.

(3) *Manager, National NAGPRA Program* means the official of the Department of the Interior designated by the Secretary as responsible for administration of matters relating to this part. Communications to the Manager, National NAGPRA Program, should be addressed to: Manager, National NAGPRA Program, National Park Service (MS 2253 MIB), 1849 C Street NW., Washington, DC 20240.

(d) *What objects are covered by these regulations?* The Act covers four types of Native American objects. The term *Native American* means of, or relating to, a tribe, people, or culture indigenous to the United States, including Alaska and Hawaii.

(1) *Human remains* means the physical remains of the body of a person of Native American ancestry. The term does not include remains or portions of remains that may reasonably be determined to have been freely given or naturally shed by the individual from whose body they were obtained, such as hair made into ropes or nets. For the purposes of determining cultural affiliation, human remains incorporated into a funerary object, sacred object, or object of cultural patrimony, as defined below, must be considered as part of that item.

(2) *Funerary objects* means items that, as part of the death rite or ceremony of a culture, are reasonably believed to have been placed intentionally at the time of death or later with or near individual human remains. Funerary objects must be identified by a preponderance of the evidence as having been removed from a specific burial site of an individual affiliated with a particular

Indian tribe or Native Hawaiian organization or as being related to specific individuals or families or to known human remains. The term *burial site* means any natural or prepared physical location, whether originally below, on, or above the surface of the earth, into which, as part of the death rite or ceremony of a culture, individual human remains were deposited, and includes rock cairns or pyres which do not fall within the ordinary definition of gravesite. For purposes of completing the summary requirements in §10.8 and the inventory requirements of §10.9:

(i) *Associated funerary objects* means those funerary objects for which the human remains with which they were placed intentionally are also in the possession or control of a museum or Federal agency. Associated funerary objects also means those funerary objects that were made exclusively for burial purposes or to contain human remains.

(ii) *Unassociated funerary objects* means those funerary objects for which the human remains with which they were placed intentionally are not in the possession or control of a museum or Federal agency. Objects that were displayed with individual human remains as part of a death rite or ceremony of a culture and subsequently returned or distributed according to traditional custom to living descendants or other individuals are not considered unassociated funerary objects.

(3) *Sacred objects* means items that are specific ceremonial objects needed by traditional Native American religious leaders for the practice of traditional Native American religions by their present-day adherents. While many items, from ancient pottery sherds to arrowheads, might be imbued with sacredness in the eyes of an individual, these regulations are specifically limited to objects that were devoted to a traditional Native American religious ceremony or ritual and which have religious significance or function in the continued observance or renewal of such ceremony. The term *traditional religious leader* means a person who is recognized by members of an Indian tribe or Native Hawaiian organization as:

223

(i) Being responsible for performing cultural duties relating to the ceremonial or religious traditions of that Indian tribe or Native Hawaiian organization, or

(ii) Exercising a leadership role in an Indian tribe or Native Hawaiian organization based on the tribe or organization's cultural, ceremonial, or religious practices.

(4) *Objects of cultural patrimony* means items having ongoing historical, traditional, or cultural importance central to the Indian tribe or Native Hawaiian organization itself, rather than property owned by an individual tribal or organization member. These objects are of such central importance that they may not be alienated, appropriated, or conveyed by any individual tribal or organization member. Such objects must have been considered inalienable by the culturally affiliated Indian tribe or Native Hawaiian organization at the time the object was separated from the group. Objects of cultural patrimony include items such as Zuni War Gods, the Confederacy Wampum Belts of the Iroquois, and other objects of similar character and significance to the Indian tribe or Native Hawaiian organization as a whole.

(e) *What is cultural affiliation?* Cultural affiliation means that there is a relationship of shared group identity which can reasonably be traced historically or prehistorically between members of a present-day Indian tribe or Native Hawaiian organization and an identifiable earlier group. Cultural affiliation is established where the preponderance of the evidence—based on geographical, kinship, biological, archeological, linguistic, folklore, oral tradition, historical evidence, or other information or expert opinion—reasonably leads to such a conclusion.

(f) *What types of lands do the excavation and discovery provisions of these regulations apply to?* (1) *Federal lands* means any land other than tribal lands that are controlled or owned by the United States Government, including lands selected by but not yet conveyed to Alaska Native Corporations and groups organized pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.). United States "control," as used in this definition,

refers to those lands not owned by the United States but in which the United States has a legal interest sufficient to permit it to apply these regulations without abrogating the otherwise existing legal rights of a person.

(2) *Tribal lands* means all lands which:

(i) Are within the exterior boundaries of any Indian reservation including, but not limited to, allotments held in trust or subject to a restriction on alienation by the United States; or

(ii) Comprise dependent Indian communities as recognized pursuant to 18 U.S.C. 1151; or

(iii) Are administered for the benefit of Native Hawaiians pursuant to the Hawaiian Homes Commission Act of 1920 and section 4 of the Hawaiian Statehood Admission Act (Pub.L. 86–3; 73 Stat. 6).

(iv) Actions authorized or required under these regulations will not apply to tribal lands to the extent that any action would result in a taking of property without compensation within the meaning of the Fifth Amendment of the United States Constitution.

(g) *What procedures are required by these regulations?* (1) *Summary* means the written description of collections that may contain unassociated funerary objects, sacred objects, and objects of cultural patrimony required by § 10.8 of these regulations.

(2) *Inventory* means the item-by-item description of human remains and associated funerary objects.

(3) *Intentional excavation* means the planned archeological removal of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on the surface of Federal or tribal lands pursuant to section 3 (c) of the Act.

(4) *Inadvertent discovery* means the unanticipated encounter or detection of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on the surface of Federal or tribal lands pursuant to section 3 (d) of the Act.

[60 FR 62158, Dec. 4, 1995, as amended at 62 FR 41293, Aug. 1, 1997; 70 FR 57179, Sept. 30, 2005]

**Subpart B—Human nerary Objects, jects, or Objec Patrimony From Tribal Lands**

**§ 10.3  Intentional arch vations.**

(a) *General.* This sect section 3 (c) of the Ac custody of human rer objects, sacred objects cultural patrimony tha intentionally from Fe lands after November 16

(b) *Specific Requireme:* lations permit the ı vation of human remai jects; sacred objects, o tural patrimony from F lands only if:

(1) The objects are e moved following the ı the Archaeological Re tion Act (ARPA) (16 seq.) and its implement Regarding private land terior boundaries of ı ervation, the Bureau o (BIA) will serve as the for any permits require For BIA procedures fo permits, see 25 CFR pa the Deputy Commission fairs, Department of Washington, DC 20240. administered for the b Hawaiians pursuant t Homes Commission Ac tion 4 of Pub. L. 86–3, of Hawaiian Home Lar the issuing agency for quired under the Act, State Historic Preserva the Department of La Resources acting in an ity for such issuance. requirements for issui be consistent with th the ARPA and its imp lations;

(2) The objects are consultation with or, tribal lands, consent priate Indian tribe or organization pursuant

(3) The disposition c consistent with their scribed in § 10.6; and

## DECLARATION OF LEE ACEBEDO

I, Lee Acebedo, declare as follows:

I am the Chairman of Jamul Indian Village ("Jamul" or "Tribe").  I have personal knowledge of the facts stated herein, except as to those which are based upon information and belief and, if called upon to do so, could and would testify competently thereto.

1.      The Jamul Indian Village is a federally recognized Tribe, organized in 1981 under the provisions of the Indian Reorganization Act of 1934 (25 U.S.C. §§ 461, et seq.), and occupying the Jamul Indian Reservation located in San Diego County, California.

2.      The Tribe is included in the Bureau of Indian Affair's ("BIA") list of Federally Recognized Tribes, 70 Fed. Reg. 71194, 71195 (Nov. 25, 2005).  See Ex. A.

3.      Pursuant to the Jamul Indian Village Constitution and the Tribe's Election Ordinance, the Tribe held its regular elections on June 18, 2005.

4.      I was elected Chairman of the Tribe in the June 18, 2005 elections.

5.      In the BIA's January 2006 Tribal Leaders Directory, I am listed as the Chairman of the Jamul Indian Village.  See Ex. B.

6.      In my capacity as Chairman, I maintain a working relationship with the BIA and other federal agencies on a government to government basis.

7.      The Tribe is the beneficial owner of certain parcels of land ("the Reservation"), fee title to which is held by the United States of America in trust for the Tribe and which is

commonly described as the Jamul Indian Village Reservation. The parcels of land that comprise the Reservation are 597-080-04 and 597-080-05.

8.      There is a cemetery adjacent to the Jamul Indian Village Reservation, but the cemetery is not part of the Reservation. The cemetery is located on parcel 597-080-06.

9.      The Tribe is planning to build a casino and hotel project on the Reservation. The casino plans do not include the cemetery site, and the Tribe does not plan to do any construction work on the cemetery site.

10.     The casino and hotel will be constructed on parcels 597-080-04 and 597-080-05, which are Reservation lands. The Tribe does not plan to undertake any construction work on parcel 597-080-06, which is the cemetery parcel.

11.     The Tribe is not aware of any human remains or other significant cultural artifacts on parcels 597-080-04 and 597-080-05. The Tribe previously conducted a cultural resources survey on the site, which concluded that there are no signs of human remains or other significant cultural artifacts on the Reservation site. See Declaration of Michael Baksh, Attached as Exhibit C.

12.     The Tribe is in the process of adopting an Inadvertent Discovery Plan pursuant to the Native American Graves Protection and Repatriation Act and the Archaeological Resources Protection Act for the disposition of any human remains or other associated funerary objects, objects of cultural patrimony, or sacred objects, in the event such remains or objects are discovered.

2

13.    Walter Rosales and Karen Toggery are not currently members of the Tribe, and they have never been members of the Tribe.

14.    Walter Rosales and Karen Toggery have never applied for membership with the Tribe.

15.    Walter Rosales and Karen Toggery have never been authorized to file any lawsuits in the Tribe's name.

16.    The Tribe has commenced an eviction and exclusion action against Walter Rosales and Karen Toggery in the Intertribal Court of Southern California, which the General Council of the Jamul Indian Village has designated as the Jamul Tribal Court for purposes of eviction and exclusion actions in its Eviction and Exclusion Ordinance. See Jamul Indian Village Eviction and Exclusion Ordinance Art. V, Attached as Exhibit D.

17.    The Intertribal Court of Southern California is an independent court that is patterned after the circuit court concept common in the early history of the United States. When the Intertribal Court Judge is sitting at a particular reservation, the Judge is the Judge for that reservation. See Intertribal Court Order, attached as Exhibit E, at 2.

18.    The Jamul Indian Village is one of ten Tribes in San Diego County that have designated the Intertribal Court of Southern California as their Tribal court. See Intertribal Court Order at 2.

19.    Pursuant to its Eviction and Exclusion Ordinance, the Tribe served Notices of Eviction on Walter Rosales and Karen Toggery on January 18, 2007. The Notices of Eviction are attached as Exhibits F and G.

3

20.     The Intertribal Court of Southern California has ruled that it has jurisdiction over the eviction and exclusion action. The Intertribal Court also recognized the current leadership of the Tribe, including myself. See Intertribal Court Order at 3-4.

21.     In its decision, the Intertribal Court concluded that Walter Rosales and Karen Toggery "are not nor have they ever been beneficial owners of any part of the Jamul Indian Reservation." See Intertribal Court Order at 4.

22.     The Tribe does not plan to conduct any significant construction work on the casino project prior to March 7, 2007. The Tribe plans to begin constructing a perimeter fence around the Reservation before that date. This work will involve surveying the property line and inserting stakes around the property line at fifty foot intervals. The Tribe also plans to begin removing some structures, abandoned vehicles, and debris from the Reservation.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this *13* day of February, 2007, in Sacramento, California.


By_____
    LEE ACEBEDO

4

# EXHIBIT A



**Friday,**
**November 25, 2005**

Part II

# Department of the Interior

Bureau of Indian Affairs

**Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs; Notice**

**DEPARTMENT OF THE INTERIOR**

**Bureau of Indian Affairs**

**Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice publishes the current list of 561 tribal entities recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian tribes. The list is updated from the notice published on December 5, 2003 (68 FR 68180).

**FOR FURTHER INFORMATION CONTACT:** Daisy West, Bureau of Indian Affairs, Division of Tribal Government Services, Mail Stop 320–SIB, 1951 Constitution Avenue, NW., Washington, DC 20240. Telephone number: (202) 513–7641.

**SUPPLEMENTARY INFORMATION:** This notice is published pursuant to Section 104 of the Act of November 2, 1994 (Pub. L. 103–454; 108 Stat. 4791, 4792), and in exercise of authority delegated to the Assistant Secretary—Indian Affairs under 25 U.S.C. 2 and 9 and 209 DM 8.

Published below is a list of federally acknowledged tribes in the contiguous 48 states and in Alaska.

The Delaware Tribe of Indians, Oklahoma, was removed from the list in response to a final judgment and order sought by the Cherokee Nation of Oklahoma in the United States District Court for the Northern District of Oklahoma in *Cherokee Nation of Oklahoma* v. *Norton, et al.,* Case No. 98–CV–903–TCK–FHM on remand from the Tenth Circuit Court of Appeals in *Cherokee Nation of Oklahoma* v. *Norton,* 389 F.3d 1074 (10th Cir. 2004), as amended, 2005 U.S. App. LEXIS 2773 (10th Cir. Feb. 16, 2005).

The list does not include any additional new tribes. The updates are limited to several tribal name changes. To aid in identifying tribal name changes, the tribe's former name is included with the new tribal name. We will continue to list the tribe's former name for several years before dropping the former name from the list. We have also made several corrections. To aid in identifying corrections, the tribe's previously listed name is included with the tribal name.

The listed entities are acknowledged to have the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes. We have continued the practice of listing the Alaska Native entities separately solely for the purpose of facilitating identification of them and reference to them given the large number of complex Native names.

Dated: November 14, 2005.

Michael D. Olsen,

*Acting Principal Deputy Assistant Secretary— Indian Affairs.*

**Indian Tribal Entities Within the Contiguous 48 States Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

Absentee-Shawnee Tribe of Indians of Oklahoma

Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California

Ak Chin Indian Community of the Maricopa (Ak Chin) Indian Reservation, Arizona

Alabama-Coushatta Tribes of Texas

Alabama-Quassarte Tribal Town, Oklahoma

Alturas Indian Rancheria, California

Apache Tribe of Oklahoma

Arapaho Tribe of the Wind River Reservation, Wyoming

Aroostook Band of Micmac Indians of Maine

Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana

Augustine Band of Cahuilla Mission Indians of the Augustine Reservation, California

Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin

Bay Mills Indian Community, Michigan

Bear River Band of the Rohnerville Rancheria, California

Berry Creek Rancheria of Maidu Indians of California

Big Lagoon Rancheria, California

Big Pine Band of Owens Valley Paiute Shoshone Indians of the Big Pine Reservation, California

Big Sandy Rancheria of Mono Indians of California

Big Valley Band of Pomo Indians of the Big Valley Rancheria, California

Blackfeet Tribe of the Blackfeet Indian Reservation of Montana

Blue Lake Rancheria, California

Bridgeport Paiute Indian Colony of California

Buena Vista Rancheria of Me-Wuk Indians of California

Burns Paiute Tribe of the Burns Paiute Indian Colony of Oregon

Cabazon Band of Mission Indians, California (previously listed as the Cabazon Band of Cahuilla Mission Indians of the Cabazon Reservation)

Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California

Caddo Indian Tribe of Oklahoma (formerly the Caddo Indian Tribe of Oklahoma)

Cahuilla Band of Mission Indians of the Cahuilla Reservation, California

Cahto Indian Tribe of the Laytonville Rancheria, California

California Valley Miwok Tribe, California (formerly the Sheep Ranch Rancheria of Me-Wuk Indians of California)

Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California

Capitan Grande Band of Diegueno Mission Indians of California:

Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California

Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California

Catawba Indian Nation (aka Catawba Tribe of South Carolina)

Cayuga Nation of New York

Cedarville Rancheria, California

Chemehuevi Indian Tribe of the Chemehuevi Reservation, California

Cher-Ae Heights Indian Community of the Trinidad Rancheria, California

Cherokee Nation, Oklahoma

Cheyenne-Arapaho Tribes of Oklahoma

Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota

Chickasaw Nation, Oklahoma

Chicken Ranch Rancheria of Me-Wuk Indians of California

Chippewa-Cree Indians of the Rocky Boy's Reservation, Montana

Chitimacha Tribe of Louisiana

Choctaw Nation of Oklahoma

Citizen Potawatomi Nation, Oklahoma

Cloverdale Rancheria of Pomo Indians of California

Cocopah Tribe of Arizona

Coeur D'Alene Tribe of the Coeur D'Alene Reservation, Idaho

Cold Springs Rancheria of Mono Indians of California

Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California

Comanche Nation, Oklahoma

Confederated Salish & Kootenai Tribes of the Flathead Reservation, Montana

Confederated Tribes of the Chehalis Reservation, Washington

Confederated Tribes of the Colville Reservation, Washington

Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians of Oregon

Confederated Tribes of the Goshute Reservation, Nevada and Utah

Confederated Tribes of the Grand Ronde Community of Oregon

Federal Register / Vol. 70, No. 226 / Friday, November 25, 2005 / Notices    71195

Confederated Tribes of the Siletz Reservation, Oregon
Confederated Tribes of the Umatilla Reservation, Oregon
Confederated Tribes of the Warm Springs Reservation of Oregon
Confederated Tribes and Bands of the Yakama Nation, Washington
Coquille Tribe of Oregon
Cortina Indian Rancheria of Wintun Indians of California
Coushatta Tribe of Louisiana
Cow Creek Band of Umpqua Indians of Oregon
Cowlitz Indian Tribe, Washington
Coyote Valley Band of Pomo Indians of California
Crow Tribe of Montana
Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota
Death Valley Timbi-Sha Shoshone Band of California
Delaware Nation, Oklahoma
Dry Creek Rancheria of Pomo Indians of California
Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada
Eastern Band of Cherokee Indians of North Carolina
Eastern Shawnee Tribe of Oklahoma
Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California
Elk Valley Rancheria, California
Ely Shoshone Tribe of Nevada
Enterprise Rancheria of Maidu Indians of California
Ewiiaapaayp Band of Kumeyaay Indians, California (formerly the Cuyapaipe Community of Diegueno Mission Indians of the Cuyapaipe Reservation)
Federated Indians of Graton Rancheria, California (formerly the Graton Rancheria)
Flandreau Santee Sioux Tribe of South Dakota
Forest County Potawatomi Community, Wisconsin
Fort Belknap Indian Community of the Fort Belknap Reservation of Montana
Fort Bidwell Indian Community of the Fort Bidwell Reservation of California
Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California
Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon
Fort McDowell Yavapai Nation, Arizona
Fort Mojave Indian Tribe of Arizona, California & Nevada
Fort Sill Apache Tribe of Oklahoma
Gila River Indian Community of the Gila River Indian Reservation, Arizona
Grand Traverse Band of Ottawa and Chippewa Indians, Michigan
Greenville Rancheria of Maidu Indians of California

Grindstone Indian Rancheria of Wintun-Wailaki Indians of California
Guidiville Rancheria of California
Habematolel Pomo of Upper Lake, California (formerly the Upper Lake Band of Pomo Indians of Upper Lake Rancheria of California)
Hannahville Indian Community, Michigan
Havasupai Tribe of the Havasupai Reservation, Arizona
Ho-Chunk Nation of Wisconsin
Hoh Indian Tribe of the Hoh Indian Reservation, Washington
Hoopa Valley Tribe, California
Hopi Tribe of Arizona
Hopland Band of Pomo Indians of the Hopland Rancheria, California
Houlton Band of Maliseet Indians of Maine
Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona
Huron Potawatomi, Inc., Michigan
Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California
Ione Band of Miwok Indians of California
Iowa Tribe of Kansas and Nebraska
Iowa Tribe of Oklahoma
Jackson Rancheria of Me-Wuk Indians of California
Jamestown S'Klallam Tribe of Washington
Jamul Indian Village of California
Jena Band of Choctaw Indians, Louisiana
Jicarilla Apache Nation, New Mexico
Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona
Kalispel Indian Community of the Kalispel Reservation, Washington
Karuk Tribe of California
Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California
Kaw Nation, Oklahoma
Keweenaw Bay Indian Community, Michigan
Kialegee Tribal Town, Oklahoma
Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas
Kickapoo Tribe of Oklahoma
Kickapoo Traditional Tribe of Texas
Kiowa Indian Tribe of Oklahoma
Klamath Tribes, Oregon (formerly the Klamath Indian Tribe of Oregon)
Kootenai Tribe of Idaho
La Jolla Band of Luiseno Mission Indians of the La Jolla Reservation, California
La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California
Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin
Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin

Lac Vieux Desert Band of Lake Superior Chippewa Indians, Michigan
Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada
Little River Band of Ottawa Indians, Michigan
Little Traverse Bay Bands of Odawa Indians, Michigan
Lower Lake Rancheria, California
Los Coyotes Band of Cahuilla & Cupeno Indians of the Los Coyotes Reservation, California (formerly the Los Coyotes Band of Cahuilla Mission Indians of the Los Coyotes Reservation)
Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada
Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota
Lower Elwha Tribal Community of the Lower Elwha Reservation, Washington
Lower Sioux Indian Community in the State of Minnesota
Lummi Tribe of the Lummi Reservation, Washington
Lytton Rancheria of California
Makah Indian Tribe of the Makah Indian Reservation, Washington
Manchester Band of Pomo Indians of the Manchester-Point Arena Rancheria, California
Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California
Mashantucket Pequot Tribe of Connecticut
Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan
Mechoopda Indian Tribe of Chico Rancheria, California
Menominee Indian Tribe of Wisconsin
Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California
Mescalero Apache Tribe of the Mescalero Reservation, New Mexico
Miami Tribe of Oklahoma
Miccosukee Tribe of Indians of Florida
Middletown Rancheria of Pomo Indians of California
Minnesota Chippewa Tribe, Minnesota (Six component reservations: Bois Forte Band (Nett Lake); Fond du Lac Band; Grand Portage Band; Leech Lake Band; Mille Lacs Band; White Earth Band)
Mississippi Band of Choctaw Indians, Mississippi
Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada
Modoc Tribe of Oklahoma
Mohegan Indian Tribe of Connecticut
Mooretown Rancheria of Maidu Indians of California
Morongo Band of Cahuilla Mission Indians of the Morongo Reservation, California

Muckleshoot Indian Tribe of the Muckleshoot Reservation, Washington
Muscogee (Creek) Nation, Oklahoma
Narragansett Indian Tribe of Rhode Island
Navajo Nation, Arizona, New Mexico & Utah
Nez Perce Tribe of Idaho
Nisqually Indian Tribe of the Nisqually Reservation, Washington
Nooksack Indian Tribe of Washington
Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana
Northfork Rancheria of Mono Indians of California
Northwestern Band of Shoshoni Nation of Utah (Washakie)
Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota
Omaha Tribe of Nebraska
Oneida Nation of New York
Oneida Tribe of Indians of Wisconsin
Onondaga Nation of New York
Osage Tribe, Oklahoma
Ottawa Tribe of Oklahoma
Otoe-Missouria Tribe of Indians, Oklahoma
Paiute Indian Tribe of Utah (Cedar City Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes)
Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California
Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada
Paiute-Shoshone Indians of the Lone Pine Community of the Lone Pine Reservation, California
Pala Band of Luiseno Mission Indians of the Pala Reservation, California
Pascua Yaqui Tribe of Arizona
Paskenta Band of Nomlaki Indians of California
Passamaquoddy Tribe of Maine
Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California
Pawnee Nation of Oklahoma
Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California
Penobscot Tribe of Maine
Peoria Tribe of Indians of Oklahoma
Picayune Rancheria of Chukchansi Indians of California
Pinoleville Rancheria of Pomo Indians of California
Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias)
Poarch Band of Creek Indians of Alabama
Pokagon Band of Potawatomi Indians, Michigan and Indiana
Ponca Tribe of Indians of Oklahoma

Ponca Tribe of Nebraska
Port Gamble Indian Community of the Port Gamble Reservation, Washington
Potter Valley Tribe, California (formerly the Potter Valley Rancheria of Pomo Indians of California)
Prairie Band of Potawatomi Nation, Kansas
Prairie Island Indian Community in the State of Minnesota
Pueblo of Acoma, New Mexico
Pueblo of Cochiti, New Mexico
Pueblo of Jemez, New Mexico
Pueblo of Isleta, New Mexico
Pueblo of Laguna, New Mexico
Pueblo of Nambe, New Mexico
Pueblo of Picuris, New Mexico
Pueblo of Pojoaque, New Mexico
Pueblo of San Felipe, New Mexico
Pueblo of San Juan, New Mexico
Pueblo of San Ildefonso, New Mexico
Pueblo of Sandia, New Mexico
Pueblo of Santa Ana, New Mexico
Pueblo of Santa Clara, New Mexico
Pueblo of Santo Domingo, New Mexico
Pueblo of Taos, New Mexico
Pueblo of Tesuque, New Mexico
Pueblo of Zia, New Mexico
Puyallup Tribe of the Puyallup Reservation, Washington
Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada
Quapaw Tribe of Indians, Oklahoma
Quartz Valley Indian Community of the Quartz Valley Reservation of California
Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona
Quileute Tribe of the Quileute Reservation, Washington
Quinault Tribe of the Quinault Reservation, Washington
Ramona Band or Village of Cahuilla Mission Indians of California
Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin
Red Lake Band of Chippewa Indians, Minnesota
Redding Rancheria, California
Redwood Valley Rancheria of Pomo Indians of California
Reno-Sparks Indian Colony, Nevada
Resighini Rancheria, California
Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California
Robinson Rancheria of Pomo Indians of California
Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota
Round Valley Indian Tribes of the Round Valley Reservation, California
Rumsey Indian Rancheria of Wintun Indians of California
Sac & Fox Tribe of the Mississippi in Iowa
Sac & Fox Nation of Missouri in Kansas and Nebraska
Sac & Fox Nation, Oklahoma

Saginaw Chippewa Indian Tribe of Michigan
St. Croix Chippewa Indians of Wisconsin
St. Regis Band of Mohawk Indians of New York
Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona
Samish Indian Tribe, Washington
San Carlos Apache Tribe of the San Carlos Reservation, Arizona
San Juan Southern Paiute Tribe of Arizona
San Manual Band of Serrano Mission Indians of the San Manual Reservation, California
San Pasqual Band of Diegueno Mission Indians of California
Santa Rosa Indian Community of the Santa Rosa Rancheria, California
Santa Rosa Band of Cahuilla Mission Indians of the Santa Rosa Reservation, California
Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California
Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation, California
Santee Sioux Nation, Nebraska (formerly the Santee Sioux Tribe of the Santee Reservation of Nebraska)
Sauk-Suiattle Indian Tribe of Washington
Sault Ste. Marie Tribe of Chippewa Indians of Michigan
Scotts Valley Band of Pomo Indians of California
Seminole Nation of Oklahoma
Seminole Tribe of Florida, Dania, Big Cypress, Brighton, Hollywood & Tampa Reservations
Seneca Nation of New York
Seneca-Cayuga Tribe of Oklahoma
Shakopee Mdewakanton Sioux Community of Minnesota
Shawnee Tribe, Oklahoma
Sherwood Valley Rancheria of Pomo Indians of California
Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California
Shoalwater Bay Tribe of the Shoalwater Bay Indian Reservation, Washington
Shoshone Tribe of the Wind River Reservation, Wyoming
Shoshone-Bannock Tribes of the Fort Hall Reservation of Idaho
Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada
Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota (formerly the Sisseton-Wahpeton Sioux Tribe of the Lake Traverse Reservation)
Skokomish Indian Tribe of the Skokomish Reservation, Washington
Skull Valley Band of Goshute Indians of Utah

Smith River Rancheria, California
Snoqualmie Tribe, Washington
Soboba Band of Luiseno Indians, California
Sokaogon Chippewa Community, Wisconsin
Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado
Spirit Lake Tribe, North Dakota
Spokane Tribe of the Spokane Reservation, Washington
Squaxin Island Tribe of the Squaxin Island Reservation, Washington
Standing Rock Sioux Tribe of North & South Dakota
Stockbridge Munsee Community, Wisconsin
Stillaguamish Tribe of Washington
Summit Lake Paiute Tribe of Nevada
Suquamish Indian Tribe of the Port Madison Reservation, Washington
Susanville Indian Rancheria, California
Swinomish Indians of the Swinomish Reservation, Washington
Sycuan Band of the Kumeyaay Nation (formerly the Sycuan Band of Diegueno Mission Indians of California)
Table Mountain Rancheria of California
Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band)
Thlopthlocco Tribal Town, Oklahoma
Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota
Tohono O'odham Nation of Arizona
Tonawanda Band of Seneca Indians of New York
Tonkawa Tribe of Indians of Oklahoma
Tonto Apache Tribe of Arizona
Torres Martinez Desert Cahuilla Indians, California (formerly the Torres-Martinez Band of Cahuilla Mission Indians of California)
Tule River Indian Tribe of the Tule River Reservation, California
Tulalip Tribes of the Tulalip Reservation, Washington
Tunica-Biloxi Indian Tribe of Louisiana
Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California
Turtle Mountain Band of Chippewa Indians of North Dakota
Tuscarora Nation of New York
Twenty-Nine Palms Band of Mission Indians of California
United Auburn Indian Community of the Auburn Rancheria of California
United Keetoowah Band of Cherokee Indians in Oklahoma
Upper Sioux Community, Minnesota
Upper Skagit Indian Tribe of Washington
Ute Indian Tribe of the Uintah & Ouray Reservation, Utah
Ute Mountain Tribe of the Ute Mountain Reservation, Colorado, New Mexico & Utah

Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California
Walker River Paiute Tribe of the Walker River Reservation, Nevada
Wampanoag Tribe of Gay Head (Aquinnah) of Massachusetts
Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches)
White Mountain Apache Tribe of the Fort Apache Reservation, Arizona
Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma
Winnebago Tribe of Nebraska
Winnemucca Indian Colony of Nevada
Wiyot Tribe, California (formerly the Table Bluff Reservation—Wiyot Tribe)
Wyandotte Nation, Oklahoma (formerly the Wyandotte Tribe of Oklahoma)
Yankton Sioux Tribe of South Dakota
Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona
Yavapai-Prescott Tribe of the Yavapai Reservation, Arizona
Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada
Yomba Shoshone Tribe of the Yomba Reservation, Nevada
Ysleta Del Sur Pueblo of Texas
Yurok Tribe of the Yurok Reservation, California
Zuni Tribe of the Zuni Reservation, New Mexico

**Native Entities Within the State of Alaska Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

Native Village of Afognak (formerly the Village of Afognak)
Agdaagux Tribe of King Cove
Native Village of Akhiok
Akiachak Native Community
Akiak Native Community
Native Village of Akutan
Village of Alakanuk
Alatna Village
Native Village of Aleknagik
Algaaciq Native Village (St. Mary's)
Allakaket Village
Native Village of Ambler
Village of Anaktuvuk Pass
Yupiit of Andreafski
Angoon Community Association
Village of Aniak
Anvik Village
Arctic Village (See Native Village of Venetie Tribal Government)
Asa'carsarmiut (formerly the Native Village of Mountain Village)
Native Village of Atka
Village of Atmautluak
Atqasuk Village (Atkasook)
Native Village of Barrow Inupiat Traditional Government
Beaver Village
Native Village of Belkofski

Village of Bill Moore's Slough
Birch Creek Tribe
Native Village of Brevig Mission
Native Village of Buckland
Native Village of Cantwell
Native Village of Chanega (aka Chenega)
Chalkyitsik Village
Cheesh-Na Tribe (formerly the Native Village of Chistochina)
Village of Chefornak
Chevak Native Village
Chickaloon Native Village
Native Village of Chignik
Native Village of Chignik Lagoon
Chignik Lake Village
Chilkat Indian Village (Klukwan)
Chilkoot Indian Association (Haines)
Chinik Eskimo Community (Golovin)
Native Village of Chitina
Native Village of Chuathbaluk (Russian Mission, Kuskokwim)
Chuloonawick Native Village
Circle Native Community
Village of Clarks Point
Native Village of Council
Craig Community Association
Village of Crooked Creek
Curyung Tribal Council (formerly the Native Village of Dillingham)
Native Village of Deering
Native Village of Diomede (aka Inalik)
Village of Dot Lake
Douglas Indian Association
Native Village of Eagle
Native Village of Eek
Egegik Village
Eklutna Native Village
Native Village of Ekuk
Ekwok Village
Native Village of Elim
Emmonak Village
Evansville Village (aka Bettles Field)
Native Village of Eyak (Cordova)
Native Village of False Pass
Native Village of Fort Yukon
Native Village of Gakona
Galena Village (aka Louden Village)
Native Village of Gambell
Native Village of Georgetown
Native Village of Goodnews Bay
Organized Village of Grayling (aka Holikachuk)
Gulkana Village
Native Village of Hamilton
Healy Lake Village
Holy Cross Village
Hoonah Indian Association
Native Village of Hooper Bay
Hughes Village
Huslia Village
Hydaburg Cooperative Association
Igiugig Village
Village of Iliamna
Inupiat Community of the Arctic Slope
Iqurmuit Traditional Council (formerly the Native Village of Russian Mission)
Ivanoff Bay Village
Kaguyak Village
Organized Village of Kake

71198    Federal Register / Vol. 70, No. 226 / Friday, November 25, 2005 / Notices

Kaktovik Village (aka Barter Island)
Village of Kalskag
Village of Kaltag
Native Village of Kanatak
Native Village of Karluk
Organized Village of Kasaan
Kasigluk Traditional Elders Council
   (formerly the Native Village of
   Kasigluk)
Kenaitze Indian Tribe
Ketchikan Indian Corporation
Native Village of Kiana
King Island Native Community
King Salmon Tribe
Native Village of Kipnuk
Native Village of Kivalina
Klawock Cooperative Association
Native Village of Kluti Kaah (aka Copper
   Center)
Knik Tribe
Native Village of Kobuk
Kokhanok Village
Native Village of Kongiganak
Village of Kotlik
Native Village of Kotzebue
Native Village of Koyuk
Koyukuk Native Village
Organized Village of Kwethluk
Native Village of Kwigillingok
Native Village of Kwinhagak (aka
   Quinhagak)
Native Village of Larsen Bay
Levelock Village
Lesnoi Village (aka Woody Island)
Lime Village
Village of Lower Kalskag
Manley Hot Springs Village
Manokotak Village
Native Village of Marshall (aka Fortuna
   Ledge)
Native Village of Mary's Igloo
McGrath Native Village
Native Village of Mekoryuk
Mentasta Traditional Council
Metlakatla Indian Community, Annette
   Island Reserve
Native Village of Minto
Naknek Native Village
Native Village of Nanwalek (aka English
   Bay)
Native Village of Napaimute
Native Village of Napakiak
Native Village of Napaskiak
Native Village of Nelson Lagoon
Nenana Native Association

New Koliganek Village Council
   (formerly the Koliganek Village)
New Stuyahok Village
Newhalen Village
Newtok Village
Native Village of Nightmute
Nikolai Village
Native Village of Nikolski
Ninilchik Village
Native Village of Noatak
Nome Eskimo Community
Nondalton Village
Noorvik Native Community
Northway Village
Native Village of Nuiqsut (aka Nooiksut)
Nulato Village
Nunakauyarmiut Tribe (formerly the
   Native Village of Toksook Bay)
Native Village of Nunapitchuk
Village of Ohogamiut
Village of Old Harbor
Orutsararmuit Native Village (aka
   Bethel)
Oscarville Traditional Village
Native Village of Ouzinkie
Native Village of Paimiut
Pauloff Harbor Village
Pedro Bay Village
Native Village of Perryville
Petersburg Indian Association
Native Village of Pilot Point
Pilot Station Traditional Village
Native Village of Pitka's Point
Platinum Traditional Village
Native Village of Point Hope
Native Village of Point Lay
Native Village of Port Graham
Native Village of Port Heiden
Native Village of Port Lions
Portage Creek Village (aka Ohgsenakale)
Pribilof Islands Aleut Communities of
   St. Paul & St. George Islands
Qagan Tayagungin Tribe of Sand Point
   Village
Qawalangin Tribe of Unalaska
Rampart Village
Village of Red Devil
Native Village of Ruby
Saint George Island (See Pribilof Islands
   Aleut Communities of St. Paul & St.
   George Islands)
Native Village of Saint Michael
Saint Paul Island (See Pribilof Islands
   Aleut Communities of St. Paul & St.
   George Islands)

Village of Salamatoff
Native Village of Savoonga
Organized Village of Saxman
Native Village of Scammon Bay
Native Village of Selawik
Seldovia Village Tribe
Shageluk Native Village
Native Village of Shaktoolik
Native Village of Sheldon's Point
Native Village of Shishmaref
Native Village of Shungnak
Sitka Tribe of Alaska
Skagway Village
Village of Sleetmute
Village of Solomon
South Naknek Village
Stebbins Community Association
Native Village of Stevens
Village of Stony River
Sun'aq Tribe of Kodiak (formerly the
   Shoonaq' Tribe of Kodiak)
Takotna Village
Native Village of Tanacross
Native Village of Tanana
Native Village of Tatitlek
Native Village of Tazlina
Telida Village
Native Village of Teller
Native Village of Tetlin
Central Council of the Tlingit & Haida
   Indian Tribes
Traditional Village of Togiak
Tuluksak Native Community
Native Village of Tuntutuliak
Native Village of Tununak
Twin Hills Village
Native Village of Tyonek
Ugashik Village
Umkumiute Native Village
Native Village of Unalakleet
Native Village of Unga
Village of Venetie (See Native Village of
   Venetie Tribal Government)
Native Village of Venetie Tribal
   Government (Arctic Village and
   Village of Venetie)
Village of Wainwright
Native Village of Wales
Native Village of White Mountain
Wrangell Cooperative Association
Yakutat Tlingit Tribe

[FR Doc. 05–23268 Filed 11–23–05; 8:45 am]
BILLING CODE 4310–4J–P

# EXHIBIT B



**Tribal Leaders Directory**
**January 2006**

The printing date appears on the lower left-hand
corner of the pages in section 2.

A copy of the Microsoft Access 2000 database file
or the Adobe Acrobat file can be obtained by regular mail.
Fax your request to (202) 219-2327.
Specify the file format you need and
give your mailing address.



TAKE PRIDE
IN AMERICA

This directory is posted on the Department of the Interior
website. Go to the internet address below and scroll to the
middle of the page. The link is in the Tribal Governments section.

http://library.doi.gov/internet/native.html

*Tribal Leaders and*
*BIA Representatives*

## Pacific Region

| | |
|---|---|
| BIA Agency Office: **Central California Agency** | BIA Agency Office: **Southern California Agency** |
| Self-Gov. Compact: | Self-Gov. Compact: |
| Term of Office - Expiration Date:     **May 2005** | Term of Office - Expiration Date:     **Indefinite** |
| **Wanda Balderama, Chairperson** | **Rebecca Osuna, Chairperson** |
| **Hopland Reservation** | **Inaja-Cosmit Reservation** |
| **3000 Shanel Road** | **309 S. Maple Street** |
| **Hopland, CA 95449** | **Escondido, CA 92025** |
| Phone No:  **(707) 744-1647** Fax No: **(707) 744-8641** | Phone No:  **(760) 737-7628** Fax No: **(760) 749-9152** |
| e-mail: | e-mail: |
| www.shokawah.com/tribal.html and www. hoplandtribe.com | |
| BIA Agency Office: **Central California Agency** | BIA Agency Office: **Central California Agency** |
| Self-Gov. Compact: | Self-Gov. Compact: |
| Term of Office - Expiration Date: | Term of Office - Expiration Date: |
| **Mathew Franklin, Chairman** | **Margaret Dalton, Chairperson** |
| **Ione Band of Miwok Indians** | **Jackson Rancheria** |
| **P.O. Box 1190** | **P.O. Box 1090** |
| **Ione, CA 95640** | **Jackson, CA 95642** |
| Phone No:  **(209) 274-6753** Fax No: **(209) 274-6636** | Phone No:  **(209) 223-1935** Fax No: **(209) 223-5366** |
| e-mail: ioneband@jps.net | e-mail: |
| BIA Agency Office: **Southern California Agency** | BIA Agency Office: **Northern California Agency** |
| Self-Gov. Compact: | Self-Gov. Compact:  **YES** |
| Term of Office - Expiration Date:     **Dec 2006** | Term of Office - Expiration Date:     **May 2005** |
| **Leon Acebedo, Chairman** | **Arch Super, Chairman** |
| **Jamul Indian Village** | **Karuk Tribe of California** |
| **P.O. Box 612** | **P.O. Box 1016** |
| **Jamul, CA 91935** | **Happy Camp, CA 96039** |
| Phone No:  **(619) 669-4785** Fax No: **(619) 669-4817** | Phone No:  **(530) 493-5305** Fax No: **(530) 493-5322** |
| e-mail: | e-mail: |
| BIA Agency Office: **Southern California Agency** | BIA Agency Office: **Southern California Agency** |
| Self-Gov. Compact: | Self-Gov. Compact: |
| Term of Office - Expiration Date:     **Jan 2006** | Term of Office - Expiration Date:     **Indefinite** |
| **Tracy Lee Nelson, Chairman** | **Gwendolyn Parada, Chairperson** |
| **La Jolla Band of Luiseno Indians** | **La Posta Band of Mission Indians** |
| **22000 Highway 76** | **P.O. Box 1120** |
| **Pauma Valley, CA 92061** | **Boulevard, CA 91905** |
| Phone No:  **(760) 742-3771** Fax No: **(760) 742-1704** | Phone No:  **(619) 478-2113** Fax No: **(619) 478-2125** |
| e-mail: | e-mail: |

*State:*   California

## *Pacific Region*

### *Agency:*   Central California Agency

42   Robinson Rancheria of Pomo Indians of California

43   Round Valley Indian Tribes of the Round Valley Reservation (formerly the Covelo Indian Community)

44   Rumsey Indian Rancheria of Wintun Indians of California

45   Santa Rosa Indian Community of the Santa Rosa Rancheria

46   Scotts Valley Band of Pomo Indians of California

47   Sherwood Valley Rancheria of Pomo Indians of California

48   Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract)

49   Table Mountain Rancheria of California

50   Tule River Indian Tribe of the Tule River Reservation

51   Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California

52   United Auburn Indian Community of the Auburn Rancheria of California

53   Upper Lake Band of Pomo Indians of Upper Lake Rancheria of California

54   Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation

### *Agency:*   Northern California Agency

55   Alturas Indian Rancheria

56   Bear River Band of the Rohnerville Rancheria

57   Big Lagoon Rancheria

58   Blue Lake Rancheria

59   Cedarville Rancheria

60   Cher-Ae Heights Indian Community of the Trinidad Rancheria

61   Elk Valley Rancheria

62   Fort Bidwell Indian Community of the Fort Bidwell Reservation of California

63   Hoopa Valley Tribe

## *Pacific Region*

### *Agency:*   Northern California Agency

64   Karuk Tribe of California

65   Pit River Tribe (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias)

66   Quartz Valley Indian Community of the Quartz Valley Reservation of California

67   Redding Rancheria

68   Resighini Rancheria

69   Smith River Rancheria

70   Susanville Indian Rancheria

71   Wiyot Tribe (formerly Table Bluff Reservation - Wiyot Tribe)

72   Yurok Tribe of the Yurok Reservation

### *Agency:*   Pacific Region

73   Cabazon Band of Mission Indians

### *Agency:*   Palm Springs Agency

74   Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation

### *Agency:*   Southern California Agency

75   Augustine Band of Cahuilla Mission Indians of the Augustine Reservation

76   Cahuilla Band of Mission Indians of the Cahuilla Reservation

77   Campo Band of Diegueno Mission Indians of the Campo Indian Reservation

78   Capitan Grande Band of Diegueno Mission Indians of California (two component reservations): Barona Group and the Viejas (Baron Long) Group

79   Ewiiaapaayp Band of Kumeyaay Indians (formerly the Cuyapaipe Community of Diegueno Mission Indians of the Cuyapaipe Reservation)

80   Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation

81   Jamul Indian Village of California

# *Name Index - Tribal Leaders and BIA Representatives*

| *Name* | *Organization* | Section 2 Page No. |
|---|---|---|
| , Chairman | Winnemucca Tribal Council | 95 |
| , Chairman | California Valley Miwok Tribe | 65 |
| , Chairman | Manchester - Point Arena Band of Pomo Indians | 69 |
| , | Red Lake Field Office | 45 |
| , Superintendent | Makah Agency | 53 |
| Charles S. Abalana, First Chief | Egegik Village | 9 |
| Greg Abrahamson, Chairman | Spokane Business Council | 60 |
| Leon Acebedo, Chairman | Jamul Indian Village | 68 |
| Bert Adams, Sr., President | Yakutat Tlingit Tribe | 30 |
| Donald Adams, President | Native Village of Tetlin (IRA) | 28 |
| Edward J. Adams, Sr., President | Native Village of Sheldon Point | 25 |
| Max Agayar, President | Village of Alakanuk | 2 |
| Orval Ahkinga, President | Native Village of Diomede (IRA) (aka Inalik) | 8 |
| Luki Akelkok, Sr., President | Ekwok Village | 9 |
| Virgil Akins, Superintendent | Northern California Agency | 62 |
| Isaac K. Akootchook, President | Kaktovik Village | 12 |
| Virginia Aleck, President | Chignik Lake Village | 6 |
| Adilai R. Alexander, First Chief | Native Village of Fort Yukon (IRA) | 10 |
| Tony Alexia, First Chief | Nikolai Village | 19 |
| Fred Alexie, First Chief | Kaltag Tribal Council | 13 |
| Chief J. Allan, Chairman | Coeur d'Alene Tribal Council | 56 |
| Mark Allen, President | Flandreau Santee Sioux Executive Committee | 42 |
| Wm. Ron Allen, Chairman | Jamestown S'Klallam Tribal Council | 57 |
| Gail Alstrom, President | Yuplit of Andreafski | 3 |
| Mark Altvater, Governor | Passamaquoddy Tribe - Pleasant Point Reservation | 38 |
| Eleanor R. Amaktoolik, President | Chinik Eskimo Community | 7 |
| Rolin M. Amodo, President | Native Village of Akhiok | 2 |

EXHIBIT C

## DECLARATION OF MICHAEL BAKSH

I, Michael Baksh, declare as follows:

I served as Project Manager for a cultural resource survey that was conducted on the Jamul Indian Village in 1998. I have personal knowledge of the facts stated herein, except as to those which are based upon information and belief and, if called upon to do so, could and would testify competently thereto.

1. I received my Ph.D in Anthropology from the University of California, Los Angeles and have been an Anthropologist from the time I received my degree to the present.

2. I am currently President and Principal Anthropologist at Tierra Environmental Services, an environmental consulting firm in San Diego, California.

3. In my capacity as an Anthropologist and Archeologist with Tierra Environmental Services, I served as the Project Manager for a cultural resource survey that was conducted for the Jamul Indian Village in 1998.

4. The survey was conducted on the Jamul Indian Village trust land ("Reservation"), as well as on a 3.7-acre parcel of land that the Tribe proposed to have transferred to the United States into trust for the Tribe.

5. The purpose of the survey was to identify any cultural resources located on the survey site and to ensure that no significant cultural resources would be impacted by the Tribe's proposed casino plans.

6. The survey included a search for signs of human remains or any other remains on the project site.

7.  The survey did not reveal any significant cultural resources or artifacts on the Jamul Indian Village Reservation.

8.  The survey did not reveal any signs of human remains or any other remains on the Reservation.

9.  The survey did not reveal any cultural resources on the Reservation that qualify as potentially significant resources under the National Historic Preservation Act.

10. We have retained a copy of the survey report in our office, and I have reviewed it for the purpose of preparing this declaration.

11. I am aware of the claims made by Plaintiffs in this matter.  Based on my participation in the cultural resources survey, I know of no facts that would support Plaintiffs' contentions that the Reservation contains Native American human remains and related items that will be disturbed by the contemplated construction.

Executed this 9th day of February, 2007, at San Diego, California.


By: _Michael Baksh_____

Michael Baksh, Ph.D

2

# EXHIBIT D





CELEBRATING 10,000 YEARS IN SAN DIEGO

# JAMUL INDIAN VILLAGE
# EVICTION AND EXCLUSION ORDINANCE

### Ordinance No. 2007- 01
(Amending Ordinance No. 2001-02)

Pursuant to the authority vested in the Jamul General Council by the Constitution of the Jamul Tribe, adopted on May 9, 1981, and amended on August 31, 1996, Article 8 thereunder, the General Council hereby amends Ordinance No. 2001-02 (governing tribal evictions and exclusions) in its entirety to read as follows and establishes the following procedures governing the eviction and exclusion of persons and entities, business or otherwise, from the lands of the Jamul Indian Village.

## ARTICLE I.  PURPOSES AND FINDING

Section 1:    The purposes of this ordinance are:

(a)    To promote the safety of all Jamul tribal members on reservation trust lands.

(b)    To promote and protect the peace, health, and general welfare of the membership of the Jamul Indian Village, pursuant to Article 8, Section 1(g) of the Jamul Constitution.

(c)    To establish uniform rules and procedures for the removal of persons and property from the lands of the Jamul Indian Village.

Section 2:    The General Council finds that the subject matter of this ordinance directly affects the political integrity, the economic security, and the health and welfare of the Tribe.

## ARTICLE II.  DEFINITIONS

Section 1.    "Executive Committee" shall mean the elected governing officials of the Tribe.

Section 2.    "Jamul Tribal Court" shall mean the Court established by, or authorized by, the General Council of the Tribe to hear any appeal from any eviction or exclusion order under this ordinance.

Section 3.    "Person" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

Section 4.    "Premises" shall mean that parcel of Reservation lands that is the subject of an

JAMUL INDIAN VILLAGE
1
—————————— *A Federally Recognized Tribal Nation* ——————————

P.O. Box 612 • Jamul, CA 91935 • Tel: 619.669.4785 • Fax: 619.669.4817

order of eviction.

Section 5.    "Reservation lands" shall mean all lands within the exterior boundaries of the Jamul Indian Village Reservation held in trust by the United States for the benefit of the Tribe.

Section 6.    "Tribe" shall mean the Jamul Indian Village.


## ARTICLE III.   GROUNDS FOR EVICTION OR EXCLUSION

Section 1.    Right to Possession of Reservation Lands – A person may exercise possession of Reservation lands only pursuant to a valid lease, assignment or license (a) authorized by the General Council of the Tribe and (b) which is in effect.

Section 2.    Grounds for Eviction – A person is subject to eviction from Reservation lands under this ordinance for any one or more of the following reasons:

(a)    Such person is in possession of Reservation lands without the consent of the Tribe evidenced by lease, assignment or license authorized by the General Council of the Tribe.

(b)    Such person is in possession of Reservation lands which such person had possessed with the consent of the Tribe evidenced by lease, assignment or license authorized by the General Council of the Tribe, which consent has subsequently been withdrawn by the General Council of the Tribe consistent with the terms of such lease, assignment or license.

(c)    Such person is in possession of Reservation lands which such person had possessed with the consent of the Tribe evidenced by lease, assignment or license authorized by the General Council of the Tribe, and such person is in default of its obligations under such lease, assignment or license.

Section 3.    Grounds for Exclusion – A person is subject to exclusion from Reservation lands under this ordinance for any one or more of the following reasons:

(a)    Such person is not an enrolled member of the Tribe.

(b)    Such person (i) is an enrolled member of the Tribe, (ii) does not have a present right to possession of Reservation lands under Section 1 of this Article III, and (iii) the General Council of the Tribe has determined by a majority at a General Council meeting, that the presence of such person on Reservation lands is inimical to the peace, health, or general welfare of the membership of the Tribe.


## ARTICLE IV.  NOTICE OF EVICTION OR EXCLUSION

2

Section 1.    Commencement of Eviction or Exclusion Action – Upon a determination of the General Council of the Tribe that a Person should be evicted or excluded from Reservation lands, the Tribe shall commence an action in the Jamul Tribal Court seeking such eviction or exclusion. An eviction or exclusion action shall be governed by the rules applicable to civil actions in the Jamul Tribal Court, subject to (a) the requirements of Section 2 of this Article IV and (b) the modifications of such rules provided for in Article V, Section 5 of this ordinance.

Section 2.    Service of Complaint – In addition to the elements required by the civil rules of the Jamul Tribal Court, the complaint in an action for eviction or exclusion shall contain, or shall be accompanied by a separate notice containing:

(a)    A brief summary of the reason for eviction, exclusion or both.

(b)    In the case of an action for eviction, a specific period of time, not less than 15 calendar days, in which the Person is to vacate the Premises and to remove any and all property.

(c)    A statement that the Person may contest the eviction or exclusion by making a written request for a hearing before the Jamul Tribal Court within the time period provided by the rules of the Jamul Tribal court (as modified in accordance with Article V, Section 5 of this ordinance).

(d)    A statement that any property left on the Premises after the date specified in the notice may be either disposed of, or stored, at the Tribe's election, that any stored property must be reclaimed within 14 days (except for vehicles, which shall be accorded 30 days), and that any accrued storage costs must also be paid.

(e)    A statement that, in the event of any contest of the eviction or exclusion before the Jamul Tribal Court, the decision of the Jamul Tribal Court is final and not subject to further appeal.

## ARTICLE V.  JURISDICTION OF THE JAMUL TRIBAL COURT

Section 1.    Designation of Jamul Tribal Court – The Intertribal Court of Southern California is hereby designated as the Jamul Tribal Court for the purpose of this ordinance, with the power and authority to hear and adjudicate actions seeking eviction or exclusion as provided herein.

Section 2.    Validation Actions – The Jamul Tribal Court is hereby granted jurisdiction to hear and adjudicate (a) declaratory actions brought by the Tribe seeking the validation of this ordinance or of any action of the Tribe taken hereunder, and (b) challenges brought by any Person challenging the validity of this ordinance or any action of the Tribe taken hereunder.

3

**Section 3.**    Jurisdiction Exclusive – The jurisdiction of the Jamul Tribal Court under Sections 1 and 2 of this Article V is exclusive as to any other court, tribal, state or federal.

**Section 4.**    Decisions Final – All decisions of the Jamul Tribal Court under this Article V shall be final and not subject to further appeal.

**Section 5.**    Rules of Procedure – The Executive Committee is hereby authorized and directed to prepare and adopt rules of procedure to be followed by the Jamul Tribal Court in connection with actions for eviction or exclusion hereunder.

## ARTICLE VI.   ENFORCEMENT

**Section 1.**    Enforcement of Eviction and Exclusion Orders – The Executive Committee is authorized to take any and all steps necessary to enforce any eviction or exclusion order of the Jamul Tribal Court.

**Section 2.**    Assistance from Law Enforcement – In cases where it deems it necessary or desirable, the Executive Committee is authorized to seek the assistance of state or federal law enforcement authorities, including the Bureau of Indian Affairs, and to retain any other personnel for such purpose, to assist with, or to keep the peace in connection with, the enforcement of any eviction or exclusion order of the Jamul Tribal Court.

## ARTICLE VII.   ADOPTION AND AMENDMENT

Section 1.    This Ordinance shall be adopted by a majority vote of tribal members voting at a duly called General Council meeting with a quorum present, and shall be amended in the same manner.

## C E R T I F I C A T I O N

This is to certify that this Amendment to Ordinance No. 2001-02 (governing tribal evictions and exclusions), was adopted by the Jamul General Council at a duly called meeting with a quorum present, on January _5_ , 2007, by a vote of _17_ FOR, _0_ , Opposed, and _0_ Abstaining.

Leon Acebedo, Chairman

Carlene Chamberlain, Vice-Chair

Erica M. Pinto, Council Member

Kenneth Meza, Council Member

Robert Mesa, Council Member

Julia Lotta Secretary/Treasurer

4

# EXHIBIT E

# JAMUL TRIBAL COURT
### Intertribal Court of Southern California

| Attorney for Plaintiff or Plaintiff without an Attorney | (For Court Use Only) |
|---|---|
| EUGENE MADRIGAL<br>LAW OFFICE OF EUGENE R. MADRIGAL<br>28581 Old Town Front Street, Ste. 208<br>Temecula, CA 92590<br>Telephone: (951) 695-7080 / Facsimile: (951) 695-7081 | |
| Attorney for Defendant or Defendant without an Attorney<br>PATRICK D. WEBB<br>WEBB & CAREY APC<br>401 B Street, Ste. 306<br>San Diego, CA 92101<br>Telephone: (619) 236-1650 / Facsimile: (619) 236-1283 | |

| JAMUL INDIAN VILLAGE,<br>    Plaintiffs,<br>        vs.<br>WALTER ROSALES, KAREN TOGGERY, LOUIS AHYULE GOMEZ,<br>and DOES 1 through 20, inclusive,<br>    Defendants | |
|---|---|
| **ORDER AFTER HEARING<br>FINDINGS** | Case Number:<br>JAMUL 07-01-01 |

This matter came as specially set by the Court for an Order to Show Cause as to why this case as set in the Jamul Tribal Court for an eviction of the above named Defendants currently residing on the Jamul Tribal Village should not proceed.  Appearing for the Plaintiff was Eugene Madrigal, Law Office of Eugene R. Madrigal and Skip Durocher, Dorsey & Whitney LLP.  Specially appearing on behalf of the Defendants was Mr. Patrick D. Webb Esq., Webb & Carey APC.

### INTRODUCTION

Attorney for the Defendants in his request for a hearing in this matter proposed several legal questions regarding the jurisdiction of the current Jamul Tribal Court. Defendants allege the "eviction and exclusion ordinance No. 2007-01 which this case is premised upon was not adopted by the lawful members of the General Council of the Jamul Indian Village", and therefore did not convey or confer jurisdiction in this case on the Intertribal Court of Southern California. They further suggest the only Jamul Tribal Court in existence was created on May 9, 1981 by the then Tribal Council and that Defendant Karen Toggery was "the only lawfully elected judge of that court since 1995." Counsel for Defendants also suggest they are "beneficial owners" of certain land parcels located on the reservation

1  and that they are the "lawfully elected governing officials of the Jamul Indian Village" and that the

2  current Tribal Counsel and Chairman are not lawfully elected officials. Plaintiff, the Jamul Indian Village

3  disagrees on all points with Defendant's position. Thus the purpose of this hearing was to examine the

4  parties differing position and from there determine if the eviction process should go forward.

5                                        DISSUCSSION

6        In proceeding with this matter the Court explained to all parties present and respective Counsel

7  that the Intertribal Court of Southern California was appointed to act as the Tribal Court for the Jamul

8  Tribe based upon approval of the Inter-governmental Agreement and then passed by resolution passed by

9  the current Tribal Council and was approved by the General Council. Defendants argued they were the

10  true Tribal government and only they could adopt such an action. They further alleged that Defendant

11  Ms. Karen Toggery was the only Tribal Judge as elected in 1995. The result, as argued, by Defendants is

12  that the current Jamul Tribal Court had no jurisdiction in this matter. Defendants Toggery and Rosales

13  also contend that they are the "beneficial owners" of a certain parcel 597-080-04 which is currently part

14  of the Jamul Indian Village. It is these issues and other questions as presented at the hearing these

15  findings will address.

16                          THE INTERTRIBAL COURT OF SOUTHERN CALIFORNIA

17        The proceedings began with an effort to clarify the Intertribal Court of Southern California's

18  (ICSC) position in this case. The Court took time to explain to all parties how the ICSC was formed and

19  how it came to be the Court in which this matter is to be heard. By way of a brief review it was explained

20  that the ICSC was appointed by the current Tribal Council with the approval of the General Council to act

21  as "the Jamul Tribal Court" and that there are 9 other Tribes within San Diego County who have agreed

22  to the Inter-governmental agreement and passed similar resolutions naming the ICSC to serve as "their"

23  Tribal Court. In effect when the ICSC Judge is sitting at any particular reservation he/she is the Judge for

24  that reservation and no other. The Judge follows the laws, procedures, customs and traditions of the

25  Reservation he/she is sitting in. Conceptually this is patterned after a Circuit Court concept common in

the early history of the United States. The ICSC receives no monies from individuals or Tribes nor does it

or has it received any revenue from any gaming Tribe or entity. It is funded solely by a host of State and

Federal grants specifically created to further the development and implementation of Tribal Courts and

Version 1 (2007-01)     Order After Hearing Findings - 2

FEB-09-2007 15:48 From:ICSC HUMAN                  7607391472              TO:9918931881

1    the Tribal Court system. Initially funding coming from a United States Department of Justice grant,

2    applied for under the Southern California Tribal Chairmen's Association provided the monies for the

3    ICSC. It should also be noted that Tribes and individual Tribal members are not charged when using the

4    services of the ICSC.

5                                           FINDINGS

6    1.   Defendants alleged in their responsive pleadings and by way of oral argument "the purported

7         eviction and exclusion ordinance No. 2007-01 was not lawfully adopted by lawful members of

8         the General Council of the Jamul Indian Village and therefore cannot confer jurisdiction on the

9         ICSC." In reviewing the exhibits presented in this matter relating to this argument, and after

10        hearing argument the Court disagrees with Defendants contentions. There have been numerous

11        lawsuits, administrative hearings and other legal challenges directly or indirectly related in part

12        to this issue as well as others in this matter. In each case the Defendants have been unsuccessful

13        in challenging the legitimate status of both the current Tribal membership enrollment roles as

14        well as related matters and the current legal status of the current Tribal Council and Tribal

15        Chairman. In preparing for this hearing the Court reviewed all exhibits presented by the parties

16        including the sworn declarations of the Acting Director of the Riverside Office of the Bureau of

17        Indian Affairs (BIA), which clearly recognized the Tribal government as currently

18        constituted as the only legitimate Tribal government of the Jamul Indian Village. This exhibit

19        goes on to convey its approval of the Tribal elections, including that of the current Tribal

20        Chairman, which had been challenged. In a case filed in the United State District Court in

21        Washington D.C. appealing the Interior Board of Indian Appeals (IBIA), one of three separate

22        appeals, challenging the BIA and the IBIA findings Judge Gladys Kessler presiding, it states that

23        the IBIA decisions are final and "not arbitrary and capricious or contrary to law" as contended by

24        the Defendants. Rather the law provides that the IBIA decisions are final and that further actions

25        or motions do not stay those decisions. IBIA decisions are to be carried out not withstanding

          subsequent appeals. This Court agrees with those findings.,

     2.   Defendants allege they are "beneficial owners" of parcel 597-080-04 a portion of that

          property currently referred to as the Jamul Indian Village. Again respectfully Defendants are

1   mistaken. While they have continuously challenged it, the record including, records from a host

2   of Court decisions and exhibits make it clear Defendants are not enrolled members of the Jamul

3   Indian Tribe and even if they were, individual Tribal members cannot claim an individual right

4   allotment or otherwise to any parcel. "Rather as pointed out by United States District Judge Irma

5   Gonzales in this case and directly relating to this issue "the parcel is held by the United States in

6   trust for the benefit of the Jamul Tribe." She goes on to note "the manner in which a tribe

7   chooses to use its property can be controlled by individual members only to the extent the

8   members participate in the governmental process of the Tribe." While in his oral argument to the

9   Court, Counsel for the Defendants contended this was mere "dicta". This Court disagrees and

10  concludes that this factor went directly to the heart of her decision. Defendants are not nor have

11  they ever have been beneficial owners of any part of the Jamul Indian Reservation.

12  3.  Defendants contend "there is only one Jamul Indian Village Tribal Court that was created

13      pursuant to the May 9, 1981, Jamul Indian Village constitution and the Indian Reorganization Act

14      of 1934.25 U.S.C. 461 et seq., and that Ms. Karen Toggery is and has been the only lawfully

15      elected Judge of that Court since 1995." This argument carries no water. The Tribe is lawfully

16      formed and recognized by the Federal government, and has both a constitutional and inherent

17      right to select its judicial officers as well as reject them. In this case by way of a Tribal

18      Resolution and subsequent vote of the General Council they have chosen to form the Court as

19      described above.  It is clear to this Court that Ms. Toggery even if she were once a Tribal Judge

20      has since been rejected as such.  Further even if there was (and there is not) a remote possibility

21      this allegation were true Ms. Toggery from a pure ethical prospective, as a named Defendant in

22      this case, would be deemed unfit to preside in such an action.

23  4.  The remaining issue as addressed in the Defensive pleadings is that of jurisdiction.  Defendants

24      contend they have not submitted to the jurisdiction of the Intertribal Court of Southern California.

25      As explained above it is not the jurisdiction of the ICSC that is to be argued.  The question is,

    does the Jamul Tribal Court as constituted using the services of the ICSC have jurisdiction in this

    matter? The answer is unequivocally yes!  As discussed, this Court finds the current Tribal

    government of the Jamul Indian Village the only legitimate Tribal governmental authority of the

1   Tribe as recognized by the Federal Government and pursuant to the Tribal Constitution. Therein

2   based upon the Tribes inherent powers coupled with its constitution it has the right to convene its

3   own Tribal Court as it has done. Therefore the Tribe has jurisdiction over its lands and those who

4   choose to enter upon those lands just as the Defendants have chosen to do so. There is no dispute

5   Defendants are on Tribal land and are not currently recognized as or enrolled as Tribal members.

6   Additionally the Tribe is exercising its civil regulatory jurisdiction over those on Tribal lands be

7   they Indian or non-Indian. This being established not unlike any sovereign power the Tribe has

8   jurisdiction over those who voluntary choose to enter Tribal lands and in this case reside on

9   Tribal lands. Thus it is not a matter of whether or not the Defendants choose to "submit" to the

10  jurisdiction of the Tribe and in turn the Tribal Court they do so by law, by their mere presence on

11  Tribal land.

12  COMMENT AND CONCLUSION

13  It is this Courts opinion the Defendants challenges fly in the face of not only its own conclusions

14  but that of numerous administrative and Court decisions and appeals denying them the identical relief

15  they currently seek in the Tribal Court. Given the current state of both Federal and State law and under

16  Public Law 280 this Court is of the opinion had a Tribal Court been in existence at the time this case and

17  the issues contained therein first came to light, the matter would have been long resolved and done so at

18  the Tribal level. This case as argued revolves around Tribal issues and should not involve either the State

19  or Federal Governments. The Constitution of the Jamul Indian Village is clear. It grants Tribal members

20  and their elected government the power and authority to adopt ordinances and make laws to "promote the

21  peace, health, morals, education and general welfare" of the Village and its members. This is in fact

22  exactly what the Tribe has done. And in defending their sovereign rights as a Tribe, they have

23  contradicted in one legal forum or another every challenge the Defendants have made. This is not some

24  grand game where a small minority should be allowed to hold hostage by way of repeated unsuccessful

25  legal challenges the majority. The position of the current Tribal government and Tribal membership has

been time and time again made clear by the Courts and again is repeated by this Court. They are the

correct and legitimate membership and governing body. Defendants do not in any way represent the

Jamul Indian Village.

Version 1 (2007-01)    Order After Hearing Findings - 5

This has been a long and protracted controversy. Defendants have for a period of 12 years filed numerous lawsuits challenging the Tribal Government, Tribal land use, Tribal elections and much more. While not prevailing, at every turn they continue. The time has come to put this matter to rest! Defendants will file, as ordered at the hearing, an answer to the Tribes complaint for eviction on or before February 8, 2007. A trial on Plaintiffs complaint for eviction will then proceed as ordered at a hearing on February 23, 2007 in the Jamul Tribal Court located at 13910 Lyons Valley Road, Jamul, CA 91935 at 10:a.m.

**IT IS SO ORDERED:**

ANTHONY J. BRANDENBURG,
CHIEF JUDGE JAMUL TRIBAL COURT

Version 1 (2007-01)        Order After Hearing Findings - 6

EXHIBIT F

# NOTICE OF EVICTION AND EXCLUSION

TO:        Walter Rosales and any and all other occupants of the property at 14191
           Highway 94, Jamul, California 91935.

DATED:     January 17, 2007

**NOTICE IS HEREBY GIVEN:** that any right you may have had, if any, to use and
occupy the above identified property on the Jamul Indian Village Reservation is
rescinded and revoked by action of the Jamul Indian Village General Council. A tribal
court action for eviction and exclusion has also been filed against you in the Jamul Tribal
Court, Intertribal Court of Southern California, in accordance with Exclusion and
Eviction Ordinance of the Jamul Indian Village.

The reason for this action, includes, but may not be limited to, the following: You are not
a member of the Jamul Indian Village, you are in possession of Jamul Reservation lands
without the consent of the Tribe evidenced by lease, assignment or license authorized by
the General Council of the Jamul Indian Village, you have no rights to the use of the
property of the Jamul Indian Village, and the Jamul General Council has therefore
authorized your eviction and exclusion from Jamul Reservation lands.

YOU MUST VACATE THE PROPERTY BY NO LATER THAN: Fifteen (15)
calendar days from the date this Notice and a copy of the eviction and exclusion action
were served upon you, or these documents were posted on the premises, whichever
occurred first.

Removal of Personal Property: You must remove all personal property and possessions
from the premises by the above specified time. Any personal property found on the
premises after the above date shall be removed and disposed of, or stored, at the option of
the Jamul Indian Village. If the property is stored, it must be claimed within 14 days (30
days for vehicles), and any accrued storage costs must be paid. If not claimed in this time
period, the property may be sold or destroyed.

Request For Tribal Court Hearing: If you wish to contest this action, you must file a
written request for a hearing in the Jamul Tribal Court, Intertribal Court of Southern
California, within 5 calendar days of the date this Notice and a copy of the eviction and
exclusion action were served on you, or were posted on the premises, whichever occurred
first. The Tribal Court will then advise you of the date and time of your hearing. A copy
of the required Hearing Request Form is attached.

Relocation Expenses: In order to provide an incentive for prompt compliance with this
Notice, the Jamul Indian Village has authorized the payment of reasonable relocation
expenses. A payment of $5,000 will be made upon your written consent to comply with
this Notice, and an additional $5,000 payment will be made within 10 days after you

1

vacate the premises and all personal property has been removed.

YOU ARE FURTHER ADVISED: that failure to comply with this Notice could result in money damages, including attorney's fees and costs, being assessed against you for continued unlawful occupation of reservation lands.

The decision of the Jamul Tribal Court shall be final and not subject to further appeal.

Jamul Indian Village
P.O.B. 612
Jamul, Ca  91935

2

# EXHIBIT G

# NOTICE OF EVICTION AND EXCLUSION

TO:         Karen Toggery and any and all other occupants of the property at 14191 Highway 94 #14, Jamul, California 91935.

DATED:    January 17, 2007

**NOTICE IS HEREBY GIVEN:** that any right you may have had, if any, to use and occupy the above identified property on the Jamul Indian Village Reservation is rescinded and revoked by action of the Jamul Indian Village General Council. A tribal court action for eviction and exclusion has also been filed against you in the Jamul Tribal Court, Intertribal Court of Southern California, in accordance with Exclusion and Eviction Ordinance of the Jamul Indian Village.

The reason for this action, includes, but may not be limited to, the following: You are not a member of the Jamul Indian Village, you are in possession of Jamul Reservation lands without the consent of the Tribe evidenced by lease, assignment or license authorized by the General Council of the Jamul Indian Village, you have no rights to the use of the property of the Jamul Indian Village, and the Jamul General Council has therefore authorized your eviction and exclusion from Jamul Reservation lands.

YOU MUST VACATE THE PROPERTY BY NO LATER THAN: Fifteen (15) calendar days from the date this Notice and a copy of the eviction and exclusion action were served upon you, or these documents were posted on the premises, whichever occurred first.

Removal of Personal Property: You must remove all personal property and possessions from the premises by the above specified time. Any personal property found on the premises after the above date shall be removed and disposed of, or stored, at the option of the Jamul Indian Village. If the property is stored, it must be claimed within 14 days (30 days for vehicles), and any accrued storage costs must be paid. If not claimed in this time period, the property may be sold or destroyed.

Request For Tribal Court Hearing: If you wish to contest this action, you must file a written request for a hearing in the Jamul Tribal Court, Intertribal Court of Southern California, within 5 calendar days of the date this Notice and a copy of the eviction and exclusion action were served on you, or were posted on the premises, whichever occurred first. The Tribal Court will then advise you of the date and time of your hearing. A copy of the required Hearing Request Form is attached.

Relocation Expenses: In order to provide an incentive for prompt compliance with this Notice, the Jamul Indian Village has authorized the payment of reasonable relocation expenses. A payment of $5,000 will be made upon your written consent to comply with this Notice, and an additional $5,000 payment will be made within 10 days after you

1

vacate the premises and all personal property has been removed.

YOU ARE FURTHER ADVISED: that failure to comply with this Notice could result in money damages, including attorney's fees and costs, being assessed against you for continued unlawful occupation of reservation lands.

The decision of the Jamul Tribal Court shall be final and not subject to further appeal.

Jamul Indian Village
P.O.B. 612
Jamul, Ca 91935

2