# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| WALTER J. ROSALES, ESTATE OF HELEN ) | CASE NUMBER:  **01:07 cv 00162** |
| CUERO, ESTATE OF DEAN ROSALES, P.O. ) | |
| Box 85, Jamul, California, 91935    ) | JUDGE:       **Judge Rosemary M. Collyer** |
|                    ) | |
| KAREN TOGGERY, ESTATE OF MARIE    ) | DECK TYPE:    **Tribal Rights** |
| TOGGERY, ESTATE OF MATTHEW      ) | |
| TOGGERY, P.O. Box 375, Jamul, California, ) | DATE STAMP: |
| 91935                  ) | |
|                    ) | |
| JAMUL INDIAN VILLAGE, a federally    ) | **PLAINTIFFS' MEMORANDUM OF POINTS AND** |
| recognized Indian tribe, P.O. Box 612, Jamul, ) | **AUTHORITIES IN REPLY TO OPPOSITION TO** |
| California, 91935.            ) | **MOTION FOR PRELIMINARY INJUNCTION** |
|                    ) | |
|        Plaintiffs,        ) | |
| vs.                   ) | |
| UNITED STATES OF AMERICA,       ) | |
| Department of Justice          ) | |
| 950 Pennsylvania Avenue, NW       ) | |
| Washington, D.C. 20530-0001,       ) | |
| and its divisions, including but not limited to, ) | |
| DEPARTMENT OF THE INTERIOR, by and ) | |
| through Secretary DIRK KEMPTHORNE, in his ) | |
| official capacity,           ) | |
| 1849 C Street, NW,           ) | |
| Washington, D.C. 20240,         ) | |
| BUREAU OF INDIAN AFFAIRS, by and    ) | |
| through Assistant Secretary of Indian Affairs, ) | |
| JAMES E. CASON, in his official capacity,   ) | |
| 1849 C Street. NW, Washington, D.C. 20240, ) | |
|                    ) | |
|        Defendants.        ) | |

# TABLE OF CONTENTS

## THE GOVERNMENT'S MIS-PERCEPTION OF THE ISSUES

A.  The Government seeks to deny Plaintiffs' relief before Plaintiffs' claims can be fully and fairly litigated. ............................................................................................................ 1

B.  The United States has waived its sovereign immunity for Plaintiffs' claims under the Administrative Procedure Act, NAGPRA and the Federal Tort Claims Act. .................... 1

C.  It is Defendants who seek to circumvent administrative review of their statutory violations and provide no substantive reason why a preliminary injunction should not be granted. ......... 2

D.  Plaintiffs seek a prohibitory injunction on Federal lands (Parcels 04 and 05). .................. 3

E.  Defendants' lack of respect for the fact that they may be wrong, and Plaintiffs may be right, has lead to the failure to follow DOI/BIA policy with regard to recognition of Plaintiffs as members of the tribe, and that the tribe is a proper Plaintiff in this action. ......................... 4

F.  Plaintiffs' beneficial ownership and trespass claims have never been finally decided. ...... 6

G.  Plaintiffs' beneficial ownership claims are not subject to exhaustion of tribal remedies. ... 7

H.  The balance of harm tips strongly in favor of Plaintiffs. ................................................... 8

## ARGUMENT

I.  NAGPRA REQUIRES THAT THE GOVERNMENT SECURE  AND PROTECT THE INADVERTENTLY DISCOVERED NATIVE AMERICAN HUMAN REMAINS AND FUNERARY OBJECTS FROM MUTILATION, DESECRATION AND DISINTERMENT BY THIRD PARTIES.

A.  Defendants concede the government's extensive obligations and duties under NAGPRA and its regulations. ...................................................................................................... 10

B.  The NAGPRA regulations control use of the federal lands and tribal lands upon which Native American human remains and funerary objects are inadvertently discovered, whether that use is by tribal or non-tribal third parties. ............................................................................ 16

II.  THE GOVERNMENT'S TRUST RESPONSIBILITY ALSO REQUIRES PROTECTION FROM TRESPASS ON PLAINTIFFS' BENEFICIAL OWNERSHIP INTEREST IN PARCEL 597-080-04 BY TRIBAL OR NON-TRIBAL THIRD PARTIES.

A.  The Government's trust responsibility requires protection from trespass. ........................ 20

B.  Plaintiffs are the beneficial owners of parcel 597-080-04. ............................................... 21

III.  CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

Abenaki Nation of Miss. v. Hughes,
  805 F. Supp. 234 (D. Vt. 1992) ................................................................. 10

Bonnichsen v. United States,
  969 F. Supp. 614, *aff'd*, 367 F.3d 864 (9th Cir.2004) ............................. 2

Cherokee Nation of Oklahoma v. Muskogee Area Dir.,
  22 IBIA 240 (1992) ...................................................................................... 5

Coast Indian Comty. v. United States,
  550 F.2d 639 (Fed. Cl. 1977) .................................................. 7, 19, 20, 21, 22, 24, 25

Comanche Nation v. United States,
  393 F. Supp. 2d 1196 (W.D. Okla. 2005) ................................................. 20

Commissioner v. Sunnen,
  333 U.S. 591 (1948) ...................................................................................... 7

Co. of Oneida v. Oneida Indian Nation,
  470 U.S. 226 (1985) .................................................................................... 18

Co. of Yakima v. Yakima Indian Nation,
  502 U.S. 251 (1992) ................................................................................. 18-19

Creek Nation v. United States,
  318 U.S. 629 (1943) .................................................................................... 21

Duncan v. United States,
  667 F.2d 36 (Fed. Ct. Cl. 1981) ................................................................ 19

Elliott v. F.D.I.C.,
  305 F. Supp. 2d 79 (D.D.C. 2004) ............................................................... 7

Feres v. United States,
  340 U.S. 135 (1950) ...................................................................................... 2

Five Sandoval Indian Pueblos, Inc. v Deputy Comm. Indian Affairs,
  21 IBIA 17 (1991) ......................................................................................... 5

Hammerberg v. Portland Area Dir.,
  24 IBIA 78 (1993) ......................................................................................... 5

Harjo v. Andrus,
  581 F.2d 949 (D.C. Cir. 1978) ................................................................... 20

Harjo v. Kleppe,
    420 F. Supp. 1110 (D.D.C. 1976) ................................................................ 20

Hawk v. Danforth,
    2006 U.S. Dist. LEXIS 58104 (E.D. Wis. 2006) ........................................ 10

Heckler v. Chaney,
    470 U.S. 821 (1985) ................................................................................... 21

Indian Towing Co. v. United States,
    350 U.S. 61 (1955) ....................................................................................... 2

Kansas v. Norton,
    249 F.3d 1213 (10th Cir. 2001) .................................................................. 24

Keechi v. United States,
    604 F. Supp. 267 (D.D.C. 1985) ........................................................... 20, 21

Lewis v Norton,
    424 F.3d 959 (9th Cir. 2005) ....................................................................... 6

Milam v. United States,
    10 I.L.R. 3013 (D.D.C. Dec. 23, 1982) ................................................. 18, 20

Minn. Chippewa Tribe v. United States,
    14 Cl. Ct. 116 (1987) ................................................................................. 19

Molzoff v. United States,
    502 U.S. 301 (1992) ..................................................................................... 2

National Farmers Union Ins. Cos. v. Crow Tribe,
    471 U.S. 845 (1985) ..................................................................................... 8

Next Wave Personal Comm. Inc. v. F.C.C.,
    254 F.3d 130 (D.C. Cir. 2001) ..................................................................... 7

Osage Tribe of Indians of Okla. v. United States,
    No. 99-550 L (Ct. Fed. Cl. 2006) .............................................................. 18

Peters v. Pauma Sch. Dist.,
    91 Cal.App.2d 792 (1928) ............................................................................ 3

Pueblo of San Ildefonso,
    103 F.3d 936 (10 Cir. 1996) ........................................................................ 2

Pyramid Lake Paiute Tribe of Indians v. Morton,
    354 F. Supp. 252 (D.D.C. 1973) ............................................................... 21

Reo v. U.S. Postal Serv.,
    98 F.3d 73 (3rd Cir. 1996) ........................................................................................ 2

Rosales v. Sacramento Area Dir.,
    32 IBIA 167 (1998) ............................................................................................ 5, 23

Rosales v. United States,
    73 Fed.Appx. 913 (9th Cir. 2003) ......................................................................... 6

Sac & Fox Nation v. Norton,
    240 F.3d 1250 (10th Cir. 2001) .............................................................................. 3

San Carlos Apache Tribe v. United States,
    272 F. Supp. 2d 860 (D. Ariz. 2003) ................................... 2, 10, 11, 12, 13, 16

Seminole Nation of Okla. v. Norton,
    223 F. Supp. 2d 122 (D.D.C. 2002) ................................................................ 18, 20

Shoshone-Bannock Tribes v. Reno,
    56 F.3d 1476 (D.C. Cir. 1995) .............................................................................. 21

Thomas v. United States,
    141 F. Supp. 2d 1185 (W.D. Wis. 2001) ............................................................. 18

United Auburn Indian Cmty. v. Sacramento Area Dir.,
    24 IBIA 33 (1993) ................................................................................................... 5

United States v. Assiniboine Tribe,
    428 F.2d 1324 (Fed. Cl. 1970) ...................................................................... 7, 21-22

United States v. Jim,
    409 U.S. 80 (1972) ................................................................................................ 20

United States v. Creek Nation,
    295 U.S. 103 (1935) .............................................................................................. 18

United States v. Flournoy Live-Stock & Real-Estate Co.,
    69 F. 886 (D. Neb. 1895) ...................................................................................... 21

United States v. Mason,
    412 U.S. 391 (1973) .............................................................................................. 19

United States v. Mitchell,
    463 U.S. 206 (1983) .............................................................................................. 21

United States v. Pawnee Business Council,
    382 F. Supp. 54 (N.D. Okla 1974) ....................................................................... 20

United States v. State Tax Comm.,
    535 F.2d 300 (5th Cir. 1976)................................................................. 7, 22, 24, 25

United States v. Wilson,
    881 F.2d 596 (9th Cir. 1989)................................................................. 21

Washington v. Indiana H.S. Athletic Ass'n. Inc.,
    181 F.3d 840 (7th Cir. 1999)................................................................. 1

Whelan v. Abell,
    48 F.3d 1247 (D.C. Cir. 1995) ................................................................ 6-7

Wisconsin v. Stockbridge-Munsee Cmty.,
    67 F. Supp. 2d 990 (E.D. Wis. 1999).................................................... 3

Yankton Sioux Tribe v. U.S.(Yankton Sioux I),
    83 F. Supp. 2d 1047 (D.S.D. 2000) .................................... 2, 4, 9, 10, 11, 12, 13, 15, 17, 19

Yankton Sioux Tribe v. U.S. (Yankton Sioux II),
    209 F. Supp. 1008 (D.S.D. 2002) ...................................... 1, 9, 10, 11, 15, 16, 17, 18, 19

Yankton Sioux Tribe v. U.S. (Yankton Sioux III),
    258 F. Supp. 2d 1027 (D.S.D. 2003) .................................... 9, 10, 17, 18, 19

Zaslow v. Kroenert,
    29 Cal.2d 541 (1946) ............................................................................ 23

**Statutes**

5 U.S.C. § 701-706 ................................................................................ 2

5 U.S.C. § 702....................................................................................... 2

16 U.S.C. §§ 470aa-470mm................................................................. 18

25 U.S.C. § 465..................................................................................... 4, 21, 22

25 U.S.C. § 467..................................................................................... 3, 4

25 U.S.C. § 3001.................................................................................. 1

25 U.S.C. § 3001(5)............................................................................. 3, 7

25 U.S.C. § 3002(a)(1)......................................................................... 9

25 U.S.C. § 3002(c)(1)......................................................................... 18

25 U.S.C. § 3002(d)............................................................................. 10

25 U.S.C. § 3002(d)(1) ................................................................................. 11

25 U.S.C. § 3009 ............................................................................................ 2

25 U.S.C. § 3013 ............................................................................................ 2

28 U.S.C. § 2674 ............................................................................................ 2

Cal. Civil Code 685-86 .................................................................................. 23

Cal. Health & Safety Code 7050.5 ............................................................... 3-4

Cal. Pub. Res. Code 5297.94-97 .................................................................... 4

Cal. Pub. Res. Code 5297.9-5297.98 ............................................................. 2

Cal. Pub. Res. Code 5297.98 ..................................................................... 3, 17

Cal. Pub. Res. Code 5297.98(b)(1)(B) ........................................................... 2

**Regulations**

43 C.F.R. §§ 10.1-10.17.......................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................. 6

Fed. R. Civ. P. 19 ...................................................................................... 6, 7

Fed. R. Civ. P. 56 .......................................................................................... 6

**Miscellaneous**

1 Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs 1917-1974
        at 668, 724, 747, 1479, available at http://thorpe.ou.edu/solicitor.html ....................... 7, 22, 23, 24

Draft Agreement for Consultation, Treatment and Disposition of Human Remains and Cultural Items that may
        be Discovered Inadvertently During Planned Activities at the Statute of Liberty between DOI,
        National Park Service and the Delaware Nation and the Stockbridge-Munsee Coummunity of
        Wisconsin...................................................................................................... 17

The Four Reservations Act § 2, ch. 48, 13 Stat. 39 ...................................................... 3

Cohen, Felix, Handbook of Federal Indian Law, Ch. 1, Sec. D5, p. 45, fn. 158 (DOI 1982) ...................... 4

Cohen, Felix, Handbook of Federal Indian Law, p. 224 (DOI 1982)........................................ 19

Cohen, Felix, Handbook of Federal Indian Law, Ch. 11, B3, pp. 615-16 (DOI 1982) ............................ 23

## THE GOVERNMENT'S MIS-PERCEPTION OF THE ISSUES

**A. The Government seeks to deny Plaintiffs' relief before Plaintiffs' claims can be fully and fairly litigated.**

What is the government's rush to deny Plaintiffs' motion for a preliminary injunction to maintain the status quo, in order to provide time to fully and fairly litigate Plaintiffs' claims for protection under the Native American Graves Protection & Repatriation Act ("NAGPRA") and for protection of Plaintiffs' beneficial ownership of the federal land, known as parcel 597-080-04 ("Parcel 04")?

In the meantime, Plaintiffs face the immediate and irreparable threat of knowing and willful mutilation, desecration, and disinterment of Plaintiffs' Native American human remains and associated funerary objects, by third party grading contractors, in violation of the federal NAGPRA regulations. 25 U.S.C. § 3001 et seq., and 43 C.F.R. §§ 10.1-10.17. Such irreparable harm, combined with the reasonable probability, if not clear likelihood, of success on the NAGPRA merits – which need be no more than a *negligible chance* of succeeding on the merits, <u>Washington v. Indiana H.S. Athletic Ass'n. Inc.</u>, 181 F.3d 840, 846 (7th Cir. 1999), and which clearly "raise[] questions so serious and difficult as to call for more deliberate investigation," <u>Yankton Sioux Tribe v. U.S. (Yankton Sioux II)</u>, 209 F. Supp. 1008, 1024 (D.S.D. 2002) – requires issuance of the requested preliminary injunction.

Contrary to Defendants' unsupported assertion in their broad brush opposition, which admits only a superficial and cursory reading of the relevant statutes and regulations, <u>see</u> Opp. at 2, the NAGPRA regulations set out extensive obligations and duties of the United States and its agencies to protect Plaintiffs' Native American human remains and associated funerary objects from mutilation, desecration and disinterment, resulting from grading and construction activities by third parties, <u>see</u> 43 C.F.R. § 10.1-10.17, none of which the federal officials have performed, despite the admitted inadvertent discovery of Native American human remains on the federal lands known as parcels 597-080-04 and 597-080-05 ("Parcel 05").

**B. The United States has waived its sovereign immunity for Plaintiffs' claims under the Administrative Procedure Act, NAGPRA and the Federal Tort Claims Act.**

As discussed with the Court at the February 16, 2007 hearing, the Administrative Procedure Act

(APA), 5 U.S.C. §§ 701-06, NAGPRA's enforcement and savings clauses, 25 U.S.C. §§ 3009 and 3013,[1] and

the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674, combine to waive the government's sovereign

immunity and establish the government's liability for failing to abide by the additional protections afforded

Plaintiffs under the California NAGPRA, Cal. Pub. Res. Code 5297.9-5297.98, including the latest

amendment requiring the maintenance of the lineal descendants' preference to preserve their human remains

and associated funerary objects "in place." Cal. Pub. Res. Code 5297.98(b)(1)(B).

Section 2674 of Title 28 U.S.C., the Federal Tort Claims Act (FTCA), removes the sovereign

immunity of the United States for negligently breaching its statutory duties and applies the same measure of

liability to the United States as is applied under the law of the state where the damage occurs. Feres v. United

States, 340 U.S. 135, 141 (1950). Under the FTCA, the United States is liable "in the same manner and to the

same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. Thus, the extent of the

United States' liability under the FTCA is generally determined by reference to state law. Molzoff v. United

States, 502 U.S. 301, 305 (1992); Indian Towing Co. v. United States, 350 U.S. 61, 64-65, 68-69 (1955); Reo

v. U.S. Postal Service, 98 F.3d 73, 75 (3rd Cir. 1996).

### C.  It is Defendants who seek to circumvent administrative review of their statutory violations and provide no substantive reason why a preliminary injunction should not be granted.

Contrary to Defendants' assertion, Opp. at 1, it is Defendants who are attempting to "circumvent the

normal channels of administrative review of leadership and gaming issues," by attempting to favor the

opposing faction by allowing grading of the relevant parcels in violation of Defendants' obligations and duties

under NAGPRA to prevent irreparable damage to Plaintiffs' families' human remains and associated funerary

objects, before the NAGPRA claims and administrative review of membership and leadership issues can be

---

[1] See Plaintiffs' original citation of Bonnichsen v. United States, 969 F. Supp. 614, 627 n. 17, aff'd, 367 F.3d 864, 873-74 (9th Cir. 2004) (explaining that this language is a clear expression of Congress' intent to establish a right to declaratory and injunctive relief to redress violations of NAGPRA); Pueblo of San Ildefonso, 103 F.3d 936, 938 (10th Cir. 1996); San Carlos, 272 F. Supp. 2d at 886; and Yankton Sioux Tribe v. U.S. Army Corps of Engineers ("Yankton Sioux I"), 83 F. Supp. 2d 1047, 1054 n.8. (D.S.D. 2000) ("the United States has expressly waived its sovereign immunity in suits which, like this one, seek non-monetary relief. 5 U.S.C. § 702.")

finally determined in the normal course in this action and the action before Judge Gladys Kessler of this Court.

Defendants do not provide any reason why a preliminary injunction should not be issued while the location, disposition and repatriation of Plaintiffs' Native American human remains and associated funerary objects are determined in the normal course, pursuant to the extensive regulations adopted by the DOI/BIA under NAGPRA. 43 C.F.R. §§ 10.1-10.17. Nor do they provide any reason why a preliminary injunction should not be issued to maintain the status quo, while the significant issues and serious questions concerning who are the legitimate members and lawfully elected leaders of the Jamul Indian Village are finally determined in the action pending before Judge Kessler in <u>Rosales v. United States,</u> Case No. 1:03 CV 01117 (D.D.C.).

### D. Plaintiffs seek a prohibitory injunction on federal lands (Parcels 04 and 05).

Contrary to Defendants' misleading assertion, Plaintiffs primarily seek a prohibitory injunction to prevent allowing any grading on the Federal land, Parcels 04 and 05,[2] and on the private land still owned by the Catholic Church, 597-080-06 ("Parcel 06"), under Cal. Pub. Res. Code 5297.98 and Cal. Health & Safety

---

[2] It must be remembered that both Parcels 04 and 05 are Federal lands, since the title to both parcels is in the name of the United States. <u>See</u> Complaint Exs. D and G, and 25 U.S.C. § 3001(5). As discussed further below at II, though Parcel 04 is beneficially owned by the individual Plaintiffs, and Parcel 05 may be beneficially owned by the subsequently federally recognized entity, the Jamul Indian Village, which is a named Plaintiff in this action, title is still held in the name of the United States on both parcels. Contrary to Defendants' assertions, for NAGPRA purposes, "tribal land" is defined as "(A) all lands within the exterior boundaries of any Indian reservation; (B) all dependent Indian communities." 25 U.S.C. § 3001(15). Here, no "reservation," nor any "dependent Indian community," was ever created. The Interior Secretary's power to designate new Indian reservations under 25 U.S.C. § 467 has not been used in California, since Congress specifically limited California to four Indian reservations in 1864, pursuant to The Four Reservations Act § 2, ch. 48, 13 Stat. 39, 40, and Congress never created an Indian reservation in Jamul. A reservation may only be created by act of Congress, treaty, executive order, or administrative proclamation by the Secretary, as required by 25 U.S.C. § 467. <u>See</u> <u>Peters v. Pauma Sch. Dist.,</u> 91 Cal. App. 2d 792, 794 (1928). Here, there has been no Secretarial "proclamation" of such a reservation, as required by 25 U.S.C. § 467. <u>See</u> <u>Wisconsin v. Stockbridge-Munsee Cmty.,</u> 67 F. Supp. 2d 990, 1003 (E.D. Wis. 1999). The Government's citation to a transmittal letter from a DOI/BIA realty officer suggesting a reservation may be established, Def. Ex. B at 14, does not indicate that a reservation ever was established, and Interior's later memos indicate that none was established. Complaint Ex. E. The Government's <u>Handbook of Federal Indian Law</u> by Felix Cohen (DOI 1982) declares: "Any implication that lands purchased for tribes under section 5 of the IRA [25 U.S.C. § 465] would constitute a reservation is negated by section 7 of that Act, 25 U.S.C. § 467 . . . ." Ch. 1, Sec. D5, page 45 n.158. Thus, the Government's mere acquisition of the land in trust does not create a reservation. <u>Sac & Fox Nation v. Norton,</u> 240 F.3d 1250, 1257 (10th Cir. 2001) ; <u>Stockbridge-Munsee Cmty.,</u> 67 F. Supp. 2d at 1003.

Code 7050.5.[3]  What Defendants call a mandatory injunction is, in all actuality, a prohibitory injunction preventing the United States from failing to perform the NAGPRA obligations and duties to preserve Plaintiffs' families' human remains and funerary objects where they were interred on Federal lands, pursuant to the traditional customs and practices of Plaintiffs' tribe.[4]

> ### E. Defendants' lack of respect for the fact that they may be wrong, and Plaintiffs may be right, has lead to the failure to follow DOI/BIA policy with regard to recognition of Plaintiffs as members of the tribe, and that the tribe is a proper Plaintiff in this action.

The tenor of Defendants' opposition exhibits a callous disregard for the sensitive nature of the irreparable harm to Plaintiffs' Native American human remains and associated funerary objects, if grading is permitted to occur, while the individual Plaintiffs' rights as lineal descendants, legitimate members and lawfully elected leaders of the Jamul Indian Village are finally determined.  Defendants' opposition also demonstrates an indifference and lack of respect for Plaintiffs' claims to be the lineal descendants of their forbears, legitimate members and lawfully elected leaders of the tribe, and that the federally recognized tribe is, in fact, a Plaintiff in this action.

Contrary to Defendants' unsupported assertion, the fact that the BIA continues to ignore its own precedent and attempt to "recognize" the other faction as leaders of the tribe flies in the face of legal precedent that holds that the DOI/BIA has lost jurisdiction to recognize the tribe's leadership while its original membership and leadership decisions remain on appeal and administrative review before Judge Kessler.  See

---

[3] Even though Mr. Acebedo's declaration claims that the other faction is not presently planning construction activities on Parcel 06, Cal. Pub. Res. Code 5297.94-97 also prohibits any public agency, including the U.S. DOI/BIA, from allowing any "interfer[ence] with the free expression or exercise of Native American religion, . . . caus[ing] severe or irreparable damage to any Native American sanctified cemetery, [or] bar[ring] appropriate access" to a ceremonial site, which interference will surely be caused by the 14 story casino covering every square foot of Parcels 04 and 05 that the other faction does plan to construct.

[4] As held in Yankton Sioux I, 83 F. Supp. 2d at 1047, Plaintiffs here have demonstrated a clear right to a writ of mandamus under 28 U.S.C. § 1361.  "[T]he named defendants who are officers of the Corps shall be required, under a writ of mandamus, to protect the remains in accordance with this Opinion . . . .  Under [NAGPRA] and the regulations, the Tribe has a clear right to the protection of human remains of which its members are the likely descendants and defendants have a clear duty to protect those remains. There is no alternative remedy which could adequately compensate the Tribe for the loss or destruction of those remains."

Hammerberg v. Portland Area Dir., 24 IBIA 78 (1993) (citing Five Sandoval Indian Pueblos, Inc. v Deputy Comm. Indian Affairs, 21 IBIA 17, 18-19 (1991)).  "The Area Director's [] decision, made while this matter was pending before the Board, has no force or effect." Hammerberg, 24 IBIA at 79; see also United Auburn Indian Cmty. v. Sacramento Area Dir., 24 IBIA 33, 38-39 (1993); Cherokee Nation of Okla. v. Muskogee Area Dir., 22 IBIA 240, 244 (1992). This is particularly important here where the IBIA has determined that "[d]epartmental recognition of the results of any of the elections would violate the Village's constitution," Rosales v. Sacramento Area Dir., 32 IBIA 167 (1998), because the government could not determine what number of voters constituted a lawful majority of the general council, nor could it determine  who was lawfully elected as leaders of the tribe.

Defendants' conscious disregard of the mere possibility, notwithstanding the probability, that Plaintiffs are right in their claims, and that the other faction is wrong, cannot support the denial of Plaintiffs' motion for a preliminary injunction. Defendants' failure to acknowledge this possibility, that Plaintiffs' claims will be finally determined in their favor, is contrary to what the Court must consider in the face of the severely irreparable harm threatened to Plaintiffs' families' human remains and associated funerary objects, and is ample justification for the issuance of a preliminary injunction to maintain the status quo, in light of the lack of any palpable downside to waiting to allow grading of the parcels, until Plaintiffs' claims are fully and finally determined.[5]

---

[5] This fair and even-handed approach to the outstanding legal issues as to who are the lineal descendants, who are the proper plaintiffs, and as to the fact that the tribe is, in fact, a Plaintiff in this action, the action before Judge Kessler, and the action before Judge Edward Damich in the U.S. Court of Federal Claims, undoubtedly factored into Judge Damich's decision to continue the stay of any further litigation before the Court of Federal Claims until a final decision is reached before Judge Kessler as to whether the named Plaintiffs here are, as they claim, legitimate members and lawfully elected leaders of the tribe who should be recognized by the United States and all of its agencies as one of the Plaintiffs in this action. See Pltfs.' Complaint, Exs. I and J.

**F.  Plaintiffs' beneficial ownership and trespass claims have never been finally decided.**

Also contrary to Defendants' misleading misrepresentation, Plaintiffs' trespass claims in their second cause of action, based upon their beneficial ownership of the federal Parcel 04, have not failed to name all indispensable parties, nor have they been previously litigated in any forum.  First, the federally recognized Jamul Indian Village tribe is a Plaintiff in this action (and the actions before Judge Kessler and Judge Damich), and therefore cannot be denied relief for failure to be made an indispensable party under Rule 19, particularly where Judge Kessler's action is not yet final.[6]  Second, as noted during the hearing on February 16, 2007, the prior Southern District of California action merely sought the issuance of a "trust patent," based upon Plaintiffs' single cause of action to enforce an "allotment" of what is now known as Parcel 04.  That action did not seek a declaration as to Plaintiffs' beneficial ownership of the federal Parcel 04.  See Rosales v. United States, Case No. 01cv951 (S.D. Cal.) ("Rosales S.D. Cal."), Complaint, attached as Ex. A hereto.  There, the government's Rule 12(b)(6) motion to dismiss was denied, and its alternative Rule 56 motion for summary judgment was granted, denying Plaintiffs an "allotment" and any issuance of a "trust patent" in Parcel 04. Def. Ex. E.

Moreover, the unpublished summary judgment decision in Rosales S.D. Cal. was not adopted by the Ninth Circuit on Plaintiffs' appeal.  See Rosales v. United States, 73 Fed. Appx. 913, 914 (9th Cir. 2003).  Instead, the Ninth Circuit dismissed the action, due to the absence of the Jamul Indian Village as an indispensable party to the action, under Fed. R. Civ. P. Rule 19. None of the purported "factual" findings referenced by the government in its moving papers were adopted or affirmed by the Ninth Circuit, and more importantly, none of the claimed determinations of "beneficial ownership" of Parcel 04 were necessary to the trial court's denial of the issuance of a "trust patent" for any "allotment" of the parcel; hence they are mere *dicta*, and not a final factual determination on the merits. Issue preclusion applies only to preclude litigation of issues "actually and necessarily determined" by an earlier adjudication, Whelan v. Abell, 48 F.3d 1247, 1255-

---

[6] Hence, Defendants' citation of Lewis v Norton, 424 F.3d 959, 963 (9th Cir. 2005) is inapposite. Since the tribe itself is a plaintiff here, there can be no end run around tribal immunity.

56 (D.C. Cir. 1995); and "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding." <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 599-600 (1948). If it is "uncertain whether [an] issue was actually and necessarily decided in [prior] litigation, then relitigation of the issue is not precluded." <u>Next Wave Personal Comm. Inc. v. F.C.C.</u>, 254 F.3d 130, 147 (D.C. Cir. 2001).

As explained at the February 16, 2007 hearing, Plaintiffs are therefore not barred by either of the issue preclusion doctrines of *res judicata* or collateral estoppel from seeking to prevent any alienation or trespass against their beneficial ownership of Parcel 04, since until this action was filed, Plaintiffs had not sought any declaratory relief that they were designated by the Secretary of the Interior as the beneficial owners of the parcel, pursuant to 25 U.S.C. § 465 and the holdings in <u>Coast Indian Cmty. v. United States,</u> 550 F.2d 639 (Fed. Cl. 1977) , <u>United States v. Assiniboine Tribe,</u> 428 F.2d 1324, 1329-30 (Fed. Cl. 1970), <u>United States v. State Tax Comm.,</u> 535 F.2d 300, 304 (5th Cir. 1976), and 1 <u>Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs 1917-1974</u> at 668, 724, 747, and 1479.

**G.  Plaintiffs' beneficial ownership claims are not subject to exhaustion of tribal remedies.**

Also contrary to Defendants' misrepresentation, Plaintiffs' beneficial ownership claims to the federal Parcel 04 are not subject to the exhaustion of tribal remedies. First, Parcel 04 is by definition federal lands (and not tribal lands), and therefore not subject to tribal remedies, since the U.S. holds title expressly "in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate," and the individual Plaintiffs (and not the tribe) were designated the beneficial owners, as in  <u>Coast Indian Cmty.,</u> <u>supra</u>. <u>See</u> Rosales Dec. ¶ 13, and II below. "Federal lands" means any land other than tribal lands which are controlled or owned by the United States . . . ." 25 U.S.C. § 3001(5). Second, there is only one Jamul Indian Village tribal court, and that was created by the tribe in 1995, when Karen Toggery was elected its only judge. Third, neither the lawful membership or leadership of the tribe, nor Plaintiffs, have ever lawfully adopted an eviction ordinance or consented to the jurisdiction of the hastily created alternative dispute resolution service, known as the "Intertribal Court of Southern California," as a substitute for the one and only

7

Jamul Indian Village tribal court. Fourth, Plaintiffs have been seeking full faith and credit for the one and only Jamul Indian Village tribal court decision against the other faction before Judge Damich in the U.S. Court of Federal Claims, <u>Rosales v. U.S.</u> Case No. 98-860 L (Ct. Fed. Cl.), and before the San Diego Superior Court in the consolidated actions known as <u>Jamul Indian Village v.Hunter</u>, S.D.S.C. Case Nos. 698798 and 723872, both of which have stayed final determination of the full faith and credit to be accorded Judge Toggery's decision pending final judgment in the action now before Judge Kessler in <u>Rosales v. United States,</u> Case No. 1:03 CV 01117 (D.D.C.). <u>See</u> Mot. Exs. I and J, and Exs. B and C hereto.[7]

### H. The balance of harm tips strongly in favor of Plaintiffs.

The balance of hardships tips strongly in favor of Plaintiffs, given the irreparable nature of the threatened mutilation, desecration and disinterment of their families' human remains and funerary objects if grading is permitted on any of the three relevant parcels.[8] The government has proffered no harm to Defendants or third parties other than the passage of time necessary for the United States and its agencies to comply with the regulations under NAGPRA. Hence, the Court has a clear balance in favor of issuing a preliminary injunction to maintain the status quo, by prohibiting the allowance of any grading on the parcels in question while the serious and significant issues raised in Plaintiffs' complaint are fully and fairly litigated in due course and the government complies with the cessation of construction, consultation, written notice, disposition and repatriation, place and manner of delivery, of Plaintiffs' families' human remains and funerary objects mandated by the NAGPRA regulations. 43 C.F.R. § 10.1-10.17.

---

[7] Hence, avoiding the procedural nightmare described in <u>National Farmers Union Ins. Cos. v. Crow Tribe</u>, 471 U.S. 845, 857 (1985) requires maintaining the status quo, while full faith and credit is given to the original one and only Jamul Indian Village tribal court's decisions, and while the action before Judge Kessler finally determines that the other faction's subsequent eviction ordinance and hiring of "the Intertribal Court of Southern California" was not lawfully accomplished.

[8] Contrary to Defendants' erroneous assertion, Opp. at 35, Plaintiffs have not here sued for damages; a prayer for declaratory relief that the government is liable for having caused the Plaintiffs immeasurable monetary damages is not a claim for damages, and if granted will not allow execution on such a judgment, and is certainly not an admission that monetary damages could compensate the irreparable damage to Plaintiffs' families' human remains and funerary objects.

Finally, the Court need look no further than the <u>Yankton Sioux</u> trilogy of cases[9] to find ample precedent for issuing a preliminary injunction to maintain the status quo until all of Plaintiffs' claims are properly, fairly and finally adjudicated. There, as here, though the litigation and the compliance with the NAGPRA regulations took three years, Plaintiffs were entitled to both a preliminary, and ultimately a permanent, injunction prohibiting construction on the site of the interment of their Native American human remains and associated funerary objects.

Similarly here, Plaintiffs are entitled, at a minimum, to a preliminary injunction prohibiting grading and construction activities on the site of the interment of their Native American human remains and associated funerary objects, while their claims to a permanent injunction, including their standing as lineal descendants, members and elected leaders of the tribe, and beneficial ownership of the federal land in Parcel 04, are finally determined, and while the government complies with the cessation of construction, consultation, written notice, disposition and repatriation, place and manner of delivery of Plaintiffs' families' human remains and funerary objects mandated by the NAGPRA regulations. 43 C.F.R. § 10.1-10.17.

---

[9] <u>Yankton Sioux Tribe v. U. S. Army Corps of Eng'rs</u> ("<u>Yankton Sioux I</u>"), 83 F. Supp. 2d 1047, 1060 (D. S.D. 2000); <u>Yankton Sioux Tribe v. U. S. Army Corps of Eng'rs</u> ("<u>Yankton Sioux II</u>"), 209 F. Supp. 2d 1008, 1021-22 (D.S.D. 2002); and <u>Yankton Sioux Tribe v. U. S. Army Corps of Eng'rs</u> ("<u>Yankton Sioux III</u>"), 258 F. Supp. 2d 1027, 1032-5 (D.S.D. 2003).

9

**ARGUMENT**

I.    **NAGPRA REQUIRES THAT THE GOVERNMENT SECURE AND PROTECT THE INADVERTENTLY DISCOVERED NATIVE AMERICAN HUMAN REMAINS AND FUNERARY OBJECTS FROM MUTILATION, DESECRATION AND DISINTERMENT BY THIRD PARTIES.**

   **A. Defendants concede the government's extensive obligations and duties under NAGPRA and its regulations.**

Defendants concede that NAGPRA "vests lineal descendants (like the individual Plaintiffs here) with a paramount right of control" over inadvertently discovered Native American human remains and associated funerary objects on Federal or tribal lands. Opp. at 5; 25 U.S.C. § 3002(a)(1). Defendants also concede that "NAGPRA also sets forth the conditions and duties related to . . . inadvertent discovery of such items," Opp. at 5, 43 C.F.R. §§ 10.1(b)(1), and 10.4(a),[10] and that, as far as the United States is concerned, it has inadvertently discovered that Plaintiffs and their forbears have interred Native American human remains and funerary objects on all three parcels, 597-080-04, 597-080-05 and 597-080-06, over the last 100 years.[11]

Defendants concede that an inadvertent discovery is defined as "the unanticipated encounter or detection of human remains [and] funerary objects . . . found under or on the surface of Federal or tribal lands pursuant to [25 U.S.C. § 3002(d)]."[12] 43 C.F.R. § 10.2(g)(3). It is undisputed here that, until Plaintiffs

---

[10] "These regulations pertain to the identification and appropriate disposition of human remains, funerary objects . . . in Federal possession or control . . . discovered inadvertently on Federal or tribal lands." 43 C.F.R. §§ 10.1(b)(1)(i)-(iii). "This section carries out section 3(d) [25 U.S.C. § 3002(d)] of the Act regarding the custody of human remains, funerary objects . . . discovered inadvertently on Federal or tribal lands . . . ." 43 C.F.R. § 10.4(a).

[11] Unlike San Carlos, Hawk v. Danforth, 2006 U.S. Dist. LEXIS 58104 (E.D. Wis. 2006), and Abenaki Nation of Miss. v. Hughes, 805 F. Supp. 234, 252 (D. Vt. 1992), cited by Defendants, where the plaintiffs only anticipated discovery of human remains, the Plaintiffs here were present when their families' human remains and funerary objects were actually interred on the parcels. This also explains why the San Carlos court went to great lengths to attempt to distinguish the Yankton Sioux injunctions, where, as here, there was actual discovery of human remains on the property. Moreover, Yankton Sioux II holds that despite the fact that the government may have some prior information with which to anticipate Indian human remains at the site, the actual discovery, whether by notice from the lineal descendant who was present at the interment or a third party's backhoe, was still "inadvertent," because it was not an intentional, planned archaeological excavation or removal. 209 F. Supp. 2d at 1019.

[12] As discussed at the February 16 hearing, "The Act must therefore be interpreted to apply to all

notified the United States of the interment of their families' human remains and funerary objects on the three parcels, the United States had no reason to anticipate, encounter or detect such human remains or funerary objects on either parcel of Federal lands (Parcels 04 and 05).

Defendants further concede, Opp. at 6, that once "any person" "has discovered Native American cultural items on Federal or tribal lands . . . ," they "shall notify, in writing, the Secretary of the Department [of Interior ("DOI")], or head of any other agency or instrumentality of the United States, having primary management authority with respect to Federal lands and the appropriate Indian tribe . . . with respect to tribal lands . . . ." Plaintiffs so notified the Federal land managers, BIA and DOI, by letter on October 6, 2006, attached as Ex. D hereto, p. 8, and again by service of the Complaint.

Defendants also concede that: "If the discovery occurred in connection with an activity, including (but not limited to) **construction,** mining, logging, and agriculture, the person **shall cease** the activity **in the areas of the discovery,** make a reasonable effort to protect the items discovered before resuming such activity, and provide notice under this subsection." 25 U.S.C. § 3002(d)(1) (emphasis added[13]). Even after receipt of Plaintiffs' October 6, 2006 letter and the Complaint herein, both Defendants and the other faction failed to cease the activity in the areas of the inadvertent discovery, and failed to make reasonable effort to secure and protect Plaintiffs' families' human remains and funerary objects.

In addition, the NAGPRA regulations provide: "As soon as possible, but no later than three (3) working days after receipt of the written confirmation of notification with respect to **Federal lands** or **tribal lands** described in § 10.4(b) [the following 7 duties must be performed[14]]:

---

human remains within the meaning of 43 C.F.R. § 10.2(d)(1), and not merely human remains of prehistoric origin." Yankton Sioux II, 83 F. Supp. 2d at 1056.

[13] Throughout this section, boldface will be added to point out the obligations and duties of the Federal agency officials under the NAGPRA regulations.

[14] See Yankton Sioux I, 83 F. Supp. 2d at 1055, and Yankton Sioux II, 209 F. Supp. 2d at 1017-21, outlining the first 6 of these 7 duties.

(1)    **"[T]he responsible Federal agency official must:** [among other requirements] Take immediate steps, if necessary, to further **secure and protect inadvertently discovered human remains,** funerary objects . . . **including**, as appropriate, **stabilization or covering**." 43 C.F.R. §§ 10.4(d)(1) and (ii) and (e)(1) and (ii); see San Carlos Apache Tribe v. United States, 272 F. Supp. 2d 860, 888-89 (D. Ariz. 2003).

Again, the Federal Defendants failed to take immediate steps to further secure and protect the inadvertently discovered human remains and funerary objects, and have made no efforts to stabilize or keep the remains and funerary objects covered.

Contrary to Defendants' assertion, the ongoing activity that resulted in the inadvertent discovery cannot resume within 30 days, unless it is otherwise lawful. 43 C.F.R. § 10.4(d)(2) provides: "The activity that resulted in the inadvertent discovery may resume thirty (30) days after certification by the notified Federal agency . . . if the resumption of the activity is otherwise lawful . . . . The disposition of all human remains [and] funerary objects . . . must be carried out following § 10.6."

Hence, where the Federal officials have failed to secure and protect the human remains and funerary objects, including stabilizing and covering them, as here, the work may not resume until the remains and funerary objects are properly protected as required by sections 10.4(d) and 10.6. San Carlos, 272 F. Supp. 2d at 888-90, and Yankton Sioux I, 83 F. Supp. 2d at 1057, both make clear that the Federal agency's duty to secure and protect the human remains and funerary objects, including stabilizing and covering them, continues on past the initial 30 day consultation period:

The [Army] Corps [of Engineers] was required to comply with the notice, certification, and consultation provisions of the NAGPRA regarding the discovery of the cemetery and its contents. As the discoverer of the remains, the Corps had a duty to cease its flood control activities for 30 days and 'make a reasonable effort to protect' the inadvertently discovered items. As the federal agency responsible for managing the site, it must 'further secure and protect the inadvertently discovered human remains, including where necessary, stabilizing and covering.' [Moreover,] . . . [t]he court treated the reasonable efforts to protect the inadvertently discovered items within the 30 days prior to resumption of the flood control activities as separate and distinct from the Corps duty to secure and protect the inadvertently discovered items. The measures taken to satisfy the former would not necessarily satisfy the latter. In other words, gathering up the bones before reflooding the Lake at the end of 30 days did not satisfy the Corps obligation to secure and protect the graves that remained subject to destruction and damage from the Corps' flood control activities.

12

San Carlos, 272 F. Supp. 2d at 888-90, citing Yankton Sioux I, 83 F. Supp. 2d at 1057.  As also noted in Yankton Sioux I at 1058: "Allowing the Tribe an indefinite amount of time to perform its traditional ceremonies and gather its dead seems to be the best way to respect the Tribe's members, who have already been forced to endure the sight of their ancestors exposed on the lakeshore."

> (2)    "**[T]he responsible Federal agency official must:** . . . **Initiate consultation** on the inadvertent discovery pursuant to 10.5:" 43 C.F.R. § 10.4(d)(iv).

Again, no consultation with the lawfully elected leadership of the tribe has been initiated on the inadvertent discovery pursuant to § 10.5.  As noted in Yankton Sioux I at 1055-58, under the regulations, no one is allowed to conduct construction activity in the area of an inadvertent discovery of human remains until the federal agency "has consulted with possible lineal descendants and other tribes whose members might be buried at the site, and used that consultation to develop a written plan of action.  See 43 C.F.R. § 10.3(b); 43 C.F.R. § 10.4(d)(1)(v)."

> (3)    "**[T]he responsible Federal agency official must:** . . . If the human remains, funerary objects . . . must be excavated or removed, **follow the requirements and procedures in 10.3(b)** of these regulations . . . ." 43 C.F.R. §§ 10.4(d)(v) and (e)(iii).

As discussed at the February 16 hearing, section 10.3(b) has four requirements: (a) an Archaeological Resources Protection Act (ARPA) permit must be obtained from the Deputy Commissioner of Indian Affairs at the BIA, and this permit is further required for removal of human remains and funerary objects from "private lands" within the exterior boundaries of any Indian reservation;[15] (b) "the objects are excavated after consultation with or, in the case of tribal lands, consent of, the appropriate Indian tribe . . . pursuant to § 10.5"; (c) "The disposition of the objects is consistent with their custody as described in § 10.6"; and (d) "Proof of the consultation or consent is shown to the Federal agency official or other agency official responsible for the issuance of the required permit."  Again, none of which has been accomplished by the DOI/BIA or any of the

---

[15] As also discussed at the February 16 hearing, even though there has not yet been any "intentional archaeological excavation," the "inadvertent discovery" still requires an ARPA permit, as acknowledged in San Carlos, 272 F. Supp. 2d at 888-90, citing Yankton Sioux I, 83 F. Supp. 2d at 1057.

responsible Federal officials.

(4) "**[T]he responsible Federal agency official must: . . . Ensure that disposition of all inadvertently discovered human remains [and] funerary objects . . . is carried out following 10.6.**"  43 C.F.R.  §§ 10.4(d)(vi) and (e)(iv).

Again, neither the DOI/BIA or any of the responsible Federal officials have made any provision for the

disposition of Plaintiffs' families' human remains and funerary objects.

(5) **"Federal agency officials must consult with known lineal descendants**." "Consultation as part of . . . inadvertent discovery of human remains [and] funerary objects . . . on Federal lands must be conducted in accordance with the following requirements." 43 C.F.R. § 10.5(a).

(a) "Upon receiving notice of, or otherwise becoming aware of, an inadvertent discovery or planned activity that has resulted or may result in . . . inadvertent discovery of human remains [and] funerary objects . . . **the responsible Federal agency must,** as part of the procedures described in §§ 10.3 and 10.4, take appropriate steps to **identify the lienal descendant** . . . entitled to custody of the human remains [and] funerary objects . . . pursuant to 10.6 and 10.14.  **The Federal agency official shall notify in writing**: **(i) any known lineal descendants** of the individual whose remains [and] funerary objects . . . have been or are likely to be . . . discovered inadvertently . . . ." 43 C.F.R. § 10.5(b)(1).

(b) "The **notice must propose** a time and place for meetings or consultation to further consider the . . . inadvertent discovery, **the Federal agency's proposed treatment** of the human remains [and] funerary objects . . . that may be excavated, and the proposed disposition of any . . . inadvertently discovered human remains [and] funerary objects . . . ." 43 C.F.R. § 10.5(b)(2).

(c) "During the consultation process, as appropriate, **the Federal agency official must provide** the following information in writing to the lineal descendants...(1) **a list of all lineal descendants . . . consulted** regarding the particular human remains [and] funerary objects . . . ." 43 C.F.R. § 10.5(c)(1).

(d) "During the consultation process, **Federal agency officials must request** . . . the following information . . . (2) **Names and appropriate methods to contact lineal descendants** who should be contacted to participate in the consultation process . . . ." 43 C.F.R. § 10.5(d).

(e) "Following consultation, **the Federal agency official must prepare, approve, and sign a written plan of action.** A copy of the this plan of action must be provided to the lineal descendants . . . .  At a minimum, the plan of action must comply with § 10.3(b)(1) and document the following: . . . (2) The specific information used to determine custody pursuant to 10.6; (3) The planned treatment, care, and handling of human remains [and] funerary objects . . . (7) The kind of traditional treatment, if any, to be afforded the human remains [and] funerary objects . . . (9) The planned disposition of human remains [and] funerary objects . . . following § 10.6." 43 C.F.R. § 10.5(e).

14

Again, Defendants have failed to perform the required consultation with the Plaintiff lineal descendants; failed to notify the lineal descendants in writing; failed to propose any treatment of the human remains and funerary objects; failed to provide the list of lineal descendants consulted, failed to request contact information for the lineal descendants; failed to prepare, approve and execute a written plan of action, identifying how custody was determined, the planned treatment, care, and handling of the human remains and funerary objects, and the kind of traditional treatment afforded such remains and funerary objects; and most importantly, failed to disclose the planned disposition of the human remains and funerary objects.

(6)      "**Priority of Custody.** . . . Custody of these human remain [and] funerary objects . . . **is, with** priority given in the order listed: (1) In the case of human remains and associated funerary objects, in **the lineal descendant** of the deceased individual as determined pursuant to § 10.14(b)." 43 C.F.R. § 10.6(a).

"Upon determination of the lineal descendant . . . that under these regulations appears to be entitled to custody of particular human remains [and] funerary objects . . . discovered inadvertently on Federal lands, **the responsible Federal agency official must**, subject to the notice required herein and the limitations of § 10.15, **transfer custody of the objects to the lineal descendant** . . . following appropriate procedures, which **must respect traditional customs and practices of the affiliated Indian tribes . . . .** Prior to any such disposition by a Federal agency official, **the Federal agency official must publish general notices of the proposed disposition** in a newspaper of general circulation in the area in which the human remains [and] funerary objects . . . were discovered inadvertently . . . . The notice must provide information as to the nature and affiliation of the human remains [and] funerary objects . . . and solicit further claims to custody . . . . **The Federal agency official must send a copy of the notice** and information on when and in what newspaper(s) the notice was published **to the Manager, National NAGPRA Program**." 43 C.F.R. § 10.6(c).

[T]he regulations' concern for the traditional treatment of Native American human remains and funerary objects, see 43 C.F.R. §§ 10.5(e)(7), and (g), suggests that **the Corps should be sensitive to any desire** of the Tribe or its members to perform the actual recovery of the remains and the Tribe's **requests for treating the remains with dignity until final custody of the remains can be determined.**

Yankton Sioux I at 1059. And as explained in Yankton Sioux II:

The process necessary for legally and culturally proper reburial should be continuing even as this lawsuit progresses," and **"no further excavation, building or other construction activities [shall] be conducted at location A . . . until . . . the human remains and**

> **funerary objects inadvertently discovered . . . are properly buried** according to law and the customs of the peoples culturally affiliated with those remains and objects . . . . The other issues raised in this litigation can be decided after the human remains and funerary objects have been properly reburied.

Yankton Sioux II at 1025.  Here also, Defendants have not transferred custody of the inadvertently discovered human remains and funerary objects to the Plaintiff lineal descendants; nor have they respected traditional customs and practices of Plaintiffs' tribe by leaving the remains and funerary objects where they were interred, as demanded by Plaintiffs; nor did Defendants publish the required general notices; nor did they solicit any further claims to custody of the inadvertently discovered remains and funerary objects as required by the NAGPRA regulations.

(7) Finally, the NAGPRA regulations require repatriation of any inadvertently discovered human remains and funerary objects to the lineal descendants:

> "Upon the request of a lineal descendant . . . **a . . . Federal agency must expeditiously repatriate human remains** and associated funerary objects . . . ." 43 C.F.R. § 10.10(b)(1). "The **repatriation** of human remains [and] funerary objects . . . **must be accomplished by the . . . Federal agency** in consultation with the requesting lineal descendants . . . **to determine the place and manner of the repatriation**." 43 C.F.R. § 10.10(d).

Here also, Defendants have failed to consult with the Plaintiff lineal descendants, and further failed to repatriate Plaintiffs' families' human remains and funerary objects to the place and in the manner of the traditions and custom of Plaintiffs' tribe, where they were interred, as required by NAGPRA.

Given that Defendants have conceded the extensive nature of their NAGPRA obligations and duties to protect Plaintiffs' families' human remains and funerary objects from third parties who would mutilate, desecrate and disinter them, it is truly amazing that they have utterly failed to suggest any reason why a preliminary injunction should not be issued, at a minimum, while they belatedly attempt to comply with these admitted statutory and regulatory requirements of NAGPRA.

**B. The NAGPRA regulations control use of the federal lands and tribal lands upon which Native American human remains and funerary objects are inadvertently discovered, whether that use is by tribal or non-tribal third parties.**

Contrary to Defendants' unsupported assertion, the government's fiduciary duty and general trust

responsibility over Native Americans compels it to enforce the NAGPRA regulations against tribal and non-tribal third parties who threaten Plaintiffs' families' human remains and funerary objects with mutilation, desecration and disinterment. Yankton Sioux I, 83 F. Supp. 2d at 1047; Yankton Sioux II, 209 F. Supp. 2d at 1021-22; Yankton Sioux III, 258 F. Supp. 2d at 1032-5; San Carlos, 272 F. Supp. 2d at 888-90.

The government's duties under NAGPRA specifically include restraining such third parties from excavation, operation of heavy equipment, movement of dirt and gravel, or any other construction activities on the site of all burial grounds, human remains, and associated funerary objects. Yankton Sioux II, 209 F. Supp. 2d at 1021-22; Yankton Sioux III, 258 F. Supp. 2d at 1032-35.[16] There, the third parties were the State of South Dakota and its contractors, who were developing 100 camping spots, new roads, comfort stations, parking lots and dumping stations at the North Point Public Recreation Area at Lake Francis Case.

> The Court notes that all persons conducting construction activities at North Point must comply with NAGPRA as to *each* inadvertent discovery of Native American human remains [and] funerary objects . . . . In addition, *each* inadvertent discovery of Native American cultural items will require compliance with the protection, notification, certification and consultation duties imposed by NAGPRA and its implementing regulations.

Yankton Sioux II, 209 F. Supp. 2d at 1025-26. Upon the inadvertent discovery of human remains, as here, the Defendant Federal land manager, Army Corps of Engineers, was preliminarily and ultimately permanently enjoined to comply with NAGPRA, determine the lineal descendants' ownership, control and

---

[16] Hence, even if the Court were to decline to enforce the Plaintiff lineal descendants' preference to maintain their families' human remains "in place," pursuant to Cal. Publ Res. Code 5297.98, the federal NAGPRA has been held to prohibit construction on the site where the human remains were interred and then inadvertently discovered in the Yankton Sioux trilogy. For example, the May 1, 2003 Draft Agreement for Consultation, Treatment and Disposition of Human Remains and Cultural Items that may be Discovered Inadvertently During Planned Activities at the Statute of Liberty between DOI, National Park Service and the Delaware Nation and the Stockbridge-Munsee Coummunity of Wisconsin, attached hereto as Ex. E, states: "The Park and the Tribes agree that the preferred treatment of inadvertently discovered human remains and cultural items is to leave the human remains and cultural items *in-situ* and protect them from further disturbance . . . . If the remains and cultural items are left *in-situ*, no disposition takes place and the requirements of 43 C.F.R. 10 Sections 10.3-10.6 will have been fulfilled. The specific locations of discovery shall be withheld from disclosure (with the exception of local law enforcement officials and tribal officials as described above) and protected to the fullest extent allowed by federal law." Id. at 2-3. A similar written plan is required under NAGPRA for Jamul, and an injunction should be issued to maintain the status quo, at a minimum, to allow the government to comply with the NAGPRA regulations and create such an agreed upon written plan for treatment and disposition of Plaintiffs' human remains and cultural items with the Plaintiffs.

17

custody of the cultural items, provide notice to the lineal descendants, obtain a permit under ARPA, 16 U.S.C. §§ 470aa-470mm and 25 U.S.C. § 3002(c)(1),[17] consult with the lineal descendants, cease all construction activity in the area of the discovery, make a reasonable effort to secure and protect the items discovered before resuming such activity, including stabilizing and covering, and, ultimately, cease all construction on the site where the human remains and funerary objects were interred.  See Yankton Sioux II at 1017-21; Yankton Sioux III at 1034.

The government's trust responsibility over Native Americans and their tribes ensures that the tribes adhere to federal law to protect both the majority and minority of their members. "The Secretary of the Interior is charged not only with the duty to protect the rights of tribe, but also the rights of individual members. And the duty to protect these rights is the same whether the infringement is by nonmembers or by members of the tribe." Seminole Nation of Okla. v. Norton, 223 F. Supp. 2d 122, 137-38, 146-47 (D.D.C. 2002); Milam v. United States, 10 Indian Law Reporter ("ILR") 3013, 3017 (D.D.C. Dec. 23, 1982).  The government is not allowed "to be guided by the results it favors in its relationship with Indian tribes..." Seminole at 137-38, 146-47; Milam, at 3017.  See also Thomas v. United States, 141 F. Supp. 2d 1185, 1203 (W.D. Wis. 2001).

In discharging this trust duty, the United States is held to the highest fiduciary standard and is to take "all appropriate measures for protecting" Indian interests.  United States v. Creek Nation, 295 U.S. 103, 109-10 (1935); Osage Tribe of Indians of Okla. v. United States, No. 99-550 L (Ct. Fed. Cl. 2006)[18] ("Because of

---

[17] Yankton Sioux II & III' injunctions were based upon section "10.4 governing inadvertent discoveries explicitly incorporates the requirements of § 10.3(b) [which requires an ARPA permit, notification of, and consultation with, lineal descendants and a written plan for disposition and repatriation] if the inadvertently discovered remains must be excavated or removed."  209 F. Supp. 2d 1008, 1021 (citing 43 C.F.R. § 10.4(b)(1)(v)).  Even Defendants concede that injunctive relief is available for violations of NAGPRA, Opp. at 19 n. 13, and that Yankton Sioux II reserved judgment for a permanent injunction, and a continuing injunction against construction was granted as to the site where the human remains were interred in Yankton Sioux III. 258 F. Supp. 2d at 1034 ("the Court will order that no further excavation, building or other construction activities be conducted in Area A . . . .").

[18] Osage Tribe also notes that "in construing the applicable statutes and regulations, the [c]ourt must adhere to '[t]he canons of construction applicable in Indian law,'" citing County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247 (1985), which holds that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Id.; see Co. of Yakima v. Yakima Indian

its treaty and statutory obligations to tribal nations, the United States must be held to the 'most exacting fiduciary standards' in its relationship with the Indian beneficiaries.") (quoting Coast Indian Cmty., 550 F.2d at 652). "The 'standard of duty for the United States . . . is not mere 'reasonableness' but the highest fiduciary standards.'" Minn. Chippewa Tribe v. United States, 14 Cl. Ct. 116, 130 (1987); United States v. Mason, 412 U.S. 391, 398 (1973); Duncan v. United States, 667 F.2d 36, 45 (Fed. Ct. Cl. 1981)(citing Coast Indian Cmty., supra).

In Yankton Sioux II and III, the Courts granted both a preliminary and permanent injunction to maintain the status quo, which included "that the Court order defendants to cease all construction activity at location A [the site of the human remains]," based upon: (1) the threat of irreparable harm to the plaintiffs' human remains and funerary objects from construction activities at the site of their discovery; (2) the balance of harm tipping in favor of the plaintiffs given the inherently sensitive nature of the human remains and funerary objects, and the minimal harm to the third party State contractors, and the fact that there could be no harm to the Federal defendants since they were already compelled to comply with NAGPRA; (3) the fact that it was probable that plaintiffs would prevail "on at least some of their NAGPRA claims," since, as here, the government was wrong to assert that it need not comply with the requirements of § 10.3(b) with regard to inadvertent discoveries of human remains, which ultimately supported a permanent injunction restraining construction at the site of the human remains; and (4) the public interest, since Congress directed the protection of such Native American cultural items in NAGPRA, given the plaintiffs' beliefs about how disturbance of the families' remains affects plaintiffs' lives. 209 F. Supp. 2d 1008, 1022-24, and 258 F. Supp. 2d 1027, 1032-34.

Hence, Plaintiffs are entitled to both a preliminary and a permanent injunction, prohibiting construction on the site of the interment of their Native American human remains and associated funerary objects, since the Government is compelled to control the use of those Federal lands by tribal and non-tribal third parties in complying with NAGPRA and its regulations.

---

Nation, 502 U.S. 251 (1992); Yankton Sioux I at 1056; the Government's Handbook of Federal Indian Law, by Frank Cohen, 224 (DOI 1982).

II.  **THE GOVERNMENT'S TRUST RESPONSIBILITY ALSO REQUIRES PROTECTION FROM TRESPASS ON PLAINTIFFS' BENEFICIAL OWNERSHIP INTEREST IN PARCEL 597-080-04 BY TRIBAL OR NON-TRIBAL THIRD PARTIES.**

  A.  **The Government's trust responsibility requires protection from trespass.**

Defendants concede without argument that federal courts routinely grant injunctions to protect Indian beneficial owners from trespass on land held in trust for them by the United States. Just as with the duties under NAGPRA, the government has a fiduciary obligation under its general trust responsibility over Indians to protect an individual Indian's designated beneficial interest in trust property held in the name of the United States, from any alienation or trespass by tribal or non-tribal third parties. Coast Indian Comty., 550 F.2d at 654.[19]  Even the government admits, Opp. at 30-31, that "an individual Indian's rights in . . . unallotted property arises . . . upon individualization," citing United States v. Jim, 409 U.S. 80, 82 (1972).

As discussed at the February 16 hearing, the government's trust responsibility does require the prevention of trespass by tribal and non-tribal third parties. See, e.g., Comanche Nation v. United States, 393 F. Supp. 2d 1196, 1211 (W.D. Okla. 2005), where a preliminary injunction was granted to maintain the status quo, preventing transfer of the trust property in question to the third party, Fort Sill Apache tribe, since there were "serious, substantial and difficult questions going to the merits," requiring further litigation. Similarly, in Keechi v. United States, 604 F. Supp. 267 (D.D.C. 1985), "[t]he land thus held by the United States as trustee," was "'not subject to alienation or encumbrance by [the Indian beneficiary], except with the consent of the United States Government.'" Id. at 270. Hence, the government can be enjoined from allowing any

---

[19] As noted supra at 18, the fiduciary "duty to protect [individual Indian] rights is the same whether the infringement is by nonmembers or by members of the tribe." Seminole Nation of Okla. v. Norton, 223 F. Supp. 2d 122, 137-38, 146-47 (D.D.C. 2002); Milam, 10 ILR at 3017.  Hence, whether there is an intra-tribal dispute in Jamul (which Defendants erroneously call an "intertribal" dispute, Opp. at 27 n.19) or whether the trespassers are non-tribal third parties is not relevant to the government's fiduciary duties to protect both the individual Indians and the tribe. Where plaintiffs question not only the propriety of non-tribal third parties' efforts to co-opt tribal affairs, as here, "but the acts of federal officials in approving a tribal action," the matter is no longer merely an intra-tribal dispute and is not insulated from federal court review.  Milam at 3015, citing Harjo v. Kleppe, 420 F. Supp. 1110, 1117 (D.D.C. 1976), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C. Cir. 1978); United States v. Pawnee Business Council, 382 F. Supp. 54, 59 (N.D. Okla 1974). "As trustee, the United States is charged with the responsibility of safeguarding, from both external and internal threats . . . the political rights of Indians."  Milam at 3015.

alienation or trespass of the individual Indian's beneficial interest in such trust property.  The extent of the government's trust responsibility to prevent trespass and other alienation of trust property has long been a tenet of federal Indian law.

> Having assumed the duty of securing the use and occupancy of these lands to the [Omaha and Winebago] Indians, and being charged with the duty of enforcing the provisions of the acts of congress forbidding all alienations of the lands...the government of the United States, through the executive branch thereof, has the right to invoke the aid of the courts, by mandatory injunction and other proper process, to compel parties wrongfully in possession of the lands held in trust by the United States for the Indians to yield the possession thereof, and to restrain such parties from endeavoring to obtain or retain the possession of these lands in violation of law.

United States v. Flournoy Live-Stock & Real-Estate Co., 69 F. 886, 894 (D. Neb. 1895).  The government's fiduciary relationship will "arise[] when the Government assumes . . . control over . . . property belonging to Indians." U. S. v. Mitchell, 463 U.S. 206, 225 (1983). Such a relationship may also be created where property is purchased, as here, by the government for the express benefit of individual Indians under 25 U.S.C. § 465.[20]  See Coast Indian Comty, 550 F.2d at 642-44; Pyramid Lake Paiute Tribe of Indians v. Morton, 354 F. Supp. 252, 254 (D.D.C. 1973) (executive order setting aside public lands for exclusive use of Indians imposes fiduciary duty upon government to protect those rights); United States v. Wilson, 881 F.2d 596, 599 (9th Cir. 1989) (citing Coast Indian Cmty.).[21]

**B.  Plaintiffs are the beneficial owners of parcel 597-080-04.**

Contrary to Defendants' assertion, Plaintiffs are the beneficial owners of Parcel 04.  As set forth in the Complaint, Parcel 04 was not acquired for a tribe, leaving only the possibility under 25 U.S.C. § 465 that it was purchased and taken in trust for the individual Indian Plaintiffs and the Native American families then possessing and residing on the parcel, as set forth in Coast Indian Cmty., 550 F.2d at 639, United States v.

---

[20] Thus, falling with Defendants' admission that "enforceable governmental trust obligations" can be "anchored by statute or regulation." Opp. at 34.

[21] Hence, Defendants' citations of Creek Nation v. United States, 318 U.S. 629, 640 (1943), Shoshone-Bannock Tribes v. Reno, 56 F.3d 1476 (D.C. Cir. 1995), and Heckler v. Chaney, 470 U.S. 821 (1985), regarding the government not being an insurer of payments, nor obliged to bring suit on behalf of Indians, are inapposite, since Plaintiffs do not seek to compel payments of money, or the filing of suit by the government.

Assiniboine Tribe, 428 F.2d at 1329-30 , and 1 Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs 1917-1974 at 668, 724, 747, and 1479.

Coast Indian Cmty. held on nearly identical facts[22] that the parcel in question "was not acquired for a tribe, leaving only the possibility under the [Indian Reorganization] Act that it was purchased for individual Indians. The deed and proclamation say nothing to contradict this. Thus, the land was taken in trust for the individual Indians." Id. at 651 n. 32.  Here, Plaintiffs are among the individual "Jamul Indians of one-half degree or more Indian blood" that were designated in the 1978 grant deed, Compl. Ex. D, as the beneficiaries of the trust acquisition of Parcel 04 under 25 U.S.C. § 465.  Rosales & Toggery Decls. ¶ 2. Since the Government must concede that there was no recognized tribe of Jamul Indians in 1978, this is the only possible designation of beneficiaries permitted as a matter of law, as held in Coast Indian Cmty., 550 F.2d at 651 n.32; State Tax Comm., 535 F.2d at 304.

The government fails to cite any evidence that the subsequently created "tribe," known as the "Jamul Indian Village," was ever designated as the beneficiary of the parcel, nor that a grant deed ever transferred the parcel to the tribe.  In fact, the only evidence before the Court is that the Secretary of the Interior designated the individual "Jamul Indians of one-half or more Indian blood" to be the beneficiaries of the Parcel, by allowing them to reside upon the trust land for 25 years, just as in Coast Indian Cmty., 550 F.2d at 651 n.32.  See also Compl. Ex. D.

It is also undisputed that the Tribe did not exist, had not been created under the I.R.A., and was not recognized, in 1978, when the Government accepted the grant deed for the parcel in trust for the individual Indians described therein.  It also cannot be disputed that the Government failed to follow its own guidelines in

---

[22] Contrary to Defendants' erroneous assertion, the deed in Coast Indian Cmty. was no more silent than the Jamul deed, and in both cases the government failed to initiate formal designation procedures.  The Coast Indian Cmty. deed "was conveyed to the United States: . . . 'in Trust for such Indians of Del Norte and Humboldt Counties, in California, eligible to participate in the benefits of the [Indian Reorganization] Act of June 18, 1934, as shall be designated by the Secretary of the Interior . . . .'" 550 F.2d at 641.  The Jamul deed was conveyed to the United States "in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate." Compl. Ex. D.

recording the grant deed.  See 1 Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs 1917-74 ("Mem. Sol. Int.") at 668, 724, 747, 1479.[23]  Any transfer of an individual petitioner's designated beneficial interest to any subsequently recognized tribe must still be accomplished by recording a grant deed.  Here, no grant deed ever transferred Plaintiffs' designated beneficial interest in the parcel to any tribe.

As a matter of law, the government is estopped by its own Solicitor's memoranda to deny that the parcel is held in trust for the designated individual Indian beneficiaries, since the government concedes that the "Jamul Indians of one-half degree or more Indian blood," were not  recognized as a tribe in 1978. Memos. Sol. Int.,  at 668, 724, 747, 1479. These memoranda admit that such trust acquisitions cannot be made for a "tribe" that does not yet exist.[24]  There, Interior's Solicitor declared that a grant deed could not "designate" an un-recognized "tribe" as a beneficiary, since  "there is in fact no existing tribe of Indians in Mississippi known as the Choctaw Tribe." Mem. Sol. Int., at 668.[25]  There, the Choctaw deed had to be amended and re-recorded to

---

[23] There, the Solicitor of the Interior specifically advised the field personnel of the BIA that any transfer of individual Indians' designated beneficial interest in real property must still be accomplished by recording a grant deed.  Mem. Sol. Int. at 668, 724, 747, 1479.  The Government cannot deny that its own Handbook of Federal Indian Law, Ch. 11, B3, pp. 615-16 (DOI 1982), concedes that all individual designated beneficiaries are cotenants in the trust land held by the U.S. cotenants have equal rights to possession of the property, and no single cotenant has the right to exclude any other cotenant from the property. Cal. Civil Code 685-86; Zaslow v. Kroenert, 29 Cal. 2d 541, 548 (1946). Therefore, all of the individual cotenants, including the Plaintiffs here, must consent to any transfer of their individual beneficiaries' designation to a subsequently recognized "tribe" before the subsequently recognized "tribe" may lawfully be designated as the beneficiary and acquire "jurisdiction" over the parcel. Id.  Here, it is no wonder that the "Jamul Indians of one-half  degree or more Indian blood" have never consented to transfer their individual designation as beneficial owners to any subsequently created "tribe," since the IBIA found non-members participating in the tribal government, perhaps from the time the entity was first recognized.  Rosales v. Sacramento Area Dir., 32 IBIA at 168. Here, there was no such consent by the individual Indian cotenants, including the Plaintiffs, and the government never recorded a subsequent grant deed transferring the individual Indian beneficiaries' interest in the parcel to any subsequently recognized tribe, including the Jamul Indian Village.

[24] The government failed to cite these memos to the Rosales S.D. Cal court, and Plaintiffs did not discover them at the University of Oklahoma until after notice of appeal, which explains that decision's erroneous and non-binding dicta, Def. Ex. B, which was not adopted by the Ninth Circuit.  Def. Ex. C.

[25] There, Solicitor Margold describes how the grant deed should have been prepared for the Mississippi Choctaws: "The United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior, until such time as the Choctaw

23

designate any subsequently recognized tribe a beneficiary; otherwise the property would remain in trust for the individual Indians, and not a tribe, as in Coast Indian Cmty., 550 F.2d at 651.[26]  State Tax Comm. similarly holds that the absence of the words "then in trust for such organized tribe" in a relief act designating individual Choctaw beneficiaries meant that "only those individuals designated by the Interior Secretary were to have the benefit of this" designation, since "[n]either a tribe nor a reservation is mentioned."  535 F.2d at 304.

Here, the 1978 grant deed does not contain the words proscribed by the Solicitor, "until such time as they organize." Mem. Sol. Int. at 21.  Nor does it state: "and then in trust for such organized tribe."  Hence, there was no transfer of the designation of the individual Indian beneficiaries, including Plaintiffs, to any subsequently recognized tribe.

The Jamul Indian Village has never had jurisdiction over Parcel 04, and there has never been a transfer of the Parcel to the tribe.  As noted above, the government has conceded that it has "no record of the 1978 trust parcel [04] being known as the Jamul Indian Village." Compl. Ex. E.  The Jamul Indian Village is only a tribal governmental entity, landless at its creation, and did not exist until its constitution was adopted in 1981. "An Indian tribe's jurisdiction derives from the will of Congress, Kansas v. Norton, 249 F.3d 1213, 1229-31 (10th Cir. 2001), and Congress never granted "jurisdiction" over Parcel 04, which was deeded to the United States for the express benefit of individual half-blood Jamul Indians in 1978, and not to the tribal governmental entity that was subsequently recognized in 1981.  Thus, the government is estopped to deny that the "only possible" designation that exists in the 1978 grant deed, as a matter of law, is that Parcel 04 was taken in trust for the "individual" "Jamul Indians of one-half degree or more Indian blood," including Plaintiffs, as was held in

---

Indians of Mississippi shall be organized as an Indian tribe pursuant to the act of June 18, 1934 (48 Stat. 984), and then in trust for such organized tribe." Mem. Sol. Int., at 668 (emphasis added). Similarly, no such language appears in the 1978 Jamul grant deed. Compl. Ex. D.

[26]  "In all of those cases where the title papers have already been returned to the field, instructions should be given to the field agents to have the deeds corrected before they are recorded.  In that case where the deed has already been recorded and accepted, it will be necessary to secure a new deed. The necessary corrections will be made in the other cases which are now pending in this office.  The error . . . arises perhaps out of unusual circumstances, but its one that might have been avoided." Mem. Sol. Int. at 668.

Coast Indian Cmty., 550 F.2d at 651 n.32, and State Tax Comm., 535 F2d. at 304.  Thus, Plaintiffs remain entitled to a preliminary and permanent injunction to protect their beneficial ownership of Parcel 04 from trespass on the land held in trust for them by the United States.

## III.    CONCLUSION

For the foregoing reasons, the Court is required to issue the requested preliminary and permanent injunction to preserve the status quo and prevent the threatened irreparable trespass, mutilation, desecration, and disinterment of Plaintiffs' human remains, and associated funerary objects, at least until such time as Plaintiffs are finally determined to be the lineal descendants, lawful members and lawfully elected leaders of the tribe, and beneficial owners of parcel 597-080-04, and until the government complies with NAGPRA.

Dated: February 26, 2007                    **BOIES, SCHILLER & FLEXNER LLP**

/s/ Louis G. Smith
William A. Isaacson, Esq., D.C. Bar No. 414788
Tanya Chutkan, Esq., D.C. Bar No. 420478
Louis G. Smith, Esq., D.D.C. Bar No. D00299
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Avenue, N.W. Ste 800
Washington, District of Columbia 20015
Tel (202) 237-2727
Fax (202) 237-6131


**WEBB & CAREY**

/s/ Patrick D. Webb
Patrick D. Webb, Esq., Calif. Bar No. 82857
**WEBB & CAREY**
401 B Street, Suite 306
San Diego, Calif. 92101
Tel (619) 236-1650
Fax (619) 236-1283

Attorneys for WALTER ROSALES, KAREN TOGGERY, JAMUL INDIAN VILLAGE, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TOGGERY

EXHIBIT A

1 | Patrick D. Webb, Esq., State Bar No. 82857
2 | **WEBB & CAREY**
  | 401 B Street, Suite 306
3 | San Diego, Calif. 92101
  | (619) 236-1650
4 | Attorneys for Plaintiffs
5 |
6 |
7 |
8 | **UNITED STATES DISTRICT COURT**
9 | **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
10 | WALTER ROSALES, MARIE )   Case No. 'CV 0951 IEG (JAH)
   | TOGGERY, and KAREN TOGGERY )
11 |                            )   **COMPLAINT FOR DECLARATORY**
   |        Plaintiffs,         )   **AND INJUNCTIVE RELIEF**
12 |                            )
   | vs.                        )   **AND DEMAND FOR JURY**
13 |                            )
14 |                            )
   | UNITED STATES OF AMERICA, and its )
15 | divisions, including but not limited to, the )
   | DEPARTMENT OF THE INTERIOR, the )
16 | BUREAU OF INDIAN AFFAIRS, the )
   | NATIONAL INDIAN GAMING )
17 | COMMISSION, and DOES 1-20, )
   |                            )
18 |        Defendants.         )
   | _____ )
19 |
20 |     Plaintiffs allege upon information and belief as follows:

**PARTIES**

21 |     1. Plaintiffs, WALTER ROSALES, MARIE TOGGERY, KAREN TOGGERY, are

Indian residents of San Diego County, with half or more degree of California Indian blood, and

are enrolled members of the JAMUL INDIAN VILLAGE (hereinafter JAMUL), a tribal

governmental entity of Kumeyaay Indians, recognized by Congress, governed by a Constitution

adopted on May 9, 1981, pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. 461 et

seq., and located in Jamul, California.

1    2. The Defendants are the UNITED STATES OF AMERICA, and its divisions,

2    including, but not limited to, the DEPARTMENT OF THE INTERIOR, the BUREAU OF

3    INDIAN AFFAIRS, and the NATIONAL INDIAN GAMING COMMISSION.

4    3. Defendants Does 1 through 20, inclusive, are sued herein under fictitious names.

5    Their true names and capacities are unknown to Plaintiffs at this time. When the true names and

6    capacities of said defendants are ascertained by Plaintiffs, Plaintiffs will seek leave to amend this

7    complaint to insert their true names and capacities. Plaintiffs are informed and believe, and

8    based thereon allege, that each of the fictitiously named defendants is responsible in some

9    measure for the actions, events and damages herein alleged, and are the agents of each of the

10   defendants.

11   4. Plaintiffs are informed and believe and on such information and belief allege that at all

12   times herein mentioned, defendants, and each of them, were the agent, employee and/or joint

13   venturer of their co-defendants, and were acting within the course and scope of such agency,

14   employment and/or joint venture and with the permission and consent of their co-defendants and

15   defendants. Each reference to one defendant is also a reference to each and every other

16   defendant. Plaintiffs are informed and believe and thereon allege that the defendants, and each of

17   them, conspired with each other, to engage in acts in furtherance of a conspiracy to wrongfully

18   and illegally violate the Plaintiffs' property rights, rendering each of the defendants jointly and

19   severally liable for all resulting and irreparable damage to Plaintiffs.

20                                    **RELATED ACTIONS**

21   5. WALTER ROSALES, MARIE TOGGERY, KAREN TOGGERY, are also appellants,

22   along with fellow JAMUL members, Jane Dumas, Joe Comacho, Gerald Mesa and Robert M.

23   Mesa, in a pending administrative appeal before the Interior Board of Indian Appeals in Case No.

24   IBIA 00-28-A. There the Plaintiffs seek to set aside the Pacific Regional Director and the So.

25   California Agency Superintendent of the Bureau of Indian Affairs' failure to follow Chief Judge

26   Kathryn Lynn's April 22, 1998 decision as to the membership and leadership of the Jamul Indian

27   Village. The April 22, 1998 decision of the IBIA recognized Jane Dumas as the Vice-chairperson

28

1   of the village, and directed the Pacific Regional Director and the So. Cal. Agency Superintendent

2   to "assist the Village's actual members in addressing their membership and leadership problems

3   in light of this" Board's prior determinations. 32 IBIA 167-68.

4        6. The IBIA also found on October 26, 1996, in Case No. 97-7-A, that it is a violation of

5   the IBIA's prior rulings for the Regional Director or the Agency Superintendent to recognize

6   subsequent purported election results of the Jamul Indian Village, until the membership dispute

7   has been resolved; "once an appeal is filed with the [IBIA], the BIA loses jurisdiction over the

8   matter except to participate in the appeal as a party. See Hammerberg v. Acting Portland Area

9   Director 24 IBIA 78 (1993)."

10       7. Therefore, since the remand of what the IBIA describes as "the membership and

11  leadership"dispute has not reached a final decision, even yet, the only government of the Jamul

12  Indian Village that has been lawfully recognized by the highest ranking member of the U.S.

13  government and the Department of Interior is that elected by the Jamul Indian Village General

14  Council in 1992, where IBIA appellant Jane Dumas is Vice-Chairperson.

15       8. WALTER ROSALES, MARIE TOGGERY, Jane Dumas, the estate of Val Mesa, Joe

16  Comacho, Bernice Mesa, Vivian Flores, Leslie A. Mesa, Gerald Mesa, Robert M. Mesa, and

17  William Mesa, and the Jamul Indian Village, through its duly elected chairperson, WALTER

18  ROSALES, are also Plaintiffs before the U.S. Court of Federal Claims, Case No. 98-860-L. This

19  action seeks damages against the U.S. government for breach of contract, breach of fiduciary

20  duty, breach of trust, interference with contract and prospective economic advantage, taking,

21  accounting, and violations of civil rights. The action was stayed on April 19, 2000, pending the

22  outcome of the IBIA Case No. 00-28-A. Tribal Judge KAREN TOGGERY is not a plaintiff in

23  the Court of Claims action, since the government's failure to give her Tribal court judgment full

24  faith and credit against certain residents and non-residents of the Village remains at issue in that

25  case.

26

27

28

**JURISDICTION**

9.  Jurisdiction is alleged pursuant to 28 U.S.C. 1331, federal question, 28 U.S.C. 1346, United States as a defendant, 28 U.S.C. 1361, mandamus, 28 U.S.C. 2201, declaratory judgments, 28 U.S.C. 1353, claims for allotments, 25 U.S.C. 345, actions for allotments, 25 U.S.C. 335, extension of provisions to allotments, 25 U.S.C. 348, trust allotments and contracts touching the same, 25 U.S.C. 465, Indian Reorganization Act land acquisitions, 18 U.S.C. 1151, claims arising in Indian country, and 25 U.S.C. 81, contracts with Indians.

**GENERAL ALLEGATIONS**

10.  On September 26, 1912, J.D. Spreckel's Coronado Beach Company deeded 2.21 acres of land in Jamul, California, to the Roman Catholic Bishop of Monterey and Los Angeles, a corporate in sole of the State of California, "to be used for the purposes of an Indian graveyard and approach thereto." A true and correct copy of that deed is attached hereto as Exhibit A.

11.  From their birth, the Plaintiffs' families were occupants by sufferance, in possession of certain private property, contiguous to that Indian graveyard in Jamul, California, which private property was owned by the Lawrence and Donald Daley families, and the Catholic Diocese.

12.  During the latter part of the 1970's the Plaintiffs and their families negotiated a gift of that certain property of which they were in possession from the Daley families and the Catholic Diocese.  The Daley families agreed to convey title to the land then occupied by the Plaintiffs to the UNITED STATES in trust for the explicit benefit of those half-blood Jamul Indians then occupying the property. The Daley families specifically agreed to this form of conveyance in order to provide a place for the Plaintiffs and their families to live in perpetuity, protected by the UNITED STATES as a trustee against all forms of alienation, trespass and infringement.

13.  On December 27, 1978, Lawrence and Donald Daley, recorded a grant deed of parcel 597-080-01, consisting of approximately 4.66 acres, to "the United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate."  A true and correct copy of that deed is attached hereto as Exhibit B.

-4-

14. This deed was recorded nearly three years before the Constitution of the Jamul Indian Village was adopted, and three years before the Congress of the United States recognized the creation of the Jamul Indian Village under the Indian Reorganization Act of 1934. This deed was accepted by the UNITED STATES on December 21, 1978, pursuant to Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465. The Plaintiffs thereby became entitled to this allotment of land under Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465, and the General Allotment Act of 1887, as amended in 1894, 25 U.S.C. 345.

15. On May 9, 1981, Plaintiff WALTER ROSALES, certified on behalf of the election board, that sixteen of twenty three registered voters adopted the Jamul Indian Village constitution. The UNITED STATES acknowledged the adoption of the constitution on July 7, 1981, and the Congress of the UNITED STATES recognized the Jamul Indian Village by publication in the Federal Register on November 24, 1982. When the Jamul Indian Village was created on May 9, 1981, under the terms of the Indian Reorganization Act of 1934, it was a landless governmental entity. To date, the UNITED STATES has not set aside or created an Indian reservation for the Jamul Indian Village.

16. Subsequently, the Catholic Diocese agreed to provide certain land to the Jamul Indian Village for the purpose of maintaining the road and utilities to the Indian graveyard, provided for by the original Coronado Beach Company deed to the Catholic Diocese.

17. On July 27, 1982, the Roman Catholic Bishop of San Diego, successor to the Roman Catholic Bishop of Monterey and Los Angeles, a corporation sole, recorded a grant deed of parcel 597-080-02, consisting of approximately 1.372 acres, to "the United States of America in trust for the Jamul Indian Village." A true and correct copy of that deed is attached hereto as Exhibit C. Excepted therefrom was that portion of the Coronado Beach Company land grant, consisting of the approximately .838 acre Indian graveyard, to which the Catholic Diocese retains title. The grantor also explicitly reserved "to himself and his successors or assigns an easement for (1) utility service lines and (2) ingress and egress over the existing well-traveled road," which

1  extends the entire length of the 1.372 acres from California State Highway 94 to the Indian

2  graveyard.

3      18. On February 5, 2001, the UNITED STATES took action, and first published notice,

4  denying Plaintiffs' entitlement and excluding them from their allotment of land in parcel 597-

5  080-01.

6      19. The Defendants denial of Plaintiffs' entitlement and exclusion from their allotment

7  of land has caused the Plaintiffs severe property damage, consequential damages, physical and

8  bodily injury, including severe emotional distress, all in excess of the jurisdictional limit of this

9  court, subject to proof at trial. These acts have unduly interfered with the Plaintiffs' rights to the

10 quiet enjoyment of their allotment of land, and interfered with the Plaintiffs' civil rights to due

11 process and equal protection of the laws.

12     20. Plaintiffs have been greatly and irreparably damaged by reason of Defendants'

13 infringement and violation of their property and civil rights, and unless Defendants are enjoined

14 by this court, they will continue their violation of Plaintiffs' property and civil rights, further

15 irreparably harming the Plaintiffs.

16     21. As a result of the wrongful conduct of the defendants as herein alleged, Plaintiffs are

17 entitled to a temporary, preliminary and permanent injunction to prevent great and irreparable

18 injury resulting from the infringement and violation of their property and civil rights, from the

19 likelihood that Defendants will be unable to respond in damages, and from the difficulty or

20 impossibility to ascertain the exact amount of personal bodily injury and property damage

21 Plaintiffs have sustained, and will in the future sustain. These ongoing and continuing injuries

22 sustained by Plaintiffs cannot be fully compensated in damages and Plaintiffs are without an

23 adequate remedy at law without the imposition of the requested equitable injunctive relief.

**FIRST CLAIM FOR RELIEF**

(Declaratory and Injunctive Relief for Denial of Entitlement to Allotment)

26     22. Plaintiffs incorporate by reference paragraphs 1 through 21 of this complaint as

27 though fully set forth herein.

28

1       23.  Plaintiffs are entitled to an allotment of parcel 597-080-01, under the Indian

2  Reorganization Act of 1934, and the General Allotment Act of 1887.

3       24.  Defendants have denied the Plaintiffs' their entitlement and excluded them from their

4  allotment of land in parcel 597-080-01.

5       25.  An actual controversy has arisen and now exists between Plaintiffs and Defendants

6  regarding their respective rights, duties and obligations in that Plaintiffs contend that Defendants

7  are liable to Plaintiffs for the statutory, contractual, and tortious deprivations of their property

8  and civil rights alleged herein, and defendants deny such liability to Plaintiffs.

9       26.  Plaintiffs desire a judicial determination of the respective rights of Plaintiffs and

10  Defendants.

11       27.  Such a declaration is necessary and appropriate at this time so that the parties may

12  ascertain their rights and duties with respect to each other.

13       28.  Plaintiffs have been greatly and irreparably damaged by reason of said Defendant's

14  statutory, contractual, and tortious deprivations of Plaintiffs' property and civil rights alleged

15  herein, and unless Defendants are enjoined by this court, they will continue the violation of

16  Plaintiffs' rights further irreparably harming the Plaintiffs.

17       29.  As a result of the wrongful conduct of said defendants as herein alleged, Plaintiffs are

18  entitled to a temporary, preliminary and permanent injunction to prevent great and irreparable

19  injury resulting from the infringement and violation of their property and civil rights, from the

20  likelihood that Defendants will be unable to respond in damages, and from the difficulty or

21  impossibility to ascertain the exact amount of personal bodily injury and property damage

22  Plaintiffs have, and will in the future, sustain. These ongoing and continuing injuries sustained by

23  Plaintiffs cannot be fully compensated in damages and Plaintiffs are without an adequate remedy

24  at law without the imposition of the requested equitable injunctive relief.

25  **WHEREFORE** Plaintiffs pray for judgment as follows:

26       1.     That the court declare that Plaintiffs became entitled to the allotment of parcel

27  597-080-01, pursuant to Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465,

28

upon the December 27, 1978 recordation of the grant deed by Lawrence and Donald Daley to "the United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate."

2.     That Defendants, and their officers, agents, servants, employees and attorneys and all persons in active concert with them, or any of them, be compelled to issue to Plaintiffs a trust patent for parcel 597-080-01;

3.     That Defendants, and their officers, agents, servants, employees and attorneys and all persons in active concert with them, or any of them, be temporarily, preliminarily and permanently enjoined from further denying their entitlement to the allotment of parcel 597-080-01;

4.     That Defendants, and their officers, agents, servants, employees and attorneys and all persons in active concert with them, or any of them, be temporarily, preliminarily and permanently enjoined from further excluding the Plaintiffs from their allotment of parcel 597-080-01;

5.     That the court declare that the Defendants are liable for money damages for deprivation of the use and benefit by Plaintiffs of the allotted parcel 597-080-01;

6.     That Plaintiffs be awarded their reasonable attorneys' fees, costs, and expenses in this action; and

7.     That Plaintiffs be awarded such other and further relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand trial by jury.

Dated: May 28, 2001                    **WEBB & CAREY**

Patrick D. Webb, Attorneys for Plaintiffs
WALTER ROSALES, MARIE TOGGERY and
KAREN TOGGERY

-8-

EXHIBIT B

1 | Patrick D. Webb, Esq., State Bar No. 82857
  | **WEBB, SMELKO & CAREY**
2 | 350 West Ash, Suite 701
  | San Diego, California 92101
3 | (619) 236-1200
  | fax (619) 236-1283
4 |
  | Attorneys For Plaintiffs
5 |
6 |
7 |
8 |                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9 |                          **FOR THE COUNTY OF SAN DIEGO**
10 |
11 | JAMUL INDIAN VILLAGE, WALTER          )   Case No. **00698798**
   | ROSALES, JANE DUMAS, SARAH            )
12 | ALDAMAS, VAL MESA, ADOLPH             )   **COMPLAINT ON SISTER STATE**
   | THING, JOE COMACHO, HELEN             )   **JUDGMENT**
13 | CUERO, BERNICE MESA, VIVIAN           )
   | FLORES, and MARIE TOGGERY,            )
14 |                                       )
15 |       Plaintiffs,                )
   |                                       )
16 | vs.                                   )
   |                                       )
17 | RAYMOND HUNTER, MARCIA                )
   | GORING-GOMEZ, MARY ALVAREZ,           )
18 | LEE SHAW-CONWAY, ELEANOR              )
   | MILLER, EUGENE R. MADRIGAL, and       )
19 | DOES 1-20,                            )
   |                                       )
20 |       Defendants.                )
21 | _____ )

22 |     Plaintiffs  JAMUL INDIAN VILLAGE, WALTER ROSALES, JANE DUMAS, SARAH

23 | ALDAMAS, VAL MESA, ADOLPH THING, JOE COMACHO, HELEN CUERO, BERNICE

24 | MESA, VIVIAN FLORES, and MARIE TOGGERY, ("PLAINTIFFS") allege:

25 | 1.     JAMUL INDIAN VILLAGE (hereinafter JAMUL) is a tribal governmental entity of

26 | Kumeyaay Mission Indians governed by a Constitution adopted pursuant to the Indian

27 | Reorganization Act of 1934, 25 U.S.C. 461 et seq., located on the Jamul Indian Reservation, in

28 | Jamul, California.

C  KENNETH E. MARTONE
Clerk of the Superior Court

APR 0 2 1996

By: JOANNE ALOSI. Deputy
BUSINESS

2.    RAYMOND HUNTER, MARCIA GORING-GOMEZ, MARY ALVAREZ, LEE SHAW-CONWAY, ELEANOR MILLER, EUGENE R. MADRIGAL ("DEFENDANTS") are residents of San Diego County, but **are not** enrolled members of the JAMUL INDIAN VILLAGE. The BIA has never recognized these individuals as enrolled members of JAMUL. RAYMOND HUNTER declares himself to be a member of the Rincon, San Luiseno Band of Mission Indians, in a September 12, 1979 consent decree filed by HUNTER settling the Rincon Band's claims that he wrongfully converted federal water rights on the Rincon reservation and violated the Rincon water ordinance in San Diego Superior Court Case No. N10601. As a declared member of the Rincon Band, HUNTER is not even qualified to be a member of JAMUL. JAMUL Const. Art. III, Sec. 2.

3.    At all times herein mentioned, the Jamul Indian Village Tribal Court on the Jamul Indian Reservation located in Jamul, California, was and now is a court of general jurisdiction created pursuant to the Jamul Constitution, the U.S. Constitution, and the Indian Reorganization Act of 1934, 25 U.S.C. 461 et seq.

4.    On or about December 1, 1995, a judgment was duly given and made by the above-mentioned court in favor of PLAINTIFFS. A true and correct copy of that judgment is attached hereto as Exhibit A and made a part hereof. PLAINTIFFS hereby request that the Court take judicial notice of the record of such judgment, pursuant to Evidence Code sections 452 and 453.

5.    The above-mentioned judgment has become final. It has never been vacated, modified, or set aside, and the time for appeal has expired.

6.    According to the terms of the above-mentioned judgment, PLAINTIFFS recovered judgment against DEFENDANTS, permanently enjoining DEFENDANTS from further using, altering and damaging Jamul Indian Village assets, from interfering with the Jamul General Council's determination of the uses to which Tribal funds and assets are put, from interfering with the voting rights of the PLAINTIFFS, from failing to recognize the June 1995 election of Walter Rosales as Chairperson, Jane Dumas as Vice-chairperson, Sarah Aldamas, Adolph Thing and Val Mesa as members of the executive committee.

1    7.      According to the terms of the above-mentioned judgment, DEFENDANTS were further

2    ordered to return to the care, custody and control of the Jamul General Council all grants, bank

3    accounts and other Tribal funds and assets.

4    8.      PLAINTIFFS have demanded that DEFENDANTS comply with the judgment, but

5    DEFENDANTS continue to do the acts the Court enjoined and continue to fail to return all

6    grants, bank accounts and other Tribal funds and assets to the care, custody and control of the

7    Jamul General Council.

8        WHEREFORE, PLAINTIFFS pray for judgment as follows:

9        1.      That DEFENDANTS, and their officers, agents, servants, employees and

10    attorneys and all persons in active concert with them, or any of them, be permanently enjoined

11    from further using, altering and damaging Jamul Indian Village assets.

12        2.      That DEFENDANTS, and their officers, agents, servants, employees and attorneys

13    and all persons in active concert with them, or any of them, be permanently enjoined from refusing

14    to permit, and interfering with, the Jamul General Council's determination of the uses to which

15    Tribal funds and assets are put, and interfering with the voting rights of the PLAINTIFFS.

16        3.      That DEFENDANTS, and their officers, agents, servants, employees and attorneys

17    and all persons in active concert with them, or any of them, be permanently enjoined from failing

18    to recognize the June 1995 election of Walter Rosales as Chairperson, Jane Dumas, as Vice-

19    chairperson, Sarah Aldamas, Adolph Thing and Val Mesa as members of the executive

20    committee.

21        4.      That DEFENDANTS, and their officers, agents, servants, employees and attorneys

22    and all persons in active concert with them, or any of them, are to return all grants, bank accounts

23    and other Tribal funds and assets to the care, custody and control of the Jamul General Council.

24    Dated: _April 2_____, 1996        **WEBB, SMELKO & CAREY**
                                                     A Professional Corporation

25

26                By:          _____

27                              Patrick D. Webb, Attorneys for
                                     JAMUL INDIAN VILLAGE and the
                                     INDIVIDUAL PLAINTIFFS

28



JAMUL INDIAN VILLAGE TRIBAL COURT

| | |
|---|---|
| JAMUL INDIAN VILLAGE, WALTER ROSALES, JANE DUMAS, SARAH ALDAMAS, VAL MESA, ADOLPH THING, JOE COMACHO, HELEN CUERO, BERNICE MESA, VIVIAN FLORES, and MARIE TOGGERY, | Case No. 95-0001 KT |
| | JUDGMENT |
| Plaintiffs, | |
| vs. | |
| RAYMOND HUNTER, MARCIA GORING-GOMEZ, MARY ALVAREZ, LEE SHAW-CONWAY, ELEANOR MILLER, JAMES ALVAREZ, EUGENE R. MADRIGAL, and DOES 1-20, | |
| Defendants | |

It appearing from the records in the above-entitled action and from the evidence submitted to the court for the hearing on Plaintiffs' application for default judgment on December 1, 1995, at which Patrick D. Webb of Webb, Smelko & Carey appeared for plaintiffs, and Defendants failed to appear, that:

1.    Defendants RAYMOND HUNTER, MARCIA GORING-GOMEZ, MARY ALVAREZ, LEE SHAW-CONWAY, ELEANOR MILLER, EUGENE R. MADRIGAL are not infants or incompetent persons or in military service or otherwise exempted under the Solders' and Sailors' Civil Relief Act of 1940, and

1    2.    Said defendants have not appeared in this action, and default has been entered on

2    November 24, 1995.

3    3.    Notice of the application for default judgment by court was served upon said

4    defendants by U.S. mail on Eugene R. Madrigal, the attorney known to be representing them in

5    the U.S. District Court for the So. Dist. Of California, Case No. 95-0131R(BTM), on November

6    24, 1995.

7    4.    Plaintiffs are entitled to judgment against said defendants on account of the claims

8    pleaded in the complaint, to wit: negligence; fraud; negligent misrepresentation; interference with

9    contractual relations and prospective economic advantage; conversion; professional negligence as

10    to defendant MADRIGAL, breach of fiduciary duty as to defendant MADRIGAL, breach of

11    contract as to defendant MADRIGAL, infringement of civil rights to full and equal benefit of all

12    laws and proceedings for the security of persons and property and the right to vote, due to age,

13    ancestry and opposition to the defendants' political agenda, in violation of 25 U.S.C. 1302(8) and

14    42 U.S.C. 1981, infringement of civil rights to equally occupy and enjoy real and personal

15    property due to age, ancestry and opposition to the defendants political agenda, in violation of 25

16    U.S.C. 1302(8) and 42 U.S.C. 1982, infringement of civil rights by conspiracy to prevent by

17    force, intimidation or threat the right to vote due to age, ancestry and opposition to defendants'

18    political agenda, in violation of 25 U.S.C. 1302(8) and 42 U.S.C. 1985(1), infringement of civil

19    rights by conspiracy to prevent the exercise of the right to vote in retaliation for opposition to

20    defendants' political agenda, due to age and ancestry, in violation of 25 U.S.C. 1302(8) and 42

21    U.S.C. 1985(2); infringement of civil rights by conspiracy to deprive plaintiffs of equal protection

22    of the laws and equal privileges and immunities under the law, due to their age, ancestry, and

23    opposition to Defendants' political agenda, in violation of 25 U.S.C. 1302(8) and 42 U.S.C.

24    1985(3); violation of the National Historical Preservation Act and the National Environmental

25    Policy Act; violation of the Indian Gaming Regulatory Act; and Declaratory Relief, as more

26    particularly plead in the Complaint:

27

28

-2-

1    Now, therefore, based upon the Plaintiffs' application for entry of default judgment, and

2    this court's above-stated findings. JUDGMENT IS HEREBY ENTERED against RAYMOND

3    HUNTER, MARCIA GORING-GOMEZ, MARY ALVAREZ, LEE SHAW-CONWAY,

4    ELEANOR MILLER, EUGENE R. MADRIGAL, as follows:

5        A.    Said Defendants, and their officers, agents, servants, employees and

6    attorneys and all persons in active concert with them, or any of them, are permanently enjoined

7    from further using, altering and damaging JAMUL INDIAN VILLAGE assets;

8        B.    Said Defendants, and their officers, agents, servants, employees and

9    attorneys and all persons in active concert with them, or any of them, are not, and have never

10   been properly, enrolled members of the JAMUL INDIAN VILLAGE, and are not, and have never

11   been properly, enrolled members of the JAMUL General Council, and they are permanently

12   enjoined from interfering with the JAMUL General Council' determination of the uses to which

13   Tribal funds and assets are put, and they are further permanently enjoined from interfering with

14   the voting rights of the plaintiffs, and all grants, bank accounts, and other Tribal funds and assets

15   shall be returned to the care, custody and control of the JAMUL General Council;

16       C.    Said Defendants, and their officers, agents, servants, employees and

17   attorneys and all persons in active concert with them, or any of them, are permanently enjoined

18   from failing to recognize the June 1995 election of WALTER ROSALES as Chairperson, JANE

19   DUMAS, as Vice-chairperson, SARAH ALDAMAS, ADOLPH THING, and VAL MESA, as

20   members of the executive committee.

21       D.  Plaintiffs are awarded general damages in the amount of $700,853.00;

22       E.  Plaintiffs are awarded punitive damages in the amount of $50,000; and

23       F   Plaintiffs are awarded their reasonable attorneys' fees, costs, and expenses in

24   this action in the amount of $132,865.04

25   Dated: December 1, 1995

26

27                                   _____
                                     Karen Toggery, Tribal Judge
28

-3-

JAMUL INDIAN VILLAGE TRIBAL COURT    )
JAMUL INDIAN RESERVATION    ) ss.
JAMUL, CALIFORNIA    )

     I, Jo Dean, Clerk of the Jamul Indian Village Tribal Court, do hereby certify that the attached Judgment for Case No. 95 0001 KT, <u>Jamul Indian Village, et al. v. Raymond Hunter, et al.</u>, dated December 1, 1995, is a true and correct copy, the original of which is on file in the Jamul Indian Village Tribal Court.

     Dated this 21ᵗʰ day of March, 1996.


Jo Dean
Clerk of the Jamul Indian Village Tribal Court

EXHIBIT C

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

| CASE NUMBER | COMPLAINT DATE | HEARING DATE | HEARING TIME | DEPT | FOR COURT USE ONLY |
|---|---|---|---|---|---|
| 698798 | | 10/21/98 | 9:00 a.m. | 43 | KENNETH E. MARTONE Clerk of the Superior Court |

OCT 2 1 1998

By: B. OSTHOFF, Deputy

| JUDGE | CLERK |
|---|---|
| J MICHAEL BOLLMAN | BARBARA OSTHOFF |

| REPORTER | CSR # |
|---|---|
| Narma Jean Flores | 7413 |

| PLAINTIFF/PETITIONER | ATTORNEY FOR PLAINTIFF/PETITIONER |
|---|---|
| JAMUL INDIAN VILLAGE | |

| DEFENDANT/RESPONDENT | ATTORNEY FOR DEFENDANT/RESPONDENT |
|---|---|
| RAYMOND HUNTER | |

COUNSEL FOR MOVING PARTY MUST FILL IN TOP PORTION, EXCLUDING NAMES OF JUDGE, CLERK AND REPORTER. ALL COUNSEL MUST PRINT NAMES IN SPACE OPPOSITE THE NAME OF THE PARTY THEY REPRESENT.

EX PARTE APPLICATION FOR: __TO SET MOTION TO CONSOLIDATE__

MOVING PARTY: _____ (D) EUGENE RICHARD MADRIGAL

☑ ORDER BY COURT ☐ GRANTED ☑ DENIED *w/o prejudice* ☐ ORDER SHORTENING TIME IS ☐ GRANTED ☐ DENIED

☐ PURSUANT TO STIPULATION

☐ MOTION TO/FOR _____ IS SET ON _____

☐ RULING BY TELEPHONIC RECORDING/NO APPEARANCE NECESSARY

☐ TRIAL DATE CONTINUED TO: _____ ON MOTION OF PLT / DFT ☐ BY COURT

☐ TRIAL READINESS CONFERENCE CONTINUED TO: _____ ON MOTION OF PLT / DFT ☐ BY COURT

☐ SET CASE MANAGEMENT CONFERENCE ON _____ ☐ CASE DESIGNATED EXCEPTIONAL

☐ 1ST EXCHANGE OF EXPERTS _____ 2ND EXCHANGE OF EXPERTS _____ ☐ ALL DEADLINES REMAIN AS SET

☐ MOTION/DISCOVERY DATE MOVED TO _____ NON JURY/JURY REQUESTED BY PLT/DFT EST. LENGTH OF TRIAL __ DAYS

☐ VACATE ALL HEARING DATES ☐ ORDERED TO ARB./MED. ☐ REMOVED FROM ARB./MED. ☐ SET ON 45 DAY DISMISSAL CALENDAR

☐ PREFERENCE GRANTED ☐ 70 YEAR ☐ 5 YEAR ☐ OTHER _____

☐ ASSIGNED TO JUDGE _____ FOR ALL PURPOSES INCLUDING TRIAL

☐ LEAD CASE NO. _____ CONSOLIDATED WITH _____

OTHER *Case # 723872 to be assigned to Jd Bollman and to be Coordinated/Consolidated to this case. Both cases are to be stayed/dismissed until the (3) Interior Board of Indian affairs pending appeals are resolved. Both cases are dismissed w/o prejudice; Court reserves jurisdiction to vacate dismissal nunc pro tunc. All dates are vacate & parties are not giving up any rights.*

DATED: 10/21/98                    *Michael Bollman*

JUDGE OF THE SUPERIOR COURT

SUPCT CIV-7(Rev. 7-98)    **EX PARTE APPLICATION (Coordinated Rules, Division II, Chapter 7)**

EXHIBIT D

Law Offices
## Webb & Carey
A Professional Corporation
**401 B Street Suite 306**
**San Diego, California  92101**
TEL (619) 236-1650
FAX (619) 236-1283


October 6, 2006


**CERTIFIED RETURN RECEIPT REQUESTED**


Alleged Chairman Leon Acebedo
Jamul Indian Village
PO Box 612
Jamul CA 91935

Re:    Alleged Tribal Environmental Impact Statement/Report (TEIS/R) Comments, Jamul Indian Village

Dear Leon:

As you are well aware, our office continues to represent the majority of the surviving founding members of the Jamul Indian Village. Our clients continue to oppose the purported Village Casino Project, because that proposal calls for razing their homes on Parcel 597-080-01, and thereby violating their usufructuary property rights in that parcel as the designated beneficiaries of their allotments in the parcel from the United States, Department of Interior.

Our clients hereby further memorialize their continuing opposition to any further consideration of the TEIS/R, since it is premature, arbitrary and capricious to consider it at this time, for the following reasons:

1.    The alleged 2006 Off-Reservation Environmental Impact Ordinance purportedly providing for review by the tribe of any proposed TEIS/R was illegally adopted by a faction consisting in part of non-members, who were not authorized by a true majority of the properly and lawfully enrolled members of the tribe to adopt such a procedure. See discussion in 3 and 4 below.

Leon Acebedo
October 6, 2006
Page 2

2.     The TEIS/R fails to establish the findings of fact and conclusions required by 25
       CFR 151.3 and 151.4, with regard to the "tribe's governing documents
       authorizing the tribe to take the requested action," and "the reservation
       boundaries."

       As you have been made aware, Parcel 597-080-01 was allotted to our clients in 1978, as
individual Jamul Indians of one-half degree or more Indian blood, as designated in the grant deed
from the Daleys, and accepted by the U.S. in trust for their individual benefit. Hence, the Parcel
does not qualify for "gaming" under IGRA, 25 USC 2703(4), since it never was designated a
"reservation," nor land "over which an Indian tribe exercises governmental power."

       The "tribe's governing document," is its original constitution, and Carmen Facio's May 9,
2000 memo to Nancy Pierskalla and George Skibine makes clear that the U.S. has "no record of
the 1978 trust parcel [597-080-01] being known as the Jamul Village," over which the
"constitution states thay [sic] have jurisdiction."

       Contrary to the unsupported and erroneous statements in the TEIS/R, regarding land
status, as the BIA is well aware, Judge Gonzalez' decision of February 13, 2002, may not be
cited as precedent, was not a final decision, and is certainly not binding on the determination by
the Secretary as to whether Parcel 597-080-01 qualifies for "gaming" under 25 U.S.C. 2703(4).
While the Ninth Circuit Court of Appeal affirmed the dismissal of our clients' claims in that
action, the Court of Appeal abandoned Judge Gonzalez' findings entirely, and held, on other
facts and for procedural reasons only, that the tribe was an indispensable party, and that our
clients' designated allotments in Parcel 597-080-01 could not be adjudicated in that action.

       Contrary to the TEIS/R, there has been no finding by the Ninth Circuit Court of Appeal
that Parcel 597-080-01 is, or ever was, a "reservation," or  land "over which an Indian tribe
exercises governmental power." Contrary to the TEIS/R the So. Dist. of Cal. District Court
opinion has been vacated and superceded by the Ninth Circuit's opinion of August 11, 2003,
which made no finding as to the status of the land in Parcel 597-080-01. Moreover, the District
Court opinion made no finding that a "reservation" was ever actually created following receipt of
the letter request with the 11 half-blood signatures.

       Contrary to the TEIS/R, the fact that the governmental entity known as the Jamul Indian
Village has been listed on the federal register of recognized tribes since 1981, does not evidence
any "exercise of governmental power," over Parcel 597-080-01. As the BIA well knows, many
tribes are landless, yet still recognized by the federal government. Moreover, there is no listing in
the federal register indicating any "exercise of governmental power" by any Indian tribe over
Parcel 597-080-01. Most importantly, the government's own records, as reflected in the Facio
May 9, 2000 memo, concede that the Jamul Indian Village has never "exercised governmental

Leon Acebedo
October 6, 2006
Page 3

power" over Parcel 597-080-01.

Finally, the Ninth Circuit's opinion, far from resolving the land status of Parcel 597-080-01, leaves the U.S. in the unenviable position of having to compensate our clients for depriving them of their designated allotments in Parcel 597-080-01, "without due process" in violation of the 5th Amendment of the U.S. Constitution, if their homes are razed and their usufructuary property rights in Parcel 597-080-01 arising from their having been designated the beneficiaries of the allotments in that parcel are usurped to construct a casino on Parcel 597-080-01. The tribe will not be an indispensable party in any subsequent action, if any further action for damages against the U.S. is required because our clients' property will then have been "taken""without just compensation." Our clients seek just such compensation in the action known as Rosales et al. v. United States, U.S. Court of Federal Claims, Case No. 98-860 L, which remains pending prior to trial, before the Hon. Edward Damich.

Parcel No. 597-080-01, as recorded in San Diego County, California, is held in trust by the United States for the Plaintiffs, who are "such Jamul Indians of one-half degree or more Indian blood," and were designated by the Secretary of the Interior as trust beneficiaries of this allotment, pursuant to the grant deed recorded in San Diego County on December 27, 1978. Coast Indian Community v. U.S. (Fed. Cl. 1977) 550 F.2d 639; 1 Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs 1917-1974 at 668, 724, 747, and 1479. Coast Indian Community, supra, held on nearly identical facts, that the parcel in question, "was not acquired for a tribe, leaving only the possibility under the [Indian Reorganization] Act that it was purchased for individual Indians. The deed and proclamation say nothing to contradict this. Thus, the land was taken in trust for the individual Indians." 550 F2.d 639, 651, n. 32.

3.    The legitimate majority of the Jamul Indian Village General Council still has not authorized any Village Casino Project on behalf of the Jamul Indian Village.

Contrary to the TEIS/R, tribal membership and leadership issues are not solely "internal tribal matters,"particularly where "the legality of acts of federal officials in approving a tribal action, [are at issue] the matter is not merely an intratribal dispute insulated from federal court review." Milam v. U.S.D.O.I. (D.D.C. 1982) 10 I.L.R. 3113, citing Harjo v. Kleppe, 420 F.Supp. 1110, 1117 (D.D.C. 1976), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C. Cir. 1978) and U.S. Pawnee Business Council, 382 F.Supp. 54, 59 (N.D. Okla. 1974). See also, Goodface v. Grassrope, 708 F.2d 335, 338(8th Cir. 1983) finding BIA actions concerning who to "recognize" in a tribal government could be reviewed under the arbitrary or capricious standard in 5 U.S.C. 706(2)(A).

Contrary to the TEIS/R, U.S. District Judge Rhoades' June 21, 1995 comments regarding tribal membership and leadership may not be cited as precedent, were not a final judgment, and

Leon Acebedo
October 6, 2006
Page 4

therefore not binding upon the BIA. As the BIA is well aware, the action before Judge Rhoades
in the So. Dist. of Cal. was dismissed without prejudice, and has been re-filed before the U.S.
Court of Federal Claims, Case No. 98-860L, where it has been stayed, pending resolution of the
IBIA appeals, which are presently under review by Judge Gladys Kessler in U.S. Dist. Ct. for
D.C., Case No. 1:03CV1117(GK).

Contrary to the TEIS/R, whether the tribe was without authority to lower the blood
quantum for membership in the tribe after 25 U.S.C. 476 (f) and (g) were adopted, or not, a
faction of the tribe illegally staged the purported constitutional amendment to attempt to lower
that quantum, and failed to follow the tribe's constitution, in attempting to amend the
constitution. As the BIA is well aware, these violations of the Village constitution, the Indian
Reorganization Act, IGRA, and the Administrative Procedure Act, remain pending before Judge
Gladys Kessler in U.S. Dist. Ct. for D.C., Case No. 1:03CV1117(GK).

Contrary to the TEIS/R, the BIA is well aware that it is blatantly disingenuous to claim
that "no appeals are presently pending before the IBIA," without also explaining that, IBIA
Administrative Law Judge Kathryn Lynn's decision of March 4, 2003, remains under review by
Judge Gladys Kessler in U.S. Dist. Ct. for D.C., Case No. 1:03CV1117(GK).

Hence, it is still true that the only "government" of the Jamul Indian Village that has been
lawfully recognized by the U.S. government is that elected by the Jamul General Council in
1992, 32 IBIA 167, and that recognized government has not applied for any land to be taken into
trust, nor has it authorized the preparation of the TEIS/R or the proposed Village Casino Project.
Hence, it remains premature to further consider the TEIS/R, since there is no lawful application
for a review of any TEIS/R at this time.

4.     The Jamul Indian Village remains without jurisdiction to consider the TEIS/R and
       the proposed Village Casino Project, since the membership and leadership issues
       appealed to the Interior Board of Indian Appeals (IBIA), remain under review by
       Judge Gladys Kessler in U.S. Dist. Ct. for D.C., Case No. 1:03CV1117(GK).

The lawfully enrolled membership of the Jamul Indian Village remains without
jurisdiction to consider any election authorizing the proposed Village Casino Project, until the
membership dispute has been resolved. As determined by IBIA Chief Judge Kathryn Lynn's
October 26, 1996, order in Case No. 97-7-A; "once an appeal is filed with the [IBIA], the BIA
loses jurisdiction over the matter except to participate in the appeal as a party. See Hammerberg
v. Acting Portland Area Director 24 IBIA 78 (1993)." On April 19, 2000, Judge Diane Gilbert
(Weinstein) Sypolt stayed Rosales et al v. United States, U.S. Court of Federal Claims Case No.
98-860 L, pending disposition of the consolidated IBIA appeals, which remain unresolved.  On
January 16, 2002, Judge Lynn further ruled in IBIA Docket Nos. 99-4-A and 00-28-A: "The

Leon Acebedo
October 6, 2006
Page 5

Board notes that it may also ultimately prove necessary to stay further consideration of the proposed trust acquisition should the tribal membership and election questions not be resolved." Without such jurisdiction, it remains premature to further consider the TEIS/R, at this time.

5.    Class III gambling is not lawful on individual Indian trust land. 25 U.S.C. 2710 and 2719.

Contrary to the TEIS/R, the tribe's failure to have an approved Class III Gaming Ordinance clearly "relates to the tribe's proposed Village Casino Project." It also demonstrates that there is no justification for the project, since the purported purpose of the project cannot be fulfilled. Given the unresolved membership and leadership issues, there is no certainty that the NIGC will grant approval of any purported Class III ordinance adopted by nonmembers and those not qualified to be members of the tribe.

The TEIS/R fails to deny that IGRA only allows Class III gaming on Indian lands "over which an Indian tribe exercises governmental power," 25 U.S.C. 2703(4)(B) and 2710(d)(1) and (2), which has specifically been found to require that the recognized tribal "sovereign, in its sovereign capacity, must have jurisdiction over that land." Kansas v. Norton (10th Cir. 2001) 249 F.3d 1213, 1229-31; See also, Sac & Fox Nation v. Norton (10th Cir.2001) 240 F.3d 1250, 1257, and Wisconsin v. Stockbridge-Munsee Community (E.D. Wis. 1999) 67 F. Supp. 2d 990, 1003-4. Furthermore, the TEIS/R fails to deny that there has been no final determination that any tribe "exercises governmental power," as to Parcel 597-080-01.

6.    The proposed Class III gaming violates the Indian Gaming Regulatory Act (IGRA) and the proposed Jamul Tribal-State compact.

The TEIS/R concedes that Class III gaming is lawful only if: a Class III gaming ordinance has been lawfully adopted by the governing body having jurisdiction over qualified Indian land, in compliance with the tribe's constitution, and in conformance with a lawfully adopted Tribal-State compact, both of which must have been adopted without undue influence. 25 U.S.C. 2710.

The TEIS/R also concedes that no Class III gaming license, nor any Tribal-State compact, has yet been determined to be lawfully adopted by any faction of the tribe. Chief Administrative Judge, Kathryn Lynn has already determined that the "governing body" of the village has failed to comply with the "governing documents of the tribe," 25 U.S.C. 2710(d)(2)(B), and that "Departmental recognition of the results of any of the elections would violate the Village's constitution." 32 IBIA 167.

The TEIS/R also concedes in silence that the currently recognized tribal government can not lawfully adopt a Class III gaming ordinance, nor adopt the proposed compact, since that governing body has been significantly and unduly influenced to adopt both the ordinance and the

Leon Acebedo
October 6, 2006
Page 6

compact. The TEIS/R fails to deny that certain "gaming resource suppliers" and "financing sources," as defined by the Jamul-California compact, have been unlawfully paying the Jamul Indian Village more than $40,000 per month, in violation of the California compacts' prohibition of payments in excess of $25,000 per year, prior to the adoption of a Class III gaming ordinance and the licensing of any such supplier and/or financing source. Sec. 6.1, 6.4.3, 6.4.5, 6.4.8 and 6.5.6.

Nor has the TEIS/R denied that these certain gaming resource suppliers and financing sources have been continuously violating IGRA, 25 U.S.C. 2710(d) and 2711(e), and the proposed Jamul Tribal-State Compact by unduly interfering and influencing, and by attempting to unduly interfere or influence, for their gain or advantage, the decisions and processes of tribal government at the Jamul Indian Village, relating to Class III gaming activities. The TEIS/R also fails to deny that certain gaming resource suppliers and financing sources have been further violating the Jamul Tribal-State Compact, IGRA, and 18 U.S.C. 597, by unlawfully contributing money and other valuable consideration to members and non-members of the Jamul Indian Village, with which they have been unduly influenced to attend meetings, in order to attempt to unduly influence their vote in favor of a Class III gaming ordinance at Jamul.

Conceding the violations of IGRA and the proposed Jamul Tribal-State Compact, in silence, the gaming faction instead argues that our clients have no standing to seek damages for such violations. However, their failure to deny the fact that the violations have occurred, concedes the point that the Village Casino Project cannot be premised upon a continuing violation of IGRA or the Compact. Neither Judge Kessler, nor Judge Damich have yet decided whether our clients are entitled to damages in federal court for such violations; nor does the fact that they have not yet reached a final decision, in any way sanction, nor allow, the continuing violation of IGRA and the Compact, and in no way allows the Village Casino Project to be used for further violations of IGRA and the Compact, if arbitrarily and capriciously granted.

Hence, it remains premature to further consider the TEIS/R, where the proposed gaming continues to violate both IGRA and the California compacts, at this time.

7.     The proposed Village Casino Project is also premature because it does not, and cannot, meet the criteria set forth in the BIA's "October 2001 Checklist for Gaming Acquisitions," and 25 C.F.R. 151 et seq., in that it is detrimental to the surrounding community, and two Governors of California concur that it is detrimental to the surrounding community.

The TEIS/R fails to deny that the majority (8 of the then surviving 12) of those who originally voted to adopt the JAMUL Constitution, declared with personal knowledge, under penalty of perjury on July 20, 1998: (1) that they adopted the first, and only proper, Enrollment

Leon Acebedo
October 6, 2006
Page 7

Ordinance on November 19, 1994, (2) that Joe Comacho, Jane Dumas, Karen Toggery, Daniel Mesa, Leona Mesa, Arcelia Mesa, Mike Mesa, Walter Rosales, Adolph Thing, and Bernice Mesa, were properly enrolled as members of JAMUL on June 10, 1995, and along with the then surviving 12 original members to vote for the JAMUL Constitution constituted the legitimate members of JAMUL, (3) that a majority of the properly enrolled members of the General Council voted to create the JAMUL Tribal Court on July 15, 1995, (4) that a majority of the properly enrolled members of the General Council elected Walter Rosales, Chairperson, Jane Dumas Vice Chairperson, and Bernice Mesa, Val Mesa, and Sarah Aldamas to the executive committee of the tribe on June 21, 1997. None of which voted to amend the Village constitution to lower the blood quantum for membership, nor voted for any Class III gaming ordinance, nor the purported 2006 Off-Reservation Environmental Impact Ordinance.

Nor does the TEIS/R deny that former Governor Davis, and present Governor Schwarzenegger has already determined that the proposed "gaming establishment" would be "detrimental to the surrounding community." As catalogued in former Governor Davis' July 17, 2001 letter to the Acting Superintendent of the BIA, and Governor Schwarzenegger's September 10, 2004 letter to Clayton Gregory, Pacific Regional Director of the BIA, their determination that such a gaming establishment would be detrimental to the surrounding community is also shared by the local government officials, including then California State Senator David G. Kelley, United States Representative Duncan Hunter, the County of San Diego Board of Supervisors, the Jamul/Dulzura Planning Group, the Endangered Habitats League, and the Back Country Coalition. As reflected in the public comments to the BIA on February 6, 2003, this determination is also shared by State Assemblyman Jay La Suer, the Sierra Club, and the Otay Water District, not to mention 97% of the residents of Jamul.

The TEIS/R fails to deny that both Governor Davis and Schwarzenegger inescapably concluded:

> That the Tribe's proposal is inconsistent with the Multiple Species Conservation Plan, established by the United States Fish and Wildlife Service, the State Department of Fish and Game and the County of San Diego, restrictions on development and presents a serious threat to the viability of a significant portion of the State's recently acquired ecological reserve.

> Here, there are significant potentially unmitigable adverse impacts on sensitive State resources. In this case, the Tribe's proposed use represents a paradigm for the kind of land use conflicts which the Bureau should not permit to occur as a result of a fee to trust proposal.

Leon Acebedo
October 6, 2006
Page 8

It unnecessarily threatens to degrade significant State environmental resources and is thus inimical to the public health and welfare. That a fair balancing of State and Tribal interests in this instance requires that the Bureau deny the Tribe's application at this time.

Contrary to the false statements in the TEIS/R, 3.1-8, V, Cultural Resources, the construction of the proposed casino will cause a significant desecration of the human remains that have been interred on Parcel 597-080-01 over the last 100 years, including those of the family of the current residents most recently interred last month.

Finally, our clients continue to adopt all of the reasons evidencing the deficiencies of the TEIS/R, which were read into the record on February 6, 2003, and on September 27, 2006, and particularly those evidencing the items outlined in the October 2001 Checklist:

1.  Evidence of unmitigable environmental impacts.

2.  Reasonably anticipated unmitigable impacts on the social structure, infrastructure, services, housing, community character, and land use patters of the surrounding community.

3.  Unmitigable impact on the economic development, income, and employment of the surrounding community.

4.  Costs of impacts to the surrounding community beyond the sources of revenue to accommodate them.

--all of which further indicate that the proposed Village Casino Project will be detrimental to the surrounding community.

Should the gaming faction of the tribe continue to take any further action with regard to the TEIS/R or the proposed Village Casino Project, our clients will have no alternative but to pursue their rights before the courts to set aside any such agency action for failure to meet statutory, procedural, and constitutional requirements, where such action is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Kansas v. Norton (10th Cir. 2001) 249 F.3d 1213, 1229-31, and Sac & Fox Nation v. Norton (10th Cir.2001) 240 F.3d 1250, 1260-68.

Leon Acebedo
October 6, 2006
Page 9


For all of these reasons, our clients continue to oppose the pending TEIS/R and the Village Casino Project, and insist that it remains premature, and will be arbitrary and capricious, for the gaming faction of the tribe to further consider the TEIS/R, at this time.

Very truly yours,

Patrick D. Webb
**WEBB & CAREY**

cc:    Walter Rosales, Chairman Jamul Indian Village
Karen Toggery, Councilperson Jamul Indian Village
George Skibine, Director, OIGM
Senator Dianne Feinstein
Senator Barbara Boxer
Congressman Duncan Hunter, 52nd District California
Governor-elect Arnold Schwarzenegger, State of California
Assemblyman Jay LeSuer, 77th District
Supervisor Dianne Jacob, 2nd District, County of San Diego
Department of Planning and Land Use, County of San Diego
U.S. Department of the Interior, Bureau of Indian Affairs, Pacific Regional Director
National Indian Gaming Commission
U.S. EPA Region

EXHIBIT E



### Memorandum of Agreement

## For Consultations, Treatment and Disposition of Human Remains and Cultural Items
## That May Be Discovered Inadvertently During Planned Activities
## at Statue of Liberty National Monument

### May 1, 2003

This Agreement is entered into by and between the U.S. Department of Interior, National Park Service, and the following parties: the Delaware Nation, the Delaware Tribe of Indians, and the Stockbridge-Munsee Community of Wisconsin.

### Purpose

The purpose of this Memorandum of Agreement is to describe the procedures that will be followed by the National Park Service, Statue of Liberty National Monument, in the event there is an inadvertent discovery of human remains, funerary objects, sacred objects and objects of cultural patrimony within the Park. These procedures carry out the provisions of the Native American Graves Protection and Repatriation Act (NAGPRA) (25 U.S.C. 3001 et seq.) and its implementing regulations (43 CFR Part 10) regarding consultation, treatment and disposition of human remains and cultural items that are inadvertently discovered in the course of planned activities in the Park.

During 2003, the Statue of Liberty National Monument plans to conduct maintenance and stabilization activities that will involve ground disturbances within the Park. In addition, the Park plans to conduct preliminary archeological investigations at specified localities within the Park. This Agreement has been written to comply with the requirements of NAGPRA and the Archeological Resources Protection Act (ARPA) in the case that inadvertent discovery does occur.

### Definitions

All definitions in NAGPRA are incorporated into and apply to the terms used in this Agreement. The term 'cultural items' shall refer to funerary objects, sacred objects and objects of cultural patrimony as defined in NAGPRA. National Park Service policy states, "Inadvertent discovery means the unanticipated encounter or detection of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on federal or tribal lands" (Cultural Resource Management Guideline (DO 28), Appendix R: NAGPRA Compliance, p. 325).

### Cultural Affiliation

The preponderance of geographical, archeological, linguistic, folklore, oral tradition and historical evidence identifies the following tribes as most likely to have a shared group identity with (be culturally affiliated with) an earlier group who occupied and used this unit of the national park system in past centuries: the Delaware Nation, the Delaware Tribe of Indians, and the Stockbridge-Munsee Community of Wisconsin.



**Identification of Human Remains as Native American**

In the event that human remains are encountered, all work will cease pending notification of the Superintendent, U.S. Park Police, Chief of Museum Services Division, Park Archeologist, Criminal Investigator, local law enforcement official, the County Medical Examiner/Coroner, and a forensic anthropologist. These officials will make an on-site determination whether the location is a crime scene or an archeological discovery. Upon notification that law enforcement has no further interest in the matter and the remains are determined to be Native American, the procedures outlined below shall be implemented.

**Notification and Consultation in the Case of an Inadvertent Discovery**

If Native American human remains or cultural items are inadvertently discovered, the NPS will cease activity in the immediate area of the human remains and objects, protect the remains and cultural items from further disturbance, and consult with the Tribes in keeping with 43 CFR Sections 10.4 – 10.6 and as outlined below.

1. <u>Notification of NPS</u>: The person who has identified the Native American human remains or cultural items shall provide immediate verbal or telephone notification of the discovery to the Superintendent of the Park. This notification shall be followed by formal written notification.

2. <u>Cease Activity</u>: The NPS shall immediately stop the activity in the area of the inadvertently discovered Native American human remains and cultural items and take action to secure and protect the human remains and cultural items. The action shall be directed at stabilizing and covering the discovered objects, as well as maintaining the sanctity of the site. The appropriate actions shall include covering the human remains and cultural items with a natural fiber cloth such as cotton or muslin and placing tobacco near the remains. No photographs will be taken.

3. <u>Notification of Tribes</u>: The Superintendent, as soon as possible but no later than three days after receiving notification of the discovery, shall notify the Tribes by telephone. Each Tribe's officially designated NAGPRA Representative shall be notified, or in the case the tribe has no NAGPRA Representative, notification shall be given to the Tribal Chief. This notification shall include information about the kinds and condition of human remains and cultural items, the circumstances under which they were discovered, and the measures taken to secure the area and protect the objects. Written notification shall follow the telephone notification.

4. <u>Consultation with Tribes</u>: The Superintendent shall initiate consultations with the Tribes. He or she shall provide written notice that proposes a time and place for meetings or consultations to further consider the inadvertent discovery, the Park's proposed treatment of the human remains and cultural items that may be excavated, and the proposed disposition of such remains and items.

**Treatment and Disposition of Human Remains and Cultural Items**

The Park and the Tribes agree that the preferred treatment of inadvertently discovered human remains and cultural items is to leave the human remains and cultural items in-situ and protect



them from further disturbance. Non-destructive "in-field" documentation of the remains and cultural items will be carried out in consultation with the Tribes, who may stipulate the appropriateness of certain methods of documentation. If the remains and cultural items are left in-situ, no disposition takes place and the requirements of 43 CFR 10 Sections 10.3-10.6 will have been fulfilled. The specific locations of discovery shall be withheld from disclosure (with the exception of local law enforcement officials and tribal officials as described above) and protected to the fullest extent allowed by federal law.

**Written Plan of Action**

If the human remains and cultural items cannot otherwise be left in place, the Superintendent shall, following consultations with the Tribes, prepare, approve and sign a written Plan of Action as described in 43 CFR Section 10.5(e) prior to excavation and removal. He or she will provide a copy to each of the Tribes. The NPS will remove them for disposition to the culturally affiliated Tribes (which may include reburial elsewhere within the Park). A determination of cultural affiliation will be required prior to disposition in keeping with 43 CFR Section 10.6, Custody. The preponderance of geographical, archeological, linguistic, folklore, oral tradition and historical evidence will be used for the determination of custody of the discovered items.

**Public Notice**

Following a determination of cultural affiliation, if the culturally affiliated Tribes request the disposition of cultural items to tribal custody, upon receipt of a written request by the Tribes the NPS, in compliance with Section 10.6(c), shall publish a general notice of the proposed disposition in the New York Times, the Anadarko Daily News, the Bartlesville Examiner Enterprise, and the Shawano Evening Leader. The notice will provide information as to the nature and affiliation of the cultural items and solicit further claims to custody. The notice will be published at least two times at least a week apart and final disposition will not take place until at least 30 days after publication of the second notice to allow additional claimants to come forward. A copy of the newspaper notices along with information on when and in what newspaper it was published will be sent by the Park to the Departmental Consulting Archeologist.

If no other claimants come forward, the Park will prepare transfer of custody papers and obtain signatures from the culturally affiliated Tribes prior to final disposition.

**Term and Amendment**

From the date of the last signature, this MOA shall remain in effect for one year and may be amended only with the written consent of all parties hereto at the time of such amendment. Any signatory party may terminate their participation in this MOA upon 60 days written notice to the other signatories.

DRAFT

**Signatures**

**National Park Service**

By:_____     Date:_____

Title:_____


**Delaware Tribe**

By:_____     Date:_____

Title:_____


**Delaware Tribe of Indians**

By:_____     Date:_____

Title:_____


**Stockbridge-Munsee Community of Wisconsin**

By:_____     Date:_____

Title:_____