## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WALTER J. ROSALES, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, P.O. Box 85, Jamul, California, 91935 | ) ) ) ) ) | **CASE NUMBER:**    1:07-cv-00162 |
| KAREN TOGGERY, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TOGGERY, P.O. Box 375, Jamul, California, 91935 | ) ) ) ) ) | **JUDGE:**    Judge Rosemary M. Collyer  **DECK TYPE:**    Tribal Rights |
| JAMUL INDIAN VILLAGE, a federally recognized Indian tribe, P.O. Box 612 Jamul, California, 91935 | ) ) ) ) | **DATE STAMP:** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, by and through DIRK KEMPTHORNE, in his official capacity, | ) ) ) ) ) | |
| BUREAU OF INDIAN AFFAIRS, by and through Assistant Secretary of Indian Affairs, JAMES E. CASON. | ) ) ) ) | |
| Defendants. | ) | |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE

March 5, 2007.

Respectfully submitted,

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
SAMANTHA KLEIN
ALEX KRIEGSMAN
Trial Attorneys
United States Department of Justice
Environment and Natural Resources Division
By:    */s/ Samantha Klein*

Samantha Klein
Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-0474
Facsimile: (202) 305-0506

By:    _/s/ Alex Kriegsman_____
Alex Kriegsman
Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-3022
Facsimile: (202) 305-0506

Of Counsel:
Tobias Halvarson, Attorney-Advisor
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240
Tel: (202) 208-6930
Facsimile: (202) 219-1791

ATTORNEYS FOR DEFENDANTS

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE**

**PRELIMINARY STATEMENT**

Defendants respectfully submit this Reply in support of their Motion to Transfer Venue to the Southern District of California.  (Doc. 6).  As set forth in Defendants' opening brief, transfer is appropriate here under 28 U.S.C. § 1404(a).  Plaintiffs are residents of the Southern District of California (Compl. ¶ 1), the Tribe that Plaintiffs claim to belong to is located in the Southern District of California (id.), and the parcels of land at issue are located in the Southern District of California , id. at ¶¶ 9-11.  In addition, Plaintiffs' lead counsel, Patrick Webb, is located in the Southern District California, and Plaintiffs' Complaint is based, in large part, on California law.  Id. at ¶¶ 2, 5, 9, 10, 23, 24, 26, 29-31, 35-42, 53.  There are several officials from Defendant Bureau of Indian Affairs ("BIA"), with knowledge of the underlying facts of Plaintiffs' claims, who are located in California.[1]   In contrast, the Complaint does not allege any particular connection between this case, or the requested relief, and the District of Columbia.

Plaintiffs' opposition memorandum asserts that venue is not proper in the Southern District of California under 28 U.S.C. § 1391(e)(1) because Defendants are not residents of the Southern District of California.  Pl. Transfer Opp. at 6-7.  (Doc. 11).  But even if this were true, Plaintiffs' argument would be without merit.  Plaintiffs ignore 28 U.S.C. § 1391(e)(2), which provides that venue is proper in the district where the "property that is the subject of the action is situated."  Because the land in question is in the Southern District of California, Plaintiffs' argument must fail.

---

[1]James Fletcher, Superintendent of the Southern California Agency is in Riverside, California; and Clay Gregory, Regional Director for the Pacific Region and Dan Hall, Regional Archaeological Director are in Sacramento, California.

## ARGUMENT

**I.    Venue Is Proper in the Southern District of California Under 28 U.S.C. § 1391**

The parties agree that a "threshold consideration" in determining the appropriateness of transfer under Section 1404(a) is whether the action "might have been brought" in the transferee district. Nichols v. U.S. Bureau of Prisons, 895 F. Supp. 6, 8 (D.D.C. 1995); see also Van Dusen v. Barrack, 376 U.S. 612, 615 (1964) (transfer power is expressly limited by the clause restricting transfer to those districts in which the action "might have been brought"). As set forth in Defendants' opening brief, this element is certainly satisfied in this case because Plaintiffs are residents of the Southern District of California and the parcels of land that are the subject of the action are situated in the Southern District of California. 28 U.S.C. §§ 1391(b), (e). Yet Plaintiffs now argue that this Court "does not have discretion to transfer venue" because this action could not have been brought in the Southern District of California. This is so, Plaintiffs assert, because "none of the relevant federal NAGPRA officials reside in that district." Pl. Transfer Opp. at 4. However, Plaintiffs' argument is based on a selective omission of portions of 28 U.S.C. § 1391 and must fail.

Plaintiffs note that civil actions against the United States, or officers or employees of the United States "may be brought in any district in which the defendant resides." Pl. Transfer Opp. at 6 (citing 28 U.S.C. § 1391). Plaintiffs next assert that Defendants' residence, for purpose of venue, is the District of Columbia. Id. at 7 (citing cases). But Plaintiffs then conclude that this action "therefore . . . cannot have been brought in the Southern District of California." Id. Plaintiffs' argument ignores the plain language of 28 U.S.C. § 1391, which provides other grounds for venue. Section 1391(e) provides in full:

> **A civil action in which the defendant is an officer or employee of the United States** or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, **may, except as otherwise provided by law, be brought in any judicial district in which** (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or **a substantial part of the property that is the subject of the action is situated**, or (3) the plaintiff resides if no real property is involved in the action.

(Emphasis added).

Because the parcels of land that form the basis of Plaintiffs' NAGPRA, beneficial ownership and trespass claims are all located in the Southern District of California, this action could have been brought in the Southern District of California. 28 U.S.C. § 1391(e)(2). Plaintiffs' argument is therefore without merit and this Court has broad discretion to transfer this action to the Southern District of California. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981); Van Dusen, 376 U.S. at 616.[2/]

## II.    The Southern District of California is the More Appropriate Venue Under 28 U.S.C. § 1404(a)

### A.    Transfer to the Southern District of California Is in the Interests of Justice

As set forth in Defendants' opening brief, the parcels of land giving rise to the present dispute are located in the Southern District of California. Compl. at ¶¶ 11, 14. In addition,

---

[2/]Plaintiffs also assert that their claims "do not arise out of the locus of the real property." Pl. Transfer Opp. at 9. This is a curious assertion, given that Plaintiffs ask this Court to declare them the beneficial owners of the land and ask this Court to enjoin the United States from failing to prevent trespass on this land. Compl. at ¶ 15, Prayer ¶ 3; Pl. Preliminary Injunction Mem. at 24-27. But even if the land in question were not the subject of this action, venue would still be proper under 28 U.S.C. § 1391(e)(3) because the Plaintiffs reside in the Southern District of California. See id.

Plaintiffs' lawsuit is based, in large part, on California law.[3]  Moreover, the parties alleged to be the trespassing parties – over which Plaintiffs ask the Court to require the United States to take action against – are also located in California.  Compl. at ¶¶ 1, 9, 26-27.  Accordingly, this case implicates interests in California.  See Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 26 (D.D.C. 2002), (ordering transfer based on "local interest in deciding a sizeable local controversy at home"); Southern Utah Wilderness Alliance v. Norton, 315 F. Supp. 2d 82, 88 (D.D.C. 2004) (action transferred where it "directly touch[ed] local citizens.").  Here, the ramifications and considerations resulting from review in the District of Columbia would impact California lands and citizens.  In contrast, the Complaint does not allege any connection to the lands or citizens of the District of Columbia.

Plaintiffs argue that in evaluating the interests of justice, the Court must consider Plaintiffs' privacy rights and that because Plaintiffs' NAGPRA claims regarding their families' remains is of a private nature, this Court should not consider "this dispute to be of a 'local' character."  Pl. Transfer Opp. at 11.  Plaintiffs cite no authority for the proposition that when a dispute is "private" in nature, it is not a "local" dispute.   Moreover, even if this argument were valid, Plaintiffs also bring claims regarding beneficial ownership of the land and trespass. Compl. at ¶ 11, 14.  However, Plaintiffs have argued in the past that their beneficial ownership

_____

[3]Plaintiffs' opposition memorandum asserts that "[c]ontrary to Defendants' hyperbole, Plaintiffs' action is premised upon the violation of the federal NAGPRA and its regulations, and **not California law**."  Pl. Transfer Opp. at 2 (emphasis added).  This assertion is contradicted by Plaintiffs' own Complaint, which contains numerous references to California law.  See ¶¶ 2, 5, 9, 10, 23, 24, 26, 29-31, 35-42, 53.  It was also contradicted by Plaintiffs' counsel at the February 16, 2007 hearing, when he repeatedly insisted that California law is applicable to the United States.  See Transcript of Hearing, Defendants' Sur-Reply, Exhibit J at 4-6.   See also Preliminary Injunction Reply at 2 (asserting that the United states waived its sovereign immunity and is liable under the "California NAGPRA").

claims affect "thousands of Native Americans with millions of acres of land in the nine western

states of the Ninth Circuit." See Exhibit G at 3.  As the Supreme Court stated in Gulf Oil v.

Gilbert, 330 U.S. 501 (1947):

> In cases which touch the affairs of many persons, there is reason for holding trial
> [or motions hearing] in their view and reach rather than in remote parts of the
> country where they can learn of it by report only.  There is a local interest in
> having localized controversies decided at home.

Id. at 509.  As this Court stated more recently:

> [T]here is a significant benefit to allowing those whose lives will be most
> immediately affected by the outcome of litigation, as well as the local media, to
> physically attend the proceedings which will determine the outcome.  There is no
> substitute for personally observing, watching and evaluating the judge who
> presides, hearing the quality of the arguments, and getting a first-hand impression
> of whether the proceeding is being handled with the appropriate fairness and
> seriousness.

Santee Sioux Tribe of Nebraska v. National Indian Gaming Commission, Civ. No. 99-528, Slip

op. at 8 (D.D.C. Apr. 19, 1999), Transfer Mot., Exhibit A.

Plaintiffs' beneficial ownership and trespass claims present a local controversy in the

Southern District of California without any connection to the District of Columbia.  Accordingly,

it is in the interest of justice to have this controversy litigated in the Southern District of

California.[4]

---

[4] Plaintiffs also assert that Defendants have somehow waived the right to move to transfer venue
because Defendants did not do so in a pending action before Judge Kessler, Rosales v. United
States, 03cv1117.  See Pl. Transfer Opp. at 6.  Plaintiffs do not cite any authority for this
proposition.  The previously filed actions review three separate decisions by an adjudicatory
appeals board that is located in the metropolitan D.C. area, which involve among another things
whether or not non-members who did not register for an election can appeal to the board
challenging that election,  Rosales v. Sacramento Area Director, 34 IBIA 50 (1999), and whether
challenges were  moot.  Rosales v. Sacramento Area Director, 34 IBIA 125 (1999); Rosales v.
Pacific Regional Director, 39 IBIA 12 (2003) (Rosales IV).  None of the challenges in that case
convert Plaintiffs into the federally recognized Tribe, or make them members or officers of the

**B.**    **Transfer to the Southern District of California Will Serve the Convenience of the Parties and Witnesses**

Plaintiffs' Opposition asserts that the convenience of the parties will not be served by transfer to the Southern District of California.  Pl. Transfer Opp. at 9.  This is apparently so, because the Bureau of Indian Affairs officials cited by Defendants are in the Central and Eastern District of California, rather than the Southern District.  Id. at 4-5.  But Plaintiffs do not dispute that these individuals are in California and not the District of Columbia.  Moreover, as set forth in Defendants' opening brief, there are numerous parties in the Southern District of California.  Although Plaintiffs have retained local counsel in Washington, D.C., Plaintiffs' lead attorney, Patrick Webb, is located in the Southern District of California.  Plaintiffs are all residents of the Southern District of California, and the Jamul Indian Village is in the Southern District of California.  Compl. at ¶¶ 1, 9.  Presumably, litigation in the Southern District of California is decidedly more convenient for Plaintiffs.  Furthermore, the State of California and its political subdivisions responsible for the California statutory provisions in issue here are within the jurisdiction of the Southern District of California.  It should also be noted that Plaintiffs have filed a related action in California state court.  See Transfer Mot., Exhibit F.  Finally, the headquarters of the federally recognized leadership of the Tribe is located in the Southern District of California. Compl. at  ¶¶ 1, 9.  Thus, in regard to the convenience of the parties (and

Tribe.  The appeals before the IBIA addressed procedural and jurisdictional voting appeal issues.  More importantly, Plaintiffs' argument must fail because the action before Judge Kessler is not for beneficial ownership or trespass – and therefore directly tied to the land in question – but raise the narrower question of whether specific jurisdictional and  merits issues on election and voting decisions of the Interior Board of Indian Appeals were arbitrary and capricious.  See Exhibit H at 4.  This case by contrast is intimately linked to land in California and the unquestionably involves on-going development decisions on the use and control of land by the federally recognized Tribe and its members which are located there.

in the interests of justice), transfer of this case to the Southern District of California is appropriate.

## III.    Plaintiffs' Choice of Forum Is Entitled to Little, If Any, Deference

Plaintiffs assert that their choice of forum is entitled to deference.  Pl. Transfer Opp. at 10-11.  But as set forth in Defendants' opening brief, when a plaintiff chooses a forum that is not its home – as is the case here – the plaintiff's choice of forum is entitled to far less deference than the choice of a home forum.  See Piper Aircraft Co., 454 U.S. at 255-56; Shawnee Tribe, 298 F. Supp. 2d at 24-25 (The deference that may ordinarily be due a plaintiff's choice of forum is substantially lessened where suit was brought in the plaintiff's non-home forum and transfer is sought to the forum where the plaintiff resides.)

The United States District Court's deference principles in the District of Columbia apply equally to tribal plaintiffs as they do to any non-Indian plaintiff.  See Shawnee Tribe, 298 F. Supp. 2d at 25.  See also, e.g., Santee Sioux Tribe of Nebraska, Civ. No. 99-528, Slip op. at 6-7 ("[W]here, as here, the plaintiff does not reside in the chosen district, and defendant seeks to transfer the case to plaintiff's home forum, the traditional deference to a plaintiff's choice of forum is substantially lessened"), Transfer Mot, Exhibit A (citing Citizens Advocates for Responsible Expansion v. Dole, 561 F. Supp. 1238, 1239 (D.D.C. 1983).

## **CONCLUSION**

For the reasons set forth above, Defendants' motion to transfer this action to the Southern

District of California should be granted.

March 5, 2007.

Respectfully submitted,
MATTHEW J. MCKEOWN
Acting Assistant Attorney General
SAMANTHA KLEIN
ALEX KRIEGSMAN
Trial Attorneys
United States Department of Justice
Environment and Natural Resources Division

By:      */s/ Samantha Klein*
Samantha Klein
Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-0474
Facsimile: (202) 305-0506

By:      */s/ Alex Kriegsman*
Alex Kriegsman
Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-3022
Facsimile: (202) 305-0506

Of Counsel:
Tobias Halvarson, Attorney-Advisor
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240
Tel: (202) 208-6930
Facsimile: (202) 219-1791

-8-

ATTORNEYS FOR DEFENDANTS

Exhibit G

No. 03-895

In the

# Supreme Court of the United States

WALTER ROSALES, MARIE TOGGERY,
and KAREN TOGGERY,

*Petitioners,*

*v.*

UNITED STATES OF AMERICA, U.S. DEPARTMENT
OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS,
and NATIONAL INDIAN GAMING COMMISSION,

*Respondents.*

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

## PETITION FOR A WRIT OF CERTIORARI

Patrick D. Webb, Esq.
*Counsel of Record*
WEBB & CAREY
401 B Street
Suite 306
San Diego, CA 92101
(619) 236-1650
*Attorneys for Petitioners*

i

## QUESTIONS PRESENTED

Whether a federally recognized Indian tribe is a necessary and indispensable party to an action by individual Indians to enforce their allotments of non-tribal land pursuant to 25 U.S.C. 345.

Whether individual Indians can be deprived of all rights and remedies provided by 25 U.S.C. 345, when a subsequently recognized Indian tribe falsely claims sovereignty over non-tribal land allotted to the individual Indians.

ii
## TABLE OF CONTENTS

QUESTIONS PRESENTED ............................................. i

TABLE OF CONTENTS.................................................. ii

TABLE OF AUTHORITIES........................................... iii

OPINIONS BELOW................................................... 1

JURISDICTION......................................................... 1

CONSTITUTIONAL AND STATUTORY
PROVISIONS ........................................................... 1

STATEMENT OF THE CASE...................................... 1

    Introduction ................................................. 1

    Procedural History ...................................... 3

    Statement of Facts...................................... 5

REASONS FOR GRANTING WRIT........................... 10

I.    THE COURT OF APPEALS' DECISION IS
    IN CONFLICT WITH THE DECISIONS OF
    OTHER COURTS OF APPEALS .................... 10

II.   CONCLUSION ....................................... 19

iii

APPENDIX

Circuit Court Order (8/11/03) ........................................ 1a

District Court Order (4/22/02).................................... 5a

Order Denying Rehearing ........................................... 18a

Constitutional and Statutory Provisions.................. 19a

iv

# TABLE OF AUTHORITIES

### CASES

ANTOINE V. UNITED STATES ("ANTOINE"), 637
    F.2D 1177, 1181-82 (8TH CIR. 1981), 637 F.2D
    1177, 1181-82 (8TH CIR. 1981) ................. 10, 11, 12, 17,18

CITIZEN BAND POTAWATOMI INDIAN TRIBE OF
    OKLA. V. COLLIER ("POTAWATOMI"),17 F.3D
    1292, 1294 (10TH CIR. 1994), 17 F.3D 1292, 1294
    (10TH CIR. 1994)......................................................*passim*

CONFEDERATED SALISH AND KOOTENAI TRIBES
    V. UNITED STATES, 401 F.2D 785 (CT. CL. 1968),
    CERT. DENIED, 393 U.S. 1055 (1969) ............................ 18

DAVIS V. UNITED STATES 192 F.3D 951, 958-59
    (10TH CIR. 1999)...................................................11, 16, 17

KANSAS V. NORTON, 249 F.3D 1213, 1226-27 (10TH
    CIR. 2001).......................................................................... 16

KESCOLI V. BABBITT, 101 F.3D 1304, 1311 (9TH
    CIR. 1996).......................................................................... 17

PIT RIVER HOME AND AGRIC. COOP. ASS'N V.
    UNITED STATES, 30 F.3D 1088 (9TH CIR. 1994)........... 15

RISHELL V. JANE PHILLIPS EPISCOPAL MEM'L
    MED. CTR., 94 F.3D 1407, 1413 (10TH CIR. 1996) ....... 17

SAC AND FOX V. NORTON, 240 F.3D 1250, 1260
    (10TH CIR. 2001)............................................................. 17

v

SHERMOEN V. UNITED STATES, 982 F.2D 1312,
 1318 (9TH CIR. 1992).................................................11, 16

TEMPLE V. SYNTHES CORPORATION, LTD., 498
 U.S. 5, 8 (1990)...................................................................20

UNITED STATES V. CREEK NATION, 295 U.S. 103,
 111 (1935)..........................................................................18

UNITED STATES V. KLAMATH AND MOADOC
 TRIBES, 304 U.S. 119 (1938)............................................18

UNITED STATES V. STATE TAX COMM., 535 F.2D
 300, 304 (5TH CIR.1976)......................................................6

YELLOWSTONE COUNTY V. PEASE, 96 F.3D 1169,
 1172 (9TH CIR. 1996)..........................................................11

ZASLOW V. KROENERT, 29 CAL.2D 541, 548 (1946)............8

## Statutes and Other Authorities

25 U.S.C. 345.................................................................*passim*

25 U.S.C. 348.......................................................................6

25 U.S.C. 461..................................................................2, 5

25 U.S.C. 465.........................................................3, 6, 7, 13

25 U.S.C. 476...................................................................7, 11

28 U.S.C. 1254.....................................................................1

Cal. Civil Code 685-86.........................................................8

Fifth Amendment, U.S. Const. amend. V .................1, 18

vi

17 Stat. 159 (1872) ............................................................. 13

25 C.F.R. 151.8 .................................................................. 14

1

## OPINIONS BELOW

The decision of the United States Court of Appeals for the Ninth Circuit, filed August 11, 2003, is set forth in the Appendix ("App.") pp. 1a-5a. The opinion of the United States District Court for the Southern District of California, filed April 22, 2002, is set forth in the Appendix at pp. 5a-17a.

## JURISDICTION

The statutory provision for this Court's jurisdiction is 28 U.S.C. Section 1254. The United States Court of Appeals for the Ninth Circuit denied the Petitioners' Petition for Rehearing on September 19, 2003. App. p. 18a. This Petition was timely filed.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

This case involves the Fifth Amendment, U.S. Const. amend. V, actions for allotments pursuant to 25 U.S.C. 345, and Rule 19 of the Federal Rules of Civil Procedure, the relevant portions of which are set forth verbatim at App. pp. 19a-22a.

## STATEMENT OF THE CASE

### Introduction

The United States has allowed a false claim of sovereignty by a recently created, non-historical, reorganized Indian tribe to deprive the individual

2

Indian Petitioners of all rights and remedies to enforce their allotments in trust Parcel 597-080-01, pursuant to 25 U.S.C. 345.

The Ninth Circuit court of appeals decision in this case, erroneously found the Jamul Indian Village to be a necessary and indispensable party to this action, and thereby denied Petitioners' all rights and remedies to enforce their allotments in trust Parcel 597-080-01, pursuant to 25 U.S.C. 345.

The Ninth Circuit's decision in this case conflicts with long standing precedent in the Eighth and Tenth Circuits, and denies individual Indian owners of millions of acres of allotted land in the nine western states the remedies to enforce their allotments provided in 25 U.S.C. 345. Here, the Ninth Circuit is alone among the circuit courts of appeals in erroneously holding that a federally recognized tribe is a necessary and indispensable party to an action to enforce individual Indians' allotments under 25 U.S.C. 345, requiring dismissal of the individual Indians' claims due to the tribe's sovereign immunity. Such a disparity in outcome, based upon in which circuit the allotment was made, has not been, and cannot be, justified.

While the general practice of allotting reservation land to individual Indians ceased with the passage of the Indian Reorganization Act of 1934 ("I.R.A.") 25 U.S.C. 461, the United States concedes that more than 90 million acres of America have been "allotted" to Indians since passage of the General Allotment Act of 1887. Felix Cohen, Handbook of Federal Indian Law (DOI 1982) Ch. 11, Sec. B1, p.614. Moreover, the United States continues to accept

3

individual gifts of land from private citizens, as here, in trust for the benefit of designated individual Indian "allottees," pursuant to the Indian Reorganization Act. 25 U.S.C. 465. Felix Cohen, Handbook of Federal Indian Law (DOI 1982) Ch. 1, Sec. D4, p.41, n. 118. Some of the more well known allotments in Southern California that have been before this Court include those in and around Palm Springs, involving individual members of the Cabazon, Augustine, Torres-Martinez and Agua Caliente Bands of Mission Indians. Felix Cohen, Handbook of Federal Indian Law (DOI 1982) Ch. 11, Sec. B1, p.614, n. 20.

Certiorari should be granted in this case to eliminate the conflict among the circuit courts of appeals, and to decide important questions of federal Indian law that have not been, but should be, settled by this Court to prevent false claims of sovereignty from taking individual Indian allotments without just compensation. Without this Court's intervention, thousands of Native Americans with millions of acres of land in the nine western states of the Ninth Circuit will continue to be deprived of the remedies Congress provided in 25 U.S.C. 345.

**Procedural History**

Petitioner's Complaint was filed on May 30, 2001. Respondents moved to dismiss pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6), which motion was denied by the District Court for So. California on October 15, 2001. An Answer was filed on behalf of the Respondents on November 1, 2001.

4

Respondents again moved to dismiss, or in the alternative, for judgment on the pleadings and summary judgment on November 9, 2001, alleging that there was no ripe case or controversy, Petitioners lacked standing, and Petitioners had failed to exhaust administrative remedies.

On February 14, 2002, the District Court for So. California granted the Respondents' motion for summary judgment, and denied the Respondents' motions to dismiss and for judgment on the pleadings.

Petitioners moved for new trial, or in the alternative, relief from judgment on February 22, 2002. The District Court for So. California construed Petitioner's motion for a new trial as a motion for reconsideration, and then denied Petitioners' motion for reconsideration, on April 22, 2002. App. at pp.5a-17a.

Petitioners timely filed a notice of appeal of the District Court's order granting summary judgment, and denying Petitioners' motion for new trial and relief from judgment, which had been construed as a motion for reconsideration, on May 10, 2002. The United States Court of Appeals for the Ninth Circuit affirmed the District Court's decision in an unpublished Memorandum Decision on August 11, 2003. App. pp.1a-4a.

Petitioners timely filed a motion for rehearing, which was denied by the United States Court of Appeals for the Ninth Circuit on September 19, 2003. App. p.18a. This petition was timely filed on December 18, 2003.

5

## Statement of Facts

Petitioners, Walter Rosales, Marie Toggery, and Karen Toggery, are Indians with half or more degree of California Indian blood, and are enrolled members of the Jamul Indian Village, a tribal governmental entity of Kumeyaay Indians, recognized by Congress in 1981, governed by a constitution adopted pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. 461 et seq., and located in Jamul, California.[1]

On September 26, 1912, J.D. Spreckel's Coronado Beach Company deeded 2.21 acres of land in Jamul, California, to the Roman Catholic Bishop of Monterey and Los Angeles, "to be used for the purposes of an Indian graveyard and approach thereto." Petitioners and their families were, from their birth, occupants by sufferance, in possession of certain private property, contiguous to that Indian graveyard, which was owned by the non-Indian Daley family.

During the latter part of the 1970's the Petitioners and their families negotiated a gift of the property that they possessed. The Daleys agreed to convey title to the land to the United States in trust for the explicit benefit of those half-blood Jamul Indians then occupying the property. The Daleys used this form of conveyance to provide a place for the Petitioners and their families to live in perpetuity, protected by the United States, as a trustee, against all forms of

---

[1] Marie Toggery died during the pendency of this dispute. Her surviving claims are now being prosecuted by the representative of her estate, Karen Toggery.

6

alienation, trespass and infringement.

On December 27, 1978, the Daleys, recorded a grant deed of parcel 597-080-01, consisting of approximately 4.66 acres, to "the United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate." However, upon the recording of the grant deed, the United States failed to issue trust patents to the individual beneficiaries of that deed, as provided for in 25 U.S.C. 348.

Instead, in the absence of specifically prescribed designation procedures, the Secretary of the Interior designated the Petitioners, among other half blood Jamul Indians, as beneficiaries of trust Parcel 597-080-01, by locating them on the property, acquiescing in their continued presence, possession and use of Parcel 597-080-01 for 25 years, building houses for them on the Parcel, and providing the Petitioners with services usually accorded Indians who have been designated beneficiaries of land acquired and held in trust for individual Indians under 25 U.S.C. 465.

Similar forms of grant deeds have long been accepted by the BIA and similar designations of individual Indians' trust allotments have long been made by the BIA, and enforced by the courts. See, *Coast Indian Community v. U.S. ("Coast")*, 550 F.2d 639, 651, n32 (Fed. Cl. 1977); *United States v. State Tax Comm.*, 535 F.2d 300, 304 (5th Cir.1976); and Memoranda of the Solicitor of the Interior, reprinted in 1 Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-74 ("Mem. Sol. Int.") at 668, 724, 747, and 1479, involving for e.g., the

7

Mississippi Choctaws, the St. Croix Chippewas, the Nahma and Beaver Indians, and the Nooksack Indians.

The grant deed was recorded on December 27, 1978, three years before Congress recognized the creation of the tribe known as the Jamul Indian Village in 1981. This deed was accepted by the United States, pursuant to 25 U.S.C. 465, on behalf of the individual Jamul Indians of one-half or more Indian blood, who were then in possession of the parcel. The Petitioners thereby became entitled to this allotment of land under 25 U.S.C. 465, and 25 U.S.C. 345.

On May 9, 1981, Petitioner Watler Rosales certified that sixteen of twenty three registered voters adopted the Jamul Indian Village constitution, pursuant to the Indian Reorganization Act of 1934. 25 U.S.C. 476. The United States acknowledged the adoption of the constitution on July 7, 1981, and Congress recognized the Jamul Indian Village by publication in the Federal Register on November 24, 1982. When the Jamul Indian Village was created on May 9, 1981, it was a landless governmental entity.

The United States has confirmed that Parcel 597-080-01 was accepted into trust on behalf of individual Indians, including the Petitioners, and not on behalf of any then recognized, or any subsequently recognized, Indian tribe. The United States' August 3, 2000 response to Petitioners' Freedom of Information Act ("FOIA") request, contains a May 9, 2000 memo from Carmen Facio of the Pacific Regional office of the BIA to Nancy Pierskalla and George Skibine of BIA in Washington, D.C., stating that the: "[c]urrent trust parcel was accepted into trust in 1978 for Jamul Indians

8

of ½ degree (4.66 acres)," and that there is "no record of the 1978 trust parcel being known as the Jamul Village."

There is no subsequent record of any transfer of Parcel 597-080-01, from the United States' trust on behalf of the individual half-blood Jamul Indians designated by the Secretary, to any tribe, including the Jamul Indian Village.

All individual designated allotment beneficiaries of land held in trust by the United States are cotenants. Cohen, Handbook of Federal Indian Law (DOI 1982) Ch. 11, B3, pp.615-16. As such, cotenants have equal rights to possession, and no single cotenant has the right to exclude any other cotenant from the property. Cal. Civil Code 685-86; *Zaslow v. Kroenert*, 29 Cal.2d 541, 548 (1946). Therefore, all of the individual cotenants must consent to any transfer of their interest in the trust parcel to any subsequently recognized tribe.

Here, there is no evidence of any consent by the Petitioners to such a transfer. Nor is there any wonder why the Petitioners have never consented to such a transfer of their individual interests to the subsequently created tribe. The Interior Board of Indian Appeals has found non-members illegally participating in the Jamul Indian Village tribal government since the tribe was first recognized. 32 IBIA 166.

The Solicitor of the Interior specifically advises the field personnel of the BIA that any transfer of individual Indians' designated trust allotments must

9

still be accomplished the old-fashioned way, by recording a grant deed. 1 Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-74 ("Mem. Sol. Int.") at 668, 724, 747, and 1479. Where, as here, no subsequent grant deed was recorded, the Petitioners' designated allotments in the trust property cannot have been transferred to any subsequently recognized tribe.

On or about February 5, 2001, the United States published a notice calling for the "razing" of the Petitioners' homes on their allotments in parcel 597-080-01, and their "displacement" from their allotment in parcel 597-080-01.    Publishing the February 5, 2001 notice has, both denied, and excluded, the Petitioners from the quiet enjoyment of their allotments as designated beneficiaries of the trust Parcel 597-080-01. The United States' denial of Petitioners' entitlement, and exclusion from their allotment of land, has caused the Petitioners severe property damage, consequential damages, physical and bodily injury, including severe emotional distress, subject to proof at trial.

Petitioners are entitled to enjoin the alienation of their allotments, and prohibit the razing of their homes on their allotments, because the United States has admitted that parcel 597-080-01 is not land over which an Indian tribe exercises governmental power, since it was deeded to the U.S. in trust for certain individual Indians, including the Petitioners, and was not deeded in trust for any recognized Indian tribe, then in existence, or subsequently recognized by Congress.    By virtue of their allotments in, and designation as beneficiaries of, the trust parcel, the Petitioners possess fee simple property rights in parcel

10

597-080-01, as against all others, save the United States. These usufructuary rights entitle the Petitioners to exclude all others, including the subsequently created tribe and those that seek to trespass upon their designated allotments to raze their homes.

Petitioners therefore seek a declaration of their rights to their allotment in, and designation as trust beneficiaries of, parcel 597-080-01, pursuant to 25 U.S.C. 345. They also seek to enjoin the Respondents from denying, and otherwise excluding the Petitioners from, their allotment in, and designation as trust beneficiaries of, parcel 597-080-01.

## REASONS FOR GRANTING THE WRIT

### I.  THE COURT OF APPEALS' DECISION IS IN CONFLICT WITH THE DECISIONS OF OTHER COURTS OF APPEALS

The Ninth Circuit decision in this case is in conflict with the decisions of the Eighth and Tenth Circuit courts of appeals, which hold that a federally recognized tribe is not a necessary and indispensable party to an action to enforce an individual Indian's allotment under 25 U.S.C. 345. *Antoine v. United States ("Antoine")*, 637 F.2d 1177, 1181-82 (8th Cir. 1981), *reaffirmed after remand*, 710 F.2d 477, 478; *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier ("Potawatomi")*,17 F.3d 1292, 1294 (10th Cir. 1994), *reaffirmed after remand*, 142 F.3d 1325, 1329.

11

Here, the Ninth Circuit decision erroneously holds that the subsequently recognized tribe, known as the Jamul Indian Village, is a necessary and indispensable party to the individual Indian Petitioners' action to enforce their allotments in non-tribal land, which they acquired when the land was deeded to the United States in trust for their individual benefit, three years before the tribe was established under 25 U.S.C. 476. App. 1a-4a.

Here, the Jamul Indian Village is not a necessary or indispensable party to Petitioners' action, because there is no evidence in the record that it ever claimed a "legally protected interest" in Parcel 597-080-01. See for e.g., *Yellowstone County v. Pease*, 96 F.3d 1169, 1172 (9th Cir. 1996); *Antoine v. United States*, 637 F.2d 1177, 1181-82 (8th Cir. 1981); *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*,17 F.3d 1292, 1294 (10th Cir. 1994). As held by both the Ninth and Tenth Circuits, a "legally protected interest" excludes those "claimed" interests that are "patently frivolous." *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992); *Davis v. United States* 192 F.3d 951, 958-59 (10th Cir. 1999).

Contrary to the Ninth Circuit's erroneous finding, App. 2a, the United States has already conceded that the Village has not "claimed jurisdiction over the parcel of land at issue in this action." The United States' response to Petitioners' FOIA request, contains a May 9, 2000 memo from Carmen Facio of the Pacific Regional office of the BIA to Nancy Pierskalla and George Skibine of the BIA in Washington, D.C., stating that the: "[c]urrent trust parcel was accepted into trust in 1978 for Jamul Indians of ½ degree (4.66

12

acres)," and that there is "no record of the 1978 trust parcel being known as the Jamul Village."

However, even if the Ninth Circuit's finding was not erroneous, it would still conflict with the Eighth and Tenth Circuit decisions in which a tribe's claim to individual Indians' allotments does not make the tribe a necessary or indispensable party to an action to enforce the individual Indians' allotments pursuant to 25 U.S.C. 345. *Antoine v. United States*, 637 F.2d 1177, 1181-82 (8th Cir. 1981); *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1294 (10th Cir. 1994).

> This language [of 25 U.S.C. 345] is unequivocal. The United States, as the allotting agent, is the appropriate defendant in suits involving the right to an allotment. In our view, determining whether an Indian should have received a patent for an allotment of land under section 345 requires the presence of no party other than the United States. Furthermore, if it is determined that the United States wrongfully withheld a patent for an allotment, the government may be held liable for damages, regardless of the presence or absence of other potential parties. *Antoine*, 637 F.2d 1177, 1181.

The Ninth Circuit's decision also fails to acknowledge and distinguish the Tenth Circuit's decision in *Potawatomi*, 17 F.3d 1292, 1294. There, the Tenth Circuit reversed the district court's finding that

13

a "tribe" was necessary or indispensable to an action over trust allotments, because the "tribe" had no "protected interest" in the individual Shawnee Indians' trust applications.

There, as here, the Tenth Circuit found that the BIA had the power to grant trust allotments of land to individual Absentee-Shawnee Indians within the Potawatomi reservation, under 25 U.S.C. 465 and a May 23,1872 Act of Congress, ch. 206, 17 Stat. 159 (1872). The Potawatomis sued the BIA to prevent the grant of such trust allotments to the individual Absentee-Shawnee Indians.    The Tenth Circuit reversed dismissal for failure to join the Absentee-Shawnee "tribe," finding that the United States had failed to show that the Absentee-Shawnee tribe had a "legally protected interest," since the Absentee-Shawnee tribe had never been granted an "undivided trust or restricted interest" in the land.

There, as here, the Tenth Circuit found that the alleged "interest" of the Absentee-Shawnee tribe was merely an expectation, just as the alleged "interest" of the Jamul Indian Village is merely an expectation that has not yet come to pass, and such expectations do not constitute a legally protected interest for purposes of necessary party analysis under Fed. R. Civ. P. 19. *Potawatomi*, 17 F.3d at 1294.

In *Potawatomi*, the BIA never transferred any trust or protected interest to the Absentee-Shawnee tribe, just as in this case, the BIA never transferred any trust or protected interest in Parcel 597-080-01 to the Jamul Indian Village, after the Petitioners became designated beneficiaries of the trust parcel. Therefore

14

the Tenth Circuit found that the "tribe" had no conflict with the designated individual Indian trust applications, and was not a necessary or indispensable party to the action.

> The 1872 Act does not create any "undivided trust or restricted interest" of the Absentee-Shawnee tribe in the Potawatomi tribe's land for purposes of 25 C.F.R. 151.8. It merely grants the Secretary of Interior the power to allot land to individual Absentee-Shawnee tribesmen. The Act does not mention any power to allot lands to the Absentee-Shawnee collectively as a tribe. Moreover, as the Potawatomi tribe correctly points out in its brief, this "interest" is merely an expectation of the Absentee-Shawnee tribe that the BIA will evaluate their applications as they would Potawatomi applications. This expectation is not a legally protected interest for purposes of 12(b)(7) necessary party analysis. ...
>
> In the absence of evidence showing the nature of the Absentee-Shawnee tribe's interest in Potawatomi land, the BIA failed to sustain its burden with respect to its motion under 12(b)(7). For this reason the district court abused its discretion in dismissing the action. *Potawatomi*, 17 F.3d 1292, 1294.

Here, there is a similar lack of evidence showing any protected interest of the Jamul Indian Village tribe

15

in Parcel 597-080-01.   Just as the 1872 Act did not create any "undivided trust or restricted trust interest" in the Absentee-Shawnee tribe, the 1978 grant deed here did not, and could not, create any protected interest in a "tribe" that had yet to organize, had yet to adopt a constitution, had yet to be recognized, and had yet to exist in 1978. Moreover, there is no evidence that any protected interest in Parcel 597-080-01 was ever subsequently transferred to the Jamul Indian Village tribe. It therefore remains an abuse of discretion for the Ninth Circuit to have dismissed this action, where the BIA failed to make a Fed. R. Civ. P.12(b)(7) motion, let alone sustain its burden under Fed. R. Civ. P.19.

Similarly, here, until the BIA amends the grant deed to transfer the present designation of the individual Jamul Indian beneficiaries, to the subsequently recognized "tribe," the United States has failed to prove that the subsequently created "tribe" is either a necessary or indispensable party to this action.

The absence of any subsequently recorded transfer of the Petitioners' trust interest, also explains why the Ninth Circuit's reliance on its earlier decision in *Pit River Home and Agric. Coop. Ass'n v. United States*, 30 F.3d 1088 (9th Cir. 1994), is erroneous. In *Pit River*, unlike here, there was a formal designation of the subsequently recognized "tribe" as the beneficiary of the grant deed, after the tribe was recognized. 30 F.3d at 1093.   Here, the United States concedes in silence that there has been no such recorded transfer, amended grant deed, nor any formal designation of the Jamul Indian Village "tribe" as the beneficiary of the 1978 Daley grant deed, after the Village was recognized in 1981.

16

Here, there are no competing interests between the subsequently recognized "tribe" and the Petitioners who were designated individual trust beneficiaries, because the United States has conceded that the "tribe" did not exist when the Petitioners' designated interest was originally recorded in the 1978 deed, and there has been no subsequent transfer of any interest in the parcel to the tribe.

As was found in *Kansas v. Norton*, 249 F.3d 1213, 1226-27 (10th Cir. 2001):

> Thus, the absence of the Miami Tribe does not prevent the State from obtaining its requested relief or an adequate judgment. Nor do we believe the absence of the Tribe is likely to subject the parties to this action to multiple or inconsistent obligations..."

A "tribe" that did not exist in 1978 simply cannot be found to have acquired a "legally protected interest" in Parcel 597-080-01 when the grant deed was recorded in 1978, and any claim by the United States to the contrary is patently frivolous. *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992); *Davis v. United States*, 192 F.3d 951, 958-59 (10th Cir. 1999).

The United States has simply submitted no evidence that any amendment to the grant deed was ever recorded, transferring the individual Indian beneficiaries' designation to the subsequently created "tribe," after its recognition in 1981. Therefore, just as was found in *Potawatomi*:"In the absence of evidence showing the nature of the Absentee-Shawnee tribe's

17

interest in Potawatomi land, the BIA failed to sustain its burden with respect to its motion..." under Rule 19 here. Id., at 1294.

The Ninth Circuit's decision also conflicts with the Eighth and Tenth Circuits decisions by denying the Petitioners all rights and remedies pursuant to 25 U.S.C. 345, without any attempt to shape the equitable relief requested to avoid this prejudice. App. 3a. For example, the Eighth Circuit noted that a damages remedy could be shaped to avoid any potential infringement if any other non-party were found to be in possession of the allotment: "if it is determined that the United States wrongfully withheld a patent for an allotment, the government may be held liable for damages, regardless of the presence or absence of other potential parties." *Antoine*, 637 F.2d 1177, 1181.

"[T]he absence of an alternative forum [sh]ould weigh heavily, if not conclusively against dismissal." *Sac and Fox v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001), citing, *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1413 (10th Cir. 1996). Even the Ninth Circuit has, on a prior occasion, conceded that courts should be "extra cautious" before dismissing an action pursuant to Rule 19, where "there does not appear to be any alternative forum in which plaintiffs' claims can be heard." *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996).

Here, there was certainly no need to throw the baby out with the bath water and dismiss the Petitioners' entire action to protect any interest the United States perceives the tribe has in Parcel 597-080-01. Even if there had been a subsequent transfer of the

18

Petitioners' interest in the trust parcel to the tribe, as the Eighth Circuit held in *Antoine*, the Petitioners would remain equitably entitled to damages from the United States for the wrongful withholding of a patent for their original allotment in 1978, since such damages would not impair any subsequent interest the tribe allegedly acquired.

Ultimately in the remand of *Antoine*, the District Court awarded damages to prevent violation of the 5th Amendment's prohibition against the taking of private property without just compensation. The Eighth Circuit then affirmed the award of damages for the value of the allotment taken, plus an amount sufficient "to produce the present full equivalent of that value paid contemporaneously with the taking." *Antoine v. United States (II)*, 710 F.2d 477, 479-80 (8th Cir. 1983), citing this Court's opinion in *United States v. Creek Nation*, 295 U.S. 103, 111 (1935), and citing *Confederated Salish and Kootenai Tribes v. United States*, 401 F.2d 785 (Ct. Cl. 1968), *cert. denied*, 393 U.S. 1055 (1969), and *United States v. Klamath and Moadoc Tribes*, 304 U.S. 119 (1938).

Individual Indians in the Ninth Circuit, including the Petitioners, should not be denied just compensation or any of the remedies provided by 25 U.S.C. 345 in the other circuits, just because their tribe was subsequently recognized after the United States acquired land in trust for their individual benefit in California, instead of the Dakotas.

19

## II.    CONCLUSION

The decision of the Ninth Circuit Court of Appeals conflicts with the Eighth and Tenth Circuit courts of appeals. As the Eighth and Tenth Circuits have held, a federally recognized Indian tribe is not, and should not be, a necessary and indispensable party to an action to enforce individual Indians' allotments under 25 U.S.C. 345.

More importantly, a false claim of sovereignty by a subsequently created I.R.A. tribe, should not be allowed to deprive individual Indians of all remedies provided by 25 U.S.C. 345.

As Felix Cohen, IBIA Chairman under President Roosevelt, and the primary draftsman of the Indian Reorganization Act, warned in 1953:

> "Like the miner's canary, the Indian
> marks the shifts from fresh air to poison
> gas in our political atmosphere; and our
> treatment of Indians, even more than our
> treatment of other minorities, reflects the
> rise and fall in our democratic faith..."
> Cohen, Handbook of Federal Indian Law
> (DOI 1982) p. v.

Particularly in these times of great challenge to our distinctly American freedoms, the United States should not allow false claims of tribal sovereignty to take individual Indians' allotments without just compensation, lest our democratic faith fail these indigenous Americans.

20

For all of the foregoing reasons, since the "threshold requirements of Rule 19(a) have not been satisfied," as this Court decided in its *per curiam* opinion, *Temple v. Synthes Corporation, Ltd.*, 498 U.S. 5, 8 (1990), the writ of certiorari should be granted, the judgment of the Ninth Circuit Court of Appeals should be reversed, and the Petitioners' action should be remanded for trial.

Respectfully submitted

**Patrick D. Webb**
  *Counsel of Record*
Webb & Carey
401 B Street, Ste. 306
San Diego, Cal. 92101
(619) 236-1650 Tel
(619) 236-1283 Fax
  *Attorneys for Petitioners*

1a

(Any footnotes trail end of each document)

No. 02-55800

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WALTER ROSALES; et al.,
Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA; et al.,
Defendants - Appellees.

July 8, 2003, Argued and Submitted,
Pasadena, California
August 11, 2003, Filed

COUNSEL:    For  WALTER  ROSALES,  MARIE
TOGGERY,    KAREN    TOGGERY,    Plaintiffs  -
Appellants: Patrick D. Webb, Esq., WEBB & CAREY,
San Diego, CA.

For  UNITED  STATES  OF  AMERICA,  U.S.
DEPARTMENT OF THE INTERIOR, BUREAU OF
INDIAN AFFAIRS, NATIONAL INDIAN GAMING
COMMISSION, Defendants - Appellees: M. Alice
Thurston, Esq., Mark R. Haag, Esq., Katherine J.
Barton, Esq., U.S. DEPARTMENT OF JUSTICE,
Washington, DC.

For UNITED STATES OF AMERICA, Defendant -
Appellee: Appellate Section, U.S. DEPARTMENT OF
JUSTICE, Washington, DC.

2a

For UNITED STATES OF AMERICA, U.S. DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS, NATIONAL INDIAN GAMING COMMISSION, Defendants - Appellees: Robert H. Plaxico, AUSA, Peter John Sholl, Esq., USSD - OFFICE OF THE U.S. ATTORNEY, San Diego, CA.

JUDGES: Before: SILVERMAN, W. FLETCHER, and RAWLINSON, Circuit Judges.

OPINION: MEMORANDUM *

Plaintiffs-Appellants Walter Rosales et al., appeal from an order of the district court granting the United States' motion for summary judgment and dismissing their claims. Because we find that the Jamul Indian Village (the "Village") is a necessary and indispensable party pursuant to Fed. R. Civ. P. 19, we affirm the district court's order dismissing this action. Although the district court did not address whether the Village was a necessary and indispensable party, we have authority to address the issue on appeal. *See Pit River Home and Agric. Coop. Assoc. v. United States*, 30 F.3d 1088, 1099 (9th Cir. 1994).

The Village is a necessary party pursuant to Rule 19(a)(2)(i), which provides that an absent party is necessary if "the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect that interest[.]" Fed. R. Civ. P. 19(a)(2)(i). The Village has claimed jurisdiction over the parcel of land at issue in this action since at least 1981.

3a

This interest would be impaired if Appellants were declared to be the beneficial owners of the land.

The Village enjoys sovereign immunity from suit and cannot be forced to join this action without its consent. *See Clinton v. Babbitt*, 180 F.3d 1081, 1090 (9th Cir. 1999). Furthermore, the United States is not an adequate representative of the Village's interests in this action because the United States cannot adequately represent the interests of one tribe in an intertribal dispute. *See Pit River*, 30 F.3d at 1101.

The Village is also an indispensable party pursuant to Rule 19(b), which requires the court to examine the following factors in order to determine whether this action should be dismissed: (1) prejudice to the absent party or those already parties; (2) the extent to which relief could be shaped to avoid prejudice; (3) adequacy of the judgment rendered without the absent party; and (4) whether plaintiff has another adequate remedy. *See* Fed. R. Civ. P. 19(b). The Village would be prejudiced if Appellants were granted beneficial ownership of the parcel of land, and relief cannot be shaped to avoid this prejudice. While Appellants do not appear to have another adequate remedy, "the tribe's interest in maintaining [its] sovereign immunity outweighs the plaintiffs' interest in litigating their claims." *See American Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1025 (9th Cir. 2002) (citations omitted). For these reasons, the Village is a necessary and indispensable party, without whom this action cannot proceed.

AFFIRMED.

4a

Footnotes

* This disposition is not appropriate for publication and
may not be cited to by the courts of this circuit except
as provided by Ninth Circuit Rule 36-3.

5a

CASE NO. 01-951-IEG (JAH)

UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF CALIFORNIA

WALTER ROSALES, MARIE TOGGERY, and
KAREN TOGGERY,
Plaintiffs,

vs.

UNITED STATES OF AMERICA, et al.,
Defendants.

ORDER (1) CONSTRUING PLAINTIFFS' MOTION
FOR A NEW TRIAL AS A MORTION FOR
RECONSIDERATION; and (2) DENYING
PLAINTIFFS' MOTION FOR RECONSIDERATION

[Doc. No. 37]

Presently before the Court is plaintiffs Walter Rosales, Marie Toggery, and Karen Toggery's ("plaintiffs") motion for new trial and relief from judgment. For the reasons discussed below, the Court construes plaintiffs' motion as a motion for reconsideration and denies plaintiffs' motion.

BACKGROUND

On May 30, 2001, plaintiffs Walter Rosales Marie Toggery, and Karen Toggery ("plaintiffs") filed a complaint far declaratory and injunctive relief pursuant to the Indian Reorganization Act of 1934. In their complaint, plaintiffs seek (1) a declaration of their

6a

entitlement to the allotment of parcel number 597-080-01; (2) to compel defendants to issue to plaintiffs a trust patent for the above-mentioned parcel; (3) to enjoin defendants from further denying plaintiffs' entitlement to the parcel; (4) money damages for deprivation of the use and benefit of their parcel; and (5) reasonable attorneys' fees, costs, and expenses. In their complaint, plaintiffs allege that on February 5, 2001, the United States took action, and first published notice, denying plaintiffs' entitlement and excluding them from their allotment of land in parcel 597-08001." (Compl. at 6 ¶ 18.) This notice, attached to defendants' motion as Exhibit A, was issued by the Bureau of Indian Land Affairs pursuant to 25 C.F.R. §§ 151.10 and 151.11 and invited the public to comment on the pending application by the Jamul Indian Village Reservation for the United States to take certain parcels into trust for the benefit of the Reservation. The pending application does not include the parcel to which plaintiffs claim allotment rights, but plaintiffs allege that the publication of the notice apprised them of the government's failure to issue a patent to plaintiffs for an allotment to parcel 597-080-01. The leadership of the Jamul Reservation has been pursuing the trust application in an effort to commence gaming activities on tribal land. However, plaintiffs contend that they do not challenge the pending application for trust status of the potential gaming property but rather the government's failure to issue a patent to plaintiffs for an allotment on a separate piece of land, parcel 597-080-01.

On August 10, 2001, defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 4(i), 8(a), 12(b)(2), and 12(b)(6), for failure to comply

7a

with minimum federal pleading requirements, lack of
personal jurisdiction, insufficient service of process, and
failure to state a claim upon which relief may be
granted. In their motion to dismiss, defendants also
contended that the Doe defendants named by plaintiffs
in their complaint were improper and should be
dismissed. Plaintiffs filed an opposition to the motion on
October 1, 2001. Defendants filed their reply on October
15, 2001. In their reply, defendants withdrew the
portion of their motion to dismiss based on lack of
personal jurisdiction and insufficient service of process
under Rules 4(i), 12(b)(2), and 12(b)(5), in light of the
additional information regarding service of the
summons and complaint that plaintiffs attached to their
opposition to defendants' motion. On October 16, 2001,
the Court denied defendants' motion.

On November 9, 2001, defendants filed a motion to
dismiss or, in the alternative, for judgment on the
pleadings or summary judgment. In their motion,
defendants contended that they were entitled to
dismissal, judgment on the pleadings, or summary
judgment on the basis that (1) the case is not ripe for
adjudication; (2) plaintiffs lack standing; and (3)
plaintiffs have not exhausted their administrative
remedies. Defendants further contended in their motion
that plaintiffs cannot claim allotment rights to parcel
number 597-080-01 because this form of ownership was
abolished in 1934. Finally, defendants argued in their
motion that defendant National Indian Gaming
Commission ("NIGC") is also entitled to dismissal,
judgment on the pleadings or summary judgment
because it does not play a role in determining whether
land should be acquired by the United States in trust.
In their opposition, plaintiffs contended that defendants

8a

mischaracterized the nature of their claims. Plaintiffs emphasized that they are not challenging the application for trust status currently pending before the Bureau of Indian Affairs. Rather, plaintiffs argued that the gravamen of their complaint is that the government failed to issue them a patent for an allotment to parcel number 597-080-01, which was conveyed to the United States in trust in 1978. In support of plaintiffs' claim to this allotment, plaintiffs attached to their complaint the 1978 deed by which parcel number 597-080-01 was conveyed to the United States "in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate." (See Compl., Ex. B.)

In its order of February 14, 2002, the Court granted defendants' motion for summary judgment on the basis that plaintiffs had no individual rights to an allotment in parcel number 597080-01 because the deed to the United States provided that the United States would hold the land in trust for "such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate." The Court found that this language referred to the Jamul tribe rather than to the half-blooded Jamul Indians then residing on the parcel. (See Summary Judgment Order at 13.) Thus, plaintiffs could not claim rights to land that was deeded in trust for the Jamul tribe as a whole. Rather, the Court found that plaintiffs' rights in parcel     597-080-01     were derivative of those of the tribe and that plaintiffs must pursue these rights through tribal government mechanisms. (See id. at 13-15.)

On February 22, 2002, plaintiffs filed the instant "motion for new trial and relief from judgment."

9a

Defendants filed an opposition on March 25, 2002, and plaintiffs filed their reply on April 2, 2002. On April 8, 2002, the Court heard oral argument on plaintiffs' motion. The Court now turns to the merits of the motion.

## DISCUSSION

### I.    Legal Standard for Motion for Reconsideration

A party may file a Rule 59(e) motion following a summary judgment order because it is considered a "judgment" within the meaning of Rule 54(a). See Fed. R. Civ. P. 54(a) (noting that a "judgment" includes "a decree and any order from which an appeal lies"). A notion to reconsider brought a s motion to amend or alter the judgment pursuant to Federal Rule of Civil Procedure 59(e) is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an "intervening change in controlling law." School Dist. No. 1J, Multnomah County v. AC and S, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993).

A Rule 59(e) motion, however, should not be used to relitigate old matters, raise new arguments, or present evidence that could have been raised prior to the court's entry of judgment. See Brown v. Wright, ht, 585 F.2d 708, 710 (9th    Cir. 1978) (holding that a motion to amend is not to be used "to introduce evidence that was available at trial but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits."); Simon v. United States, 891 F.2d 1154, 1159 (5th Cir.    1990) ("These    [Rule    59]

10a

motions cannot be used to raise arguments which could, and should, have been made before the judgment issued. Moreover, they cannot be used to argue a case under a new legal theory."); Savers Federal Sav. & Loan Ass'n v. Reetz, 888 F. 2d 1497, 1508-09 (5th Cir. 1989) (finding no abuse in denying a Rule 59(e) motion seeking to raise new reasons that summary judgment was inappropriate); Morales v. Quintiles Transnational Corp., 25 F. Supp. 2d 369, 372 (S.D.N.Y. 1998) (holding that a motion for reconsideration under Rule 59(e) "is not a substitute for appeal and 'may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision.") (citations omitted) (emphasis added).

In their moving papers, plaintiffs cite the standard for a new trial under Rule 59(a). However, a plain reading a Rule 59(a) indicates that it is not applicable. Rather, Rule 59(a) applies (1) "in an action in which there has been a trial by jury;" or (2) "in an action tried without a jury." Furthermore, the cases cited by plaintiffs in their discussion of the appropriate legal standard each involve motions brought subsequent to trial. In the instant case, there has not been a trial. Rather, plaintiffs seek reconsideration of the Court's order granting defendants' motion for summary judgment. Thus, the Court construes plaintiffs' motion as a motion for reconsideration brought under Rule 59(e). Applying the standard for Rule 59(e) motions, plaintiffs do not cite to any newly discovered evidence or "intervening change[s] in controlling law." See School Dist. No. IJ, Multnomah County AC and Inc., 5 F.3d 1255, 1263 (9th Cir. 1993). Rather, plaintiffs' arguments for reconsideration appear to be that the Court committed clear error or that its decision was manifestly unjust.

11a

See id. Thus, the Court applies this standard to plaintiffs' motion.

II.     Analysis     of     Plaintiffs'     Arguments     for Reconsideration

A.     Trust Patent Sought by Plaintiffs

Plaintiffs' first argument for reconsideration is that the Court misapprehended the form of relief sought by plaintiffs. Plaintiffs emphasize the Court's statement in the summary judgment order that "[i]t is unclear from plaintiffs' complaint and briefs whether they seek to compel the government to issue a fee patent or a trust patent." (See Summary Judgment Order at 13 n.3.) In the instant motion, plaintiffs emphasize that they "do not seek to hold fee simple title," but "merely wish to enforce their rights to have the Government hold title in trust for the express benefit of 'Jamul Indians of one-half degree or more Indian blood,' who were residing on the property in 1978 when the Government[ ] accepted the Daley grant deed." (See Pls.' Mem. P. & A. at 5.)

However, the Court found in its order granting defendants' motion for summary judgment that "[r]egardless of whether plaintiffs seek to compel the issuance of a fee or trust patent, it is clear that plaintiffs' claim fails on either basis in light of the 1978 deed's language designating the Tribe, rather than the individual plaintiffs, as the beneficiaries of parcel number 597-080-01." (See Summary Judgment Order at 13 n.) Thus, as the Court found in its previous order, plaintiffs are not entitled to any rights in parcel 597-080-01 independently of their rights as tribe members.fn1

12a

B.    Plaintiffs' Rights as a "Dependent Indian Community" Residing on Parcel Number 597-080-01

Plaintiffs also object to the Court's characterization of their claim as one seeking to enforce their individual rights in the parcel. Rather, plaintiffs contend that they are tenants in common with the other half-blooded Jamul Indians residing on the parcel when the United States took it into trust in 1975. Plaintiffs contend that they were members of a "dependent Indian community" for which the government accepted parcel number 597-080-01 into trust in 1978. In support of this proposition, plaintiffs cite to Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520 (1998) and United-States v McGowan, 302 U.S. 535 (1938). This "dependent Indian community," plaintiffs argue, was not a tribe in 1978 when the deed was executed; thus, the land could not have been accepted into trust for the benefit of the "tribe." Plaintiffs argue that the acceptance of the deed into trust did not "designate the tribe" and that the tribe could not have been recognized as such in 1975 because the Secretary did not approve its constitution until July 7, 1981.

Plaintiffs' use of the term "dependent Indian community" in this context is misplaced, however, as the term is relevant to federal criminal and civil jurisdiction over Indian lands, rather than forms of Indian ownership of land. See, e.g., Alaska v. Native Village of Venetie, 522 U.S. 520, 527 (1998) (holding that under 18 U.S.C. § 1151, "dependent Indian communities" refer to Indian lands that are neither reservations nor allotments but are subject to federal jurisdiction). Furthermore, Ninth Circuit case law indicates that the Secretary of the Interior uses

13a

language such as that found in the 1975 deed to refer to tribes that have yet to be formed. For example, in Pit River Home and Agric. Coop. Ass'n v. United State, the Secretary of the Interior interpreted the language, "in trust for such Bands of the Pit River Indian of the State of California as shall be designated by the Secretary of the Interior" to mean that "the whole Pit River Indian Tribe or Nation when it has organized to include all elements of the Pit River Indians and has received Secretarial approval of the constitution adopted for this purpose should be designated the beneficial owner of the XL Ranch." 30 F.3d 1085, 1092-93 (9th Cir. 1994). Significantly, the Secretary did not interpret the above language to designate as beneficiaries only the bands of Pit River Indians then residing on the land.

Thus, applying the Secretary's interpretation of similar language from Pit River, it is clear that the 1975 deed's language designating as beneficiaries "such Jamul Indians of one-half degree or more blood as the Secretary of the Interior may designate" indicates the Secretary's intent to accept parcel number 597-080-01 into trust for the Jamul Tribe upon its recognition, rather than for the individuals, or the "dependent Indian community" then residing on the land. (See Compl., Ex. B.) As the Court found in its order granting defendants' notion for summary judgment, the Secretary's intent is further illustrated by the 1975 letter from the United States Department of the Interior, attached to defendants' reply as Exhibit L, which notes that, as of March 15, 1978, the Department of the Interior "ha[d] received eleven signatures out of the thirteen ½ bloods for the Bureau of Indian Affairs to proceed with the proposed acquisition through a

14a

donation to establish the Jamul Indian Reservation."
(See Summary Judgment Order at 14 (citing Defs.' Ex.
L).) Thus, plaintiffs' argument that the Court erred by
failing to recognize the "dependent Indian community"
comprised of the Jamul Indians residing on parcel 597-
080-01 as the beneficiaries of the 1978 trust deed lacks
merit.

C.    Genuine Issue of Material Fact as to whether
There Was a Recognized Tribe When the United States
Accepted Parcel Number 597-080-01 into Trust in 1978

Finally, plaintiffs argue that there is a genuine issue of
material fact as to whether the Secretary of the
Interior had recognized the Jamul Tribe when the
United States accepted parcel number 597-080-01 into
trust in 1978. Plaintiffs cite to Native Village of Tyonek
v. Puckett, 957 F.2d 631, 634-35 (9th Cir. 1992) for the
proposition that the Court is required to make express
factual findings to determine that a Jamul tribe existed
in 1975. However, Puckett involved the issue of
"whether any Alaskan native village constitutes an
Indian tribe for the purpose of sovereign immunity."
Id. at 635. Furthermore, the Court need not determine
whether there is a Jamul Tribe; it need only find, as it
did in the summary judgment order, that there is no
genuine issue of material fact that the 1978 deed did not
grant plaintiffs any rights in parcel 597-080-01 other
than as members of the anticipated Jamul Tribe.

Plaintiffs' argument that the Court must make specific
factual findings as to whether a tribe existed in 1978 is
misplaced, as the deed language conveyed the parcel in
trust for the anticipated Jamul Tribe. Plaintiffs cite to
no authority showing that the United States is

15a

unauthorized to accept land into trust for a tribe prior to its formal recognition by the Secretary of the Interior. Plaintiffs do not dispute that upon the Secretary's approval of the Jamul Tribe's constitution in 1981, the Jamul Indians became a "tribe." Thus, plaintiffs' argument requires the Court to find that the Secretary is prohibited from conveying land in trust to a tribe prior to its formal recognition by the Secretary of the Interior. The Court is aware of no authority for such a proposition. To the contrary, the Secretary of the Interior has specifically concluded that conveyances into trust for tribes that have yet to be designated are effective transfers intended to benefit the tribe as a whole upon its recognition.fn2 See, e.g., Pit River, 30 F.3d at 1092-93. Thus, the Court finds no clear error or manifest justice in its determination that the language of the 1975 deed conveying parcel number 597-080-01 into trust for "such Jamul Indians of one-half degree or more blood as the Secretary of the Interior may designate" refers to the Jamul Tribe rather than the individual Jamul Indians then residing on the parcel.fn3

CONCLUSION

For the foregoing reasons, the Court construes plaintiffs' "motion for a new trial" as a Rule 59(e) motion for reconsideration. The Court further finds that plaintiffs have failed to show that the Court's order granting defendants' motion for summary judgment contained "clear error" or was "manifestly unjust." The Court finds no other basis for reconsideration. Thus, the Court DENIES plaintiffs' motion for reconsideration.

IT IS SO ORDERED.

16a

IRMA E. GONZALEZ
United States District Judge

Dated: 4/22/02

cc:    Magistrate Judge Houston
       all parties

Footnotes

fn1 Plaintiffs also argue in their reply that there is no
requirement that individual Indians for whom the
United States accepts land into trust must be members
of a tribe. Pls.' Reply at 6.) However, the Court
acknowledged that under section 465, land could be
taken into trust for individual Indians. (See Summary
Judgment Order at 10.) The Court determined
defendants were entitled to summary judgment on the
basis that the 1975 conclusively established that the
United States did not take the parcel into trust for
individual Indians but for the anticipated Jamul Tribe
as a whole. (See id. at 12-14.)

fn2 The government also emphasizes that under 5
U.S.C. § 476, an Indian group could organize and adopt
a constitution only if the group is an "Indian tribe" –
defined under section 479 as "the Indians residing on
one reservation" or under section 479a(2) as any "tribe,
band, nation, pueblo, village or community that the
Secretary of the Interior acknowledges to exist as an
Indian tribe." See 25 U.S.C. §§ 476, 479. Thus, the
government contends, parcel number 597-480-01 was
part of the "reservation" prior to 1951 because the
Jamul Indian could have their constitution approved by
the Secretary only if they were residing on a

17a

"reservation" as a tribe. This argument forms an alternative basis for the Court's finding that plaintiffs have no rights in parcel number 597-080-01 other than through normal tribal government mechanisms. See F. Cohen, Handbook of Federal Indian Law, at 472 (1982 ed.) ("The manner in which a tribe chooses to use its property can be controlled by individual tribe members only to the extent that the members participate in the governmental processes of the tribe.").

fn3 The Court also rejects plaintiffs' suggestion that the Secretary was required to "initiate designation proceedings" subsequent to its acceptance of parcel number 597-084-41 into trust. Courts have recognized under similar circumstances that "it [is] not necessary that the designation be made by a formal proclamation." Coast-Indian Cmty v. United States, 550 F. 2d 639, 643 (Ct. I. 1977). Rather, "designation may be inferred by law." Id. at 644. Here, the Court finds that the Secretary's recognition of the Jamul Tribe's constitution in 1981 accomplished such designation in light of the intent reflected in the 1978 deed.

18a

NOT FOR PUBLICATION

No. 02-55800

D.C. No. CV-01-00951-IEG
Southern District of California,
San Diego

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WALTER ROSALES; MARIE TOGGERY;
KAREN TOGGERY,
Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA; U.S.
DEPARTMENT OF THE INTERIOR; BUREAU
OF INDIAN AFFAIRS; NATIONAL INDIAN
GAMING COMMISSION,
Defendants-Appellees.

Filed: September 19, 2003

ORDER

Before:  SILVERMAN,  W.  FLETCHER,  and
RALWINSON, Circuit Judges.

Appellants' Petition for Rehearing filed on August 27,
2003, is DENIED.

19a

U.S. Const. Amend. V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

20a

25 U.S.C. 345. Actions for allotments

All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper circuit court [district court] of the United States; and said circuit courts [district courts] are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty (and in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant); and the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him, but this provision shall not apply to any lands now [Aug. 15, 1894] held by either of the Five Civilized Tribes, nor to any of the lands within the Quapaw Indian Agency: Provided, That the right of appeal shall be allowed to either party as in other cases.

21a

Fed. R. Civ. P., Rule 19. Joinder of Persons Needed for Just Adjudication

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

(b) Determination by Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial

22a

to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

(c) Pleading Reasons for Nonjoinder. A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivision (a)(1)-(2) hereof who are not joined, and the reasons why they are not joined.

(d) Exception of Class Actions. This rule is subject to the provisions of Rule 23.

Exhibit H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Walter Rosales, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case Number 1, 03CV01117 (GK) |
| | ) | |
| United States, et al. | ) | Judge Gladys Kessler |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### CROSS MOTION FOR SUMMARY JUDGMENT

Defendants respectfully move for summary judgment for the reasons stated in the following memorandum and on the basis of the administrative record filed in this case for each of the challenged decisions. Defendants also oppose plaintiffs' motion for summary judgment for the reasons stated in the memorandum that follows.

### MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs Walter J. Rosales and Karen Toggery seek judicial review of three decisions of the Interior Board of Indian Appeals ("IBIA"). All three decisions concern the Jamul Indian Village ("Village" or "Tribe"), a federally recognized Indian tribe.

The first IBIA decision challenged by plaintiffs dismissed their appeal concerning the purported failure of the Bureau of Indian Affairs (BIA) to render a decision on a letter objecting to a Secretarial election that was to be held on August 31, 1996. The IBIA held that the BIA had rendered a decision on their letter by holding the election as scheduled. The IBIA also noted that plaintiffs were not eligible to vote in that Secretarial election, nor had they challenged the results of that election or its procedures within the regulatory time frame. *Rosales v. Sacramento Area Director*, 34 IBIA 50 (1999), (*Rosales II*).

The second IBIA decision challenged by plaintiffs dismissed as moot their challenge to the BIA decision recognizing the results of a 1997 tribal election of officers, since the BIA's approval of a subsequent 1999 tribal election for officers had not been challenged or appealed. *Rosales v. Sacramento Area Director*, 34 IBIA 125 (1999) (*Rosales III*).

The final IBIA decision challenged by plaintiffs is *Rosales v. Pacific Regional Director*, 39 IBIA 12 (2003) (*Rosales IV*). In *Rosales IV*, the IBIA first reviewed the BIA's decision upholding a 2001 tribal election. The IBIA noted that the results of the Secretarial election to amend the Tribe's IRA constitution were final with the decision of *Rosales II* on July 29, 1999, and that no evidence was presented that the 2001 tribal election was conducted in violation of the amended constitution. The IBIA upheld the approval of the 2001 election. The IBIA then affirmed *Rosales III*'s dismissal of the challenge to the prior election in 1997, which was the subject of a request for reconsideration, as moot, and dismissed the challenge to the prior election in 1999, as moot.

The administrative records of the three challenged IBIA decisions were filed with this court on November 24, 2003, and this court denied plaintiffs' motion to augment the record by order dated January 21, 2004.

## JURISDICTION

The only waiver of sovereign immunity alleged which provides jurisdiction to this court with respect to the federal defendants, to the extent plaintiffs have standing, is the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Plaintiffs also allege the mandamus statute, 28 U.S.C. § 1361, but do not set out a mandamus claim in their Complaint or in their Motion for Summary Judgment. Plaintiffs rely on 28 U.S.C. §1362, but this provision does not waive the federal government's immunity from suit. *Scholder v. United States*, 428 F.2d 1123 (9th Cir.1970), cert. denied, 400 U.S. 942 (1970). It is a statute like 28 U.S.C. § 1331, also alleged by plaintiffs that, while conferring general jurisdiction, does not waive sovereign immunity. *See Cheyenne-Arapaho Gaming Commission v. National Indian Gaming Commission*, 214 F. Supp.2d 1155, 1162 (N.D. Okla. 2002); *Western Shoshone Business Council, for and on Behalf of Western Shoshone Tribe of the Duck Valley Reservation v. Babbitt*, 1 F.3d 1052, 1058-59 (10th Cir. 1993) ("For the same reasons that plaintiffs cannot bring this action under § 1331, they also cannot assert jurisdiction under § 1362").

The Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, likewise does not operate to waive the United States' sovereign immunity. *B.R. Mackay & Sons, Inc. v. United States*, 633 F. Supp. 1290, 1295 (D. Utah,1986), citing *Balistrier v. United States*, 303 F.2d 617 (7th Cir. 1962). Plaintiffs' reliance on 28 U.S.C. § 1346, often referred to as the "Little Tucker Act," is misplaced because it gives the district courts concurrent jurisdiction with the United States Court

3

of Federal Claims over certain monetary claims, not for the claims asserted in this action.  The

only remaining jurisdictional allegation is 28 U.S.C. § 1344.  Section 1344 does not constitute a

waiver of sovereign immunity.  Even then, it is a narrow provision allowing suits to recover

office denied on the basis of race color, or previous condition of servitude, and only permits

candidates deprived of any office on that basis to bring suit.  *Hubbard v. Ammerman*,, 465 F.2d

1169 (5th Cir. 1972), *cert. denied* ,410 U.S. 910; *Gray v. Main*, 291 F. Supp. 998. (M.D. Ala.

1966).  The Complaint makes no allegations that could come under the purview of this statute.

## STATEMENT OF THE ISSUES PRESENTED

Whether the IBIA decisions in *Rosales II, Rosales III,* or *Rosales IV* are arbitrary or

capricious or not otherwise in accordance with law.

## STATEMENT OF FACTS

Plaintiffs are not original members of the Jamul Indian Village.  The administrative

record before the IBIA in *Rosales II* included no evidence that the original members had

admitted new members in accordance with the Tribe's constitution.  In November 1995, a

quorum of the surviving original members voted unanimously to have an election to amend the

Tribe's IRA constitution.  The election was held and the constitution was amended to change the

blood quantum requirements for membership.  Because neither Walter Rosales nor Karen

Toggery were original members, they were not entitled to vote in the 1996 federal election to

amend the constitution.  Ten months after the election, plaintiffs appealed to IBIA the BIA's

purported failure to respond to their letter objecting to the scheduled election to amend the

Tribe's constitution.  In 1998, the IBIA in *Rosales II* dismissed their appeal.

4

The administrative record before the IBIA in *Rosales IV* included no evidence that the 2001 tribal election of officers violated the Tribe's amended constitution. The IBIA therefore dismissed plaintiffs' appeal. The IBIA also addressed a request for reconsideration and affirmed the dismissal in *Rosales III* of plaintiffs' challenge to the 1997 tribal election of officers as mooted by the subsequent valid election of officers.

## STANDARD OF REVIEW

Plaintiffs seek judicial review of the three IBIA decisions pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Section 706(2)(A) of the APA authorizes courts to set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In applying the arbitrary and capricious standard, a court must determine whether "the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). Although this inquiry must be thorough, the standard of review is narrow and highly deferential, *Overton Park*, 401 U.S. at 416; the agency's decision is "entitled to a presumption of regularity," *id.* at 415; and a court cannot substitute its judgment for that of the agency, *id.* at 416. *See NRDC v. SEC*, 606 F.2d 1031, 1048 (D.C. Cir. 1979)*, Pozzie v. United States Department of Housing and Urban Development,* 48 F.3d 1026, 1029 (7th Cir. 1995) (standard of review is deferential, presuming validity of agency actions as long as the decision has a "rational basis"). Judicial review under the APA is narrow; it is not a *de novo* review.

A reviewing court should affirm the agency's decision as long as the administrative record demonstrates that the agency has reviewed and fairly weighed the relevant data and

5

articulated a rational connection between the facts found and the decision made. *Olenhouse*, 42

F.3d at 1574. The objective of the court's inquiry is "whether there has been a clear error of

judgment." *Overton Park,* 401 U.S. at 416. Under the APA, the Court may not substitute its

judgment for that of the Secretary. *Id.* Because the court's review is limited to the agency's

action, that review is based on the administrative record, the information available to the agency

decision maker at the time of the challenged action. 5 U.S.C. § 706; *Florida Power Light Co. v.*

*Lorion,* 470 U.S. 729, 743 (1985); *Camp v. Pitts,* 411 U.S. 138, 142 (1973); *Fund for Animals v.*

*Williams,* 245 F. Supp. 2d 49, 54-55 (D.D.C. 2003). The agency's weighing of the evidence

differently than that advocated by others does not make the decision arbitrary and capricious.

*United States v. Morgan,* 313 U.S. 409, 419 (1941) (the Secretary can attach a different

significance from the data).

The Department's decision in this case is owed substantial deference because it involves

matters of relations with Indian tribes over which the Department has been delegated substantial

authority. The Department has been delegated authority to manage Indian affairs and matters

arising out of Indian relations. 25 U.S.C. §§ 2, 9; 43 U.S.C. § 1457. The decisions challenged

here fall squarely within the subject matter that courts have found requires a large degree of

deference. *United States v. Holliday*, 70 U.S. 407 (1865), *United States v. Sandoval*, 231 U.S. 28

(1913).

Finally, the decisions here were made with formal proceedings, which further supports a

deferential review of the expert agency's determination. See *United States v. Mead Corp.*, 533

U.S. 218, 230 (2001) ("It is fair to assume generally that Congress contemplates administrative

action with the effect of law when it provides for a relatively formal administrative procedure

6

tending to foster the fairness and deliberation that should underlie a pronouncement of such force").

## SUMMARY OF ARGUMENT

The IBIA decision in *Rosales II* is not arbitrary and capricious or contrary to law. In *Rosales II*, the plaintiffs appealed the agency's purported lack of response to a letter they wrote dated August 28, 1996. That letter objected to the proposed Secretarial election to amend the Tribe's constitution. The IBIA's decision that the agency had responded to plaintiffs by holding the election is not arbitrary and capricious. Further, as determined by IBIA, neither Walter Rosales nor Karen Toggery were entitled to vote in that election, nor to challenge it, nor had done so within the regulatory time periods. As such, they were not persons whose interest are adversely affected by the holding of the election. The IBIA dismissed their appeal.

The administrative decision in *Rosales III* held that the challenge to a 1997 tribal election is moot. This IBIA decision is not arbitrary and capricious, and, in any event, is superceded by the decision in *Rosales IV.* The decision in *Rosales IV* upheld the 2001 tribal election of officers because no evidence was submitted that the election violated the amended constitution. This IBIA decision withstands judicial review and is not arbitrary and capricious or contrary to law.

## ARGUMENT

Listed as a plaintiff in this district court proceeding is the "Jamul Indian Village," based on the individual plaintiffs' contention that the three IBIA decisions are arbitrary and capricious and that they themselves are the leaders of the Tribe. Because this assertion assumes the merits of the litigation, any reference to plaintiffs in this brief is limited to the individual plaintiffs. It is the position of the defendants that the "Jamul Indian Village" is not before this court. Of note,

7

the "Jamul Indian Village" was not an appellant in any of these three IBIA proceedings.

AR 2271, AR 1287, AR 0970.[1/]

### A.    BACKGROUND: ORGANIZATION OF JAMUL INDIAN VILLAGE AND OTHER FINAL JUDICIAL AND ADMINISTRATIVE DECISIONS INVOLVING THESE PLAINTIFFS.

### 1.    Organization of Jamul Indian Village

The Jamul Indian Village was organized in 1981 under the Indian Reorganization Act

(IRA), 25 U.S.C. §§ 461-479, and is included in the list of Federally Recognized Tribes, 68 *Fed.*

*Reg.* 68180, 68181 (Dec. 5, 2003).  The tribe was organized as a community of half-bloods in

1981 after land was purchased for them as a reservation under the IRA.  25 U.S.C. § 479,

*Rosales v. Sacramento Area Director,* 32 IBIA 158, 159 (1998), (*Rosales I).*  Twenty three

individuals were eligible to vote to organize the Tribe.  AR 2317.  These 23 persons are

members of the Jamul Indian Village (Plaintiffs' Memorandum of Points and Authorities in

Support of Motion for Summary Judgment, at 6, hereafter Plfs' MSJ).  Plaintiffs are not among

these 23 individuals.

The Indian Reorganization Act, 25 U.S.C. § 476 (1988), and federal regulations govern

the procedure to amend tribal constitutions adopted under the IRA, such as that of the Jamul

---

[1/]The Jamul Indian Village's recognized leadership has not sought to join this litigation as a party.  Indeed the Jamul Indian Village with its recognized leadership took positions aligned with the Bureau of Indian Affairs before the IBIA.  *See* AR-0292, 1240, 1263, 2256.  The Plaintiffs purport to bring this action on behalf of the Village, under 28 U.S.C. § 1362, as they allege in their Complaint, but cannot do sot. *See Jamul Indian Village v. Hunter,* Civil No. 95-0351-R (S.D. Cal.), slip op. dated September 9, 1996 at 20, attached as Exhibit A.  ("Jane Dumas is the only plaintiff in this case.  *See* Order filed June 22, 1995.  As such this action is not brought by 'any Indian tribe.'  Moreover, Dumas' faction does not represent a 'governing body recognized by the Secretary of the Interior.'  As such, Section 1362, cannot provide jurisdiction in this Court in the present action filed by Dumas." *Id.*).  The individual plaintiffs are not recognized by the Secretary as the governing body of the Jamul Indian Village.

Indian Village. 25 C.F.R. Part 81, *Tribal Reorganization Under a Federal Statute.*[2]  An election

to amend an IRA constitution is a Secretarial election, a federal - not tribal - election. *Cheyenne*

*River Sioux Tribe. v. Andrus*, 566 F. 2d 1085 (8th Cir. 1977), *cert. denied* 439 U.S. 820 (1978);

*Thomas v. United States*, 189 F.3d 662, 667 (7th Cir. 1999); 25 C.F.R. §§ 81.1(s), 81.2.  Under

these regulations, members of the tribe must register to vote in the Secretarial election, 25 C.F.R.

§§ 81.6(d), 81.11, 81.13, and challenges to the results of the election must be filed by qualified

voters within a prescribed period of time, 25 C.F.R. § 81.22.

     **2.**    *Rosales v. United States,* **(S.D. Calif), regarding the Tribe's reservation**

     In 2001, plaintiffs Walter Rosales and Karen Toggery and others, filed a complaint

alleging that they were entitled to an allotment on the reservation.  The federal district for the

Southern District of California, in an unreported decision, *Rosales v. United States*, Civil No. 01-

951, slip op. filed February 14, 2002, attached as Exhibit B, held that their claim for a trust

patent was not ripe, and in the alternative, that the IRA did not provide for the issuance of a fee

patent to Indians.  The district court held also that the language of the 1978 deed clearly

conveyed the parcel in trust for the benefit of the Jamul Indian Village as a whole, not for

specific individual Indians.  The district court denied plaintiffs' motion for reconsideration,

noting that it had ruled earlier that the parcel is held in trust for the *tribe* as a whole, not for

petitioners as individuals. *Rosales v. United States*, Civil No. 01-951, slip op. at 3,  filed April

22, 2002, attached as Exhibit C.  On appeal, the Ninth Circuit Court of Appeals, also in an

unpublished decision, held that the Tribe was an indispensable party under Fed. R. Civ. Pro. 19

---

[2]Part 81 was last revised in 1981.  To the extent the regulations are inconsistent with the 1988
amendments to the IRA, the statute controls.

to the action and could not be joined because it enjoys sovereign immunity from suit, and

dismissed the case. *Rosales v. United States,* 73 Fed. Appx. 913, 2003 U.S. App. LEXIS 16467

(2003), *cert. denied,* 124 S.Ct. 1657 (2004), attached as Exhibit D. For the same reasons stated

in the district court and Ninth Circuit decisions, plaintiffs are precluded here from arguing that

the property was taken in trust for the specific occupants rather than the tribe as a whole. Plfs

MSJ at 4.

3.     **_Rosales I_ - not challenged by plaintiffs and the statute of limitations precludes any challenge**

In *Rosales v. Sacramento Area Director,* 32 IBIA 158 (1998), (*Rosales I),* these same

plaintiffs were among those who challenged various actions and inactions of the Sacramento

Area Director, BIA, relating to a leadership dispute of the Jamul Indian Village arising from

tribal elections in 1994 and 1995. *Id.* at 158. Plaintiffs did not seek judicial review of this IBIA

decision and thus facts material to its holding are binding on them. *Rosales I* held in part that

there was no evidence presented that the original 23 members of the Jamul Indian Village ever

admitted new members in accordance with its constitution, and that Walter J. Rosales and Karen

Toggery were not among the original 23 members. *Id.* at 166.

*Rosales I* found that the tribal election dispute could not be resolved without first

addressing tribal membership. *Id.* at 162. As provided in the decision, at 166:

> A determination of who is a tribal member must, however, precede any
> determination of who is a tribal leader. Without knowing who is a tribal member,
> neither the Village nor the Department is in a position to know whether a tribal
> election was conducted in accordance with the constitution; i.e., whether only
> tribal members voted in that election . . . and whether only tribal members were
> elected to office.

The IBIA found that neither faction demonstrated that voting in its elections was restricted to tribal members, or that only tribal members were elected to tribal office. The IBIA found also that "[n]o party . . . has submitted any evidence that the original 23 members of the Village ever admitted new members in accordance with Article III, section 1, of the Village's constitution . . . . If the original 23 members have, in fact admitted new members, they have the responsibility to show that such action was taken in accordance with the constitution and to provide BIA with an up-to-date list of tribal members." *Id.* at 166.[3]    The IBIA, therefore, reinstated the leaders elected in the last prior undisputed election, finding that it could not determine, based on the evidence presented, if either faction before it was validly elected by the membership. *Id.* at 168.

The IBIA, in its April, 1998, ruling, requested the Area Director to assist the Village's actual members in addressing their membership and leadership problems. *Id.* at 168. The BIA responded by completing a genealogy study on the original 23 members of the Tribe.[4]  Also, in 1996, prior to the filing of the Notice of Appeal in *Rosales I*, the BIA held an election on a proposed amendment to the membership provision in the Tribe's constitution. Prior to holding

---

[3]The 1981 Constitution of the Jamul Indian Village, AR 2366 - 2376, approved by the Department of the Interior, provides in Article III, "Membership", Section 1 that "[t]he members of the Jamul Indian Village shall consist of those persons who file applications for membership with and are found qualified by the executive committee" who meet certain qualifications. AR 2366. Article III, Section 3 provides that "[t]he governing body shall adopt an enrollment ordinance, subject to the approval of the Secretary of the Interior, governing . . . the enrollment of new members. . . " AR 2367.

[4]A genealogy study dated May 5, 1998, completed after the decision in *Rosales I*, reviewed the ancestry of these 23 persons and determined that all 23 possessed ½ degree or more California Indian blood, the required blood quantum for organization as a community of half-bloods under 25 U.S.C. § 479. AR 1801. This study addressed the IBIA concern that the BIA never actually made and/or verified blood quantum determinations of these 23 individuals. 32 IBIA at 162.

11

the election, the BIA addressed membership issues. The BIA determined that no enrollment ordinance had been submitted to the BIA for approval as required by the Tribe's constitution and that any enrollment of new members was therefore invalid.[5] In holding this Secretarial election the BIA, therefore, relied on the representations of the original 23 members who were then alive (15) and who attended and voted at the General Council meeting requesting the Secretarial election. AR 1707, AR 2265. Also, the BIA permitted only the surviving original members to register and vote in the election. AR 2257. These BIA decisions in conducting the election were consistent with the subsequent holding in *Rosales I* that no party showed that the 23 original members ever admitted new members in accordance with their constitution.

*Rosales I* also discussed the 1994 amendments to the IRA that provide that the Department shall make no distinctions among recognized tribes. 25 U.S.C. § 476 (f) & (g). The IBIA noted that this amendment precluded the distinction previously made between "historic" and "created" tribes, and put tribes on an equal footing. The IBIA found that the Tribe has all of the same rights and authorities as every other recognized Indian tribe to define its membership criteria. 32 IBIA at 165-166.

---

[5] As explained by subsequent letter dated October 10, 1996, BIA Sacramento Area Office to Attorney Webb, regarding certain 1994 and 1995 elections, AR 2335 at 2337:

> Both parties have submitted documents referring to several enrollment ordinances which were purportedly adopted; however, both Agency and Area Office records show that no ordinance or a formal request had been submitted requesting review and approval as required by Article III-MEMBERSHIP Section 3. Because of this, it is the Bureau's position that any enrollment adopted by either side is invalid because it lacks Bureau approval. We must then look to the list of the original members who voted to adopt the Jamul Village Tribal Constitution on May 9, 1981.

Plaintiffs do not challenge *Rosales I* and the statute of limitations has run on the April

1998 decision, precluding any such challenge. *See,* Plaintiffs' Motion to Augment the Record, at

3 ("The complaint does not seek direct review of Judge Lynn's April 22, 1998 decision") and

Complaint (Prayer for Relief in Complaint does not request any relief concerning *Rosales I*).

**B.    THE IBIA DECISION IN *ROSALES II* IS NOT ARBITRARY AND CAPRICIOUS.**

The BIA had responded to the letter objecting to the scheduled holding of the secretarial

election. Further, plaintiffs were not qualified voters in that election.

**1.    Summary of *Rosales II***

On July 10, 1997, plaintiffs Walter Rosales and Karen Toggery and others appealed to

IBIA the alleged failure of the BIA "to render a decision on APPELLANTS' August 28, 1996

[letter] object[ing]" to the scheduled Secretarial election to amend the Jamul Constitution, or to

set a date to decide the objection. AR 2272. The Secretarial election was held on August 31,

1996, as scheduled, and Walter Rosales and Karen Toggery appealed to the IBIA approximately

10 months later. On July 29, 1999, the IBIA dismissed the challenge to the BIA's alleged failure

to render a decision, finding that the holding of the election was a response to the letter. 34 IBIA

50 (1999), AR 1353.

The IBIA decision addressed the appellants' argument that the BIA had not responded to

the letter dated August 28, 1996, filed by Attorney Webb, on behalf of unnamed clients, in which

objections were raised concerning the proposed Secretarial election. The IBIA quoted from the

letter that "If [the Superintendent] or any agent of the U.S. persists . . . in holding the . . .

'election', my clients will have no alternative but to pursue their rights against such action . . ."

34 IBIA at 52. The IBIA found that the operative language of the letter was that "if the election

13

was held, Appellants would take action." The Board concluded that the only decision BIA was required to make in response to the August 28, 1996, letter was whether it would hold the Secretarial election despite the objections raised in the letter," *id.* at 52, and that the holding of the election was "an adequate response." *Id.* at 53.

The IBIA also rejected the argument that the pre-election letter was a timely appeal from the results of the Secretarial election. Under 25 C.F.R. § 81.22, "any qualified voter" within three days "following the posting of the results," may file a challenge *"together with substantiating evidence."*

First, the IBIA reasonably discounted the letter based on its timing - how a letter written *before* the election could be a challenge to the *results* of the election. ("Putting aside the practical question of how one can challenge the results of an election that has not yet been held . . ." AR 1356)

Second, the IBIA found that there was no evidence in the record as to who "the clients" referenced in the letter were. Thus it was not possible to determine if those "clients" were "qualified voters." 34 IBIA at 53.

Third, the IBIA, "for the purposes of this discussion only," assumed that the letter was authorized by some of all of the appellants before the IBIA. *Id.* The IBIA noted that the administrative record showed that only original members were allowed to register to vote, and that none of the plaintiffs was a surviving original member. The IBIA then found that none of the appellants was a qualified voter - and thus, the letter was not an appropriate challenge, irrespective of its timing, as only qualified voters had rights under the regulations to challenge an election. 25 C.F.R. § 81.22. *Id.* at 53-54.

14

Finally, the IBIA rejected appellants' argument that all of the living original members (15) were "qualified voters," noting that the regulations provide that eligible members of the Tribe must register to vote in the Secretarial election. *Id.* at 53, 25 C.F.R. §§ 81.6(d), 81.11, 81.13. The IBIA observed, nonetheless, that none of the appellants, which included Walter Rosales and Karen Toggery, was one of the 15 living original voters, *id.,* and thus the question of having to register was not an issue that impacted them. The IBIA concluded that neither Walter Rosales nor Karen Toggery were persons whose interests are adversely affected by the holding of the election. 25 C.F.R. § 2.8.

The IBIA determined that "the August 28, 1996, letter did not require a response from BIA beyond a decision as to whether or not to hold the Secretarial election, and that there was no valid challenge to the Secretarial election under 25 C.F.R. § 81.22." 34 IBIA at 54.

Nearly 4 years later, plaintiffs now challenge the dismissal of their appeal as arbitrary and capricious and not otherwise in accordance with law. Under the APA, plaintiffs here can only challenge IBIA's dismissal of their appeal concerning BIA's alleged failure to respond to their letter - the agency action under review. They cannot seek review *de novo* review of the BIA's holding of the election.

### 2.   Plaintiffs' Appeal to IBIA Concerned an Alleged Failure of the BIA to Respond to a Letter.

Plaintiffs' characterized their appeal in their brief before the IBIA. That brief informs this court of the issues decided by IBIA that are subject to review:

> Docket No. 98-9-A is not an appeal, *per se*, of the Deputy Commissioner's purported October 15, 1996 "approval" of the invalid August 31, 1996 "Secretarial election." Rather, it is an appeal of the preceding failure of the Sacramento Area Director to rule upon Appellants' August 28, 199**6** challenge to

15

the illegal "Secretarial election" then being staged by the So. Cal. Regional
Superintendents, **before** the invalid "Secretarial election" was held . . .

AR 2218. Plaintiffs' premise is that their writing an objection to the election in which they could

not vote was sufficient to prevent the holding of the election, and that the holding of the election

was not a response to their letter. Their premise is without foundation. IBIA's dismissal of their

action was not arbitrary and capricious or contrary to law.

The IBIA decision in *Rosales II* held that the BIA had responded to the letter objecting to

the future holding of the election by holding the election as scheduled. The IBIA decision held

also that Walter Rosales and Karen Toggery were not "qualified voters" and had not filed a

challenge to the results of the election as required by the regulations. The IBIA decision is fully

supported by its record, and plaintiffs point to no evidence in the record that indicates that the

IBIA decision is arbitrary and capricious.

Plaintiffs provide no legitimate argument that the BIA was required to provide a written

decision to their letter objecting to the holding of the Secretarial election to amend the Jamul

Village's IRA constitution, and that until such a response was provided, that the BIA could not

hold the election. The only argument plaintiffs appear to make is that since their challenge to the

certain elections of tribal officers in 1994 and 1995 (*Rosales I*) was pending before IBIA, the

BIA was without jurisdiction to act on a request for a Secretarial election to amend the Tribe's

constitution. Plfs MSJ at 16. Although an appeal to IBIA may prevent the specific decision that

is appealed from being final or effective, 43 C.F.R. § 4.21, there is no authority that provides that

such an appeal prevents the BIA from acting on other unrelated matters concerning the Tribe.

Although plaintiffs cite *Hammerberg v. Acting Portland Area Director,* 24 IBIA 78 (1993), for

support, that case held merely that once an appeal was filed, the BIA loses jurisdiction over the

16

particular matter except to participate as a party in the appeal. *Hammerberg* does not stand for the proposition that the BIA loses jurisdiction over unrelated matters.[6] Further, *Hammerberg* was an Indian Financing Act case and did not concern membership or leadership issues as alleged by plaintiffs. Plfs MSJ at 17. Thus, the appeal of elections of tribal officers was not an impediment to BIA proceeding with the Secretarial election to amend the Tribe's constitution.

The absurdity of plaintiffs position - that the Secretarial election could not be held without a direct response to their letter - is clear. Plaintiffs were not even entitled to vote in that election. In short, plaintiffs were not persons adversely impacted by the agency decision to hold the election, 25 C.F.R. § 2.8, and had no standing to delay the Secretarial election in which they had no right to participate.

### 3.    Walter Rosales and Karen Toggery Have No Interest Adversely Affected by the Holding of the Secretarial Election.

Walter Rosales and Karen Toggery did not allege before the IBIA in *Rosales II* that they were entitled to vote in the Secretarial election. Nor do they so allege here. They cite no evidence in the administrative record that they were entitled to vote in the Secretarial election, or to register to vote in that election. They are not original members of the Tribe. AR 2317. Although they disagreed that the 15 living original members had to register to vote, they did not challenge that the registration was limited to those 15 living original members, a class in which they do not belong.

---

[6]Resolving who was elected an officer of the Tribe does not impact the vote of the General Council to have a Secretarial election. As discussed below, a quorum of original members of the Tribe voted to have a Secretarial election, and, as held by IBIA in *Rosales I*, there was no evidence that any persons other than those 23 were members of the Tribe.

Further, plaintiffs do not allege, nor do they cite any document in the administrative record that they attempted to register to vote in the Secretarial election and were denied that opportunity. Plaintiffs cite no evidence that they filed an eligibility dispute with the election board, 25 C.F.R. § 81.13, through which the board, prior to the election, could determine if they were entitled to vote. There is no evidence that plaintiffs exhausted their regulatory remedies and procedures.

Plaintiffs cite no evidence in the administrative record before the BIA or IBIA in *Rosales II* that they applied for and were found admitted as members of the Tribe under an ordinance adopted in accordance with the Tribe's constitution, Art. III. Section 1. AR 2366. Plaintiffs cite no evidence in this administrative record that the original 23 members submitted an enrollment ordinance to the BIA for approval as required by the Tribe's constitution or that it admitted new members. In fact, evidence in the administrative record confirms that no enrollment ordinance was submitted to the agency: "both Agency and Area Office records show that no ordinance or a formal request had been submitted requesting review and approval as required by Article III-MEMBERSHIP Section 3." AR 2337. Nor was such evidence provided in *Rosales I.* 32 IBIA at 166. Indeed, the IBIA in *Rosales I* found that only the original 23 were valid members and Walter Rosales and Karen Toggery did not appeal that decision. Plaintiffs here have no right or standing to challenge an election in which they were not entitled to participate.[2/]

---

[2/]Plaintiffs allege before this court that they "subsequently" submitted evidence to the BIA and the IBIA that a majority of the surviving original 23 "admitted new members." Plfs MSJ at 10. They cite AR0330-0360 - documents submitted in the year 2000, in the administrative record in *Rosales IV*, subsequent to the IBIA decisions in *Rosales I, II,* and *III.* Since judicial review is limited to review of the record in existence at the time of the decision, *Overton Park*, these

Finally, plaintiffs cite no challenge with substantiating evidence that was filed with the election board within the regulatory three day period, 25 C.F.R. § 81.22, after the election was held. Nor do plaintiffs allege that any evidence in the administrative record of *Rosales II* that was ignored by the IBIA in ruling in *Rosales II*.

Plaintiffs, in short, are not "persons whose interests are adversely affected, or whose ability to protect such interests is impeded by the failure of an official to act on a request" objecting to the Secretarial election, within the meaning of 25 C.F.R. § 2.8. A pending appeal in another matter *(Rosales I)* does not preclude other BIA action. Nor does such an appeal give appellants standing to prevent the BIA from holding a Secretarial election in which they have no right to participate. Because plaintiffs were not entitled to vote in the election, they have no right to challenge it. Plaintiffs have suffered no injury in fact and the IBIA dismissal of their claim was not arbitrary and capricious. The IBIA decision in *Rosales II* dismissing their appeal, therefore, withstands judicial review.

### 4.    Additional Argument Raised by Plaintiffs Concerning the Secretarial Election.

Plaintiffs in their briefs challenge the procedures leading to the holding of the Secretarial election, including some issues not raised before the IBIA. They have no standing to do so here. Judicial review is limited to review of the IBIA decision that dismissed their challenge because

---

documents have no impact in the review of *Rosales II*. Further, although these documents include a purported 1994 enrollment ordinance, there is no evidence that the ordinance was provided to the BIA for approval in accordance with the Tribe's constitution, Art. III, Sec. 3. AR 2367. In fact, the administrative record includes a document that the ordinance was not submitted to BIA. AR 2337. Finally, plaintiffs do not argue here or before the IBIA that they were entitled to vote in the Secretarial election and/or were denied that opportunity. They do not dispute that only those surviving original 23 members were eligible to register to vote on the constitutional amendment.

19

they were not persons adversely impacted by any agency action. It is a review based on the administrative record. We respond to these arguments here based on the administrative record in *Rosales II.*

      **a.**   **The Secretarial election was requested by a majority of a quorum of qualified voters.**

Plaintiffs allege that the Jamul Indian Village had not requested a Secretarial election, nor was there a petition requesting the election. Plfs MSJ at 17. They base their challenge on their argument that the BIA could not determine the proper quorum of qualified and registered voters. Plfs MSJ at 18.

The administrative record documents that on November 4, 1995, the tribal council of the Jamul Indian Village requested the Secretary call an election to amend its constitution. Those attending the meeting included original members, as well as others. There was, however, a quorum of 30% of the 15 surviving original members, and they voted unanimously on Resolution 95:47 requesting a Secretarial election to amend their constitution. AR 1707 (listing by name the 5 original members constituting a quorum and voting unanimously to hold a Secretarial election), AR 1446 (Resolution 95.47 passed unanimously), AR 1697 (regarding vote at meeting on Resolution), AR 1444 (listing of the fifteen then living members).[9] The IBIA so

_____

[9]The Secretary of the Interior shall authorize the calling of an election to amend an IRA constitution "when requested pursuant to the amendment article" of the constitution. 25 C.F.R. § 81.5(d). Article IV provides that the general council is composed of all qualified voters of the Village who are 18 years of age or older. AR 2367. Article XI provides that a quorum consists of 30% of the qualified voters. AR 2372. Article XVI of the Jamul Village's constitution provides that a request to amend the constitution can be made by the general council *or* upon receipt of a petition signed by 30% of the qualified voters. AR 2374. Plaintiffs argue that there is "no evidence in the record that a lawful majority of qualified members" requested the Secretarial election. Plfs MSJ at 18, 19. Plaintiffs ignore AR 1707 that lists the members forming the quorum and their unanimous vote. Plaintiffs also apply the wrong standard. The

held. 34 IBIA 50, 51 (1998). Plaintiffs did not allege before IBIA in *Rosales II*, nor do they now cite evidence in that record, that there were other members eligible to request this election.

Only the 15 survivors of the original 23 members were allowed to register and participate in the election and plaintiffs cite no evidence in the administrative record that non-members registered or voted in the Secretarial election.[9] Indeed, plaintiffs concede that all 15 are members of the Tribe. Plfs MSJ at 10. The administrative record also includes declarations from nine of the twelve survivors that they did not support Rosales and Toggery's appeal before the IBIA. AR 1422, 1435-1443.

The BIA limited the voters to the survivors of the original 23 members because it had concluded, as explained by letter dated October 10, 1996, regarding certain 1994 and 1995 elections, AR 2335 at 2337, that no enrollment ordinance had been submitted to the BIA or approved by BIA as required by the Tribe's constitution, and that there was no evidence that those original 23 ever admitted new members in accord with the constitution. Therefore, only original members who voted to adopt the Jamul Village Tribal Constitution on May 9, 1981, (15 still living original members) were entitled to register to vote in the election. This conclusion is

---

constitution requires only a majority vote of the general council when a quorum is present, not a majority vote of all members. Further, it is clear that non-members attending that meeting are not to be counted in determining a majority vote. Plfs MSJ at 8.

[9]Plaintiffs alleged in their letter to BIA before the Secretarial election that none of the 7 who voted were eligible to vote because they did not reside on the reservation. AR 2275. Plaintiffs appear to have abandoned this argument before IBIA and instead argued that all 15 persons were eligible to vote in the Secretarial election, an argument reiterated here. Plfs MSJ at 10. Since plaintiffs cite no evidence in the administrative record, or here, that they were entitled to vote in the Secretarial election, they have no standing to raise any issues concerning the voters' eligibility. Nor did they do so within the regulatory procedures either before the election with the election board, 25 C.F.R. § 81.13, or after the election within 3 days with substantiating evidence. 25 C.F.R. § 81.22

consistent with the subsequent decision in *Rosales I* that only the original 23 persons were

members of the Tribe, a decision not challenged by plaintiffs. 32 IBIA at 166. Contrary to

plaintiffs' allegations, Plfs MSJ at 17,19, the BIA could determine that a lawful majority

requested the Secretarial election, and protected their rights.

   **b.    Plaintiffs have no standing to challenge that the timing of the**
           **Secretarial election rendered it void.**

   Under the IRA, the Secretary shall call and hold an election within 90 days of receipt of a

tribal request for election to ratify an amendment to its constitution. 25 U.S.C. § 476(c)(1)(B).

Plaintiffs argue that the Secretarial election was not held within 90 days of the request for the

election, and thus is void. Plfs MSJ at 21. This court should reject this argument for numerous

reasons.

   First, this argument was not raised before IBIA and thus is not properly before this court.

Under ordinary principles of administrative law a reviewing court will not consider arguments

that a party failed to raise in timely fashion before an administrative agency. *See United States v.*

*L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 36-37 (1952); *Unemployment Compensation Comm'n*

*of Alaska v. Aragon,* 329 U.S. 143, 155 (1946); *Hormel v. Helvering,* 312 U.S. 552, 556-557

(1941); see also 2 K. Davis & R. Pierce, Administrative Law Treatise § 15.8, pp. 341-344 (3d

ed.1994).[19]  The judicially-imposed issue exhaustion requirement – which is analogized "to the

rule that appellate courts will not consider arguments not raised before trial courts," *Sims v.*

---

[19]  The Supreme Court explained: "[O]rderly procedure and good administration require that
objections to the proceedings of an administrative agency be made while it has opportunity for
correction in order to raise issues reviewable by the courts. ... [C]ourts should not topple over
administrative decisions unless the administrative body not only has erred but has erred against
objection made at the time appropriate under its practice." *L.A. Tucker Truck Lines, supra,* at 37.

*Apfel,* 530 U.S. 103, 108-09 (2000), applies to administrative proceedings that are similar to traditional litigation – that is, whether the proceeding before the administrative agency is sufficiently "adversarial," as opposed to "inquisitorial." *Sims,* 530 U.S. at 109-110; *see Osborne v. Babbitt,* 61 F.3d 810, 814 (10th Cir. 1995) (argument not made in BIA probate appeal at agency waived). The IBIA proceedings are adversarial, conducted on the record. *See generally,* 43 C.F.R. §§ 4.1, 4.20-31, 4.310-318. The BIA is represented by government counsel and appellants are represented by their attorneys before the Board. 43 C.F.R. § 4.3.

Second, plaintiffs have no standing to raise this issue as they were not entitled to vote in the election. As to the Constitutional requirements for standing, the Supreme Court in *Defenders of Wildlife v. Lujan,* 504 U.S. 555 (1992) reiterated that a plaintiff seeking to invoke a federal court's jurisdiction must establish: (1) that it has suffered an "injury in fact," which is concrete and particularized, and actual or imminent, not conjectural or hypothetical," 504 U.S. at 560; (2) that its injury is fairly traceable to the challenged action of the defendant, *id.,* and (3) that it is "'likely' as opposed to merely 'speculative'" that the plaintiff's injury will be "'redressed by a favorable decision,'" *Lujan,* 504 U.S. at 561. These three elements constitute the "irreducible minimum" required by Article III of the Constitution. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472 (1982).

Plaintiffs, however, cannot satisfy any of the three requirements. Here, there is no injury in fact because plaintiffs were not entitled to vote in the election, and thus any delay in holding the election did not impact them. Since they had no injury, it is not traceable to defendants. To the extent they allege "injury" because the Tribe's constitution was amended, that "injury" is traceable to the voters, not the defendants. Also, it is not likely that the injury is redressable

here. The only remedy available under the APA is remand to the agency, and as discussed next, the 90 day time period does not create a remedy for a non-qualified voter.

Failure to adhere to time periods in holding an election does not void an election, but instead provides rights to the qualified voters to compel action by the BIA to hold an election. As stated in *Coyote Valley Band of Pomo Indians v. United States*, 639 F. Supp. 165, 173 (E.D. Cal. 1986), prior to the 1988 amendment to the IRA that imposed a time period, "the Secretary has a mandatory duty to call elections" upon a request from an eligible tribe and could not delay the election indefinitely. The court noted that the regulations provide that the Secretary shall authorize the calling of an election upon the request from the tribal government, 25 C.F.R. § 81.5(a). The court found that the use of the word "shall" imposes a nondiscretionary duty on the Secretary to call elections and comports with the language in 25 U.S.C. § 476. *Id.* at 174-75.[1] Contrary to plaintiffs arguments, the statute does not provide that the BIA is "statutorily required to await a fresh request before proceeding to stage such an election" as alleged by plaintiffs. Plfs MSJ at 21. Such an argument conflicts with the reasoning and ruling in *Coyote Valley*.

If anything, the IRA provides the opposite result of that argued here by plaintiffs. The IRA provides that if the Secretary does not approve or disapprove amendments within 45 days from holding the election, that the "Secretary's approval shall be considered as given." 25 U.S.C. § 476(d)(2). Further, the district court in *Thomas v. United States,* 141 F. Supp.2d 1185, 1199 (W.D. Wis. 2001), following remand from the Seventh Circuit on Fed.R.Civ.P. 19 issues, 189

---

[1]Subsequently, Congress amended the IRA to include a timetable for calling an election - thus permitting a mandamus action to compel the calling of it.

24

F.3d 662 (7th Cir. 1999), *cert. denied* 121 S.Ct. 33 (2000), found that the BIA could not

disapprove the amendments outside the 45 day period, even though the Secretary found a

fundamental flaw in the election after the election results had been approved.

Plaintiffs here seek to have this court remand the approval of the amendments, approved

in 1996, to the Department for disapproval outside the 45 day period.  Of note, plaintiffs cite no

case law to support their argument that not holding the election within 90 days would void the

subsequent election and approval.  Further, this issue of reversal of the approval specifically was

not presented before the IBIA in *Rosales II*, AR 2218.  Finally, plaintiffs have no standing here

to challenge the results of an election in which they were not entitled to vote.

Finally, general election law disfavors voiding an election based on a procedural

technicality where the will of the voters is express.  In general, if there is substantial compliance

with the statutes regulating elections, then the election is valid.  And, where an election reflects

the will of the voters, courts are disinclined to set such election aside because of a departure from

a statutory provision as to the time of holding it.  Rather, courts are willing to treat statutory

provision pertaining to the time of holding an election as directory, so as to authorize or permit

the election to be held at a later date, where the person or body charged with the duty of calling

or holding the election has failed or refused to do so.  *Chicago, Milwaukee, St. Paul & Pacific*

*Railroad Co., v. Fallon County*, 28 P.2d 462, 463-464 (Sup. Ct. Montana, 1933), 26 Am. Jur. 2d.

§ 319.

For the foregoing reasons, plaintiffs should fail in their present attempt to have an

election in which they could not vote, which was held outside a 90 day time period, set aside.

       **c.**      **Plaintiffs have no standing to argue that all 15 persons were eligible to vote in the Secretarial election.**

Plaintiffs argue also that the 15 persons did not have to register to vote in the Secretarial election and that the BIA violated the IRA and the National Voter Registration Act, 42 U.S.C. § 1973gg-6, by requiring the 15 to register to vote in the Secretarial election. Plfs MSJ at 22. Plaintiffs also argue that the vote was insufficient to pass the amendment. Plfs MSJ at 26-28.

Plaintiffs erroneously equate members of an Indian tribe with "qualified voters" in a Secretarial election. They disagree with the regulatory requirement that members must register to vote in the election and argue that this requirement is an unlawful removal of voters from a voters list. Plaintiffs have no standing to make this argument that at best could be raised by the 15 living members. Of note, nine of the twelve survivors did not support plaintiffs before the IBIA in *Rosales II.* AR 1422, 1435-1443. Walter Rosales and Karen Toggery did not allege before the IBIA that they were entitled to vote in the Secretarial election or that they were denied the opportunity to register. They therefore lack standing to raise this issue before this court. .

### d. The election was valid.

Assuming arguendo, that plaintiffs had standing, their argument nevertheless fails on its merits. Secretarial elections are federal elections, *Thomas,* 189 F.3d at 667; *Cheyenne River Sioux*, 566 F.2d at 1088, and are governed by the IRA and its implementing regulations. The regulations provide that after receiving a proper request for a Secretarial election, the "authorizing officer" of the BIA calls the election, 25 C.F.R. § 81.1(c). For a reorganized tribe to amend its constitution, only members "who have duly registered shall be entitled to vote." 25 C.F.R. § 81.6(d). "Registration" is "the act whereby persons, who are eligible to vote, become entitled or qualified to cast ballots" in the Secretarial election by having their names placed on the list of persons who will be permitted to vote. 25 C.F.R. § 81.1(o). In other words, tribal

members must register with the election board in order to be "qualified" to vote in the federal

election. Only registered persons are entitled to vote in the federal election, and the sufficiency

of the vote is based upon the number of registered voters who vote, provided a certain

percentage does so. 25 C.F.R. § 81.11(a).

These regulations and their interpretation are entitled to deference. *Chevron, U.S.A., Inc.*

*v. Natural Resources Defense Council,* 467 U.S. 837, 842-43 (1984) ("[C]onsiderable weight

should be accorded to an executive department's construction of a statutory scheme it is

entrusted to administer."), *Coyote Valley,* 639 F. Supp. at 174 (providing great deference to the

Part 81 regulations), *Shakopee Mdewakanton Sioux Community v. Babbitt,* 107 F.3d 667, 671 (8th

Cir. 1997) (providing controlling weight to the Secretary's interpretation of its regulations).

Plaintiffs rely on *Thomas.* Plfs MSJ at 23. Of note, the same registration requirements

were used in *Thomas,* where the 3,659 voting-eligible members of the tribe were told of the need

to register, and 1,130 members did. At the election, 650 votes were cast, and both amendments

passed, with votes of 542-105 and 373 to 274. 141 F. Supp. at 1188, 1189. The court upheld

these results under the IRA.[12] This holding is contrary to the argument of plaintiffs here that

51% of the 15 members of the tribe had to adopt the amendments.

Plaintiffs also rely on *Shakopee Mdewakanton Sioux Community v. Babbitt,* 107 F.3d 667

(8th Cir. 1997). There, the Eighth Circuit upheld the decision of the Secretary disapproving the

---

[12]The registration process is the creation of a voter roll for the Secretarial election. It is not the
removal of persons from an existing federal voter list. It is the same process used in 1981 in
reorganizing the Jamul Indian Village, *compare* AR 2314-16 (petition) with AR 2317 (list of
registered voters). Nor do plaintiffs have standing to raise this issue when they themselves were
not among the original 15, and they were neither entitled to vote in the prior 1981 Secretarial
election, nor removed from any voter list.

results of the Secretarial election within the 45 time period, where the Secretary could not determine if the correct persons voted in the election, and could not determine that there was harmless error.[13] AR 2237. The Secretary's decision was in response to challenges, with substantiating evidence, filed within the regulatory 3 day time period, 25 C.F.R. § 81.22. In addition, challenges to the posted list of registered voters were filed before the election board before the election was held. 25 C.F.R. § 81.13. No similar challenges were filed by plaintiffs here. AR 2233 (distinguishing election at Shakopee from that at Jamul); AR 2235-2244 (Assistant Secretary's decision letter in Shakopee).

The election results on the Jamul constitutional amendment conformed to the amendment article of the Tribe's 1981 constitution. Eight of the 15 eligible members registered and became "qualified voters" "entitled" to vote (25 C.F.R. 81.1(o)); 7 voted in the election which was more than 51% of those "entitled" to vote, and the vote was unanimous. AR 1449. The constitution as amended was approved on October 15, 1996.[14] AR 1450. *Rosales II,* 34 IBIA 50, at 51.

The IBIA decision in Rosales II, holding that plaintiffs' "August 28, 1996, letter did not require a response from BIA beyond a decision as to whether or not to hold the Secretarial election, and that there was no valid challenge to the Secretarial election under 25 C.F.R. § 81.22" is not arbitrary and capricious, or contrary to law. Plaintiffs' arguments to the contrary are without support.

---

[13]Of note, even if Walter Rosales and Karen Toggery challenged the election results with the regulatory time period and alleged that they had been denied the opportunity to register to vote, it would have been harmless error. The vote would have changed from 7-0 to 7-2, assuming plaintiffs would have voted against the amendment.

[14]The amended constitution is located at AR 0543-0553, *Rosales IV.*

**B.     THE IBIA DECISION IN *ROSALES III* IS NOT ARBITRARY OR
        CAPRICIOUS.**

In *Rosales v. Sacramento Area Director,* 34 IBIA 125 (1999), (*Rosales III*), the IBIA

dismissed as moot plaintiffs' challenge to the BIA decision recognizing the results of a 1997

tribal election of officers.  The IBIA reasoned that since the BIA's approval of a subsequent

1999 the tribal election for officers had not been challenged or appealed, appellants challenge to

the prior 1997 election was moot, citing IBIA precedent.  Appellants filed a request for

reconsideration, alleging that the 1999 election was challenged, and the IBIA took the request for

reconsideration under advisement.  AR 1075-56.  The IBIA in *Rosales IV* denied the motion for

reconsideration, letting stand the dismissal of the challenge to the 1997 election as moot, after

finding that the 2001 election of tribal officers was a valid election.  Plaintiffs make no specific

arguments challenging the reasoning in *Rosales III* that subsequent valid elections moot out

challenges to prior elections.  Therefore, the decision in *Rosales III* is not arbitrary and

capricious.

**C.     THE IBIA DECISION IN *ROSALES IV* IS NOT ARBITRARY OR
        CAPRICIOUS.**

In *Rosales v. Pacific Regional Director*, 39 IBIA 12 (2003), (*Rosales IV*), the IBIA

reviewed the BIA's decision upholding a 2001 tribal election of officers.  The IBIA noted that

the results of the Secretarial election to amend the Tribe's IRA constitution were final with the

decision of *Rosales II* on July 29, 1999, and that no evidence was presented that the 2001 tribal

election was conducted in violation of the amended constitution.  The IBIA upheld the approval

of the 2001 election.  The IBIA then denied the motion to reconsider *Rosales III* and found that

the challenges to the prior elections in 1997 and 1999 were moot.

29

The IBIA in *Rosales IV* recognized that a lasting resolution of the issues raised in the series of appeals could occur only with a resolution of the underlying membership questions previously identified in *Rosales I* and requested a report from the BIA Regional Director, and accepted comments from plaintiffs on it.  39 IBIA at 13-14, AR 0035-0040 (status report).  The IBIA noted that the genealogy report confirmed that all 23 original members met the requirements of the Tribe's 1981 constitution, *id.* at 14, and noted that the only voters in the Secretarial election at issue in *Rosales II* were original members.  *Id.* at 15.  The IBIA noted that it had rejected appellants argument that the Tribe could not amend its constitution's ½ blood requirement for membership in *Rosales I*, a decision not challenged by plaintiffs.  *Id.* at 15.  The decision then rejected appellants' argument that the BIA had not addressed the membership issues raised in *Rosales I.*

The IBIA then noted that most of appellants' remaining arguments were based on their contention that the 1996 Secretarial election was invalid.  39 IBIA at 15.  The IBIA noted that the decision in *Rosales II* was final for the Department on July 29, 1999, and the fact that it was decided on procedural grounds rather than substantive grounds "does not enable Appellants to continue to assert their substantive arguments."  *Id.*  "The bottom line . . . is that Appellants failed successfully to challenge the 1996 Secretarial election, and the Village's Constitution was amended to allow membership with a 1/4-degree blood quantum."  *Id.*  The IBIA found that the 2001 tribal election was held after the constitutional amendment was adopted and that appellants "failed to show that the 2001 election was not conducted in accordance with the Constitution[]".  *Id.*  The IBIA held that they did not carry their burden of proving that the BIA committed any reversible error in recognizing the 2001 tribal election results.  *Id.*  The IBIA therefore found the

30

2001 tribal election valid, and that it mooted out challenges to the prior 1997 and 1999 tribal elections. *Id.* at 16.

Plaintiffs argue before this court that *Rosales IV* is arbitrary and capricious because the Tribe's constitution was not lawfully amended: "Plaintiffs have consistently claimed that, since April 22, 1998, there has never been a lawfully called, or lawfully conducted, Secretarial election to amend the original constitution . . ." Plfs MSJ at 30. However, as briefed above, the August 31, 1996, Secretarial election was valid and was never challenged by a qualified voter. Therefore, plaintiffs' argument fails.

Finally, plaintiffs argue also that the BIA did not comply with *Rosales I*'s request to assist the Village's members in addressing their membership and leadership problems. Plfs MSJ at 31. The IBIA in *Rosales IV,* however, rejected this contention, noting that the genealogy report addressed the issues raised in *Rosales I*.[19]

Plaintiffs cite no evidence in the administrative record of *Rosales IV* and make no viable argument that the IBIA decision in *Rosales IV* is arbitrary and capricious.

**CONCLUSION**

---

[19]In short, having verified that all 23 were valid members, it was confirmed that the subsequent votes to amend the constitution were made by legitimate members. Also, as delineated above, Walter Rosales and Karen Toggery have never challenged that persons other than the surviving original members were entitled to vote in that election and never alleged that they tried to register to vote and/or were denied the right to vote in that election. *See also supra* fn.7 above, that no evidence is in the record that the 1994 enrollment ordinance was ever presented to the BIA in accord with the Tribe's constitution.

31

For the foregoing reasons, the IBIA decisions in Rosales II, III, and IV are not arbitrary and capricious or contrary to law and judgment should be entered dismissing plaintiffs' action with prejudice, and denying plaintiffs' motion for summary judgment.

Dated June 14, 2004                    Respectfully submitted,

                                       THOMAS L. SANSONETTI
                                       Assistant Attorney General


                              By:      Electronically Signed
                                       EDWARD J. PASSARELLI  VA Bar # 16212
                                       Senior Counsel
                                       General Litigation Section
                                       Environment & Natural Resources Division
                                       U.S. Department of Justice
                                       P.O. Box 663
                                       Washington, D.C. 20004
                                       Telephone: (202) 305-0468
                                       Fax:       (202) 305-0506

                                       Attorney for Defendants



Of Counsel:
Barbara N. Coen, DC #966374
U.S. Department of the Interior
Division of Indian Affairs
Room 6456, 1840 C Street N.W.
Washington, D.C. 20240
202-208-6526