# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| WALTER J. ROSALES, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, P.O. Box 85, Jamul, California, 91935 | ) ) ) ) |
| | ) |
| KAREN TOGGERY, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TOGGERY, P.O. Box 375, Jamul, California, 91935 | ) ) ) ) ) |
| JAMUL INDIAN VILLAGE, a federally recognized Indian tribe, P.O. Box 612, Jamul, California, 91935. | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) |
| UNITED STATES OF AMERICA, Department of Justice 950 Pennsylvania Avenue, NW Washington, D.C. 20530-0001, and its divisions, including but not limited to, DEPARTMENT OF THE INTERIOR, by and through Secretary DIRK KEMPTHORNE, in his official capacity, 1849 C Street, NW, Washington, D.C. 20240, BUREAU OF INDIAN AFFAIRS, by and through Assistant Secretary of Indian Affairs, JAMES E. CASON, in his official capacity, 1849 C Street. NW, Washington, D.C. 20240, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

**CASE NUMBER:**  **01:07 cv 00162**

**JUDGE:**  **Judge Rosemary M. Collyer**

**DECK TYPE:**  **Tribal Rights**

**DATE STAMP:**

**PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

## PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs submit this emergency motion requesting a temporary restraining order as follows:

1.      That the United States, and its agencies, including, but not limited to, the Department of Interior and Bureau of Indian Affairs, and their officers, agents, servants, employees and attorneys and all persons in active concert with them, or any of them, be temporarily enjoined from, and enjoined from allowing, grading, excavating, operating heavy equipment, moving dirt and/or gravel, or any other construction activities on the parcels now known as 597-080-04, 597-080-05 and 597-080-06, and otherwise mutilating, disinterring, removing, excavating, and disturbing in any way, any Native Americans human remains, and the items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in Cal. Pub. Res. Code 5097.9-5097.99, and 25 U.S.C. § 3001, that have been inhumed, interred, and deposited on the parcels now known as 597-080-04, 597-080-05 and 597-080-06; and

2.      that the United States, and its agencies, including, but not limited to, the Department of Interior and Bureau of Indian Affairs, and their officers, agents, servants, employees and attorneys and all persons in active concert with them, or any of them, be temporarily restrained from approving or allowing any alienation of Plaintiffs' rights to possession and quiet enjoyment of parcel 597-080-04.

Plaintiffs have notified Defendants' counsel of this motion. Defendants' counsel have not yet responded to indicate whether they will oppose.  Webb Decl. ¶ 2.

## I.    AN EMERGENCY TEMPORARY RESTRAINING ORDER IS REQUIRED TO MAINTAIN THE STATUS QUO.

As set out in the Plaintiffs' original moving papers in support of a preliminary injunction, Plaintiffs have been under the imminent threat of the knowing and wilful mutilation, desecration, and disinterment of their families' Native American human remains, and associated funerary objects. On

February 2, 2007, Plaintiffs were also threatened by the opposing tribal faction with an attempt to forcibly remove them from their homes on parcel 597-080-04 (parcel 04).

On March 8, 2007, a large caterpillar tractor used for commercial grading and demolition of houses, trespassed onto the Plaintiffs' beneficially owned parcel 04, and was parked adjacent to their homes. On Saturday, March 10, 2007 at 7:30 a.m. PST, the opposing faction's hired enforcers attempted to forcibly remove the Plaintiffs from their homes on parcel 04. After a four hour stand-off, following a melee involving 50 neighbors and friends, many who were beaten and pepper sprayed while they were trying to protect the Plaintiffs' rights to assemble, petition their government, meet with their attorneys, and be secure in their homes, Plaintiffs received a written promise that the opposing faction would not demolish their homes until close of business on March 16, 2007. Rosales Decl. Ex. D.

Plaintiffs therefore seek this emergency temporary restraining order to prevent any further alienation of their right to possession and quiet enjoyment of their homes and parcel 04, and to prevent any grading excavating, operating of heavy equipment, moving dirt and/or gravel, or any other construction activities on the parcel 04, until such time as the Court rules on Plaintiffs' motion for a preliminary injunction.

As the Court is generally aware, Plaintiffs have a similar state court action for a preliminary injunction to prevent their state government from allowing any grading on parcels 04, 05 and 06. On February 2, 2007, a temporary restraining order was issued by Judge Ronald Prager, prohibiting GMH Manufactured Housing Services from removing certain manufactured housing from parcels 04 and 05. Exhibit A to Webb Decl. In defiance of the court's order, the faction that opposes the Plaintiffs within the tribe, merely hired other un-identified workers to remove the units, which were removed from the property before any further relief could be obtained from the court. Rosales Dec. ¶

3.

On March 8, 2007, heavy construction activity began on the parcels, in that perimeter fencing was being installed along the neighboring property lines, and a very large commercial caterpillar tractor was driven onto parcel 597-080-04, with which to demolish the Plaintiffs houses and perform the grading identified on the Notice of Intent filed with the California Water Resources Control Board, as depicted in the photographs in Exhibit A, and the Notice of Intent in Exhibit B of Rosales Decl. The Acebedo Declaration admits that the opposing faction would commence construction immediately after March 7, 2007.  As set forth in Plaintiffs' Declarations, just moving the tractor onto the property has disturbed the Native American human remains that have been interred there, which disturbance should be immediately restrained, at least until this court has a full and fair opportunity to determine the Plaintiffs' motion for a preliminary injunction. Rosales Decl. ¶ 4.

On March 9, 2007, Plaintiffs sought a further temporary restraining order from Judge Prager against McCarthy Building Companies, Inc.  Judge Prager expressed his consternation that there was a significant threat that the opposing faction would attempt to commence work on Saturday, March 10. However, 18 months previously the opposing faction had an asphalt company pave an additional entrance to the property on the neighboring parcel between 5:00 p.m. on a Friday night and 5:00 p.m. on a Sunday night, to avoid an injunction before the work could be completed.  Webb Decl. ¶ 4.

At 4:45 p.m., PST, Plaintiffs' emergency motion for a further temporary restraining order against McCarthy was continued to Wednesday, March 14, 2007 at 1:30 p.m., upon Dorsey & Whitney's representation, purportedly on behalf of McCarthy, that the caterpillar tractor did not belong to the company, and that McCarthy would not commence any grading or other construction work on the property until Judge Prager had an opportunity to hear the matter on March 14, 2007. Dorsey & Whitney's failure to be granted leave to appear for  the Plaintiff, Jamul Indian Village,

notwithstanding, Dorsey & Whitney would not promise, when asked by the court and Plaintiffs' counsel, whether any other entity other than McCarthy would refrain from commencing work until the judge could properly hear the matter. Webb Decl. ¶ 5.

On Saturday, March 10, 2007, as described in detail in Rosales Decl., outrageously and in conscious disregard of Plaintiffs' First and Fourth Amendment rights to peacefully assemble, petition their government, meet with their attorneys, and be secure in their homes, at 7:30 a.m., PST, the opposing faction's purported security firm attempted to forcibly remove the individual Plaintiffs from their homes. The Plaintiffs' doors were battered down, attempts were made to drag them from their homes, they were struck by metal batons, and threatened with firearms and being maced and pepper sprayed in the face.[1]

Plaintiffs immediately called 911 and their attorneys, seeking the support the San Diego County sheriff's office had promised they would provide to "maintain the peace." After refusing to leave their homes, and upon being further threatened with increasingly escalating bodily harm, to avoid further injury, Walter went outside his home to await the arrival of the San Diego Sheriffs. Karen and her son Ahyule, in the meantime, were physically dragged from their home.

Upon the arrival of 5 sheriff's patrol cars at the adjacent fire station, approximately 50 of Walter and Karen's friends and neighbors arrived to assist in protecting their rights to be secure in

---

[1] These hired enforcers claimed to be operating under the authority of an order from an alternative dispute resolution service provided by a consortium of North San Diego County tribes, before which the Plaintiffs never consented to appear to determine any of the issues already at issue in this lawsuit, concerning their beneficial ownership of parcel 04. The enforcers claimed they were hired by the opposing faction to enforce an order of the Jamul Tribal Court. However, the one and only lawfully created Jamul Tribal Court came into existence in 1995, when Judge Karen Toggery was elected judge. The one and only Jamul Tribal Court has rendered only one judgment to date, against a number of the purported opposing faction members, and is currently pending full faith and credit enforcement under California's Sister State Judgment Act in Jamul Indian Village v. Hunter, San Diego Superior Court Case No. 00698798, where the action has been stayed pending the outcome of the IBIA appeals. See, a copy of the Complaint therein and Judge Bollman's October 21, 1998 stay order Exhibit A

their homes and protect their families' human remains from being further mutilated, desecrated and disinterred. At approximately 9:30 a.m. Walter, his attorney Patrick Webb, and many of the neighbors peaceably walked onto Walter's property from the California ecological preserve immediately to the south of the property and into his house.

Whereupon, the opposing faction's enforcers immediately set upon the peaceful assembly, inside and outside Walter's home, and began striking the people with metal batons, and pepper spraying several individuals in the face. Requests for assistance from the sheriffs were ignored for nearly 15 minutes, during which time paramedics from the immediately adjacent fire station were not permitted to treat the injured. As the attached photograph from the San Diego Union depicts, Exhibit C, as those in the house were attempting to peacefully leave, the enforcers kept pepper spraying them from behind. Such unreasonable and undue force would never be permitted had legitimate law enforcement been on Walter and Karen's property at the time.

After the sheriffs finally permitted the paramedics to treat the injured, several were taken to local hospitals. In the melee that ensued, Plaintiffs' lawyer was assaulted and battered by one of the enforcers, while he was attempting to meet with his clients and summon help from the sheriffs and paramedics. After some time, and the arrival of more than 10 additional sheriffs, the enforcers were separated from the crowd of neighbors and the deputies lined up between the two groups, while Plaintiffs' attorney began negotiations with the sheriffs shuttling various offers from the opposing faction to the Plaintiffs. After four long hours, the Plaintiffs extracted a written agreement from the opposing faction, witnessed by two of the sheriffs, preventing the demolition of Plaintiffs' homes until Friday, March 16, 2007 at 5:00 p.m. A copy of which is attached hereto as Exhibit D. In exchange for this agreement, under duress of personal injury and further bodily harm, Walter and Karen were forcibly prohibited from returning to their homes, while the sheriffs stood by and

6

allowed the use of unreasonable and undue force to prevent them from returning to their homes, despite admitting that Walter and Karen had a Fourth Amendment right to return to their homes. All of their personal belongings, and perishables were then roughly thrown into trucks, hauled and then dumped into two Public Storage units six miles away by members of the opposing faction.

Plaintiffs are obviously threatened with continuing irreparable harm from the imminent mutilation, desecration and disinterment of their families' remains on parcel 04 and 05. Their right to possession and quiet enjoyment of their homes and parcel 04 have now also been irreparably damaged.

Additional grounds for this emergency motion for a temporary restraining order are more particularly stated in the Plaintiffs' original Motion for a Preliminary Injunction and its supporting original and reply Memoranda of Points and Authorities, and incorporated herein by this reference, the supporting Declarations of Walter Rosales, Karen Toggery, and Patrick Webb and the pleadings and records on file in this action, and on such oral and documentary evidence as may be presented at any hearing on this emergency motion.

## II.   A TEMPORARY RESTRAINING ORDER SHALL BE ISSUED TO PREVENT THE POSSIBILITY OF IRREPARABLE INJURY, WHERE, AS HERE, PLAINTIFFS HAVE SUCH A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

A temporary restraining order shall be issued where the plaintiff shows: (1) a likelihood of success on the merits and mere possibility of irreparable injury, or (2) the existence of serious question going to the merits and the balance of hardships tipped in its favor. A 'likelihood of success" exists if the party seeking the injunctive relief shows that it has a *better than negligible* chance of succeeding on the merits. Washington v. Indiana High School Athletic Ass'n, Inc., 181 F.3d 840, 846 (7th Cir. 1999).

**A.    Irreparable Mutilation, Desecration, and Disinterment of Plaintiffs'
Families' Human Remains and Funerary Objects Will Occur Without a
Temporary Restraining Order.**

McCarthy Building Companies Inc., the general contractor/developer of the opposing

faction's impermissible attempt to build a gambling casino on Plaintiffs' beneficially owned

property, has only agreed to forestall grading and construction activities until March 14, 2007.

Hence, a temporary restraining order should be issued to maintain the status quo until the

Plaintiffs' motion for a preliminary injunction can be determined after a full and fair opportunity

for review by the Court.

The government's fiduciary duty and general trust responsibility over Native Americans

compels it to enforce the NAGPRA regulations against tribal and non-tribal third parties who

threaten the Plaintiffs' families' human remains and funerary objects with mutilation, desecration

and disinterment.  Yankton Sioux  I, 83 F.Supp.2d 1047 (D. S.D. 2000), Yankton Sioux II, 209

F. Supp.2d 1008, 1021-22 (D.S.D. 2002), and Yankton Sioux III, 258 F. Supp.2d 1027, 1032-5

(D.S.D. 2003); San Carlos Apache Tribe v. U.S. 272 F. Supp. 2d 860, 888-90 (D. Ariz. 2003).

The government's duties under NAGPRA specifically include restraining such third

parties from excavation, operation of heavy equipment, movement of dirt and gravel, or any other

construction activities on the site of all burial grounds, human remains, and associated funerary

objects. Yankton Sioux II, 209 F. Supp.2d 1008, 1021-22 (D.S.D. 2002), and Yankton Sioux III,

258 F. Supp.2d 1027, 1032-5 (D.S.D. 2003).

In Yankton Sioux II and III, the Courts granted both a preliminary and ultimately

stipulated  continuing injunction to maintain the status quo, which included "that the Court order

defendants to cease all construction activity at location A [the site of the human remains]," based

upon: (1) the threat of irreparable harm to the plaintiffs' human remains and funerary objects

8

from construction activities at the site of their discovery; (2) the balance of harm tipping in favor of the plaintiffs given the inherently sensitive nature of the human remains and funerary objects, and the minimal harm to the third party State contractors, and the fact that there could be no harm to the Federal defendants since they were already compelled to comply with NAGPRA; (3) the fact that it was probable that plaintiffs would prevail "on at least some of their NAGPRA claims," since, as here, the government was wrong to assert that it need not comply with the requirements of 10.3(b) with regard to inadvertent discoveries of human remains, which ultimately supported a stipulated continuing injunction restraining construction at the site of the human remains; and (4) the public interest, since Congress directed the protection of such Native American cultural items in NAGPRA, given the plaintiffs' beliefs about how disturbance of the families' remains affects plaintiffs' lives. 209 F. Supp.2d 1008, 1022-24, and 258 F. Supp.2d 1027, 1032-34.

Therefore, a temporary restraining order preventing any grading or other similar construction work should be issued here, until such time as the Court has a full and fair opportunity to rule upon the Plaintiffs' motion for a preliminary injunction.

**B.      Plaintiffs Have been Forcibly, Irreparably and Illegally Removed From Their Homes, Which Will Be Destroyed, Commencing on March 16, 2007, Absent a Temporary Restraining Order.**

Plaintiffs cannot be forcibly removed from their own beneficially owned homes on parcel 04.  The enforcers for the opposing faction trespassed on the Plaintiffs' beneficial interest in parcel 04, and illegally and physically removed the Plaintiffs from their homes on March 10, 2007.  The government still has a fiduciary obligation to prevent such alienation of the Plaintiffs' beneficial interest in parcel 04.

Federal courts routinely grant injunctions to protect Indian beneficial owners from

trespass on land held in trust for them by the United States. Just as with the duties under

NAGPRA, the government has a fiduciary obligation under its general trust responsibility over

Indians to protect an individual Indian's designated beneficial interest in trust property held in the

name of the United States, from any alienation or trespass by tribal or non-tribal third parties.

Coast Indian Comty v. U.S. (Fed. Cl. 1977) 550 F.2d 639, 654.[2] Even the government admits at

30-31 of its opposition to Plaintiffs' motion for a preliminary injunction, that "an individual

Indian's rights in..unallotted property arises ...upon individualization," citing U.S. v. Jim 409

U.S. 80, 82 (1972).

    As discussed at the February 16 hearing, the government's trust responsibility does

require the prevention of trespass by tribal and non-tribal third parties. See for e.g., Comanche

Nation v. U.S., 393 F.Supp.2d 1196, 1211 (W.D. Okla. 2005), where a preliminary injunction

was granted to maintain the status quo, preventing transfer of the trust property in question to the

third party, Fort Sill Apache tribe, since there were "serious, substantial and difficult questions

going to the merits," requiring further litigation. Similarly, in Keechi v. U.S., 604 F.Supp. 267

(D.D.C. 1985), "[t]he land thus held by the United States as trustee," was "'not subject to

alienation or encumbrance by [the Indian beneficiary], except with the consent of the United

States Government.'" Id., at 270. Hence, the government can be enjoined from allowing any

---

[2] The fiduciary "duty to protect [individual Indian] rights is the same whether the infringement is by nonmembers or by members of the tribe." Seminole Nation of Okla. v. Norton, 223 F. Supp.2d 122, 137-38, 146-47 (D.D.C. 2002); Milam v. United States, 10 Indian Law Reporter ("ILR") 3013, 3017 (D.D.C. Dec. 23, 1982). Hence, whether there is an intra-tribal dispute in Jamul (which Defendants erroneously call an "intertribal" dispute, Opp. 27, n.19) or whether the trespassers are non-tribal third parties, is not relevant to the government's fiduciary duties to protect both the individual Indians and the tribe. Where plaintiffs question not only the propriety of non-tribal third parties efforts to co-opt tribal affairs, as here, "but the acts of federal officials in approving a tribal action," the matter is no longer merely an intra-tribal dispute and is not insulated from federal court review. Milam, at 3015, citing Harjo v. Kleppe, 420 F. Supp. 1110, 1117 (D.D.C. 1976), aff'd sub nom. Harjo v. Andrus 581 F.2d 949 (D.C. Cir. 1978); U.S. v. Pawnee Business Council, 382 F. Supp. 54, 59 (N.D. Okla 1974). "As trustee, the United States is charged with the responsibility of

alienation or trespass of the individual Indian's beneficial interest in such trust property. The extent of the government's trust responsibility to prevent trespass and other alienation of trust property has long been a tenet of federal Indian law.

> Having assumed the duty of securing the use and occupancy of these lands to the [Omaha and Winebago] Indians, and being charged with the duty of enforcing the provisions of the acts of congress forbidding all alienations of the lands...the government of the United States, through the executive branch thereof, has the right to invoke the aid of the courts, by mandatory injunction and other proper process, to compel parties wrongfully in possession of the lands held in trust by the United States for the Indians to yield the possession thereof, and to restrain such parties from endeavoring to obtain or retain the possession of these lands in violation of law.

U.S. v. Flournoy Live-Stock & Real-Estate Co., 69 F. 886, 894 (D. Neb. 1895). The government's fiduciary relationship will "arise[] when the Government assumes...control over...property belonging to Indians." U. S. v. Mitchell, 463 U.S. 206, 225 (1983). Such a relationship may also be created where property is purchased, as here, by the government for the express benefit of individual Indians under 25 U.S.C. 465.[3] Coast Indian Comty v. U.S., 550 F.2d 639, 642-44 (Fed. Cl. 1977); Pyramid Lake Paiute Tribe of Indians v. Morton, 354 F. Supp. 252, 254 (D.D.C. 1973)(executive order setting aside public lands for exclusive use of Indians imposes fiduciary duty upon government to protect those rights); U.S. v. Wilson, 881 F.2d 596, 599 (9th Cir. 1989)(citing Coast, supra).

III. **JUDGE KESSLER'S MARCH 8, 2007 SUMMARY JUDGMENT ORDER DOES NOT AFFECT PLAINTIFFS' NAGPRA OR BENEFICIAL OWNERSHIP CLAIMS IN THIS ACTION.**

Contrary to the government's March 9, 2007 request to submit Judge Kessler's summary

---

safeguarding, from both external and internal threats...the political rights of Indians." Milam at 3015.

[3] Thus, falling with the Defendants' admission that "enforceable governmental trust obligations" can be "anchored by statute or regulation." Opp. at 34.

11

judgment order in <u>Rosales v. U.S. et al.</u> D.C. D. Case No. 1:03CV01117, as supplemental

authority in this action, who speaks for the lawfully elected leadership of the tribe is not relevant

to the individual Plaintiffs' NAGPRA claims, nor to their beneficial ownership claims in parcel

04.

      The government cannot deny its own FOIA response, Complaint, Exhibit E, confirming

that parcel 04 has never been known as the Jamul Indian Village, and that the title conveyed to

the United States in the original grant deed for what is now known as parcel 04, Complaint

Exhibit D, has never been transferred to the subsequently and federally recognized tribe, known

as the Jamul Indian Village.

      Hence, the tribe is not, and cannot be, an indispensable party to the Plaintiffs' individual

NAGPRA claims to protect their families' human remains and funerary objects as lineal

descendants, which claims exist separate and apart from whether the Plaintiffs are members or

leaders of the tribe or not.

      Similarly, with regard to Plaintiffs' beneficial ownership claims in parcel 04, the tribe is

not, and cannot be, an indispensable party since the government's own records confirm the tribe

has never been either the titled owner, nor the beneficial owner of parcel 04.

      Most importantly, no matter who is ultimately determined to be the lawfully elected

leaders of the tribe, authorized to appear in this action as a party, no one has submitted any

admissible evidence to this Court that the federally recognized tribal entity, known as the Jamul

Indian Village, has ever owned or lawfully exercised federally recognized governmental authority

over parcel 04. Hence, the fact that the opposing faction seeks to cloak its unlawful attempts to

usurp "beneficial ownership" of parcel 04 from the individual Plaintiffs with some kind of

sovereign immunitty, until there is sufficient admissible evidence to create a triable issue of

material fact as to the entity's ownership or federally recognized governmental authority over

parcel 04, this Court must conclude as did the Federal Court of U.S. Claims in Coast Indian

Commty. v. U.S. 550 F.2d 639 (Fed. Cl. 1977) that the parcel is beneficially owned by the

Plaintiffs, as a matter of law.

Therefore, based upon the only admissible evidence before the court, Compl. Exs. D and

E, as a matter of law, the tribe cannot be held to be an indispensable party to the Plaintiffs'

litigation of their beneficial ownership of parcel 04.  To find otherwise, would sanction any

recognized tribe laying claim to any property in the United States, and forcibly evicting all others

from that property, and then claiming that because they are a federally recognized tribal entity

they cannot be sued for alienation of the property from the rightfully titled and beneficial owners.

Such is not, and has never been the law.

## IV.    CONCLUSION

Therefore, for the foregoing reasons the Court is required to issue the requested

temporary restraining order to preserve the status quo and prevent the threatened and continuing

irreparable trespass, mutilation, desecration, and disinterment of Plaintiffs' human remains, and

associated funerary objects, at least until such time as the Court has had a full and fair

opportunity to determine Plaintiffs' motion for a preliminary injunction.


Dated: March 12, 2007                    **BOIES, SCHILLER & FLEXNER LLP**

                                         /s/ Louis G. Smith
                                         William A. Isaacson, Esq., D.C. Bar No. 414788
                                         Tanya Chutkan, Esq., D.C. Bar No. 420478
                                         Louis G. Smith, Esq., D.D.C. Bar No. D00299
                                         **BOIES, SCHILLER & FLEXNER LLP**
                                         5301 Wisconsin Avenue, N.W. Ste 800
                                         Washington, District of Columbia 20015

Tel (202) 237-2727
Fax (202) 237-6131


**WEBB & CAREY**

/s/ Patrick D. Webb
Patrick D. Webb, Esq., Calif. Bar No. 82857
**WEBB & CAREY**
401 B Street, Suite 306
San Diego, Calif. 92101
Tel (619) 236-1650
Fax (619) 236-1283


Attorneys for WALTER ROSALES, KAREN TOGGERY, JAMUL INDIAN VILLAGE, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TOGGERY

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

WALTER J. ROSALES, ESTATE OF     )
HELEN CUERO, ESTATE OF DEAN    )
ROSALES, P.O. Box 85, Jamul, California, )
91935     )
     )
KAREN TOGGERY, ESTATE OF MARIE )
TOGGERY, ESTATE OF MATTHEW   )
TOGGERY, P.O. Box 375, Jamul,    )
California, 91935     )
     )
JAMUL INDIAN VILLAGE, a federally  )
recognized Indian tribe, P.O. Box 612,  )
Jamul, California, 91935.     )
            Plaintiffs,    )
vs.     )
UNITED STATES OF AMERICA,    )
Department of Justice     )
950 Pennsylvania Avenue, NW    )
Washington, D.C. 20530-0001,    )
and its divisions, including but not limited )
to, DEPARTMENT OF THE INTERIOR, )
by and through Secretary DIRK    )
KEMPTHORNE, in his official capacity, )
1849 C Street, NW,     )
Washington, D.C. 20240,    )
BUREAU OF INDIAN AFFAIRS, by and )
through Assistant Secretary of Indian  )
Affairs, JAMES E. CASON, in his official )
capacity, 1849 C Street. NW, Washington, )
D.C. 20240,     )
            Defendants.    )
     )

**CASE NUMBER:**    **1:07 CV 00162**

**JUDGE:**    **Rosemary Collyer**

**DECK TYPE:**    **Tribal Rights**

**DATE STAMP:**

**DECLARATION OF PATRICK D. WEBB IN
SUPPORT OF PLAINTIFFS' EMERGENCY
MOTION FOR A TEMPORARY
RESTRAINING ORDER**

I, PATRICK D. WEBB, declare:

1.　　I am an attorney licensed to practice law before all the courts of the State of California, and a shareholder and employee of Webb & Carey, A.P.C.., and counsel for Plaintiffs. I have personal knowledge of the matters set forth herein and if called upon as a witness I would and could competently testify thereto.

2.　　I have notified counsel for Defendants of our intent to file this emergency motion. Defendants' counsel has not yet responded to indicate whether they will oppose.

3.　　Plaintiffs have a similar state court action for a preliminary injunction to prevent their state government from allowing any grading on parcels 04, 05 and 06 in San Diego Superior Court Case No. 878709.  On February 2, 2007, a temporary restraining order was issued by Judge Ronald Prager, prohibiting GMH Manufactured Housing Services from removing certain manufactured housing from parcels 04 and 05, which is attached to this declaration as Exhibit A.

4.　　On March 9, 2007, Plaintiffs sought a further temporary restraining order from Judge Prager against McCarthy Building Companies, Inc., which was the developer/general contractor identified on the Notice of Intent filed with the California Water Resources Control Board to comply with the Clean Water Act.  Judge Prager expressed his consternation that there was a significant threat that the opposing faction would attempt to commence work on Saturday, March 10. However, 18 months previously the opposing faction had an asphalt company pave an additional entrance to the property on the neighboring parcel between 5:00 p.m. on a Friday night and 5:00 p.m. on a Sunday night, to avoid an injunction before the work could be completed.

2

5.      At 4:45 p.m., PST, Plaintiffs' emergency motion for a further temporary restraining order against McCarthy was continued to Wednesday, March 14, 2007 at 1:30 p.m., upon Dorsey & Whitney's representation, purportedly on behalf of McCarthy, that the caterpillar tractor did not belong to the company, and that McCarthy would not commence any grading or other construction work on the property until Judge Prager had an opportunity to hear the matter on March 14, 2007.  Dorsey & Whitney's failure to be granted leave to appear for  the Plaintiff, Jamul Indian Village, notwithstanding, Dorsey & Whitney would not promise, when asked by the court and myself, whether any other entity other than McCarthy would refrain from commencing work until the judge could properly hear the matter.

6.      In the melee that ensued, on March 10, 2007 at Walter Rosales' home, I was assaulted and battered by one of the opposing faction's enforcers, while I was attempting to meet with my clients at their homes and summon help from the sheriffs and paramedics.

7.      After four long hours, on March 10, 2007, the Plaintiffs extracted a written agreement from the opposing faction, witnessed by two of the sheriffs and myself, preventing the demolition of Plaintiffs' homes until Friday, March 16, 2007 at 5:00 p.m. A copy of which is attached to the motion as Exhibit D. In exchange for this agreement, under duress of personal injury and further bodily harm, Walter Rosales and Karen Toggery were forcibly prohibited from returning to their homes, while the sheriffs stood by and allowed the use of unreasonable and undue force to prevent them from returning to their homes, despite admitting that Walter and

3

Karen had a Fourth Amendment right to return to their homes.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 12th day of February 2007 in San Diego, California.

/s/ Patrick D. Webb_____
Patrick D. Webb

4

EXHIBIT A

1
2
3    F I L E D
     Clerk of the Superior Court

4
5    FEB 0 2 2007

     By: K SANDOVAL, Deputy
6
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF SAN DIEGO

10   WALTER ROSALES, KAREN              )    Case No.  GIC 878709
     TOGGERY, JAMUL INDIAN VILLAGE,     )
11   ESTATE OF HELEN CUERO, ESTATE      )
     OF DEAN ROSALES, ESTATE OF         )    TEMPORARY RESTRAINING ORDER
12   MARIE TOGGERY, ESTATE OF           )
     MATTHEW TOGGERY,                   )
13                                      )
               Plaintiffs,              )
14                                      )
     v.                                 )
15                                      )
     STATE OF CALIFORNIA, and its NATIVE)
16   AMERICAN HERITAGE COMMISSION       )
     and WATER RESOURCES CONTROL        )
17   BOARD, and DOES 1-20,              )
                                        )
18             Defendants.              )
                                        )
19   _____)

20         Plaintiffs, WALTER ROSALES, KAREN TOGGERY, JAMUL INDIAN VILLAGE,

21   ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, ESTATE OF MARIE

22   TOGGERY, ESTATE OF MATTHEW TOGGERY, ex parte motion for a temporary restraining

23   order, came on regularly for hearing on February 2, 2007, at 8:30 a.m. in the above-entitled court,

24   Department 71, the Hon. Ronald Prager, presiding. Patrick Webb of WEBB & CAREY,

25   appeared on behalf of Plaintiffs, and after due notice of this exparte motion to Defendant, GMH

26   Manufactured Housing Services, but without its appearance, and after considering the parties'

27   papers and hearing oral argument, and good cause appearing:

28

                                          1
     NOTICE OF MOTION FOR PRELIMINARY INJUNCTION

1      IT IS ORDERED that Defendant GMH Manufactured Housing Services, and their

2   officers, agents, servants, employees and attorneys and all persons in active concert with them, or

3   any of them, be temporarily restrained, until further order of the court on March 19, 2007, from

4   removing any manufactured housing units, grading, excavating, operating heavy equipment,

5   moving dirt and/or gravel, or any other construction activities on the parcels now known as 597-

6   080-04, 597-080-05 and 597-080-06, and otherwise mutilating, disinterring, removing,

7   excavating, and disturbing in any way, any Native American human remains, and the items

8   associated with their human remains, including, but not limited to grave goods, cultural items,

9   associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in Cal.

10   Pub. Res. Code 5097.9-5097.99, and 25 U.S.C. 3001, that have been inhumed, interred, and

11   deposited on the parcels now known as 597-080-04, 597-080-05 and 597-080-06.

12   Dated: February 2, 2007

13

14                           RONALD S. PRAGER
                                Ronald Prager
                                Superior Court Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION FOR PRELIMINARY INJUNCTION

William A. Isaacson, Esq., DC Bar No. 414788
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Avenue, N.W. Ste 800
Washington, District of Columbia 20015
Tel  (202) 237-2727
Fax (202) 237-6131

Patrick D. Webb, Esq., CA State Bar No. 82857
**WEBB & CAREY**
401 B Street, Suite 306
San Diego, Calif. 92101
Tel  (619) 236-1650
Fax (619) 236-1283

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| WALTER J. ROSALES, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, P.O. Box 85, Jamul, California, 91935 ) ) ) ) | **CASE NUMBER:**   1:07 CV 00162 |
| KAREN TOGGERY, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TOGGERY, P.O. Box 375, Jamul, California, 91935 ) ) ) ) ) | **JUDGE:**     **Rosemary Collyer**<br><br>**DECK TYPE:**    **Tribal Rights**<br><br>**DATE STAMP:** |
| JAMUL INDIAN VILLAGE, a federally recognized Indian tribe, P.O. Box 612, Jamul, California, 91935. ) ) ) | **DECLARATION OF WALTER ROSALES IN SUPPORT OF PLAINTIFFS' MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER** |

WALTER J. ROSALES, ESTATE OF
HELEN CUERO, ESTATE OF DEAN
ROSALES, P.O. Box 85, Jamul, California,
91935

KAREN TOGGERY, ESTATE OF MARIE
TOGGERY, ESTATE OF MATTHEW
TOGGERY, P.O. Box 375, Jamul,
California, 91935

JAMUL INDIAN VILLAGE, a federally
recognized Indian tribe, P.O. Box 612,
Jamul, California, 91935.
                    Plaintiffs,
vs.
UNITED STATES OF AMERICA,
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001,
and its divisions, including but not limited
to, DEPARTMENT OF THE INTERIOR,
by and through Secretary DIRK
KEMPTHORNE, in his official capacity,
1849 C Street, NW,
Washington, D.C. 20240,
BUREAU OF INDIAN AFFAIRS, by and
through Assistant Secretary of Indian
Affairs, JAMES E. CASON, in his official
capacity, 1849 C Street. NW, Washington,
D.C. 20240,
                    Defendants.

I, WALTER J. ROSALES declare:

1.     I have personal knowledge of the matters set forth herein and if called upon as a
witness I would and could competently testify thereto.

2.     I am a Native American resident of San Diego County of one-half or more degree
of California Indian blood, and am an enrolled member and lawfully elected officer of the
Plaintiff, JAMUL INDIAN VILLAGE (hereinafter VILLAGE), and duly authorized to file this
action on behalf of the VILLAGE, which is a tribal governmental entity of Kumeyaay Indians,
recognized by the United States' Congress, governed by a Constitution adopted on May 9, 1981,
pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. 461 et seq., and located in Jamul,
California.

3.     Subsequent to the execution and filing of San Diego Superior Court Judge
Pragers' February 2, 2007 temporary restraining order, other un-identified workers removed
three manufactured housing units from parcel 04 and 05, before any further relief could be
obtained from the court.

4.     On March 8, 2007, heavy construction activity began on the parcels, in that
perimeter fencing was being installed along the neighboring property lines, and a very large
commercial caterpillar tractor was driven onto parcel 04, with which to demolish our houses and
perform the grading identified on the Notice of Intent filed with the California Water Resources
Control Board, as depicted in the photographs in Exhibit A, and the Notice of Intent in Exhibit
B. Just moving the tractor onto the property has disturbed the Native American human remains
that have been interred there.

5.     On Saturday, March 10, 2007, outrageously and in conscious disregard of Karen
and my  First and Fourth Amendment rights to peacefully assemble, petition our government,

1

meet with our attorneys, and be secure in our homes, at 7:30 a.m., PST, the opposing faction's

purported security firm of rent-a-thugs attempted to forcibly remove Karen and I from our

homes. In true armed, jack-booted, storm trooper fashion, these thugs battered down Karen's

door, physically attempted to drag us from our homes, struck us with metal batons, and

threatened us with firearms and being maced and pepper sprayed in the face.

6.    We immediately called 911 and our attorney, Patrick Webb, seeking the support

the San Diego County sheriff's office had promised they would provide to "maintain the peace."

After refusing to leave our homes, and upon being further threatened with increasingly escalating

bodily harm, to avoid further personal injury and death, I went outside my home to await the

arrival of the San Diego Sheriffs. Karen and her son Ahyule, in the meantime, were physically

dragged from their home by the rent-a-thugs.

7.    Upon the arrival of 5 sheriff's patrol cars at the adjacent fire station,

approximately 50 of our friends and neighbors arrived to assist in protecting our rights to be

secure in our homes and protect our families' human remains from being further mutilated,

desecrated and disinterred. At approximately 9:30 a.m. I and my attorney, Patrick Webb, and

many of the neighbors peaceably walked onto my property from the California ecological

preserve immediately to the south of the property and into my house.

8.    Whereupon, the rent-a-thugs immediately set upon us, inside and outside my

home, and began striking and beating the us with metal batons, and pepper spraying several

individuals in the face. Screams for assistance from the sheriffs were ignored for nearly 15

minutes, during which time paramedics from the immediately adjacent fire station were not

permitted to treat the injured. As the attached photograph from the San Diego Union depicts,

Exhibit C, as those in the house were attempting to peacefully leave, the rent-a-thugs kept pepper

2

spraying them from behind. Such unreasonable and undue force would never be permitted had legitimate law enforcement been on our property at the time.

9.     After the sheriffs finally permitted the paramedics to treat the injured, several were taken to local hospitals. In the melee that ensued, my lawyer was assaulted and battered by one of the rent-a-thugs, while he was attempting to meet with us and summon help from the sheriffs and paramedics. After some time, and the arrival of more than 10 additional sheriffs, the rent-a-thugs were separated from the crowd of neighbors and a phalanx of deputies lined up between the two groups, while my lawyer began negotiations with the sheriffs, shuttling various offers from the opposing faction to us. After four long hours in the sun, Karen and I extracted a written agreement from the opposing faction, witnessed by two of the sheriffs, preventing the demolition of our homes until Friday, March 16, 2007 at 5:00 p.m. A copy of which is attached hereto as Exhibit D. In exchange for this illegally extorted agreement, under duress of personal injury and further bodily harm, Karen and I were forcibly prohibited from returning to our homes, while the sheriffs stood by and allowed the use of unreasonable and undue force to prevent us from returning to our homes, despite admitting that we had a Fourth Amendment right to return to our homes.

10. All of our personal belongings and perishables were then roughly thrown into trucks, hauled and then dumped into two Public Storage units six miles away by members of the opposing faction.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 11th day of March 2007 in Jamul, California.

_Walter Rosales_
Walter Rosales

4

EXHIBIT A





EXHIBIT B




**NOTICE OF INTENT**
TO COMPLY WITH THE TERMS OF THE
GENERAL PERMIT TO DISCHARGE STORM WATER
ASSOCIATED WITH CONSTRUCTION ACTIVITY (WQ ORDER No. 99-08-DWQ)

## I. NOI STATUS (SEE INSTRUCTIONS)

MARK ONLY ONE ITEM    1 [x] New Construction    2. [ ] Change of Information for WDID#

## II. PROPERTY OWNER

| Name Jamul Indian Village | Contact Person Lee Acebedo |
|---|---|
| Mailing Address P.O. Box 612 | Title Tribal Chairman |
| City Jamul | State CA | Zip 91935 | Phone (619) 669-4785 |

## III. DEVELOPER/CONTRACTOR INFORMATION

| Developer/Contractor McCarthy Building Companies, Inc. | Contact Person Brent Newby |
|---|---|
| Mailing Address 6165 Greenwich Drive, Suite 340 | Title Preconstruction Director |
| City San Diego | State CA | Zip 92122 | Phone 858-784-0347 |

## IV. CONSTRUCTION PROJECT INFORMATION

| Site/Project Name Jamul Indian Village Casino and Resort Project | Site Contact Person Brent Newby |
|---|---|

| Physical Address/Location 14191 Highway 94 | Latitude n/a ° | Longitude n/a ° | County San Diego |

| City (or nearest City) Jamul | Zip 91935 | Site Phone Number n/a | Emergency Phone Number |

A. Total size of construction site area: 8.9 Acres

B. Total area to be disturbed: 7.2 Acres (% of total 81 )

C. Percent of site imperviousness (including rooftops):

Before Construction: 34 %

After Construction: 84 %

D. Tract Number(s): n/a

E. Mile Post Marker: n/a

F. Is the construction site part of a larger common plan of development or sale?    [ ] YES  [x] NO

G. Name of plan of development: n/a

H. Construction commencement date: 10/09/06

I. % of site to be mass graded: 68

J. Projected construction dates:

Complete grading 04/09/07    Complete project 10/09/08

K. Type of Construction (Check all that apply):

1. [ ] Residential    2. [x] Commercial    3. [ ] Industrial    4. [ ] Reconstruction    5. [ ] Transportation

6. [ ] Utility    Description: _____    7. [ ] Other (Please List): _____

## V. BILLING INFORMATION

| SEND BILL TO [x] OWNER (as in II. above) | Name | Contact Person |
|---|---|---|
| [ ] DEVELOPER (as in III. above) | Mailing Address | Phone/Fax |
| [ ] OTHER (enter information at right) | City | State | Zip |

A. Has a local agency approved a required erosion/sediment control plan? ........................................ YES ☐  NO ☒

Does the erosion/sediment control plan address construction activities such as infrastructure and structures? ........................ YES ☒  NO ☐

Name of local agency: _____ n/a _____   Phone: _n/a_

B. Is this project or any part thereof, subject to conditions imposed under a CWA Section 404 permit of 401 Water Quality Certification? ........ YES ☐  NO ☒

If yes, provide details _____

## VII. RECEIVING WATER INFORMATION

A. Does the storm water runoff from the construction site discharge to (Check all that apply):

1. ☒  Indirectly to waters of the U.S.

2. ☐  Storm drain system - Enter owner's name: _____

3. ☐  Directly to waters of U.S. (e.g. , river, lake, creek, stream, bay, ocean, etc.)

B. Name of receiving water: (river, lake, creek, stream, bay, ocean): _____

## VIII. IMPLEMENTATION OF NPDES PERMIT REQUIREMENTS

A. STORM WATER POLLUTION PREVENTION PLAN (SWPPP) (check one)

☐  A SWPPP has been prepared for this facility and is available for review.  Date Prepared: __/__/__  Date Amended: __/__/__

☒  A SWPPP will be prepared and ready for review by (enter date):   10/09/06

☒  A tentative schedule has been included in the SWPPP for activities such as grading, street construction, home construction, etc.

B. MONITORING PROGRAM

☒  A monitoring and maintenance schedule has been developed that includes inspection of the construction BMPs before anticipated storm events and after actual storm events and is available for review.

If checked above: A qualified person has been assigned responsibility for pre-storm and post-storm BMP inspections to identify effectiveness and necessary repairs or design changes. ........................ ☒ YES  ☐ NO

Name: _____   Phone: _____

C. PERMIT COMPLIANCE RESPONSIBILITY

A qualified person has been assigned responsibility to ensure full compliance with the Permit, and to implement all elements of the Storm Water Pollution Prevention Plan including:

1. Preparing an annual compliance evaluation ........................ ☒ YES  ☐ NO

Name: _____   Phone: _____

2. Eliminating all unauthorized discharges ........................ ☒ YES  ☐ NO

## IX. VICINITY MAP AND FEE (must show site location in relation to nearest named streets, intersections, etc.)

Have you included a vicinity map with this submittal? ........................ ☒ YES  ☐ NO

Have you included payment of the annual fee with this submittal? ........................ ☒ YES  ☐ NO

## X. CERTIFICATIONS

"I certify under penalty of law that this document and all attachments were prepared under my direction and supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine or imprisonment. In addition, I certify that the provisions of the permit, including the development and implementation of a Storm Water Pollution Prevention Plan and a Monitoring Program Plan will be complied with."

Printed Name: _Julia Lotta_

Signature: _Julia Lotta_   Date: _10/24/06_

Title: _Secretary / Treasurer_

## Figure 1 -- Plan Vicinity Map



# STORM WATER POLLUTION PREVENTION PLAN
# JAMUL CASINO AND RESORT PROJECT
# VICINITY MAP

### Project Area Topography

EXHIBIT C



EXHIBIT D



3/10/07

To Mr Patrick Webb

Re:    Walter Rosales and Karen Toggery
       Residences —

I agree, as Tribal Chairman for the Jamul
Indian village, that we will not
demolish the residences of Walter Rosales
and Karen Toggery, until after the
close of business, March 16, 2007.
     The Executive Committee of the Jamul Indian
village will meet on Wednesday to further
affirm my decision.
     The Tribe will remain in lockup, at cost
$125 each (total) every day until Mar 16, 2007
                    Jim Adolfo
                    Chairman

                    Jay Chambers, Captain
                    Hope Hackwise

              Witnessed by    Paul Webb