**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WALTER J. ROSALES, et al., | ) | **CASE NUMBER:     01:07 cv 00162** |
| | ) | |
| Plaintiffs, | ) | **JUDGE:     Judge Rosemary M. Collyer** |
| vs. | ) | |
| | ) | **DECK TYPE:     Tribal Rights** |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | **DATE STAMP:** |
| Defendants. | ) | |
| | ) | |
| | ) | **PLAINTIFFS' OPPOSITION TO THE GOVERNMENT'S** |
| | ) | **MOTION FOR LEAVE TO FILE SURREPLY** |

Plaintiffs submit this opposition to Defendants' motion for leave to file a surreply.

## I.     THE GOVERNMENT'S PROPOSED SURREPLY IS NOT PERMITTED.

District of Columbia Local Rule 5.1(i) provides: "A paper that does not conform to the requirements of this Rule and Rule 10(a) of the Federal Rules of Civil Procedure shall not be accepted for filing." Surreplies are only permitted where the party seeking supplemental briefing (1) seeks to address new matters raised in a reply, and (2) is otherwise unable to respond to those new matters: "[a] surreply may be filed only be leave of Court, and only to address new matters raised in a reply to which a party would otherwise be unable to respond." Klayman v. Judicial Watch, Inc., Slip Op., 2007 WL 140978, *18 n.11 (Kollar-Kotelly, J.) (D.D.C. Jan. 17, 2007) (emphasis added). See also Taylor v. Sebelius, 350 F. Supp. 888, 900 (D. Kan. 2004), citing Humphries v. Williams Natural Gas Co., Case No. 96-4196-SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998); Federal Civil Procedure before Trial (Rutter 2006) 12:110 (explaining that surreply memoranda are typically not permitted since no response to the reply brief is provided for in the rules), citing Springs Industries, Inc. v. American Motorists Ins. Co., 137 F.R.D. 238, 240 (N.D. Tex. 1991).

### A.     Because No New Matters Are Improperly Raised In Plaintiffs' Reply, The Government's Motion for Leave to File Should Be Denied and the Government's Proposed Surreply Stricken.

In Klayman, the plaintiffs sought leave to file a surreply that specifically limited to the narrow issue of whether certain evidence related to a single claim of their nine-count complaint was privileged. Klayman, 2007

1

WL 140978 at *4 (describing the counts of the complaint), *18 n.11 (denoting the limited scope of the proposed

surreply). Notwithstanding that stated limitation, Judge Kollar-Kotelly explained that since the reply in <u>Klayman</u>

"d[id] not raise any new matters, and [the] proposed surreply simply seeks to continue arguing a matter already

addressed in [o]pposition. . . . it is not appropriate to permit the sur-reply to be filed." <u>Id.</u> Likewise, while the

Government's proposed surreply purports to address only issues raised "for the first time," instead it revisits

virtually every issue of contention related to Plaintiffs' claims.

     All but one of the issues identified by the Government as "new" to Plaintiffs' briefing were previously

addressed by the parties' briefs and further discussed with the Court at the March 2, 2007 hearing on Plaintiffs'

Motion for Preliminary Injunction. The issue of whether the land on which Plaintiffs' funerary items are located

and their relatives' remains interred is federal or tribal was implicated throughout Plaintiffs' brief. <u>See</u>, <u>e.g.</u>, Pls.'

Mot. for Prelim. Injunction, 14 (noting that Plaintiffs' claims are proper in part because NAGPRA "extends the

common law protection to Native American cultural items <u>on federally held lands</u>.") (emphasis added); <u>id.</u> at 26

(noting that as in <u>Washoe Tribe of Nevada and California v. Greeley</u>, 674 F.2d 816 (9th Cir. 1982), the lands at

issue here "were never part of a reservation."). The issue of which persons have authority to bring claims on

behalf of the Tribe has been discussed even more thoroughly, forming a key tenet of the Complaint and of

Plaintiffs' presentation of the facts in their moving papers. (Compl. ¶ 1; Pls.' Mot. for Prelim. Injunction at 4.)

     Moreover, the issue of government waiver of sovereign immunity cannot be used to shoehorn all of the

Government's newest and most refined arguments as to issues already vigorously litigated into a new briefing.

Where a party "fail[s] to put forth its best case in its opposition is not grounds for permitting a surreply." <u>U.S. v.</u>

<u>Baroid Corp.</u>, 346 F. Supp. 138, 143 (D.D.C. 2004). A motion to file a surreply will be denied where it does not

supply adequate grounds for the filing of such a further response, in that "new matter" was not introduced in the

reply as that term is defined in the caselaw. <u>U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.</u>,

238 F. Supp. 2d 270, 279 (D.D.C. 2002). <u>See</u> <u>also</u> <u>Derringer v. Denko</u>, 126 Fed. Appx. 901, 903 (10th Cir. 2005)

(court denied the motion for leave to file a surreply on the ground that the reply had raised no new legal argument

or evidentiary material). The broad scope of the Government's proposed surreply, which marshals all of the

Government's arguments to support its view of likelihood of success on the merits and balancing of the equities, marks an unjust attempt to "continue arguing . . . matter[s] already addressed," both in the Complaint and throughout Plaintiffs' moving papers.  Klayman, 2007 WL 140978 at *18 n.11.

A reply brief on a motion may properly address matters raised in the opposition brief and affidavits, particularly where the plaintiff fleshes out the legal justification for the facts pled in the complaint or answers direct questions from the court. See, e.g., Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 767 F. Supp. 1220, 1235 (S.D.N.Y. 1991), rev'd on other grounds, 967 F2d 742 (2nd Cir. 1992).  It is within the district court's discretion to consider issues raised in Plaintiffs' reply which are responsive to Defendants' opposition to motion for preliminary injunction without granting leave to file a surreply. See, e.g., Glenn K. Jackson v. Roe, 273 F3d 1192, 1201-1202 (9th Cir. 2001).

  **B. Because the Government Is Otherwise Able to Respond to Plaintiffs' Reply, The Government's Motion for Leave to File Should Be Denied and  the Government's Proposed Surreply Stricken.**

Moreover, the Government will have ample opportunity to raise the issues in its proposed surreply at the hearing scheduled before this Court on March 15, 2007 at 4 p.m.  For that reason alone, the Government's proposed surreply is improper and should not be allowed.  E.g., United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 270, 276-77 (D.D.C. 2002).

**II. PLAINTIFFS' REPLY MERELY RESPONDED TO DEFENDANTS' OPPOSITION AND DID NOT RAISE ANY ISSUES THAT PLAINTIFFS HAD NOT ALREADY RAISED.**

Defendants' brief in support of their motion for leave to file a surreply fails to note any truly new legal issues raised in Plaintiffs' Reply that were not raised in the Plaintiffs' Complaint or Motion for Preliminary Injunction.  As noted above, the Defendants' failure to put forth their best case in opposition to Plaintiffs' motion for preliminary injunction is simply not grounds for permitting a surreply. U.S. v. Baroid Corp., 346 F. Supp. 138, 143 (D.D.C. 2004).

**A.      Waiver of the Government's Sovereign Immunity Is Not a New Issue in Plaintiffs' Reply.**

Contrary to Defendants' erroneous assertion, the government's waiver of sovereign immunity for declaratory relief under the Administrative Procedure Act was first raised in Plaintiffs' Complaint at ¶ 8, citing 25 U.S.C. §§ 465 and 3001 et seq., and 5 U.S.C. 704, and in their Motion at 14. The citation to the Federal Tort Claims Act in Plaintiffs' Reply was in direct response to the Court's question at the February 16, 2007 hearing on the motion for preliminary injunction as to the basis for the United States' obligation to comply with state law, including California's version of NAGPRA, Cal. Pub. Res. Code 5297.9-99.   The government's proposed surreply is merely a rehash of its original opposition concerning sovereign immunity, and does not deny that the United States is obligated to comply with state law under the F.T.C.A., which obligation may also form the basis for equitable relief in the form of a prohibitory injunction to prevent irreparable harm from a threatened violation of state law.

**B.      Whether Parcel 04 Is Federal Land Or Tribal Land Is Not a New Issue in Plaintiffs' Reply.**

Contrary to the Defendants' assertion, the issue as to whether Parcels 04 and 05 are federal land or tribal land was also clearly raised in Plaintiffs' Complaint and Motion.  Moreover, the fact that no Indian reservation was created in Jamul was noted in Plaintiffs' Complaint ¶¶ 15-19, and thus should have been fully addressed in the government's opposition so that Plaintiffs could appropriately respond in their reply and not be precluded from responding to the government's afterthoughts in the proposed surreply.

The government concedes that no reservation was formally created in Jamul, as there is no treaty, act of Congress or executive proclamation, under 25 U.S.C. § 467 or otherwise. The government also does not deny that a formal reservation may only be created by act of Congress, treaty, executive order, or administrative proclamation by the Secretary, as required by § 467.[1] Peters v. Pauma Sch. Dist., 91 Cal.App.792, 794 (1928);

---

[1] Though the government's recent revision of its Handbook, which does not apply to acquisitions in 1978 and 1981, as here, suggests that 25 U.S.C. § 467 is a "holdover from the era prior to the enactment of the Indian country definition," [18 U.S.C. 1151, which does not define reservation], Id., at 191 n.413, the government concedes that the executive proclamation in § 467 is still one of the only three ways in which a reservation can be formally created.

see also U.S. v. Azure, 801 F.2d 336, 338 (8th Cir. 1986) (cited by the government) (formal reservation is only created by treaty, statute, or executive order; recognition of de facto reservation still required property to be beneficially held for recognized tribe, the Turtle Mountain Indian Reservation); Sac & Fox Tribe of the Mississippi in Iowa v. Licklider, 576 F.2d 145, 149-50 (8th Cir. 1978) (same for the Sac & Fox Tribe of the Mississippi in Iowa). Finally, the government concedes that the mere acquisition of the land in trust does not create a reservation. Sac & Fox Nation v. Norton, 240 F.3d 1250, 1267 (10th Cir. 2001) ("land reserved for use as a cemetery was not a reservation," surreply at 11); Wisconsin v. Stockbridge-Munsee Community 67 F. Supp. 2d 990, 1003 (E.D. Wisc. 1999).

The government suggests that a Jamul Indian Village "reservation" may be "informally implied" from the Daly grant deed. But the government's own records indicate that Parcel 04 was never "land over which [the Jamul Indian Village] is recognized by the United States as having governmental jurisdiction," Compl. Ex. E, as required under the BIA definition of "reservation" in 25 C.F.R. § 151.2(f). Moreover, the government's latest attempt to argue that a reservation must be implied to exist still presupposes that the land was taken into trust for a "tribe," and not for individual Indians, as here, under 25 U.S.C. § 465, as set forth in the deed for Parcel 04 in 1978.[2] Complaint Ex. D.

---

[2] This is also the reason why Plaintiffs cited to the 1982 edition of the Federal Handbook of Indian Law: Both Parcel 04 and 05 were acquired during the tenure of the then-current 1982 edition of the Handbook. The sections concerning acquiring trust land for individual Indians under 25 U.S.C. § 465 were not changed by the Department of the Interior and Related Agencies Appropriations Act, 115 Stat. 414 (Nov. 5, 2001), Pub. L. No. 107-63 sect. 134 (2001), nor affected by the decisions in *Okla. Tax Comm. v. Citizen Band of Potawatomi Indian Tribe*, 498 U.S. 505, 511 (1991) and *United States v. John*, 437 U.S. 634, 649 (1978), which did not find that an acquisition for individual Indians constituted a "reservation," and only held that a reservation would be found for acquisitions on behalf of an already recognized tribe, like the Mississippi Choctaws. See also cases cited infra.

Even while citing the 2005 revision of the Handbook, which cannot apply to acquisitions in 1978 and 1981, the government concedes that it is only "**tribal** trust land [that] is the equivalent of a reservation" ( 2005 ed. at 191, emphasis added), and that "the term 'reservation' . . . merged with the treaty use of the word to form a single definition describing federally protected Indian **tribal** lands" (2005 ed. at 189, emphasis added), and not land acquired for individual Indians, as here, under 25 U.S.C. § 465. See Compl. Ex. D. This is also why Plaintiffs did not cite the remaining portion of the 1982 edition's n.158, which the government also concedes only refers to **tribal** residences in *John*, where a reservation was created by proclamation in 1944, and leases to **tribes**

None of the government's cases hold that a "reservation" may be implied where, as here, the parcel in question was acquired for the designated benefit of individual Indians under 25 U.S.C. § 465, as the Secretary of Interior subsequently designated by allowing them to live there for 29 years.[3] This is consistent with the courts' interpretation of the word "reservation" under the criminal jurisdiction of 18 U.S.C. 1151, defining Indian country to **include only** formal and informal **reservations for tribes**, dependent Indian communities, and Indian allotments, **but not land held in trust for individual Indians**, as here, where the allotment was denied. The government obviously concedes that Plaintiffs' prior litigation in the So. Dist. of Cal. already determined that Plaintiffs were not entitled to an "allotment" of parcel 04, since it was not acquired as a dependent Indian community.[4] See, the government's proposed surreply, at 6, where it concedes that the term "reservation" has only been "interpreted to include lands that have not formally been designated reservations," where those lands are "held in trust by the United States for the use and benefit of an Indian **tribe**," and not where they are held in

_____

in *Mescalero Apache Tribe v. Jones* 411 U.S. 145 (1973), and **tribal** trust land in *Cheyenne-Araphao Tribes v. Oklahoma*, 618 F.2d 665 (10th Cir. 1980).

[3] See the government's citation of *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 515 U.S. 450, 453, n2 (1995) (no reservation found; remanded to determine if 800 acres was still held as a reservation for the Sac & Fox Nation, a dependent Indian community on allotted lands, not trust land for individual Indians); *United States v. Roberts*, 185 F.3d 1125, 1133 (10th Cir. 1999) (property specifically held in trust for Choctaw Nation, not individual Indians); *United States v. John,* 437 U.S. 634, 649 (1978) (stating that although there was "no apparent reason why these lands . . . did not become a reservation," nonetheless, no reservation was found until "the situation was completely clarified by the proclamation in 1944 of a reservation" for the recognized Mississippi Band); *Oklahoma Tax Comm. v. Chickasaw Nation*, 515 U.S. 450, 452-53 (1995) (tribal trust land, not trust land for individual Indians); *Oklahoma Tax Comm. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 507(1991) (land held in trust for Potawatomi tribe, not trust land for individual Indians); *Minnesota v. Hitchcock*, 185 U.S. 373, 390 (1902) (reservation for tribe created by treaty); *U.S. v. Azure*, 801 F.2d 336, 337 (8th Cir. 1986) (land held in trust for Turtle Mountain Indian Reservation, not for individual Indians). In all of these cases, none of the property was acquired for individual Indians under 25 U.S.C. § 465, as here. In all of the cases cited by the government, the grant deeds or acts of Congress held the land in trust for named tribes.

[4] This also explains why Plaintiffs' second cause of action is not barred by any form of issue preclusion: it seeks separate equitable relief for the Plaintiffs as mere beneficial owners, since the Plaintiffs were denied the creation of an "allotment" of Parcel 04 under the 1987 General Allotment Act.

trust for the designated benefit of individual Indians under 25 U.S.C. 465, as here.[5]

Similarly, the government's argument that Parcel 04 was acquired so that the Jamul Indian Village could ultimately be federally recognized as a tribe is equally unavailing, and highlights the fact that after acquisition of the property in trust, the government never transferred the property to the subsequently recognized tribe known as the Jamul Indian Village. Proposed Surreply 10.  In fact, the government's Handbook explains the significant distinction between (1) taking land into trust for "individual" Indians to allow them to subsequently become a recognized tribe under the IRA, as here, and (2) recognizing a landless "tribe" under the IRA, and then having the Secretary take land in trust for the then recognized "tribe," which is the only way an informal tribal reservation could be implied, which the government concedes did not happen here, since there was no recognized tribe in 1978, when the Daley grant deed for Parcel 04 was recorded. Compl. Ex. D.

> Persons of one-half or more Indian blood . . . but not residing on a reservation cannot organize under the IRA, but are nevertheless eligible to enjoy some of its provisions. e.g., Maynor v. Morton, 509 F.2d 1254 (D.C. Cir. 1975). One provision of the IRA gives the Secretary discretionary authority to accept or purchase land in trust for Indians included within its provisions. 25 U.S.C. § 465. The Solicitor has held that the Secretary may exercise this authority for all individuals of one-half or more Indian blood. Once these ***individuals become the beneficiaries of land held in trust*** they can organize themselves as a government . . .

Cohen Handbook of Federal Indian Law at 15-16 (1982 Ed.).  The Handbook continues:

> This approach has also been used for the Quartz Valley Indians, Duckwater Shoshone Indians, Yomba Shoshone Indians, Port Gamble Band of Clallam Indians, and Sokaogan Chippewa Indians (Mole Lake Band). . . .  This procedure has been suggested for other Indian groups as well. *E.g.*, Memo. Sol. Int. May 1, 1937, *reprinted in* 1 Interior Opinions, *supra* not 76, at 1479 (status of Nahma and Beaver Island Indians). Handbook. Ch.1, Sec. B2e, pp.15-16 fn. 86.

> In other cases nonreservation tribes have become eligible for organization under the IRA by first being recognized as a tribe under the Act and then having the Secretary take land in trust for the tribe.

Handbook. Ch.1, Sec. B2e, pp.15-16.

---

[5] Even with regard to the four unique reservations of California, the government concedes that the Mission Reservation's 19 tracts in southern California did not include any land in Jamul, California, nor even mention any tribe in Jamul. Surreply 7, citing *Matz*, 412 U.S. at 493 n.15 & 494.

In fact, the government's citation of the DOI Sol. Opinion concerning the St. Croix Chippewas, 1 Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs 1917-74, 724 (U.S.D.O.I. 1979) ("Mem. Sol. Int.") confirms that where the grant deed, Compl. Ex. D, fails to contain the final phrase, "until such time as they organize under section 16 of the [IRA] and then for the benefit of such organization," the property remains in trust for the individual Indians, who may or may not ever have decided to transfer their beneficial interest to any subsequently recognized tribe. The government's Handbook concludes: "This memo held that the Secretary could purchase land in trust for the St. Croix Indians of one-half or more Indian blood, and once they had established a land base they could organize under the Act." Id. at 15 n.86.

This is exactly what happened here. The original grant deed, Compl Ex. D, failed to contain the final phrase transferring the beneficial interest in the property to the subsequently recognized Jamul Indian Village. It is still undisputed that the Tribe did not exist, had not been created under the I.R.A., and was not recognized, in 1978, when the Government accepted the grant deed for the parcel in trust for the individual Indians described therein. There is also no dispute that the Government failed to follow its own guidelines in recording the grant deed. Mem. Sol. Int. at 668, 724, 747, and 1479.[6] Hence, for there to be any subsequent transfer of the individual Plaintiffs' designated beneficial interest in Parcel 04 to any subsequently recognized tribe, such a

_____

[6] There, the Solicitor of the Interior specifically advised the field personnel of the BIA that any transfer of individual Indians' designated beneficial interest in real property must still be accomplished by recording a grant deed. Mem. Sol. Int. at 668, 724, 747, and 1479. The Government cannot deny that its own Handbook of Federal Indian Law, Ch. 11, B3, pp. 615-16 (DOI 1982), concedes that all individual designated beneficiaries are cotenants in the trust land held by the U.S. Cotenants have equal rights to possession of the property, and no single cotenant has the right to exclude any other cotenant from the property. Cal. Civil Code 685-86; Zaslow v. Kroenert, 29 Cal.2d 541, 548 (1946). Therefore, all of the individual cotenants, including the Plaintiffs here, must consent to any transfer of their individual beneficiaries' designation to a subsequently recognized "tribe," before the subsequently recognized "tribe" may lawfully be designated as the beneficiary and acquire "jurisdiction" over the parcel. Id. Here, it is no wonder that the "Jamul Indians of one-half degree or more Indian blood" have never consented to transfer their individual designation as beneficial owners to any subsequently created "tribe," since the IBIA found non-members participating in the tribal government, perhaps from the time the entity was first recognized. 32 IBIA 166. Here, there is no such consent by the individual Indian co-tenants, including the Plaintiffs, and the government never recorded a subsequent grant deed, transferring the individual Indian beneficiaries' interest in the parcel to any subsequently recognized tribe, including the Jamul Indian Village.

transfer must still be accomplished the old fashioned way: by recording a grant deed.  Here, no grant deed ever transferred the individual Plaintiffs' designated beneficial interest in the Parcel to any tribe.

These Solicitor's memoranda admit that the 1978 trust acquisition cannot be made for a "tribe" that did not then exist.  A grant deed simply cannot "designate" a "tribe" that does not exist as a beneficiary, since "there is in fact no existing tribe of Indians in Mississippi known as the Choctaw Tribe." <u>Mem. Sol. Int.</u>, at 668.[7]  There, the Choctaw deed had to be amended and re-recorded to designate any subsequently recognized tribe a beneficiary; otherwise the property would remain in trust for the individual Indians, and not a tribe, as in <u>Coast</u>, 550 F.2d at 651, and <u>U.S. v. State Tax Comm.</u>, 535 F.2d 300, 304 (5th Cir. 1976) (similarly holding that the absence of the words "then in trust for such organized tribe" in a relief act designating individual Choctaw beneficiaries meant that "only those <u>individuals</u> designated by the Interior Secretary were to have the benefit of this" designation, since "[n]either a tribe nor a reservation is mentioned.").

> In all of those cases where the title papers have already been returned to the field, instructions should be given to the field agents to have the deeds corrected before they are recorded.  In that case where the deed has already been recorded and accepted, it will be necessary to secure a new deed. The necessary corrections will be made in the other cases which are now pending in this office.  The error . . . arises perhaps out of unusual circumstances, but its one that might have been avoided."

<u>Mem. Sol. Int.</u>, at 668.

Here, the 1978 grant deed does not contain the words proscribed by the Solicitor, "until such time as they organize." Compl. Ex. D.  Nor does it state: "and then in trust for such organized tribe."  Moreover, it is conceded that there was no transfer of the designation of the individual Indian beneficiaries, including the Plaintiffs, to any subsequently recognized tribe, since no subsequent grant deed has ever been recorded.

---

[7] There, Solicitor Margold describes how the grant deed should have been prepared for the Mississippi Choctaws: "The United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior, **until such time as the Choctaw Indians of Mississippi shall be organized as an Indian tribe** pursuant to the act of June 18, 1934 (48 Stat. 984), and **then in trust for such organized tribe**." <u>Mem. Sol. Int.</u>, at 668 (emphasis added). Similarly, no such language appears in the 1978 Jamul grant deed. Comp. Ex. D.

In any event, whether Parcel 04 or 05 is ultimately to be treated as Federal land or tribal land remains a material issue of fact that cannot reasonably be decided on the conflicting declarations before the court in a pre-trial motion for a preliminary injunction. Given the strong likelihood that Plaintiffs' beneficial ownership interest will be established based upon the record now before the court, Plaintiffs should be protected with a preliminary injunction against any alienation of their beneficial interest, at least until the parties to this action have the opportunity to offer witness testimony as to how title was acquired, for what purpose, and who was allowed to live on the property for the last 29 years, before a final determination as to the land status is made by the Court. Moreover, until this significant legal issue is finally determined, the Court should maintain the status quo and prevent the government from allowing any grading of the property, particularly given the incredibly sensitive nature of the threatened irreparable harm to the Plaintiffs' families' human remains and funerary objects.

**C.    NAGPRA's Application To Both Federal _And_ Tribal Land Is Not a New Issue In Plaintiffs' Reply.**

Most importantly, the government's proposed surreply cannot deny that the federal NAGPRA requirements for cessation of construction, written notice, disposition and repatriation, place and manner of delivery of Plaintiffs' families' human remains and funerary objects apply to **both Federal and tribal lands**, under 25 U.S.C. § 3002(d) and 43 C.F.R. §§ 10.2(f), 10.2(g)(4), 10.4(b), 10.4(c), 10.4(d)-(e), and 10.6, as raised in Plaintiffs' Complaint and Motion.[8]

> (d) Inadvertent discovery of Native American remains and objects. (1) Any person who knows, or has reason to know, that such person has discovered Native American cultural items on **Federal or tribal lands** after November 16, 1990, shall notify the Secretary of the Department.

25 U.S.C. § 3002(d). Defendants simply fail to cite the obligation to notify the Secretary of the Interior, and the Secretary's continuing obligation, once notified, to "certify" that the appropriate lineal descendants of the tribe have been so notified. See Proposed Surreply at 13.

---

[8] As noted above, the Court is permitted to consider issues raised in Plaintiffs' reply which are responsive to Defendants' opposition to motion for preliminary injunction without granting leave to file a surreply. See, e.g., Glenn K. Jackson, 273 F3d at 1201-1202.

(f) What types of lands do the excavation and discovery provisions of these regulations apply to? (1) **Federal lands** . . . (2) **Tribal lands** . . .

(g) What procedures are required by these regulations?...(4) Inadvertent discovery means the unanticipated encounter or detection of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on the surface of **Federal or tribal lands** pursuant to section 3(d) of the Act [25 U.S.C. § 30002(d)].

43 C.F.R. §§ 10.2(f), (g)(4).

Any person who knows or has reason to know that he or she has discovered inadvertently human remains, funerary objects, sacred objects, or objects of cultural patrimony on **Federal or tribal lands** after November 16, 1990, must provide . . . .

43 C.F.R. § 10.4(b).

If the inadvertent discovery occurred in connection with an on-going activity on **Federal or tribal lands**, the person, in addition to providing the notice described above, must stop activity in the area of the inadvertent discovery and make a reasonable effort to protect the human remains, funerary objects . . . discovered inadvertently.[9]

43 C.F.R. § 10.4(c).

(1) As soon as possible, but no later than three (3) working days after receipt of the written confirmation of notification with respect to **Federal lands** described in 10.4(b), the responsible Federal agency official must . . .

43 C.F.R. § 10.4(d).

(1) As soon as possible, but no later than three (3) working days after receipt of the written confirmation of notification with respect to **Tribal lands** described in 10.4(b), the responsible Federal agency official must . . .

43 C.F.R. § 10.4(e). It should be noted that the requirements of § 10.4(e) for Tribal lands are identical to the requirements of § 10.4(d) for Federal lands, including the requirements for written notification to the lineal descendants, taking immediate steps to secure and protect inadvertently discovered human remains, funerary objects, sacred objects, or objects of cultural patrimony, including, as appropriate, stabilization or covering, and

---

[9] Contrary to the government's inaccurate citation, Proposed Surreply 11 n 8, it is not the tribe but "the person" making the inadvertent discovery who must cease the ongoing construction activity, which the government concedes would include the third party contractors on the site who have been informed that there are Native American human remains and funerary objects interred there.

disposition and repatriation under §§ 10.6 and 10.10, particularly here, where the Plaintiff tribe seeks compliance

with the regulation.

> For purposes of this section, custody means ownership or control of human remains, funerary objects, sacred objects, or objects of cultural patrimony . . . discovered inadvertently in **Federal or tribal lands** after November 16, 1990. Custody of these human remains, funerary objects, sacred objects, or objects of cultural patrimony is, with priority given in the order listed: (1) In the case of human remains and associated funerary objects, in the lineal descendant of the deceased individual as determined pursuant to § 10.14(b).

43 C.F.R. § 10.6(a).

> (b) Human remains and associated funerary objects–(1) Criteria. Upon the request of a lineal descendant . . . a . . . **Federal agency must** expeditiously repatriate human remains and associated funerary objects if all of the following criteria are met: (I) The human remains or associated funerary object meets the definitions established in 10.2(d)(1) or (d)(2)(i)...[r]epatriation must take place within ninety (90) days of receipt of a written request for repatriation that satisfies the requirements of 10.10(B)(1) . . . [following] at least thirty (30) days after publication of the notice of inventory completion in the Federal Register as described in 10.9 . . . .
>
> (d) The repatriation of human remains, funerary objects . . . must be accomplished by . . . the . . . Federal agency in consultation with the requesting lineal descendants . . . as appropriate, to determine the place and manner of the repatriation.

43 C.F.R. §§ 10.10(b), (d).

> Associated funerary objects means those funerary objects for which the human remains with which they were placed intentionally are also in the possession or control of a...Federal agency.

43 C.F.R. § 10.2(d)(2)(i).[10]

Contrary to the government's erroneous assertion, see Proposed Surreply at 13-14, the trilogy of Yankton

Sioux Tribe v. U. S. Army Corps of Engineers ("Yankton Sioux I"), 83 F. Supp. 2d 1047, 1060 (D. S.D. 2000);

Yankton Sioux II, 209 F. Supp. 2d 1008, 1021-22 (D.S.D. 2002); and Yankton Sioux III, 258 F. Supp. 2d 1027,

1032-35 (D.S.D. 2003), and San Carlos Apache Tribe v. United States, 272 F. Supp. 2d 860 (D. Ariz. 2003), all

---

[10] Contrary to Defendants' Proposed Surreply at 13 n.7, NAGPRA repatriation requirements apply to any human remains and associated funerary objects "in possession or control" of a Federal agency, and not just museums. Here, the DOI/BIA is the federal land manager for the property for which the United States holds title, Parcels 04 and 05, and therefore is still the Federal agency in possession of the Plaintiffs' families' human remains and funerary objects.

held that NAGPRA "governs the inadvertent discovery of Native American cultural items on [both] **Federal and tribal lands**." Yankton Sioux I, at 1055. Yankton Sioux II noted at 1017-19 that the land had actually been transferred to the State of South Dakota, but that the United States [Army] Corps [of Engineers] will retain, and will exercise, all authority, jurisdiction, and powers of approval" over the land, id., just as in this case the government's FOIA response, Compl. Ex. E, indicates that the United States retains all governmental jurisdiction over Parcel 04. See Yankton III at 1032-34; San Carlos at 887. Moreover, "the San Carlos Reservoir was on Federal land, within the exterior boundaries of the San Carlos Apache Tribe Reservation." San Carlos at 867.

Also contrary to Defendants' false assertion, see Proposed Surreply 14, this case does not concern the activities of a federally recognized Tribe on tribal land, but on land that is beneficially owned by the individual Plaintiffs, for which title is held explicitly in the name of the "United States in trust for Jamul Indians of one-half degree or more Indian blood as the Secretary of Interior shall designate." Compl. Ex. D.

It should also be emphasized that the opposing faction of the tribe has attempted to amend the tribe's constitution to lower the blood quantum for membership to 1/4 Indian blood. See Judge Kessler's summary judgment decision in the government's request to submit supplemental authority. Though Plaintiffs are challenging the summary judgment in the action before Judge Kessler, which will likely be appealed in due course, Judge Kessler's summary judgment actually precludes the currently recognized Jamul Indian Village from acquiring any beneficial interest in Parcel 04 as a matter of law, because it now explicitly allows 1/4 bloods as members and leaders of the tribe, thereby excluding the tribe, as a matter of law, under the terms of the title in the grant deed, from ever being made beneficial owners without the creation of new grant deed transferring the beneficial ownership by the designated individual Indians, including the Plaintiffs, to the new tribe of 1/4 bloods, which the government concedes has never been recorded.[11]

Also contrary to the government's erroneous assertion, see Proposed Surreply at 14, the government

_____

[11] Judge Kessler's March 8, 2007 decision, therefore, precludes the Jamul Indian Village from becoming an indispensable party here, as a matter of law.

conceded at the hearing on February 16 that it first learned that there were Native American human remains and funerary objects interred on Parcels 04 and 05 when it received Plaintiffs' complaint and declarations. Hence, the "discovery" was inadvertent, in that, per the regulations, the discovery was not due to an "intentional excavation," as held in Yankton Sioux I at 1056; San Carlos, supra at 888, and defined by 43 C.F.R. § 10.2(g)(4) "as the unanticipated encounter or detection," without regard to whether the encounter or detection is based upon notice from the lineal descendants as to the interment of their families' human remains and funerary objects on the site, as here, or by a third party grading contractor using a backhoe.

Moreover, Yankton Sioux II holds that despite the fact that the government may have some prior information with which to anticipate Indian human remains at the site, the actual discovery, whether by notice from the lineal descendant who was present at the interment, or a third party's backhoe, was still "inadvertent," because it was not an intentional, planned archaeological excavation or removal. 209 F.Supp.2d 1008, 1019. The government also concedes this point. Proposed Surreply 17 n.12. Contrary to Defendants' unsupported assertion, Hawk v. Danforth, 2006 U.S. Dist. LEXIS 58104 at *4 (E.D. Wis. 2006) does not hold that notice to the federal land manager from the lineal descendant who was present at the interment will not constitute an inadvertent discovery of the human remains and funerary objects. Nor do the Defendants provide any reason why notice from the lineal descendant with knowledge of such interment should not constitute an inadvertent discovery as defined by the NAGPRA regulations.

As set forth in the Plaintiffs' subsequent declarations in support of an emergency temporary restraining order: not only has there been an admitted inadvertent discovery of the interment of human remains and funerary objects on Parcels 04 and 05, but Plaintiffs have unequivocally established that grading has commenced and irreparably damaged the interment of those remains and objects, and that Plaintiffs were inexcusably, outrageously and in conscious disregard of their Constitutional rights to be secure in their homes deprived of their statutory right to the "first preference as lineal descendents [sic] with regards to human remains and associated funerary objects," as the government concedes. Proposed Surreply 15.

**D.    NAGPRA's Provision That The Lineal Descendants Shall Have Ownership And Control Of Inadvertently Discovered Human Remains And Funerary Objects Is Not A New Issue In Plaintiffs' Reply.**

Plaintiffs' Complaint and moving papers all allege that Plaintiffs, as their families' lineal descendants, have ownership and control of their families' Native American human remains and associated funerary objects. Hence, here also, the government should not be permitted a surreply, where it should have submitted all of its points and authorities on this issue in its original opposition to the motion for a preliminary injunction, and where Plaintiffs would be deprived of the opportunity to reply if leave to surreply were granted.

Plaintiffs have never claimed that NAGPRA's regulations "are a bar to the development of Federal or tribal lands on which human remains or objects are found." Rather, Plaintiffs merely claim that the government must (1) comply with NAGPRA's regulations before such development is permitted, and (2) be enjoined from permitting such development until it complies with the regulations, by issuing proper notice to all potential lineal descendants, preparing of a proper written plan for disposition and repatriation, and ceasing all construction activity until such time as these requirements are satisfied.

Just as in <u>Yankton Sioux</u> trilogy, even though it may take the same 3 year period to accomplish the notice, written plans, disposition and repatriation, Plaintiffs are still statutorily entitled to an injunction to prevent irreparable mutilation, desecration and disinterment of their families' human remains while they attempt to obtain the same stipulated injunction that prevented all construction on the site where their families' human remains and funerary objects are interred.[12]   The fact that the required preliminary injunction may incidentally delay construction on Parcels 04 and 05 does not mean that NAGPRA has become a land management statute (although

---

[12] Contrary to the government's implication, <u>see</u> Proposed Surreply 18, <u>Yankton Sioux I</u> did not hold that all NAGPRA preliminary injunction must be limited to a mere 30 days. Rather, there, based on the unique facts of the case, the human remains and funerary objects at Lake Francis Case could be properly interred within 30 days of certification of notification of their inadvertent discovery. <u>Yankton Sioux II</u> clearly left the injunction in place for nearly 2 more years, and <u>Yankton III</u> ended with a stipulated agreed upon injunction not to build on the site where the human remains were interred.  Plaintiffs deserve the same opportunity to reach a similar written plan for disposition and repatriation of their families' human remains and funerary objects without fear that they will be bulldozed into oblivion before the required written plan can be created.

Defendants cite no authorities, statutes or regulations that prohibit such land management by the United States).

Even the government concedes that the Statue of Liberty NAGPRA agreement is not prohibited. Plaintiffs remain

entitled to the statutory cessation of construction activities while Plaintiffs attempt to obtain the same protections

afforded in the Statue of Liberty agreement.

Hence, even though <u>Yankton Sioux III</u> notes that the NAGPRA regulations do not permanently prohibit

inadvertent discoverers from conducting construction activities in the area where human remains and funerary

objects are discovered, <u>Yankton Sioux II</u> certainly ordered the cessation of all such construction activities at the

site of interment, and ordered any of the dirt that had been moved was to be replaced at the original site of the

discovery. Both the State and Federal governments finally stipulated to that injunction in <u>Yankton Sioux III</u>.

Plaintiffs here deserve the same right to a similar preliminary injunction while they are permitted to negotiate such

a result without any grading or any further irreparable harm to their families' human remains and funerary

objects.

**E.    Plaintiffs' Beneficial Ownership of Parcel 04 Is Not A New Issue In Plaintiffs' Reply, Nor Is The Fact That The Tribe Cannot Be An Indispensable Party.**

Here, too, Plaintiffs' Complaint and Motion clearly raised their beneficial ownership of Parcel 04, so

Defendants should not be permitted a surreply on these issues.

Moreover, the government cannot deny its own FOIA response, Complaint, Exhibit E, confirming that

Parcel 04 has never been known as the Jamul Indian Village, and that the title conveyed to the United States in the

original grant deed for what is now known as Parcel 04, Complaint Exhibit D, has never been transferred to the

subsequently and federally recognized tribe known as the Jamul Indian Village.

Hence, the tribe is not, and cannot be, as a matter of law, an indispensable party to the Plaintiffs'

individual NAGPRA claims to protect their families' human remains and funerary objects as lineal descendants,

which claims exist separate and apart from whether Plaintiffs are members or leaders of the tribe or not.

Similarly, with regard to Plaintiffs' beneficial ownership claims in Parcel 04, the tribe is not, and cannot be, an

16

indispensable party since the government's own records confirm that the tribe has never been the titled owner nor the beneficial owner of Parcel 04.

Most importantly, no matter who is ultimately determined to be the lawfully elected leaders of the tribe authorized to appear in this action as a party, no one has submitted any admissible evidence to this Court that the subsequently federally recognized tribal entity known as the Jamul Indian Village has ever owned or lawfully exercised federally recognized governmental jurisdiction or authority over Parcel 04. Hence, the opposing faction cannot cloak its unlawful attempts to usurp "beneficial ownership" of Parcel 04 from the individual Plaintiffs with some kind of sovereign immunity. Until there is sufficient evidence admitted to create a triable issue of material fact as to the entity's ownership or federally recognized governmental jurisdiction or authority over Parcel 04, this Court must conclude as did the Federal Court of U.S. Claims in Coast Indian Commty. v. U.S., 550 F.2d 639 (Fed. Cl. 1977) that the Parcel is beneficially owned by the Plaintiffs as a matter of law.

Based upon the only admissible evidence before the court, Compl. Exs. D and E, as a matter of law, the tribe cannot be held to be an indispensable party to the Plaintiffs' litigation of their beneficial ownership of Parcel 04. To find otherwise would permit any recognized tribe to lay claim to any property in the United States; forcibly evict all others from that property at gunpoint (as was done here); claim that because they are a federally recognized tribal entity, they cannot be sued for alienation of the property from the rightfully titled and beneficial owners; and then claim that those illegally evicted must have their action dismissed because the federally recognized tribe cannot be made a party to a suit. Such is not, and has never been, the law.

In addition, the government ignores their own requested supplemental authority in Judge Kessler's summary judgment decision. As noted above, because the government has now permitted (illegally or otherwise) the opposing faction to lower the blood quantum for membership in the tribe to 1/4 Indian blood, as a matter of law the newly amended tribe cannot hold beneficial title to Parcel 04, which was deeded in trust to the United States for "Jamul Indians of one-half degree Indian blood" only. Compl. Ex. D. Again, since the tribe is (for the time being) recognized to allow 1/4 bloods, the tribe is no longer entitled to, nor can it hold a beneficial interest

17

in, Parcel 04, and therefore cannot, as a matter of law, be an indispensable party to this action.[13]

Contrary to the government's March 9, 2007 request to submit Judge Kessler's summary judgment order in <u>Rosales v. U.S. et al.</u> D.C. D. Case No. 1:03CV01117, as supplemental authority in this action, who speaks for the lawfully elected leadership of the tribe is not relevant either to the individual Plaintiffs' NAGPRA claims or to their beneficial ownership interest in Parcel 04. The Plaintiffs' personal injury claims as the lineal descendants who own and control their families' human remains and funerary objects will continue to exist no matter who is determined to be the lawfully elected tribe leaders. Similarly, Plaintiffs' individual beneficial ownership claims cannot conflict with any interest of the tribe, since, as a matter of law, the government's own documents admit that the tribe has no interest Parcel 04, Compl. Ex. E, and since, as a matter of law, the Secretary of Interior designated the individual Indians the beneficial owners of Parcel 04 in 1978. <u>Coast</u>, 550 F.2d at 651; <u>U.S. v. State Tax Comm.</u>, 535 F.2d 300, 304 (5th Cir. 1976).

**F.    Leave To File A Surreply Should Not Be Granted To Allow Defendants To Merely Rehash Their Trespass Arguments.**

Plaintiffs' Complaint and Motion clearly alleged Plaintiffs' beneficial ownership interest in Parcel 04. The government's proposed surreply merely rehashes its arguments that the government is neither an insurer nor guarantor, which Plaintiffs never claimed in the first instance. Nor do Plaintiffs claim that the government has any

---

[13] This also explains why the Ninth Circuit decision cannot preclude this action,: At the time they were rendered, the IBIA appeals were not final; Judge Kessler's case had not reached a final judgment; and there was no final decision allowing the tribe to admit 1/4 bloods, which would preclude the tribe, as a matter of law, from claiming any beneficial interest in Parcel 04.

Moreover, contrary to the government's surreply fn 15, there is no requirement that the Plaintiffs must avail themselves of their tribal court, where this court has concurrent jurisdiction over their beneficial interest in parcel 04, and no party has instituted any action before the one and only lawfully created Jamul Tribal Court seeking a determination as to Plaintiffs' beneficial interest in the parcel. The one and only Jamul Tribal Court came into existence in 1995, when Judge Karen Toggery was elected judge. The one and only Jamul Tribal Court has rendered only one judgment to date, against a number of the purported opposing faction members, and is currently pending full faith and credit enforcement under California's Sister State Judgment Act in <u>Jamul Indian Village v. Hunter</u>, San Diego Superior Court Case No. 00698798, where the action has been stayed pending the outcome of the IBIA appeals. See, a copy of the Complaint therein and Judge Bollman's October 21, 1998 stay order, Exhibit A to Plaintiffs' emergency motion for a temporary restraining order.

obligation to "initiate suit." Hence, as set forth in Plaintiffs' Reply at n.21, Defendants' citations of <u>Creek Nation</u> <u>v. U.S.</u>, 318 U.S. 629, 640 (1943), <u>Shoshone-Bannock Tribes v. Reno</u>, 56 F.3d 1476 (D.C. Cir. 1995), and <u>Heckler v. Chaney</u>, 470 U.S. 821 (1985), regarding the government not being either an insurer of payments or obliged to bring suit on behalf of Indians, are inapposite because Plaintiffs do not seek to compel payments of money or the filing of suit by the government.

Similarly, contrary to the Defendants' erroneous contention, Plaintiffs have cited "an unambiguous provision by Congress that clearly outlines a federal trust responsibility." <u>See</u> <u>U.S. v. Mitchell</u>, 463 U.S. 206, 225 (1983); NAGPRA, 25 U.S.C. § 3001 et seq; 43 C.F.R. §§ 10.1-17; and the Indian Reorganization Act, 25 U.S.C. § 465, under which the government accepted the Daley grant deed in trust for individual Indians, including Plaintiffs.

Finally, the government fails to distinguish <u>Comanche Nation v. U.S.</u>, 393 F. Supp. 2d 1196 (W.D. Okla. 2005), claiming it does not involve trespass; but misses the point that a preliminary injunction was granted to maintain the status quo, preventing transfer or alienation of the trust property in question to the third party, Fort Sill Apache tribe, since there were "serious, substantial and difficult questions going to the merits," requiring further litigation. Similarly the government fails to distinguish the remainder of Plaintiffs' authority indicating that the government can be enjoined from allowing any alienation or trespass of the individual Indians' beneficial interest in such trust property. <u>See</u>, <u>e.g.</u>, <u>Keechi v. United States</u>, 604 F. Supp. 267 (D.D.C. 1985); <u>United States</u> <u>v. Flournoy Live-Stock & Real-Estate Co.</u>, 69 F. 886, 894 (D. Neb. 1895).

Plaintiffs' motion for a preliminary injunction should be granted, just as in <u>Yankton Sioux II and III</u>, where the Courts granted both a preliminary and ultimately stipulated continuing injunction to maintain the status quo which included "that the Court order defendants to cease all construction activity at location A [the site of the human remains]," based upon (1) the threat of irreparable harm to the plaintiffs' human remains and funerary objects from construction activities at the site of their discovery; (2) the balance of harm tipping in favor of the plaintiffs given the inherently sensitive nature of the human remains and funerary objects, and the minimal harm

to the third party State contractors, and the fact that there could be no harm to the Federal defendants since they were already compelled to comply with NAGPRA; (3) the fact that it was probable that plaintiffs would prevail "on at least some of their NAGPRA claims," since, as here, the government was wrong to assert that it need not comply with the requirements of 10.3(b) with regard to inadvertent discoveries of human remains, which ultimately supported a stipulated continuing injunction restraining construction at the site of the human remains; and (4) the public interest, since Congress directed the protection of such Native American cultural items in NAGPRA, given Plaintiffs' beliefs about how disturbance of the families' remains affects Plaintiffs' lives, 209 F. Supp. 2d 1008, 1022-24; 258 F. Supp. 2d 1027, 1032-34.

## III.    CONCLUSION

It is quite clear that Defendants merely want another bite at the apple, in hopes that they can accomplish what they failed to establish in their original opposition.  Plaintiffs raised no new legal issues in their reply that were not in direct response to the opposition filed by the Plaintiff or to questions from the Court at the hearing on February 16, 2007.

For all of these reasons, the Defendants' motion for leave to file a surreply should be denied in all respects.

Dated: March 15, 2007                              **BOIES, SCHILLER & FLEXNER LLP**

/s/ Aaron J. Snow
William A. Isaacson, Esq., D.C. Bar No. 414788
Tanya Chutkan, Esq., D.C. Bar No. 420478
Louis G. Smith, Esq., Bar No. D00299
Aaron J. Snow, Esq., D.C. Bar No. 500161
5301 Wisconsin Avenue, N.W. Ste 800
Washington, District of Columbia 20015
Tel  (202) 237-2727
Fax (202) 237-6131

**WEBB & CAREY**

20

/s/Patrick D. Webb
Patrick D. Webb, Esq., Calif. Bar No. 82857
**WEBB & CAREY**
401 B Street, Suite 306
San Diego, Calif. 92101
Tel  (619) 236-1650
Fax (619) 236-1283

Attorneys for WALTER ROSALES, KAREN TOGGERY, JAMUL INDIAN VILLAGE, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TOGGERY

21

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

WALTER J. ROSALES, ESTATE OF )
HELEN CUERO, ESTATE OF DEAN )
ROSALES, P.O. Box 85, Jamul, California, )
91935 )
)
KAREN TOGGERY, ESTATE OF MARIE )
TOGGERY, ESTATE OF MATTHEW )
TOGGERY, P.O. Box 375, Jamul, )
California, 91935 )
)
JAMUL INDIAN VILLAGE, a federally )
recognized Indian tribe, P.O. Box 612, )
Jamul, California, 91935. )
)
    Plaintiffs, )
  vs. )
)
UNITED STATES OF AMERICA, )
Department of Justice and its divisions, )
including but not limited to, DEPARTMENT )
OF THE INTERIOR, by and through )
Secretary DIRK KEMPTHORNE, in his )
official capacity, )
)
BUREAU OF INDIAN AFFAIRS, by and )
through Assistant Secretary of Indian )
Affairs, JAMES E. CASON, in his official )
capacity. )
)
    Defendants. )

**CASE NUMBER:**  **1:07 CV 00162**

**JUDGE:**    **Rosemary M. Collyer**

**DECK TYPE:**  **Tribal Rights**

**DATE STAMP:**

**ORDER DENYING DEFENDANTS'
MOTION FOR LEAVE TO FILE A
SURREPLY OPPOSING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

## ORDER DENYING DEFENDANTS' MOTION FOR LEAVE TO FILE A SURREPLY OPPOSING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On careful consideration, the Court hereby DENIES Defendants' Motion for Leave to File a Surreply in Opposition to Motion for Preliminary Injunction [Dkt # 13-2].  Accordingly, it is FURTHER ORDERED:

that Defendants' Surreply in Opposition to Plaintiffs' Motion for Preliminary Injunction is hereby STRICKEN.

SO ORDERED, this ____ day of ____, 2007.

_____
Rosemary M. Collyer
UNITED STATES DISTRICT JUDGE

2

Slip Copy                                                                Page 1

Slip Copy, 2007 WL 140978 (D.D.C.)

**(Cite as: Slip Copy)**

Briefs and Other Related Documents

Klayman v. Judicial Watch, Inc.D.D.C.,2007.Only the Westlaw citation is currently available.

United States District Court,District of Columbia.

Larry KLAYMAN, et al., Plaintiffs,

v.

JUDICIAL WATCH, INC., et al., Defendants.

**Civil Action No. 06-670 (CKK).**

Jan. 17, 2007.

Daniel J. Dugan, Spector Gadon & Rosen, P.C., Philadelphia, PA, for Plaintiffs.

Richard Wayne Driscoll, Driscoll & Seltzer, PLLC, Alexandria, VA, for Defendants.

**MEMORANDUM OPINION**

COLLEEN KOLLAR-KOTELLY, United States District Judge.

**\*1** Plaintiffs, Larry Klayman and Louise Benson, brought this action against Defendants-Judicial Watch, Inc. (hereinafter "Judicial Watch"), a non-profit public interest government watchdog organization; Thomas J. Fitton, President of Judicial Watch; Paul J. Orfanedes, Secretary and a Director of Judicial Watch; and Christopher J. Farrell, a Director of Judicial Watch-alleging fraudulent misrepresentation, breach of contract, unjust enrichment, violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B), violation of Florida Statute § 540.08, and defamation. Presently before the Court are a number of motions, including: (1) the motion to dismiss Counts One, Two, Three, Four, Five, Six, and Nine of Plaintiffs' Second Amended Complaint brought by Defendants Judicial Watch and Fitton; (2) Plaintiffs' motion for leave to file a sur-reply regarding the motion to dismiss brought by Defendants Judicial Watch and Fitton; (3) the separate motion to dismiss the Second Amended Complaint brought by Defendants Orfanedes and Farrell; (4) the motion to strike portions of Plaintiffs' Second Amended Complaint brought by Defendants Judicial Watch and Fitton; and (5) the motion to sever the claims of Plaintiff Benson from those of Plaintiff Klayman, brought by Defendants Judicial Watch and Fitton.

**\*1** Upon a searching consideration of the filings currently before the Court on these motions, the attached exhibits, and the relevant statutes and case law, with respect to the motion to dismiss Plaintiffs' Second Amended Complaint brought by Defendants Judicial Watch and Fitton, the Court shall (1) dismiss without prejudice Counts One, Two, and Three of Plaintiffs' Second Amended Complaint for lack of subject matter jurisdiction; (2) deny the motion to dismiss as to Counts Four, Five, and Six; (3) as to Count Nine of Plaintiffs' Second Amended Complaint, grant-in-part the motion to dismiss brought by Defendants Judicial Watch and Fitton insofar as it relates to allegedly defamatory statements made in Judicial Watch Form 990 tax returns and allegedly doctored press quotations posted on the Judicial Watch website; and (4) as to Count Nine of Plaintiffs' Second Amended Complaint, deny-in-part the motion to dismiss brought by Defendants Judicial Watch and Fitton insofar as it is based on allegedly false statements to Judicial Watch employees and the media. FN1 To the extent that Defendants Orfanedes and Farrell have joined in Fitton and Judicial Watch's motion to dismiss as to Counts Four, Five, and Nine, the Court's conclusions with respect to those Counts apply equally to Orfanedes and Farrell. Furthermore, the Court shall (5) deny Plaintiffs' motion for leave to file a sur-reply; (6) deny the motion to dismiss Plaintiffs' Second Amended Complaint brought by Defendants Orfanedes and Farrell (insofar as it raises an additional argument not addressed in Fitton and Judicial Watch's motion to dismiss); (7) deny the motion to strike brought by Defendants Fitton and Judicial Watch; and (8) deny as moot the motion to sever brought by Defendants Judicial Watch and Fitton.

> FN1. In light of the Court's granting-in-part and denying-in-part the motion to dismiss brought by Defendants Judicial Watch and Fitton, Counts Four, Five, Six, Seven, Eight, and Nine (to the extent that Count Nine is based on allegedly defamatory statements made to Judicial Watch employees and the media) of the Second Amended Complaint remain viable as to Defendants Judicial

Watch and Fitton. In addition, with respect to Defendants Orfanedes and Farrell, Counts Four, Five, and Nine (to the extent that Count Nine is based on allegedly defamatory statements made to Judicial Watch employees and the media) remain viable.

## I: BACKGROUND

### A. The Parties

**\*2** Defendant Judicial Watch, Inc. is a 501(c)(3) organization formed under the laws of the District of Columbia and headquartered in the District of Columbia, which Plaintiffs describe as a "public interest government watchdog to investigate and prosecute government corruption and abuse." Second Am. Compl. (hereinafter "SAC") ¶ 20. Defendant Fitton is President of Judicial Watch, Defendant Orfanedes is the Secretary and a Director of Judicial Watch, and Defendant Farrell is a Director of Judicial Watch. *Id.* ¶¶ 21-23.

**\*2** Plaintiff Larry Klayman ("Klayman") is the self-described founder and former Chairman and General Counsel of Judicial Watch, who resides in and practices law in the State of Florida. *Id.* ¶¶ 1, 18, 26. Plaintiff Louise Benson ("Benson") is a resident of California who has been a supporter of and donor to Judicial Watch. *Id.* ¶ 19.

### B. Klayman's Tenure At and Decision to Leave Judicial Watch

**\*2** Klayman alleges that in 1994, he "conceived of, incorporated and founded Judicial Watch to restore and promote ethics in the government and in the legal profession...." *Id.* ¶ 2. According to Klayman, during the ten (10) years after he founded Judicial Watch, the organization grew to a $28 million plus per year foundation with regional offices in five cities, employed about 50 employees, and planned to expand nationally and internationally. *Id.* ¶ 4. In addition, Judicial Watch had nationally syndicated radio and television shows called "The Judicial Watch Report," and, according to Klayman, "achieved many notable successful verdicts or findings in courts throughout the United States." *Id.*

**\*2** Klayman further alleges that in 2003, he decided to leave Judicial Watch in order to run for a seat in the United States Senate from his home state of Florida. *Id.* ¶¶ 5-6. As a result, Klayman entered into severance negotiations with Fitton, Orfanedes, and Farrell. *Id.* ¶ 7. On September 19, 2003, Klayman entered into a detailed Severance Agreement, signed by Klayman and Fitton, on behalf of Judicial Watch, and attested to by Orfanedes, as Corporate Secretary of Judicial Watch. *Id.;* Defs .' Judicial Watch and Fitton Mot. to Dismiss Second Am. Compl. (hereinafter "Fitton/JW Mot. to Dismiss"); Ex. 1 (9/19/03 Severance Agreement). In addition, Klayman alleges that before he left Judicial Watch, he discovered that, contrary to representations Fitton had previously made, Fitton had not obtained an undergraduate degree. *Id.* ¶ 8. As a result, Klayman alleges that, "[a]s a condition to his signing the Severance Agreement and stepping down from Judicial Watch, Klayman insisted, and Fitton agreed, to have Judicial Watch hire a qualified person to become Chairman." *Id.* ¶ 10.

### C. Events Subsequent to Klayman's Departure from Judicial Watch

**\*2** Klayman alleges that, "[i]nstead of taking the steps he promised to find a distinguished and qualified Chairman to run Judicial Watch, Fitton has solely acted to entrench himself as head of Judicial Watch," and that as a result, "today there is no Chairman, and Fitton controls Judicial Watch." *Id.* ¶¶ 11-12. Klayman further alleges that, since Klayman's departure from Judicial Watch, Fitton has mismanaged Judicial Watch and misled "Klayman and others to promote his personal agenda, interests, and political ideology to the detriment of Judicial Watch, Klayman, and Judicial Watch's donors and supporters." *Id.* ¶¶ 13-14. Klayman also alleges that Judicial Watch, Fitton, Orfanedes, and Farrell have "defamed, disparaged and cast Klayman in a false light to denigrate Klayman, and in an effort to undermine Klayman's ability to return to the helm of Judicial Watch or compete with Judicial Watch in the future." *Id.* ¶ 16.

**\*3** In addition, Klayman alleges that, more than a month after he stepped down as Chairman and General Counsel of Judicial Watch, Fitton caused Judicial Watch to send a fund-raising letter that falsely repres-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ented that Klayman was still Chairman and General Counsel of Judicial Watch, and used Klayman's name and image without permission. *Id.* ¶ 48; Ex. A (10/03 Judicial Watch Verdict mailing). Klayman alleges that this mailing created confusion among donors, who mistakenly sent donations to Judicial Watch, believing that Klayman was still running Judicial Watch. *Id.* ¶ 49.

### D. Benson's Donation to Judicial Watch

**\*3** Plaintiffs allege that in November 2002, while Klayman was still Chairman and General Counsel of Judicial Watch, Judicial Watch began a campaign to raise funds to purchase the building in which Judicial Watch's headquarters was located. *Id.* ¶ 50. As a result, Judicial Watch sent solicitations to potential donors, including Benson. *Id.;* Ex. B (copy of solicitation sent to Benson). Benson alleges that, relying on representations made in that solicitation, that the money raised would be used to purchase the Judicial Watch headquarters building, she pledged $50,000 to Judicial Watch and paid $15,000 up front to Judicial Watch. *Id.* ¶ 51. In addition, Benson alleges that she entered into an agreement with Judicial Watch that, as consideration for her $50,000 pledge and $15,000 up-front payment, Judicial Watch would name the President's Office in the headquarters after Benson, and that Judicial Watch further agreed that after purchasing the building, Judicial Watch would place a plaque on the President's Office recognizing Benson's contribution. *Id.* ¶¶ 81-83.

**\*3** Benson alleges that, after Klayman's departure from Judicial Watch, "Fitton caused Judicial Watch to cease actively pursuing the purchase of the Building, but concealed that fact from Benson and other similarly situated donors and supporters of Judicial Watch." *Id.* ¶ 53. Indeed, Benson alleges "on information and belief" that "Fitton caused Judicial Watch to commingle with Judicial Watch's operating funds, or misuse in other ways, the approximately $1.4 million raised from Benson and others." *Id.* ¶ 56. Nevertheless, Benson alleges, Judicial Watch published newsletters in February 2005 and September 2005 which led Benson and other donors to believe that Judicial Watch was actively pursuing the purchase of the headquarters building and maintaining donations

in a segregated, interest-bearing account. *Id.* ¶¶ 55, 57; Exs. C (2/05 Judicial Watch Verdict) and D (9/05 Judicial Watch Verdict). Benson specifically alleges that when she questioned Judicial Watch about the status of her donation and Judicial Watch's attempts to purchase the headquarters building, Judicial Watch fund-raiser Robert G. Mills "deliberately misrepresented that Judicial Watch was actively attempting to purchase the Building." *Id.* ¶¶ 60-61.

### E. Plaintiffs' Second Amended Complaint

**\*4** Plaintiffs filed their initial Complaint against Defendants Judicial Watch and Fitton on April 12, 2006, and thereafter filed an Amended Complaint against Judicial Watch and Fitton on May 1, 2006. Plaintiffs filed their Second Amended Complaint on June 14, 2006, in which they maintained the same nine Counts, but added Defendants Orfanedes and Farrell. Counts One, through Three of Plaintiffs' Second Amended Complaint are brought by Plaintiff Benson, while Counts Four through Nine of Plaintiffs' Second Amended Complaint are brought by Plaintiff Klayman.

**\*4** In Count One, Benson claims Fraudulent Misrepresentation against Fitton and Judicial Watch, alleging that Fitton and Judicial Watch misrepresented that they intend to use Benson's money to purchase a headquarters for Judicial Watch, despite having taken no steps to purchase the building, in order to induce Benson from demanding a refund of her donation. SAC ¶¶ 68-78. In Count Two, Benson claims Breach of Contract solely against Judicial Watch, alleging that by not purchasing a building for Judicial Watch headquarters, Judicial Watch breached its agreement offering Benson naming rights to the President's Office in consideration for her pledge of $50,000 and contribution of $15,000. *Id.* ¶¶ 79-88. In Count Three, Benson claims Unjust Enrichment solely against Judicial Watch, alleging that Judicial Watch accepted and used the benefit of Benson's $15,000 contribution, which she made in the belief that Judicial Watch would purchase the headquarters building and provide her with naming rights. Count Three further alleges that Benson "conferred a substantial benefit upon Judicial Watch in an amount in excess of $65,000" through support services she provided Judi-

cial Watch "with the expectation that Fitton and others would act honestly and ethically toward her and to the public generally." *Id.* ¶¶ 89-96.

**\*4** Counts Four and Five are brought by Klayman against all Defendants, and relate to the fund-raising mailing sent by Judicial Watch a month after Klayman's departure which allegedly misrepresented that Klayman was still Chairman and General Counsel of Judicial Watch. Count Four alleges that the mailing constituted false designation of origin, false and misleading descriptions, false and misleading representations, false and misleading advertising, and other acts of unfair competition, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B). *Id.* ¶ 97-106. Count Five alleges that the mailing constituted an unauthorized use of Klayman's name and likeness, in violation of Florida Statute § 540.08. *Id.* ¶¶ 107-114.

**\*4** Counts Six, Seven, and Eight are brought by Klayman solely against Judicial Watch and seek three separate remedies for Breach of Contract-rescission, damages, and specific performance. Count Six alleges that Judicial Watch willfully breached the Severance Agreement by (1) defaming, disparaging and casting Klayman in a false light to the public and the media; (2) failing to pay Klayman the full amount due under the Severance Agreement; (3) failing to return all of Klayman's property; (4) failing to take affirmative steps to purchase the Judicial Watch headquarters building and remove Klayman as guarantor for the Judicial Watch lease; and (5) failing to find a suitable successor for Klayman as Chairman of Judicial Watch. *Id.* ¶¶ 33-47; 115-132. Klayman alleges that these "deliberate misrepresentations materially induced [him] to enter into the Severance Agreement," and further claims that in light of Judicial Watch's pervasive breaches of the Severance Agreement, monetary damages would be inadequate. *Id.* ¶¶ 133-135. As a result, Klayman claims that the Severance Agreement must be rescinded, with Klayman restored to his position as Chairman of Judicial Watch. *Id.* ¶¶ 135-137.

**\*5** Count Seven incorporates by reference Klayman's previous allegations and seeks damages for Judicial Watch's alleged breach of the Severance Agreement.

*Id.* ¶¶ 138-140. Count Eight seeks specific performance as a remedy for Judicial Watch's alleged breach of the Severance Agreement, incorporating by reference Klayman's previous allegations, and further alleging that Judicial Watch has breached the Severance Agreement by: (1) failing to remove Klayman as guarantor for all credit card accounts; and (2) failing to provide Klayman access to documents. *Id.* ¶¶ 141-147.

**\*5** Finally, Klayman brings Count Nine against all Defendants for Defamation. Under the heading "Count Nine" of the Second Amended Complaint, Klayman describes three allegedly defamatory publications. First, Klayman alleges that, in its 2003 and 2004 Form 990 tax returns, Judicial Watch knowingly published false and misleading statements that Klayman owed Judicial Watch certain monies, and that Judicial Watch subsequently published the false tax returns on its website. *Id.* ¶¶ 66, 150-151. Second, Klayman alleges that, in response to his filing of the initial Complaint in this action, Fitton and Judicial Watch knowingly sent a false statement to Judicial Watch employees claiming that Klayman filed this action because he owed Judicial Watch a significant sum of money. *Id.* ¶ 154. Klayman alleges that when they published the false and misleading statement, "all Defendants knew that Klayman did not, individually, owe Judicial Watch any money." *Id.* ¶ 155. Third, Klayman alleges that Fitton and Judicial Watch published knowingly false statements in a number of media outlets, including *The Washington Post, The Washington Times, World NetDaily.com,* and *Slate.com,* by telling reporters that "Klayman filed his suit as a 'tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch.**' " *Id.* ¶¶ 156-157 (emphasis in original).

**\*5** In addition, elsewhere in the Second Amended Complaint, under the heading "Defamation, Disparagement of Klayman and Misrepresentation," Klayman alleges that Fitton has caused Judicial Watch to disparage and defame Klayman "in violation of the Severance Agreement" by allegedly doctoring press quotations originally made about Klayman so that they refer to Judicial Watch instead, and then posting these false statements on the Judicial Watch website.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5
Slip Copy, 2007 WL 140978 (D.D.C.)
**(Cite as: Slip Copy)**

*Id.* ¶ 65. It is unclear whether these allegations support Klayman's three Counts for breach of contract or instead relate to Count Nine, Klayman's claim for defamation.

**\*5** On June 28, 2006, Defendants Fitton and Judicial Watch filed a Motion to Dismiss Counts One, Two, Three, Four, Five, Six, and Nine of Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Motion to Dismiss brought by Defendants Fitton and Judicial Watch did not address Count Seven, Klayman's claim for damages based on breach of the Severance Agreement, or Count Eight, Klayman's claim for specific performance based on breach of the Severance Agreement.FN2 Plaintiffs filed their Opposition to the motion to dismiss brought by Defendants Fitton and Judicial Watch (hereinafter "Pls' Opp'n to Fitton/JW Mot .") on August 8, 2006, and Defendants Fitton and Judicial Watch filed their reply (hereinafter "Fitton/JW Reply") on September 1, 2006. Plaintiffs subsequently filed a motion for leave to file a sur-reply on September 14, 2006, which all Defendants opposed on September 22, 2006.

> FN2. The Court notes that on December 26, 2006, all Defendants filed a Motion for Summary Judgment as to Klayman's breach of contract claims, Counts Six, Seven, and Eight of the Second Amended Complaint. That Motion for Summary Judgment is not yet ripe.

**\*6** Also on June 28, 2006, Defendants Fitton and Judicial Watch filed a Motion to Sever the Claims of Plaintiff Benson from the Claims of Plaintiff Klayman, pursuant to Federal Rule of Civil Procedure 20(a) and Local Civil Rule 7. 1, as well as a Motion to Strike portions of the Second Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(f). *See* Mot. to Sever; Mot. to Strike. Plaintiffs opposed each of these motions on August 7, 2006, and Fitton and Judicial Watch filed their replies in further support of these motions on September 1, 2006.

**\*6** Furthermore, on July 10, 2006, Defendants Orfanedes and Farrell filed a separate Motion to Dismiss the Second Amended Complaint (hereinafter "Orfanedes/Farrell Mot. to Dismiss"), in which they expressly join the Motion to Dismiss previously filed by Defendants Fitton and Judicial Watch as to the substance of those Counts in which they were named as defendants (Count Four-Violation of the Lanham Act; Count Five-Violation of Florida Statute 540.08; and Count Nine-Defamation). In addition, Defendants Orfanedes and Farrell argue that Klayman's claims against them should be dismissed because the allegations contained in the Second Amended Complaint fail to support individual liability on their parts. *See generally* Orfanedes/Farrell Mot. to Dismiss. Plaintiffs filed their Opposition to that motion on August 7, 2006 (hereinafter "Pls' Opp'n to Orfanedes/Farrell Mot."), and Defendants Orfanedes and Farrell filed their Reply on September 1, 2006 (hereinafter "Orfanedes/Farrell Reply").

## II: LEGAL STANDARDS

**\*6** In evaluating a motion to dismiss for failure to state a claim made pursuant to Federal Rule of Civil Procedure 12(b)(6), "the Court must construe the complaint in the light most favorable to plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *In re United Mine Workers of Am. Employee Benefit Plans Litig., 854 F.Supp. 914, 915 (D.D.C.1994); see also Schuler v. United States, 617 F.2d 605, 608 (D.C.Cir.1979)* ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged ."). While the Court must construe the complaint in the Plaintiff's favor, it "need not accept inferences drawn by [the] plaintif[f] if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C.Cir.1994).* Moreover, the Court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC, 132 F.3d 753, 762 (D.C.Cir.1997).* The Court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C.Cir.1997); Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 n. 6*

(D.C.Cir.1993). Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint. *Henthorn v. Dep't of Navy,* 29 F.3d 682, 688 (D.C.Cir.1994); *cf. Behrens v. Pelletier,* 516 U.S. 299, 309 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

## III: DISCUSSION

### A. Motion to Dismiss Brought by Defendants Judicial Watch and Fitton

**\*7** Defendants Fitton and Judicial Watch argue that Counts One, Two, Three, Four, Five, Six, and Nine of the Second Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For their part, Plaintiffs contend that the allegations contained in each of the challenged counts are sufficient to state a cause of action, and that dismissal is therefore inappropriate. The Court shall address each of the challenged counts in turn.

### 1. Plaintiff Benson's Claims-Counts One, Two, and Three

**\*7** Plaintiff Benson brings claims of fraudulent misrepresentation, breach of contract, and unjust enrichment, alleging that she pledged $50,000 to Judicial Watch, $15,000 of which she donated up front, in reliance on representations made by Judicial Watch while Klayman was still Chairman and General Counsel that the money she contributed would be used to purchase the building housing Judicial Watch's headquarters. SAC ¶¶ 50-51. Benson further alleges that she entered into an agreement with Judicial Watch that, as consideration for her pledge and contribution, she would receive naming rights to the President's Office in the headquarters building. *Id.* ¶¶ 81-83. Benson alleges that Judicial Watch and Fitton have continued to represent to her and other donors, in mailings and orally, that they are actively working to purchase the headquarters building, despite the fact that they have ceased actively pursuing the purchase of the building. *Id.* ¶¶ 53-61. In addition, Benson al-

leges that she provided Judicial Watch with support services worth in excess of $65,000 "with the expectation that Fitton and others would act honestly and ethically toward her," but that Fitton and others have failed to do so. *Id.* ¶¶ 89-96. Defendants Fitton and Judicial Watch argue that Benson's allegations fail to state a claim for fraudulent misrepresentation, breach of contract, or unjust enrichment.

### a. Count One-Fraudulent Misrepresentation

**\*7** To state a claim for fraudulent misrepresentation, Benson must show "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Chedick v. Nash,* 151 F.3d 1077, 1081 (D.C .Cir.1998) (citing *Hercules & Co., Ltd. v. Shama Restaurant Corp.,* 613 A.2d 916, 923 (D.C.1992)). To prevail, Benson must also show that she has "suffered some injury as a consequence of [her] reliance on the misrepresentation." *Id.* (citing *Dresser v. Sunderland Apartments Tenants Ass'n, Inc.,* 465 A.2d 835, 839 (D.C.1983)). Fitton and Judicial Watch argue that, because Benson alleges that she made her pledge and contribution in reliance on representations made by Judicial Watch while Klayman was still Chairman and General Counsel, *see* SAC ¶¶ 50-51, she does not allege detrimental reliance on any misrepresentation by either Fitton or Judicial Watch. Fitton/JW Mot. to Dismiss at 4-5. Fitton and Judicial Watch further argue that Benson does not allege detrimental reliance because she does not allege any deadline by which Judicial Watch was required to purchase a headquarters building. *Id.*

**\*8** Benson's allegations are sufficient to state a claim for fraudulent misrepresentation. Benson specifically alleges that after Klayman left, Judicial Watch ceased actively pursuing the purchase of a headquarters building. SAC ¶ 53. Nevertheless, Benson alleges, Judicial Watch published newsletters in February and September 2005 representing that Judicial Watch was actively pursuing the purchase of a headquarters building, and a Judicial Watch fund-raiser told Benson that Judicial Watch was actively pursuing the purchase when Benson inquired as to the status of her donation. *Id.* ¶¶ 55-61. Benson further alleges that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Fitton and Judicial Watch knew that these representations were fraudulent, and made these misrepresentations to induce Benson and other donors not to seek a return of their donations. *Id.* ¶¶ 75-76. Notwithstanding the argument made by Fitton and Judicial Watch that Judicial Watch never committed to purchase a headquarters building by a date certain, Benson states a claim for fraudulent misrepresentation by alleging that Judicial Watch specifically misrepresented that it was actively pursuing the purchase of the building, when it had actually ceased to do so, in order to prevent Benson from seeking a return of her donation.

*8 Benson's claim for fraudulent misrepresentation is, however, limited to her allegation that she did not seek a return of her $15,000 donation. Benson does not allege that she ever donated the additional $35,000 she pledged to Judicial Watch, and as such cannot demonstrate detrimental reliance with respect to that amount. *See* SAC; Ex. B at 40 (list of Benson donations totaling $15,000 to Judicial Watch, indicating that last donation dated 7/24/03).

### b. Count Two-Breach of Contract

*8 Fitton and Judicial Watch make three arguments with respect to Benson's claim for breach of contract. First, they argue that, rather than being consideration for an agreement, Benson's donation was a gift that was complete upon delivery. Fitton/JW Mot. to Dismiss at 5-6. Second, they argue that Benson's failure to donate the additional $35,000 she pledged to Judicial Watch constitutes a breach of contract that precludes her from enforcing the terms of the contract she alleges. *Id.* at 6-7. Finally, they argue that because Benson does not allege that Judicial Watch committed to purchase a headquarters building by a date certain, her claim for breach of contract is not yet ripe. *Id.* at 7-8. Fitton and Judicial Watch's second two arguments merit little attention. Benson has alleged that she entered into an agreement with Judicial Watch whereby she pledged $50,000 and donated $15,000 up front in order to secure naming rights to the President's Office. SAC ¶¶ 50-51, 81-83. Benson specifically alleges that she "made her pledge solely on the condition that Judicial Watch was and would continue to actively pursue the purchase of the [headquarters] Building." *Id.* ¶ 52. Construing these

allegations in the light most favorable to Benson, she has alleged that she entered into a conditional agreement with Judicial Watch, which Judicial Watch breached by failing to actively pursue the purchase of a headquarters building, and further that Judicial Watch's breach relieved her of her obligation to donate the additional $35,000 she had pledged.

*9 Fitton and Judicial Watch's argument that Benson's $15,000 donation was a gift is more compelling, but nevertheless ultimately unsuccessful at the motion to dismiss stage. As Fitton and Judicial Watch acknowledge, under the law of the District of Columbia, the essential elements of a valid *inter vivos* gift are donative intent, delivery, and acceptance. *Zoob v. Jordan,* 841 A.2d 761, 765 (D.C.2004); *see also Murray v. Gadsden,* 197 F.2d 194 (D.C.Cir.1952). Moreover, "to prove donative intent, it must be shown from the evidence that the donor clearly and unmistakenly intended to permanently relinquish all interest in and control over the gift." *Zoob,* 841 A.2d at 765 (citing *Ross v. Fierro,* 659 A.2d 234, 239 (D.C.1995)). Benson clearly alleges that she did not intend her $15,000 donation to Judicial Watch to be a gift, but rather intended it as payment in consideration for naming rights in the Judicial Watch headquarters. SAC ¶¶ 50-51, 81-83. Whether Benson, in fact, intended to make a gift is therefore a question of fact that cannot be resolved on a motion to dismiss. *See Nwaoha v. Onyeoziri,* Civ. A. No. 04-1799(GK), 2006 WL 3361540, *3 (D.D.C. Nov. 20, 2006).

### c. Count Three-Unjust Enrichment

*9 Unjust enrichment is a quasi-contractual claim, which requires Benson to show that Judicial Watch was unjustly enriched at her expense and that the circumstances are such that in good conscience Judicial Watch should make restitution. *News World Comm'ns, Inc. v. Thompsen,* 878 A.2d 1218, 1222 (D.C.2005) (citing *Vereen v. Clayborne,* 623 A.2d 1190, 1194 (D.C.1993)). However, where the recipient of a benefit was under no notice that the person conferring a benefit expected payment in exchange, no injustice can be shown. *See H.G. Smithy Co. v. Washington Med. Ctr.,* 374 A.2d 891, 895 (D.C.1977). Benson alleges that she entered into an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agreement with Judicial Watch whereby she would receive naming rights in the Judicial Watch headquarters. SAC ¶¶ 50-51, 81-83. Her allegations regarding her $15,000 contribution to Judicial Watch are thus sufficient to state a claim for unjust enrichment because she alleges that Judicial Watch was on notice that she expected them to actively pursue the purchase of a headquarters building in exchange for her donation.

**9** Benson also alleges, however, that she "conferred a substantial benefit upon Judicial Watch" by providing support services worth at least $65,000 to the organization "with the expectation that Fitton and others would act honestly and ethically toward her." *Id.* ¶ 95. Fitton and Judicial Watch correctly argue that this allegation does not state a claim for unjust enrichment because Benson does not allege that Judicial Watch had notice that she expected to be paid for her support services if Fitton and others did not live up to Benson's expectations regarding their conduct. *See* Fitton/JW Mot. to Dismiss at 7-9. Instead, Benson alleges that, at some unspecified time, she volunteered her services to Judicial Watch and that she now believes that "Fitton and Judicial Watch have not acted properly by deliberately misleading donors and improperly converting Judicial Watch into a partisan organization." SAC ¶ 96. These allegations are entirely insufficient to demonstrate that "the circumstances were such that in good conscience [Judicial Watch] should make restitution." *News World Commc'ns, 878 A.2d at 1222; Vereen, 623 A.2d at 1194.* As Benson cannot maintain a claim for unjust enrichment based on the support services she allegedly provided to Judicial Watch, her claim for unjust enrichment, like her claims for fraudulent misrepresentation and breach of contract, are limited to the $15,000 she allegedly donated to Judicial Watch.

*d. This Court Lacks Jurisdiction Over Plaintiff Benson's Claims*

**10** "When it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, it shall dismiss the action." *Fed.R.Civ.P. 12(h)(3).* Moreover, "[i]f a court determines that it lacks subject matter jurisdiction, it therefore is duty bound to dismiss the case on its own motion." *Hawk*

*v. Olson, 326 U.S. 271, 272. 66 S.Ct. 116, 90 L.Ed. 61 (1945).* As discussed above, Benson's allegations are sufficient to state claims for fraudulent misrepresentation, breach of contract, and unjust enrichment; however, each of those claims is limited to Benson's allegations regarding the $15,000 she donated to Judicial Watch. Benson's claims therefore do not establish that the amount in controversy exceeds $75,000, as is required for this Court to exercise diversity jurisdiction under *28 U.S.C. § 1332(a).*

**10** The Court is aware that in *Exxon Mobil Corporation v. Allapattah Services, Inc., 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005),* the Supreme Court declared:

**10** If the court has original jurisdiction over a single claim in the complaint, it has original jurisdiction over a "civil action" within the meaning of § 1367(a), even if the civil action over which it has jurisdiction comprises fewer claims than were included in the complaint. Once the court determines it has original jurisdiction over the civil action, it can turn to the question whether it has a constitutional and statutory basis for exercising supplemental jurisdiction over the other claims in the action.

**10** *Exxon Mobil, 545 U.S. at ----, 125 S.Ct. at 2620-21.* Here, Plaintiff Klayman alleges damages totaling at least $3,500,000. See SAC at 32-33. [FN3] As a result, if Klayman's claims meet the amount in controversy requirement of *28 U.S.C. § 1332(a),* the Court has original jurisdiction over the instant "civil action," and may, if proper, exercise supplemental jurisdiction over Benson's claims.

FN3. The Court shall not, at this point, address whether Klayman has, in fact, stated a claim with respect to each Count comprising his total alleged damages, but rather shall assume that Klayman's claims meet the amount in controversy requirement and continue to determine whether the Court has a "constitutional and statutory basis for exercising supplemental jurisdiction" over Benson's claims. *Exxon Mobil, 545 U.S. at ----, 125 S.Ct. at 2620-21.*

**10** Pursuant to *28 U.S.C. § 1367(a),* a district court

that has original jurisdiction over a civil action "shall have supplemental jurisdiction over all other claims that are so related to claims in the action ... that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Court of Appeals for the District of Columbia Circuit has stated that "it is clear that section 1367(a) authorizes a district court to exercise its supplemental jurisdiction in mandatory language." *Lindsay v. Gov't Employees Ins. Co.*, 448 F.3d 416, 421 (D.C.Cir.2006) (citing, *inter alia*, *McCoy v. Webster*, 47 F.3d 404, 406 n. 3 (11th Cir.1995) ("Section 1367(a) *requires* the district court to exercise supplemental jurisdiction over claims which are closely related to claims over which the district court has original jurisdiction.") (emphasis in *Lindsay* )). However, 28 U.S.C. § 1367(a) also provides bases on which a district court may decline to exercise supplemental jurisdiction, including that "the 'other' claims are *not* 'so related' to the claims within the court's original jurisdiction that they constitute part of the same 'case or controversy.' " *Lindsay,* 448 F.3d at 421 (emphasis in original).

**\*11** The Court concludes that, even if this Court properly has original jurisdiction over Klayman's claims, Benson claims are not "so related" to Klayman's claims as to form part of the same "case or controversy" because the two Plaintiffs' claims do not "derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Benson's claims relate solely to her allegations that she donated $15,000 to Judicial Watch based on representations that her contribution would be used to purchase a headquarters building and that she would receive naming rights in the building. In contrast, Klayman's claims arise out of a wide range of events, including the negotiation and signing of the Severance Agreement, Judicial Watch's subsequent mailing of allegedly misleading fund-raising materials, Judicial Watch's alleged efforts to defame and disparage Klayman once he departed, and Judicial Watch's various alleged breaches of the Severance Agreement. As such, Klayman and Benson's claims cannot be said to "derive from the same nucleus of operative fact" and are not "so related" to each other as to form part of

the same "case or controversy." The Court therefore declines to exercise supplemental jurisdiction over Benson's claims and, as a result, shall dismiss without prejudice Counts One, Two, and Three of the Second Amended Complaint for lack of subject matter jurisdiction.

*2. Plaintiff Klayman's Claims-Counts Four, Five, Six, and Nine*

*a. Count Four-Violation of the Lanham Act*

**\*11** Plaintiff Klayman alleges that, more than a month after he stepped down as Chairman and General Counsel of Judicial Watch, Fitton caused Judicial Watch to send a fund-raising letter which falsely represented that Klayman was still Chairman and General Counsel of Judicial Watch and used Klayman's name and image without permission. *Id.* ¶ 48; Ex. A (10/03 Judicial Watch Verdict mailing). Klayman alleges that this mailing created confusion among donors, who mistakenly sent donations to Judicial Watch, believing that Klayman was still running Judicial Watch. *Id.* ¶ 49. Furthermore, Klayman alleges that he "is a celebrity within the non-profit legal/political community" and is "widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and public 'watchdog' groups." *Id.* ¶ 101. As a result, Klayman alleges that Defendants knowingly used his name and likeness on fund-raising materials a month after he stepped down as Chairman of Judicial Watch, thereby violating Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B). *Id.* ¶¶ 97-106.

**\*11** Section 43 (a) of the Lanham Act provides, in relevant part, as follows:

**\*11** Any person who, in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which-

**\*12** (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*12** (B) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities,

**\*12** shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**\*12** 15 U.S.C. § 1125(a). In Count Four, Klayman claims that the allegedly misleading mailing violated both prongs of the Lanham Act-the "false endorsement" prong, Section 43(a)(1)(A), and the "false advertising" prong, Section 43(a)(1)(B). SAC ¶ 98. Although Fitton and Judicial Watch interpret Klayman's claim as one asserting false endorsement under Section 43(a)(1)(A), *see* Fitton/JW Mot. to Dismiss at 11, they do not challenge his standing to bring a cause of action under the false advertising prong, Section 43(a)(1)(B). Nevertheless, the Court notes that this Circuit has not addressed whether a celebrity may bring a claim under Section 43(a) of the Lanham Act based on misleading or deceptive use of their name or likeness, and that the two Circuits and various District Courts that appear to have addressed the issue have allowed such claims to be brought under Section 43(a)(1)(A), the false endorsement prong of Section 43(a) of the Lanham Act. *See, e.g., Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 812 (9th Cir.1997); *Parks v. LaFace Records,* 329 F.3d 437, 445-46 (6th Cir.2003); *Albert Fürst von Thurn und Taxis v. Karl Prince von Thurn und Taxis,* No. 04 Civ. 6107(DAB), 2006 WL 2289847, \* 10-11 (S.D.N.Y. Aug. 8, 2006). As a result, the Court shall consider whether Klayman states a claim for false endorsement in violation of Section 43(a)(1)(A) of the Lanham Act.

**\*12** "Celebrities have standing to sue under § 43(a) because they possess an economic interest in their identities akin to that of a traditional trademark holder." *Parks,* 329 F.3d at 445 (citing *Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1110 (9th Cir.1992)). "A celebrity has a ... commercial investment in the 'drawing power' of his or her name and face in endorsing products and in marketing a career," *Allen v. National Video, Inc.,* 610 F.Supp. 612, 625 (S.D.N.Y.1985), which has been compared to the "property interest" of a trademark holder, *Parks,* 329

F.3d at 447. Fitton and Judicial Watch do not dispute that celebrities, in general, may bring false endorsement claims under Section 43(a) of the Lanham Act, and for purposes of their motion to dismiss they accept, as the Court must, Klayman's allegations that he is a "celebrity within the non-profit legal/political community" and is "widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and public 'watchdog' groups." *See* Fitton/JW Mot. to Dismiss at 11-12 (citing SAC ¶ 101). Instead, Fitton and Judicial Watch maintain that Klayman fails to state a claim for false endorsement because he does not claim "that his name and likeness have any uniquely exploitable commercial or economic value." *Id.* at 12. However, Fitton and Judicial Watch do not cite to the Court any legal authority-nor is the Court aware of any such authority-to support their argument that Klayman is required, in addition to alleging that he is a celebrity, to allege "that his name and likeness have [a] uniquely exploitable commercial or economic value." FN4

> FN4. Fitton and Judicial Watch may have drawn the idea that Klayman is required to specifically allege "that his name and likeness have [a] uniquely exploitable commercial or economic value," Fitton/JW Mot. to Dismiss at 12, from *Allen v. National Video, Inc.,* in which the court stated that the familiarity of millions of people with Woody Allen's face and his "reputation for artistic integrity, have significant, exploitable, commercial value." *Allen,* 610 F.Supp. at 617. *Allen* does not state, however, that a plaintiff must specifically allege as much in order to maintain a claim of "false endorsement" under Section 43(a) of the Lanham Act.

**\*13** The Second Amended Complaint includes the following allegations, which the Court finds sufficient to state a claim for false endorsement under Section 43(a) of the Lanham Act: (1) he is a "celebrity within the non-profit legal/political community" and is "widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and public 'watchdog' groups," SAC ¶ 101; (2) Defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"deliberately used Klayman's image and name to confuse donors into thinking that Klayman was still affiliated with Judicial Watch" and "to entice donors to continue giving donations to Judicial Watch," *id.* ¶¶ 103-104; and (3) the allegedly deceptive mailing "created confusion among donors" who "mistakenly sent donations to Judicial Watch," *id.* ¶ 49. As a result, the Court shall deny Fitton and Judicial Watch's motion to dismiss as to Count Four of the Second Amended Complaint. Furthermore, the Court's conclusion applies equally to Defendants Orfanedes and Farrell, insofar as they have joined in Fitton and Judicial Watch's motion to dismiss Count Four. The Court notes, however, that what Klayman must prove in order to succeed on a claim for false endorsement is far removed from what he must allege in order to survive a motion to dismiss. The Court does not opine at this time on whether Klayman will ultimately be required to prove that he has an economic interest in his name and likeness in order to prevail on a claim for false endorsement under Section 43(a) of the Lanham Act.

### b. Count Five-Violation of Florida Statute § 540.08

*13 Count Five relates to the same mailing that forms the basis of Count Four, and alleges that the fundraising mailing constituted an unauthorized use of Klayman's name and likeness without his "express written or oral consent." SAC ¶ 108. Klayman further alleges that these acts "were perpetrated and occurred both nationally and internationally" and that the "misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations." *Id.* at 108-109. Klayman alleges that Defendants' conduct constitutes a violation of Florida Statute § 540.08, which provides, "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by (a) such person...." Fla. Stat. § 540.08.

*13 Fitton and Judicial Watch argue that Count Five must be dismissed because, as the alleged unauthorized mailing was sent in October 2003, Klayman's claim is barred by the District of Columbia's one-year

statute of limitations for actions involving libel and slander. Fitton/JW Mot. to Dismiss at 14-16. Fitton and Judicial Watch initially argue that District of Columbia law applies to Count Five because "the parties executed a Severance Agreement on September 19, 2003 that contains a choice of law provision designating the laws of the District of Columbia as governing the relationship of the parties." *Id.* at 15. As Fitton and Judicial Watch admit, however, that choice of law provision provides that the "Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to its conflict of laws principles." *Id.* While Fitton and Judicial Watch argue that "determination of [Klayman's claims under Florida Statute § 540.08] will necessarily involve the rights of the parties as set forth in the Severance Agreement," *id.,* that is not actually the case. Klayman does not claim that the alleged unauthorized mailing was a breach of the Severance Agreement, but rather alleges that it constituted an entirely separate statutory violation which is actionable under Florida law. The fact that the Severance Agreement is governed by District of Columbia law is therefore irrelevant to determining whether Klayman's claim for a violation of Florida Statute § 540.08 is barred by a District of Columbia statute of limitations.

*14 Fitton and Judicial Watch next assert that application of the District of Columbia choice of law principles demonstrates that District of Columbia law applies because the "conduct alleged in Count Five of the Second Amended Complaint is analogous to a claim of libel and slander in the District of Columbia," which is governed by a one-year statute of limitations. *Id.* A federal court sitting in diversity must apply state law to the substantive issues before it. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938). As the statute of limitations is considered substantive for this purpose, the Court looks to state law to determine whether Klayman's cause of action based on state law has expired, and applies the District of Columbia choice of law rules to determine which state's statute of limitations applies. *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.,* 62 F.3d 1454, 1458 (D.C.Cir.1995) (citing *Guaranty Trust Co. v. York,* 326 U.S. 99, 65

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.Ct. 1464, 89 L.Ed.2079 (1945); *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); and *Lee v. Flintkote Co.,* 593 F.2d 1275, 1278-80 (D.C.Cir.1979)). Furthermore, the District of Columbia choice of law rules "treat statutes of limitations as procedural, and therefore almost always mandate application of the District's own statute of limitations." *Id.* (citations omitted).

**\*14** However, Fitton and Judicial Watch's argument that Klayman's claim under Florida Statute § 540.08 is barred by a District of Columbia statute of limitations posits a false conflict between the District of Columbia one-year statute of limitations for libel and slander and the four-year statute of limitations for actions brought under Florida Statute § 540.08. *See Epic Metals Corp. v. Condec, Inc.,* 867 F.Supp. 1009, 1015 (M.D.Fla.1994) ("Because section 540.08 does not provide its own limitations period and the action does not fall within any of the specific categories provided in Florida Statute § 95.11, the four year all inclusive statute of limitations is applicable.") (citing Fla. Stat. § 95.11(3)(p)). Under District of Columbia law, appropriation of one's name or likeness is one theory on which a plaintiff may maintain a common law tort cause of action for invasion of privacy, a tort which is governed by a one-year statute of limitations. *Grunseth v. Marriott Corp.,* 872 F.Supp. 1069, 1074 (D.C.Cir.1995) (citing *Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580, 586 (D.C.1985) and *Doe v. Southeastern University,* 732 F.Supp. 7, 8 (D.D.C.1990), *appeal dismissed,* 927 F.2d 1257 (D.C.Cir.1991)).

**\*14** In contrast, Florida Statute § 540.08 specifically states, "[t]he remedies provided for in this section shall be in addition to and not in limitation of the remedies and rights of any person under the common law against the invasion of her or his privacy." Fla. Stat. § 540.08(6). The District of Columbia one-year statute of limitations for common law claims of invasion of privacy is therefore inapplicable to Klayman's claim under Florida Statute § 540.08 because that statute is intended to create a cause of action above and beyond Klayman's rights under the common law. As a four-year statute of limitations therefore applies to Klayman's claim under Florida Statute § 540.08,

*see Epic Metals Corp.,* 867 F.Supp. at 1015, the Court shall deny Fitton and Judicial Watch's motion to dismiss as to Count Five of the Second Amended Complaint.[FN5] Furthermore, insofar as Defendants Orfanedes and Farrell joined in Fitton and Judicial Watch's motion to dismiss as to Count Five, the Court's conclusion applies equally to them.

> FN5. The Court notes that, in proceeding with this action, it will require Klayman to provide a satisfactory explanation as to why he should be allowed to invoke a Florida statute in this action, when (1) the allegedly unauthorized mailing was sent from the District of Columbia; (2) Klayman has opted to bring suit in the District of Columbia; and (3) his allegations of injury in Florida flowing from the allegedly unauthorized mailing, while sufficient to withstand a motion to dismiss for failure to state a claim, are sparse at best. *Cf. Gritzke v. M.R.A. Holding, LLC,* No. 4:01CV496-RH, 2002 WL 32107540, \*1 (N.D.Fla. Mar. 15, 2002) (denying motion to dismiss which argued that Florida Statute § 540.08 was inapplicable where videotape was made in Louisiana because plaintiff was a Florida resident who alleged that the videotape was advertised and sold in Florida).

### c. Count Six-Rescission for Breach of Contract

**\*15** In Count Six of the Second Amended Complaint, Klayman seeks rescission of the Severance Agreement, alleging various willful breaches of the Severance Agreement by Judicial Watch, and claiming that Judicial Watch's "deliberate misrepresentation" that an appropriate Chairman would be found to succeed Klayman "materially induced [him] to enter into the Severance Agreement." SAC ¶ ¶ 133-135. Klayman alleges that Fitton and Judicial Watch's breaches of the Severance Agreement are "so pervasive and widespread that monetary damages would be inadequate" and that as a result, the Severance Agreement must be rescinded, with Klayman restored to his position as Chairman of Judicial Watch. *Id.* ¶¶ 135-137. Fitton and Judicial Watch assert that Count Six must be dismissed for two reasons. First, they argue that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Klayman cannot seek the equitable remedy of rescission because an adequate remedy at law is available to him. Fitton/JW Mot. to Dismiss at 26-27. Second, they argue that before seeking rescission, Klayman must restore Judicial Watch to its pre-contract position, a feat which Fitton and Judicial Watch maintain Klayman is not able to perform. The Court finds Fitton and Judicial Watch's arguments unavailing at the motion to dismiss stage.

**\*15** Fitton and Judicial Watch correctly argue that it is a basic doctrine of equity jurisprudence that equitable relief will not be granted where the plaintiff has a complete and adequate remedy at law. *Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)* (citing *O'Shea v. Littleton, 414 U.S. 488, 499, 94 S.Ct. 669, 677-78, 38 L.Ed.2d 674 (1974)* and *Younger v. Harris, 401 U.S. 37, 43-44, 91 S.Ct. 746, 750-51, 27 L.Ed.2d 699 (1971)*). However, while Klayman does seek damages for Judicial Watch's alleged breach of the Severance Agreement in Count Seven of the Second Amended Complaint, in Count Six Klayman alleges that monetary damages are inadequate and that rescission is necessary to prevent continued harm to Klayman and Judicial Watch. SAC ¶¶ 135-36. The Court is bound to credit Klayman's allegations on a motion to dismiss. While the equitable remedies of rescission and specific performance may ultimately prove unnecessary or an inadvisable means of addressing Judicial Watch's alleged breach of the Severance Agreement, the Court cannot conclude at this stage of proceedings that they are entirely unavailable to Klayman.[FN6]

> **FN6.** In allowing Klayman to pursue his claim for rescission, the Court notes that under the law of the District of Columbia, "[w]here a party to an executed contract discovers a material misrepresentation made in the execution of the contract, that party may elect one of two mutually exclusive remedies. He may either affirm the contract and sue for damages, or repudiate the contract and recover that with which he or she has parted." *Dean v. Garland, 779 A.2d 911, 915 (D.C.2001)* (citing *Dresser, 465 A.2d at 840*). In the end, Klayman may not "rescind

for breach of contract and at the same time recover damages for the breach." *Id.* (citations omitted). Although Klayman may set forth alternative claims for relief in his Second Amended Complaint, *see* Fed.R.Civ.P. 8(e)(2), and proceed on each claim past a motion to dismiss, he cannot ultimately receive double redress for a single wrong. *Id.* at 916 (citing *Giordano v. Interdonato, 586 A.2d 714, 717 (D.C.1991)*).

**\*15** Fitton and Judicial Watch are also correct that "inherent in the remedy of rescission is the return of the parties to their pre-contract positions," such that, in order to seek rescission, Klayman must restore Judicial Watch to its position at the time the Severance Agreement was made. *Id.* at 915 (citing *Kent Homes, Inc. v. Frankel, 128 A.2d 444, 446 (D.C.1957)*. Fitton and Judicial Watch argue that "[a]s a matter of law, Klayman is not able to restore Judicial Watch to its pre-contract position" because Klayman received $600,000 pursuant to the Severance Agreement, which he has not returned, and because, according to Fitton and Judicial Watch, the "many personnel, management and other" changes that have occurred in the three years since Klayman left Judicial Watch make it impossible for him to return to his former position as Chairman. Fitton/JW Mot. to Dismiss at 28. Fitton and Judicial Watch's second argument lacks merit because, while it may be uncomfortable at this point for Klayman to return to his position as Chairman of Judicial Watch, it is not "impossible" merely because the organization has changed in the past three years. Their argument as to the monetary benefit that Klayman received under the Severance Agreement, however, has merit. If Klayman ultimately opts to pursue a claim for rescission, he will be required to return to Judicial Watch the $600,000 he received under the Severance Agreement. Nevertheless, Fitton and Judicial Watch do not cite the Court to authority-nor is the Court aware of such authority-indicating that Klayman is required to tender the monetary benefit he received at this juncture in order to maintain a cause of action for rescission. As such, the Court shall deny Fitton and Judicial Watch's motion to dismiss as to Count Six of the Second Amended Complaint.[FN7]

Slip Copy, 2007 WL 140978 (D.D.C.)
**(Cite as: Slip Copy)**

FN7. The Court shall leave further discussion of Count Six to its consideration of Defendants' not-yet-ripe Motion for Summary Judgment as to Counts Six, Seven, and Eight of the Second Amended Complaint, filed on December 26, 2006.

*d. Count Nine-Defamation*

**\*16** In Count Nine of the Second Amended Complaint, Klayman claims that "Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives ... have defamed Klayman, by publishing false statements to various persons and entities ...," SAC ¶ 149, and describes three allegedly defamatory publications, *id.* ¶¶ 148-162. First, Klayman alleges that, in its 2003 and 2004 Form 990 tax returns, Judicial Watch knowingly published false claims that Klayman owed Judicial Watch money, and subsequently published the allegedly false and misleading tax returns on its website. *Id.* ¶¶ 66, 150-151. Second, Klayman alleges that Fitton and Judicial Watch knowingly sent a false statement to Judicial Watch employees claiming that Klayman filed this action because he owed Judicial Watch a significant sum of money. *Id.* ¶ 154. Third, Klayman alleges that Fitton and Judicial Watch published knowingly false statements in a number of media outlets, including *The Washington Post, The Washington Times, World NetDaily.com,* and *Slate.com,* because Defendants falsely told reporters that "Klayman filed his suit as a 'tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch.**' " *Id.* ¶¶ 156-157 (emphasis in original).

**\*16** In addition, elsewhere in the Second Amended Complaint, Klayman alleges that Fitton has caused Judicial Watch to disparage and defame Klayman "in violation of the Severance Agreement" by allegedly doctoring press quotations originally made about Klayman so that they refer to Judicial Watch instead, and then posting these false statements on the Judicial Watch website. *Id.* ¶ 65. It is unclear whether these allegations provide support for Count Nine; however, Fitton and Judicial Watch address them in that context in their motion to dismiss. *See* Fitton/JW Mot. to Dismiss at 23-25. As such, in addition to dis-

cussing the three categories of allegedly defamatory statements described by Klayman in Count Nine, the Court shall consider whether Klayman's allegations that Judicial Watch doctored press quotations to remove references to Klayman state a claim for defamation.

**\*16** "A statement is actionable in defamation under District of Columbia law if it is both false and defamatory." *Weyrich v. The New Republic, Inc.,* 235 F.3d 617, 627 (D.C.Cir.2001) (citing *Moldea v. New York Times Co.,* 15 F.3d 1137, 1142 (D.C.Cir.1994), *rev'd in part on rhr'g,* 22 F.3d 310 (D.C.Cir.1994). FN8 On a motion made pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must assume the falsity of any express or implied factual statements, *Weyrich,* 235 F.3d at 623, and a statement is considered "defamatory 'if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community," *id. at 627* (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1293-94 (D.C.Cir.1988)). "An allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Weyrich,* 235 F.3d at 627 (citing *Howard Univ. v. Best,* 484 A.2d 958, 989 (D.C.1989)).

FN8. The Court shall apply the District of Columbia law of defamation in assessing Klayman's Count Nine. The Court notes that Defendants rely on District of Columbia law, *see* Fitton/JW Mot. to Dismiss at 16-26, and that Klayman does not actually argue that choice of law principles favor the application of Florida law, *see* Fitton/JW Reply at 6 n. 3. While Klayman does cite a single Florida case for the elements of defamation, he otherwise relies solely on District of Columbia law in opposing Fitton and Judicial Watch's motion to dismiss and states that "[a]ssuming the District of Columbia law applies to this intentional tort the required elements for the claim are the same as those required under Florida law." Pls' Opp'n to Fitton/JW Mot. at 18 n. 1. Furthermore, although the parties have not briefed this issue, the Court concludes that

applying the District of Columbia's governmental interest analysis test to determine the proper law of defamation to apply to this diversity action would likely lead as well to the application of District of Columbia law. *See* *Weyrich, 235 F.3d at 626* (citing *Klaxon, 313 U.S. at 496, 61 S.Ct. 1020).* The governmental interest approach adheres to a two-step inquiry: 1) identifying the governmental policies underlying the applicable laws; and 2) determining which state's policy would be most advanced by having its law applied to the facts of this case. *See* *Stutsman v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., 546 A.2d 367, 373 (D.C.1988)*; *Williams v. Williams, 390 A.2d 4, 6 (D.C.1978).* To evaluate which state has the stronger interest, the four factors enumerated in the *Restatement (Second) of Conflict of Laws § 145* are also considered: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship is centered. *See Hercules,* 566 A.2d at 40-41.

Here, Klayman alleges various defamatory statements, including statements published by Judicial Watch on its website, presumably from its District of Columbia headquarters; statements made to members of the media, including *The Washington Post* and *The Washington Times;* and statements made to Judicial Watch employees, again presumably at the District of Columbia headquarters. As a result, the majority of the alleged conduct causing Klayman's injury occurred in the District of Columbia. In addition, Judicial Watch is headquartered in the District of Columbia, and the Klayman-Judicial Watch relationship is centered in the District of Columbia, where Klayman was employed by Judicial Watch. While Klayman alleges that he is a resident of Florida and that, as such, harm to his reputation accrued in Florida, it appears that the District of Columbia's

interest in this action is stronger. The Court shall therefore apply the District of Columbia law of defamation in assessing Count Nine. If the parties disagree with this conclusion, they are instructed to brief the issue completely in their next round of briefing.

**\*17** Fitton and Judicial Watch assert, and Klayman does not contest, that the appropriate standard for defamation to apply in this case is that of a public person. *See* Fitton/JW Mot. to Dismiss at 16 n. 6; Pls' Opp'n to Fitton/JW Mot. at 21. As the Supreme Court has explained,

**\*17** Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures ... may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.

**\*17** *Gertz v. Welch, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).* However, as Klayman correctly notes, on a motion to dismiss made under *Federal Rule of Civil Procedure 12(b)(6)*, the Court must assume that statements were made with knowledge of their falsity or disregard for their truth. *Weyrich, 235 F.3d at 623.* On this motion, the Court is therefore required only to decide whether the allegedly defamatory statements "(1) contain[ ] express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place appellant in an offensive false light." *Id.* (citing *Moldea, 15 F.3d at 1142-43; Guilford Transp. Ind., Inc. v. Wilner, 760 A.2d 580, 597 (D.C.2000)).*

*i. Statements in Form 990 Tax Returns*

**\*17** Fitton and Judicial Watch argue that Klayman cannot state a claim for defamation based on the alleged false statements made in Judicial Watch's 2003 and 2004 Form 990 tax returns because "[a] s a matter of law and of public policy, statements contained in mandatory governmental filings are absolutely privileged against claims for defamation, regardless of the existence or absence of actual malice." Fitton/

JW Mot. to Dismiss at 17.[FN9] In support of this as-sertion, Fitton and Judicial Watch point to the Re-statement Second of Torts § 592A, which states that "[o]ne who is required by law to publish defamatory matter is absolutely privileged to publish it." Restate-ment (Second) of Torts § 592A (1977).

> FN9. The Court notes that affirmative de-fenses, such as privilege, may be raised on a motion made pursuant to Federal Rule of Civil Procedure 12(b) "when the facts that give rise to the defense are clear from the face of the complaint." Smith-Haynie v. Dis-trict of Columbia, 155 F.3d 575, 578 (D.C.Cir.1998). Here, the Second Amended Complaint specifically alleges that Defend-ants published defamatory statements in their Form 990 tax returns, and made those returns available on the Judicial Watch web-site. SAC ¶¶ 66, 150-51. As such, it is ap-propriate for Fitton and Judicial Watch to raise their affirmative defense on a motion to dismiss under Rule 12(b). The Court fur-ther notes that Fitton and Judicial Watch's Seventeenth Affirmative Defense pled in their Answer to Plaintiffs' Second Amended Complaint is an affirmative defense of priv-ilege as against Klayman's claim for defam-ation. See Ans. of Defs. JW and Fitton to Pls' Second Am. Compl. at 11.

*17 As Fitton and Judicial Watch explain, IRS regu-lations provide that a 501(c)(3) non-profit organiza-tion like Judicial Watch "shall make its annual in-formation returns ... available for public inspection without charge in [its offices] during regular business hours." Fitton/JW Mot. to Dismiss at 18; 26 C.F.R. § 301.6104(d)-1(a). In addition, the regulations provide that Judicial Watch "shall provide a copy without charge ... of all or any part of any application re-quired to made available for public inspection under this paragraph to any individual who makes a request for such copy in person or in writing." Id. The regu-lations further provide that a 501(c)(3) organization is not required to comply with requests for copies of its annual information return if "the organization has made the requested document widely available," Fit-ton/JW Mot. to Dismiss at 18; 26 C.F .R. §

301.6104(d)-2(a), and specifically explain that a 501(c)(3) organization may make its annual informa-tion return "widely available" by posting it on the or-ganization's webpage, Fitton/JW Mot. to Dismiss at 18; 26 C.F.R. § 301.6104(d)-2(b)(2). Fitton and Judi-cial Watch thus argue that "[w]hen Judicial Watch posted its Forms 990 on its website, it did so not on its own initiative, but in order to ensure compliance with the law" and that the "privilege for this type of compulsory publication is-and as a matter of public policy, must be-absolute." Fitton/JW Mot. to Dismiss at 18-19. Fitton and Judicial Watch further rely on Goggins v. Hoddes, 265 A.2d 302 (D.C.1970), in which the District of Columbia Court of Appeals found that a report which an employer filed with the District Unemployment Compensation Board could not form the basis of an action for libel because the employer was required by law to file the report. Id. at 303.[FN10]

> FN10. Neither party has cited the Court to case law specifically addressing the issue of whether an absolute privilege applies to tax returns, nor did the Court locate such case law in its own research. The Court is aware that courts in other jurisdictions, in the con-text of other forms required by law to be submitted, have considered a qualified priv-ilege appropriate. See, e.g., Dawson v.. New York Life Ins. Co., 135 F.3d 1158 (7th Cir.1998). However, the Court is aware of no precedent from this jurisdiction indicat-ing that the privilege at issue is qualified rather than absolute.

*18 Klayman disputes Fitton and Judicial Watch's as-sertion that statements made in its Form 990 tax re-turns are absolutely privileged. Klayman concedes that Judicial Watch is required to make its annual in-formation returns available for public inspection, but maintains that the decision to make a return widely available by posting it on the organization's website is elective rather than mandatory. Pls' Opp'n to Fit-ton/JW Mot. at 19-21 Klayman thus seeks to distin-guish Goggins by arguing that in that case, the re-ports were required to be published and were to be kept confidential, whereas in the instant case, Klay-man argues, the "publication was voluntary and

broad." *Id.* at 19. However, the applicable regulations specifically provide that a 501(c)(3) may, in lieu of complying with requests for copies of its annual information return, make the document "widely available," and that one permissible means of doing so is posting the document on the organization's webpage. 26 C.F.R. §§ 301.6104(d)-2(a), 2(b)(2). As such, in filing its Form 990 tax returns and posting them on the organization's website, Judicial Watch was performing a duty required by law in a means specifically permitted by the applicable regulations. Judicial Watch was therefore acting pursuant to its legal duty, and cannot be said to have "voluntarily" published allegedly defamatory material.

**\*18** Moreover, Klayman's attempt to distinguish the instant case from *Goggins* on the grounds that the forms in *Goggins* were kept confidential and never published to outside parties is unavailing. To meet the element of publication in the context of defamation, "[i]t is not necessary that the defamatory matter be communicated to a large or even a substantial group of persons. It is enough that it is communicated to a single individual other than the one defamed." Restatement (Second) of Torts § 577 cmt. b (1977); *see also* Steinbuch v. Cutler, Civ. A. No. 05-0970(PLF), 2006 WL 3060084 (D.D.C. Oct. 30, 2006) ("as used in connection with liability for defamation ... '[p]ublication' can mean communication to a single person.") (citing Restatement (Second) of Torts § 652D cmt. a). As a result, the fact that Judicial Watch allegedly published defamatory material to anyone who visited the organization's website, while the defendant in *Goggins* published the allegedly defamatory form only to the District Unemployment Compensation Board, is a distinction of no legal consequence.

**\*18** Finally, Klayman argues that there is "no privilege known to the common law of defamation protecting the intentional publication of false material," and as such, that Judicial Watch's Form 990 tax returns cannot be absolutely privileged because Klayman alleges that the returns contain defamatory and ancillary information. Pls' Opp'n to Fitton/JW Mot. to Dismiss at 20-21. However, "the fact that the [returns were] defamatory (if [they were] ) cannot determine the applicability of the privilege, since the very pur-

pose of the privilege is to protect against liability for defamation." Messina v. Krakower, 439 F.3d 755, 760 (D.C.Cir.2006) (addressing statements made in complaint in connection with applicability of litigation privilege). The Court shall therefore grant Fitton and Judicial Watch's motion to dismiss Count Nine insofar as it is based on allegedly defamatory statements made in Judicial Watch Form 990 tax returns.FN11 Furthermore, the Court's conclusion applies equally to Defendants Orfanedes and Farrell, who joined in Fitton and Judicial Watch's motion to dismiss as to Count Nine.

> FN11. Fitton and Judicial Watch filed their reply in further support of their motion to dismiss Counts One through Six and Nine of the Amended Complaint on September 1, 2006. Plaintiffs subsequently filed a motion for leave to file a sur-reply on September 14, 2006. Plaintiffs proposed sur-reply is limited to the issue of whether Judicial Watch's Form 990 tax returns were subject to an absolute privilege, and Defendants opposed Plaintiffs' motion for leave to file a sur-reply on September 22, 2006. The Court shall deny Plaintiffs' motion for leave to file a sur-reply. "A surreply may be filed only by leave of Court, and only to address new matters raised in a reply to which a party would otherwise be unable to respond." United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F.Supp.2d 270, 276-77 (D.D.C.2002). Here, Fitton and Judicial Watch's reply does not raise any new matters, and Plaintiffs' proposed sur-reply simply seeks to continue arguing a matter already addressed in his Opposition. As such, it is not appropriate to permit the sur-reply to be filed.

### ii. Statement to Judicial Watch Employees

**\*19** Fitton and Judicial Watch next argue that Klayman cannot maintain a claim for defamation based on an allegedly false statement sent by Defendants to Judicial Watch employees claiming that Klayman filed this action because he owed Judicial Watch a significant sum of money, SAC ¶ 154, because "such

statements are mere expressions of opinion regarding a matter of public concern, namely the dispute between a well-known public watchdog group and its former chairman." Fitton/JW Mot. to Dismiss at 21. Fitton and Judicial Watch are correct that "[f]air comment or criticism on a matter of public interest is not actionable so long as the comment is not motivated by malice." *Fisher v. Washington Post Co.,* 212 A.2d 335, 337 (D.C.1965). Indeed, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). This "fair comment privilege" "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our nation." *Id.* (citing *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 53-55, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

**\*19** However, it is equally true that the "fair comment defense goes only to opinions expressed by the writer and does not extend to misstatements of fact." *Fisher,* 212 A.2d at 337 (citing *Washington Times Co. v. Bonner,* 86 F.2d 836 (D.C.Cir.1936)). "Thus where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard for the truth" and with some level of fault. *Milkovich,* 497 U.S. at 20-21, 110 S.Ct. 2695. Here, while Fitton and Judicial Watch claim that their "[s]tatements regarding the perceived motive for [Klayman's] lawsuit.. are mere expressions of opinion regarding a matter of public concern," Fitton/JW Mot. to Dismiss at 21, Klayman specifically alleges that Judicial Watch made false and defamatory statements of fact. According to Klayman, "Fitton and Judicial Watch knowingly sent a false statement to all Judicial Watch employees, which stated that Klayman filed his lawsuit because he owed Judicial Watch a significant sum of money," and that all Defendants "knew that Klayman did not, individually, owe Judicial Watch any money when they published the false and misleading statement."

SAC ¶¶ 154-155.[FN12] Accepting Klayman's allegations as true, it is clear that Fitton and Judicial Watch's allegedly defamatory statements are "not the sort of loose, figurative, or hyperbolic language which would negate the impression that" Fitton and Judicial Watch were seriously maintaining that Klayman owed Judicial Watch a significant sum of money. *Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695. Moreover, the "connotation" that Klayman owed Judicial Watch money "is sufficiently factual to be susceptible of being proved true or false," *id.,* and as such Judicial Watch's allegedly defamatory statement to Judicial Watch employees may properly form the basis for Klayman's action for defamation. The Court shall therefore deny Fitton and Judicial Watch's motion to dismiss the Second Amended Complaint insofar as it relates to allegations that they knowingly misrepresented to Judicial Watch employees that Klayman owed the organization significant sums of money. Furthermore, as Defendants Orfanedes and Farrell joined in Fitton and Judicial Watch's motion to dismiss as to Count Nine, the Court's conclusion applies equally to them.

> FN12. Klayman's allegations that Fitton and Judicial Watch knowingly misstated to Judicial Watch employees that Klayman owed Judicial Watch a significant sum of money, while admittedly sparse, are sufficient to meet the notice pleading requirement applicable to defamation actions. *See Croixland Props. Ltd. P'ship v. Corcoran,* 174 F.3d 213, 215 n. 2 (D.C.Cir.1999) ("the Federal Rules of Civil Procedure impose no special pleading requirements for defamation as they do for a specified list of other matters."). However, in addition to the allegations discussed above, in his Opposition to Fitton and Judicial Watch's motion to dismiss, Klayman argues that two additional allegations-included in Plaintiffs' Second Amended Complaint but not under the heading "Count Nine"-describe further defamatory misstatements of fact by Fitton and Judicial Watch. Pls' Opp'n to Fitton/JW Mot. to Dismiss at 22. Specifically, Klayman points to his allegations that Fitton and Judicial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Watch (1) affirmatively told callers to Judicial Watch that "they could not discuss the 'reasons' why Klayman left Judicial Watch, contrary to the express provisions in the Severance Agreement, in order to create the erroneous impression that Klayman was forced to leave Judicial Watch," SAC ¶ 37; and (2) "[o]n information and belief ... interfered with Klayman's relationships with ... former clients who had offered to help Klayman in his Senate campaign, by disparaging, defaming, holding in a false light and providing false and misleading information to them to cause them to sever their relationships with Klayman." *Id.;* SAC ¶ 66J. Klayman argues that these statements "contain verifiably false statements of fact which contain reasonable defamatory meaning" because the Severance Agreement states that "Klayman's separation shall be treated for all purposes as a voluntary resignation." Pls' Opp'n to Fitton/JW Mot. to Dismiss at 22.

Neither of these allegations are sufficient to state a claim for defamation. Klayman's allegation that Fitton and Judicial Watch interfered with Klayman's relationships with former clients fails to meet even the notice pleading requirement of Federal Rule of Civil Procedure 8 because it does not actually allege a particular "false and defamatory statement" or even the general nature of any allegedly defamatory statements, and is therefore insufficient "to permit the opposing party to form responsive pleadings." *See* Crowley v. N. Am. Telecomm. Ass'n., 691 A.2d 1169, 1172 (D.C.1997). Furthermore, Klayman's allegation that Fitton and Judicial Watch told callers that they "could not discuss the 'reasons' why Klayman left Judicial Watch" is not reasonably capable of having a defamatory meaning because it is not even "unpleasant or offensive," let alone "odious, infamous, or ridiculous." Weyrich, 235 F.3d at 627 (citing Howard Univ., 484 A.2d at 989).

*iii. Statements to the Media*

**\*20** In their motion to dismiss, Fitton and Judicial Watch argue that Klayman's claim for defamation must be dismissed to the extent that it is based on alleged threats made by Defendants to the media "that Judicial Watch could and would take legal action against the media outlets if they permitted Klayman to appear and truthfully state he was the founder and former Chairman of Judicial Watch." Fitton/JW Mot. to Dismiss at 25-26. However, as Klayman points out in his Opposition to Fitton and Judicial Watch's motion to dismiss, Count Nine does not specifically refer to the allegations challenged by Fitton and Judicial Watch, but instead includes allegations that Fitton and Judicial Watch published knowingly false statements in media outlets, including *The Washington Post, The Washington Times,* World NetDaily.com, and Slate.com, that "Klayman filed his suit as a 'tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch.**" Pls' Opp'n to Fitton/JW Mot. to Dismiss at 25; SAC ¶¶ 156-157 (emphasis in original). Fitton and Judicial Watch appear to accept this clarification, as they do not respond to Klayman's allegations regarding threats to media outlets in their Reply in further support of their motion to dismiss.

**\*20** With respect to Klayman's allegations that Fitton and Judicial Watch misrepresented to the media that Klayman owed Judicial Watch more than a quarter of a million dollars, Fitton and Judicial Watch assert that such statements were nothing more than expressions of opinion regarding a matter of public concern. Fitton/JW Mot. to Dismiss at 21. However, as discussed above, this argument is unavailing because Klayman clearly alleges misstatements of verifiable facts. Indeed, Klayman sufficiently alleges (1) that Defendants made false and defamatory statements concerning Klayman; (2) published the statements without privilege to various media outlets; (3) with knowledge of the falsity of their statements; and (4) that Defendants' false statements caused damage to Klayman. *See* Crowley, 691 A.2d at 1172 n. 2 (stating elements of defamation under District of Columbia common law). The Court shall therefore deny Fitton and Judicial Watch's motion to dismiss Count Nine of the Second Amended Complaint to the

Slip Copy
Slip Copy, 2007 WL 140978 (D.D.C.)
**(Cite as: Slip Copy)**

extent that it is based on allegedly false statements to the media. Furthermore, insofar as Defendants Orfanedes and Farrell joined in Fitton and Judicial Watch's motion to dismiss as to Count Nine, the Court's conclusion applies equally to them.

*iv. Removal of Klayman's Name from Statements on Judicial Watch Website*

**\*20** Finally, Fitton and Judicial Watch argue that Count Nine of the Second Amended Complaint must be dismissed insofar as it is based on Klayman's allegations that Fitton and Judicial Watch doctored press quotations originally made about Klayman so that they refer to Judicial Watch instead, and then posted these false statements on the Judicial Watch website. Fitton/JW Mot. to Dismiss at 23-25; SAC ¶ 65. Although these allegations are not included under the heading "Count Nine" in the Second Amended Complaint, Fitton and Judicial Watch address them in that context in their motion to dismiss, and Klayman challenges Fitton and Judicial Watch's arguments in his Opposition to their motion to dismiss. Pls' Opp'n to Fitton/JW Mot. to Dismiss at 23-24. As a result, the Court considers whether such allegations can support Klayman's claim for defamation, and concludes that they cannot.

**\*21** Fitton and Judicial Watch argue that Klayman's allegations regarding doctored press quotations cannot support a claim for defamation because on their face they are not defamatory and do not concern Klayman. Fitton/JW Mot. to Dismiss at 23. In response, Klayman unpersuasively argues that "the statements ... are defamatory when considered in context and taken as a whole [because the] effect of these statements on Judicial Watch's intended audience is to undermine Klayman's ability to advocate as an attorney, represent and fundraise as a public figure." Pls' Opp'n to Fitton/JW Mot. to Dismiss at 24. "[T]o satisfy the 'of and concerning' element [of a claim for defamation], it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." *Croixland, 174 F.3d at 216*. However, the Court cannot conclude that Klayman has satisfied this element, based on a plain reading of the Second Amended Complaint.

**\*21** The Second Amended Complaint posits as examples of Fitton and Judicial Watch's alleged doctoring of press quotations two purportedly altered quotations. Klayman first seeks to compare an allegedly doctored quotation reading, "Judicial Watch appears to be the main public interest litigator at this time, no small feat," (attributed to the *National Journal,* June 24, 2002), with the purportedly original quotation, which reads "He (Klayman) appears to be the major public litigator at this time." SAC ¶ 65. Further, Klayman alleges that a quotation from Judicial Watch's website reading "Thanks, in part to aggressive litigation, Judicial Watch was recently named on of the top ten most effective government watchdog organizations by *The Hill* newspaper and a force in Washington by the *National Journal*" is based on a "real quote" from the *National Journal* of June 24, 2002 that reads "... through his challenge of secrecy rules, Klayman has become a major force in Washington." However, on their faces, the quotations as they now read do not refer to Klayman at all, and thus cannot be said to lead anyone to conclude that they refer to Klayman by description. As such, the quotations cannot form the basis for a defamation action because they are not "of and concerning" Klayman. What Klayman actually alleges is that Fitton and Judicial Watch have failed to give him credit where credit is due; while Klayman make take issue with Fitton and Judicial Watch's alleged doctoring of quotations, the quotations in question, as they now read, cannot reasonably be read as defaming Klayman. As a result, the Court shall grant Fitton and Judicial Watch's motion to dismiss Count Nine of the Second Amended Complaint insofar as it is based on the allegedly doctored quotations. Furthermore, as Defendants Orfanedes and Farrell joined in Fitton and Judicial Watch's motion to dismiss Count Nine, the Court's conclusion applies equally to them.

*B. Defendants Orfanedes and Farrell's Motion to Dismiss*

**\*22** Defendants Orfanedes and Farrell are named as individual defendants in Counts Four (Lanham Act), Five (Florida Statute 540.08), and Nine (Defamation) of the Second Amended Complaint. Orfanedes and Farrell have filed a separate Motion to Dismiss the Second Amended Complaint, in which they join Fit-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 140978 (D.D.C.)
**(Cite as: Slip Copy)**

ton and Judicial Watch's motion to dismiss as to the substance of Counts Four, Five, and Nine. The Court will not repeat its conclusions with respect to Fitton and Judicial Watch's motion to dismiss Counts Four, Five, and Nine; however, as Orfanedes and Farrell have joined in the substance of that motion, as noted above, the Court's conclusion with respect to each Count applies equally to them.

**\*22** In their separate motion to dismiss, Orfanedes and Farrell further argue that Klayman's claims against them must be dismissed because Klayman's allegations fail to support individual liability on their parts. Orfanedes/Farrell Mot. to Dismiss at 2. Klayman opposes Orfanedes and Farrell's motion to dismiss by arguing that Orfanedes and Farrell are named throughout the allegations of the Second Amended Complaint, and that this is sufficient to give Orfanedes and Farrell notice "that they are alleged to have committed, participated in, or inspired the complained of acts." *Id.* at 7. Moreover, Klayman argues, "the issue of whether Orfanedes and Farrell individually participated and are responsible for the alleged wrongdoing is a question of fact and, therefore, not disposable" on a motion to dismiss. *Id.*

**\*22** "Under the law of the District of Columbia, corporate officers are not shielded by the limited liability of the corporation for [sic] liability for their own tortious acts." *Camacho v. 1440 Rhode Island Ave. Corp., 620 A.2d 242, 246 (D.C.1993).* Rather, "[i]ndividual liability attaches when a corporate officer either physically commits the tortious conduct, or participates in 'some meaningful sense' in the tortious conduct." *Id.* at 427 (citing *Vuitch v. Furr, 482 A.2d 811, 823 (D.C.1984).* Orfanedes and Farrell argue that Klayman has failed to allege that they participated in "some meaningful sense" in Judicial Watch's purportedly tortious conduct, and that as a result he has failed to demonstrate that individual liability is appropriate. In support of this argument, Orfanedes and Farrell claim that Klayman has simply inserted their names into the relevant paragraphs of his Amended Complaint, rather than actually alleging culpable conduct on their parts. Orfanedes and Farrell may be correct that Klayman has simply inserted their names into the relevant paragraphs of the Amended Complaint. However, as the Second

Amended Complaint now reads, it sufficiently alleges that Orfanedes and Farrell individually participated in "some meaningful sense" in Judicial Watch's purportedly tortious behavior. The Court agrees that these allegations are somewhat sparse, but they are nevertheless sufficient to withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b).

**\*23** Specifically, in Count Four, Klayman alleges that Orfanedes and Farrell, along with the other defendants, "deliberately used Klayman's image and name to confuse donors into thinking that Klayman was still affiliated with Judicial Watch" in order to "entice donors to continue giving donations to Judicial Watch." SAC ¶¶ 103-104. Klayman thus sufficiently alleges that Orfanedes and Farrell participated in Judicial Watch's decision to send the allegedly misleading fund-raising mailing to Judicial Watch donors in order to elicit contributions. Likewise, in Count Five, Klayman alleges that Orfanedes and Farrell, along with the other defendants, "deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate," *Id.* ¶ 109; that the "misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations," *id.* ¶ 110; and that Orfanedes and Farrell "knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness." These allegations are sufficient to plead Orfanedes and Farrell's meaningful participation in Judicial Watch's purportedly unauthorized use of Klayman's name and likeness. Finally, in Count Nine, Klayman alleges that despite knowing that Klayman did not, individually, owe Judicial Watch any money, Fitton and Orfanedes falsely told reporters that Klayman owed Judicial Watch more than a quarter of a million dollars. SAC ¶¶ 149-150, 157-159, 161. These allegations sufficiently plead that Orfanedes and Farrell meaningfully participated in Judicial Watch's alleged defamation of Klayman. The Court shall therefore deny Orfanedes and Farrell's separate motion to dismiss the Second Amended Complaint to the extent that it raises an argument not addressed in the motion to dismiss brought by De-

fendants Fitton and Judicial Watch.

*C. Defendants' Motion to Strike Portions of the
Second Amended Complaint*

**\*23** In addition to moving to dismiss the entire Second Amended Complaint, Defendants Fitton and Judicial Watch have moved, pursuant to Federal Rule of Civil Procedure 12(f) to strike various allegations contained in the Second Amended Complaint on the grounds that they are "immaterial, impertinent, and scandalous," as well as to strike "Plaintiff Klayman's request to be reinstated to his former positions of Chairman and General Counsel of Judicial Watch, Inc." Mot. to Strike at 1. Klayman opposes this request, arguing that the challenged allegations are not "scandalous" and bear directly on the claims of the Second Amended Complaint. Pls' Opp'n to Mot. to Strike.

**\*23** Federal Rule of Civil Procedure 12(f) provides that "the court may order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Motions to strike pleadings are generally considered a drastic remedy disfavored by courts, and the decision to deny or grant such motions is in the sound discretion of the Court. *Canady v. Erbe Elektromedizin GmbH,* 307 F.Supp.2d 2, 7-8 (D.D .C.2004). In the context of Rule 12(f), the word "scandalous" "generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Pigford v.. Veneman,* 215 F.R.D. 2, 4 (D.D.C.2003) (citations omitted). Matter in pleadings is immaterial and impertinent where it "is not materially relevant to any pleaded claim for relief or defense." *Makuch v. Fed. Bureau of Investigation,* Civ. A. No. 99-1094(RMU), 2000 WL 914767 (D.D.C. Jan. 7, 2000) (citations omitted).

**\*24** As an initial matter, the Court notes that, insofar as Fitton and Judicial Watch challenge allegations raised in connection with Benson's claims, such allegations are no longer operative in light of the Court's dismissal of Benson's claims for lack of subject matter jurisdiction. Furthermore, the Court finds that none of the allegations relating to Klayman's

claims that Fitton and Judicial Watch seek to challenge are, in fact, "scandalous," as that term is used in the context of motions to strike. Moreover, the Court is unable at this stage of proceedings to determine whether any of the challenged allegations will ultimately prove relevant to Klayman's legal claims. As this matter progresses, the issues and claims may become more narrow and certain allegations may prove superfluous, but the Court cannot, at this point in time, determine that the allegations challenged by Fitton and Judicial Watch are either immaterial or impertinent.

**\*24** Finally, as Klayman correctly argues, a motion to strike made pursuant to Rule 12(f) is not the proper vehicle for seeking the dismissal of Klayman's demand for reinstatement as Chairman and General Counsel of Judicial Watch, nor do Fitton and Judicial Watch cite any legal authority for striking a claim for relief on a Rule 12(f) motion. *See* Pls' Opp'n to Mot. to Strike at 11 (citing *Wright & Miller, Federal Practice and Procedure:* Civil 3d § 1379). In the context of their motion to dismiss, Fitton and Judicial Watch raise a number of challenges to Klayman's claim for rescission, which they repeat in their motion to strike. However, as discussed above, Klayman's claim for rescission is sufficient to survive a motion to dismiss, and the Court will not reconsider Fitton and Judicial Watch's arguments in the improper context of a motion to strike made pursuant to Federal Rule of Civil Procedure 12(f).

*D. Defendants Fitton and Judicial Watch's Motion to
Sever is Moot*

**\*24** Fitton and Judicial Watch have further moved, pursuant to Federal Rule of Civil Procedure 20(a) and Local Civil Rule 7. 1, to sever the claims of Plaintiff Benson from those of Plaintiff Klayman. However, in light of the Court's dismissal of Plaintiff Benson's claims for lack of subject matter jurisdiction, Fitton and Judicial Watch's motion to sever is now moot. As such, the Court shall deny the motion to sever.

**IV: CONCLUSION**

**\*24** For the reasons set forth above, with respect to the motion to dismiss Plaintiffs' Second Amended

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint brought by Defendants Judicial Watch and Fitton, the Court shall (1) dismiss without prejudice Counts One, Two, and Three of Plaintiffs' Second Amended Complaint for lack of subject matter jurisdiction; (2) deny the motion to dismiss as to Counts Four, Five, and Six; (3) as to Count Nine of Plaintiffs' Second Amended Complaint, grant-in-part the motion to dismiss brought by Defendants Judicial Watch and Fitton insofar as it relates to allegedly defamatory statements made in Judicial Watch Form 990 tax returns and allegedly doctored press quotations posted on the Judicial Watch website; and (4) as to Count Nine of Plaintiffs' Second Amended Complaint, deny-in-part the motion to dismiss brought by Defendants Judicial Watch and Fitton insofar as it is based on allegedly false statements to Judicial Watch employees and the media. To the extent that Defendants Orfanedes and Farrell have joined in Fitton and Judicial Watch's motion to dismiss as to Counts Four, Five, and Nine, the Court's conclusions with respect to those Counts apply equally to them. Furthermore, the Court shall (5) deny Plaintiffs' motion for leave to file a sur-reply; (6) deny the motion to dismiss Plaintiffs' Second Amended Complaint brought by Defendants Orfanedes and Farrell (insofar as it raises an additional argument not addressed in Fitton and Judicial Watch's motion to dismiss); (7) deny the motion to strike brought by Defendants Fitton and Judicial Watch; and (8) deny as moot the motion to sever brought by Defendants Judicial Watch and Fitton.

**\*25** An appropriate Order accompanies this Memorandum Opinion.

D.D.C.,2007.
Klayman v. Judicial Watch, Inc.
Slip Copy, 2007 WL 140978 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:06cv00670 (Docket) (Apr. 12, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.