# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

WALTER J. ROSALES, ESTATE OF )
HELEN CUERO, ESTATE OF DEAN )
ROSALES, P.O. Box 85, Jamul, California, )
91935 )
                                 )
KAREN TOGGERY, ESTATE OF )
MARIE TOGGERY, ESTATE OF )
MATTHEW TINEJERO TOGGERY, P.O. )
Box 375, Jamul, California, 91935 )
                                 )
JAMUL INDIAN VILLAGE, a federally )
recognized Indian tribe, P.O. Box 612, )
Jamul, California, 91935 )
                                 )
               Plaintiffs, )
vs. )
                                 )
UNITED STATES OF AMERICA, )
Department of Justice )
950 Pennsylvania Avenue, NW )
Washington, D.C. 20530-0001 )
and its divisions, including but not limited )
to, )
                                 )
DEPARTMENT OF THE INTERIOR, )
by and through Secretary DIRK )
KEMPTHORNE, in his official capacity, )
1849 C Street, NW, Washington, D.C. )
20240, )
                                 )
BUREAU OF INDIAN AFFAIRS, by and )
through Assistant Secretary of Indian )
Affairs, JAMES E. CASON, in his official )
capacity, 1849 C. Street, NW, Washington, )
D.C. 20240, )
                                 )
               Defendants. )

Civil Action No. 1:07-cv-00162-RMC

---

## MEMORANDUM OF JAMUL INDIAN VILLAGE
## IN OPPOSITION TO PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

Respectfully Submitted,

FREDERICK G. JAUSS IV
DORSEY & WHITNEY LLP

By: /s/ *Frederick G. Jauss IV*
FREDERICK G. JAUSS IV
(D.C. Bar No. 485642)
DORSEY & WHITNEY LLP
Washington Square
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20036
Telephone: (202) 442-3000
Facsimile: (202) 442-3199

SKIP DUROCHER
(D.C. Bar No. MI 0006)*
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

## I.     INTRODUCTION

The Jamul Indian Village ("Jamul" or "Tribe") respectfully submits this memorandum as

amicus curiae to advise the Court that the above-captioned case cannot be properly adjudicated

because of the Plaintiffs' failure to join the Tribe. The Tribe is not a party to this action and

Plaintiffs' counsel has never been authorized to commence this lawsuit in the name of the Tribe.

The only plaintiffs in this case, Walter Rosales and Karen Toggery, are not members of the

Jamul Indian Village and do not act on the Tribe's behalf.[1]

---

*Mr. Durocher's renewal of his admission to the U.S. District Court for the District of Columbia is pending pursuant to Local Rule 83.9.

[1] The caption of the pleadings in this case includes the Jamul Indian Village as a plaintiff. As demonstrated below, the Jamul Indian Village is not a plaintiff to this action, Mr. Rosales and Ms.

As detailed below, this dispute is yet another chapter in a long history of vexatious and meritless litigation brought by Mr. Rosales and Ms. Toggery and their counsel in an effort to interfere with the Tribe's sovereign activities on its trust land. The sole purpose of the litigation before this Court is to interfere with the lawful activities of the duly recognized government of the Tribe.

Plaintiffs in this action seek to adjudicate rights and claims relating to lands held in trust by the United States on behalf of the Tribe. To support their claims in this lawsuit, Plaintiffs allege that they have an ownership in some or all of these lands. In fact, as other courts have already held, these lands are held in trust for the benefit of the Tribe, not for Mr. Rosales and Ms. Toggery. The disposition of this action in the absence of the Tribe will unquestionably impair or impede the Tribe's ability to protect its interest in the property that is the subject of this litigation. Pursuant to Rule 19 of the Federal Rules of Civil Procedure, the Court should dismiss this matter for failure to join the Jamul Indian Village, a necessary and indispensable party that cannot be joined because of its sovereign immunity.[2]

## II.    BACKGROUND

### A.    The Tribe

The Jamul Indian Village is a federally recognized tribe, organized under the provisions of the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 461, *et seq*. See Affidavit of Chairman Lee Acebedo ("Acebedo Aff.") ¶ 1. The Tribe occupies the Jamul Indian Village Reservation ("Reservation") located in San Diego County, California. Id. The Bureau of Indian

---

Toggery are not members of the Tribe, and neither they nor their counsel are authorized to represent the Tribe. For this reason, when the Tribe refers to "Plaintiffs" in this memorandum, it is referring only to Mr. Rosales and Ms. Toggery.

[2] The Tribe does not intend to waive, nor does it waive, its sovereign immunity by filing this amicus brief.

Affairs ("BIA") recognizes and maintains a working relationship with Chairman Lee Acebedo and the Tribe's duly elected Executive Committee. <u>See</u> Affidavit of James Fletcher ("Fletcher Aff."), ¶ 6. Mr. Rosales and Ms. Toggery are not members of the Tribe, and they have never been members of the Tribe. <u>See</u> Acebedo Aff. ¶ 13.

**B.     <u>The Parcels of Land that are the Subject of this Dispute</u>**

The Plaintiffs' claims focus on three parcels of land. Two of these parcels make up what is commonly known as the Jamul Indian Village Reservation. The first parcel, referred to by the Plaintiffs in their Complaint sometimes as Parcel 597-080-01 and sometimes as Parcel 597-080-04 ("Parcel 597-080-04"), is a 4.66 acre portion of Rancho Jamul. The parcel was conveyed on December 12, 1978, by Donald and Lawrence Daley to the "United States of America for trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate." <u>See</u> Compl. Exh. D. The parcel was taken into trust by the United States on December 21, 1978. <u>See</u> <u>id.</u>

The remaining two parcels originally formed a 2.21 acre portion of Rancho Jamul, title to which was held by the Roman Catholic Bishop of San Diego. The Plaintiffs refer to this parcel as 597-080-02. <u>See</u> Compl. ¶ 10. On May 25, 1982, the Roman Catholic Bishop conveyed a 1.372 acre portion of the 2.21 acre parcel "to the United States of America in trust for the Jamul Indian Village." <u>See</u> Compl. Exh. G. The United States took the parcel into trust on July 2, 1982. <u>See</u> <u>id.</u> The 1982 grant deed from the Roman Catholic Bishop excepted 0.838 acres of the original 2.21 acre parcel from the conveyance. <u>See</u> <u>id.</u> The excepted portion remains the property of the Roman Catholic church. The 1.372 acre parcel conveyed to the United States in trust is referred to by the Plaintiffs as Parcel 597-080-05, and the 0.838 acre parcel that was excepted from the conveyance is referred to as Parcel 597-080-06. The Jamul Indian Village Reservation is located on Parcels 597-080-04 and 597-080-05. An Indian cemetery is located on Parcel 597-080-06, the parcel owned by the Catholic Church.

The Tribe plans to commence a casino and hotel project on Parcels 597-080-04 and 597-080-05. <u>See</u> Acebedo Aff. ¶ 10. The Tribe's casino plans do not include Parcel 597-080-06,

which is the cemetery parcel owned by the Catholic Church.  See id.  The Tribe previously

conducted a cultural resources survey that included Parcels 597-080-04 and 597-080-05.  The

survey concluded that there are no signs of human remains or other significant cultural artifacts

on the Reservation site.  See Declaration of Michael Baksh, Attached as Exhibit C to the

Affidavit of Chairman Acebedo.  In addition, the Tribe is in the process of adopting an

Inadvertent Discovery Plan ("IDP") pursuant to the Native American Graves Protection and

Repatriation Act ("NAGPRA"), 25 U.S.C. § 3301 et seq., and the Archaeological Resources

Protection Act ("ARPA"), 16 U.S.C. § 470 et seq., for the disposition of any human remains or

other associated funerary objects, objects of cultural patrimony, or sacred objects, in the unlikely

event such remains or objects are discovered.  See Acebedo Aff. ¶ 12.  Among other things, the

IDP will set forth written procedures for the Tribe to follow in the event it discovers human

remains or other cultural artifacts during the construction project.

**C.**     **Prior Litigation Brought by Mr. Rosales and Ms. Toggery**

For more than ten years, Mr. Rosales and Ms. Toggery have sought to interfere with the

Tribe's economic development plans on its trust lands through a series of meritless lawsuits.

None of Plaintiffs' claims has succeeded.  Plaintiffs continue to attempt to interfere with the

Tribe's sovereign activities through this lawsuit and a concurrent lawsuit filed by Plaintiffs in

state court in San Diego County, California.  A brief history of some of the lawsuits brought by

Mr. Rosales and Ms. Toggery and their counsel illustrates the vexatious nature of their activities

and the fact that, like the claims frivolously asserted in the past, their present claims are also

without merit.

1.     Jamul Indian Village v. Hunter, et al., Civil Case No. 95-0131-R.  On January 31,

1995, Mr. Rosales' and Ms. Toggery's attorney, Patrick Webb, filed an action in the United

States District Court for the Southern District of California.  The complaint was improperly filed

in the Tribe's name against the Jamul Executive Committee and the Bureau of Indian Affairs

("BIA").  The complaint alleged that the Jamul Executive Committee and the BIA should have

recognized an alleged recall election of the Executive Committee, and sought damages under

5

various theories. In two opinions, Judge Rhoades held that the plaintiffs failed to exhaust their administrative remedies for challenging tribal leadership elections, and that the cited statutes did not support any of the plaintiffs' alleged damages. See Affidavit of Frederick G. Jauss IV ("Jauss Aff.") Exhs. A and B. Although Judge Rhoades afforded the plaintiffs an opportunity to amend their complaint on a narrow issue, the plaintiffs voluntarily dismissed the complaint on September 30, 1996, and on the same day, filed a substantially similar complaint in the United States District Court for the Central District of California, discussed in paragraph 2 below.

2.    Walter Rosales v. United States, No. 96-cv-6879. As discussed above, facing dismissal of their claims in the United States District Court for the Southern District of California, the same Plaintiffs (this time filing in their own names) re-filed the same case in the United States District Court for the Central District of California on September 9, 1996. The court transferred the action back to the Southern District of California, and the Plaintiffs' attorney voluntarily dismissed the case on November 12, 1998.[3] See Jauss Aff. Exh. C. In a subsequent order, the court issued a warning that "should this case come again before this Court due to attorney Webb's procedural tactics and maneuvering . . . this Court will not be reluctant to impose appropriate sanctions at that time . . . ." See Jauss Aff. Exh. D.

3.    Rosales v. United States, et al., No. 98-860. On November 12, 1998, Mr. Rosales, Ms. Toggery, and others filed a case in the United States Court of Federal Claims re-alleging the claims regarding election results that previously had been dismissed from the Southern District of California and the Central District of California. Facing another motion to dismiss, the Plaintiffs stipulated to a stay pending the completion of administrative appeals before the Interior Board of Indian Appeals ("IBIA"). See Jauss Aff. Exh. E. Although the IBIA dismissed the Plaintiffs' claims on March 4, 2003, the Court of Claims case has remained stayed because the plaintiffs appealed the final IBIA decision to the Federal District Court for the District of Columbia. See Section D below.

---

[3]       The case number in the Southern District of California was 97-CV-769.

4.    Rosales, et al. v. Kean Argovitz Resorts, et al., No. 00-cv-1910 (POR).  On September 22, 2000, Mr. Rosales and Ms. Toggery filed a complaint in the United States District Court for the Southern District of California against the company the Tribe proposed to have manage its future gaming operation.  The complaint alleged that the proposed management contract was void because the existing tribal leadership was not legitimate.  The court dismissed the Plaintiffs' first and second amended complaints, the second with prejudice, on February 2, 2001, and April 18, 2001, respectively.  See Jauss Aff. Exhs. F and G.  The court held that neither the Indian Gaming Regulatory Act ("IGRA") nor Jamul's tribal-state compact created a private cause of action, and that IGRA preempted the Plaintiffs' state law claims.  The Ninth Circuit Court of Appeals affirmed the dismissal on June 12, 2002, and the United States Supreme Court denied certiorari on October 21, 2002.  Jauss Aff. Exhs. H and I.

5.    Rosales v. United States, NIGC, et al., No. 01-cv-951.  On May 30, 2001, Mr. Rosales and Ms. Toggery filed a complaint in the United States District Court for the Southern District of California, seeking a declaration of their supposed entitlement to an allotment of parcel number 597-080-01, one of the same parcels of land that they assert they are entitled to in the present case.  Judge Gonzalez granted summary judgment in favor of the United States on February 13, 2002, rejecting the Plaintiffs' contention that they had an individual right to Parcel 597-080-01, now known as Parcel 597-080-04: "[P]laintiffs cannot claim an individual right, allotment or otherwise, to parcel 597-080-01.  Rather, the parcel is held by the United States in trust for the benefit of the Jamul Tribe."  See Jauss Aff. Exh. J (Order Granting Defendants' Mot. for Summary Judgment at 14).  The Ninth Circuit Court of Appeals affirmed the decision on August 11, 2003, concluding that the Jamul Indian Village was a necessary and indispensable party, and that the Tribe could not be joined because it did not waive its sovereign immunity.  Rosales v. United States, No. 02-55800, 2003 WL 21920015, at **1 (9th Cir. Aug. 11, 2003).  The Ninth Circuit observed: "The [Jamul Indian] Village would be prejudiced if Appellants were granted beneficial ownership of the parcel of land, and relief cannot be shaped to avoid this

7

prejudice." Id.; Jauss Aff. Exh. K. The United States Supreme Court denied certiorari on March 22, 2004. Jauss Aff. Exh. L.

**D.      Plaintiffs' Unsuccessful IBIA Challenges**

In addition to filing suit in various courts, Mr. Rosales and Ms. Toggery challenged three tribal elections held by the Jamul Indian Village, filing appeals with the Interior Board of Indian Appeals ("IBIA"). In an order regarding three consolidated appeals, the IBIA determined that Mr. Rosales and Ms. Toggery failed to establish that any of the elections were improper. See Jauss Aff. Exh. M (IBIA Order Denying Petition for Reconsideration of Docket No. IBIA 99-4-A, Dismissing Docket No. IBIA 00-28-A as Moot; and Affirming Decision in Docket No. IBIA 02-47-A (Mar. 4, 2003). The IBIA denied Mr. Rosales and Ms. Toggery's motion for reconsideration of the BIA Regional Director's dismissal of their challenge to the 1997 election; dismissed their challenge to the 1999 election; and affirmed the BIA Regional Director's determination that the Tribe's 2001 election was valid. See id. The IBIA admonished Rosales, Toggery, and the other appellants to participate in Jamul's governmental process, rather than bringing fruitless challenges. Id. at n.5.

**E.      Jamul Tribal Elections and Federal Recognition of Current Tribal Government**

As the IBIA recognized in its final decision regarding Rosales and Toggery's election challenges, the Jamul Tribe conducts elections pursuant to its Constitution adopted by the Tribe and approved by the Department of the Interior. Articles 4 and 5 of the Jamul Constitution set forth the procedures for electing the leadership of the Jamul Tribe. See Jauss Aff. Exh. O. In its 2003 decision, the IBIA recognized the validity of the Tribe's 2001 elections. See 39 IBIA 12, 16 (Mar. 3, 2003). The Tribe has held subsequent elections pursuant to its Constitution, and the current Chairman, Leon Acebedo, was lawfully elected in the June 18, 2005 elections. See Acebedo Aff. ¶ 4; Fletcher Aff. ¶ 3. The BIA has explicitly recognized the current leadership of the Jamul Indian Village, and the BIA conducts business with Chairman Acebedo and the General Council on a government to government basis. Fletcher Aff. ¶ 6.

**F.**    **Status of the IBIA Final Decision**

On May 23, 2003, Mr. Rosales and Ms. Toggery appealed the final decision of the IBIA

to the United States District Court for the District of Columbia.[4]  On June 14, 2004, the United

States moved for summary judgment.  Jauss Aff. Exh. N.  The motion has been pending for more

than two and a half years.  Given Plaintiffs' remarkable lack of success in all of their other legal

challenges, and the deferential standard of review afforded to agency decisions under the

Administrative Procedures Act, 5 U.S.C. §§ 701-06, there is no reason to doubt that the Court

will grant the United States' motion for summary judgment.

More importantly, Rosales and Toggery have not procured any stay enjoining the Jamul

Tribal Council from carrying on with the business of governing the Tribe while the appeal is

pending.  See Administrative Procedures Act, 5 U.S.C. § 705 (providing procedure for obtaining

a stay pending an appeal of an administrative decision).  Under the IBIA's administrative

regulations, IBIA decisions are final pending appeal.  See 43 C.F.R. § 4.312 ("Unless otherwise

stated in the decision, rulings by the [IBIA] are final for the Department and must be given

immediate effect."); see also 43 C.F.R. § 4.315; 43 C.F.R. § 4.21(d).  Because the IBIA decision

is final during the pendency of any appeal, Chairman Acebedo, the Tribe's Executive

Committee, and the Jamul General Council have continued to govern the Tribe with the

recognition of the federal government.

**G.**    **The Designation of the Intertribal Court of Southern California**

The federally-approved Jamul Indian Village Constitution authorizes the Jamul General

Council to enact ordinances and establish a Tribal Court.  See Jauss Aff. Exh. O (Jamul

Constitution Art. 8).  Pursuant to its authority under the Jamul Constitution, the Tribe's General

Council enacted an Eviction and Exclusion Ordinance.  See Acebedo Aff. Exh. D.  The

---

[4]      The case on appeal is <u>Rosales et al. v. United States</u>, No. 1:03-cv-01117.

Ordinance designated the Intertribal Court of Southern California ("ICSC")[5] as the Jamul Tribal

Court for purposes of eviction and exclusion actions. Pursuant to its Eviction and Exclusion

Ordinance, the Tribe served Notices of Eviction on Mr. Rosales and Ms. Toggery on January 18,

2007. See id. Exs. F and G. The basis for the Tribe's action is that Mr. Rosales and Ms.

Toggery are non-members of the Tribe who are residing on the Reservation without the Tribe's

permission.

 The ICSC, sitting by designation as the Jamul Tribal Court, recognized the Tribe's

current leadership in a recent decision relating to its jurisdiction in the eviction proceeding. See

Acebedo Aff. Exh. E (Intertribal Court Order). Chief Judge Brandenburg, a former California

Superior Court Commissioner who is now Chief Judge of the ICSC, recognized that the current

Tribal leadership is the legitimate government of the Tribe: "[T]his Court finds the current

Tribal government of the Jamul Indian Village the only legitimate Tribal governmental authority

of the Tribe as recognized by the Federal Government and pursuant to the Tribal Constitution."

See Acebedo Aff. Exh. E (Intertribal Court Order) at 5. In addition, the court rejected Rosales'

and Toggery's claims that they are the beneficial owners of Parcel 597-080-04: "[R]ecords from

a host of Court decisions and exhibits make it clear Defendants are not enrolled members of the

Jamul Indian Tribe and even if they were, individual Tribal members cannot claim an individual

right allotment or otherwise to any parcel. . . . Defendants are not nor have they ever have been

beneficial owners of any part of the Jamul Indian Reservation." Id. at 4.[6]

---

  [5] The ICSC is an independent Tribal court that operates on a circuit court model. In order
to participate in the ICSC, each member Tribe passes a resolution designating the ICSC as its Tribal
Court. The Tribal Court judge travels from reservation to reservation to hear cases. Currently, the ICSC
has ten member Tribes. The ICSC is funded by state and federal grants, and does not receive money from
individual Tribes. See Intertribal Court Order, Acebedo Aff. Exh. E; see also
http://www.icsc.us/Welcome.html.

  [6] After initially entering a "special" appearance, Rosales and Toggery failed to file a
responsive pleading to the Complaint in the Tribal Court. On February 16, 2007, the Tribal Court issued
an Order and Default Judgment. (Jauss Aff. Exh. P.) The Order and Default Judgment provides that the
Tribal Court "will retain jurisdiction over this matter as long as necessary to enforce this Judgment and to
hear any related issues." (Id. p. 3.)

**F.    The Present Case and the Parallel State Court Proceedings**

The present lawsuit represents yet another meritless effort on the part of Mr. Rosales, Ms. Toggery, and their attorney to disrupt the Tribe's economic development and interfere with its planned activities on its trust lands. Plaintiffs allege violations of Cal. Pub. Res. Code § 5097.9-5097.99, and NAGPRA, 25 U.S.C. §§ 3001 et seq., and yet again assert their claim that they are beneficial owners of Parcel 597-080-04 (also referred to by Plaintiffs as Parcel 597-080-01).[7] This is the same claim that Judge Gonzalez rejected in her decision in 2002. Jauss Aff. Exh. J. In pursuit of their claim, Mr. Rosales and Ms. Toggery once again purport to be the Jamul Tribe, rather than naming the Tribe as a defendant. As discussed above, the IBIA, the BIA, and the ICSC (serving as the Jamul Tribal Court) have all rejected the Plaintiffs' contention that they are the Jamul Tribe, and the federal government recognizes Chairman Acebedo and the Tribe's current government.

As discussed below, the Tribe is a necessary and indispensable party to this action. Because the Tribe cannot be joined to this action in light of its sovereign immunity, the Court must dismiss this action.

### III.    ARGUMENT

The Court must dismiss this action pursuant to Rule 19 of the Federal Rules of Civil Procedure. When applying Rule 19, a court first examines whether the absent party is "necessary" to the suit. Fed.R.Civ.P. 19(a). If so, the court then examines whether joinder of the absent party is feasible. If the absent party cannot be joined, the court must then assess whether the missing party is "indispensable" so that 'in equity and good conscience' the suit should be

---

[7]    As noted above, Mr. Rosales, Ms. Toggery, and their attorney have also filed a lawsuit in California state court, <u>Rosales v. State of California</u>, Case No.: GIC878709, raising identical issues to those raised here. On March 19, 2007, the Superior Court will hear a motion to dismiss that case, including the Tribe's Amicus brief in support of the defendants' motions.

dismissed." Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir. 1990). As discussed

below, the Court should dismiss this matter for Plaintiffs' failure to join an indispensable party.


**A.**     **The Tribe is an Absent Party Necessary to the Lawsuit.**

The first step in determining whether an absent party is indispensable under Rule 19 is to

evaluate whether the absent party is necessary to the lawsuit. Rule 19 provides in pertinent part

as follows:

> a person who is subject to service of process and whose joinder
> will not deprive the court of jurisdiction over the subject matter of
> the action shall be joined as a party in the action if (1) in the
> person's absence complete relief cannot be accorded among those
> already parties, or (2) the person claims an interest relating to the
> subject of the action and is so situated that the disposition of the
> action in the person's absence may (i) as a practical matter impair
> or impede the person's ability to protect that interest or (ii) leave
> any of the persons already parties subject to a substantial risk of
> incurring double, multiple, or otherwise inconsistent obligations by
> reason of the claimed interest.

Fed.R.Civ.P. 19(a).

Here, there is no question that the Tribe claims an interest relating to the subject of the

action, and disposition of this action in the Tribe's absence may impair the Tribe's ability to

protect that interest. Plaintiffs seek injunctive relief regarding economic development and other

activities on various lands on held in trust by the United States. Plaintiffs claim that these lands

are held in trust on behalf of the individual plaintiffs, not for the benefit of the Tribe. The Tribe

vehemently disagrees and contends that the lands are held in trust for the Tribe. The United

States happens to agree with the Tribe. A federal district court that closely examined the issue

agreed that the " parcel is held by the United States in trust for the benefit of the Jamul Tribe."

See Jauss Aff. Exh. J, at 14. More recently, the Jamul Tribal Court also reviewed this issue, and

reached the same conclusion. See Acebedo Aff. Exh. E, at 4.

Even if this issue had not already been resolved in favor of the Tribe, it is enough for purposes of Rule 19 that the absent party claims an interest relating to the subject of the action. As two different Courts of Appeals have observed:

> Under [Rule 19], the finding that a party is necessary to the action is predicated only on that party having a *claim* to an interest . . . Just adjudication of claims requires that courts protect a party's right to be heard and to participate in adjudication of a claimed interest, even if the dispute is ultimately resolved to the detriment of the party.
>
> Thus, the joinder rule is to be applied so as to preserve the right of parties to "make known their interests and legal theories."

Keweenaw Bay Indian Cmty. v. Mich., 11 F. 3d 1341, 1347 (6th Cir. 1993) (quoting Shermoen v. United States, 982 F.2d 1312, 1317-18 (9th Cir. 1992) (citations omitted)) (emphasis in original). Here, not only does the Tribe have a claim to an interest in the subject land, but in fact owns the lands at issue.

Moreover, disposition of the claim in this action, in the absence of the Tribe, might impair or impede the Tribe's ability to protect that interest. The Tribe intends to engage in economic development on the land in question. If the Court were to issue an order that created some obstacle with respect to the Tribe's activities, or were to issue an order that called into question the Tribe's ownership of the land, it goes without saying that the Tribe's interests would be impacted or impaired. See, e.g., Wichita & Affiliated Tribes of Okla. v. Hodel, 788 F.2d 765 (D.C. Cir. 1986) (challenge by one of three tribes seeking retroactive allocation of income of land held in trust by United States for all three tribes; other tribes who were beneficiaries of the trust were necessary parties to litigation); see also Pit. River Home & Agric. Coop. Ass'n v. United States, 30 F.3d 1088, 1099 (9th Cir. 1994) (noting in Rule 19 analysis that absent party has legal interest in litigation involving property that Interior Secretary acknowledges is beneficially owned by absent party).

There is no question but that the Tribe is a necessary party under Fed.R.Civ.P. 19(a).

**B.    Joinder of the Tribe is not Feasible.**

Once it is determined that a party necessary to the litigation is absent, the Court must determine whether joinder of that party to the litigation is feasible. Fed.R.Civ.P. 19(b). As noted above, the Jamul Indian Village is a federally recognized Indian Tribe. As such, it enjoys sovereign immunity from an unconsented suit. See, e.g., Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998) (Indian tribe is subject to suit only where Congress has authorized the suit or where the tribe has waived its sovereign immunity); Pan A. Co. v. Sycuan Band of Mission Indians, 884 F.2d 416, 418 (9th Cir. 1989) ("Absent congressional or tribal consent to suit, state and federal courts have no jurisdiction over Indian tribes; only consent gives the court the jurisdictional authority to adjudicate claims raised by or against tribal defendants.") Here, there is no suggestion that the Tribe has waived its immunity, nor any evidence that Congress has authorized the suit. For this reason, joinder of the Tribe is not feasible even though it is a necessary party.

**C.    The Tribe is an Indispensable Party.**

The Tribe is a necessary party under Rule 19(a) and its sovereign immunity as a federally recognized Indian tribe prevents its joinder. Pursuant to Rule 19(b), the Court must therefore determine whether the Tribe is indispensable by considering the following factors:

> (1) the extent to which a judgment rendered in the person's absence might be prejudicial to the absent person or those already parties;
>
> (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can by lessened or avoided;

(3) whether a judgment rendered in the person's absence will be adequate; and

(4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). "These four factors are not rigid, technical tests, but rather guides to the overarching equity and good conscience determination." Brown v. United States, 42 Fed. Cl. 538, 565 (1998) (quoting Wichita, 788 F.2d at 774). In other words, because the Tribe cannot be joined, the Court must determine whether its absence precludes effective resolution of this dispute.

The four factors of Rule 19(b) strongly favor a finding that the Tribe is indispensable[8] and this case be dismissed.

1.     *A judgment rendered in the Tribe's absence would be prejudicial to the Tribe.* "Conflicting claims by beneficiaries to a common trust present a textbook example of a case where one party may be severely prejudiced by a decision in his absence." Wichita, 788 F.2d at 774 (citations omitted). Conflicting claims as to ownership of land held in trust by the United States present a similar situation. The Tribe will clearly suffer prejudice if Plaintiffs are successful in this suit in asserting land ownership rights in the Tribe's absence. See Quileute Indian Tribe v. Babbitt, 18 F.3d 1456, 1459-60 (9th Cir. 1994) (stating that prejudice stems from the same legal interests making someone a necessary party); Confederated Tribes of Chehalis Indian Reservation v. Lujan, 928 F.2d 1496, 1499 (9th Cir. 1991) (same). There is no partial or compromise remedy in this instance which would not prejudice the Tribe, since an award of

---

8     An interest in land is an important factor in finding a party indispensable to pending litigation, and courts have held that the owner or claimant of an interest in the property which is the subject matter of litigation has the right to intervene in that litigation. See Blackfeet and Gros Ventre Tribe of Indians, et al. v. United States of America 162 Ct.Cl. 136 (1963). Another court has observed the rule that "a party to a contract is per se indispensable to litigation affecting it." Davis v. United States, 192 F.3d 951, 960 n.10 (10th Cir. 1999) (citing Lomayaktewa v. Hathaway, 520 F.2d 1324, 1325 (9th Cir. 1975)).

injunctive relief, or a declaration regarding the ownership of the land in favor of the Plaintiffs, would necessarily prejudice the Tribe's interests with respect to those same trust lands and interests, as well as its ability to exercise governmental authority over those lands. See Pit River Home, 30 F.3d at 1101 (finding that a determination of rights of a party to the beneficial ownership of trust lands prejudices the absent tribe's ownership and governing interest in such lands). Furthermore, the ability of the absent party to intervene cannot be deemed to lessen the prejudice if intervention requires a waiver of immunity. See Wichita, 788 F.2d at 775 (rejecting notion that ability of absent tribe to intervene mitigates the prejudice of proceeding because "[i]t is wholly at odds with the policy of tribal immunity to put the tribe to this Hobson's choice between waiving its immunity or waiving its right to not have a case proceed without it."); Pueblo of Sandia v. Babbitt, 48 F.Supp.2d 49, 54 (D.D.C. 1999) (failure of sovereign to intervene does not impact the balancing under Rule 19(b)).

Because a judgment rendered in the Tribe's absence would be prejudicial to the Tribe, this factor weighs heavily in favor of dismissal.

> B.    *Prejudice Cannot Be Mitigated By Shaping of Relief.*

There is no relief or remedy that would lessen the prejudice the Tribe might suffer if the Court decides this action in its absence. Plaintiffs are seeking injunctive relief that could impact the Tribe's ability to exercise governmental authority over the lands in question, and to engage in its sovereign right of economic development. Thus, there is no way for the Court to decide this issue in favor of Plaintiffs without significantly prejudicing the rights of the Tribe. The Tribe simply cannot fathom any compromise position that would satisfy Plaintiffs and not prejudice the Tribe.

Plaintiffs and the Tribe have mutually exclusive claims to the subject lands. Because relief cannot be shaped in a manner to lessen the prejudice, this factor also weighs heavily in favor of dismissal. See Wichita, 788 F.2d at 776 (Where parties' claims are mutually exclusive, "the problem of indispensability of an absent party is accentuated.").

C.    *A Judgment Rendered in the Tribe's Absence Would Be Inadequate.*

Plaintiffs seek injunctive relief that, if granted, would harm the interests of the Tribe. Clearly such a remedy would not be adequate because it would implicitly resolve issues not fully briefed by all of the parties with an interest in the conclusion. Because a judgment rendered in the Tribe's absence would be inadequate, this factor also weighs heavily in favor of dismissal.

D.    *The Absence of an Alternative Remedy Requires Dismissal.*

Plaintiffs have an adequate remedy with respect to their alleged concerns regarding the inadvertent discovery of human remains or funerary objects. The Tribe is in the process of negotiating an IDP with the Department of the Interior that will specifically address the Tribe's conduct in the unlikely event that such a discovery takes place. See Acebedo Aff. ¶ 12.

Even if Plaintiffs had no remedy because of the Tribe's sovereign immunity, this would be insufficient to outweigh all of the other factors which so strongly favor dismissal. See Wichita, 788 F.2d at 777 (observing that the absence of an alternative forum "does not mean that an action should proceed solely because the plaintiff otherwise would not have an adequate remedy, as this would be a misconstruction of the rule and would contravene the established doctrine of indispensability. 3A Moore's Federal Practice ¶ 19.07-2[4], at 19-153 (1984).") (internal quotations omitted); Confederated Tribes of the Chehalis Indian Reservation, 129 F.R.D. at 175 (referring plaintiff tribes' inability to prosecute their claim in the absence of another Indian tribe to be a "Catch-22" necessitated by the law on joinder of parties), aff'd, 928

F.2d 1496 (9th Cir. 1991) (en banc) ; <u>Kickapoo Tribe of Oklahoma</u>, 728 F. Supp. at 797

(observing that a Rule 19 dismissal that leaves a plaintiff without an adequate remedy is "less

troublesome" when dismissal is mandated by tribal immunity).

In short, if Plaintiffs' true concern is the proper handling of any human remains or

funerary objects that might be discovered, they have adequate protections under NAGPRA and

the IDP that the Tribe is negotiating with the Department of the Interior.  In addition, dismissal is

mandated because the Tribe is an indispensable party that is immune from suit.


**D.    Plaintiffs Offer No Good Response to the Court's Lack of Jurisdiction Pursuant to Rule 19.**

In their Reply Brief filed on February 26, 2007, Plaintiffs claim they "have not failed to

name all indispensable parties [because] Jamul Indian Village is a Plaintiff in this action."  Reply

Brief at p. 6.  Plaintiffs contend that, because "Judge Kessler's action is not yet final," the matter

of who is the Tribe remains unresolved and this Court can deem the Plaintiffs to be the Jamul

Indian Village.  <u>Id.</u>

In making this argument, Plaintiffs get one thing right and several things wrong.

Plaintiffs correctly acknowledge that because of its sovereign immunity, the Tribe is an

indispensable party to this dispute; on this issue there is no disagreement.  But Plaintiffs are

incorrect with respect to (a) whether the Tribe is indeed a party to this suit, <u>i.e.</u>, whether Toggery

and Rosales are the lawful government of the Tribe; and (b) the effect of the prior proceedings

and determinations on this Court.

In support of their argument that Plaintiffs are the Tribe, Plaintiffs in their Reply go to

great lengths in arguing that the decision by Judge Gonzalez of the Southern District of

California granting summary judgment in favor of the United States on February 13, 2002, (Exh.

J) was vacated by the subsequent appeal.  <u>See</u> <u>Rosales v. United States</u>, 73 Fed.Appx. 913, 2003

WL 21920015 (9th Cir. (Cal.) 2003).  But the 9th Circuit decision provides Plaintiffs no comfort.

In that decision, the court  concluded that Rosales and Toggery, who were in that action claiming
to be the Tribe, were not the Tribe.  The Ninth Circuit implicitly found what Judge Gonzalez had
explicitly concluded:

> The [Jamul Indian] Village is a necessary party pursuant to Rule
> 19(a)(2)(i), which provides that an absent party is necessary if "the
> person claims an interest relating to the subject of the action and is
> so situated that the disposition of the action in the person's absence
> may ... as a practical matter impair or impede the person's ability
> to protect that interest[.]" Fed. R. Civ. P. 19(a)(2)(i).  The [Jamul
> Indian] Village has claimed jurisdiction over the parcel of land at
> issue in this action since at least 1981.  This interest would be
> impaired if Appellants were declared to be the beneficial owners of
> the land. . . . The Village enjoys sovereign immunity from suit and
> cannot be forced to join this action without its consent.

United States v. Rosales, 2003 WL 21920015, at **1.

Plaintiffs try to convince this Court that the Ninth Circuit's holding is distinguishable
from these facts because in that case the issue of who was the Tribe was "not actually and
necessarily determined."  Reply Brief p. 6.  Nothing could be farther from the truth.  In that case,
Plaintiffs advanced the same arguments they assert in this case: they contended that Toggery and
Rosales were the lawful government of the Tribe and that the IBIA determinations were not
effective.  See Jauss Aff. Exh. Q (Southern District Complaint).  Judge Gonzalez summarily
dismissed these arguments, concluding that "the Court is not the proper forum for such a
challenge."  Jauss Aff. Exh. J, p. 14, fn. 4.

A determination of who was the lawful and legitimate government of the Tribe was thus
necessarily decided by the Ninth Circuit.  By dismissing the case based on Rule 19, the Ninth
Circuit recognized that the Plaintiffs were not the Tribe.  Thus, Plaintiffs are left with this
inescapable conclusion:  the Ninth Circuit has already dismissed a lawsuit involving the *same*

plaintiffs[9] asserting essentially the *same* claim to the *same* parcel of land at issue in this case. This Court should reach the same result that the Ninth Circuit reached in <u>Rosales</u>.

Plaintiffs are also incorrect in claiming that their perpetual appeals and new case filings somehow bar this Court from considering whether the Jamul Indian Village is an indispensable party (and by extension whether Plaintiffs constitute the Jamul Indian Village). As previously discussed, the IBIA has issued a final determination on that precise issue. Plaintiffs have not procured any stay enjoining Chairman Acebedo and the Jamul Tribal Council from carrying on with the business of governing while the appeal is pending. <u>See</u> Administrative Procedures Act, 5 U.S.C. § 705 (providing procedure for obtaining a stay pending an appeal of an administrative decision). As noted, under the IBIA's administrative regulations, IBIA decisions are final pending appeal. <u>See</u> 43 C.F.R. § 4.312 ("Unless otherwise stated in the decision, rulings by the [IBIA] are final for the Department and must be given immediate effect."); <u>see also</u> 43 C.F.R. § 4.315; 43 C.F.R. § 4.21(d). Because the IBIA decision is final pending appeal, there is no question that Chairman Acebedo, the Tribe's Executive Committee, and the Jamul General Council are the legitimate leadership of the Tribe.

---

9       Although in that case, the lawsuit was not brought in the name of the Jamul Indian Village, for reasons already explained, the invalid attempt to add the Tribe as a party by filing this lawsuit should be disregarded. The true Jamul Indian Village is no more a plaintiff in this case than it was in the federal lawsuit in the Southern District of California.

## IV.    CONCLUSION

In this action, Plaintiffs seek to substantively and drastically affect the legal rights of the federally recognized Jamul Indian Village, a party not present in the suit and a party that cannot be joined.  Resolution of this litigation in the Tribe's absence might impair or impede the Tribe's ability to exercise its governmental authority over the land in question, and to engage in economic development on behalf of the Tribe.  For this reason, the Tribe respectfully requests that this Court dismiss this action pursuant to Rule 19 of the Federal Rules of Civil Procedure.

Respectfully Submitted,

FREDERICK G. JAUSS IV
DORSEY & WHITNEY LLP

By: /s/ Frederick G. Jauss IV
    FREDERICK G. JAUSS IV
    (D.C. Bar No. 485642)
    DORSEY & WHITNEY LLP
    Washington Square
    1050 Connecticut Avenue, NW
    Suite 1250
    Washington, DC 20036
    Telephone:  (202) 442-3000
    Facsimile:  (202) 442-3199

SKIP DUROCHER
(D.C. Bar No. MI 0006)*
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

March 5, 2007

*Mr. Durocher's renewal of his admission to the U.S. District Court for the District of Columbia is pending pursuant to local Rule 83.9

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

WALTER J. ROSALES, ESTATE OF )
HELEN CUERO, ESTATE OF DEAN )
ROSALES, P.O. Box 85, Jamul, California, )
91935 )
  )
KAREN TOGGERY, ESTATE OF )
MARIE TOGGERY, ESTATE OF )
MATTHEW TINEJERO TOGGERY, P.O. )
Box 375, Jamul, California, 91935 )
  )
JAMUL INDIAN VILLAGE, a federally )
recognized Indian tribe, P.O. Box 612, )
Jamul, California, 91935 )
  )
                Plaintiffs, )
vs. )      Civil Action No. 1:07-cv-00162-RMC
  )
UNITED STATES OF AMERICA, )
Department of Justice )
950 Pennsylvania Avenue, NW )
Washington, D.C.  20530-0001 )
and its divisions, including but not limited )
to, )
  )
DEPARTMENT OF THE INTERIOR, )
by and through Secretary DIRK )
KEMPTHORNE, in his official capacity, )
1849 C Street, NW, Washington, D.C. )
20240, )
  )
BUREAU OF INDIAN AFFAIRS, by and )
through Assistant Secretary of Indian )
Affairs, JAMES E. CASON, in his official )
capacity, 1849 C. Street, NW, Washington, )
D.C. 20240, )
  )
              Defendants. )
_____)

## AFFIDAVIT OF LEE ACEBEDO IN SUPPORT OF

## JAMUL INDIAN VILLAGE'S AMICUS BRIEF

Respectfully Submitted,
FREDERICK G. JAUSS IV
DORSEY & WHITNEY LLP


By: /s/ Frederick G. Jauss IV
FREDERICK G. JAUSS IV
(D.C. Bar No. 485642)
DORSEY & WHITNEY LLP
Washington Square
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20036
Telephone:  (202) 442-3000
Facsimile:  (202) 442-3199


SKIP DUROCHER
(D.C. Bar No. MI 0006)*[1]
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

---

[1] Mr. Durocher's renewal of his admission to the U.S. District Court for the District of Columbia is pending pursuant to Local Rule 83.9.

## DECLARATION OF LEE ACEBEDO

I, Lee Acebedo, declare as follows:

I am the Chairman of Jamul Indian Village ("Jamul" or "Tribe").  I have personal knowledge of the facts stated herein, except as to those which are based upon information and belief and, if called upon to do so, could and would testify competently thereto.

1.      The Jamul Indian Village is a federally recognized Tribe, organized in 1981 under the provisions of the Indian Reorganization Act of 1934 (25 U.S.C. §§ 461, et seq.), and occupying the Jamul Indian Reservation located in San Diego County, California.

2.      The Tribe is included in the Bureau of Indian Affair's ("BIA") list of Federally Recognized Tribes, 70 Fed. Reg. 71194, 71195 (Nov. 25, 2005).  See Ex. A.

3.      Pursuant to the Jamul Indian Village Constitution and the Tribe's Election Ordinance, the Tribe held its regular elections on June 18, 2005.

4.      I was elected Chairman of the Tribe in the June 18, 2005 elections.

5.      In the BIA's January 2006 Tribal Leaders Directory, I am listed as the Chairman of the Jamul Indian Village.  See Ex. B.

6.      In my capacity as Chairman, I maintain a working relationship with the BIA and other federal agencies on a government to government basis.

7.      The Tribe is the beneficial owner of certain parcels of land ("the Reservation"), fee title to which is held by the United States of America in trust for the Tribe and which is

commonly described as the Jamul Indian Village Reservation. The parcels of land that comprise the Reservation are 597-080-04 and 597-080-05.

8.     There is a cemetery adjacent to the Jamul Indian Village Reservation, but the cemetery is not part of the Reservation. The cemetery is located on parcel 597-080-06.

9.     The Tribe is planning to build a casino and hotel project on the Reservation. The casino plans do not include the cemetery site, and the Tribe does not plan to do any construction work on the cemetery site.

10.     The casino and hotel will be constructed on parcels 597-080-04 and 597-080-05, which are Reservation lands. The Tribe does not plan to undertake any construction work on parcel 597-080-06, which is the cemetery parcel.

11.     The Tribe is not aware of any human remains or other significant cultural artifacts on parcels 597-080-04 and 597-080-05. The Tribe previously conducted a cultural resources survey on the site, which concluded that there are no signs of human remains or other significant cultural artifacts on the Reservation site. See Declaration of Michael Baksh, Attached as Exhibit C.

12.     The Tribe is in the process of adopting an Inadvertent Discovery Plan pursuant to the Native American Graves Protection and Repatriation Act and the Archaeological Resources Protection Act for the disposition of any human remains or other associated funerary objects, objects of cultural patrimony, or sacred objects, in the event such remains or objects are discovered.

2

13.    Walter Rosales and Karen Toggery are not currently members of the Tribe, and they have never been members of the Tribe.

14.    Walter Rosales and Karen Toggery have never applied for membership with the Tribe.

15.    Walter Rosales and Karen Toggery have never been authorized to file any lawsuits in the Tribe's name.

16.    The Tribe has commenced an eviction and exclusion action against Walter Rosales and Karen Toggery in the Intertribal Court of Southern California, which the General Council of the Jamul Indian Village has designated as the Jamul Tribal Court for purposes of eviction and exclusion actions in its Eviction and Exclusion Ordinance.  See Jamul Indian Village Eviction and Exclusion Ordinance Art. V, Attached as Exhibit D.

17.    The Intertribal Court of Southern California is an independent court that is patterned after the circuit court concept common in the early history of the United States.  When the Intertribal Court Judge is sitting at a particular reservation, the Judge is the Judge for that reservation.  See Intertribal Court Order, attached as Exhibit E, at 2.

18.    The Jamul Indian Village is one of ten Tribes in San Diego County that have designated the Intertribal Court of Southern California as their Tribal court.  See Intertribal Court Order at 2.

19.    Pursuant to its Eviction and Exclusion Ordinance, the Tribe served Notices of Eviction on Walter Rosales and Karen Toggery on January 18, 2007.  The Notices of Eviction are attached as Exhibits F and G.

3

20.    The Intertribal Court of Southern California has ruled that it has jurisdiction over the eviction and exclusion action. The Intertribal Court also recognized the current leadership of the Tribe, including myself. See Intertribal Court Order at 3-4.

21.    In its decision, the Intertribal Court concluded that Walter Rosales and Karen Toggery "are not nor have they ever been beneficial owners of any part of the Jamul Indian Reservation." See Intertribal Court Order at 4.

22.    The Tribe does not plan to conduct any significant construction work on the casino project prior to March 7, 2007. The Tribe plans to begin constructing a perimeter fence around the Reservation before that date. This work will involve surveying the property line and inserting stakes around the property line at fifty foot intervals. The Tribe also plans to begin removing some structures, abandoned vehicles, and debris from the Reservation.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this *13* day of February, 2007, in Sacramento, California.

By: _____
     LEE ACEBEDO

4

EXHIBIT A



Friday,
November 25, 2005

Part II

# Department of the Interior

Bureau of Indian Affairs

Indian Entities Recognized and Eligible to
Receive Services from the United States
Bureau of Indian Affairs; Notice

# DEPARTMENT OF THE INTERIOR

## Bureau of Indian Affairs

## Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice publishes the current list of 561 tribal entities recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian tribes. The list is updated from the notice published on December 5, 2003 (68 FR 68180).

**FOR FURTHER INFORMATION CONTACT:** Daisy West, Bureau of Indian Affairs, Division of Tribal Government Services, Mail Stop 320–SIB, 1951 Constitution Avenue, NW., Washington, DC 20240. Telephone number: (202) 513–7641.

**SUPPLEMENTARY INFORMATION:** This notice is published pursuant to Section 104 of the Act of November 2, 1994 (Pub. L. 103–454; 108 Stat. 4791, 4792), and in exercise of authority delegated to the Assistant Secretary—Indian Affairs under 25 U.S.C. 2 and 9 and 209 DM 8.

Published below is a list of federally acknowledged tribes in the contiguous 48 states and in Alaska.

The Delaware Tribe of Indians, Oklahoma, was removed from the list in response to a final judgment and order sought by the Cherokee Nation of Oklahoma in the United States District Court for the Northern District of Oklahoma in *Cherokee Nation of Oklahoma* v. *Norton, et al.*, Case No. 98–CV–903–TCK–FHM on remand from the Tenth Circuit Court of Appeals in *Cherokee Nation of Oklahoma* v. *Norton*, 389 F.3d 1074 (10th Cir. 2004), as amended, 2005 U.S. App. LEXIS 2773 (10th Cir. Feb. 16, 2005).

The list does not include any additional new tribes. The updates are limited to several tribal name changes. To aid in identifying tribal name changes, the tribe's former name is included with the new tribal name. We will continue to list the tribe's former name for several years before dropping the former name from the list. We have also made several corrections. To aid in identifying corrections, the tribe's previously listed name is included with the tribal name.

The listed entities are acknowledged to have the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes. We have continued the practice of listing the Alaska Native entities separately solely for the purpose of facilitating identification of them and reference to them given the large number of complex Native names.

Dated: November 14, 2005.

Michael D. Olsen,

*Acting Principal Deputy Assistant Secretary— Indian Affairs.*

## Indian Tribal Entities Within the Contiguous 48 States Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs

Absentee-Shawnee Tribe of Indians of Oklahoma
Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California
Ak Chin Indian Community of the Maricopa (Ak Chin) Indian Reservation, Arizona
Alabama-Coushatta Tribes of Texas
Alabama-Quassarte Tribal Town, Oklahoma
Alturas Indian Rancheria, California
Apache Tribe of Oklahoma
Arapahoe Tribe of the Wind River Reservation, Wyoming
Aroostook Band of Micmac Indians of Maine
Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana
Augustine Band of Cahuilla Mission Indians of the Augustine Reservation, California
Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin
Bay Mills Indian Community, Michigan
Bear River Band of the Rohnerville Rancheria, California
Berry Creek Rancheria of Maidu Indians of California
Big Lagoon Rancheria, California
Big Pine Band of Owens Valley Paiute Shoshone Indians of the Big Pine Reservation, California
Big Sandy Rancheria of Mono Indians of California
Big Valley Band of Pomo Indians of the Big Valley Rancheria, California
Blackfeet Tribe of the Blackfeet Indian Reservation of Montana
Blue Lake Rancheria, California
Bridgeport Paiute Indian Colony of California
Buena Vista Rancheria of Me-Wuk Indians of California
Burns Paiute Tribe of the Burns Paiute Indian Colony of Oregon
Cabazon Band of Mission Indians, California (previously listed as the Cabazon Band of Cahuilla Mission Indians of the Cabazon Reservation)

Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California
Caddo Nation of Oklahoma (formerly the Caddo Indian Tribe of Oklahoma)
Cahuilla Band of Mission Indians of the Cahuilla Reservation, California
Cahto Indian Tribe of the Laytonville Rancheria, California
California Valley Miwok Tribe, California (formerly the Sheep Ranch Rancheria of Me-Wuk Indians of California)
Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California
Capitan Grande Band of Diegueno Mission Indians of California:
Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California
Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California
Catawba Indian Nation (aka Catawba Tribe of South Carolina)
Cayuga Nation of New York
Cedarville Rancheria, California
Chemehuevi Indian Tribe of the Chemehuevi Reservation, California
Cher-Ae Heights Indian Community of the Trinidad Rancheria, California
Cherokee Nation, Oklahoma
Cheyenne-Arapaho Tribes of Oklahoma
Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota
Chickasaw Nation, Oklahoma
Chicken Ranch Rancheria of Me-Wuk Indians of California
Chippewa-Cree Indians of the Rocky Boy's Reservation, Montana
Chitimacha Tribe of Louisiana
Choctaw Nation of Oklahoma
Citizen Potawatomi Nation, Oklahoma
Cloverdale Rancheria of Pomo Indians of California
Cocopah Tribe of Arizona
Coeur D'Alene Tribe of the Coeur D'Alene Reservation, Idaho
Cold Springs Rancheria of Mono Indians of California
Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California
Comanche Nation, Oklahoma
Confederated Salish & Kootenai Tribes of the Flathead Reservation, Montana
Confederated Tribes of the Chehalis Reservation, Washington
Confederated Tribes of the Colville Reservation, Washington
Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians of Oregon
Confederated Tribes of the Goshute Reservation, Nevada and Utah
Confederated Tribes of the Grand Ronde Community of Oregon

Confederated Tribes of the Siletz Reservation, Oregon
Confederated Tribes of the Umatilla Reservation, Oregon
Confederated Tribes of the Warm Springs Reservation of Oregon
Confederated Tribes and Bands of the Yakama Nation, Washington
Coquille Tribe of Oregon
Cortina Indian Rancheria of Wintun Indians of California
Coushatta Tribe of Louisiana
Cow Creek Band of Umpqua Indians of Oregon
Cowlitz Indian Tribe, Washington
Coyote Valley Band of Pomo Indians of California
Crow Tribe of Montana
Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota
Death Valley Timbi-Sha Shoshone Band of California
Delaware Nation, Oklahoma
Dry Creek Rancheria of Pomo Indians of California
Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada
Eastern Band of Cherokee Indians of North Carolina
Eastern Shawnee Tribe of Oklahoma
Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California
Elk Valley Rancheria, California
Ely Shoshone Tribe of Nevada
Enterprise Rancheria of Maidu Indians of California
Ewiiaapaayp Band of Kumeyaay Indians, California (formerly the Cuyapaipe Community of Diegueno Mission Indians of the Cuyapaipe Reservation)
Federated Indians of Graton Rancheria, California (formerly the Graton Rancheria)
Flandreau Santee Sioux Tribe of South Dakota
Forest County Potawatomi Community, Wisconsin
Fort Belknap Indian Community of the Fort Belknap Reservation of Montana
Fort Bidwell Indian Community of the Fort Bidwell Reservation of California
Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California
Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon
Fort McDowell Yavapai Nation, Arizona
Fort Mojave Indian Tribe of Arizona, California & Nevada
Fort Sill Apache Tribe of Oklahoma
Gila River Indian Community of the Gila River Indian Reservation, Arizona
Grand Traverse Band of Ottawa and Chippewa Indians, Michigan
Greenville Rancheria of Maidu Indians of California

Grindstone Indian Rancheria of Wintun-Wailaki Indians of California
Guidiville Rancheria of California
Habematolel Pomo of Upper Lake, California (formerly the Upper Lake Band of Pomo Indians of Upper Lake Rancheria of California)
Hannahville Indian Community, Michigan
Havasupai Tribe of the Havasupai Reservation, Arizona
Ho-Chunk Nation of Wisconsin
Hoh Indian Tribe of the Hoh Indian Reservation, Washington
Hoopa Valley Tribe, California
Hopi Tribe of Arizona
Hopland Band of Pomo Indians of the Hopland Rancheria, California
Houlton Band of Maliseet Indians of Maine
Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona
Huron Potawatomi, Inc., Michigan
Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California
Ione Band of Miwok Indians of California
Iowa Tribe of Kansas and Nebraska
Iowa Tribe of Oklahoma
Jackson Rancheria of Me-Wuk Indians of California
Jamestown S'Klallam Tribe of Washington
Jamul Indian Village of California
Jena Band of Choctaw Indians, Louisiana
Jicarilla Apache Nation, New Mexico
Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona
Kalispel Indian Community of the Kalispel Reservation, Washington
Karuk Tribe of California
Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California
Kaw Nation, Oklahoma
Keweenaw Bay Indian Community, Michigan
Kialegee Tribal Town, Oklahoma
Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas
Kickapoo Tribe of Oklahoma
Kickapoo Traditional Tribe of Texas
Kiowa Indian Tribe of Oklahoma
Klamath Tribes, Oregon (formerly the Klamath Indian Tribe of Oregon)
Kootenai Tribe of Idaho
La Jolla Band of Luiseno Mission Indians of the La Jolla Reservation, California
La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California
Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin
Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin

Lac Vieux Desert Band of Lake Superior Chippewa Indians, Michigan
Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada
Little River Band of Ottawa Indians, Michigan
Little Traverse Bay Bands of Odawa Indians, Michigan
Lower Lake Rancheria, California
Los Coyotes Band of Cahuilla & Cupeno Indians of the Los Coyotes Reservation, California (formerly the Los Coyotes Band of Cahuilla Mission Indians of the Los Coyotes Reservation)
Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada
Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota
Lower Elwha Tribal Community of the Lower Elwha Reservation, Washington
Lower Sioux Indian Community in the State of Minnesota
Lummi Tribe of the Lummi Reservation, Washington
Lytton Rancheria of California
Makah Indian Tribe of the Makah Indian Reservation, Washington
Manchester Band of Pomo Indians of the Manchester-Point Arena Rancheria, California
Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California
Mashantucket Pequot Tribe of Connecticut
Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan
Mechoopda Indian Tribe of Chico Rancheria, California
Menominee Indian Tribe of Wisconsin
Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California
Mescalero Apache Tribe of the Mescalero Reservation, New Mexico
Miami Tribe of Oklahoma
Miccosukee Tribe of Indians of Florida
Middletown Rancheria of Pomo Indians of California
Minnesota Chippewa Tribe, Minnesota (Six component reservations: Bois Forte Band (Nett Lake); Fond du Lac Band; Grand Portage Band; Leech Lake Band; Mille Lacs Band; White Earth Band)
Mississippi Band of Choctaw Indians, Mississippi
Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada
Modoc Tribe of Oklahoma
Mohegan Indian Tribe of Connecticut
Mooretown Rancheria of Maidu Indians of California
Morongo Band of Cahuilla Mission Indians of the Morongo Reservation, California

Muckleshoot Indian Tribe of the Muckleshoot Reservation, Washington

Muscogee (Creek) Nation, Oklahoma

Narragansett Indian Tribe of Rhode Island

Navajo Nation, Arizona, New Mexico & Utah

Nez Perce Tribe of Idaho

Nisqually Indian Tribe of the Nisqually Reservation, Washington

Nooksack Indian Tribe of Washington

Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana

Northfork Rancheria of Mono Indians of California

Northwestern Band of Shoshoni Nation of Utah (Washakie)

Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota

Omaha Tribe of Nebraska

Oneida Nation of New York

Oneida Tribe of Indians of Wisconsin

Onondaga Nation of New York

Osage Tribe, Oklahoma

Ottawa Tribe of Oklahoma

Otoe-Missouria Tribe of Indians, Oklahoma

Paiute Indian Tribe of Utah (Cedar City Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes)

Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California

Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada

Paiute-Shoshone Indians of the Lone Pine Community of the Lone Pine Reservation, California

Pala Band of Luiseno Mission Indians of the Pala Reservation, California

Pascua Yaqui Tribe of Arizona

Paskenta Band of Nomlaki Indians of California

Passamaquoddy Tribe of Maine

Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California

Pawnee Nation of Oklahoma

Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California

Penobscot Tribe of Maine

Peoria Tribe of Indians of Oklahoma

Picayune Rancheria of Chukchansi Indians of California

Pinoleville Rancheria of Pomo Indians of California

Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias)

Poarch Band of Creek Indians of Alabama

Pokagon Band of Potawatomi Indians, Michigan and Indiana

Ponca Tribe of Indians of Oklahoma

Ponca Tribe of Nebraska

Port Gamble Indian Community of the Port Gamble Reservation, Washington

Potter Valley Tribe, California (formerly the Potter Valley Rancheria of Pomo Indians of California)

Prairie Band of Potawatomi Nation, Kansas

Prairie Island Indian Community in the State of Minnesota

Pueblo of Acoma, New Mexico

Pueblo of Cochiti, New Mexico

Pueblo of Jemez, New Mexico

Pueblo of Isleta, New Mexico

Pueblo of Laguna, New Mexico

Pueblo of Nambe, New Mexico

Pueblo of Picuris, New Mexico

Pueblo of Pojoaque, New Mexico

Pueblo of San Felipe, New Mexico

Pueblo of San Juan, New Mexico

Pueblo of San Ildefonso, New Mexico

Pueblo of Sandia, New Mexico

Pueblo of Santa Ana, New Mexico

Pueblo of Santa Clara, New Mexico

Pueblo of Santo Domingo, New Mexico

Pueblo of Taos, New Mexico

Pueblo of Tesuque, New Mexico

Pueblo of Zia, New Mexico

Puyallup Tribe of the Puyallup Reservation, Washington

Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada

Quapaw Tribe of Indians, Oklahoma

Quartz Valley Indian Community of the Quartz Valley Reservation of California

Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona

Quileute Tribe of the Quileute Reservation, Washington

Quinault Tribe of the Quinault Reservation, Washington

Ramona Band or Village of Cahuilla Mission Indians of California

Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin

Red Lake Band of Chippewa Indians, Minnesota

Redding Rancheria, California

Redwood Valley Rancheria of Pomo Indians of California

Reno-Sparks Indian Colony, Nevada

Resighini Rancheria, California

Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California

Robinson Rancheria of Pomo Indians of California

Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota

Round Valley Indian Tribes of the Round Valley Reservation, California

Rumsey Indian Rancheria of Wintun Indians of California

Sac & Fox Tribe of the Mississippi in Iowa

Sac & Fox Nation of Missouri in Kansas and Nebraska

Sac & Fox Nation, Oklahoma

Saginaw Chippewa Indian Tribe of Michigan

St. Croix Chippewa Indians of Wisconsin

St. Regis Band of Mohawk Indians of New York

Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona

Samish Indian Tribe, Washington

San Carlos Apache Tribe of the San Carlos Reservation, Arizona

San Juan Southern Paiute Tribe of Arizona

San Manual Band of Serrano Mission Indians of the San Manual Reservation, California

San Pasqual Band of Diegueno Mission Indians of California

Santa Rosa Indian Community of the Santa Rosa Rancheria, California

Santa Rosa Band of Cahuilla Mission Indians of the Santa Rosa Reservation, California

Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California

Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation, California

Santee Sioux Nation, Nebraska (formerly the Santee Sioux Tribe of the Santee Reservation of Nebraska)

Sauk-Suiattle Indian Tribe of Washington

Sault Ste. Marie Tribe of Chippewa Indians of Michigan

Scotts Valley Band of Pomo Indians of California

Seminole Nation of Oklahoma

Seminole Tribe of Florida, Dania, Big Cypress, Brighton, Hollywood & Tampa Reservations

Seneca Nation of New York

Seneca-Cayuga Tribe of Oklahoma

Shakopee Mdewakanton Sioux Community of Minnesota

Shawnee Tribe, Oklahoma

Sherwood Valley Rancheria of Pomo Indians of California

Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California

Shoalwater Bay Tribe of the Shoalwater Bay Indian Reservation, Washington

Shoshone Tribe of the Wind River Reservation, Wyoming

Shoshone-Bannock Tribes of the Fort Hall Reservation of Idaho

Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada

Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota (formerly the Sisseton-Wahpeton Sioux Tribe of the Lake Traverse Reservation)

Skokomish Indian Tribe of the Skokomish Reservation, Washington

Skull Valley Band of Goshute Indians of Utah

Smith River Rancheria, California
Snoqualmie Tribe, Washington
Soboba Band of Luiseno Indians, California
Sokaogon Chippewa Community, Wisconsin
Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado
Spirit Lake Tribe, North Dakota
Spokane Tribe of the Spokane Reservation, Washington
Squaxin Island Tribe of the Squaxin Island Reservation, Washington
Standing Rock Sioux Tribe of North & South Dakota
Stockbridge Munsee Community, Wisconsin
Stillaguamish Tribe of Washington
Summit Lake Paiute Tribe of Nevada
Suquamish Indian Tribe of the Port Madison Reservation, Washington
Susanville Indian Rancheria, California
Swinomish Indians of the Swinomish Reservation, Washington
Sycuan Band of the Kumeyaay Nation (formerly the Sycuan Band of Diegueno Mission Indians of California)
Table Mountain Rancheria of California
Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band)
Thlopthlocco Tribal Town, Oklahoma
Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota
Tohono O'odham Nation of Arizona
Tonawanda Band of Seneca Indians of New York
Tonkawa Tribe of Indians of Oklahoma
Tonto Apache Tribe of Arizona
Torres Martinez Desert Cahuilla Indians, California (formerly the Torres-Martinez Band of Cahuilla Mission Indians of California)
Tule River Indian Tribe of the Tule River Reservation, California
Tulalip Tribes of the Tulalip Reservation, Washington
Tunica-Biloxi Indian Tribe of Louisiana
Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California
Turtle Mountain Band of Chippewa Indians of North Dakota
Tuscarora Nation of New York
Twenty-Nine Palms Band of Mission Indians of California
United Auburn Indian Community of the Auburn Rancheria of California
United Keetoowah Band of Cherokee Indians in Oklahoma
Upper Sioux Community, Minnesota
Upper Skagit Indian Tribe of Washington
Ute Indian Tribe of the Uintah & Ouray Reservation, Utah
Ute Mountain Tribe of the Ute Mountain Reservation, Colorado, New Mexico & Utah

Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California
Walker River Paiute Tribe of the Walker River Reservation, Nevada
Wampanoag Tribe of Gay Head (Aquinnah) of Massachusetts
Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches)
White Mountain Apache Tribe of the Fort Apache Reservation, Arizona
Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma
Winnebago Tribe of Nebraska
Winnemucca Indian Colony of Nevada
Wiyot Tribe, California (formerly the Table Bluff Reservation—Wiyot Tribe)
Wyandotte Nation, Oklahoma (formerly the Wyandotte Tribe of Oklahoma)
Yankton Sioux Tribe of South Dakota
Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona
Yavapai-Prescott Tribe of the Yavapai Reservation, Arizona
Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada
Yomba Shoshone Tribe of the Yomba Reservation, Nevada
Ysleta Del Sur Pueblo of Texas
Yurok Tribe of the Yurok Reservation, California
Zuni Tribe of the Zuni Reservation, New Mexico

**Native Entities Within the State of Alaska Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

Native Village of Afognak (formerly the Village of Afognak)
Agdaagux Tribe of King Cove
Native Village of Akhiok
Akiachak Native Community
Native Village of Akutan
Village of Alakanuk
Alatna Village
Native Village of Aleknagik
Algaaciq Native Village (St. Mary's)
Allakaket Village
Native Village of Ambler
Village of Anaktuvuk Pass
Yupiit of Andreafski
Angoon Community Association
Village of Aniak
Anvik Village
Arctic Village (See Native Village of Venetie Tribal Government)
Asa'carsarmiut Tribe (formerly the Native Village of Mountain Village)
Native Village of Atka
Village of Atmautluak
Atqasuk Village (Atkasook)
Native Village of Barrow Inupiat Traditional Government
Beaver Village
Native Village of Belkofski

Village of Bill Moore's Slough
Birch Creek Tribe
Native Village of Brevig Mission
Native Village of Buckland
Native Village of Cantwell
Native Village of Chanega (aka Chenega)
Chalkyitsik Village
Cheesh-Na Tribe (formerly the Native Village of Chistochina)
Village of Chefornak
Chevak Native Village
Chickaloon Native Village
Native Village of Chignik
Native Village of Chignik Lagoon
Chignik Lake Village
Chilkat Indian Village (Klukwan)
Chilkoot Indian Association (Haines)
Chinik Eskimo Community (Golovin)
Native Village of Chitina
Native Village of Chuathbaluk (Russian Mission, Kuskokwim)
Chuloonawick Native Village
Circle Native Community
Village of Clarks Point
Native Village of Council
Craig Community Association
Village of Crooked Creek
Curyung Tribal Council (formerly the Native Village of Dillingham)
Native Village of Deering
Native Village of Diomede (aka Inalik)
Village of Dot Lake
Douglas Indian Association
Native Village of Eagle
Native Village of Eek
Egegik Village
Eklutna Native Village
Native Village of Ekuk
Ekwok Village
Native Village of Elim
Emmonak Village
Evansville Village (aka Bettles Field)
Native Village of Eyak (Cordova)
Native Village of False Pass
Native Village of Fort Yukon
Native Village of Gakona
Galena Village (aka Louden Village)
Native Village of Gambell
Native Village of Georgetown
Native Village of Goodnews Bay
Organized Village of Grayling (aka Holikachuk)
Gulkana Village
Native Village of Hamilton
Healy Lake Village
Holy Cross Village
Hoonah Indian Association
Native Village of Hooper Bay
Hughes Village
Huslia Village
Hydaburg Cooperative Association
Igiugig Village
Village of Iliamna
Inupiat Community of the Arctic Slope
Iqurmuit Traditional Council (formerly the Native Village of Russian Mission)
Ivanoff Bay Village
Kaguyak Village
Organized Village of Kake

**71198**    **Federal Register** / Vol. 70, No. 226 / Friday, November 25, 2005 / Notices

Kaktovik Village (aka Barter Island)
Village of Kalskag
Village of Kaltag
Native Village of Kanatak
Native Village of Karluk
Organized Village of Kasaan
Kasigluk Traditional Elders Council
  (formerly the Native Village of
  Kasigluk)
Kenaitze Indian Tribe
Ketchikan Indian Corporation
Native Village of Kiana
King Island Native Community
King Salmon Tribe
Native Village of Kipnuk
Native Village of Kivalina
Klawock Cooperative Association
Native Village of Kluti Kaah (aka Copper
  Center)
Knik Tribe
Native Village of Kobuk
Kokhanok Village
Native Village of Kongiganak
Village of Kotlik
Native Village of Kotzebue
Native Village of Koyuk
Koyukuk Native Village
Organized Village of Kwethluk
Native Village of Kwigillingok
Native Village of Kwinhagak (aka
  Quinhagak)
Native Village of Larsen Bay
Levelock Village
Lesnoi Village (aka Woody Island)
Lime Village
Village of Lower Kalskag
Manley Hot Springs Village
Manokotak Village
Native Village of Marshall (aka Fortuna
  Ledge)
Native Village of Mary's Igloo
McGrath Native Village
Native Village of Mekoryuk
Mentasta Traditional Council
Metlakatla Indian Community, Annette
  Island Reserve
Native Village of Minto
Naknek Native Village
Native Village of Nanwalek (aka English
  Bay)
Native Village of Napaimute
Native Village of Napakiak
Native Village of Napaskiak
Native Village of Nelson Lagoon
Nenana Native Association

New Koliganek Village Council
  (formerly the Koliganek Village)
New Stuyahok Village
Newhalen Village
Newtok Village
Native Village of Nightmute
Nikolai Village
Native Village of Nikolski
Ninilchik Village
Native Village of Noatak
Nome Eskimo Community
Nondalton Village
Noorvik Native Community
Northway Village
Native Village of Nuiqsut (aka Nooiksut)
Nulato Village
Nunakauyarmiut Tribe (formerly the
  Native Village of Toksook Bay)
Native Village of Nunapitchuk
Village of Ohogamiut
Village of Old Harbor
Orutsararmuit Native Village (aka
  Bethel)
Oscarville Traditional Village
Native Village of Ouzinkie
Native Village of Paimiut
Pauloff Harbor Village
Pedro Bay Village
Native Village of Perryville
Petersburg Indian Association
Native Village of Pilot Point
Pilot Station Traditional Village
Native Village of Pitka's Point
Platinum Traditional Village
Native Village of Point Hope
Native Village of Point Lay
Native Village of Port Graham
Native Village of Port Heiden
Native Village of Port Lions
Portage Creek Village (aka Ohgsenakale)
Pribilof Islands Aleut Communities of
  St. Paul & St. George Islands
Qagan Tayagungin Tribe of Sand Point
  Village
Qawalangin Tribe of Unalaska
Rampart Village
Village of Red Devil
Native Village of Ruby
Saint George Island (See Pribilof Islands
  Aleut Communities of St. Paul & St.
  George Islands)
Native Village of Saint Michael
Saint Paul Island (See Pribilof Islands
  Aleut Communities of St. Paul & St.
  George Islands)

Village of Salamatoff
Native Village of Savoonga
Organized Village of Saxman
Native Village of Scammon Bay
Native Village of Selawik
Seldovia Village Tribe
Shageluk Native Village
Native Village of Shaktoolik
Native Village of Sheldon's Point
Native Village of Shishmaref
Native Village of Shungnak
Sitka Tribe of Alaska
Skagway Village
Village of Sleetmute
Village of Solomon
South Naknek Village
Stebbins Community Association
Native Village of Stevens
Village of Stony River
Sun'aq Tribe of Kodiak (formerly the
  Shoonaq' Tribe of Kodiak)
Takotna Village
Native Village of Tanacross
Native Village of Tanana
Native Village of Tatitlek
Native Village of Tazlina
Telida Village
Native Village of Teller
Native Village of Tetlin
Central Council of the Tlingit & Haida
  Indian Tribes
Traditional Village of Togiak
Tuluksak Native Community
Native Village of Tuntutuliak
Native Village of Tununak
Twin Hills Village
Native Village of Tyonek
Ugashik Village
Umkumiute Native Village
Native Village of Unalakleet
Native Village of Unga
Village of Venetie (See Native Village of
  Venetie Tribal Government)
Native Village of Venetie Tribal
  Government (Arctic Village and
  Village of Venetie)
Village of Wainwright
Native Village of Wales
Native Village of White Mountain
Wrangell Cooperative Association
Yakutat Tlingit Tribe

[FR Doc. 05–23268 Filed 11–23–05; 8:45 am]
**BILLING CODE 4310-4J-P**

EXHIBIT B



# Tribal Leaders Directory
## January 2006

The printing date appears on the lower left-hand
corner of the pages in section 2.

A copy of the Microsoft Access 2000 database file
or the Adobe Acrobat file can be obtained by regular mail.
Fax your request to (202) 219-2327.
Specify the file format you need and
give your mailing address.



This directory is posted on the Department of the Interior
website. Go to the internet address below and scroll to the
middle of the page. The link is in the Tribal Governments section.

http://library.doi.gov/internet/native.html

*Tribal Leaders and
BIA Representatives*

## *Pacific Region*

---

BIA Agency Office: **Central California Agency**

Self-Gov. Compact:

Term of Office - Expiration Date:    **May 2005**

**Wanda Balderama, Chairperson**
**Hopland Reservation**
**3000 Shanel Road**
**Hopland, CA 95449**
Phone No:    **(707) 744-1647** Fax No: **(707) 744-8641**
e-mail:
**www.shokawah.com/tribal.html and www. hoplandtribe.com**

---

BIA Agency Office: **Southern California Agency**

Self-Gov. Compact:

Term of Office - Expiration Date:    **Indefinite**

**Rebecca Osuna, Chairperson**
**Inaja-Cosmit Reservation**
**309 S. Maple Street**
**Escondido, CA 92025**
Phone No:    **(760) 737-7628** Fax No: **(760) 749-9152**
e-mail:

---

BIA Agency Office: **Central California Agency**

Self-Gov. Compact:

Term of Office - Expiration Date:

**Mathew Franklin, Chairman**
**Ione Band of Miwok Indians**
**P.O. Box 1190**
**Ione, CA 95640**
Phone No:    **(209) 274-6753** Fax No: **(209) 274-6636**
e-mail: **ioneband@jps.net**

---

BIA Agency Office: **Central California Agency**

Self-Gov. Compact:

Term of Office - Expiration Date:

**Margaret Dalton, Chairperson**
**Jackson Rancheria**
**P.O. Box 1090**
**Jackson, CA 95642**
Phone No:    **(209) 223-1935** Fax No: **(209) 223-5366**
e-mail:

---

BIA Agency Office: **Southern California Agency**

Self-Gov. Compact:

Term of Office - Expiration Date:    **Dec 2006**

**Leon Acebedo, Chairman**
**Jamul Indian Village**
**P.O. Box 612**
**Jamul, CA 91935**
Phone No:    **(619) 669-4785** Fax No: **(619) 669-4817**
e-mail:

---

BIA Agency Office: **Northern California Agency**

Self-Gov. Compact: **YES**

Term of Office - Expiration Date:    **May 2005**

**Arch Super, Chairman**
**Karuk Tribe of California**
**P.O. Box 1016**
**Happy Camp, CA 96039**
Phone No:    **(530) 493-5305** Fax No: **(530) 493-5322**
e-mail:

---

BIA Agency Office: **Southern California Agency**

Self-Gov. Compact:

Term of Office - Expiration Date:    **Jan 2006**

**Tracy Lee Nelson, Chairman**
**La Jolla Band of Luiseno Indians**
**22000 Highway 76**
**Pauma Valley, CA 92061**
Phone No:    **(760) 742-3771** Fax No: **(760) 742-1704**
e-mail:

---

BIA Agency Office: **Southern California Agency**

Self-Gov. Compact:

Term of Office - Expiration Date:    **Indefinite**

**Gwendolyn Parada, Chairperson**
**La Posta Band of Mission Indians**
**P.O. Box 1120**
**Boulevard, CA 91905**
Phone No:    **(619) 478-2113** Fax No: **(619) 478-2125**
e-mail:

---

*State:*  California

## *Pacific Region*

### *Agency:*  *Central California Agency*

42  Robinson Rancheria of Pomo Indians of California

43  Round Valley Indian Tribes of the Round Valley Reservation (formerly the Covelo Indian Communit

44  Rumsey Indian Rancheria of Wintun Indians of California

45  Santa Rosa Indian Community of the Santa Rosa Rancheria

46  Scotts Valley Band of Pomo Indians of California

47  Sherwood Valley Rancheria of Pomo Indians of California

48  Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract)

49  Table Mountain Rancheria of California

50  Tule River Indian Tribe of the Tule River Reservatio

51  Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California

52  United Auburn Indian Community of the Auburn Rancheria of California

53  Upper Lake Band of Pomo Indians of Upper Lake Rancheria of California

54  Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation

### *Agency:*  *Northern California Agency*

55  Alturas Indian Rancheria

56  Bear River Band of the Rohnerville Rancheria

57  Big Lagoon Rancheria

58  Blue Lake Rancheria

59  Cedarville Rancheria

60  Cher-Ae Heights Indian Community of the Trinidad Rancheria

61  Elk Valley Rancheria

62  Fort Bidwell Indian Community of the Fort Bidwell Reservation of California

63  Hoopa Valley Tribe

## *Pacific Region*

### *Agency:*  *Northern California Agency*

64  Karuk Tribe of California

65  Pit River Tribe (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias)

66  Quartz Valley Indian Community of the Quartz Valley Reservation of California

67  Redding Rancheria

68  Resighini Rancheria

69  Smith River Rancheria

70  Susanville Indian Rancheria

71  Wiyot Tribe (formerly Table Bluff Reservation - Wiyot Tribe)

72  Yurok Tribe of the Yurok Reservation

### *Agency:*  *Pacific Region*

73  Cabazon Band of Mission Indians

### *Agency:*  *Palm Springs Agency*

74  Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation

### *Agency:*  *Southern California Agency*

75  Augustine Band of Cahuilla Mission Indians of the Augustine Reservation

76  Cahuilla Band of Mission Indians of the Cahuilla Reservation

77  Campo Band of Diegueno Mission Indians of the Campo Indian Reservation

78  Capitan Grande Band of Diegueno Mission Indians of California (two component reservations): Barona Group and the Viejas (Baron Long) Group

79  Ewiiaapaayp Band of Kumeyaay Indians (formerly the Cuyapaipe Community of Diegueno Mission Indians of the Cuyapaipe Reservation)

80  Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation

81  Jamul Indian Village of California

# *Name Index – Tribal Leaders and BIA Representatives*

| *Name* | *Organization* | *Section 2 Page No.* |
| --- | --- | --- |
| , Chairman | Winnemucca Tribal Council | 95 |
| , Chairman | California Valley Miwok Tribe | 65 |
| , Chairman | Manchester - Point Arena Band of Pomo Indians | 69 |
| , | Red Lake Field Office | 45 |
| , Superintendent | Makah Agency | 53 |
| Charles S. Abalana, First Chief | Egegik Village | 9 |
| Greg  Abrahamson, Chairman | Spokane Business Council | 60 |
| Leon  Acebedo, Chairman | Jamul Indian Village | 68 |
| Bert  Adams, Sr., President | Yakutat Tlingit Tribe | 30 |
| Donald  Adams, President | Native Village of Tetlin (IRA) | 28 |
| Edward J. Adams, Sr., President | Native Village of Sheldon Point | 25 |
| Max  Agayar, President | Village of Alakanuk | 2 |
| Orval  Ahkinga, President | Native Village of Diomede (IRA) (aka Inalik) | 8 |
| Luki  Akelkok, Sr., President | Ekwok Village | 9 |
| Virgil  Akins, Superintendent | Northern California Agency | 62 |
| Isaac K. Akootchook, President | Kaktovik Village | 12 |
| Virginia  Aleck, President | Chignik Lake Village | 6 |
| Adliai R. Alexander, First Chief | Native Village of Fort Yukon (IRA) | 10 |
| Tony  Alexia, First Chief | Nikolai Village | 19 |
| Fred  Alexie, First Chief | Kaltag Tribal Council | 13 |
| Chief J. Allan, Chairman | Coeur d'Alene Tribal Council | 56 |
| Mark  Allen, President | Flandreau Santee Sioux Executive Committee | 42 |
| Wm. Ron  Allen, Chairman | Jamestown S'Klallam Tribal Council | 57 |
| Gail  Alstrom, President | Yupiit of Andreafski | 3 |
| Mark  Altvater, Governor | Passamaquoddy Tribe - Pleasant Point Reservation | 38 |
| Eleanor R. Amaktoolik, President | Chinik Eskimo Community | 7 |
| Rolin M. Amodo, President | Native Village of Akhiok | 2 |

EXHIBIT C

## DECLARATION OF MICHAEL BAKSH

I, Michael Baksh, declare as follows:

I served as Project Manager for a cultural resource survey that was conducted on the Jamul Indian Village in 1998. I have personal knowledge of the facts stated herein, except as to those which are based upon information and belief and, if called upon to do so, could and would testify competently thereto.

1. I received my Ph.D in Anthropology from the University of California, Los Angeles and have been an Anthropologist from the time I received my degree to the present.

2. I am currently President and Principal Anthropologist at Tierra Environmental Services, an environmental consulting firm in San Diego, California.

3. In my capacity as an Anthropologist and Archeologist with Tierra Environmental Services, I served as the Project Manager for a cultural resource survey that was conducted for the Jamul Indian Village in 1998.

4. The survey was conducted on the Jamul Indian Village trust land ("Reservation"), as well as on a 3.7-acre parcel of land that the Tribe proposed to have transferred to the United States into trust for the Tribe.

5. The purpose of the survey was to identify any cultural resources located on the survey site and to ensure that no significant cultural resources would be impacted by the Tribe's proposed casino plans.

6. The survey included a search for signs of human remains or any other remains on the project site.

7. The survey did not reveal any significant cultural resources or artifacts on the Jamul Indian Village Reservation.

8. The survey did not reveal any signs of human remains or any other remains on the Reservation.

9. The survey did not reveal any cultural resources on the Reservation that qualify as potentially significant resources under the National Historic Preservation Act.

10. We have retained a copy of the survey report in our office, and I have reviewed it for the purpose of preparing this declaration.

11. I am aware of the claims made by Plaintiffs in this matter. Based on my participation in the cultural resources survey, I know of no facts that would support Plaintiffs' contentions that the Reservation contains Native American human remains and related items that will be disturbed by the contemplated construction.

Executed this 9th day of February, 2007, at San Diego, California.

By: _Michael Baksh_

Michael Baksh, Ph.D

4824-7114-2145\3 2/9/2007 1:08 PM

EXHIBIT D



CELEBRATING 10,000 YEARS IN SAN DIEGO

# JAMUL INDIAN VILLAGE
# EVICTION AND EXCLUSION ORDINANCE

## Ordinance No. 2007- 01
### (Amending Ordinance No. 2001-02)

Pursuant to the authority vested in the Jamul General Council by the Constitution of the Jamul Tribe, adopted on May 9, 1981, and amended on August 31, 1996, Article 8 thereunder, the General Council hereby amends Ordinance No. 2001-02 (governing tribal evictions and exclusions) in its entirety to read as follows and establishes the following procedures governing the eviction and exclusion of persons and entities, business or otherwise, from the lands of the Jamul Indian Village.

## ARTICLE I.  PURPOSES AND FINDING

Section 1:    The purposes of this ordinance are:

(a)    To promote the safety of all Jamul tribal members on reservation trust lands.

(b)    To promote and protect the peace, health, and general welfare of the membership of the Jamul Indian Village, pursuant to Article 8, Section 1(g) of the Jamul Constitution.

(c)    To establish uniform rules and procedures for the removal of persons and property from the lands of the Jamul Indian Village.

Section 2:    The General Council finds that the subject matter of this ordinance directly affects the political integrity, the economic security, and the health and welfare of the Tribe.

## ARTICLE II.  DEFINITIONS

Section 1.    "Executive Committee" shall mean the elected governing officials of the Tribe.

Section 2.    "Jamul Tribal Court" shall mean the Court established by, or authorized by, the General Council of the Tribe to hear any appeal from any eviction or exclusion order under this ordinance.

Section 3.    "Person" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

Section 4.    "Premises" shall mean that parcel of Reservation lands that is the subject of an

JAMUL INDIAN VILLAGE
1
———————————— *A Federally Recognized Tribal Nation* ————————————
P.O. Box 612 • Jamul, CA 91935 • Tel: 619.669.4785 • Fax: 619.669.4817

order o̲_̲_̲.ction.

| Section 5. | "Reservation lands" shall mean all lands within the exterior boundaries of the Jamul Indian Village Reservation held in trust by the United States for the benefit of the Tribe. |

Section 5.    "Reservation lands" shall mean all lands within the exterior boundaries of the Jamul Indian Village Reservation held in trust by the United States for the benefit of the Tribe.

Section 6.    "Tribe" shall mean the Jamul Indian Village.

## ARTICLE III.  GROUNDS FOR EVICTION OR EXCLUSION

Section 1.    Right to Possession of Reservation Lands – A person may exercise possession of Reservation lands only pursuant to a valid lease, assignment or license (a) authorized by the General Council of the Tribe and (b) which is in effect.

Section 2.    Grounds for Eviction – A person is subject to eviction from Reservation lands under this ordinance for any one or more of the following reasons:

(a)    Such person is in possession of Reservation lands without the consent of the Tribe evidenced by lease, assignment or license authorized by the General Council of the Tribe.

(b)    Such person is in possession of Reservation lands which such person had possessed with the consent of the Tribe evidenced by lease, assignment or license authorized by the General Council of the Tribe, which consent has subsequently been withdrawn by the General Council of the Tribe consistent with the terms of such lease, assignment or license.

(c)    Such person is in possession of Reservation lands which such person had possessed with the consent of the Tribe evidenced by lease, assignment or license authorized by the General Council of the Tribe, and such person is in default of its obligations under such lease, assignment or license.

Section 3.    Grounds for Exclusion – A person is subject to exclusion from Reservation lands under this ordinance for any one or more of the following reasons:

(a)    Such person is not an enrolled member of the Tribe.

(b)    Such person (i) is an enrolled member of the Tribe, (ii) does not have a present right to possession of Reservation lands under Section 1 of this Article III, and (iii) the General Council of the Tribe has determined by a majority at a General Council meeting, that the presence of such person on Reservation lands is inimical to the peace, health, or general welfare of the membership of the Tribe.

## ARTICLE IV.  NOTICE OF EVICTION OR EXCLUSION

2

Section 1.     **Commencement of Eviction or Exclusion Action** – Upon a determination of the General Council of the Tribe that a Person should be evicted or excluded from Reservation lands, the Tribe shall commence an action in the Jamul Tribal Court seeking such eviction or exclusion. An eviction or exclusion action shall be governed by the rules applicable to civil actions in the Jamul Tribal Court, subject to (a) the requirements of Section 2 of this Article IV and (b) the modifications of such rules provided for in Article V, Section 5 of this ordinance.

Section 2.     **Service of Complaint** – In addition to the elements required by the civil rules of the Jamul Tribal Court, the complaint in an action for eviction or exclusion shall contain, or shall be accompanied by a separate notice containing:

(a)     A brief summary of the reason for eviction, exclusion or both.

(b)     In the case of an action for eviction, a specific period of time, not less than 15 calendar days, in which the Person is to vacate the Premises and to remove any and all property.

(c)     A statement that the Person may contest the eviction or exclusion by making a written request for a hearing before the Jamul Tribal Court within the time period provided by the rules of the Jamul Tribal court (as modified in accordance with Article V, Section 5 of this ordinance).

(d)     A statement that any property left on the Premises after the date specified in the notice may be either disposed of, or stored, at the Tribe's election, that any stored property must be reclaimed within 14 days (except for vehicles, which shall be accorded 30 days), and that any accrued storage costs must also be paid.

(e)     A statement that, in the event of any contest of the eviction or exclusion before the Jamul Tribal Court, the decision of the Jamul Tribal Court is final and not subject to further appeal.

## ARTICLE V.  JURISDICTION OF THE JAMUL TRIBAL COURT

Section 1.     **Designation of Jamul Tribal Court** – The Intertribal Court of Southern California is hereby designated as the Jamul Tribal Court for the purpose of this ordinance, with the power and authority to hear and adjudicate actions seeking eviction or exclusion as provided herein.

Section 2.     **Validation Actions** – The Jamul Tribal Court is hereby granted jurisdiction to hear and adjudicate (a) declaratory actions brought by the Tribe seeking the validation of this ordinance or of any action of the Tribe taken hereunder, and (b) challenges brought by any Person challenging the validity of this ordinance or any action of the Tribe taken hereunder.

3

<u>Section 3.</u>     Jurisdiction Exclusive – The jurisdiction of the Jamul Tribal Court under Sections 1 and 2 of this Article V is exclusive as to any other court, tribal, state or federal.

<u>Section 4.</u>     Decisions Final – All decisions of the Jamul Tribal Court under this Article V shall be final and not subject to further appeal.

<u>Section 5.</u>     Rules of Procedure – The Executive Committee is hereby authorized and directed to prepare and adopt rules of procedure to be followed by the Jamul Tribal Court in connection with actions for eviction or exclusion hereunder.

## ARTICLE VI.  ENFORCEMENT

<u>Section 1.</u>     Enforcement of Eviction and Exclusion Orders – The Executive Committee is authorized to take any and all steps necessary to enforce any eviction or exclusion order of the Jamul Tribal Court.

<u>Section 2.</u>     Assistance from Law Enforcement – In cases where it deems it necessary or desirable, the Executive Committee is authorized to seek the assistance of state or federal law enforcement authorities, including the Bureau of Indian Affairs, and to retain any other personnel for such purpose, to assist with, or to keep the peace in connection with, the enforcement of any eviction or exclusion order of the Jamul Tribal Court.

## ARTICLE VII.  ADOPTION AND AMENDMENT

Section 1.     This Ordinance shall be adopted by a majority vote of tribal members voting at a duly called General Council meeting with a quorum present, and shall be amended in the same manner.

## C E R T I F I C A T I O N

This is to certify that this Amendment to Ordinance No. 2001-02 (governing tribal evictions and exclusions), was adopted by the Jamul General Council at a duly called meeting with a quorum present, on January _5_ , 2007, by a vote of _17_ FOR, _0_ , Opposed, and _0_ Abstaining.

_____          _____
Leon Acebedo, Chairman                    Carlene Chamberlain, Vice-Chair

_____          _____
Erica M. Pinto, Council Member            Kenneth Meza, Council Member

_____          _____
Robert Mesa, Council Member               Julia Lotta Secretary/Treasurer

4

EXHIBIT E

FEB-08-2007 15:48 From:ICSC ADMIN    7607391472    To:9516957081    P.2

Case 1:07-cv-00162-RMC    Document 32-3    Filed 03/19/2007    Page 3 of 14    P.2.

# JAMUL TRIBAL COURT
### Intertribal Court of Southern California

| Attorney for Plaintiff or Plaintiff without an Attorney | (For Court Use Only) |
|---|---|
| EUGENE MADRIGAL<br>LAW OFFICE OF EUGENE R. MADRIGAL<br>28581 Old Town Front Street, Ste. 208<br>Temecula, CA 92590<br>Telephone: (951) 695-7080 / Facsimile: (951) 695-7081 | |
| Attorney for Defendant or Defendant without an Attorney | |
| PATRICK D. WEBB<br>WEBB & CAREY APC<br>401 B Street, Ste. 306<br>San Diego, CA 92101<br>Telephone: (619) 236-1650 / Facsimile: (619) 236-1283 | |
| JAMUL INDIAN VILLAGE,<br>    Plaintiffs,<br>        vs.<br>WALTER ROSALES, KAREN TOGGERY, LOUIS AHYULE GOMEZ,<br>and DOES 1 through 20, inclusive,<br>    Defendants | |
| **ORDER AFTER HEARING<br>FINDINGS** | Case Number:<br>JAMUL 07-01-01 |

This matter came as specially set by the Court for an Order to Show Cause as to why this case as set in the Jamul Tribal Court for an eviction of the above named Defendants currently residing on the Jamul Tribal Village should not proceed. Appearing for the Plaintiff was Eugene Madrigal, Law Office of Eugene R. Madrigal and Skip Durocher, Dorsey & Whitney LLP. Specially appearing on behalf of the Defendants was Mr. Patrick D. Webb Esq., Webb & Carey APC.

## INTRODUCTION

Attorney for the Defendants in his request for a hearing in this matter proposed several legal questions regarding the jurisdiction of the current Jamul Tribal Court. Defendants allege the "eviction and exclusion ordinance No. 2007-01 which this case is premised upon was not adopted by the lawful members of the General Council of the Jamul Indian Village", and therefore did not convey or confer jurisdiction in this case on the Intertribal Court of Southern California. They further suggest the only Jamul Tribal Court in existence was created on May 9, 1981 by the then Tribal Council and that Defendant Karen Toggery was "the only lawfully elected judge of that court since 1995." Counsel for Defendants also suggest they are "beneficial owners" of certain land parcels located on the reservation

and that they are the "lawfully elected governing officials of the Jamul Indian Village" and that the current Tribal Counsel and Chairman are not lawfully elected officials. Plaintiff, the Jamul Indian Village disagrees on all points with Defendant's position. Thus the purpose of this hearing was to examine the parties differing position and from there determine if the eviction process should go forward.

## DISSUCSSION

In proceeding with this matter the Court explained to all parties present and respective Counsel that the Intertribal Court of Southern California was appointed to act as the Tribal Court for the Jamul Tribe based upon approval of the Inter-governmental Agreement and then passed by resolution passed by the current Tribal Council and was approved by the General Council. Defendants argued they were the true Tribal government and only they could adopt such an action. They further alleged that Defendant Ms. Karen Toggery was the only Tribal Judge as elected in 1995. The result, as argued, by Defendants is that the current Jamul Tribal Court had no jurisdiction in this matter. Defendants Toggery and Rosales also contend that they are the "beneficial owners" of a certain parcel 597-080-04 which is currently part of the Jamul Indian Village. It is these issues and other questions as presented at the hearing these findings will address.

## THE INTERTRIBAL COURT OF SOUTHERN CALIFORNIA

The proceedings began with an effort to clarify the Intertribal Court of Southern California's (ICSC) position in this case. The Court took time to explain to all parties how the ICSC was formed and how it came to be the Court in which this matter is to be heard. By way of a brief review it was explained that the ICSC was appointed by the current Tribal Council with the approval of the General Council to act as "the Jamul Tribal Court" and that there are 9 other Tribes within San Diego County who have agreed to the Inter-governmental agreement and passed similar resolutions naming the ICSC to serve as "their" Tribal Court. In effect when the ICSC Judge is sitting at any particular reservation he/she is the Judge for that reservation and no other. The Judge follows the laws, procedures, customs and traditions of the Reservation he/she is sitting in. Conceptually this is patterned after a Circuit Court concept common in the early history of the United States. The ICSC receives no monies from individuals or Tribes nor does it or has it received any revenue from any gaming Tribe or entity. It is funded solely by a host of State and Federal grants specifically created to further the development and implementation of Tribal Courts and

the Tribal Court system. Initially funding coming from a United States Department of Justice grant,

applied for under the Southern California Tribal Chairmen's Association provided the monies for the

ICSC. It should also be noted that Tribes and individual Tribal members are not charged when using the

services of the ICSC.

FINDINGS

1. Defendants alleged in their responsive pleadings and by way of oral argument "the purported

   eviction and exclusion ordinance No. 2007-01 was not lawfully adopted by lawful members of

   the General Council of the Jamul Indian Village and therefore cannot confer jurisdiction on the

   ICSC." In reviewing the exhibits presented in this matter relating to this argument, and after

   hearing argument the Court disagrees with Defendants contentions. There have been numerous

   lawsuits, administrative hearings and other legal challenges directly or indirectly related in part

   to this issue as well as others in this matter. In each case the Defendants have been unsuccessful

   in challenging the legitimate status of both the current Tribal membership enrollment roles as

   well as related matters and the current legal status of the current Tribal Council and Tribal

   Chairman. In preparing for this hearing the Court reviewed all exhibits presented by the parties

   including the sworn declarations of the Acting Director of the Riverside Office of the Bureau of

   Indian Affairs (BIA), which clearly recognized the Tribal government as currently

   constituted as the only legitimate Tribal government of the Jamul Indian Village. This exhibit

   goes on to convey its approval of the Tribal elections, including that of the current Tribal

   Chairman, which had been challenged. In a case filed in the United State District Court in

   Washington D.C. appealing the Interior Board of Indian Appeals (IBIA), one of three separate

   appeals, challenging the BIA and the IBIA findings Judge Gladys Kessler presiding, it states that

   the IBIA decisions are final and "not arbitrary and capricious or contrary to law" as contended by

   the Defendants. Rather the law provides that the IBIA decisions are final and that further actions

   or motions do not stay those decisions. IBIA decisions are to be carried out not withstanding

   subsequent appeals. This Court agrees with those findings.,

2. Defendants allege they are "beneficial owners" of parcel 597-080-04 a portion of that

   property currently referred to as the Jamul Indian Village. Again respectfully Defendants are

mistaken. While they have continuously challenged it, the record including, records from a host of Court decisions and exhibits make it clear Defendants are not enrolled members of the Jamul Indian Tribe and even if they were, individual Tribal members cannot claim an individual right allotment or otherwise to any parcel. "Rather as pointed out by United States District Judge Irma Gonzales in this case and directly relating to this issue "the parcel is held by the United States in trust for the benefit of the Jamul Tribe." She goes on to note "the manner in which a tribe chooses to use its property can be controlled by individual members only to the extent the members participate in the governmental process of the Tribe." While in his oral argument to the Court, Counsel for the Defendants contended this was mere "dicta". This Court disagrees and concludes that this factor went directly to the heart of her decision. Defendants are not nor have they ever have been beneficial owners of any part of the Jamul Indian Reservation.

3. Defendants contend "there is only one Jamul Indian Village Tribal Court that was created pursuant to the May 9, 1981, Jamul Indian Village constitution and the Indian Reorganization Act of 1934. 25 U.S.C. 461 et seq., and that Ms. Karen Toggery is and has been the only lawfully elected Judge of that Court since 1995." This argument carries no water. The Tribe is lawfully formed and recognized by the Federal government, and has both a constitutional and inherent right to select its judicial officers as well as reject them. In this case by way of a Tribal Resolution and subsequent vote of the General Council they have chosen to form the Court as described above. It is clear to this Court that Ms. Toggery even if she were once a Tribal Judge has since been rejected as such. Further even if there was (and there is not) a remote possibility this allegation were true Ms. Toggery from a pure ethical prospective, as a named Defendant in this case, would be deemed unfit to preside in such an action.

4. The remaining issue as addressed in the Defensive pleadings is that of jurisdiction. Defendants contend they have not submitted to the jurisdiction of the Intertribal Court of Southern California. As explained above it is not the jurisdiction of the ICSC that is to be argued. The question is, does the Jamul Tribal Court as constituted using the services of the ICSC have jurisdiction in this matter? The answer is unequivocally yes! As discussed, this Court finds the current Tribal government of the Jamul Indian Village the only legitimate Tribal governmental authority of the

Tribe as recognized by the Federal Government and pursuant to the Tribal Constitution. Therein based upon the Tribes inherent powers coupled with its constitution it has the right to convene its own Tribal Court as it has done. Therefore the Tribe has jurisdiction over its lands and those who choose to enter upon those lands just as the Defendants have chosen to do so. There is no dispute Defendants are on Tribal land and are not currently recognized as or enrolled as Tribal members. Additionally the Tribe is exercising its civil regulatory jurisdiction over those on Tribal lands be they Indian or non-Indian. This being established not unlike any sovereign power the Tribe has jurisdiction over those who voluntary choose to enter Tribal lands and in this case reside on Tribal lands. Thus it is not a matter of whether or not the Defendants choose to "submit" to the jurisdiction of the Tribe and in turn the Tribal Court they do so by law, by their mere presence on Tribal land.

## COMMENT AND CONCLUSION

It is this Courts opinion the Defendants challenges fly in the face of not only its own conclusions but that of numerous administrative and Court decisions and appeals denying them the identical relief they currently seek in the Tribal Court. Given the current state of both Federal and State law and under Public Law 280 this Court is of the opinion had a Tribal Court been in existence at the time this case and the issues contained therein first came to light, the matter would have been long resolved and done so at the Tribal level. This case as argued revolves around Tribal issues and should not involve either the State or Federal Governments. The Constitution of the Jamul Indian Village is clear. It grants Tribal members and their elected government the power and authority to adopt ordinances and make laws to "promote the peace, health, morals, education and general welfare" of the Village and its members. This is in fact exactly what the Tribe has done. And in defending their sovereign rights as a Tribe, they have contradicted in one legal forum or another every challenge the Defendants have made. This is not some grand game where a small minority should be allowed to hold hostage by way of repeated unsuccessful legal challenges the majority. The position of the current Tribal government and Tribal membership has been time and time again made clear by the Courts and again is repeated by this Court. They are the correct and legitimate membership and governing body. Defendants do not in any way represent the Jamul Indian Village.

Version 1 (2007-01)      Order After Hearing Findings - 5

This has been a long and protracted controversy. Defendants have for a period of 12 years filed numerous lawsuits challenging the Tribal Government, Tribal land use, Tribal elections and much more. While not prevailing, at every turn they continue. The time has come to put this matter to rest! Defendants will file, as ordered at the hearing, an answer to the Tribes complaint for eviction on or before February 8, 2007. A trial on Plaintiffs complaint for eviction will then proceed as ordered at a hearing on February 23, 2007 in the Jamul Tribal Court located at 13910 Lyons Valley Road, Jamul, CA 91935 at 10:a.m.

**IT IS SO ORDERED:**

ANTHONY J. BRANDENBURG,
CHIEF JUDGE JAMUL TRIBAL COURT

EXHIBIT F

## NOTICE OF EVICTION AND EXCLUSION

TO:         Walter Rosales and any and all other occupants of the property at 14191
            Highway 94, Jamul, California 91935.

DATED:      January 17, 2007

**NOTICE IS HEREBY GIVEN:** that any right you may have had, if any, to use and
occupy the above identified property on the Jamul Indian Village Reservation is
rescinded and revoked by action of the Jamul Indian Village General Council. A tribal
court action for eviction and exclusion has also been filed against you in the Jamul Tribal
Court, Intertribal Court of Southern California, in accordance with Exclusion and
Eviction Ordinance of the Jamul Indian Village.

The reason for this action, includes, but may not be limited to, the following: You are not
a member of the Jamul Indian Village, you are in possession of Jamul Reservation lands
without the consent of the Tribe evidenced by lease, assignment or license authorized by
the General Council of the Jamul Indian Village, you have no rights to the use of the
property of the Jamul Indian Village, and the Jamul General Council has therefore
authorized your eviction and exclusion from Jamul Reservation lands.

YOU MUST VACATE THE PROPERTY BY NO LATER THAN: Fifteen (15)
calendar days from the date this Notice and a copy of the eviction and exclusion action
were served upon you, or these documents were posted on the premises, whichever
occurred first.

Removal of Personal Property: You must remove all personal property and possessions
from the premises by the above specified time. Any personal property found on the
premises after the above date shall be removed and disposed of, or stored, at the option of
the Jamul Indian Village. If the property is stored, it must be claimed within 14 days (30
days for vehicles), and any accrued storage costs must be paid. If not claimed in this time
period, the property may be sold or destroyed.

Request For Tribal Court Hearing: If you wish to contest this action, you must file a
written request for a hearing in the Jamul Tribal Court, Intertribal Court of Southern
California, within 5 calendar days of the date this Notice and a copy of the eviction and
exclusion action were served on you, or were posted on the premises, whichever occurred
first. The Tribal Court will then advise you of the date and time of your hearing. A copy
of the required Hearing Request Form is attached.

Relocation Expenses: In order to provide an incentive for prompt compliance with this
Notice, the Jamul Indian Village has authorized the payment of reasonable relocation
expenses. A payment of $5,000 will be made upon your written consent to comply with
this Notice, and an additional $5,000 payment will be made within 10 days after you

1

vacate the premises and all personal property has been removed.

YOU ARE FURTHER ADVISED: that failure to comply with this Notice could result in money damages, including attorney's fees and costs, being assessed against you for continued unlawful occupation of reservation lands.

The decision of the Jamul Tribal Court shall be final and not subject to further appeal.

Jamul Indian Village
P.O.B. 612
Jamul, Ca  91935

2

EXHIBIT G

# NOTICE OF EVICTION AND EXCLUSION

TO:     Karen Toggery and any and all other occupants of the property at 14191
        Highway 94 #14, Jamul, California 91935.

DATED:     January 17, 2007

**NOTICE IS HEREBY GIVEN:** that any right you may have had, if any, to use and
occupy the above identified property on the Jamul Indian Village Reservation is
rescinded and revoked by action of the Jamul Indian Village General Council. A tribal
court action for eviction and exclusion has also been filed against you in the Jamul Tribal
Court, Intertribal Court of Southern California, in accordance with Exclusion and
Eviction Ordinance of the Jamul Indian Village.

The reason for this action, includes, but may not be limited to, the following: You are not
a member of the Jamul Indian Village, you are in possession of Jamul Reservation lands
without the consent of the Tribe evidenced by lease, assignment or license authorized by
the General Council of the Jamul Indian Village, you have no rights to the use of the
property of the Jamul Indian Village, and the Jamul General Council has therefore
authorized your eviction and exclusion from Jamul Reservation lands.

YOU MUST VACATE THE PROPERTY BY NO LATER THAN:  Fifteen (15)
calendar days from the date this Notice and a copy of the eviction and exclusion action
were served upon you, or these documents were posted on the premises, whichever
occurred first.

Removal of Personal Property: You must remove all personal property and possessions
from the premises by the above specified time.  Any personal property found on the
premises after the above date shall be removed and disposed of, or stored, at the option of
the Jamul Indian Village.  If the property is stored, it must be claimed within 14 days (30
days for vehicles), and any accrued storage costs must be paid. If not claimed in this time
period, the property may be sold or destroyed.

Request For Tribal Court Hearing: If you wish to contest this action, you must file a
written request for a hearing in the Jamul Tribal Court, Intertribal Court of Southern
California, within 5 calendar days of the date this Notice and a copy of the eviction and
exclusion action were served on you, or were posted on the premises, whichever occurred
first. The Tribal Court will then advise you of the date and time of your hearing. A copy
of the required Hearing Request Form is attached.

Relocation Expenses: In order to provide an incentive for prompt compliance with this
Notice, the Jamul Indian Village has authorized the payment of reasonable relocation
expenses. A payment of $5,000 will be made upon your written consent to comply with
this Notice, and an additional $5,000 payment will be made within 10 days after you

1

vacate the prem.. and all personal property has been ..oved.

YOU ARE FURTHER ADVISED: that failure to comply with this Notice could result in money damages, including attorney's fees and costs, being assessed against you for continued unlawful occupation of reservation lands.

The decision of the Jamul Tribal Court shall be final and not subject to further appeal.

Jamul Indian Village
P.O.B. 612
Jamul, Ca 91935

2

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WALTER J. ROSALES, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, P.O. Box 85, Jamul, California, 91935<br><br>KAREN TOGGERY, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TINEJERO TOGGERY, P.O. Box 375, Jamul, California, 91935<br><br>JAMUL INDIAN VILLAGE, a federally recognized Indian tribe, P.O. Box 612, Jamul, California, 91935<br><br>     Plaintiffs,<br>vs.<br><br>UNITED STATES OF AMERICA, Department of Justice 950 Pennsylvania Avenue, NW Washington, D.C. 20530-0001 and its divisions, including but not limited to,<br><br>DEPARTMENT OF THE INTERIOR, by and through Secretary DIRK KEMPTHORNE, in his official capacity, 1849 C Street, NW, Washington, D.C. 20240,<br><br>BUREAU OF INDIAN AFFAIRS, by and through Assistant Secretary of Indian Affairs, JAMES E. CASON, in his official capacity, 1849 C. Street, NW, Washington, D.C. 20240,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:07-cv-00162-RMC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF JAMES FLETCHER IN SUPPORT OF

## JAMUL INDIAN VILLAGE'S AMICUS BRIEF

Respectfully Submitted,
FREDERICK G. JAUSS IV
DORSEY & WHITNEY LLP

By:  */s/ Frederick G. Jauss IV*
FREDERICK G. JAUSS IV
(D.C. Bar No. 485642)
DORSEY & WHITNEY LLP
Washington Square
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20036
Telephone:  (202) 442-3000
Facsimile:  (202) 442-3199

SKIP DUROCHER
(D.C. Bar No. MI 0006)*[1]
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

---

[1] Mr. Durocher's renewal of his admission to the U.S. District Court for the District of Columbia is pending pursuant to Local Rule 83.9.

## DECLARATION OF JAMES FLETCHER

I, JAMES FLETCHER, declare and say:

1. I am the Superintendent of the Southern California Agency Office of the Bureau of Indian Affairs, located in Riverside, California.

2. The Southern California Agency Office is charged with the trust responsibility of administering federal programs concerning federally recognized Indian tribes in the Southern California Agency's jurisdiction, which includes the Jamul Indian Village (Band), located in San Diego County, California.

3. Based on the 2005 Report of Tribal Election, the 2005 Election Results, and the 2005 Run Off Elections Results, which were certified and submitted by the Band's Election Committee; I am aware that the Band held its regular elections on June 18, 2005, and elected the following named individuals to the following positions on its Executive Committee: Leon Acebedo, Chairman; Carlene Chamberlain, Vice-Chairperson; Erica Pinto, Committee Member; Robert W. Mesa, Committee Member; Eleanor Miller, Committee Member; and Julia Lotta, Secretary/Treasurer.

4. Based on the certified notice from the Election Committee dated 7-16-05, I am further aware that Committee Member Eleanor Miller was subsequently replaced by Committee Member Kenneth Meza.

5. The term office for the above Executive Committee Members is two years, from June 18, 2005 through June 16, 2007, which is consistent with Article 5-Election, Section 1 of the Band's Constitution. A copy of a letter sent by this Office to the Jamul Tribe, dated August 9, 2005, recognizing the Executive Committee Members and their terms of office is also attached.

6. It is through the above named duly elected and recognized tribal officials of the Jamul Indian Village that the Bureau of Indian Affairs maintains a government to government working relationship with the Jamul Tribe.

I declare under penalty of perjury under the laws of the State of California that the foregoing statements are true and correct to the best of my knowledge. Executed at Riverside, California, on January 27 2007

JAMES FLETCHER,
Superintendent, Southern California Agency Office

IN REPLY REFER TO

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE INTERIOR**

**BUREAU OF INDIAN AFFAIRS**
Southern California Agency
1451 Research Park Dr., Suite 100
Riverside, CA 92507-2154
Telephone (951) 276-6624  Telefax (951) 276-6641

Tribal Operations
Jamul – Elections

AUG 9 - 2005

Mr. Leon Acebedo, Chairman
JAMUL INDIAN VILLAGE
P.O. Box 612
Jamul, CA 91935

Dear Chairman Acebedo:

We thank Ms. Julia Lotta, Jamul Secretary/Treasurer for providing the final results from the tribal election and the run off election.  Via facsimile Agency received the documents August 2, 2005.

CONGRATULATIONS to you and the other members on returning to the Executive Committee.  We welcome Robert W. Mesa and Eleanor Miller for their first terms to the Committee, a copy of this letter will be provided each elected official.

From the "Report of Tribal Election", term is set for two (2) years beginning June 18, 2005 and ending June 16, 2007.

If there are any questions or issues you would like to discuss, please feel free to contact our office at (951) 276-6624.

Sincerely,



James J. Fletcher
ACTING Superintendent

cc:    Carlene Chamberlain, Vice-Chairperson
Julia Lotta, Secretary/Treasurer
Erica Pinto, Committee Member
Robert W. Mesa, Committee Member
Eleanor Miller, Committee Member
Tribal Operations/Pacific Region w/reports
Tribal Government/Central Office w/reports

**TAKE PRIDE**
**IN AMERICA**

# REPORT OF TRIBAL ELECTION

**NAME OF BAND:** Jamul Indian Village    **DATE OF ELECTION:** 6/18/05

| NAME & POSITION | NO. OF VOTES | ADDRESS | TERM OF OFFICE | TELEPHONE NUMBER |
|---|---|---|---|---|
| Spokesman/Chairman: Leon Acebedo | 20 | P.O. Box 612, Jamul CA 91935 | | (619) 669-4785 |
| Vice-Spokesman/Vice-Chairman: Carlene Chamberlain | 21 | " | " | " |
| Secretary: Julia Lotta | 0 | " | " | " |
| Treasurer: Julia Lotta | 0 | " | " | " |
| Council Member: Erica Pinto | 19 | P.O. Box 612 Jamul CA 91935 | " | (619) 669-4785 |
| Council Member: Robert W. Mesa | 22 | " | " | " |
| Council Member: Eleanor Miller | 15 | " | " | " |
| Council Member: | | | | |
| Alternate Member: | | | | |
| Alternate Member: | | | | |

**Term Begins:** 6/18/05    **Term Expires:** 6/16/07    **Term of Office:** 2 yrs

**Tribal Address:** Jamul Indian Village
P.O. Box 612
Jamul CA 91935

**Telephone No.:** (619) 669-4785
**Fax No.:** (619) 669-4817
**E-Mail Address:** jamulrez @sctdv.net

We hereby certify that the election results are true and correct.

**ELECTION COMMITTEE OR BOARD:**
1. _Carlene Chamberlain_
2.
3.
4.
5.

# JAMUL INDIAN VILLAGE
## 2005 ELECTION RESULTS

OF THE 43 ELIGIBLE VOTERS, **37** VOTED IN THIS ELECTION.

WALK IN **25** , ABSENTEE **12**

**CHAIRMAN**

~~████████~~ **20**

RAYMOND HUNTER SR **16**

**VICE-CHAIRPERSON**

CARLENE CHAMBERLAIN **18**

KENNETH MEZA SR **18**

**COMMITTEE MEMBERS**

DALEANE ADAMS **10**

TERESA COUSINS **14**

ROBERT W MESA **14**

ANNABELLE MEZA **6**

~~████████~~ **15**

~~████████~~ **18**

JESSE PINTO SR **13**

ADOLPH THING **11**

LOUIS THING **7**

WE CERTIFY THE ABOVE INFORMATION TO BE TRUE AND ACCURATE.

_signature_    _signature_
TINA MEZA    VERONICA THING

_signature_
JASON PINTO    JAMES HUNTER (alternate)

6/18/05
DATE

# JAMUL INDIAN VILLAGE
## 2005 RUN OFF ELECTION RESULTS

OF THE 43 ELIGIBLE VOTERS __30__ VOTED IN THIS RUN OFF
ELECTION, ALL VOTES WERE ABSENTEE

**VICE-CHAIRPERSON**

CARLENE CHAMBERLAIN __21__

KENNETH MEZA SR __8__

**COMMITTEE MEMBER**

TERESA COUSINS __7__

ROBERT W. MESA __22__

WE CERTIFY THE ABOVE INFORMATION TO BE TRUE AND
ACCURATE

__TINA MEZA__          __VERONICA THING__

__JASON PINTO__          __JAMES HUNTER (ALTERNATE)__

DATE __7/16/05__

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WALTER J. ROSALES, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, P.O. Box 85, Jamul, California, 91935 | ) ) ) ) |  |
| KAREN TOGGERY, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TINEJERO TOGGERY, P.O. Box 375, Jamul, California, 91935 | ) ) ) ) ) |  |
| JAMUL INDIAN VILLAGE, a federally recognized Indian tribe, P.O. Box 612, Jamul, California, 91935 | ) ) ) ) |  |
| Plaintiffs, | ) |  |
| vs. | ) | Civil Action No. 1:07-cv-00162-RMC |
| UNITED STATES OF AMERICA, Department of Justice 950 Pennsylvania Avenue, NW Washington, D.C. 20530-0001 and its divisions, including but not limited to, | ) ) ) ) ) ) ) |  |
| DEPARTMENT OF THE INTERIOR, by and through Secretary DIRK KEMPTHORNE, in his official capacity, 1849 C Street, NW, Washington, D.C. 20240, | ) ) ) ) ) |  |
| BUREAU OF INDIAN AFFAIRS, by and through Assistant Secretary of Indian Affairs, JAMES E. CASON, in his official capacity, 1849 C. Street, NW, Washington, D.C. 20240, | ) ) ) ) ) |  |
| Defendants. | ) ) |  |

## AFFIDAVIT OF FREDERICK G. JAUSS IV IN SUPPORT OF
## JAMUL INDIAN VILLAGE'S AMICUS BRIEF

Respectfully Submitted,
FREDERICK G. JAUSS IV
DORSEY & WHITNEY LLP

By:  */s/ Frederick G. Jauss IV*
FREDERICK G. JAUSS IV
(D.C. Bar No. 485642)
DORSEY & WHITNEY LLP
Washington Square
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20036
Telephone:  (202) 442-3000
Facsimile:  (202) 442-3199

SKIP DUROCHER
(D.C. Bar No. MI 0006)*
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

---

* Mr. Durocher's renewal of his admission to the U.S. District Court for the District of Columbia is pending pursuant to Local Rule 83.9.

2

## AFFIDAVIT OF FREDERICK G. JAUSS IV

I, Frederick G. Jauss IV, declare as follows:

I am an attorney for the Jamul Indian Village. I have personal knowledge of the facts stated herein, except as to those which are based upon information and belief and, if called upon to do so, could and would testify competently thereto.

1.     A true and correct copy of an order issued by Judge Rhoades of the United States District Court for the Southern District of California (Case No. 95-CV-131), dated June 21, 1995, is attached as Exhibit A.

2.     A true and correct copy of an order issued by Judge Rhoades of the United States District Court for the Southern District of California (Case No. 95-CV-131), dated September 9, 1996, is attached as Exhibit B.

3.     A true and correct copy of the plaintiffs' notice of voluntary dismissal, filed in the United States District Court for the Southern District of California (Case No. 97-CV-769) and dated November 12, 1998, is attached as Exhibit C.

4.     A true and correct copy of an order issued by Judge Rhoades of the United States District Court for the Southern District of California (Case No. 97-CV-769), dated January 27, 1999, is attached as Exhibit D.

5.     A true and correct copy of an order issued by Judge Damich of the United States Court of Federal Claims (Case No. 98-860), dated February 1, 2006, is attached as Exhibit E.

6.     A true and correct copy of an order issued by Judge Whelan of the United States District Court for the Southern District of California (Case. No. 00-CV-1910), dated February 1, 2001, is attached as Exhibit F.

3

7.    A true and correct copy of an order issued by Judge Whelan of the United States District Court for the Southern District of California (Case. No. 00-CV-1910), dated April 18, 2001, is attached as Exhibit G.

8.    A true and correct copy of an order issued by the Ninth Circuit Court of Appeals in Rosales v. Kean Argovitz Resorts, Inc., on June 12, 2002, is attached as Exhibit H.

9.    A true and correct copy of a Westlaw reporter image, containing a denial of certiorari issued by the United States Supreme Court in Rosales v. Kean Argovitz Resorts, Inc., on October 21, 2002, is attached as Exhibit I.

10.    A true and correct copy of an order issued by Judge Gonzalez of the United States District Court for the Southern District of California (Case No. 01-CV-951), dated February 13, 2002, is attached as Exhibit J.

11.    A true and correct copy of a Westlaw reporter image, containing an order issued by the Ninth Circuit Court of Appeals on August 11, 2003, is attached as Exhibit K.

12.    A true and correct copy of a Westlaw reporter image, containing a denial of certiorari issued by the United States Supreme Court in Rosales v. United States on March 22, 2004, is attached as Exhibit L.

13.    A true and correct copy of an order issued by the Interior Board of Indian Appeals, dated March 4, 2003, is attached as Exhibit M.

14.    A true and correct copy of a motion for summary judgment filed by the United States in the United States District Court for the District of Columbia (Case No. 1:03-CV-1117) on June 15, 2004, is attached as Exhibit N.

15.    A true and correct copy of the Jamul Indian Village Constitution is attached as Exhibit O.

16.    The current status of the Tribal Court action is as follows.  After initially entering a "special" appearance, Rosales and Toggery failed to file a responsive pleading to the Complaint in the Tribal Court.  On February 16, 2007, the Tribal Court issued an Order and Default Judgment, a true and correct copy of which is attached hereto as Exhibit P.  The Order and Default Judgment provides that the Tribal Court "will retain jurisdiction over this matter as long as necessary to enforce this Judgment and to hear any related issues."

17.    A true and correct copy of plaintiffs' complaint for declaratory and injunctive relief, filed in the United States District Court for the Southern District of California (Case No. 01-CV-951) and dated May 28, 2001, is attached hereto as Exhibit Q.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.  Executed this 5th day of March, 2007, at Washington, DC.

FREDERICK O. JAUSS IV

5

# EXHIBIT A

```
              FILED
         ┌─────────────────┐
         │   JUN 2 2 1995   │
         └─────────────────┘
      CLERK, U.S. DISTRICT COURT
    SOUTHERN DISTRICT OF CALIFORNIA
    BY                      DEPUTY
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAMUL INDIAN VILLAGE, et al., )    CIVIL NO. 95-0131-R (BTM)
                              )
              Plaintiffs,     )
                              )    ORDER GRANTING IN PART AND
        v.                    )    DENYING IN PART DEFENDANTS'
                              )    MOTION TO DISMISS
RAYMOND HUNTER, et al.,       )
                              )
              Defendants.     )
_____)


    This matter is before this Court on Defendants' motion to

dismiss or, in the alternative, for summary judgment.  The

parties appeared for oral argument at 10:30 a.m. on June 5,

1995.  Patrick Webb appeared for Plaintiff, Eugene Madrigal

appeared for Tribal Defendants, and Paul Beckhart appeared for

Federal Defendants.  In support of their motions to dismiss,

Defendants contend that this Court lacks jurisdiction over this

dispute.  For the reasons given below, Defendants' motions to

dismiss are GRANTED IN PART AND DENIED IN PART.


I.  PARTIES

    The Amended Complaint lists two Plaintiffs, Jane Dumas and

the Jamul Indian Village (the "Tribe").  Dumas purports to sue

on behalf of herself and all other similarly situated members of

**EXHIBIT C**

the Tribe. This Court recognizes Dumas as the only Plaintiff. To say that this action has been brought on behalf of the Tribe assumes a result very much in dispute; namely, whether the appropriate Executive Committee or the appropriate General Council of the Tribe has authorized suit on behalf of the Tribe.

The "Federal Defendants" include the United States, the U.S. Department of the Interior, the Bureau of Indian Affairs, and an individual federal employee, Virgil Townsend, Superintendent Southern California Agency. The "Tribal Defendants" include members of a rival faction of the Tribe: Raymond Hunter, Marcia Goring-Gomez, Mary Alvarez, Lee Shaw-Conway, Eleanor Miller, and James Alvarez. Also named as one of the Tribal Defendants is Eugene R. Madrigal, the attorney for the Tribe. Each of the defendants has filed a motion to dismiss except Defendant Virgil Townsend.[1]

II.  BACKGROUND

Dumas filed this action on January 31, 1995 alleging a conflict between rival factions within the Jamul Indian Village seeking injunctive relief and unspecified damages. Dumas alleges that on September 3, 1994 Defendants Raymond Hunter, Marcia Goring-Gomez, Mary Alvarez, and Lee Shaw-Conway were recalled from their positions on the Tribe's executive committee

---

[1]     There is a dispute as to whether Townsend has been adequately served in accordance with Fed.R.Civ.P. 4.  At this time, this Court does not address whether service was proper.  As discussed below, the claims which are dismissed as to Federal Defendants are also dismissed with respect to Townsend.

2

by the tribe's general council[2] but nevertheless have refused to obey the recall, vacate their offices, turn over tribal records, and acknowledge their lack of authority. Dumas alleges that shortly after the recall elections on September 3, 1994, the general council elected a new executive committee, with Dumas as its chairperson.

Dumas sought a temporary restraining order ("TRO") to block what they characterize as the renegade executive committee's attempt to raze the Tribal Hall. Dumas alleged in her ex parte application for TRO that if this Court did not issue a TRO, Tribal Defendants (or some of them) would begin bulldozing the Tribal Hall at 7:30 a.m. on February 1, 1995. In order to prevent Tribal Defendants from demolishing what Dumas describes as an historic and "long respected cultural asset of the Tribe" without an opportunity to first develop the facts, this Court granted Dumas' request for TRO. On February 2, 1995, this Court issued a preliminary injunction on the ground that the balance of equities tipped sharply in favor of Dumas. This Court reasoned that Dumas demonstrated irreparable harm if the Tribal Hall was demolished. Dumas filed a First Amended Complaint on March 17, 1995, which raises twenty-one separate claims. Defendants now move to dismiss.

//

//

---

[2] According to Dumas, the Tribe's general council is made up of all qualified voters who are eighteen years old or older.

3

III. DISCUSSION

  A.   Claims Against Federal Defendants

    1.   Administrative review

    Dumas' allegations against Federal Defendants center on the BIA's failure to recognize her faction as the legitimate tribal government.  Insofar as her complaint is premised on an adverse decision by the BIA, however, Dumas' complaint is not properly before this Court.  Dumas has not exhausted her administrative remedies.

    In Runs After v. United States, 766 F.2d 347, 352 (8th Cir. 1985), the Eighth Circuit found that the district court "acted within its discretion in requiring appellants to exhaust administrative remedies."  Indeed, the Eighth Circuit found that the governmental interests in requiring exhaustion of administrative remedies were particularly strong in Runs After because of the BIA's "expertise and extensive experience in dealing with Indian affairs":

> The interest of the BIA and its parent Department of Interior in administrative autonomy also supports requiring exhaustion of administrative remedies. . . . [T]he somewhat anomalous and complex relationship between the quasi-sovereign Indian tribes and the federal government also supports, in general, requiring appellants to initially seek an administrative solution through the BIA and the Department of Interior.

Id; see also Goodface v. Grassrope, 708 F.2d 335, 339 (8th Cir. 1983) (district court erred in reaching merits of election dispute where BIA declined to recognize either of competing tribal factions); Milam v. United States Dep't of Interior, 10 Indian L. Rep. 3013, 3017 (D.D.C. Dec. 23, 1982) (reviewing,

4

under arbitrary and capricious standard, Secretary of the Interior's final decision to recognize "dissidents'" removal of plaintiffs from office).

In James v. United States Dep't of Health & Human Servs., 824 F.2d 1132, 1135 (D.C. Cir. 1987), plaintiffs sued the Department of the Interior on the grounds that its failure to recognize their tribe on the "list of federally recognized Indian tribes was arbitrary, capricious, an abuse of discretion, a breach of the United States' trust responsibility to American Indians and contrary to applicable law." The D.C. Circuit affirmed the district court's dismissal of plaintiffs' complaint against the Department of Interior for failure to exhaust administrative remedies. Id.

The James court noted four reasons why courts require exhaustion of administrative remedies:

> "First, it carries out the congressional purpose in granting authority to the agency by discouraging the frequent and deliberate flouting of administrative processes [that] could . . . encourage[e] people to ignore its procedures. Second, it protects agency autonomy by allowing the agency the opportunity in the first instance to apply its expertise, exercise whatever discretion it may have been granted, and correct its own errors. Third, it aids judicial review by allowing the parties and the agency to develop the facts of the case in the administrative proceeding. Fourth, it promotes judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency."

Id. at 1137-38 (quoting Andrade v. Lauer, 729 F.2d 1475, 1484 (D.C. Cir. 1984)) (brackets and ellipses in original).

None of the four factors can be discounted in this case. First, if this Court assumed jurisdiction over Dumas' suit at the present time, this Court would run the risk of encouraging people unhappy with a BIA decision to skip the administrative appeal process and go straight to federal court. Second, by asserting jurisdiction, this Court would eliminate any chance that the BIA might correct any mistake it might have made and would deprive this Court, and even Dumas, of the benefit of the BIA's expertise. Third, further proceedings certainly would develop the facts of this case. No one, not even Dumas, appears to have settled on a set of operative facts. Fourth, following an administrative appeal, this Court may rely on administrative factfinding, thus conserving judicial resources.

In support of her argument that this Court has jurisdiction over Federal Defendants, Dumas cites cases that actually support Federal Defendants' positions. In at least two of the cases Dumas cites, the plaintiffs exhausted all administrative remedies before the district courts issued their rulings. _See, e.g._, Goodface, 708 F.2d at 337 (district court had authority to review, pursuant to the APA, the BIA's _final decision_ to refuse to recognize either of two competing tribal councils); Milam, 10 Indian L. Rep. at 3014 (noting that plaintiffs sought review of final agency decision of the Department of Interior).

In Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496, 499 (9th Cir. 1980), the Ninth Circuit noted four exceptions to the rule requiring exhaustion of administrative remedies: 1)

6

1     administrative remedies would be inadequate or not efficacious;

2     2) pursuit of administrative remedies would be futile; 3)

3     irreparable injury will result; or 4) where the administrative

4     proceeding would be void.  Despite Dumas' arguments to the

5     contrary, her case does not fit any of the exceptions.

6        First, Dumas has not shown that administrative remedies

7     would be inadequate.  If Dumas succeeds on administrative

8     appeal, the BIA will recognize her faction as the controlling

9     faction and deal with the Tribe only through her faction.

10    Recognition by the BIA would confer substantial economic power

11    on plaintiff's group, making Tribal Defendants' assertion of

12    control virtually meaningless.

13       Second, Dumas has not shown that relief would be futile.

14    According to Dumas, "That the BIA is biased here, [sic] can be

15    gleaned from its repeatedly stubborn failure to correct its

16    errors when they have been pointed out." (Pl.'s Opp. at 12.)

17    Dumas, however, has not pointed to any evidence suggesting any

18    institutional bias against her faction.  One BIA official has

19    refused to recognize the validity of one recall election.  Dumas

20    has not attempted to seek further review by the BIA or the

21    Department of Interior.

22       Third, Dumas has not shown that irreparable injury will

23    result if she must pursue administrative appeals.  Rather than

24    point to any specific threat of irreparable injury arising out

25    of the requirement that she take an administrative appeal, Dumas

26    faults Federal Defendants for failing to disprove her vague

27

28

7

allegations of irreparable harm. Dumas appears to ask this
Court to assume that the Tribal Hall will be destroyed if she
has to take an administrative appeal. Dumas, however, has not
explained the connection between the BIA's actions and the
survival of the Tribal Hall. In any event, counsel for Tribal
Defendants informed this Court at oral argument that Tribal
Defendants have no plans to tear down the Tribal Hall. Dumas
also suggests that she will suffer irreparable harm by virtue of
the BIA's actions because the Tribe will be unable to self-
govern. Other than her conclusion, Dumas provides no authority
or evidence as to why her contention constitutes irreparable
harm excusing the exhaustion requirement.

Finally, Dumas has not even suggested that further
administrative proceedings would be void.

Dumas also cites Aleknagik for the proposition that the BIA
and the Department of Interior have little interest in hearing
appeals from Townsend's decisions. Her argument is without
merit. In Aleknagik, the Ninth Circuit found that the
plaintiffs' claim involving the meaning of two federal statutes
was "particularly within the judiciary's competence." Id. at
501. In the case at hand, by contrast, Dumas' complaint centers
on the BIA's interpretation of the Jamul Constitution and its
review of disputed facts concerning a recall election.
Townsend's decision implicates the BIA's expertise in construing
Indian constitutions and its familiarity with the disputes
between rival factions in the Jamul Tribe.

8

In addition, Dumas contends that her complaint is based, at least in part, on "unrequested" actions by the BIA. According to Dumas, the BIA and the Department of Interior breached their affirmative trust duties to ensure tribal self-government. Since the BIA's failure to intervene cannot be viewed as a single act or omission, Dumas argues, there was nothing to appeal.

Dumas has cited no authority for the proposition that she need not pursue administrative remedies for "unrequested actions." Indeed, in at least one of the cases she cites in support of her analysis, the plaintiffs brought suit only after exhausting all administrative remedies. See Milam, 10 Indian L. Rep. at 3014. This Court is unprepared to find that the BIA's trust duty requires that agency to interfere with tribal self-government. If Dumas had her way, the BIA could avoid liability only by involving itself in the adoption of enrollment ordinances, the determination of election eligibility, and electoral procedures even if no one asked for the BIA's input. Such liability is inconsistent with the presumption that tribes should determine their own membership and select their own leaders. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 72 n.36 (1978) ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."); Wheeler v. Swimmer, 835 F.2d 259 (10th Cir. 1987) ("The right to conduct an election without federal interference is essential to the exercise of the

9

[tribe's] right to self-government."). In short, Dumas'
"unrequested action" theory does not help her avoid the
requirement that she exhaust administrative remedies.

Finally, Dumas argues that the BIA has failed to comply
with its own procedures in failing to give proper notice about
how to take an administrative appeal. On March 22, 1995,
however, Townsend explained to Dumas that she could file a
written appeal within thirty days. Townsend instructed her that
she could "appeal under 25 CFR Part 2" and enclosed a copy of
the relevant part of the C.F.R. The section Townsend supplied
indicates the official to whom an appeal may be taken and the
procedures for an appellant to follow. Although Townsend did
not attach the instructions regarding appeal to his original
letter, his failure does not bind this Court to hear Dumas'
complaint against Federal Defendants at this time. Instead,
Townsend's delay in forwarding the information merely tolled the
thirty-day limit on bringing an administrative appeal.

Since Dumas already had filed suit when the BIA informed
her of her right to file an administrative appeal, this Court
finds that the BIA's thirty-day limit for filing an appeal has
been equitably tolled pending this Court's decision on the
exhaustion of administrative remedies issue. See Miles v.
Department of the Army, 881 F.2d 777, 780 (9th Cir. 1989) ("The
thirty-day time limit is treated as a statute of limitations for
filing suit and is subject to waiver, equitable tolling, and
estoppel."); cf. Appalachian Ins. Co. v. McDonnell Douglas

10

1  Corp., 214 Cal. App. 3d 1, 41 (1989) (holding statute of

2  limitations for state court action was equitably tolled where

3  the defendant had removed the earlier state court action to

4  federal court). Dumas must file her administrative appeal, if

5  she seeks to continue her litigation, within thirty days of the

6  filing of this Order.[3]

7        2.   Claims under Federal Statutes

8        Any claim for damages against the United States or a

9  federal agency is barred by sovereign immunity unless Congress

10  has consented to suit. Blackmar v. Guerre, 342 U.S. 512, 515

11  (1952); Midwest Growers Co-op. Corp. v. Kirkemo, 533 F.2d 455,

12  465 (9th Cir. 1976); Gilbert v. Da Grossa, 756 F.2d 1455, 1460

13  n.6 (9th Cir. 1985). Congress may authorize suit only by

14  "explicit language." Blackmar, 342 U.S. at 515; Midwest

15  Growers, 533 F.2d at 465.

16       Dumas purports to have alleged claims against Federal

17  Defendants for violations of the following: (1) the Indian

18  Reorganization Act of 1934, 25 U.S.C. §§ 461-79; (2) the

19  National Historical Preservation Act, 16 U.S.C. § 470; (3) the

20  National Environmental Policy Act, 42 U.S.C. § 4321-61; (4) the

21  National Indian Gaming Regulatory Act, 25 U.S.C. § 2701-21; (5)

---

23  [3]   At oral argument, counsel for Dumas contended that the
administrative process did not require appeal but permitted appeal
24  and, therefore, she was not required to exhaust her administrative
remedy before pursuing relief in this Court. Even if this is
25  true, this Court exercises its discretion to require Dumas to
first exhaust her administrative remedies. Rodrigues v. Donovan,
26  769 F.2d 1344, 1349 n.4 (9th Cir. 1985) ("The district court may
decide to require exhaustion, or it may decide to exercise its
27  jurisdiction and allow the action to proceed.").

28                              11

the Civil Rights Act, 42 U.S.C. § 1981, 1981, 1985, 1986; (6) Administrative Procedures Act, 5 U.S.C. § 701-06; (7) the Tucker Act, 28 U.S.C. §§ 1491, 1505; and (8) the government's trust relationship with Indians.

Dumas has pointed to no "explicit language" permitting suit for damages against the United States in any of the first five Acts listed above. In fact, the Supreme Court and the Ninth Circuit have held that Congress has not waived sovereign immunity as to Bivens claims, see Arnsberg v. United States, 757 F.2d 971, 980 (9th Cir. 1985), and 42 U.S.C. §§ 1985(3) and 1986. See United States v. Testan, 424 U.S. 392, 400-01 (1976).

Of all her purported federal claims, only two of the statutes to which Dumas points contain language permitting suit against Federal Defendants. First, the Administrative Procedure Act waives sovereign immunity and provides for judicial review of agency action where there is law limiting agency discretion. See 5 U.S.C. § 702. Dumas' failure to exhaust her administrative remedies, however, precludes her from seeking relief in this court under the Administrative Procedure Act. See, e.g., 5 U.S.C. § 704; Eveland v. Director of CIA, 843 F.2d 46, 50 (1st Cir. 1988). Accordingly, this Court declines to judicially review the decision of the BIA until Dumas exhausts her administrative remedy.

Dumas also purports to invoke jurisdiction under the Tucker Act, 28 U.S.C. § 1491, and its counterpart for claims brought by Indian tribes, 28 U.S.C. § 1505, known as the "Indian Tucker

12

Act." <u>United States v. Mitchell</u>, 463 U.S. 206, 212 (1983). The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States." <u>Mitchell</u>, 463 U.S. at 216. Since the Tucker Act only provides a key to the courtroom door, a substantive right must be found in some other source of law "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491. Moreover, 28 U.S.C. §§ 1491 & 1505 authorize suits against the United States in the United States Court of Federal Claims.

Jurisdiction in the District Court must be premised on 28 U.S.C. § 1346(a)(2) or the "Little Tucker Act."

> The Little Tucker Act authorizes the district court to hear monetary claims against the United States, so long as they do not exceed $10,000. The Act does not, however, authorize the district courts to grant declaratory or equitable relief against the United States. This is true even when such relief is requested in an action brought pursuant to section 702 of the Administrative Procedure Act.

<u>Price v. U.S. General Services Admin.</u>, 894 F.2d 323, 324 (9th Cir. 1990).

In this case, Dumas seeks injunctive relief, declaratory relief, general damages, and punitive damages. Since any jurisdiction in this Court is premised on the Tucker Act, Dumas' claims against Federal Defendants for injunctive or declaratory relief are dismissed for lack of jurisdiction. Moreover, if Dumas continues to pursue relief in this Court, she must waive any claim for damage on her substantive claims in excess of

13

1  $10,000.  See <u>United States v. Lockheed L-188 Aircraft</u>, 656 F.2d

2  390, 393 n.6 (9th Cir. 1979).[4]  Thus, Dumas' claims which seek

3  damages are dismissed insofar as she seeks money damages in

4  excess of $10,000.[5]

5

6      B.  This Court Lacks Jurisdiction Over Claims Asserted
         Against Tribal Defendants

7

8      Indian tribes possess the inherent powers of sovereign

9  nations to govern both their members and their territory.  As

10  explained by the Supreme Court:

11        Indian tribes are distinct, independent political
communities, retaining their original natural rights in

12  matters of local self-government.  Although no longer
possessed of the full attributes of sovereignty, they

13  remain a separate people, with the power of regulating
their internal and social relations.  They have power to

14  make their own substantive law in internal matters, and to
enforce that law in their own forums.

15  <u>Santa Clara Pueblo</u>, 436 U.S. at 55-56 (citations and quotations

16  omitted).

17      All of Dumas' claims against Tribal Defendants turn on the

18  validity of the recall election on September 3, 1994.  According

19  to Dumas, if the recall elections did not violate the terms of

20  _____

21      [4]  If Dumas wishes to preserve her right to damages in
excess of $10,000, she must bring this action in the United States

22  Court of Federal Claims under 28 U.S.C. § 1491.

23      [5]  It is true that "[n]ot every claim invoking the
Constitution, a federal statute, or a regulation is cognizable

24  under the Tucker Act."  <u>Mitchell</u>, 463 U.S. at 217.  Thus, the
Court's ruling is made without prejudice to Federal Defendants to

25  file further briefing as to why Dumas' claims do not give rise to
jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346(a)(2),

26  or as to whether Dumas' failure to exhaust administrative remedies
should preclude her assertion of jurisdiction under the Tucker

27  Act.

28                         14

the Tribe's constitution, Tribal Defendants improperly have
exercised powers they do not possess and have no right to remain
in office.  The dispute centers on the application of one
sentence in the recall provision in the Tribe's constitution:
"Upon receipt of a petition signed by at least thirty percent
(30%) of the qualified voters requesting the recall of any
member of the executive committee, the executive committee shall
call a special general council within ten (10) days of receipt
of the petition."

Dumas' counsel purported at oral argument that this case is
not a dispute over an election or about membership.  He
conceded, however, that adjudicating Dumas' complaint would
require this Court to decide who is an Indian as defined by the
Tribe's constitution and who is a member of the Tribe.  This
Court will not usurp the Tribe's authority to determine who is
an Indian and who is a member of the Tribe.[6]  One of a tribe's
most fundamental powers is the power to determine its own
membership and is "central to its existence as an independent
political community."  Santa Clara Pueblo, 436 U.S. at 72 n.32;
see also United States v. Wheeler, 435 U.S. 313, 322 n.18
(1978); Wheeler v. Swimmer, 835 F.2d 259, 262 (10th Cir. 1987)
("The right to conduct an election without federal interference

---

[6]    Dumas purports to bring this action on behalf of herself
and all other similarly situated members of the Jamul Indian
Village.  At oral argument Dumas' counsel indicated that this case
is not a class action.  However Dumas purports to bring this
action, it still involves an intra-tribal dispute revolving around
the recall election and membership under the Tribe's Constitution.

15

1  is essential to the exercise of the [tribe's] right to self-

2  government."); <u>Runs After</u>, 766 F.2d at 352 ("We believe the

3  district court correctly held that resolution of such disputes

4  involving questions of interpretation of the tribal constitution

5  and tribal law is not within the jurisdiction of the district

6  court.").

7      Since the Tribe is comprised of a relatively small number

8  of members,[7] a determination as to who is an Indian is

9  particularly important in this case. The outcome of a Tribal

10  election could turn on whether one or two persons is considered

11  a "qualified voter" as a member of the Tribe. A ruling on who

12  is in an Indian and member of the Tribe would therefore have a

13  tremendous impact on the outcome of the Tribe's elections. For

14  the reasons that this Court refuses to determine who is an

15  Indian under the Tribe's constitution, it will not assume the

16  validity of the recall election which is the center piece of

17  Dumas' complaint. Accordingly, this Court declines to hear

18  Dumas' complaint and intrude into the internal affairs of a

19  sovereign nation.[8]

---

20

21      [7]  Although the precise number is in dispute, the parties
have indicated that the Tribe is made up of less than thirty-five

22  members.

23      [8]  Although this Court asserted jurisdiction to grant the
preliminary injunction, after further consideration of the merits

24  it now declines to exercise jurisdiction. Moreover, the fact that
the Tribe lacks its own tribal court is not determinative of

25  whether the Court has jurisdiction over Dumas' complaint. Indeed,
a fair reading of the lower court's decision in <u>Santa Clara Pueblo</u>

26  indicates that there was no tribal court available to the
plaintiff there.  <u>See</u> <u>Martinez, v. Santa Clara Pueblo</u>, 402 F.

27  Supp. 5, 11 (D.N.M. 1975).  The Court declines to interfere with

28

IV.    CONCLUSION

For the reasons given above, Federal Defendants' motion to dismiss IS GRANTED IN PART AND DENIED IN PART as follows:

(1)    claims for declaratory or injunctive relief against Federal Defendants are dismissed;

(2)    claims for money damages against Federal Defendants are dismissed insofar as Dumas seeks damages in excess of $10,000.

For the reasons given above, Tribal Defendants' motion to dismiss is GRANTED.[9]

IT IS SO ORDERED:

Date: 6/21/95

John S. Rhoades, Sr.
United States District Judge

Copies to:

All Parties

the internal affairs of a sovereign nation merely because that nation does not possess a judicial forum.

[9]    The Court wishes to make clear that this ruling also applies to the professional negligence claim against Tribal Defendant Madrigal. The Court declines to exercise supplemental jurisdiction over the claims against Madrigal on the grounds that (1) the professional negligence claim substantially predominates over the claims retained by this court, and (2) this Court concludes that the dismissal of all claims against Tribal Defendants is a compelling reason to decline jurisdiction over the claims against Madrigal. See 28 U.S.C. 1367(c)(2) & (4).

17

# EXHIBIT B

FILED

SEP - 9 1996

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAMUL INDIAN VILLAGE, et al.,  )    CIVIL NO. 95-0131-R
                               )
                Plaintiffs,    )
                               )
        v.                     )    ORDER GRANTING
                               )    FEDERAL DEFENDANTS' MOTION TO
                               )    DISMISS; GRANTING
                               )    DEFENDANT TOWNSEND'S MOTION
                               )    TO DISMISS FOR IMPROPER
                               )    SERVICE OF PROCESS; AND
HUNTER, et al.,                )    DENYING DEFENDANT TOWNSEND'S
                               )    MOTION FOR SUMMARY JUDGMENT
                Defendants.    )
_____)

     This matter is before this Court on Federal Defendants'
second Motion to Dismiss.[1]  Federal Defendants have filed a
second Motion to Dismiss Plaintiff's First Amended Complaint for
lack of subject matter jurisdiction, and for failure to state a
claim upon which relief may be granted as to the United States,

_____
     [1]The "Federal Defendants" include the United States, the U.S.
Department of the Interior, the Bureau of Indian Affairs, and an
individual federal employee, Virgil Townsend, Superintendent of the
Southern California Agency.
     As described below, the Court granted in part and denied in
part Federal Defendants' first Motion to Dismiss.  See infra,
Section I.  Defendant Townsend was not a party to the Federal
Defendants' first Motion to Dismiss due to Plaintiff's alleged
failure to effect service of process properly.  See Memorandum and
Points of Authorities in Support of Federal Defendants' Motion to
Dismiss Complaint or, in the Alternative, for Summary Judgment,
filed April 25, 1995, at page 3, footnote 1.



114-1[C]

ENTERED ON 9/9/96

1    the Bureau of Indian Affairs, and the Department of Interior.

2    Defendant Virgil Townsend also has filed a Motion to Dismiss and

3    Motion for Summary Judgment due to Plaintiff's alleged failure to

4    effect service of process properly, and due to Defendant

5    Townsend's alleged qualified immunity.

6        For the reasons given below, the Court grants Federal

7    Defendants' motion to dismiss Plaintiff's claims under Federal

8    Rule of Civil Procedure ("FRCP") 12(b)(6) for failure to state a

9    claim upon which relief can be granted.  Plaintiff may either

10   amend her cause of action under 42 U.S.C. § 1982 by September 30,

11   1996, or she may file a motion for leave to amend her First

12   Amended Complaint by September 30, 1996 (see footnote 17 for more

13   particular description).  All dates in the March 22, 1996

14   Scheduling Order are hereby extended; an Amended Scheduling Order

15   will be filed with the Clerk's Office.

16       The Court grants Defendant Townsend's motion to dismiss

17   claims against him due lack of personal jurisdiction on account of

18   Plaintiff's failure to effect service of process properly.

19   Defendant Townsend's motion for summary judgment is denied as

20   moot.

21

22   I.    BACKGROUND

23       This case essentially involves a conflict between rival

24   factions within the Jamul Indian Village.  Plaintiff Jane Dumas

25   originally filed this action on January 31, 1995, alleging a

26   conflict between rival factions within the Jamul Indian Village

27   and seeking injunctive relief and unspecified damages.  Plaintiff

28   alleges that on September 3, 1994, Tribal Defendants Raymond

1  Hunter, Marcia Goring-Gomez, Mary Alvarez, and Lee Shaw-Conway
2  were recalled from their positions on the Tribe's executive
3  committee by the Tribe's general council,[2] but that they
4  nevertheless refused to obey the recall, vacate their offices,
5  turn over tribal records, or acknowledge their lack of authority.
6  Plaintiff alleges that shortly after the recall elections on
7  September 3, 1994, the general council elected a new executive
8  committee, with Plaintiff as its chairperson.

9      Plaintiff sought a temporary restraining order ("TRO") to
10 block what she characterized as the renegade executive committee's
11 attempt to raze the Tribal Hall.  Plaintiff alleged in her ex
12 parte application for a TRO that if this Court did not issue a
13 TRO, Tribal Defendants[3] (or some of them) would begin bulldozing
14 the Tribal Hall at 7:30 a.m. on February 1, 1995.  In order to
15 prevent Tribal Defendants from demolishing what Plaintiff
16 described as an historic and "long respected cultural asset of the
17 Tribe" without an opportunity to first develop the facts, this
18 Court granted Plaintiff's request for a TRO.  On February 2, 1995,
19 this Court issued a preliminary injunction on the ground that the
20 balance of equities tipped sharply in favor of Plaintiff.  This
21 Court reasoned that Plaintiff had demonstrated that irreparable
22 harm would result if the Tribal Hall were demolished.

23

24     [2]According to Dumas, the Tribe's general council is made up of
    all qualified voters who are eighteen years old or older.
25
       [3]The Tribal Defendants included members of the rival faction of
26 the Tribe: Raymond Hunter, Marcia Goring-Gomez, Mary Alvarez, Lee
    Shaw-Conway, Eleanor Miller, and James Alvarez.  Also named as one
27 of the Tribal Defendants was Eugene R. Madrigal, the attorney for
    the Tribe.  In its June 22, 1995 Order, the Court dismissed all
28 claims against the Tribal Defendants.

-3-

1      Plaintiff filed a First Amended Complaint on March 17, 1995,

2  which raised twenty-one separate claims.  The First Amended

3  Complaint listed two Plaintiffs, Jane Dumas and the Jamul Indian

4  Village (the "Tribe").  Dumas purported to sue on behalf of

5  herself and all other similarly situated members of the Tribe.  In

6  its June 22, 1995 Order, however, this Court recognized Dumas as

7  the only Plaintiff.  The Court granted the Tribal Defendants'

8  motion to dismiss.  The Court granted in part and denied in part

9  the Federal Defendants' motion to dismiss.  More specifically, the

10  Court dismissed all of Plaintiff's claims against Federal

11  Defendants for injunctive or declaratory relief, and dismissed all

12  claims against Federal Defendants for money damages exceeding

13  $10,000.

14      On July 24, 1995, Plaintiff filed a motion for

15  reconsideration and a motion seeking leave to amend, alleging

16  "newly discovered facts."  Specifically, Plaintiff claimed that

17  each faction had held separate meetings.  Tribal Defendants had

18  re-elected Raymond Hunter as Chairman of the Tribe.  Tribal

19  Defendants' election had been reviewed and certified by the Bureau

20  of Indian Affairs.

21      The members of Plaintiff's faction also had held a meeting at

22  which they voted to create a tribal court and elected Karen

23  Toggery -- one of the purported Plaintiffs[4] to Plaintiff's action

24  -- as the "judge."  Plaintiff's faction then filed a suit against

25  Tribal Defendants in the tribal court.  Karen Toggery did not act

26  as one of the plaintiffs in the tribal action because she was the

27

     [4]In requesting leave to amend, Dumas sought to add Karen

28 Toggery as a plaintiff.

1  "judge".  On December 1, 1995, Karen Toggery the "judge" entered a

2  default judgment against Tribal Defendants in the amount of

3  $883,718.04.  Subsequently, on the motion for reconsideration

4  before this Court, Plaintiff's faction, including Karen Toggery

5  the "plaintiff," asked this Court to give full faith and credit to

6  the judgment entered by Karen Toggery the "judge."

7       Plaintiff argued that this Court must give full faith and

8  credit to the judgment entered by Karen Toggery the "tribal

9  judge."  However, at oral argument, Plaintiff's counsel conceded

10  that this Court must first be satisfied that the tribal court was

11  a valid court of jurisdiction.  The Court declined Plaintiff's

12  motion for reconsideration, and declined to give full faith and

13  credit to the "tribal judge" decision.  <u>See</u> December 20, 1995

14  Order.

15       Further, the Court carefully considered all the factors in

16  Plaintiff's motion for leave to amend.  The Court noted that the

17  causes of action and named Defendants remained the same, thereby

18  ignoring all effects of the Court's prior rulings.  The proposed

19  Second Amended Complaint continued to seek both monetary and

20  injunctive relief against Federal Defendants, notwithstanding this

21  Court's prior order that jurisdiction was limited to monetary

22  damages not to exceed $10,000.  Moreover, Plaintiff's claims

23  against Tribal Defendants still centered on the validity of recall

24  elections, an inquiry that rested on the status of qualified

25  voters, which in turn depended on who was an Indian as defined by

26  the Tribe's constitution.  The Court therefore denied Plaintiff

27  leave to amend her First Amended Complaint as futile.

28       Now Federal Defendants have filed a new motion to dismiss the

1    First Amended Complaint for lack of subject matter jurisdiction,

2    and for failure to state a claim upon which relief may be granted

3    as to the United States, the Bureau of Indian Affairs, and the

4    Department of Interior.    Federal Defendants argue that none of the

5    statues cited in the Plaintiff's First Amended Complaint

6    explicitly waive the United States' sovereign immunity so as to

7    permit Plaintiff to proceed in this Court under the Little Tucker

8    Act.  See 28 U.S.C. § 1346(a)(2)  Federal Defendant Townsend also

9    seeks an order to dismiss the actions against him based upon

10   Plaintiff's alleged failure to effect service of process properly,

11   and based on his alleged qualified immunity.

12

13   **II. For the Purposes of the Federal Defendants' Second Motion to
     Dismiss, the Operative Pleading Before the Court is Plaintiff's**

14   **First Amended Complaint.**

15        **A. Plaintiff's Second Amended Complaint Has Never Been Filed
          with the Court.**

16

17   Plaintiff has proffered a new second amended complaint, which

18   this Court has not granted leave to file.    In fact, Plaintiff has

19   never formally requested leave to file her new second amended

20   complaint.    Nonetheless, Plaintiff claims in her Opposition that

21   the Complaint has been filed, and insists in referring to her

22   second amended complaint as if it were the current Complaint

23   before the Court. See, e.g., Opposition at page 2, lines 1-4;

24   Opposition at page 18, lines 19-20.

25        However, Plaintiff's claim that the second amended complaint

26   has been filed does not make it so.    In short, Plaintiff's second

27   amended complaint has never been filed with this Court.

28   Therefore, much of Plaintiff's argument in her Opposition is

1  simply irrelevant and obfuscating.  The current Complaint before

2  the Court is Plaintiff's First Amended Complaint.

3      **B. Proffering a Second Amended Complaint Is Not the
       Functional Equivalent of Filing a Motion for Leave to Amend**

4      **the First Amended Complaint.**

5      In her Opposition, Plaintiff claims that the "filing of the

6  Second Amended Complaint moots the Federal defendants' pending

7  motion to dismiss."  <u>See</u> Opposition at page 1.  Plaintiff seems to

8  believe that she does not need leave of the Court to file a second

9  amended complaint, and that proffering a second amended complaint

10 in conjunction with an Opposition to Federal Defendants' Motion to

11 Dismiss is the functional equivalent of filing a Second Amended

12 Complaint.  Plaintiff is incorrect.

13
       **1. Plaintiff Cannot File a Second Amended Complaint as a**
14     **Matter of Course.**

15     Under Federal Rule of Civil Procedure 15(a)

16         "[a] party may amend the party's pleadings
           <u>once as a matter of course</u> at any time before
17         a responsive pleading is served....
           [o]therwise, a party may amend the party's
18         pleading only by leave of court or by written
           consent of the adverse party..."
19
   FRCP 15(a)(emphasis added).  The Court notes that Plaintiff has
20
   already amended her original Complaint once, as a matter of
21
   course.
22
       Plaintiff refers the Court to <u>Allen v. Veterans Admin.,</u> 749
23
   F.2d 1386, 1388-89 (9th Cir. 1984) to support her position that
24
   she may amend her First Amended Complaint as a matter of course.
25
   <u>See</u> Opposition at page 1.  In <u>Allen,</u> the plaintiff mistakenly had
26
   filed a claim against the Veterans Administration instead of the
27
   United States, the proper defendant.  <u>Id.</u> at 1387.  The plaintiff
28

                                    -7-

1  had never properly served the United States.  Id. at 1388.  The

2  United States Attorney's Office did not receive actual notice of

3  the action until several days after the statute of limitations had

4  run.  Id. at 1387.

5      The district court found that the United States had not

6  received sufficient notice prior to the running of the statute of

7  limitations to allow it to be added as a defendant as of the date

8  the original complaint was filed against the Veterans

9  Administration.  Id. at 1388.  The district court granted the

10  defendant's motion to dismiss on the ground that the United

11  States, rather than the Veterans Administration, was the proper

12  defendant.  The district court also denied the plaintiff's motion

13  to reconsider dismissal of her complaint, denied the plaintiff's

14  motion for leave to amend her complaint to include the United

15  States as a defendant, and denied the plaintiff relief from

16  judgment.

17      On appeal, the Ninth Circuit affirmed the district court.

18  Id. at 1388.  The Ninth Circuit noted that "a plaintiff's right to

19  amend continues after the complaint is dismissed so long as the

20  action itself has not yet been dismissed and the amended complaint

21  would itself be timely."  Id. at 1389 (citation omitted).  The

22  Ninth Circuit further noted that if the plaintiff's "amended

23  complaint was timely, her motion to amend the complaint should

24  have been granted."  Id. at 1389.  However, the Ninth Circuit

25  found that the United States Attorney and the Attorney General had

26  not been served before the statute of limitations ran, and that

27  the United States did not otherwise receive notice of the

28  plaintiff's suit prior to the running of the statute of

-8-

1    limitations. _Id._ at 1389. As such, the plaintiff did not satisfy

2    the requirements under FRCP 15(c) for relation back of amendment,

3    and plaintiff was not allowed to amend her complaint to add the

4    United States as defendant.

5        In _Allen_, the Ninth Circuit did not address whether or not

6    the plaintiff could file a second amended complaint as a matter of

7    course. _Allen_ simply does not support Plaintiff's position in the

8    present matter before the Court. To the contrary, in _Allen_ the

9    Ninth Circuit affirmed the district court's decision to deny

10   plaintiff leave to amend her _original_ complaint, due to problems

11   regarding the statute of limitation and the service of process.

12   The Ninth Circuit did not even address the filing of a second

13   amended complaint as a matter of course. Plaintiff's reliance on

14   _Allen_ to support her position that she may amend her First Amended

15   Complaint as a matter of course is therefore misplaced.

16       Nonetheless, to further support her position, Plaintiff also

17   refers the Court to William Schwarzer, et al., _California Practice_

18   _Guide, Federal Civil Procedure Before Trial_. _See_ Opposition at

19   page 1 (citing William Schwarzer, et al., _California Practice_

20   _Guide, Federal Civil Procedure Before Trial,_ The Rutter Group,

21   1994, page 9-58.3, §§ 9:263-64 (hereinafter "Schwarzer")).

22   Section 9.263 states:

23       **Example:** D moves to dismiss all causes of action in the
         complaint. P amends to add an additional cause of
24       action. Since the amendment did not affect the
         previously pleaded causes of action, the court may, in
25       its discretion, hear the original motion to dismiss.

26   _Schwarzer,_ page 9-58.3, § 9.263. Section 9.264 suggests that an

27   amended complaint may moot a previously filed motion to dismiss.

28   _Schwarzer,_ page 9-58.3, § 9.264. Both sections fall under

                                   -9-

subheading (3) "[f]ile amended complaint" and subheading (b) "[e]ffect of filing amended complaint." Thus, both sections address the filing of an amended complaint. They do not advocate a course of action in lieu of filing an amended complaint. Nor does either § 9.263 or § 9.264 state that a plaintiff may file a Second Amended Complaint as a matter of course. As such, sections 9:263-64 of Schwarzer do not support Plaintiff's apparent position.

To amend her First Amended Complaint, Plaintiff therefore needs written permission from the adverse party or leave of the Court. See F.R.C.P. 15(a). Plaintiff has provided no evidence of written permission from Federal Defendants to file a second amended complaint. Nor has Plaintiff formally requested leave to file the Second Amended Complaint she has proffered in conjunction with her Opposition.[5] The Court has never granted Plaintiff leave to file her second amended complaint. In short, Plaintiff has never filed her second amended complaint.

**2. Proffering a Second Amended Complaint is Not the Functional Equivalent of Filing a Second Amended Complaint.**

In oral argument before the Court on July 8, 1996, Plaintiff suggested that proffering a second amended complaint in an Opposition is the functional equivalent of filing a motion to amend. To support her position, Plaintiff referred the Court to

_____

[5]The Court denied Plaintiff leave to file her previous Second Amended Complaint as futile. See Order, filed December 20, 1995. The Second Amended Complaint proffered in conjunction with Plaintiff's Opposition appears to be a different Second Amended Complaint.

1   <u>Schwarzer,</u> page 9-58.1, which states in part that a plaintiff may

2   amend a complaint *pursuant to FRCP 15(a)* in response to a motion

3   to dismiss.   <u>Schwarzer</u> §9:252 (emphasis added).

4       As explained above, Rule 15(a) allows a plaintiff to amend

5   her complaint once as a matter of course; otherwise, she must

6   acquire leave of the Court or written permission from the

7   defendant.   As such, § 9:252 does not support Plaintiff's position

8   that proffering a second amended complaint in conjunction with her

9   Opposition to Federal Defendants' Motion to Dismiss is the

10  equivalent of filing a second amended complaint.

11      Nor does <u>Schwarzer</u> page 9-58.1, § 9:254 support Plaintiff's

12  position.   This section reads as follows:

13          **PRACTICE POINTER:** In opposing a Rule 12(b)(6)
            motion for failure to state a claim, include a
14          *request for leave to amend* in the event the
            motion is granted...[i]f leave to amend has
15          been granted in the past and you feel there is
            a risk the court may grant the motion to
16          dismiss with prejudice, consider attaching a
            *proposed amended complaint* to your opposition
17          papers.   The proposed amendment should address
            whatever defects are raised by the defendant.
18          This will make it more difficult for defendant
            to argue the defect could not be cured by
19          amendment...

20  Section 9:254 does not support Plaintiff's position that

21  proffering an amended complaint is the equivalent of filing an

22  amended complaint.   Nor does § 9:254 convince the Court that a

23  request for leave to amend is an adequate substitute for a fully

24  briefed motion for leave to file a second amended complaint. If

25  the Court were to permit Plaintiff to automatically file an

26  amended complaint in response to every motion to dismiss, this

27  case would never be resolved.   Rather, the case would drag on

28  without significant progress, as if to illustrate Zeno's Fifth

                                -11-

1    Paradox.[6]  Meanwhile, the Court notes that other plaintiffs are

2    waiting at the Court's door.

3        Moreover, while Federal Rule of Civil Procedure 15(a)

4    provides that leave to amend shall be freely granted when justice

5    so requires, the Court must determine the propriety of a motion

6    for leave to amend based on the consideration of four factors: 1)

7    bad faith; 2) undue delay; 3) prejudice to the opposing party; and

8    4) futility of amendment.  See DCD Programs, Ltd. v. Leighton, 833

9    F.2d 183, 186 (9th Cir. 1987).  Should Plaintiff choose to file a

10   motion for leave to amend, Federal Defendants may wish to oppose

11   Plaintiff's motion on any combination of the four grounds above.

12   In the interests of justice, Federal Defendants must be given an

13   adequate opportunity to oppose any motion Plaintiff may make for

14   leave to amend her First Amended Complaint.

15       In short, the Court finds no support for Plaintiff's position

16   that proffering a second amended complaint is the functional

17   equivalent of filing a second amended complaint.  Nor does the

18   Court believe that proffering a second amended complaint in

19   conjunction with an Opposition to Federal Defendants' motion to

20   dismiss is an adequate substitute for a formal motion for leave to

21   amend her First Amended Complaint.  The Court emphasizes that if

22   Plaintiff wishes to file a second amended complaint, the proper

23   way to do so is to file a motion for leave to amend her First

24   Amended Complaint.  In the interests of expediency, if Plaintiff

25

26       [6]  The paradox is as follows:  "Before a body in motion can
     reach a given point, it must first traverse the half of the
27   distance; before it can traverse the half, it must traverse the
     quarter; and so on, ad infinitum . . . ."  See Zeller, Die
28   Philosophie d. Griechen 54 (1876).  Thus, progress is impossible.

-12-

1   wishes to file a motion for leave to amend her First Amended

2   Complaint, the Court instructs Plaintiff that she must file such a

3   motion by September 30, 1996.  If Plaintiff files a motion for

4   leave to amend her First Amended Complaint by September 30, 1996,

5   the Court will place her motion on calendar, schedule briefing,

6   and consider whether or not justice requires the filing of a

7   second amended complaint.

8       However, for the above reasons, the Court will not allow

9   Plaintiff to file a second amended complaint without filing a

10  formal motion for leave to amend her First Amended Complaint. As

11  such, the current Complaint before the Court is Plaintiff's First

12  Amended Complaint.

14  **III. Federal Defendants' Motion to Dismiss Plaintiff's First
    Amended Complaint under FRCP 12(b)(6) is Granted Due to**
15  **Plaintiff's Failure to State a Claim upon which Relief Can Be
    Granted.**

16      **A.    The Legal Standard for Dismissal Under Rule 12(b)(6)**

17      On a motion to dismiss for failure to state a claim upon

18  which relief can be granted under Rule 12(b)(6), the complaint is

19  construed in the light most favorable to the plaintiff, and its

20  allegations are taken as true.  <u>United States v. Gaubert</u>, 499 U.S.

21  315, 327, (1991); <u>McKinney v. De Bord</u>, 507 F.2d 501, 503 (9th Cir.

22  1974).  Legal conclusions, however, are not given a presumption of

23  truthfulness merely because they are cast in the form of factual

24  allegations.  <u>Western Mining Council v. Watt</u>, 643 F.2d 618, 624

25  (9th Cir. 1981), <u>cert. denied</u>, 454 U.S. 1031 (1981).

26      In reviewing a complaint, a court should let the claims stand

27  "unless it appears beyond doubt that the plaintiff can prove no

28

-13-

1    set of facts in support of his claim which would entitle him to

2    relief." Conley v. Gibson, 355 U.S. 41, 45 (1957).

3

4        B. Discussion

5        In Federal Defendants' second Motion to Dismiss, Federal

6    Defendants claim that none of the statutes cited in Plaintiff's

7    First Amended Complaint explicitly waive the United States'

8    sovereign immunity from suit so as to permit Plaintiff to proceed

9    in this Court under the Little Tucker Act.  See Motion to Dismiss,

10   page 2-3.

11       In her Opposition Papers, Plaintiff appears to allege several

12   possible grounds upon which she can base a claim against the

13   Federal Defendants.  The Court will construe Plaintiff's

14   Opposition to concede that the grounds enumerated in her

15   Opposition constitute her sole remaining viable claims.  The Court

16   will address each of Plaintiff's arguments in turn.  The

17   discussion below will demonstrate that no viable causes of action

18   remain in Plaintiff's First Amended Complaint, and that dismissal

19   of Plaintiff's First Amended Complaint is therefore proper.[7]

20

21           1. Opposition Section II : Potential Tucker Act Claims

22       Plaintiff purports to invoke jurisdiction under the Tucker

23   Act, 28 U.S.C. § 1491, and its counterpart, the "Indian Tucker

24

25   ─────────────────

26   [7]The Court reminds the parties that in its June 22, 1995 Order,
     the Court dismissed all causes of action against the Federal
     Defendants for declaratory or injunctive relief.  The Court also
27   dismissed all claims against the Federal Defendants for money
     damages in excess of $10,000. See also footnote 3, infra (discussing
28   the Court's dismissal of claims against Tribal Defendants).

-14-

1  Act," 28 U.S.C. § 1505.[8] See United States v. Mitchell, 463 U.S.

2  206, 212 (1983).  The Tucker Act is merely a jurisdictional

3  statute and "does not create any substantive right enforceable

4  against the United States for money damages." United States v.

5  Mitchell, 463 U.S. 206, 216 (1983).  Because the Tucker Act only

6  provides a key to the courtroom door, a substantive right must be

7  found in some other source of law "founded either upon the

8  Constitution, or any Act of Congress or any regulation of an

9  executive department, or upon any express or implied contract with

10  the United States."  28 U.S.C. § 1491.  Moreover,

11      [n]ot every claim invoking the Constitution, a federal
         statute, or a regulation is cognizable under the Tucker
12      Act.  The claim must be one for money damages against
         the United States, and the claimant must demonstrate
13      that the source of substantive law he relies upon "can
         be fairly interpreted as mandating compensation by the
14      Federal Government for the damage sustained.

15  Mitchell, 463 U.S. at 216-17 (citations omitted).

16      Jurisdiction in the District Court must be premised on 28

17  U.S.C. § 1346(a)(2), also known as the "Little Tucker Act":

18      The Little Tucker Act authorizes the district court to hear
         monetary claims against the United States, so long as they do
19      not exceed $10,000.  The Act does not, however, authorize the
         district courts to grant declaratory or equitable relief
20      against the United States.  This is true even when such
         relief is requested in an action brought pursuant to section
21      702 of the Administrative Procedure Act.

22  Price v. U.S. General Services Admin., 894 F.2d 323, 324 (9th Cir.

23  1990).  Plaintiff can pursue a claim for damages under the Little

24  Tucker Act if Plaintiff can demonstrate the existence of colorable

25  allegations under a source of law "founded either upon the

26  ────────────────

27      [8]The Court notes that § 1505 only provides jurisdiction within
    the United States Court of Federal Claims. See 28 U.S.C. § 1505.
28  Thus, invocation of jurisdiction under § 1505 is improper here.

1  Constitution, or any Act of Congress or any regulation of an

2  executive department, or upon any express or implied contract with

3  the United States." 28 U.S.C. § 1491.

4

5          **a. United States v. Mitchell Provides No Basis for
            Jurisdiction under the Little Tucker Act in the Present**

6          **Case.**

7      Plaintiff attempts to establish jurisdiction under the Tucker

8  Act by relying upon United States v. Mitchell, 463 U.S. 206

9  (1983).  In Mitchell, individuals who owned land on the Quinault

10 Indian Reservation filed action seeking to recover damages from

11 the United States for the alleged mismanagement of timberlands on

12 the reservation.  Mitchell, 463 U.S. at 210.  The individuals

13 claimed that the alleged mismanagement of the United States

14 constituted a breach of the fiduciary duty owed to them as trustee

15 under a scheme of federal statutes and regulations.  Id.

16     The Supreme Court found jurisdiction under the Tucker Act.[9]

17 The Court found that the specific statutes and regulations upon

18 which the plaintiffs' claims were based gave the federal

19 government full responsibility for managing timber and land for

20 the Indians' benefits.  The Court found all the necessary elements

21 of a common law trust: a trustee, a beneficiary, and a trust

22 corpus (the timber, land, and funds). The Court held that these

23 _____

       [9]As Mitchell was on appeal from the United States Court of

24 Federal Claims, jurisdiction was also found on the Indian Tucker
   Act, 28 U.S.C. § 1505, rather than on the Little Tucker Act, 28

25 U.S.C. § 1346(a)(2).  See Mitchell, 463 U.S. at 211-12.  The Court
   reminds the parties that the Little Tucker Act limits claims for

26 monetary damages against Federal Defendants to $10,000.  See
   28 U.S.C.  § 1346(a)(2).  Plaintiff's Tucker Act claims against

27 Federal Defendants for damages exceeding $10,000 would be properly
   brought before the United States Court of Federal Claims. See 28

28 U.S.C. § 1505.

1  elements jointly created a fiduciary relationship based on the

2  resulting elaborate control the federal government held over

3  Indian forest and property. Mitchell, 463 U.S. at 224-28.

4      The present case, however, can be distinguished from

5  Mitchell. Plaintiff's causes of action do not concern the

6  (mis)management of tribal resources by the United States or any of

7  its agencies. Rather, this case concerns a tribal dispute

8  regarding who will control the tribe. As such, the elements of a

9  common law trust are not met; Plaintiff's repeated references to

10 Mitchell cannot alter the subject matter of the present dispute.

11     Additionally, in this case, the statutes relied upon by

12 Plaintiff to establish a fiduciary relationship do not contain

13 words typically indicative of a trust relationship that would

14 support a Little Tucker Act claim under a breach of fiduciary

15 trust theory. Because an analogous fiduciary duty simply does not

16 exist in the present case, Plaintiff cannot rely upon Mitchell to

17 establish jurisdiction here under the Little Tucker Act.

18     Similarly, this case does not involve fiscal mismanagement,

19 allegations of which have led to findings of jurisdiction in other

20 cases involving Little Tucker Act claims. See, e.g., Angle v.

21 United States, 709 F.2d 570 (9th Cir. 1983) (involving

22 distribution of settlement award funds); Moose v. United States,

23 674 F.2d 1277 (9th Cir. 1982) (involving alleged mismanagement of

24 award funds held in trust); cf. Hollman v. Watt, 708 F.2d 1399,

25 1401-02 (9th Cir. 1983) (finding that because government did not

26 waive sovereign immunity, government was immune from claim for

27 damages based on loss of tribal privileges due to instruction by

28 Bureau of Indian Affairs). This case simply does not involve the

-17-

1   kind of management of a natural resource, fiduciary trust, or

2   breach of contract that would implicate the Little Tucker Act.

3       For the above reasons, <u>United States v. Mitchell</u> does not

4   support a finding of a cause of action for damages under the

5   Little Tucker Act in the present case.[10]

6

7           **b. The Indian Reorganization Act of 1934 (25 U.S.C.**
            **§ 461), the Indian Gaming Regulatory Act, (25 U.S.C.**
8           **§ 2701), and the National Historical Preservation Act**
            **(16 U.S.C. § 470) Cannot Provide the Proper Basis for a**
9           **Little Tucker Act Claim.[11]**

10      The Indian Reorganization Act of 1934 (25 U.S.C. § 461), the

11  Indian Gaming Regulatory Act, (25 U.S.C. § 2701), and the National

12  Historical Preservation Act (16 U.S.C. § 470) do not explicitly

13  waive the United States' sovereign immunity from suit for monetary

14  damages.  None of the three statutes listed above explicitly

15  provide a cause of action for damages against the Federal

16  Government.  Nor has the Court found any precedent establishing an

17

---

18      [10]Moreover, the Court notes that even if a trust relationship
    were to exist, Plaintiff's claims in this court under the Little
19  Tucker Act are limited to damages not exceeding $10,000.  <u>See</u> 28
    U.S.C. § 1346(a)(2).  The Court further notes that the United States
20  Court of Federal Claims has concurrent jurisdiction with the
    district courts for claims under the Tucker Act, and that claims in
21  the United States Court of Federal Claims can exceed $10,000.  <u>See</u>
    28 U.S.C. § 1505.

22
        [11] The Court notes that in Plaintiff's Opposition, she refers
23  to a litany of statutory bases upon which she could potentially base
    a Little Tucker Act claim.  <u>See</u> Opposition at pages 5-6.  For the
24  purposes of Federal Defendants' second Motion to Dismiss, the Court
    will only address those statutes included in Plaintiff's First
25  Amended   Complaint,   the   sole   Complaint   before   the   Court.
    Nonetheless, the Court reminds Plaintiff that merely alleging the
26  violation of a federal statute is not sufficient to state a claim
    for relief, as legal conclusions are not given a presumption of
27  truthfulness merely because they are cast in the form of factual
    allegations.  <u>See Western Mining Council v. Watt,</u> 643 F.2d 618, 624
28  (9th Cir. 1981), <u>cert. denied,</u> 454 U.S. 1031 (1981).

1   implicit cause of action for damages against the Federal

2   Government under any of the three statutes above.  Further,

3   Plaintiff has not provided the Court with any cases establishing a

4   cause of action against the federal government for damages under

5   25 U.S.C. § 461, 25 U.S.C. § 2701, or 16 U.S.C. § 470.[12]

6        As none of the above three statutes provide for a cause of

7   action for damages against the Federal Defendants, none of the

8   above three statutes can provide the substantive basis "founded

9   either upon the Constitution, or any Act of Congress, or any

10  regulation of an executive department, or upon any express or

11  implied contract with the United States" for a Little Tucker Act

12  _____

13  [12]On page 6, footnote 3 of Plaintiff's Opposition, Plaintiff
    refers the Court to Ross v. Flandreau Santee Sioux Tribe, 809
14  F.Supp. 738 (D.S.D. 1992) and Maxam v. Lower Sioux Indian Community
    of Minnesota, 829 F.Supp. 277 (D. Minn. 1993).
        Ross concerned an action brought by individual tribe members
15  against the tribe and other individual tribe members.  The case
    concerned the per capita distribution of gaming profits among tribe
16  members.    The  district  court  had  previously  dismissed  the
    plaintiffs' monetary claims against the federal defendants for the
17  alleged breach of trust and fiduciary responsibilities. Ross at 745.
        In Ross, the district court noted that 25 U.S.C. § 2710(b)(3)
18  required either the Secretary of the Interior or a duly delegated
    official  to  approve  any  per  capita  distribution  plans  before
19  distribution could be made.  Ross at 742-43. However, the district
    court  held  that  it  lacked  the  power  to  review  or  direct  the
20  discretion of the Secretary of Interior in deciding whether or not
    to approve a distribution plan under 25 U.S.C. § 2710(b)(3). As
21  such, Ross does not support Plaintiff's argument.
        Similarly, Maxam concerned an action brought by tribe members
22  against the tribe, its community council, and the Secretary of the
    Interior regarding the per capita distribution of gaming revenues.
23  In Maxam, the district court only considered whether or not to
    grant  plaintiffs'  request  for  a  preliminary  injunction;  the district court
24  expressly declined to consider plaintiff's claim for monetary
    damages.    Id. at 277, 281-82.    Moreover, the gravamen of the
25  plaintiffs' complaint in Maxam concerned the plaintiffs' exclusion
    from per capita gaming revenue distribution.  The district court did
26  not even consider any causes of action against the Secretary of the
    Interior.  As the district court in Maxam did not address any claims
27  against any federal defendants, Maxam does not support finding a
    cause of action against Federal Defendants for monetary damages in
28  the present case.

-19-

1 | claim in the present case.    See 28 U.S.C. § 1346(a)(2).

2

3 |     **2. Opposition Section III : 28 U.S.C. 1362 Does Not**
      **Provide a Basis under which Plaintiff Can Pursue a Cause**
4 |     **of Action against the Federal Defendants for Damages.**

5 | 28 U.S.C. § 1362 provides as follows:

6 | The district courts shall have original jurisdiction of
   | all civil actions, brought by any Indian tribe or band
7 | with a governing body duly recognized by the Secretary
   | of the Interior, wherein the matter in controversy
8 | arises under the Constitution, laws, or treaties of the
   | United States.

9

   | Jane Dumas is the only Plaintiff in this case. See Order,
10
   | filed June 22, 1995.  As such, this action is not brought by "any
11
   | Indian tribe."  Moreover, Dumas' faction does not represent a
12
   | "governing body duly recognized by the Secretary of the Interior."
13
   | As such, § 1362 cannot provide jurisdiction in this Court in the
14
   | present action filed by Dumas.
15

16 |     Moreover, even if the present case were to involve a civil

   | action "brought by any Indian tribe or band with a governing body
17
   | duly recognized by the Secretary of the Interior," section 1362
18
   | still does not provide jurisdiction for a suit against Federal
19
   | Defendants.  The United States cannot be sued without its consent;
20
   | consent is therefore required for suits against federal agencies
21
   | or against a federal officer acting in his official capacity.
22
   | Assiniboine and Sioux Tribes of Fort Peck Indian Reservation v.
23
   | Board of Oil and Gas Conservation of the State of Montana, 792
24
   | F.2d 782, 792 (9th Cir. 1986).  Section 1362 does not waive
25
   | sovereign immunity. Scholder v. United States, 428 F.2d 1123, 1125
26
   | (9th Cir. 1970).  As such, any potential claim for damages in
27
   | this Court against Federal Defendants is still limited to $10,000
28

-20-

under the Little Tucker Act. See 28 U.S.C. §1346(a)(2)(waiving sovereign immunity for suits against the United States involving damages not exceeding $10,000).

In addition, the Court has read the cases cited by Plaintiff in Section III of her Opposition. The Court finds that none of these cases establish a basis "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States" under which Plaintiff can proceed with a Little Tucker Act claim in the present case. See 28 U.S.C. § 1491.

For example, in one case cited by Plaintiff, the district court allowed the plaintiff to sue the federal government for monetary damages under §1362 and §1346(a)(2) after plaintiff had alleged the violation of an independent federal substantive right. See Manchester Band of Pomo Indians v. United States, 363 F.Supp 1238 (N.D.Ca. 1973)(allowing suit against federal government for damages under §1346(a)(2) based on alleged violations of 25 U.S.C. § 161a-62a). In another case upon which Plaintiff relies, the district court granted the government's motion to dismiss a suit against the federal government for injunctive relief. See Salt River Pima Maricopa Indian v. Arizona Sand and Rock Co., 353 F.Supp 1098 (D. Ariz. 1972)(granting federal government's motion to dismiss motion for failure to state a claim upon which relief may be granted).[13]

_____

[13]Other cases upon which Plaintiff relies involve quiet title, which is not an issue in this case. See Fort Mojave Tribe v. Lafollette, 478 F.2d 1016 (9th Cir. 1973)(involving a quiet title suit); Park County, Montana v. USA, 454 F.Supp. 1 (D. Montana

-21-

1    In addition, many of the cases upon which Plaintiff relies

2  involve suits against parties other than the federal government.

3  Consequently, Plaintiff's reliance upon such cases is misplaced.

4  See Pueblo of Isleta v. Universal Constructors, 570 F.2d 300 (10th

5  Cir. 1978)(involving suit against party other than the

6  government); Mescalero Apache Tribe v. Burgett Floral Co., 503

7  F.2d 336 (10th Cir. 336); United States Crow Creek Sioux Tribe

8  v.Tri-County Bank of Chamberlain, 415 F.Supp 858 (D.S.D., 1976)

9  (finding jurisdiction in suit by tribe against bank); Cheyenne-

10  Arapho Tribes of Oklahoma v. Beard, 454 F.Supp 1 (D.Okla.

11  1980)(finding jurisdiction in suit between indian tribes and

12  indian officials); Quinalt Tribe of Indians v. Gallagher, 368 F.2d

13  648 (9th Cir. 1966)(involving suit against the State of

14  Washington, not the federal government).

15    For the above reasons, 28 U.S.C. § 1362 does not provide the

16  basis for a Little Tucker Act claim against Federal Defendants for

17  monetary damages in the present case.

18

19    **3. Opposition Section IV : Because Plaintiff Did Not
    Allege Violations of the Indian Self-Determination and
20    Education Assistance Act in her First Amended Complaint,
    the Indian Self-Determination and Education Assistance
21    Act Cannot Provide the Basis for a Claim against Federal
    Defendants in the Present Case.**

22
    The very inclusion of Section IV in Plaintiff's Opposition
23
  highlights a problem both Federal Defendants and the Court have
24
  faced in addressing Plaintiff's Opposition.  Plaintiff did not
25

26  _____

27  1978)(holding that §2409a(f) allowed action against United States
  for quiet title); United States v. Alpine Land and Reservoir Co.,
  431 F.2d 763 (9th Cir. 1970)(finding tribe had no standing to
28  intervene in quiet title action against government).

-22-

1    allege the violation of the Indian Self-determination and

2    Education Assistance Act in her First Amended Complaint.

3    Plaintiff cannot rely on claims not incorporated in her First

4    Amended Complaint to oppose Federal Defendants' second Motion to

5    Dismiss.  Because violations of the Indian Self-determination and

6    Education Assistance Act were not alleged in Plaintiff's First

7    Amended Complaint, such violations cannot provide an adequate

8    basis for a claim against Federal Defendants in the present case.

9

10        **4. Opposition Section V : Because Plaintiff Did Not
          Allege Violations of the Federal Tort Claims Act in Her
11        First Amended Complaint, the Federal Tort Claims Act
          Cannot Provide the Basis for a Claim against the Federal
12        Defendants for Money Damages.**

13        In Section V of her Opposition, Plaintiff asserts that the

14   Federal Tort Claims Act provides jurisdiction over unlimited

15   damage claims against the government.  However, Plaintiff did not

16   assert a cause of action under the Federal Tort Claims Act in her

17   First Amended Complaint.

18        While Plaintiff did refer to § 1346 in the section invoking

19   jurisdiction, the Federal Tort Claims Act is governed by 28 U.S.C.

20   § 2671 et seq., in conjunction with 28 U.S.C. § 1346(b).[14]

21   Plaintiff did not invoke 28 U.S.C. § 2671 et seq. anywhere in her

22   First Amended Complaint.  Nor did Plaintiff refer specifically to

23   28 U.S.C. §1346(b).  The mere invocation of § 1346 in Plaintiff's

24   First Amended Complaint, without the invocation of § 2671 et seq.,

25   is insufficient to assert a claim for relief under the Federal

26

27        [14]Section 1346(b) establishes district court jurisdiction over
     civil actions "subject to the provisions of chapter 171 of this
28   title."  Chapter 171 includes 28 U.S.C. § 2674-79.

1 | Tort Claims Act.

2 |     For the above reasons, Plaintiff cannot rely upon the Federal

3 | Tort Claims Act to establish the basis for a claim against Federal

4 | Defendants, because such claims were not incorporated in her First

5 | Amended Complaint, the only Complaint properly before the Court.

6 |

7 |           **5. Opposition Section VI : Plaintiff Has Failed to**

8 |           **Allege Facts Sufficient upon which to Base a Claim under**
           **28 U.S.C.§ 1343, in conjunction with 42 U.S.C. § 1981-**
           **82.**

9 |

10 |     In Section VI of Plaintiff's Opposition, she attempts to

11 | assert a claim against Federal Defendants for damages under 28

12 | U.S.C. § 1343.  Section 1343(a) provides as follows:

13 |     The district courts shall have original jurisdiction of
     any civil action authorized by law...(4) [t]o recover

14 |     damages or to secure equitable or other relief under any
     Act of Congress providing for the protection of civil

15 |     rights, including the right to vote.

16 | 28 U.S.C. § 1343.  In Section VI of her Opposition, Plaintiff

17 | attempts to assert a claim for the Federal Defendants' alleged

18 | violation of 42 U.S.C. §§1981-82, in conjunction with 28 U.S.C.

19 | § 1343.  The Court addresses Plaintiff's arguments below.

20 |

21 |           **a. 42 U.S.C. § 1981**

22 |     In Section IV, Plaintiff refers to 42 U.S.C. § 1981.  It

23 | appears that Plaintiff claims to have a viable cause of action

24 | against Federal Defendants for alleged civil right violations.

25 | However, the Court notes that § 1981 protects against "impairment

26 | under color of State law." 42 U.S.C. § 1981.  Sections 1981 does

27 | not generally provide a cause of action for damages against an

28 |

1   individual operating under the color of federal law.[15]   Nor does

2   § 1981 ordinarily provide a cause of action against a federal

3   agency.   As such, no cause of action appears to exist under § 1981

4   against the United States, the Bureau of Indian Affairs, or the

5   Department of Interior.

6        Moreover, the Court will later explain that it has no

7   jurisdiction over Defendant Townsend due to Plaintiff's failure to

8   execute proper service of process upon Defendant Townsend.   See

9   Section IV, infra.   The Court thus has no jurisdiction over

10  Defendant Townsend.   However, even if Plaintiff had served

11  Defendant Townsend properly, Plaintiff has failed to adequately

12  state a claim for relief for alleged violations of § 1981.

13       In her Opposition, Plaintiff relies upon Evans v. McKay, 869

14  F.2d 1341 (9th Cir. 1989) to establish a cause of action for

15  alleged § 1981 violations.   In Evans, however, the Ninth Circuit

16  held that allegations of overt acts of racial discrimination,

17  coupled with direct evidence that the defendants' conduct was

18  motivated by racial animus, was sufficient to state a claim

19  against state officers under §1981.   See Evans at 1344-45.   See

20  also Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir.

21  1987) (finding allegations that city police officers used racial

22  slurs against Plaintiff showed racial animus, therefore surviving

23  defendant's motion to dismiss § 1985 claim)(emphasis added).

24  _____

25       [15]In Evans v. McKay, 869 F.2d 1341 (9th Cir. 1989) the Ninth
    Circuit found a cause of action against Bureau of Indian Affairs
    officers due to the "peculiar" law enforcement situation in that
26  case:  the city police officers were also agents of the Bureau of
    Indian Affairs.   The defendants allegedly had been acting in their
27  capacity as city police officers.   Evans, 869 F.2d at 1348.   Similar
    "peculiarity" does not exist in the present case.

28

1    Without specifically stating to which Defendants she is

2  referring, Plaintiff alleges that "defendants'" behavior was "due

3  to [her] age, ancestry, and opposition to the Defendants'

4  political agenda". See First Amended Complaint at ¶ 90, ¶ 97,

5  ¶ 104, ¶ 111, ¶ 118.[16]    In the First Amended Complaint, however,

6  Plaintiff has not alleged the use of slurs showing animus based on

7  "age, ancestry, or opposition to the Defendants' political

8  agenda". Nor has Plaintiff alleged any overt acts suggesting such

9  animus. Rather, Plaintiff states a series of legal conclusions.

10  Somehow, Plaintiff has read animus based on "age, ancestry, and

11  opposition to the Defendants' political agenda" into Defendant

12  Townsend's behavior. Legal conclusions cast in the form of

13  factual allegations, however, are not given a presumption of

14  truthfulness. Western Mining Council v. Watt, 643 F.2d 618, 624

15  (9th Cir. 1981), cert. denied, 454 U.S. 1031 (1981). Plaintiff

16  has failed to allege overt acts or direct evidence to establish

17  ancestry-based animus. In fact, both tribal factions involved in

18  the dispute giving rise to the present action appear to be of the

19  same ancestry. With this information in mind, the Court finds no

20  factual allegations that could possibly establish that Defendant

21  Townsend discriminated against Plaintiff due to her ancestry.

22    For the reasons above, Plaintiff has failed to adequately

23

24    [16]The Court accepts Plaintiff's claim that §1981 prevents
discrimination based on ancestry as well as race. See, e.g., Saint
25  Francis College v. Al Khazraji, 481 U.S. 604, 613 (1987) (holding
that plaintiff could maintain an action under § 1981 for racial
26  discrimination based on plaintiff's status as an Arab; See also
Shaare Tfila Congregation v. Cobb, 481 U.S. 615, 617-18
27  (1987) (holding that individual may maintain § 1981-82 claim based on
individual's status as a Jew, because Jews were among people
28  considered to be of a distinct race when §1982 was passed).

1    state a claim for relief under 42 U.S.C. § 1981.

2

3                    **b. 42 U.S.C. § 1982**

4         To state a cause of action for the violation of 42 U.S.C.

5    § 1982, a plaintiff must allege that her property interests were

6    impaired on account of her race.  <u>See City of Memphis v. Greene,</u>

7    451 U.S. 100, 122-24 (1981).  Plaintiff alleges that "Defendants .

8    . . have deprived the plaintiffs of their civil rights, including

9    the right to equally occupy and enjoy real personal property, due

10   to their age, ancestry and opposition to the Defendants' political

11   agenda."  First Amended Compl. at ¶ 97.  Plaintiff also alleges

12   that "Defendants acted at times negligently, but at other times

13   willfully, with the purpose and intent to seriously injure

14   Plaintiffs...in conscious disregard of Plaintiffs' rights."  First

15   Amended Compl. at ¶ 99.

16        However, the Court notes that in asserting a cause of action

17   for violations of § 1982, Plaintiff again merely asserts a series

18   of legal conclusions.  She provides no evidence of overt acts or

19   slurs to establish discriminatory intent.  However, legal

20   conclusions are not given a presumption of truthfulness within the

21   context of a motion to dismiss.  <u>Western Mining Council v. Watt,</u>

22   643 F.2d 618, 624 (9th Cir. 1981), <u>cert. denied</u>, 454 U.S. 1031

23   (1981).  As previously described, the individuals involved in the

24   dispute giving rise to the present action are all members of the

25   Jamul tribe.  There is not a single fact in Plaintiff's First

26   Amended Complaint to support the conclusory allegation that

27   Federal Defendants' conduct was due to Plaintiff's ancestry.

28   Merely referring to the violation of a federal code is not

                                -27-

1    sufficient to state a claim upon which relief can be granted.

2        As such, the Court finds that Plaintiff has failed to state a

3    claim for relief for violations of 42 U.S.C. § 1982. Plaintiff's

4    cause of action for the alleged violation of 42 U.S.C. § 1982 is

5    dismissed; Plaintiff has until September 30, 1996 to amend.[17]

6

7    **IV. Defendant's Motion to Dismiss All Claims against Defendant
     Townsend as an Individual Is Granted.**

8

9        **A. The Court Lacks Personal Jurisdiction over Defendant
         Townsend due to Plaintiff's Ineffective Service of Process
         under FRCP 4(e).**

10

11       Plaintiff is suing Virgil Townsend, Superintendent of the

12   Bureau of Indian Affair's Southern California Agency, and is

13   seeking to impose liability upon him in his capacity as an

     individual.

14

15       Plaintiff bears the burden of establishing that this Court

16   has personal jurisdiction over each Defendant.  <u>Fields v. Sedwick

     Associated Risks, Ltd.</u>, 796 F.2d 299, 301 (9th Cir. 1986).  A

17
     federal court does not have personal jurisdiction over a defendant
18
     unless the defendant has been served in accordance with Federal
19
     Rule of Civil Procedure ("FRCP") 4.  In particular, FRCP 4(m)
20
     provides that if service is not made within 120 days of the filing
21
     of the complaint, the Court may dismiss the action without
22

23   ────────────────────

24       [17]As stated, Plaintiff may amend her cause of action under 42
     U.S.C. § 1982.  However, efficiency dictates that Plaintiff should
     not file an amended cause of action under § 1982 if she intends to
25   file a motion for leave to amend her First Amended Complaint.  If
     Plaintiff is granted leave to amend her First Amended Complaint, her
26   second amended complaint should contain any cause of action she may
     attempt to state for the violation of 42 U.S.C. § 1982.  If
27   Plaintiff's motion to amend her First Amended Complaint is denied,
     the court will address the viability of Plaintiff's cause of action
28   under § 1982 within the Order denying leave to amend.

                              -28-

1  prejudice on its own motion if the plaintiff cannot show "good

2  cause" for her failure to serve the complaint.

3      In addition, two service of process requirements exist when a

4  plaintiff aims to sue a federal employee in his individual

5  capacity for actions taken within the scope of his duties.  First,

6  the federal employee must be served as an individual.  Daly-Murphy

7  v. Winston, 837 F.2d 348, 355 (9th Cir. 1987), amending 820 F.2d

8  1470 (9th Cir. 1987).  Second, FRCP 4 requires service upon the

9  United States.  Light v. Wolf, 816 F.2d 746, 751 (D.C. Cir. 1987).

10     The Ninth Circuit requires "substantial compliance" with the

11 service requirements. Jackson v. Hayakawa, 682 F.2d 1344, 1347

12 (9th Cir. 1982).  Actual notice of the litigation cannot

13 compensate for failure to substantially comply with FRCP 4.  Id;

14 Mid-Continent Wood Products, Ind. v. Harris, 936 F.2d 297, 301

15 (7th Cir. 1991).

16     In the present action, Plaintiff is attempting to sue

17 Defendant Townsend, a federal employee, in his individual

18 capacity.  Moreover, Plaintiff is attempting to sue Defendant

19 Townsend for actions taken within the scope of his duties. See

20 Comp. at ¶ 22-23, 153-54, 159-60.  Thus, Plaintiff must serve

21 Defendant Townsend as an individual, as well as the United States.

22     In attempting to effect service of process upon Defendant

23 Townsend, Plaintiff's process server left copies of the summons

24 and complaint with a Bureau of Indian Affairs employee, Mr. Ron

25 Mead, at the Agency Headquarters in Riverside, California.

26 Plaintiff subsequently mailed copies to Defendant Townsend at the

27 Agency Headquarters.

28     Whether or not Mr. Mead was authorized to accept service on

1  behalf of Defendant Townsend as an individual remains disputed.

2  To assess Defendant Townsend's motion to dismiss, the Court

3  accepts Plaintiff's allegation that Mr. Mead informed the process

4  server that he was authorized to accept service of process for

5  Defendant Townsend.  See Opposition at p 21, line 24-27.  However,

6  FRCP 4 generally has been construed to mean that service at a

7  defendant's place of employment is inadequate. Daly-Murphy, 837

8  F.2d at 355.  Particularly in cases where money damages are sought

9  through a Bivens claims, personal service is necessary to obtain

10 jurisdiction over a defendant in his capacity as an individual;

11 service at the place of employment will not suffice. Id.

12      Plaintiffs claim that they served Townsend adequately.  For

13 support, Plaintiffs cite California Code of Civil Procedure

14 § 415.20, which states that process can be served by leaving a

15 copy of the complaint and summons at the defendant's usual place

16 of business with a person in charge of the office or place of

17 business if, despite reasonable diligence, process cannot be

18 served personally.  See CCCP § 415.20(a) (emphasis added).

19 Plaintiff, however, has presented no evidence that the complaint

20 could not have been personally delivered to Defendant Townsend

21 with reasonable diligence.  Moreover, under California law,  "[a]n

22 extrajudicial statement of a person that he or she is the agent of

23 another is not admissible to prove the fact of agency unless the

24 statement is either made in the presence of or communicated to the

25 principal and the principal acquiesces in that statement." Dill v

26 Berquist Construction, 24 Cal.App. 4th 1426, 1437 (1994).

27      As Plaintiff did not serve Defendant Townsend personally, and

28 as Plaintiff has provided no evidence that she could not have

-30-

1  served him personally with reasonable diligence, Plaintiff has

2  failed to effect service of process properly upon Defendant

3  Townsend.[18]

4

5       **B. The Court Finds No Waiver of Improper Service of Process.**

6       Plaintiff argues that Defendant Townsend waived any defect in

7  service of process.  *See* Opposition at page 22.  Plaintiff relies

8  upon FRCP 12(h)(1) for support.  Rule 12(h)(1) states that:

9            [a] defense of...insufficiency of service of process is
            waived (A) if omitted from a motion in the circumstances
10           described in subdivision (g) or (B) if it is neither
            made by motion under this rule nor included in a
11           responsive pleading or an amendment thereof permitted by
            Rule 15(a) to be made as a matter of course.

12

13 Subdivision (g) provides in part that if "party who makes a motion

14 under this rule but omits therefrom any defense or objection then

15 available to the party...the party shall not thereafter make a

16 motion based on the defense or objection so omitted."  FRCP 12(g).

17      The Court notes that Defendant Townsend was specifically

18 excluded as a party from Federal Defendants' first Motion to

19

_____

20      [18] It is true, as Plaintiff argues, that some cases would allow
   the Court to construe Rule 4 liberally and find personal
21 jurisdiction, so long as the party received sufficient notice of the
   complaint.  The Ninth Circuit has noted that these cases, however,
22 require the plaintiff to present a "justifiable excuse" for failing
   to serve the defendant properly.  Plaintiff has not met this burden.
23 *See* Daly-Murphy, 837 F.2d at 354 n.4.  Plaintiff also cites United
   Food & Com'l Wkrs U., Etc., v. Alpha Beta Co, 736 F.2d 1371, 1382
24 (9th Cir. 1984) to support his position.  In United Food, however,
   the service was allegedly improper due to a minor technical error in
25 the summons.  The summons included an incorrect date by which
   defendant was required to answer.  Defendant nonetheless answered on
26 time.  The Ninth Circuit noted that because there was no showing of
   prejudice, the plaintiff had substantially complied with the
27 requirements of FRCP, despite the minor technical error in the
   summons.  The Court finds that United Food does not support
28 Plaintiff's position because the facts are inapposite.

                              -31-

1    Dismiss, due to Plaintiff's alleged failure to effect proper

2    service of process upon Defendant Townsend.  See Motion to

3    Dismiss, or, in the alternative, for Summary Judgment, filed April

4    25, 1995, at 3 n.1. Nonetheless, Plaintiff claims that Defendant

5    Townsend's participation in discovery and case management

6    conferences without challenging the method of service of the

7    summons and complaint waived any defect in service of process.[19]

8    See Opposition at 22-23.

9         The Court has read both cases Plaintiff uses to support her

10   argument that Defendant Townsend's appearance at a case management

11   conference and participation in discovery constituted a waiver of

12   improper service of process.  The Court finds Plaintiff's reliance

13   misplaced.  First, Plaintiff refers the Court to Jackson v

14   Hayakawa, 682 F.2d 1344 (9th Cir. 1982).  In Jackson, the

15   defendants argued that they had not been properly served as

16   individuals.  Jackson at 1347.  In discussing whether service was

17   proper, the Ninth Circuit noted that "[d]efendants can waive the

18   defect of lack of personal jurisdiction by appearing generally

19   without first challenging the defect in a preliminary motion, or

20   in a responsive pleading." Jackson at 1347 (emphasis added)

21   (citations omitted).  The Ninth Circuit noted that, for example,

22   jurisdiction could attach if a defendant made a voluntary general

23   appearance, as by filing an answer through an attorney.  Id.

24

25        [19]In oral argument before the Court on July 8, 1996, Assistant
     United States Attorney Paul Beckhart noted that as an officer of the
26   government, Defendant Townsend felt obliged to comply with Court
     orders that Defendant Townsend participate in discovery and case
27   management conferences, despite the aforementioned objection to
     jurisdiction due to alleged improper service of process upon
28   Defendant Townsend.

                                  -32-

1    In the present case, however, Federal Defendants noted the
2  defect in service of process in a preliminary motion, their first
3  Motion to Dismiss.  In fact, Federal Defendants asserted that
4  because service of process upon Defendant Townsend was defective,
5  Defendant Townsend was not subject to the Court's jurisdiction and
6  thus would not be a party to the motion to dismiss filed on behalf
7  of the other Federal Defendants.  See Motion to Dismiss, or, in
8  the alternative, for Summary Judgment, filed April 25, 1995, at 3
9  n.1.  As such, Jackson does not provide support for Plaintiff's
10  argument.

11    Second, Plaintiff refers the Court to Benny v. Pipes, 799
12  F.2d 489, 492 (9th Cir. 1986).  This case does not support
13  Plaintiff's argument, either.  Rather, in Benny, the Ninth Circuit
14  held that even though the defendant already had filed several
15  motions to enlarge time to answer without challenging defective
16  service of process, the defendant had not waived his right to
17  proper service.  Benny 799 F.2d at 492-93.

18    In short, Plaintiff has provided the Court with no cases
19  supporting her position that Defendant's participation in
20  discovery and case management conferences constitutes waiver and
21  precludes any challenge Defendant may make based on Plaintiff's
22  improper service of process.  Moreover, this Court wishes to
23  emphasize that Federal Defendants did raise the issue of improper
24  service of process upon Defendant Townsend in their first Motion
25  to Dismiss.  Defendant Townsend's subsequent participation in case
26  management conferences and discovery at the Court's request does
27  not nullify Defendant Townsend's prior, explicit objection to
28  jurisdiction based on alleged improper service of process.

-33-

1   As such, this Court has no jurisdiction over Defendant

2   Townsend.  For the above reasons, all claims against Defendant

3   Townsend are dismissed for Plaintiff's failure to effect proper

4   service of process.[20]  Defendant's motion for summary judgment is

5   denied as moot.

6

7   **V.  Leave to Amend**

8   Leave to amend should be freely granted.  <u>See</u> Fed. R. Civ. P.

9   15(a); <u>Allen v. Beverly Hills</u>, 911 F.2d 367, 373 (9th Cir. 1990).

10  Leave should only be denied where "allegations of other facts

11  consistent with the challenged pleading could not possibly cure

12  the defect."  <u>Schreiber Dist. v. Serv-Well Furniture Co.</u>, 806 F.2d

13  1393, 1401 (9th Cir. 1986).

14  In the present case, it is possible that Plaintiff could

15  allege facts consistent with the pleadings that would remedy the

16  deficiencies in her federal cause of action for violations of 42

17  U.S.C. § 1982.  Therefore, the Court grants Plaintiff until

18  September 30, 1996 to amend her cause of action for violations of

19  42 U.S.C. §1982.[21]

20  The Court emphasizes that leave to amend is strictly limited

21  to the concerns addressed in this Order, and does not extend to

22  adding additional causes of action or defendants.  The Court

23  reminds Plaintiff of her obligations under Federal Rule of Civil

24

25  [20]Because the Court finds that service of process upon Defendant
    Townsend was improper, this Court will not address Defendant's other
26  argument that Defendant Townsend holds qualified immunity for his
    actions.
27

28  [21]<u>See</u> footnote 17, *infra* (describing how Plaintiff should
    proceed in amending her cause of action under 42 U.S.C. § 1982).

-34-

1   Procedure 11.

2

3   **VI. CONCLUSION**

4       For the reasons stated above, the Court dismisses Plaintiff's

5   claims against the Federal Defendants for failure to state a claim

6   upon which relief can be granted; Plaintiff has until September

7   30, 1996 to amend her cause of action under 42 U.S.C. § 1982.

8   Plaintiff has until September 30, 1996 to file a motion to amend

9   her First Amended Complaint.  As Plaintiff failed to effect

10   service upon Defendant Townsend properly, Plaintiff's causes of

11   action against Defendant Townsend are dismissed.  Defendant

12   Townsend's motion for summary judgment is denied as moot.

13

14   IT IS SO ORDERED:

15

16   Date: 9/9/96

17                             John S. Rhoades, Sr.
                                 United States District Judge

18

19   Copies to:

20   All Parties

21   Magistrate Judge Stiven

22

23

24

25

26

27

28

                                 -35-

# EXHIBIT C

1  Patrick D. Webb, Esq., State Bar No. 82857
   **WEBB, SMELKO & CAREY**
2  401 B Street, Suite 900
   San Diego, Calif. 92101
3  (619) 236-1200

4  Attorneys for JAMUL INDIAN VILLAGE,
   INDIVIDUAL PLAINTIFFS

5

6

7              **UNITED STATES DISTRICT COURT**

8        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

9  WALTER     ROSALES,    SARAH )   Case No. 97 CV 769 R (LSP)
   ALDAMAS,  VAL  MESA,  ADOLPH )
10 THING,  JOE  COMACHO,  BERNICE )
   MESA,  VIVIAN  FLORES,  MARIE )   **NOTICE OF VOLUNTARY**
11 TOGGERY  and  the  JAMUL  INDIAN )  **DISMISSAL WITHOUT**
   VILLAGE,                      )   **PREJUDICE**
12                               )
           Plaintiffs,           )
13                               )
   vs.                           )
14                               )
   VIRGIL   TOWNSEND,  Superintendent )
15 Southern California Agency of the B.I.A., )
   UNITED   STATES   OF   AMERICA, )
16 DEPARTMENT OF INTERIOR, BUREAU )
   OF INDIAN AFFAIRS, and DOES 1-20, )
17                               )
           Defendants.           )
18 _____ )

19

20     NOTICE IS HEREBY GIVEN that since: (1) no answer has been filed in this action, (2) the

21 Interior Board of Indian Appeals has yet to rule upon the plaintiffs' third and fourth appeals in

22 Docket Nos. 98-9-A, and one as yet un-assigned number, (3) no ruling has been made upon the

23 defendants' motions to dismiss in this action, and (4) the fact that the plaintiffs have filed a

24 companion action in the United States Court of Federal Claims, in Washington D.C., which includes

25 the claims raised herein, pursuant to F.R.C.P. Rule 41(a) and the decision in Moore v. Davis

26 //

27 //

28 //

59

1 | (M.D.N.C. 1976) 72 F.R.D. 96, the plaintiffs hereby dismiss the above-captioned action without

2 | prejudice.

3 | Dated: November 12, 1998

**WEBB & CAREY**

Patrick D. Webb, Attorneys for
Plaintiffs

IT IS SO ORDERED.

DATED 11|19|98

UNITED STATES DISTRICT JUDGE

-2-

**CERTIFICATE OF SERVICE**

I, the undersigned, declare:

I am a citizen of the United States, a resident of the County of San Diego, State of California, over the age of eighteen years, and not a party to the within action; that my business address is 401 B Street, Suite 306, San Diego, California 92101.

On the date entered below, I served the within:

upon the parties interested in said action by delivering a true copy thereof, to the attorney addressed as follows:

Paul E. Beckhart, Esq.
Asst. U.S. Attorney
880 Front Street, Room 6293
San Diego, Calif. 92101-8893
fax 557-5004

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 13, 1998, at San Diego, California.

Patrick D. Webb

# EXHIBIT D

FILED

99 JAN 28 PM 12: 06

BY: _____

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Walter Rosales, et al. ) | CIVIL NO. 97-0769-R |
| ) | |
| Plaintiffs, ) | ORDER DECLINING TO IMPOSE |
| ) | SANCTIONS PURSUANT TO RULE 11 |
| v. ) | |
| ) | |
| Virgil Townsend, et al. ) | |
| ) | |
| Defendants. ) | |

## I. Overview.

On November 25, 1998, this Court issued an order to the parties to show cause why it should, or should not, impose sanctions against attorney Patrick D. Webb for his actions in litigating the current action. On January 11, 1999, the Court held a hearing on its motion. For the reasons stated below, the Court declines to levy Rule 11 sanctions against attorney Webb.

## II. Background.

This matter was before the Court on federal Defendants' motion to set aside the entry of default and to dismiss the complaint or, in the alternative, for summary judgment. In



1  addition, Plaintiffs filed a motion to lift the stay on discovery.

2  The Court scheduled oral argument for these motions for November

3  16, 1998.  On November 13, 1998, Plaintiffs submitted a notice of

4  voluntary dismissal without prejudice, which this Court granted on

5  November 19, 1998.

6      This is a case with which the Court is very familiar.  On

7  January 31, 1995, Plaintiffs' attorney Patrick Webb filed a

8  complaint with this Court on behalf of a related, but different,

9  group of plaintiffs.  While the plaintiffs differed in name from

10  those in the present action, their claims were very similar to

11  those alleged in the present case, contending that certain members

12  of the Jamul tribe had been recalled from office but had

13  wrongfully failed to surrender possession, and that federal

14  officials had violated statutory and common law duties by

15  continuing to deal with this ousted faction.  In managing this

16  previous case, the Court issued two comprehensive orders, the

17  first on June 22, 1995, and the second on September 9, 1996.

18  However, rather than amend their claims in light of the Court's

19  decisions or appeal the Court's decisions, the prior plaintiffs

20  voluntarily dismissed their claims without prejudice on September

21  30, 1996.

22      On the same day, attorney Webb filed the present cause of

23  action in the Central District of California.  As stated, the

24  present complaint is very similar to the one originally filed in

25  this district in January 1995.  The Central District later

26  transferred the case back to the Southern District on April 21,

27  1997.  Thus, by dismissing the original action filed in the

28                              -2-

1    Southern District and filing a nearly identical action in the

2    Central District, attorney Webb presented this Court with a case

3    very similar to the one with which it had already rendered

4    comprehensive decisions.

5        Because of the similarity between the complaints, Defendants

6    filed motions to dismiss, premised on the same legal theories

7    relied upon in the first action.  After the Court devoted

8    substantial time and effort in preparing for the hearing on these

9    motions, Plaintiffs again sought to voluntarily dismiss their case

10   without prejudice, this time doing so on the Friday before the

11   Court's scheduled Monday hearing.

12       As stated, on November 25, 1998, this Court issued an order

13   to the parties to show cause why it should, or should not, impose

14   sanctions against attorney Webb for his actions in litigating the

15   current action.  On January 11, 1999, the Court held a hearing on

16   its motion.[1]

17

18   **III. Discussion.**

19       At this time, the Court declines to levy Rule 11 sanctions

20   against attorney Webb.  Rule 11 allows a district court to levy

21   monetary sanctions against a litigant who has used the legal

22   processes for an "improper purpose, such as to harass or to cause

23   unnecessary delay."  Fed. R. Civ. P. 11(b)(1); see Warren v.

24   _____

25       [1] Appearing at the hearing were attorney Patrick Webb,
     representing the current Plaintiffs; Assistant U.S. Attorney Paul
26   Beckhart, representing the federal Defendants; and attorney Eugene
     Madrigal, who represented the Jamul Indian Village and Raymond
27   Hunter in the prior lawsuit.

28                                -3-

1  <u>Guelker</u>, 29 F.3d 1386, 1388 (9th Cir. 1994).  While sanctions are

2  normally awarded on the motion of a party, Rule 11 permits a

3  district court to impose sanctions "on its own initiative."  Fed.

4  R. Civ. P. 11(c)(1)(B); <u>see also</u> <u>In re Itel Sec. Litig.</u>, 791 F.2d

5  672, 679 (9th Cir. 1986).

6      However, a district court may not impose monetary sanctions

7  on its own motion if the attorney against whom sanctions are being

8  sought voluntarily dismissed his client's action before the Court

9  issues its order to show cause.  <u>See</u> Fed. R. Civ. P. 11(c)(2)(B)[2];

10 William W. Schwarzer, et al., <u>Federal Civil Procedure Before Trial</u>

11 17-21 (1998) (citing Committee Notes of Amendments to Federal

12 Rules of Civil Procedure, 146 F.R.D. 401, 502 (1993)).  The

13 justification underlying this rule is that the "[p]arties settling

14 a case should not be subsequently faced with an unexpected order

15 from the court leading to monetary sanctions that might have

16 affected their willingness to settle or voluntarily dismiss a

17 case."  <u>See</u> Committee Notes, 146 F.R.D. at 502.

18     In the present case, attorney Webb requested that the

19 complaint be voluntarily dismissed without prejudice, which this

20 Court granted on November 19, 1998.  Thereafter, on November 25,

21 1998, this Court issued its order to show cause why it should, or

22

---

23     [2] This Rule provides in relevant part:

24     Monetary sanctions may not be awarded on the court's
       initiative unless the court issues its order to show
25     cause before a voluntary dismissal or settlement of the
       claims made by or against the party which is, or whose
26     attorneys are, to be sanctioned.

27 Fed. R. Civ. P. 16(c)(2)(B).

28                              -4-

1   should not, levy Rule 11 sanctions against attorney Webb.  Because

2   the Court issued its order to show cause after Plaintiffs

3   voluntarily dismissed their action, this Court cannot impose Rule

4   11 sanctions against attorney Webb on its own motion.[3]

5        Although it may not impose Rule 11 sanctions, however, this

6   Court notes that it enjoys significant, inherent powers to

7   sanction attorneys for misconduct.  Such inherent powers are

8   "governed not by rule or statute but by the control necessarily

9   vested in courts to manage their own affairs so as to achieve the

10  orderly and expeditious disposition of cases."  Chambers v. NASCO,

11  Inc., 501 U.S. 32, 43 (1991).  A court's inherent powers, however,

12  are not limitless; acting pursuant to this inherent authority, a

13  district court may only assess attorney's fees against a party who

14  has "acted in bad faith, vexatiously, wantonly, or for oppressive

15  _____

16       [3] At the hearing, the Court suggested that attorneys Beckhart
     and Madrigal could file their own motions for Rule 11 sanctions.
17   Neither party formally requested Rule 11 sanctions at that
     hearing.
18
          The Court does note, however, that on January 30, 1998,
19   Attorney Madrigal filed a motion for Rule 11 sanctions with
     Magistrate Judge Papas, on which Judge Papas deferred ruling.  In
20   responding to the Court's present order to show cause, attorney
     Madrigal asked to "renew their request for FRCP 11 sanctions."
21   (See Madrigal Request for Sanctions at 4.)

22        At this time, however, the Court declines to award Rule 11
     sanctions on attorney Madrigal's motion either.  At the hearing,
23   attorney Madrigal suggested that he would seek $1000 for time
     spent responding to discovery in the present case.  However, the
24   Court concludes that while attorney Webb's actions were
     questionable in litigating the present case, they were not so
25   egregious so as to justify the imposition of sanctions.
     Furthermore, the Court suggests that, rather than fighting over
26   this $1000 in fees, the parties' time and energy would be better
     spent preparing for the impending proceedings before the U.S.
27   Court of Federal Claims and the Interior Board of Indian Appeals.

28                                -5-

1    reasons."  Id. at 45-46 (citations omitted); see also Ford v.

2    Temple Hosp., 790 F.2d 342, 347 (3d Cir. 1986).

3         Given these narrow confines, the Court declines to levy

4    sanctions under its inherent powers as well.  While attorney

5    Webb's actions suggest that he was engaging in a kind of "forum

6    shopping," the Court concludes that his actions were not so

7    egregious so as to permit this Court to assess attorney's fees

8    under its inherent powers.

9         Therefore, at this time, the Court declines to levy sanctions

10   against attorney Webb for his action in litigating the present

11   action.[4]  The Court notes, however, that should this case come

12   again before this Court due to attorney Webb's procedural tactics

13   and maneuvering that this Court will not be reluctant to impose

14   appropriate sanctions at that time, including monetary fines and

15   possible dismissal of the action.

16

17

18

19

20   _____

21        [4] In responding to the Court's order to show cause, the
     Government suggested that the Court might sanction attorney Webb
     under 28 U.S.C. § 1927, which permits a Court to sanction any
22   attorney who "multiplies the proceedings in any case unreasonably
     and vexatiously."  28 U.S.C. § 1927.  However, section 1927
23   permits such sanctions only where the attorney has demonstrated
     subjective bad faith, meaning that he has "knowingly or recklessly
24   raise[d] a frivolous argument or argue[d] a meritorious claim for
     the purpose of harassing an opponent."  New Alaska Dev. Corp. v.
25   Guetschow, 869 F.2d 1298, 1306 (9th Cir. 1989) (quotation
     omitted).  As discussed,  the Court concludes that attorney Webb's
26   conduct was not so egregious so as to support a finding of bad
     faith.  Thus, the Court declines to levy sanctions under section
27   1927.

28                                    -6-

1    **IV.    Conclusion.**

2        For the reasons stated, the Court declines to levy sanctions

3    against attorney Webb pursuant to Rule 11.

4

5    IT IS SO ORDERED:

6

7

8

9

10   Date: 1/27/99

11                                    John S. Rhoades, Sr.

12                                    United States District Judge

13

14

15

16   Copies to:

17

18   All Parties

19   Magistrate Judge

20

21

22

23

24

25

26

27

28                                    -7-

# EXHIBIT E

# In the United States Court of Federal Claims

No. 98-860 L
(Filed: February 1, 2006)

```
**********************************
WALTER ROSALES, et al.,            *
                                   *
            Plaintiffs,            *
                                   *
    v.                             *
                                   *
THE UNITED STATES,                 *
                                   *
            Defendant.             *
                                   *
**********************************
```

## ORDER

On March 19, 2004, the court stayed this case pending final resolution of the related case of *Rosales v. United States* (1:03cv1117), which is in the U.S. District Court for the District of Columbia. The parties have reported that cross motions for summary judgment await a decision in that case.

In light of the fact that this case has been stayed for a significant period of time, the parties shall file a joint status report on or before **February 15, 2006**, addressing, with specificity, whether the stay in this case should be continued. Such a discussion shall include why issues pending in this case would be affected by resolution of the case in the district court. In addition, Plaintiffs shall provide the court with a concise summary of the claims being pursued in the district court case, as compared to those pursued here. To the extent possible at this juncture, Defendant shall provide a concise summary of its defenses to Plaintiffs' claims being pursued in the district court case, as compared to its defenses in this case.

The parties shall also address how they would propose to proceed if the court were to lift the stay.

                              s/Edward J. Damich
                              EDWARD J. DAMICH
                              Chief Judge

# EXHIBIT F

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER ROSALES, MARIE TOGGERY, and KAREN TOGGERY,<br><br>                              Plaintiffs,<br><br>        v.<br><br>KEAN ARGOVITZ RESORTS, LAKES GAMING, INC., KEAN-ARGOVITZ RESORTS-JAMUL, LC, LAKES KEAN-ARGOVITZ RESORTS-CALIFORNIA, LC, and DOES 1-20,<br><br>                              Defendants. | CASE NO.  00-CV-1910 W (POR)<br><br>**MEMORANDUM OPINION AND ORDER REGARDING FIRST AMENDED COMPLAINT** |

Before the Court is Defendants' motion to dismiss for failure to state a claim and failure to join an indispensable party under Rules 12(b)(6) and 12(b)(7) of the Federal Rules of Civil Procedure.

44.

1    Plaintiffs Walter Rosales, Marie Toggery and Karen Toggery collectively oppose.  All
2    parties are represented by counsel.  The Court decides the matter on the papers
3    submitted and without oral argument pursuant to Civil Local Rule 7.1(d.1).

4        I.    BACKGROUND

5        On October 17, 1988 Congress enacted the Indian Gaming Regulatory Act
6    ("IGRA") which, among other things, allows federally recognized Native American
7    tribes to establish casino gaming to promote tribal economic development and self-
8    sufficiency.  See 25 U.S.C. §§ 2701 et seq.  IGRA requires all Native American tribes
9    intending to pursue Class III[1] casino gaming to negotiate a Tribal-State compact
10   ("Compact") with the state in which the tribal lands are located.  See Id.  The
11   Secretary of the United States Department of the Interior must also approve the
12   Compact.  Id.

13       The Jamul Indian Village ("Village"), a federally recognized Native American
14   tribe, is seeking to establish Class III casino gaming on Jamul land.  On October 8,
15   1999 the Village executed a Tribal-State compact with the State of California.  On
16   May 5, 2000 the Secretary of the Department of the Interior approved the Compact.

17       In February 2000, before the Compact was signed by the Secretary, the Village
18   executed a management contract with Defendant Lakes Kean-Argovitz Resorts-
19   California, LLC[2], to manage Village gaming operations.  (See Defs.' Mem. of P. & A.
20   at 2.)  The National Indian Gaming Commission ("NIGC") is currently reviewing
21   the contract for final approval.  (See Id.)  Absent such approval, the project cannot

22   _____

23       [1]    Class III gaming is defined as "all forms of gaming that are not class I gaming
24   or class II gaming." 25 U.S.C. § 2703(8).  Generally, Class I gaming is typically identified
     as social games solely for prizes of minimal value.  See 25 U.S.C. § 2703(6).  Class II gaming
25   usually means the game of chance commonly known as bingo.  See 25 U.S.C. § 2703(7)(A).

26       [2]    For purposes of this motion only, the Court will collectively refer to
27   defendants Kean- Argovitz Resorts, Lake Gaming, Inc., Kean-Argovitz Resorts-Jamul, LLC,
     and Lakes Kean-Argovitz Resorts-California, LLC as "Defendants."  The Defendants
28   primarily engage in casino management.

1 | go forward. (See *Id.*)

2 | Plaintiffs Walter Rosales, Marie Toggery and Karen Toggery ("Plaintiffs") are

3 | Village members and residents. Plaintiffs' First Amended Complaint ("FAC") alleges

4 | seven claims for relief based on Defendants' association and contracts with the

5 | Village. Specifically, Plaintiffs allege: (1) interference with contractual and economic

6 | advantage; (2) fraud; (3) negligent misrepresentation; (4-6) civil rights violations per

7 | 42 U.S.C. §§ 1981, 1982 and 1985; and (7) seek declaratory relief. On December 19,

8 | 2000 Defendants responded with a motion to dismiss for failure to state a claim and

9 | failure to join an indispensable party.

10 | II.   LEGAL STANDARD

11 | A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

12 | Procedure tests the sufficiency of the complaint. See North Star Int'l. v. Arizona

13 | Corp. Comm'n., 720 F.2d 578, 581 (9th Cir. 1983). Dismissal of a claim under this

14 | Rule is appropriate only where it "appears beyond doubt that the plaintiff can prove

15 | no set of facts in support of his claim which would entitle him to relief." Levine v.

16 | Diamanthuset, Inc., 950 F.2d 1478, 1482 (9th Cir. 1991) (quoting Conley v. Gibson,

17 | 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

18 | Under Rule 12(b)(6), a court may dismiss a complaint in three instances. First,

19 | dismissal is warranted where the complaint lacks a cognizable legal theory. See

20 | Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984);

21 | Neitzke v. Williams, 490 U.S. 319, 326-27, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338

22 | (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a

23 | dispositive issue of law."). Second, a complaint may be dismissed where it presents

24 | a cognizable legal theory yet fails to plead essential facts under that theory. See

25 | Robertson, 749 F.2d at 533. Third, dismissal is appropriate where the complaint

26 | pleads facts that affirmatively establish that the plaintiff has no legal claim. See, e.g.,

27 | Weisbuch v. County of Los Angeles, 119 F.3d 778, 783 n.1 (9th Cir. 1997); American

28 | Nurses' Ass'n. v. Illinois, 783 F.2d 716, 723 (7th Cir. 1986) (Posner, C.J.) ("A plaintiff

1    who files a long and detailed complaint may plead himself out of court by including

2    factual allegations which if true show that his legal rights were not invaded.").

3         In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must

4    assume the truth of all factual allegations and must construe them in the light most

5    favorable to the nonmoving party. See North Star, 720 F.2d at 580. However, legal

6    conclusions need not be taken as true merely because they are cast in the form of

7    factual allegations. See Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.

8    1981); see also In re Verifone Sec. Litig., 11 F.3d 865, 868 (9th Cir. 1993).

9    III.    DISCUSSION

10         Defendants move to dismiss Plaintiffs' action on three grounds.   First,

11   Defendants assert that IGRA and the Village/State of California Compact do not

12   provide Plaintiffs with a private right of action. Second, Defendants contend that

13   IGRA preempts Plaintiffs' claims.  Finally, Defendants argue this action must be

14   dismissed under Rule 19(b) of the Federal Rules of Civil Procedure for lack of an

15   indispensable party, the Jamul Indian Village.  The Court will discuss each of

16   Defendants' arguments in turn.

17   A.    THERE IS NO PRIVATE RIGHT OF ACTION UNDER
         IGRA AND THE TRIBAL-STATE COMPACT
18

19         As an initial matter, Defendants contend IGRA and the Compact do not

20   provide Plaintiffs with a private right of action such that claims arising thereunder

21   are barred as a matter of law. (See Defs.' Reply at 3-4.)  The Court agrees.

22   1.    INDIAN GAMING REGULATORY ACT

23         In 1988, Congress passed IGRA to: (1) statutorily regulate Indian gaming; (2)

24   create federal standards for gaming on Indian land; and (3) establish an independent

25   federal regulatory authority thereon. See 25 U.S.C. § 2702. IGRA also established

26   the National Indian Gaming Commission ("NIGC") to oversee regulation, licensing

27   and other facets of Indian gaming. See generally 25 U.S.C. § 2704-20. The NIGC can

28   approve or disapprove license applications, management contracts and tribal gaming

1  ordinances.  See Id.  Additionally, the NIGC has a broad grant of regulatory

2  authority. See Id.

3        The Supreme Court had held that in the face of such a comprehensive

4  regulatory scheme, courts should not imply private rights of action.  See National

5  R.R. Passenger Corp. v. National Assoc. of R.R. Passengers, 414 U.S. 453, 458 (1974).

6  "[W]hen legislation expressly provides a particular remedy or remedies, courts should

7  not expand the coverage of the statute to subsume other remedies."  Id.; see also

8  Touche Ross & Co. v. Redington, 442 U.S. 560, 572 (1979) ("[W]hen Congress

9  wished to provide a private . . . remedy, it knew how to do so and did so expressly.).

10        Indeed, IGRA has explicitly provided for limited and narrow private rights of

11  action.  See Hein v. Capitan Grande Band of Diegueno Mission, 201 F.3d 1256, 1260

12  (9th Cir. 2000) (holding that IGRA provides no general private right of action).  For

13  example, IGRA specifically permits Indian tribes to file suits seeking to compel

14  NIGC management contract approval.  See 25 U.S.C. § 2711(d).  In addition, § 2714

15  extensively provides that "[d]ecisions made by the Commission pursuant to sections

16  2710 ["Tribal gaming ordinances"], 2711 ["Management contracts"], 2712 ["Review

17  of existing ordinances and contracts"], and 2713 ["Civil penalties"] of this title shall

18  be final agency decisions for purposes of appeal to the appropriate Federal district

19  court." 25 U.S.C. § 2714.

20        In this case, Plaintiffs bring suit under various theories arising under state and

21  federal law.  However, Plaintiffs candidly admit that their claims arise from

22  "Defendants' violation of IGRA and the Jamul Tribal-State Compact."  (Pls.' Opp'n

23  at 4 n.1.)  Plaintiffs argue throughout their FAC that Defendants are "continuously

24  violating . . . the Indian Gaming Regulatory Act."[3]  (FAC at ¶ 40-43, 53-56.)  In Hein,

25  the Ninth Circuit faced very similar circumstances.  In dismissing claims related to

26  IGRA, the Ninth Circuit stated:

27  _____

28      [3]    Plaintiffs also incorporate these allegations into their state and federal claims.
(See FAC at ¶ 49, 62, 72, 80, 88, 95, 103.)

[W]here IGRA creates a private cause of action, it does so explicitly. For example, it specifically provides for suit by an Indian tribe to compel action by the Commission to approve or disapprove management contracts, 25 U.S.C. § 2711(d), and also explicitly allows for tribes to sue states under some circumstances. 25 U.S.C. § 2710(d). The existence of such explicit provisions authorizing suits persuaded the Eleventh Circuit that plaintiffs could not sue for every violation of IGRA by direct action under the statute. Tamiami Partner v. Miccosukee Tribe of Indians of Florida, 63 F.3d 1030, 1049 (11th Cir. 1995.) We agree with the Eleventh Circuit's conclusion.

Hein, 201 F.3d at 1260.

Based upon IGRA's enumerated rights of action and the Ninth Circuit's reasoning in Hein, this Court concludes that IGRA provides no private cause of action for violation of its general provisions.[4] See Hein 201 F.3d at 1260. Plaintiffs cannot make an end run around IGRA's provisions by disguising their claims as violations of state and federal law. If federal courts were permitted to adjudicate any alleged IGRA violation, courts would improperly infringe upon NIGC authority – the entity Congress expressly authorized to enforce IGRA's terms. See 25 U.S.C. § 2701 et seq. Accordingly, this Court declines Plaintiffs' invitation to read into IGRA the private rights of action Plaintiffs assert in their FAC. The Court dismisses Plaintiffs' claims to the extent they rely on IGRA. Plaintiffs' claims, as alleged, do not fall under IGRA's private right of action provisions.

## 2.    TRIBAL-STATE COMPACT

To the extent Plaintiffs' claims are based on the Compact, these claims are likewise dismissed because the Compact does not create a private right of action for alleged violations thereof.

---

[4]    Furthermore, the Supreme Court observed that, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." Touche Ross & Co., 442 U.S. 560, 568 (citation omitted).

1   IGRA requires all Native American tribes pursuing Class III casino gaming to

2 execute a Tribal-State compact ("Compact") with the state in which the tribal lands

3 are located. See 25 U.S.C. § 2710(d)(3)(A). The Secretary of the Department of the

4 Interior must approve the Compact. See 25 U.S.C. § 2710(d)(3)(B). On October 8,

5 1999 the Village negotiated a Tribal-State compact with the State of California. On

6 May 5, 2000 the Secretary of the Department of the Interior approved the Compact.

7   Among the Compact's many provisions, Section 15.1 provides "[e]xcept to the

8 extent expressly provided under this Gaming Compact, this Gaming Compact is not

9 intended to, and shall not be construed to, create any right on the part of a third

10 party to bring an action to enforce any of its terms." (*Pls.' Notice of Lodgement and*

11 *Req. for Judicial Notice,* Ex. A at 37.) The aforementioned language is clear on its face.

12 Any private right of action brought under the Compact must be authorized by the

13 Compact itself.

14   In this case, Plaintiffs allege Defendants violated a variety of state and federal

15 law by breaching various provisions of the Compact. (See FAC at ¶ 40-43, 49, 53-56,

16 62, 72, 80, 88, 95, 103.) However, Plaintiffs do not identify nor does the Court find

17 any express Compact provisions which allow Plaintiffs to privately sue Defendants

18 to enforce the Compact's terms.[5] Accordingly, the Court dismisses Plaintiffs' claims

19 to the extent they rely on purported violations of the Compact.

20 **B.** **PREEMPTION OF PLAINTIFFS' STATE LAW CLAIMS**

21   Even assuming Plaintiffs could pursue a private right of action, Defendants

22 contend IGRA preempts Plaintiffs' state law claims. (See *Defs.' Mem. of P. & A.* at 11-

23 13.) Plaintiffs counter that "IGRA explicitly does not create an exclusive federal

24

---

25   [5] The Court agrees with Defendants' assertion that Plaintiffs' reliance on the
Compact is "odd[] at best." (See *Defs.' Reply* at 4 n.2.) Plaintiffs take the position that the
26 Compact is not final because of a pending tribal leadership dispute. (See *Pls.' Opp'n* at 6-7.)
Ironically, Plaintiffs simultaneously argue that the disputed conduct in this case violates the
27 same Compact. (See *Id.*) Plaintiffs cannot have it both ways. If the Compact is not final,
28 it has no legal effect, and by extension, no impact on this case.

1   scheme for the regulation of Indian gaming." (*Pls.' Opp'n* at 17.)

2         1.   IGRA'S FEDERAL PREEMPTION OF STATE LAW

3       Generally, preemption applies in Indian law where the application of state law

4   "interferes or is incompatible with federal or tribal interests as reflected in federal

5   law." See Confederated Tribes of Siletz Indians of Oregon v. State of Oregon, 143

6   F.3d 481, 487 (9th Cir. 1998) (quoting Cabazon Band of Mission Indians v. Wilson,

7   37 F.3d 430, 433 (9th Cir. 1994). "No specific congressional intent to preempt state

8   activity is required; it is enough that the state law conflicts with the purpose or

9   operation of a federal statute, regulation, or policy." Cabazon, 37 F.3d at 433

10   (citation and internal quotations omitted).

11       Congress enacted IGRA to provide statutory oversight and regulation of

12   Indian gaming. See 25 U.S.C. § 2702(1-2) (emphasis supplied). Congress passed

13   IGRA in order to: (1) establish an independent federal regulatory authority to oversee

14   Indian gaming; (2) create federal standards for regulations thereon; and (3) form the

15   NIGC to protect gaming as a tribal revenue source. See 25 U.S.C. § 2702(3). "The

16   legislative history makes clear the purpose and effect of the statute: to protect the

17   Indian gaming industry from corruption and to provide for extensive federal

18   oversight of all but the most rudimentary forms of Indian gaming." Tamiami

19   Partners v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1033 (11th Cir. 1995)

20   (footnote omitted). As further evidence of this purpose, the Senate Report submitted

21   with the statute at the time of its passage unequivocally states that IGRA "is intended

22   to expressly preempt the field in the governance of gaming activities on Indian lands."

23   Id. (citing S.Rep. No. 446, 100th Cong., 2d Sess. 15-16 (1988), *reprinted in* 1988

24   U.S.C.C.A.N. 3071, 3076).

25       Despite clear Congressional intent that federal law occupy the field of Indian

26   gaming, Plaintiffs herein seek to assert several claims arising under state law. All of

27   these claims relate to Defendants' negotiation of a casino management contract with

28   the Village. Specifically, Plaintiffs allege that Defendants have been: (1) knowingly

1    and willfully providing materially false statements or information to Village

2    members; (2) unduly interfering and influencing Class III gaming tribal government

3    decisions; (3) significantly and unduly influencing the adoption of a Class III gaming

4    ordinances, through persons whose prior activities and associations threaten the

5    public interest; and (4) unlawfully contributing money and other valuable

6    consideration to Village members and non-members to influence their vote in favor

7    of a Jamul Class III gaming ordinance. (See *FAC* at 10-11.)

8        The Court finds that all of Plaintiffs' state law claims are preempted by IGRA.

9    Recognition of Plaintiffs' state law claims would wrongfully interfere with

10   Congressional intent to statutorily regulate Indian gaming. See 25 U.S.C. § 2702(1-2).

11   Ironically, Plaintiffs' "state law" allegations directly quote Congressional findings

12   codified at 25 U.S.C. § 2711(e).[6] However, § 2711(e) exclusively assigned the NIGC

13   Chairman, not Plaintiffs, the authority to oversee Indian casino management contract

14   disputes. See 25 U.S.C. § 2711(e).

15       Congressional desire to establish a uniform body of federal Indian gaming law

16   is well founded. Hundreds of tribes are organized and reside in the Untied States.

17   Obviously, state law varies from jurisdiction to jurisdiction. Rather than apply an

18   unpredictable patchwork of state law to various Indian casino management contracts,

19   Congress implemented IGRA to establish a uniform federal body of Indian gaming

20   law. This Court will not usurp powers expressly bestowed upon the NIGC

21   Chairman by Congress. Accordingly, Plaintiffs' state law claims are preempted since

22   they conflict with IGRA's express purpose, regulation, oversight and

23

_____

24       [6]    Section 2711(e) provides that the Chairman of the NIGC *shall not approve* a
     management contract if the Chairman determines that: (1) any person "has knowingly and
25   willfully provided materially important false statements or information . . . to the Indian
     tribe;" (2) has been determined to be a person whose prior activities, criminal record if any,
26   or reputation, habits, and associations pose a threat to the public interest . . . thereto; and
27   (3) "the management contractor has, or has attempted to, unduly interfere or influence for
     its gain or advantage any decision or process of tribal government relation to the gaming
28   activity." 25 U.S.C. § 2711(e)(1)(C)-(D), (e)(2) (emphasis supplied).

1   implementation.[7]  See Cabazon Band, 37 F.3d at 433 (holding that state law is

2   preempted if it conflicts with the purpose or operation of a federal statute, regulation,

3   or policy).

4

5           2.      THE COMPACT DOES NOT REQUIRE THE APPLICATION
                    OF CALIFORNIA LAW TO PLAINTIFFS' CLAIMS

6

7          Plaintiffs further argue the Compact requires application of California law to

8   their claims for tortious interference, fraud, and negligent misrepresentation.[8]  (See

9   Pls.' Opp'n at 17-18.)  The Court disagrees.

10         "[U]nless a tribe affirmatively elects to have State laws and State jurisdiction

11  extend to tribal lands, the Congress will not uni[l]aterally impose or allow State

12  jurisdiction on Indian lands for the regulation of Indian gaming activities."  S.Rep.

13  No. 466, 100th Cong., 2d Sess. 5-6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3075.

14  "Congress . . . left states with no regulatory role over gaming except as expressly

15  authorized by IGRA, and under it, the only method by which a state can apply its

16  general civil laws to gaming is through a tribal-state compact."  Gaming Corp. of

17  America v. Dorsey & Whitney, 88 F.3d 536, 546 (8th Cir. 1996) ("Under IGRA, state

18  law may not be applied to regulate the tribal licensing process, even if indirectly,

19  unless a tribal-state compact so provides.").

20         Here, Plaintiffs admit state law will apply where "specified in the [C]ompact."

21  _____

22       [7]      Additionally, it is well-settled that management contracts between Native
    American tribes and casino management companies are vital to Indian gaming.  Indeed, it
23  would be difficult for Indian tribes and casino management companies to enter into
    management contracts if any individual tribal member could bring suit in federal court to
24  challenge the contract based on one party's negotiation tactics.  Without these contracts,
25  gaming operations would never exist on tribal lands, thus impeding Congressional intent
    of "promoting tribal economic development, self-sufficiency, and strong tribal
26  governments."  25 U.S.C. § 2702(1).

27       [8]      Once again, Plaintiffs rely on the Tribal-State compact when they contend the
28  same Compact is not final because of a pending tribal leadership dispute.

                                    - 10 -                           00cv1910 W

(*Pls.' Opp'n* at 17.)  Plaintiffs further argue the Compact provides for "the application of California's civil remedies for tortious interference, fraud, and negligent misrepresentation."  (*Id.*)  However, Plaintiffs fail to identify any language contained in the Compact which supports such a position.  This Court has likewise reviewed the Compact and cannot locate any contract language supporting Plaintiff's sweeping interpretation.  While Plaintiffs do generally cite eighteen Compact provisions -- none impose civil remedies upon the parties' gaming contract negotiations. Accordingly, the Court concludes that the California law upon which Plaintiffs' rely is not implicated or otherwise supported by the Compact's language.  The Court **DISMISSES** Plaintiff's state law claims with prejudice and without leave to amend.[9]

### C.  PLAINTIFFS' FEDERAL CIVIL RIGHTS CLAIMS

Plaintiffs' only remaining claims are those brought under 42 U.S.C. §§ 1981, 1982 and 1985.  Each of these claims exclusively rely on the factual allegations which supported Plaintiffs' now dismissed state law claims.  Because those claims have been dismissed, the Court is ill-equipped to properly examine the merits of Plaintiff's remaining federal claims.  Accordingly, the Court **DISMISSES** Plaintiffs' federal claims without prejudice and with leave to amend.

If Plaintiffs elect to file a Second Amended Complaint alleging civil rights violations under §§ 1981, 1982 and 1985, Plaintiffs must plead *specific facts* regarding each Defendants' discriminatory conduct as to each individual Plaintiff.  Because Plaintiffs' proposed civil rights claims all independently arise from rights secured by the Constitution, Plaintiffs may not rely on or otherwise refer to IGRA or the Tribal-State Compact to establish the prima facie elements of their proposed civil

_____

[9]    That is not to say, however, that Plaintiffs are completely barred from raising claims under California law.  For example, if Plaintiffs can properly allege claims that rely on California law specifically enumerated and/or identified in the Compact -- such claims may be capable of relief.  The Court need not reach these issue insofar as they were not presented to the Court.

00cv1910 W

1   rights claims.

2       The Court need not reach the parties' remaining arguments insofar as all claims

3   have now been dismissed.   To the extent Defendants contend the Jamul Indian

4   Village is a necessary and indispensable party under Rule 19(b), the Court respectfully

5   disagrees.  This action may proceed without the Village as a named party.

6   **IV.   CONCLUSION AND ORDER**

7       In light of the foregoing, the Court **GRANTS** Defendants' Rule 12(b)(6)

8   motion to dismiss (Doc. Nos. 35-1) and **DENIES** Defendants' Rule 12(b)(7) motion

9   to dismiss (Doc. No. 35-2).  The Court **DISMISSES** Plaintiffs' state law claims with

10  prejudice and without leave to amend.   The Court **DISMISSES** Plaintiffs' federal

11  claims without prejudice and with leave to amend.   Plaintiffs' Second Amended

12  Complaint must be filed and served no later than **February 28, 2001**.

13      The Court additionally **DENIES** as moot, and without prejudice, non-party

14  Bureau of Indian Affairs and National Indian Gaming Commission's motion to

15  quash subpoenas.  (Doc. No. 30-1.)

16

17  **IT IS SO ORDERED.**

18

19  DATE: February 1, 2001

20                                      Hon. THOMAS J. WHELAN
21                                      United States District Court
                                        Southern District of California
22

23  CC:   HON. LOUISA S. PORTER, UNITED STATES MAGISTRATE JUDGE
24        ALL PARTIES AND COUNSEL OF RECORD

25

26

27

28

- 12 -                                                      00cv1910 W

# EXHIBIT G

FILED

01 APR 18 PM 4:18

BY ............... DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER ROSALES, MARIE TOGGERY, and KAREN TOGGERY, | CASE NO.   00-CV-1910 W (POR) |
| Plaintiffs, | ORDER DISMISSING PLAINTIFFS' SECOND AMENDED COMPLAINT; DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND |
| v. | |
| KEAN ARGOVITZ RESORTS, LAKES GAMING, INC., KEAN-ARGOVITZ RESORTS-JAMUL, LLC, LAKES KEAN-ARGOVITZ RESORTS-CALIFORNIA, LLC, and DOES 1-20, | |
| Defendants. | |

Before the Court is Defendants' motion to dismiss Plaintiffs' Second Amended Complaint (hereinafter "SAC") pursuant to Rule 12(b)(6) of the Federal Rules of

54

00cv1910

1 Civil Procedure. Plaintiffs Walter Rosales, Marie Toggery and Karen Toggery

2 collectively oppose. Plaintiffs also seek leave to file a Third Amended Complaint

3 pursuant to Rule 15 of the Federal Rules of Civil Procedure. Defendants oppose. All

4 parties are represented by counsel. The Court decides the matter on the papers

5 submitted and without oral argument pursuant to Civil Local Rule 7.1(d.1).

6      I.    BACKGROUND

7      On October 17, 1988 Congress enacted the Indian Gaming Regulatory Act

8 ("IGRA") which, among other things, allows federally recognized Native American

9 tribes to establish casino gaming to promote tribal economic development and self-

10 sufficiency. See 25 U.S.C. §§ 2701 et seq. IGRA requires all Native American tribes

11 intending to pursue Class III[1] casino gaming to negotiate a Tribal-State compact

12 ("Compact") with the state in which the tribal lands are located. See id. The

13 Secretary of the United States Department of the Interior must also approve the

14 Compact. See id.

15      The Jamul Indian Village ("Village"), a federally recognized Native American

16 tribe, is seeking to establish Class III casino gaming on Jamul land. On October 8,

17 1999 the Village executed a Tribal-State compact with the State of California. On

18 May 5, 2000 the Secretary of the Department of the Interior approved the Compact.

19      In February 2000, before the Compact was signed by the Secretary, the Village

20 executed a management contract with Defendant Lakes Kean-Argovitz Resorts-

21 California, LLC[2], to manage Village gaming operations. (See Defs.' Mem. of P. & A.

22

23      [1]      Class III gaming is defined as "all forms of gaming that are not class I gaming

24 or class II gaming." 25 U.S.C. § 2703(8). Generally, Class I gaming is typically identified as social games solely for prizes of minimal value. See 25 U.S.C. § 2703(6). Class II gaming

25 is usually associated with games of chance such as bingo. See 25 U.S.C. § 2703(7)(A).

26      [2]      For purposes of this motion only, the Court will collectively refer to

27 defendants Kean-Argovitz Resorts, Lake Gaming, Inc., Kean-Argovitz Resorts-Jamul, LLC, and Lakes Kean-Argovitz Resorts-California, LLC as "Defendants." The Defendants

28 primarily engage in casino management.

-2-

00cv1910

1  *to Dismiss SAC* at 2-3.)  The National Indian Gaming Commission ("NIGC") is

2  currently reviewing the contract for final approval. (See *id.* at 3.)  Absent such

3  approval, the project cannot go forward. (See *id.*)

4           Plaintiffs Walter Rosales, Marie Toggery and Karen Toggery ("Plaintiffs") are

5  Village members and residents. Plaintiffs' First Amended Complaint ("FAC") alleged

6  seven claims for relief based on Defendants' association and contracts with the

7  Village. Specifically, Plaintiffs alleged: (1) interference with contractual and economic

8  advantage; (2) fraud; (3) negligent misrepresentation; (4-6) civil rights violations per

9  42 U.S.C. §§ 1981, 1982 and 1985; and (7) seek declaratory relief.

10          By order dated February 1, 2001 this Court dismissed Plaintiffs' entire FAC.

11  Specifically, the Court held that: (1) IGRA and the Compact did not provide

12  Plaintiffs with a private right of action; (2) IGRA preempted Plaintiffs' state law

13  claims; (3) the Compact did not require the application of California law to Plaintiffs'

14  claims; and (4) Plaintiffs' civil rights allegations were deficient.  Plaintiffs were

15  granted leave to amend their federal claims. However, Plaintiffs' state law claims for

16  interference with contractual and economic advantage, fraud and negligent

17  misrepresentation were dismissed with prejudice without leave to amend.

18          On February 28, 2001 Plaintiffs filed a Second Amended Complaint. Once

19  again, Plaintiffs allege: (1) interference with contractual and economic advantage; (2)

20  fraud; (3) negligent misrepresentation; (4-6) civil rights violations per 42 U.S.C. §§

21  1981, 1982 and 1985; and (7) seek declaratory relief. On March 12, 2001 Defendants

22  responded with a motion to dismiss for failure to state a claim.

23      II.    LEGAL STANDARD

24          A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

25  Procedure tests the sufficiency of the complaint. See North Star Int'l v. Arizona

26  Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983). Dismissal of a claim under this

27  Rule is appropriate only where it "appears beyond doubt that the plaintiff can prove

28  no set of facts in support of his claim which would entitle him to relief." Levine v.

1   Diamanthuset, Inc., 950 F.2d 1478, 1482 (9th Cir. 1991) (quoting Conley v. Gibson,

2   355 U.S. 41, 45-46 (1957)).

3        Under Rule 12(b)(6), a court may dismiss a complaint in three instances. First,

4   dismissal is warranted where the complaint lacks a cognizable legal theory. See

5   Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984);

6   Neitzke v. Williams, 490 U.S. 319, 326-27 (1989) ("Rule 12(b)(6) authorizes a court

7   to dismiss a claim on the basis of a dispositive issue of law."). Second, a complaint

8   may be dismissed where it presents a cognizable legal theory yet fails to plead

9   essential facts under that theory. See Robertson, 749 F.2d at 533. Third, dismissal

10  is appropriate where the complaint pleads facts that affirmatively establish that the

11  plaintiff has no legal claim. See, e.g., Weisbuch v. County of Los Angeles, 119 F.3d

12  778, 783 n.1 (9th Cir. 1997); American Nurses' Ass'n v. Illinois, 783 F.2d 716, 723

13  (7th Cir. 1986) (Posner, C.J.) ("A plaintiff who files a long and detailed complaint

14  may plead himself out of court by including factual allegations which if true show

15  that his legal rights were not invaded.").

16       In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must

17  assume the truth of all factual allegations and must construe them in the light most

18  favorable to the nonmoving party. See North Star, 720 F.2d at 580. However, legal

19  conclusions need not be taken as true merely because they are cast in the form of

20  factual allegations. See Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.

21  1981); see also In re Verifone Sec. Litig., 11 F.3d 865, 868 (9th Cir. 1993).

22  III.   DISCUSSION

23  A.   PLAINTIFFS' FEDERAL CIVIL RIGHTS CLAIMS

24       Plaintiffs allege that Defendants violated their civil rights pursuant to 42 U.S.C.

25  §§ 1981, 1982 and 1985(3). Defendants counter that Plaintiffs' allegations fail to state

26  a claim. Specifically, Defendants contend Plaintiffs' claims fail because "Plaintiffs

27  continue to rely on IGRA in order to state their theories" and "Plaintiffs have not

28  met the strict pleading requirements associated with their various Civil Rights

1    claims." (*Defs.' Mem. of P. & A. to Dismiss SAC* at 7-8.)

2         The Court agrees.

3         "[Section] 1981 prohibits racial discrimination in the making and enforcement

4    of private contracts." Patterson v. McLean Credit Union 491 U.S. 164, 172 (1989).

5    "In order to withstand a motion to dismiss for failure to state a claim, a § 1981 cause

6    of action need only allege 'that plaintiff suffered discrimination ... on the basis of

7    race.'" Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1487 (9th Cir.

8    1995) (citing Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 625 (9th Cir.

9    1988)); see also Evans v. McKay, 869 F.2d 1341, 1344 (9th Cir. 1989) ("What is

10   required in a section 1981 action ... is that the plaintiffs must show intentional

11   discrimination on account of race.").

12        Section 1982 prohibits the deprivation of property rights based on race.

13   See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 436 (1968).   The raced-based

14   deprivation must be intentional.   See General Bldg. Contractors Ass'n, Inc. v.

15   Pennsylvania, 458 U.S. 375, 387-90 (1982).

16        Finally, Section 1985(3) prohibits a conspiracy to interfere with a plaintiff's

17   civil rights. See 42 U.S.C. § 1985(3).  "An indispensable element of a claim under 42

18   U.S.C. § 1985(3) is some racial, or perhaps otherwise class-based, invidiously

19   discriminatory animus behind the conspirator's action." Addisu v. Fred Meyer, Inc.,

20   198 F.3d 1130, 1134 (9th Cir. 2000) (citation and internal quotations omitted).

21        Accordingly, in order to sustain a claim under §§ 1981, 1982 and 1985,

22   Plaintiffs must allege facts demonstrating intentional racial discrimination.

23   Specifically, Plaintiffs must "allege the events claimed to constitute intentional

24   discrimination as well as circumstances giving rise to a plausible inference of racially

25   discriminatory intent." Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir. 1994)

26   (citations omitted).  "A complaint consisting of nothing more than naked assertions,

27   and setting forth no facts upon which a court could find a violation of the Civil

28   Rights Acts, fails to state a claim under Rule 12(b)(6)." Id.

00cv1910

1      In this case, Plaintiffs' SAC does not provide a basis to infer a discriminatory

2  motive for Defendants' purported acts. Plaintiffs' factual allegations in support of

3  their civil rights claims all involve Defendants "providing valuable consideration to

4  a political faction opposed to Plaintiffs ... coupled with disparaging racial remarks

5  concerning the Plaintiffs' respective degrees of Indian blood ... referring to them as

6  'half blood Indians' and 'a half blood community.'" (SAC ¶¶ 60-61, 68-69, 76-77; see

7  also Pls.' Opp'n at 7-8, 11.) Construing Plaintiffs' allegations in the light most

8  favorable to them, North Star, 720 F.2d at 580, the above allegations do not support

9  an inference of intentional racial discrimination.

10      For example, Plaintiffs contend that Defendants illegally contributed money

11  to the Jamul Indian Village electorate, "which the Defendants have used to deprive

12  Plaintiffs' civil rights." (Pls.' Opp'n at 7.) According to Plaintiffs, Defendants

13  contributed money to a political faction opposed to: (1) Plaintiffs holding office; (2)

14  Plaintiffs' prosecution of certain IBIA (Interior Board of Indian Appeals) appeals; and

15  (3) Plaintiffs maintaining actions before the Federal Court of Claims and San Diego

16  Superior Court. (See SAC ¶¶ 60, 68, 76.) At best, these allegations support a finding

17  that Defendants' acts of contributing money were prompted by their political views

18  and not by racial bias. Accordingly, no reasonable interpretation of Plaintiffs'

19  allegations even suggest that Defendants' acts were motivated by racial

20  discrimination.

21      Plaintiffs also fail to plead facts suggesting a causal link between intentional

22  discrimination and Defendants' alleged acts. Plaintiffs' SAC only provides that

23  Defendants' acts were "coupled with disparaging racial remarks concerning the

24  Plaintiffs' respective degrees of Indian blood." (SAC ¶¶ 61, 69, 77.) Plaintiffs' SAC

25  is devoid of specific facts supporting an inference of intentional discrimination.

26  Thus, Plaintiffs' bare assertions amount to nothing more than a "'naked allegation'

27  of racial discrimination," which do not survive a motion to dismiss. Yusef, 35 F.3d

28  at 714 (citation omitted).

00cv1910

1      Next, Plaintiffs cite to <u>Evans v. McKay</u>, 869 F.2d 1341 (9th Cir. 1989) in an

2 attempt to preserve their § 1981 and § 1982 claims.[3] After a careful examination of

3 <u>Evans</u>, the Court finds that <u>Evans</u> is factually distinguishable from this case.

4      In <u>Evans</u>, plaintiffs of Caucasian descent operated a gas station on the Blackfeet

5 Indian Reservation. The plaintiffs alleged that certain defendants (Bureau of Indian

6 Affairs' ("BIA") members) ordered BIA police and road employees to refrain from

7 purchasing gas from plaintiffs. The plaintiffs further alleged that a Tribal Counsel

8 member (Mountain Chief) ordered others not to conduct business with plaintiffs.

9 This order was coupled with a statement by Mountain Chief that "whites have no

10 rights on the reservation. <u>Evans</u>, 869 F.2d at 1345.

11      The <u>Evans</u> court ultimately held that plaintiffs pleaded sufficient facts to defend

12 their § 1981 claim against a motion to dismiss. In so doing, the court noted that

13 plaintiffs "have [sufficiently] pleaded overt acts *coupled with some direct evidence that*

14 *the defendants' conduct was motivated by racial animus* [to survive a Rule 12(b)(6)

15 motion]." <u>Id.</u>, (emphasis supplied). "Plaintiffs must show intentional discrimination

16 on account of race." <u>Id.</u> at 1344.

17      Contrary to <u>Evans</u>, in this case Plaintiffs' allegations fail to show that

18 Defendants' conduct was motivated by racial animus. Plaintiffs only allege that

19 Defendants "provid[ed] valuable consideration to a political faction opposed to

20 Plaintiffs ... coupled with disparaging racial remarks concerning the Plaintiffs'

21 respective degrees of Indian blood ... referring to them as 'half blood Indians' and 'a

22 half blood community.'" (*SAC* ¶¶ 60-61, 68-69, 76-77.) These allegations differ

23 significantly from the allegations in <u>Evans</u> because the plaintiffs in that case provided

24

25        [3]    Plaintiffs cite <u>Means v. Wilson</u>, 522 F.2d 833 (8th Cir. 1975) as controlling

26 Ninth Circuit authority to support their §1985(3) claim. (<u>See</u> *Pls.' Opp'n* at 12-14.)
However, upon further examination by the Court, <u>Means</u> was decided by an Eighth Circuit

27 panel. The Court is not bound or persuaded by <u>Means</u> and declines to follow its reasoning

28 here.

1   direct evidence that defendants were racially motivated in boycotting their business.
2   In Evans, the plaintiffs alleged that defendant Mountain Chief stated "whites have
3   no rights on the reservation." Evans at 1345. Because whites allegedly had no rights
4   on the reservation, defendants ordered everyone to boycott plaintiffs' business.
5   Defendants' motivation to run plaintiffs off the reservation was obviously fueled by
6   racial discrimination.  In contrast, Plaintiffs here lack any direct evidence or
7   substantiated allegations of racial discrimination that underlies Defendants'
8   purported actions.

9       Plaintiffs' allegations, construed in the light most favorable to them, suggest
10  that Defendants' conduct was motivated by political beliefs and not racial animus.
11  There is simply no allegation that Defendants' acts were motivated by intentional
12  racial discrimination. Plaintiffs' allegations of "half blood Indians" and "a half blood
13  community" amounts to nothing more than a "'naked allegation' of racial
14  discrimination." Yusef, 35 F.3d at 714 (citation omitted).

15      Accordingly, because Plaintiffs failed to sufficiently plead racial discrimination,
16  the Court DISMISSES with prejudice Plaintiffs' civil rights claims. See, e.g. King
17  v. State of California, 784 F.2d 910, 916 (9th Cir. 1986) (affirming dismissal of
18  plaintiff's civil rights claims under 42 U.S.C. §§ 1981, 1982 and 1985 because
19  plaintiff's allegations were conclusory and unsupported by any facts).

20      **B.    PLAINTIFFS' FAILURE TO COMPLY WITH THIS COURT'S ORDER**
21      Plaintiffs' failure to comply with this Court's order dated February 1, 2001
22  further warrants dismissal.  It is well settled that a district court has the inherent
23  power to dismiss a case for failure to comply with court orders. See FED. R. CIV. P.
24  41(b); see also Televideo Systems, Inc. v. Heidenthal, 826 F.2d 915, 916 (9th Cir.
25  1987).

26      Here, the Court instructed Plaintiffs to "plead *specific facts* regarding each
27  Defendants' discriminatory conduct as to each individual Plaintiff." (*Mem. Op. &*
28  *Order dated February 1, 2001 Regarding First Am. Compl.* at 11.) However, Plaintiffs

1    only allege that Defendants "provid[ed] valuable consideration to a political faction
2    opposed to Plaintiffs ... coupled with disparaging racial remarks concerning the
3    Plaintiffs' respective degrees of Indian blood ... referring to them as 'half blood
4    Indians' and 'a half blood community.'" (*SAC* ¶¶ 60-61, 68-69, 76-77.)  Plaintiffs'
5    racial allegations are virtually identical to the deficient racial allegations in Plaintiffs'
6    now dismissed FAC. (See *FAC* ¶¶ 82, 90, 97.)  The Court finds these allegations, at
7    most, vague and ambiguous.  Plaintiffs nowhere identify which Defendant made
8    these alleged racial remarks or when they were made.

9        Because Plaintiffs have failed to plead specific facts regarding each Defendants'
10    racially discriminatory conduct in violation of this Court's prior order, Plaintiffs'
11    civil rights claims are DISMISSED with prejudice.

12    B.  PLAINTIFFS' STATE LAW CLAIMS - MOTION TO AMEND

13        Next, Plaintiffs formally withdraw their state law claims from the SAC. (See
14    *Pls.' Opp'n* at 6.)  However, Plaintiffs seek leave to amend their SAC to reallege the
15    exact same state law claims for interference with contractual and economic
16    advantage, fraud and negligent misrepresentation under California law.[4] (See *id.*)

17        Rule 15(a) of the Federal Rules of Procedures provides that after a responsive
18    pleading has been served, a party may amend its complaint only with leave of court
19    and leave "shall be freely given when justice so requires."  FED. R. CIV. P. 15(a).
20    Granting leave to amend rests in the sound discretion of the district court.
21    International Ass'n of Machinists & Aerospace Workers v. Republic Airlines, 761
22    F.2d 1386, 1390 (9th Cir. 1985).  In deciding whether to grant leave to amend, district
23    courts should consider several factors including undue delay, prejudice to the
24

25    ─────────────────────
26        [4]    The Court finds this request perplexing because Plaintiffs' SAC already alleged
    interference with contractual and economic advantage, fraud and negligent
27    misrepresentation.  If Plaintiffs alleged these same California law violations under IGRA
    or the Compact, they would be in directly violation of this Court's Order dated February
28    1, 2001.

1  opposing party, futility of the amendment, bad faith and whether plaintiff has

2  previously amended the complaint. Sisseton-Wahpeton Sioux Tribe v. U.S., 90 F.3d

3  351, 355 (9th Cir. 1996).

4      Having read and considered the papers submitted, the Court finds that futility

5  of the amendment and Plaintiffs' previous opportunity to amend weigh against

6  granting leave.

7          1.   FUTILITY

8      First, despite the strong policy in favor of granting leave to amend, "[f]utility

9  of amendment can, by itself, justify the denial of a motion for leave to amend."

10  Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995). Here, Defendants contend that

11  Plaintiffs' proposed amendment is futile because Plaintiffs' state law claims "are based

12  upon the same set of facts as were their prior claims" and have already been

13  dismissed by this Court with prejudice. (Defs.' Opp'n at 3.) The Court agrees.

14      By order dated February 1, 2001 this Court dismissed Plaintiffs' state law

15  claims *with prejudice and without leave to amend* for: (1) interference with contractual

16  and economic advantage; (2) fraud; and (3) negligent misrepresentation. Specifically,

17  the Court held that: (1) IGRA and the Compact did not provide Plaintiffs with a

18  private right of action; (2) IGRA preempted Plaintiffs' state law claims; and (3) the

19  Compact did not require the application of California law to Plaintiffs' claims.

20  Plaintiffs now try to reallege these same claims in their SAC.

21      Plaintiffs have obviously taken their previously invalid state law claims and

22  deleted all reference to IGRA and/or the Compact in an attempt to make the claims

23  whole. Plaintiffs' efforts to trade prior allegations demonstrating that IGRA and the

24  Compact expressly govern this case with "new" vague allegations concerning

25  Defendants' interaction with the Jamul Indian Village are not well taken. The

26  renewed allegations do not create valid and independent state law claims as this Court

27  outlined in its prior order. (See *Mem. Op. and Order dated Feb. 4, 2001 Regarding First*

28  *Am. Compl.* at 11 n.9.)

1    For example, Plaintiffs in their FAC allege that Defendants "unlawfully

2  contributed money and other valuable consideration to members and non-members

3  of Jamul, with which they have been bribed to attend meetings, in order to attempt

4  to influence their vote in favor of a Class III gaming ordinance at Jamul." (*FAC* ¶ 56.)

5  In Plaintiffs' SAC, they now claim that Defendants "unlawfully contribut[ed] money

6  and other valuable consideration to members and non-members of Jamul, with which

7  they have been bribed to attend meetings, in order to attempt to influence their vote

8  in favor of a political faction opposed to Plaintiffs' election to office at the Jamul

9  Indian Village." (*SAC* ¶¶ 34.) The only factual distinction between these allegations

10  is their level of specificity. Plaintiffs' FAC describes in detail Defendants' alleged

11  actions. In contrast, Plaintiffs' SAC vaguely describes Defendants' acts in a circuitous

12  attempt to plead around the claims' relation to IGRA and/or the Compact.

13  Plaintiffs' omission of IGRA and the Compact are particularly surprising here

14  because Plaintiffs alleged in their previous two complaints that their lawsuit

15  specifically involves violations of IGRA and/or the Compact. Plaintiffs cannot now

16  have it both ways.

17    Furthermore, Plaintiffs cite to IGRA in their jurisdictional allegations, 25

18  U.S.C. § 2701 et seq. (*SAC* ¶ 17) and also request this Court to issue an order

19  enjoining Defendants from violating IGRA and/or the Compact. (See *SAC Prayer*

20  *for Judgment* ¶ 1.) As stated above, the Court previously ruled that Plaintiffs cannot

21  state a cause of action for interference with contractual and economic advantage,

22  fraud and negligent misrepresentation. (See *Mem. Op. & Order dated Feb. 1, 2001*

23  *Regarding First Am. Compl.* at 4-11.) Thus, even if Plaintiffs were provided another

24  chance to amend, Plaintiffs are barred from bringing these same state law claims. In

25  sum, the Court finds that Plaintiffs' proposed amendment would be futile.

26  //

27  //

28

1          2.    <u>PREVIOUS AMENDMENTS</u>

2        Plaintiffs' previous two attempts at amending their Complaint weighs in favor

3 of dismissal. "The district court's discretion to deny leave to amend is particularly

4 broad where plaintiff has previously amended the complaint." <u>Allen v. City of</u>

5 <u>Beverly Hills</u>, 911 F.2d 367, 373 (9th Cir. 1990) (citations omitted).

6        It is implausible and inapposite to suggest that Plaintiffs, represented by capable

7 counsel, must be given a third attempt to allege state law claims that have already

8 been dismissed with prejudice. Accordingly, having weighed the relevant Rule 15(a)

9 factors, the Court **DENIES** Plaintiffs' motion to amend.

10 //

11 //

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00cv1910

1    IV.    CONCLUSION AND ORDER

2        In light of the foregoing, the Court **GRANTS** Defendants' Rule 12(b)(6)

3    motion to dismiss (Doc. No. 47-1) and **DENIES** Plaintiffs' motion for leave to

4    amend (Doc. No. 49-1).[5]

5        The Court **DISMISSES** Plaintiffs' Second Amended Complaint with prejudice

6    and without leave to amend.  The Clerk of Court shall close the district court case

7    file.

8

9        IT IS SO ORDERED.

10

11

12    DATE: April 18, 2001

13                                                Hon. THOMAS J. WHELAN
                                                  United States District Court
14                                                Southern District of California

15

16

17    CC:    HON. LOUISA S. PORTER, UNITED STATES MAGISTRATE JUDGE
              ALL PARTIES AND COUNSEL OF RECORD
18

19

20

21

22

23

24    ――――――――――――――――――

25        [5]    The Court additionally denies the parties' requests for sanctions under Rule
      11 of the Federal Rules of Civil Procedure.  All pleadings submitted to this Court (1) had
26    bases in law and fact, (2) were the result of reasonable inquiry and (3) were properly
      motivated.  See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402 (1990); see also FED.
27    R. CIV. P. 11(b).  Moreover the Court finds the timing of the parties' sanction requests do
      not rise to the level warranting the imposition of sanctions in this case.
28

# EXHIBIT H

JUDGMENT

**COSTS TAXED**

====================================================================

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

2002 JUN 17 PM 3: 18

FILED

---------------

NO. 01-55745
CT/AG#: CV-00-01910-TJW(LSP)

WALTER ROSALES; MARIE TOGGERY; KAREN TOGGERY

      Plaintiffs - Appellants

  v.

KEAN ARGOVITZ RESORTS, INC., a limited liability company;
LAKES GAMING, INC., a publicly traded company; KEAN-ARGOVITZ
RESORT-JAMUL LLC, a Nevada limited liability company; LAKES
KEAN-ARGOVITZ RESORTS-CALIFORNIA LLC, a Delaware limited
liability company

      Defendants - Appellees

---------------------

    APPEAL FROM the United States District Court for the
Southern District of California (San Diego) .

    THIS CAUSE came on to be heard on the Transcript of the
Record from the United States District Court for the
Southern District of California (San Diego)
and was duly submitted.

    ON CONSIDERATION WHEREOF, It is now here ordered and
adjudged by this Court, that the judgment of the said
District Court in this cause be, and hereby is  AFFIRMED.

Filed and entered      May 21, 2002

A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

JUN 1 2 2002

by:

ENTERED ON

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
## BILL OF COSTS

**NOTE:** If you wish to file a bill of costs, it MUST be submitted on this form and filed, with the clerk, with proof of service, within 14 days of the date of entry of judgment, and in accordance with Circuit Rule 39-1. A late bill of costs must be accompanied by a motion showing good cause. Please refer to FRAP 39, 28 U.S.C. 1920, and Circuit Rule 39-1 when preparing your bill of costs.

Walter Rosales, et al.

v. Kean Argovitz Resorts, Inc., et al.          CA No. __01-55745__

The Clerk is requested to tax the following costs against: __Plaintiffs-Appellants__

| COST TAXABLE UNDER FRAP 39, 28 U.S.C. 1920, Circuit Rule 39-1 | REQUESTED Each column must be completed | | | | ALLOWED To be completed by the clerk | | | |
|---|---|---|---|---|---|---|---|---|
| | No. Of Documents* | Pages per Document | Cost per Page** | Total Cost | No. Of Documents | Pages for Document | Cost for Page | Total Cost |
| Excerpt of Record | | | | | | | | |
| Appellee's Brief | 18 | 54 | $0.20 | $194.40 | | | | |
| Appellant's Brief | | | | | | | | |
| Appellant's Reply Brief | | | | | | | | |
| Other Excerpt of Record Appellees' Supplemental | 7 | 170 | $0.20 | $238.00 | | | | |

TOTAL: $ 432.40          TOTAL: $

**Other:** Any other requests must be accompanied by a statement explaining why the item(s) should be taxed pursuant to Circuit Rule 39-1. Additional items without such supporting statements will not be considered.

*If more than 7 excerpts or 20 briefs are requested, a statement explaining the excess number must be submitted.
**Costs per page may not exceed 20¢ or actual cost, whichever is less. Circuit Rule 39-1.

Attorneys Fees cannot be requested on this form.

I, __Justin H. Perl__, swear under penalty of perjury that the services for which costs are taxed were actually and necessarily performed, and that the requested costs were actually expended as listed. The printer's itemized statement showing actual costs per page is attached.

Signature: _____

Name of Counsel (printed or typed) __Justin H. Perl__

Date: _____   Attorney for Defendants-Appellees

Date: __6/12/02__

Costs are taxed in the amount of $ __432.40__

Clerk of Court

By: _____ Deputy Clerk

wpdocs\formsbill  REV. 1/95

JUN 12 2002

A TRUE COPY
ATTEST
CATHY A. CATTERSON
Clerk of Court

by: _____ Deputy Clerk

For Official Use Only

**FILED**

**NOT FOR PUBLICATION**

MAY 21 2002

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| WALTER ROSALES; MARIE TOGGERY; KAREN TOGGERY, | No. 01-55745 |
| Plaintiffs - Appellants, | D.C. No. CV-00-01910-TJW(LSP) |
| v. | |
| KEAN ARGOVITZ RESORTS, INC., a limited liability company; LAKES GAMING, INC., a publicly traded company; KEAN-ARGOVITZ RESORT-JAMUL, LLC, a Nevada limited liability company; LAKES KEAN-ARGOVITZ RESORTS-CALIFORNIA, LLC, a Delaware limited liability company, | MEMORANDUM* |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

---

\* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

Submitted May 10, 2002**
Pasadena, California

Before: KLEINFELD and GRABER, Circuit Judges, and BOLTON,*** District Judge.

We have carefully reviewed the Second Amended Complaint and the parties' briefs, and for the reasons stated by the district court, we agree that the plaintiffs failed to state a claim upon which relief could be granted. The decision of the district court is AFFIRMED.



A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

JUN 1 2 2002

by: _____
Deputy Clerk

---

** This panel unanimously finds this case suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).

*** The Honorable Susan Ritchie Bolton, United States District Judge for the District of Arizona, sitting by designation.

2

# EXHIBIT I



123 S.Ct. 437                                                                                                          Page 1
537 U.S. 975, 123 S.Ct. 437, 154 L.Ed.2d 332, 71 USLW 3281, 71 USLW 3163, 71 USLW 3277
**(Cite as: 537 U.S. 975, 123 S.Ct. 437)**


**H**
Briefs and Other Related Documents
Rosales v. Kean Argovitz Resots, Inc.U.S.,2002
Supreme Court of the United States
Walter **ROSALES**, Marie Toggery, and Karen
Toggery, petitioners,
v.
KEAN ARGOVITZ RESORTS, INC., et al.
**No. 02-280.**


Oct. 21, 2002.


Case below, 35 Fed.Appx. 562.


Petition for writ of certiorari to the United States
Court of Appeals for the Ninth Circuit denied.

U.S.,2002
Rosales v. Kean Argovitz Resots, Inc.
537 U.S. 975, 123 S.Ct. 437, 154 L.Ed.2d 332, 71
USLW 3281, 71 USLW 3163, 71 USLW 3277

Briefs and Other Related Documents (Back to top)

• 2002 WL 32134177 (Appellate Petition, Motion
and Filing) Brief in Opposition and Supplemental
Appendix (Sep. 18, 2002) Original Image of this
Document with Appendix (PDF)
• 02-280 (Docket) (Aug. 23, 2002)
• 2002 WL 32134175 (Appellate Petition, Motion
and Filing) Petition for Writ of Certiorari (Apr. 11,
2002) Original Image of this Document with
Appendix (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

1

2

3

4

5

6

7

FILED

02 FEB 14 AM 9: 34

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT CF CALIFORNIA

BY:                              DEPUTY

8

9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

| | |
|---|---|
| WALTER ROSALES, MARIE TOGGERY, and KAREN TOGGERY,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>　　　　　　　　　　Defendants. | CASE NO. 01-951-IEG (JAH)<br><br>**ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; and (2) DENYING DEFENDANTS' MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS**<br><br>[Doc. No. 17] |

18

19

20

21

22

23

　　　　Presently before the Court is defendants United States, Department of the Interior, Bureau of Indian Affairs, and National Indian Gaming Commission's (collectively referred to as "defendants") motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h) or, in the alternative, for judgment on the pleadings under Rule 12(c) or summary judgment under Rule 56. For the reasons discussed below, the Court grants defendants' motion for summary judgment.

24

## BACKGROUND

25

26

27

28

　　　　On May 30, 2001, plaintiffs Walter Rosales, Marie Toggery, and Karen Toggery ("plaintiffs") filed a complaint for declaratory and injunctive relief pursuant to the Indian Reorganization Act of 1934. In their complaint, plaintiffs seek (1) a declaration of plaintiffs' entitlement to the allotment of parcel number 597-080-01; (2) to compel defendants to issue to



-1-

ENTERED ON 2/19/02    01cv0951

1    plaintiffs a trust patent for the above-mentioned parcel; (3) to enjoin defendants from further

2    denying plaintiffs' entitlement to the parcel; (4) money damages for deprivation of the use and

3    benefit of their parcel; and (5) reasonable attorneys' fees, costs, and expenses. In their complaint,

4    plaintiffs allege that "on February 5, 2001, the United States took action, and first published notice,

5    denying plaintiffs' entitlement and excluding them from their allotment of land in parcel 597-080-

6    01." (Compl. at 6 ¶ 18.) This notice, attached to defendants' motion as Exhibit A, was issued by

7    the Bureau of Indian Land Affairs pursuant to 25 C.F.R. §§ 151.10 and 151.11 and invited the

8    public to comment on the pending application by the Jamul Indian Village Reservation for the

9    United States to take certain parcels into trust for the benefit of the Reservation. The pending

10   application does not include the parcel to which plaintiffs claim allotment rights, but plaintiffs

11   allege that the publication of the notice apprised them of the government's failure to issue a patent

12   to plaintiffs for an allotment to parcel 597-080-01. The leadership of the Jamul Reservation has

13   been pursuing the trust application in an effort to commence gaming activities on tribal land.

14   However, plaintiffs contend that they do not challenge the pending application for trust status of

15   the potential gaming property but rather the government's failure to issue a patent to plaintiffs for

16   an allotment on a separate piece of land, parcel 597-080-01.

17       On August 10, 2001, defendants filed a motion to dismiss pursuant to Federal Rules of

18   Civil Procedure 4(i), 8(a), 12(b)(2), and 12(b)(6), for failure to comply with minimum federal

19   pleading requirements, lack of personal jurisdiction, insufficient service of process, and failure to

20   state a claim upon which relief may be granted. In their motion to dismiss, defendants also

21   contended that the Doe defendants named by plaintiffs in their complaint are improper and should

22   be dismissed. Plaintiffs filed an opposition to the motion on October 1, 2001. Defendants filed

23   their reply on October 15, 2001. In their reply, defendants withdrew the portion of their motion to

24   dismiss based on lack of personal jurisdiction and insufficient service of process under Rules 4(i),

25   12(b)(2), and 12(b)(5), in light of the additional information regarding service of the summons and

26   complaint that plaintiffs attached to their opposition to defendants' motion. On October 16, 2001,

27   the Court denied defendants' motion.

28       On November 9, 2001, defendants filed the instant motion to dismiss or, in the alternative,

01cv0951

1  for judgment on the pleadings or summary judgment.  In their motion, defendants contend that they

2  are entitled to dismissal, judgment on the pleadings, or summary judgment on the basis that (1) the

3  case is not ripe for adjudication; (2) plaintiffs lack standing; and (3) plaintiffs have not exhausted

4  their administrative remedies.  Defendants further contend in their motion that plaintiffs cannot

5  claim allotment rights to parcel number 597-080-01 because such ownership was abolished in

6  1934.  Finally, defendants argue in their motion that defendant National Indian Gaming

7  Commission ("NIGC") is also entitled to dismissal, judgment on the pleadings or summary

8  judgment because it does not play a role in determining whether land should be acquired by the

9  United States in trust.  In their opposition, plaintiffs contend that defendants mischaracterized the

10  nature of their claims.  Plaintiffs emphasize that they are not challenging the application for trust

11  status currently pending before the Bureau of Indian Affairs.  Rather, plaintiffs contend that the

12  gravamen of their complaint is that the government failed to issue them a patent for an allotment to

13  parcel number 597-080-01, which was conveyed to the United States in trust in 1978.  In support

14  of plaintiffs' claim to this allotment, plaintiffs attach to their complaint the 1978 deed by which

15  parcel number 597-080-01 was conveyed to the United States "in trust for such Jamul Indians of

16  one-half degree or more Indian blood as the Secretary of the Interior may designate."  (See Compl.,

17  Ex. B.)

18       Responding to plaintiffs' recharacterization of their claim, defendants contend in their reply

19  that plaintiffs' argument that they are entitled to a patent for their allotment to parcel number 597-

20  080-01 lacks merit because Congress abolished the allotment form of ownership in 1934.  Here,

21  the United States took parcel number 597-080-01 into trust pursuant to 25 U.S.C. § 465.  (See

22  Compl., Ex. B.)  Defendants emphasize that, unlike land that was allotted prior to 1934 under the

23  General Allotment Act, land held in trust pursuant to § 465 does not become allotted land but

24  rather land owned by the United States for the benefit of tribes.  Defendants also contend that no

25  other allotment statute applies to the facts of this case.  Thus, plaintiffs are not entitled to the

26  issuance of a patent for parcel number 597-080-01 because the land was taken into trust by the

27  United States for the benefit of the Jamul Tribe, rather than for the individual plaintiffs.

28  ////

**DISCUSSION**

I.    **Legal Standards**

     A.    **Motion to Dismiss under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction**

        Rule 12(b)(1) of the Federal Rules of Civil Procedure allows for dismissal where there is a "lack of jurisdiction over the subject matter." See Fed. R. Civ. P. 12(b)(1). In ruling on defendant's motion, the Court is guided by well-established principles:

> Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994).

        Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in doing so rely on affidavits or any other evidence properly before the court." St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989). Thus, the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims. Id. Because the plaintiff bears the burden of establishing subject matter jurisdiction, no presumption of truthfulness attaches to the allegations of the plaintiff's complaint, and the Court must presume that it lacks jurisdiction until the plaintiff establishes jurisdiction. Stock West, Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989).

        Whether a claim is ripe for adjudication is an issue of subject matter jurisdiction under the case or controversy clause of Article III of the federal Constitution. St. Clair, 880 F.2d at 201. As any other challenge to a Court's jurisdiction over the subject matter of a case, motions raising ripeness as an issue are properly brought under Rule 12(b)(1). Id. Once a party raises this issue, "[i]t then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." Id. In deciding whether the case is ripe, the Court may look to this "extra-pleading material in deciding the issue, even if it becomes necessary to resolve factual

- 4 -

1   disputes." Id. Similarly, issues of standing go to the Court's jurisdiction over the subject matter of

2   the case and are properly raised in a motion to dismiss under Rule 12(b)(1). White v. Lee, 227

3   F.3d 1214, 1242 (9th Cir. 2000).

4        Pursuant to Rule 12(h), the Court must dismiss the action "[w]henever it appears by

5   suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter." Fed.

6   R. Civ. P. 12(h). Thus, although defendants previously filed a motion to dismiss based upon Rules

7   8(a) and 12(b)(6) and subsequently filed an answer to the complaint on November 1, 2001, the

8   instant motion is nonetheless properly before the Court. Furthermore, because lack of subject

9   matter jurisdiction is a matter in abatement, the Court may not rule on a summary judgment motion

10   "or any other matter going to the merits" where the Court determines that it lacks jurisdiction over

11   the subject matter. Capitol Indus.-EMI, Inc. v. Bennett, 681 F.2d 1107, 1118 (9th Cir. 1982).

12       **B.**    **Motion for Judgment on the Pleadings pursuant to Rule 12(c)**

13        Federal Rule of Civil Procedure 12(c) allows a motion for judgment on the pleadings to be

14   filed "after the pleadings are closed." Fed. R. Civ. P. 12(c). The motion may be brought by either

15   party "when all material allegations of fact are admitted in the pleadings and only questions of law

16   remain." Wright & Miller, 5A Federal Practice and Procedure § 1367, at 510-511; see also

17   Doleman v. Meiji Mut. Life Ins. Co., 727 F.2d 1480, 1482 (9th Cir. 1984) (quoting an earlier

18   version of Wright & Miller for the proposition that a 12(c) motion should only be granted where

19   "the movant clearly establishes that no material issue of fact remains to be resolved and that he is

20   entitled to judgment as a matter of law."); accord Vashistha v. Allstate Ins. Co., 989 F. Supp. 1029,

21   1031 (C.D. Cal. 1997). In ruling on a Rule 12(c) motion, the courts must accept all well-pleaded

22   factual allegations as true and determine whether the moving party is entitled to judgment under

23   those facts. See General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist

24   Cong. Church, 887 F.2d 228, 230 (9th Cir. 1989), cert. denied, 493 U.S. 1079 (1990). Judgment

25   on the pleadings is proper when the moving party clearly establishes on the face of the pleadings

26   that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of

27   law. Doleman, 727 F.2d at 1482.

28       If "matters outside the pleadings are presented to and not excluded by the court, the motion

01cv0951

1  shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R.

2  Civ. P. 12(c); see also Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542,

3  1550 (9th Cir. 1990) ("[J]udgment on the pleadings is improper when the district court goes

4  beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion

5  for summary judgment.") (internal citations omitted).

6      C.    **Summary Judgment pursuant to Rule 56**

7      Summary judgment is proper where "there is no genuine issue as to any material fact

8  and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A

9  material issue of fact is present when a factual determination must be made by a jury to determine

10  the rights of the parties under the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

11  248 (1986); Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993). A dispute is only

12  "genuine"when "the evidence presented is such that a jury applying that evidentiary standard could

13  reasonably find for either the plaintiff or the defendant." Anderson, 477 U.S. at 255.  In deciding a

14  motion for summary judgment, the Court must examine all the evidence in a light most favorable

15  to the non-moving party.  See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

16      A moving party who bears the burden of proof at trial is entitled to summary judgment

17  only when the evidence indicates that no genuine issue of material facts exists. Fed. R. Civ. P.

18  56(c); Celotex, 477 U.S. at 325.  If the moving party does not bear the burden of proof at trial, he

19  may discharge his burden of showing that no genuine issue of material fact remains by

20  demonstrating that "there is an absence of evidence to support the non-moving party's case."

21  Celotex, 477 U.S. at 325.  The moving party is not required to produce evidence showing the

22  absence of genuine issue of material fact on such issues, nor must the moving party support its

23  motion with evidence negating the nonmoving party's claim.  Lujan v. National Wildlife Fed'n,

24  497 U.S. 871, 885 (1990); United Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th

25  Cir.), cert. denied, 493 U.S. 809 (1989).  Instead, "the motion may, and should, be granted so long

26  as whatever is before the District Court demonstrates that the standard for the entry of judgment, as

27  set forth in Rule 56(c), is satisfied." Lujan, 497 U.S. at 885 (quoting Celotex, 477 U.S. at 323).

28      Once the moving party meets the requirement of Rule 56 by either showing that no genuine

1   issue of material fact remains or that there is an absence of evidence to support the non-moving

2   party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts

3   showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

4   (1986). It is not enough for the party opposing a properly supported motion for summary judgment

5   to "rest on mere allegations or denials of his pleadings." Id. Genuine factual issues must exist that

6   "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

7   party." Id. at 250. To make such a showing, the nonmoving party must go beyond the pleadings to

8   designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 325.

9   Such evidence need not be in a form admissible at trial to avoid summary judgment. Id. The

10  moving party is entitled to judgment as a matter of law if the nonmovant fails to make a sufficient

11  showing of an element of its case with respect to which it has the burden of proof. Id.

12  Standing

13  II.   Analysis

14        A.   Motion to Dismiss under Rule 12(b)(1) for Lack of Subject Matter
                Jurisdiction
15

16        1.   Ripeness

17        Defendants first contend that plaintiffs' claim should be dismissed for lack of subject

18  matter jurisdiction because the notice published by the Bureau of Indian Affairs indicates that no

19  action has been taken on the pending application for trust status referred to by the notice. Absent a

20  final agency decision on the matter referred to by the notice, defendants contend, plaintiffs may not

21  allege a claim arising from the defendants' publishing of a notice "denying plaintiffs' entitlement

22  and excluding them from their allotment of land in parcel 597-080-01." In their opposition,

23  plaintiffs clarify that their claim is not based on the pending application for trust status but rather

24  on the government's failure to issue a patent to parcel 597-080-01 when it accepted the parcel into

25  trust in 1978. The publishing of the notice, plaintiffs emphasize, does not form the gravamen of

26  their complaint. Rather, it merely put them on notice that no patent had issued from the

27  government's acceptance of the parcel into trust. In light of plaintiffs' clarification of the nature of

28  their claim in their opposition, it is clear that dismissal based on the ripeness doctrine is

1   inappropriate.  Because plaintiffs are challenging the government's failure to issue a patent to

2   parcel 597-080-01, rather than the pending application by the Jamul Tribe for trust status for

3   parcels 597-060-04-00, 597-060-05-00, and 597-042-13-00 (see Defs.' Ex. A), ripeness is not a

4   basis upon which the Court may grant dismissal.

5          **2.**     **Standing**

6         Defendants next contend that the Court lacks subject matter jurisdiction over plaintiffs'

7   action because plaintiffs lack standing.  Defendants' standing argument is similar to its ripeness

8   argument in that defendants contend plaintiffs have not been injured because there has been no

9   final agency decision on the proposed trust acquisition of parcels 597-060-04-00, 597-060-05-00,

10   and 597-042-13-00.  Absent a final agency decision on the pending application, defendants

11   contend, plaintiffs cannot show that they have suffered an injury in fact.  Plaintiffs' opposition to

12   this basis for dismissal parallels their opposition to defendants' ripeness argument.  Plaintiffs

13   emphasize that they are not challenging the pending application for trust status for parcels 597-

14   060-04-00, 597-060-05-00, and 597-042-13-00.  Rather, plaintiffs assert, the notice of the pending

15   trust application posted on February 5, 2001 merely informed them that the Jamul Tribe planned to

16   relocate plaintiffs' home sites onto the newly acquired trust land in order to construct gaming

17   facilities on the site of plaintiffs' alleged allotment.  (See Defs.' Ex. A at 3) (stating that the

18   proposed construction of gaming facilities "will result in the relocation of our tribal headquarters

19   and current home sites onto the proposed new trust lands").

20         Article III of the Constitution limits the jurisdiction of the federal courts to actual cases or

21   controversies.  U.S. Const. art III, § 2, cl. 1.  In order to meet the requirement for a justiciable case

22   or controversy, plaintiffs must have standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560

23   (1992) ("[T]he core component of standing is an essential and unchanging part of the

24   case-or-controversy requirement of Article III.").  The "irreducible constitutional minimum" of

25   standing requires that: (1) plaintiff has suffered an "injury in fact;" (2) the injury is "fairly

26   traceable" to the challenged conduct of the defendant, and not the result of the independent action

27   of some third party; and (3) it is likely, as opposed to merely speculative, that the injury will be

28   redressed by a favorable decision.  Medina v. Clinton, 86 F.3d 155, 157 (9th Cir. 1996) (citing

1    Lujan, 504 U.S. at 560-61). At the pleading stage, general factual allegations of injury resulting

2    from the defendant's conduct may suffice to meet the plaintiffs' burden of proof as the party

3    invoking federal jurisdiction. See Lujan, 504 U.S. at 561.

4    Given plaintiffs' recharacterization of their claim in their opposition, the Court finds that

5    plaintiffs meet the three requirements for standing. Assuming plaintiffs' allegation that the United

6    States holds land in trust for them individually to be true, plaintiffs have suffered an injury in fact

7    by the government's failure to issue a patent to plaintiffs for parcel number 597-080-01. If the

8    government indeed accepted parcel number 597-080-01 into trust for the benefit of the individual

9    plaintiffs, interference with plaintiffs' use of the land may be fairly traceable to the government's

10   alleged failure to generate the requisite patents to plaintiffs for the parcel. Finally, declaratory

11   relief from the Court regarding plaintiffs' rights in the parcel may redress plaintiffs' injury in this

12   case. To the extent that there exists a factual dispute regarding whether parcel number 597-080-01

13   was taken into trust for the benefit of plaintiffs or for the Jamul Tribe, this issue may be resolved

14   considering the evidence presented by defendants in support of their motion for summary

15   judgment.

16   **3.    Failure to Exhaust Administrative Remedies**

17   Finally, defendants argue that plaintiffs cannot pursue the instant action until they have

18   exhausted their administrative remedies with respect to the proposed trust application for parcels

19   597-060-04-00, 597-060-05-00, and 597-042-13-00. As defendants note, the Jamul Tribe's

20   application for the United States to take the above parcels into trust is still pending before the

21   Secretary of the Interior. The February 5, 2001 notice referred to by plaintiffs in their complaint is

22   merely one step in the process for trust applications with the Secretary of the Interior, defendants

23   emphasize. Even after the Secretary issues a final decision regarding the trust status of the

24   pertinent land, the decision can then be appealed to the Interior Board of Indian Appeals. (See

25   Defs.' Mem. P. & A. at 9-10.) Only after the decision regarding trust status cannot be appealed to

26   a superior authority in the Department of the Interior can the decision be considered a final

27   decision subject to judicial review under the Administrative Procedure Act ("APA"). Defendants

28   contend that because the Secretary of the Interior has not rendered a final decision regarding the

-9-

1    application for trust status for parcels 597-060-04-00, 597-060-05-00, and 597-042-13-00, the

2    Court may not adjudicate a challenge to the Secretary's decision at this time.

3    ·    While defendants' analysis would be sound if plaintiffs' claim arose directly from the

4    pending trust application, plaintiffs' opposition clarifies their position and establishes that their

5    claim does not arise from the pending trust application but rather from the United States'

6    acceptance of parcel number 597-080-01 into trust in 1978.  Consequently, plaintiffs' failure to

7    wait for a final agency decision with respect to the application for trust status for parcels 597-060-

8    04-00, 597-060-05-00, and 597-042-13-00 is not a basis upon which dismissal of the instant case is

9    warranted.  Because plaintiffs' claim does not arise from the pending application for trust status,

10    defendants' argument based upon administrative exhaustion does not provide grounds for

11    dismissal, judgment on the pleadings, or summary judgment.

12    **B.    Plaintiffs' Entitlement to Allotment**

13    Defendants argue that even if the case were ripe and plaintiffs had standing and had

14    exhausted their administrative remedies, dismissal, judgment on the pleadings, or summary

15    judgment is appropriate because plaintiffs cannot claim allotment[1] rights in parcel number 597-

16    080-01.  Defendants contend that allotment as a form of ownership was abolished in 1934 and thus

17    the conveyance of parcel number 597-080-01 in 1978 could not have vested plaintiffs with

18    allotment rights entitling them to the issuance of a fee patent.  In their opposition, plaintiffs argue

19    that Section 461 of the Indian Reorganization Act of 1934 ended the United States' policy of

20    granting allotments *of Indian land* to individual Indians, but the United States has continued to

21    hold land in trust for both tribes and individual Indians subsequent to 1934.  In particular, 25

22    U.S.C. § 465 contemplates that the United States may hold land in trust for individual Indians.  25

23    U.S.C. § 465 ("Title to any lands or rights acquired pursuant to sections 461, 462, 463, 464, 465,

24    466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be taken in the name of the

25    United States in trust for the Indian tribe or individual Indian for which the land is acquired, and

26

27    _____

28    [1]As explained by the Supreme Court in <u>Affiliated Ute Citizens of Utah v. United States</u>,
"Allotment is a term of art in Indian law.  It means a selection of specific land awarded to an individual
allottee from a common holding." 406 U.S. 128, 142-43 (1972).

- 10 -

1        As shown by the above cases, plaintiffs' claim is, at best, a claim that is not yet ripe for

2    adjudication.  Even if the General Allotment Act remained unaffected by the Indian Reorganization

3    Act of 1934, plaintiffs would have no right to a fee patent for at least 25 years after the land was

4    taken into trust by the United States.  Given that parcel number 597-080-01 was accepted into trust

5    no earlier than 1978, (see Compl., Ex. B), plaintiffs would not be able to obtain a fee patent until at

6    least 2003.  Furthermore, as indicated by Yakima, when Congress passed the Indian

7    Reorganization Act of 1934, it "extended indefinitely the existing periods of trust applicable to

8    already allotted (but not yet fee patented) Indian lands." Yakima, 502 U.S. at 255.  Thus, even if

9    plaintiffs had received an allotment under the General Allotment Act, the trust period was

10    extended indefinitely by the IRA, and plaintiffs would have no right to compel issuance of a fee

11    patent for the parcel.  See id.

12        Furthermore, it is clear from the 1978 deed that the pertinent statute under which parcel

13    number 597-080-01 was accepted into trust by the United States, 25 U.S.C. § 465,[2] does not

14    provide for the issuance of fee patents to beneficiaries of the land.  Although 25 U.S.C. § 348

15    contemplates a twenty-five year trust period after which a fee patent would be issued to the

16    beneficiary of the trust, section 348 is a part of the General Allotment Act of 1887 and is limited in

17    its application to "allotments provided for in *this* Act." See 25 U.S.C. § 348 (emphasis added).  In

18    contrast, section 465, which sets forth the conditions under which parcel number 597-080-01 was

19    accepted into trust by the United States, does not contemplate a point at which the United States

20    will cease holding the land in trust and issue a fee patent to the beneficiaries of the land.  Rather,

21    section 465 merely states,

22         The Secretary of the Interior is hereby authorized, in his discretion,
         to acquire, through purchase, relinquishment, gift, exchange, or
23         assignment, any interest in lands, water rights, or surface rights
         to lands, within or without existing reservations, including trust
24         or otherwise restricted allotments, whether the allottee be living

25

---

26        [2]Significantly, 25 U.S.C. § 465 contemplates the United States taking land into trust for the
benefit of tribes *or* individual Indians.  See 25 U.S.C. § 465 (stating that "title shall be taken in the
27    name of the United States in trust for the Indian tribe or individual Indian for which the land is
acquired . . ."); see also Chase v. McMasters, 573 F.2d 1011, 1015 (8th Cir. 1978) (rejecting party's
28    contention that section 465 does not authorize the Secretary of the Interior to acceptance conveyance
of title to land already owned in fee by an individual Indian for his benefit).

1    or deceased, for the purpose of providing land for Indians.

2    25 U.S.C. § 465. Plaintiffs point to no section *within the 1934 Act* providing for the issuance of a

3    fee patent to Indians for whose benefit the United States holds land in trust under § 465.[3] Nor is

4    the Court aware of any such provision. To the contrary, section 465 "set[s] forth a procedure by

5    which lands held by Indian tribes may become tax exempt." Cass County v. Leech Lake Band of

6    Chippewa Indians, 524 U.S. 103, 114 (1998). Under section 5 of the pre-1934 General Allotment

7    Act, 25 U.S.C. § 348, land upon which a fee patent is issued not only becomes alienable and

8    encumberable upon the issuance of the fee patent, but it also becomes subject to taxation. See

9    Yakima, 502 U.S. at 263 and n.1. The issuance of a fee patent for land taken into trust under

10   section 465 would directly contradict section 465's policy of providing tax exempt land for Indians

11   and Indian tribes. See Cass County, 524 U.S. at 114-15. Thus, plaintiffs are not entitled to

12   governmental issuance of a fee patent to parcel number 597-080-01, property taken into trust by

13   the United States under section 465.

14       Finally, considering the evidence presented by defendants in their motion, plaintiffs cannot

15   claim rights in parcel number 597-080-01 separately from those of the Jamul Tribe. First,

16   considering the language of the 1978 deed, it is clear that parcel number 597-080-01 was not

17   conveyed in trust to the United States solely for the benefit of the individual plaintiffs but rather for

18   the Jamul Tribe as a whole. The 1978 deed conveys this parcel to "[t]he United States of America

19   in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the

20   Interior may designate." (Compl., Ex. B.) Simply because plaintiffs are by birth one-half degree

21   or more Jamul Indian blood and have had continuous possession of the land does not result in the

22   conclusion that they alone are entitled to control over the parcel. Rather, the language in the 1978

23

24

25   ───────────

         [3] It is unclear from plaintiffs' complaint and briefs whether they seek to compel the government
     to issue a fee patent or a trust patent. At one point in their complaint, they state that they are
26   seeking issuance of a trust patent. (See Compl. at 8, ¶ 2.) However, plaintiffs cite to 25 U.S.C. § 348,
     which provides for the issuance of a fee patent after the expiration of a twenty-five year trust period.
27   (See id. at 4, ¶ 9.) Furthermore, plaintiffs cite in their briefs to case law pertaining to the issuance of
     fee patents. (See Pls.' Opp'n to Mot. Summary Judgment at 4.) Regardless of whether plaintiffs seek
28   to compel the issuance of a fee or trust patent, it is clear that plaintiffs' claim fails on either basis in
     light of the 1978 deed's language designating the Tribe, rather than the individual plaintiffs, as the
     beneficiaries of parcel number 597-080-01.

1  trust conveyance deed clearly refers to the Jamul Tribe, especially in light of the fact that the 1978

2  deed also references 25 U.S.C. § 479, which defines "Indian[s]" as "all persons of Indian descent

3  who are members of any recognized Indian tribe." 25 U.S.C. § 479. Section 479a further provides

4  that the Secretary of the Interior is vested with the authority to recognize Indian tribes. 25 U.S.C. §

5  479a(2). Thus, the 1978 deed's reference to "such Jamul Indians of one-half degree or more Indian

6  blood as the Secretary of the Interior may designate" is a reference to the *tribe*, rather than to the

7  individual half-blooded Jamul Indians then residing on the land.

8       In addition to the 1978 deed, the 1978 letter from the United States Department of the

9  Interior, attached to defendants' reply as Exhibit L, also shows that parcel number 597-080-01 was

10  taken into trust for the benefit of the Jamul Tribe, rather than for the individual plaintiffs. This

11  letter notes that, as of March 15, 1978, the Department of the Interior "ha[d] received eleven

12  signatures out of the thirteen ½ bloods for the Bureau of Indian Affairs to proceed with the

13  proposed acquisition through a donation to establish the Jamul Indian Reservation." (Defs.' Ex.

14  L.) Thus, plaintiffs cannot claim an individual right, allotment or otherwise, to parcel 597-080-01.

15  Rather, the parcel is held by the United States in trust for the benefit of the Jamul Tribe.[4] See F.

16  Cohen, Handbook of Federal Indian Law, at 472 (1982 ed.) ("The manner in which a tribe chooses

17  to use its property can be controlled by individual tribe members only to the extent that the

18  members participate in the governmental processes of the tribe."). Because there is no genuine

19  issue of material fact with respect to plaintiffs' rights in parcel number 597-080-01 and defendants

20  are entitled to judgment as a matter of law, summary judgment is appropriate in this case.[5]

21  ////

22

---

23  [4]To the extent that plaintiffs challenge the identity of the Jamul Tribe members and their

24  leadership, this Court is not the proper forum for such a challenge. Rather, plaintiffs should continue
    to attempt to resolve their dispute regarding tribal leadership in the pending proceedings before the
    Interior Board of Indian Appeals. (See Pls.' Ex. D.)

25

26  [5]Because the Court finds that plaintiffs have raised no genuine issue of fact with respect to their
    entitlement to an allotment of parcel number 597-080-01, the Court does not address defendants'

27  additional argument that the National Indian Gaming Commission is separately entitled to judgment
    on the pleadings. Even if plaintiffs could establish allotment rights in parcel number 597-080-01,

28  plaintiffs have not shown that their claim is ripe for judicial review given that the NIGC has not issued
    a final decision regarding the proposed gaming contract that is reviewable under Sections 701 through
    706 of the Administrative Procedure Act.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

Accordingly, for the reasons stated above, the Court **GRANTS** defendants' motion for summary judgment. The Court **DENIES** defendants' motion to dismiss, or in the alternative, for judgment on the pleadings.

**IT IS SO ORDERED.**

Dated: _Feb. 13, 2002_

IRMA E. GONZALEZ
United States District Judge

cc:    Magistrate Judge Houston
       all parties

- 15 -

01cv0951

# EXHIBIT K



73 Fed.Appx. 913                                                                                                Page 1
73 Fed.Appx. 913, 2003 WL 21920015 (9th Cir.(Cal.))
(Cite as: 73 Fed.Appx. 913,  2003 WL 21920015 (9th Cir.(Cal.)))

**H**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. (FIND CTA9 Rule 36-3.)

United States Court of Appeals,
Ninth Circuit.
Walter ROSALES;  et al., Plaintiffs--Appellants,
v.
UNITED STATES of America;  et al., Defendants--
Appellees.
No. 02-55800.
D.C. No. CV-01-00951-IEG.

Argued and Submitted July 8, 2003.
Decided Aug. 11, 2003.

Plaintiffs appealed dismissal, by the United States District Court for the Southern District of California, Irma E. Gonzalez, J., of their action in land dispute involving an Indian tribe. The Court of Appeals held that tribe was a necessary and indispensable party and could not be forced to appear.

Affirmed.

West Headnotes

[1] Indians  27(5)
209k27(5) Most Cited Cases
Dismissal of lawsuit in land dispute was required where absent Indian tribe was a necessary and indispensable party; tribe claimed jurisdiction over parcel of land at issue, that interest would be impaired if plaintiffs were declared to be the beneficial owners of the land, tribe had sovereign immunity and could not be forced to join the action without its consent, and United States could not be an adequate representative of the tribe's interest

inasmuch as government could not represent the interests of one tribe in an intertribal dispute. Fed.Rules Civ.Proc.Rule 19(a)(2)(i), 28 U.S.C.A.

[2] Indians  27(5)
209k27(5) Most Cited Cases
Dismissal of lawsuit in land dispute was required where absent Indian tribe was a necessary and indispensable party, even though plaintiffs appeared to have no other remedy; tribe would be prejudiced if plaintiffs were declared to be the beneficial owners of the land, relief could not be shaped to avoid that prejudice, and tribe's interest in maintaining its sovereign immunity outweighed plaintiffs' interest in litigating their claims.  Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.
*914 Appeal from the United States District Court for the Southern District of California, Irma E. Gonzalez, District Judge, Presiding.

Before SILVERMAN,  W.  FLETCHER,  and RAWLINSON, Circuit Judges.

MEMORANDUM [FN*]

FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

**1 Plaintiffs-Appellants Walter Rosales et al., appeal from an order of the district court granting the United States' motion for summary judgment and dismissing their claims.  Because we find that the Jamul Indian Village (the "Village") is a necessary and indispensable party pursuant to Fed.R.Civ.P. 19, we affirm the district court's order dismissing this action.  Although the district court did not address whether the Village was a necessary and indispensable party, we have authority to address the issue on appeal.  *See Pit River Home and Agric. Coop. Assoc. v. United States,* 30 F.3d 1088, 1099 (9th Cir.1994).

[1] The Village is a necessary party pursuant to Rule 19(a)(2)(i), which provides that an absent party is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

necessary if "the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect that interest[.]" Fed.R.Civ.P. 19(a)(2)(i). The Village has claimed jurisdiction over the parcel of land at issue in this action since at least 1981. This interest would be impaired if Appellants were declared to be the beneficial owners of the land.

The Village enjoys sovereign immunity from suit and cannot be forced to join this action without its consent. *See* Clinton v. Babbitt, 180 F.3d 1081, 1090 (9th Cir.1999). Furthermore, the United States is not an adequate representative of the Village's interests in this action because the United States cannot adequately represent the interests of one tribe in an intertribal dispute. *See* Pit River, 30 F.3d at 1101.

[2] The Village is also an indispensable party pursuant to Rule 19(b), which requires the court to examine the following factors in order to determine whether this action should be dismissed:  (1) prejudice to the absent party or those already parties; (2) the extent to which relief could be *915 shaped to avoid prejudice;  (3) adequacy of the judgment rendered without the absent party;  and (4) whether plaintiff has another adequate remedy.  *See* Fed.R.Civ.P. 19(b). The Village would be prejudiced if Appellants were granted beneficial ownership of the parcel of land, and relief cannot be shaped to avoid this prejudice. While Appellants do not appear to have another adequate remedy, "the tribe[']s interest in maintaining [its] sovereign immunity outweighs the plaintiffs' interest in litigating their claims." *See* American Greyhound Racing, Inc. v. Hull, 305 F.3d 1015, 1025 (9th Cir.2002) (citations omitted).  For these reasons, the Village is a necessary and indispensable party, without whom this action cannot proceed.

AFFIRMED.

73 Fed.Appx. 913, 2003 WL 21920015 (9th Cir.(Cal.))

**Briefs and Other Related Documents** (Back to top)

• 2003 WL 22025321 (Appellate Brief) Appellants' Reply Brief (Feb. 10, 2003)Original Image of this Document (PDF)

• 2003 WL 22025320 (Appellate Brief) Answering Brief of the Federal Appellees (Jan. 08, 2003)Original Image of this Document (PDF)

• 2002 WL 32155672 (Appellate Brief) Appellants' Opening Brief (Sep. 30, 2002)Original Image of this Document with Appendix (PDF)

• 02-55800 (Docket) (May. 16, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L



124 S.Ct. 1657                                                                                          Page 1
541 U.S. 936, 124 S.Ct. 1657, 158 L.Ed.2d 356, 72 USLW 3592, 72 USLW 3427, 72 USLW 3597
**(Cite as: 541 U.S. 936, 124 S.Ct. 1657)**

**H**
<u>Briefs and Other Related Documents</u>
Rosales v. U.S.U.S.,2004
         Supreme Court of the United States
     Walter **ROSALES**, Marie Toggery, and Karen
              Toggery, petitioners,
                      v.
          UNITED STATES, et al.
              **No. 03-895.**

              March 22, 2004.

Case below, <u>73 Fed.Appx. 913.</u>

Petition for writ of certiorari to the United States
Court of Appeals for the Ninth Circuit denied.

U.S.,2004
Rosales v. U.S.
541 U.S. 936, 124 S.Ct. 1657, 158 L.Ed.2d 356, 72
USLW 3592, 72 USLW 3427, 72 USLW 3597

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2004 WL 406749</u> (Appellate Petition, Motion and
Filing) Reply Brief (Mar. 02, 2004)
• <u>2004 WL 367604</u> (Appellate Petition, Motion and
Filing) Brief for the United States in Opposition (Feb.
20, 2004)
• <u>03-895</u> (Docket) (Dec. 22, 2003)
• <u>2003 WL 23015047</u> (Appellate Petition, Motion
and Filing) Petition for a Writ of Certiorari (Dec. 18,
2003) Original Image of this Document with
Appendix (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M



INTERIOR BOARD OF INDIAN APPEALS

Walter Rosales, et al. v. Pacific Regional Director, Bureau of Indian Affairs

39 IBIA 12 (03/04/2003)

Denying reconsideration of:
    34 IBIA 125

Related Board cases:
    32 IBIA 158
    34 IBIA 50



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
801 NORTH QUINCY STREET
SUITE 300
ARLINGTON, VA 22203

| | | |
|---|---|---|
| WALTER ROSALES, ET AL., | : | Order Denying Petition for Reconsi- |
| Appellants | : | deration of Docket No. IBIA 99-4-A; |
| | : | Dismissing Docket No. IBIA 00-28-A |
| | : | as Moot; and Affirming Decision in |
| v. | : | Docket No. IBIA 02-47-A |
| | : | |
| | : | Docket Nos. IBIA 99-4-A |
| | : | IBIA 00-28-A |
| PACIFIC REGIONAL DIRECTOR, | : | IBIA 02-47-A |
| BUREAU OF INDIAN AFFAIRS, | : | |
| Appellee | : | March 4, 2003 |

Appellants Walter Rosales, et al., seek review of decisions issued by the Pacific Regional Director, Bureau of Indian Affairs (Regional Director; BIA), in regard to three tribal elections for the Jamul Indian Village (Village). 1/ For the reasons discussed below, the Board of Indian Appeals (Board) denies a petition for reconsideration in one appeal, dismisses a second appeal as moot, and affirms the Regional Director's decision in the third appeal.

The Village was organized in 1981 as a community of half-bloods under the Indian Reorganization Act, 25 U.S.C. §§ 461, et seq. (IRA). The nature of its organization and the resulting membership questions have led to on-going disputes over tribal elections and tribal

---

1/ Appellants in Docket No. IBIA 99-4-A are Walter Rosales, Jane Dumas, Joe Comacho, Karen Toggery, Marie Toggery, Leslie A. Mesa, Gerald Mesa, Robert M. Mesa, William Mesa, and Vivian Flores. This appeal seeks review of the Village's 1997 tribal election. According to information in Rosales v. Pacific Regional Director, 37 IBIA 233 (2002), Marie Toggery has died since the filing of this appeal.

Appellants in Docket No. IBIA 00-28-A are Walter Rosales, Jane Dumas, Joe Comacho, Karen Toggery, Marie Toggery, Gerald Mesa, and Robert M. Mesa. This appeal seeks review of the Village's 1999 tribal election.

Appellants in Docket No. IBIA 02-47-A are Walter Rosales and Karen Toggery. This appeal seeks review of the Village's 2001 tribal election.

leadership. The background of these disputes was discussed in detail in Rosales v. Sacramento Area Director, 32 IBIA 158 (1998) (Rosales I), and will not be repeated here. 2/

In Rosales I, the Board addressed disputes arising from a 1994 recall election and the 1995 tribal election. The Board found that the tribal election disputes were rooted in a larger and more fundamental dispute over tribal membership. Although the Board and BIA are not normally part of the process for determining tribal membership, the Board found that, because the Village was organized as a community of half-bloods, BIA was responsible for making the initial determination of who was eligible to vote in the IRA election based on who possessed the requisite 1/2 degree blood quantum. It further found that there were problems with this initial determination because there was no evidence that BIA had actually successfully verified the blood quantums reported. Despite this, BIA determined that there were 23 individuals with the requisite blood quantum and allowed them to vote in the IRA election which organized the Village.

The Board stated in Rosales I:

> A determination of who is a tribal member must * * * precede any determination of who is a tribal leader. Without knowing who is a tribal member, neither the Village nor the Department [of the Interior] is in a position to know whether a tribal election was conducted in accordance with the constitution; i.e., whether only tribal members voted in that election (Art. V, sec. 3) and whether only tribal members were elected to office (Art. V, sec. 4).

32 IBIA at 166.

The Board concluded that the only way for there to be a lasting resolution of the issues raised in this series of appeals was to resolve the underlying membership questions. To that end, it requested that the Regional Director assist the Village's known members in addressing their membership and leadership problems in light of the decision in Rosales I.

In Rosales v. Sacramento Area Director, 34 IBIA 50 (1999) (Rosales II), the Board dismissed a challenge to a 1996 Secretarial election held to amend the Village's constitution. Although the same membership and leadership questions were raised in that appeal, the Board dismissed the appeal after finding "that there was no valid challenge to the Secretarial election under 25 C.F.R. § 81.22." 34 IBIA at 54.

---

2/ The Sacramento Area Director is now called the Pacific Regional Director. The Board uses the title Regional Director in this decision.

39 IBIA 13

In Rosales v. Sacramento Area Director, 34 IBIA 125 (1999) (Rosales III), the Board noted that it had consistently held that a subsequent valid tribal election moots issues relating to earlier elections. See, e.g., Hamilton v. Acting Sacramento Area Director, 29 IBIA 122, 123 (1996). Finding that the Village's 1999 tribal election had not been contested, the Board dismissed as moot a challenge to the 1997 tribal election.

Rosales III was Docket No. IBIA 99-4-A. After the Board's dismissal of their appeal, Appellants petitioned for reconsideration. They alleged that they had, in fact, challenged the 1999 election, and provided evidence of that challenge. The Board took the petition for reconsideration under advisement.

Appellants subsequently appealed from the Regional Director's decisions recognizing the results of the Village's 1999 and 2001 tribal elections. As noted above, these appeals are Docket Nos. IBIA 00-28-A (1999 election) and IBIA 02-47-A (2001 election).

In accordance with its precedent that a subsequent valid tribal election moots disputes concerning earlier elections, the Board first addresses Docket No. IBIA 02-47-A. If the 2001 tribal election is found to be valid, the challenges to the earlier elections will be rendered moot.

Appellants' major argument is that the Regional Director failed to take any action in regard to the Board's discussion of the Village's membership issues in Rosales I. So that it could determine if this allegation was correct, the Board requested a report from the Regional Director on the status of his actions in regard to assisting the Village to resolve the membership dispute. The Board received the Regional Director's response on September 16, 2002. 3/

In his status report, the Regional Director states that he believes the Village's membership issues were resolved in the Jamul Indian Village Genealogical Study prepared by Dr. Michael G. Baksh, Ph.D. This report, which was funded by BIA, had been underway when Rosales I was before the Board. The report was submitted to the Regional Director in May 1998, approximately one month after the Board's decision in Rosales I. The study completed an exhaustive review of the blood quantums of the Village's original 23 members, finding that 1 of those individuals had a 1/2 degree blood quantum, 4 had a 3/4 degree blood quantum, and the remaining 18 had a 4/4 degree blood quantum. The study also provided genealogical tables showing the blood quantums of the descendants of the original 23 members. The Regional Director formally accepted this report on September 30, 1998.

---

3/ After beginning consideration of these appeals, the Board discovered that it appeared that the Regional Director had not served a copy of his status report on Appellants. Therefore, it sent a copy to Appellants and gave them an opportunity to respond. The Board has received and considered a response from Appellants.

The Regional Director continued his status report by indicating that only persons who were among the original 23 members of the Village voted in the 1996 Secretarial election that lowered the blood quantum requirement for membership in the Village to 1/4 degree. This is the Secretarial election that was at issue in Rosales II.

Appellants contend that the Regional Director has disregarded the Board's decision in Rosales I, by failing to meet with "the true majority of the actual members of the JAMUL tribe to address their membership and leadership problems." Appellants' Dec. 31, 2001, Statement of Reasons in Docket No. IBIA 02-47-A. This contention is based on Appellants' continued argument that the blood quantum for membership in the Village cannot be lowered to less than 1/2 degree, and therefore only persons with 1/2 or more blood quantum can be "actual members" of the Village.

The Board rejected this contention in Rosales I. The contention is based on a policy, previously espoused by at least some Departmental officials, that there was a distinction between "historic" and "created" tribes. As discussed in Rosales I, 32 IBIA at 163-66, this policy was soundly rejected by Congress in 1994 when it amended the IRA by adding sections (f) and (g) to 25 U.S.C. § 476. The Village has the right to determine its own membership criteria, including, if it wishes, lowering the blood quantum for tribal membership.

The Board addresses that part of Appellants' argument in which they contend that the Regional Director has not taken action to address the membership issue. The initial problem with the Village's membership resulted from BIA's apparent failure to verify fully the blood quantums of the 23 individuals who were allowed to organize the Village. That failure was addressed in the Baksh genealogical study. The Board rejects Appellants' contention that the Regional Director has not taken action in response to its decision in Rosales I.

Appellants base most of their remaining arguments on their contention that the 1996 Secretarial election was invalid. This contention was made in Rosales II. The fact that Rosales II was decided on procedural, rather than substantive, grounds does not enable Appellants to continue to assert their substantive arguments against the election. The results of the Secretarial election became final for the Department of the Interior with the issuance of the Board's July 29, 1999, decision in Rosales II. Under these circumstances, Appellants' objections to the Secretarial election will not be entertained.

The bottom line in these appeals is that Appellants failed successfully to challenge the 1996 Secretarial election, and the Village's Constitution was amended to allow membership with a 1/4-degree blood quantum. The 2001 tribal election was held after the Constitutional amendment. Appellants have failed to show that the 2001 election was not conducted in accordance with the Constitution's lowered blood quantum requirement. Because of this failure, Appellants have not carried their burden of proving that the Regional Director committed any reversible error in his decision concerning the 2001 tribal election.

Based on the finding that the 2001 tribal election has not been successfully challenged, and is therefore considered valid, the Board finds that the challenges to the 1997 and 1999 tribal elections are moot. 4/

Therefore, pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, Appellants' petition for reconsideration of Docket No. IBIA 99-4-A is denied; their appeal in Docket No. IBIA 00-28-A is dismissed as moot; and the Regional Director's decision in Docket No. IBIA 02-47-A is affirmed. 5/

_____//original signed_____
Kathryn A. Lynn
Chief Administrative Judge

_____//original signed_____
Kathleen R. Supernaw
Acting Administrative Judge

_____

4/ Other arguments not specifically addressed were considered and found to be repetitious of arguments addressed in earlier Board decisions regarding the Village's election and leadership disputes.

5/ Appellants continue to assert that a majority of the Village's original members did not participate in tribal elections, including the 1996 Secretarial election. Even assuming that this asssertion is correct, it does not make the elections illegal. The Village's original members have the right to choose either to participate or not to participate in tribal elections.

Appellants' continued refusal to participate in the Village's tribal government by, for example, declining to register to vote and holding separate elections, only allows those individuals Appellants oppose the opportunity to run the tribal government as they choose. Appellants might wish to consider bringing their voices to the tribal council by registering to vote and by participating in the tribal government. BIA has done its part here by providing the information necessary for a determination of the blood quantums of the Village's original 23 members and, consequently, of their descendants. It would appear to now be time for all of the Village's members to help the Village move forward.

# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Walter Rosales, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case Number 1, 03CV01117 (GK) |
| ) | |
| United States, et al. ) | Judge Gladys Kessler |
| ) | |
| Defendants. ) | |

**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
CROSS MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**CROSS MOTION FOR SUMMARY JUDGMENT**

Defendants respectfully move for summary judgment for the reasons stated in the

following memorandum and on the basis of the administrative record filed in this case for each

of the challenged decisions.  Defendants also oppose plaintiffs' motion for summary judgment

for the reasons stated in the memorandum that follows.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plaintiffs Walter J. Rosales and Karen Toggery seek judicial review of three decisions of

the Interior Board of Indian Appeals ("IBIA").  All three decisions concern the Jamul Indian

Village ("Village" or "Tribe"), a federally recognized Indian tribe.

The first IBIA decision challenged by plaintiffs dismissed their appeal concerning the purported failure of the Bureau of Indian Affairs (BIA) to render a decision on a letter objecting to a Secretarial election that was to be held on August 31, 1996. The IBIA held that the BIA had rendered a decision on their letter by holding the election as scheduled. The IBIA also noted that plaintiffs were not eligible to vote in that Secretarial election, nor had they challenged the results of that election or its procedures within the regulatory time frame. *Rosales v. Sacramento Area Director*, 34 IBIA 50 (1999), (*Rosales II*).

The second IBIA decision challenged by plaintiffs dismissed as moot their challenge to the BIA decision recognizing the results of a 1997 tribal election of officers, since the BIA's approval of a subsequent 1999 tribal election for officers had not been challenged or appealed. *Rosales v. Sacramento Area Director*, 34 IBIA 125 (1999) (*Rosales III*).

The final IBIA decision challenged by plaintiffs is *Rosales v. Pacific Regional Director*, 39 IBIA 12 (2003) (*Rosales IV*). In *Rosales IV*, the IBIA first reviewed the BIA's decision upholding a 2001 tribal election. The IBIA noted that the results of the Secretarial election to amend the Tribe's IRA constitution were final with the decision of *Rosales II* on July 29, 1999, and that no evidence was presented that the 2001 tribal election was conducted in violation of the amended constitution. The IBIA upheld the approval of the 2001 election. The IBIA then affirmed *Rosales III*'s dismissal of the challenge to the prior election in 1997, which was the subject of a request for reconsideration, as moot, and dismissed the challenge to the prior election in 1999, as moot.

The administrative records of the three challenged IBIA decisions were filed with this

court on November 24, 2003, and this court denied plaintiffs' motion to augment the record by

order dated January 21, 2004.

## JURISDICTION

The only waiver of sovereign immunity alleged which provides jurisdiction to this court

with respect to the federal defendants, to the extent plaintiffs have standing, is the Administrative

Procedure Act, 5 U.S.C. §§ 701-706. Plaintiffs also allege the mandamus statute, 28 U.S.C. §

1361, but do not set out a mandamus claim in their Complaint or in their Motion for Summary

Judgment. Plaintiffs rely on 28 U.S.C. §1362, but this provision does not waive the federal

government's immunity from suit. *Scholder v. United States*, 428 F.2d 1123 (9th Cir.1970), cert.

denied, 400 U.S. 942 (1970). It is a statute like 28 U.S.C. § 1331, also alleged by plaintiffs that,

while conferring general jurisdiction, does not waive sovereign immunity. *See Cheyenne-*

*Arapaho Gaming Commission v. National Indian Gaming Commission*, 214 F. Supp.2d 1155,

1162 (N.D. Okla. 2002); *Western Shoshone Business Council, for and on Behalf of Western*

*Shoshone Tribe of the Duck Valley Reservation v. Babbitt*, 1 F.3d 1052, 1058-59 (10th Cir. 1993)

("For the same reasons that plaintiffs cannot bring this action under § 1331, they also cannot

assert jurisdiction under § 1362").

The Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, likewise does not operate to waive

the United States' sovereign immunity. *B.R. Mackay & Sons, Inc. v. United States*, 633 F. Supp.

1290, 1295 (D. Utah,1986), citing *Balistrier v. United States*, 303 F.2d 617 (7th Cir. 1962).

Plaintiffs' reliance on 28 U.S.C. § 1346, often referred to as the "Little Tucker Act," is

misplaced because it gives the district courts concurrent jurisdiction with the United States Court

3

of Federal Claims over certain monetary claims, not for the claims asserted in this action. The

only remaining jurisdictional allegation is 28 U.S.C. § 1344. Section 1344 does not constitute a

waiver of sovereign immunity. Even then, it is a narrow provision allowing suits to recover

office denied on the basis of race color, or previous condition of servitude, and only permits

candidates deprived of any office on that basis to bring suit. *Hubbard v. Ammerman,*, 465 F.2d

1169 (5th Cir. 1972), *cert. denied* ,410 U.S. 910; *Gray v. Main*, 291 F. Supp. 998. (M.D. Ala.

1966). The Complaint makes no allegations that could come under the purview of this statute.

### STATEMENT OF THE ISSUES PRESENTED

Whether the IBIA decisions in *Rosales II, Rosales III,* or *Rosales IV* are arbitrary or

capricious or not otherwise in accordance with law.

### STATEMENT OF FACTS

Plaintiffs are not original members of the Jamul Indian Village. The administrative

record before the IBIA in *Rosales II* included no evidence that the original members had

admitted new members in accordance with the Tribe's constitution. In November 1995, a

quorum of the surviving original members voted unanimously to have an election to amend the

Tribe's IRA constitution. The election was held and the constitution was amended to change the

blood quantum requirements for membership. Because neither Walter Rosales nor Karen

Toggery were original members, they were not entitled to vote in the 1996 federal election to

amend the constitution. Ten months after the election, plaintiffs appealed to IBIA the BIA's

purported failure to respond to their letter objecting to the scheduled election to amend the

Tribe's constitution. In 1998, the IBIA in *Rosales II* dismissed their appeal.

4

The administrative record before the IBIA in *Rosales IV* included no evidence that the 2001 tribal election of officers violated the Tribe's amended constitution. The IBIA therefore dismissed plaintiffs' appeal. The IBIA also addressed a request for reconsideration and affirmed the dismissal in *Rosales III* of plaintiffs' challenge to the 1997 tribal election of officers as mooted by the subsequent valid election of officers.

## STANDARD OF REVIEW

Plaintiffs seek judicial review of the three IBIA decisions pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Section 706(2)(A) of the APA authorizes courts to set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In applying the arbitrary and capricious standard, a court must determine whether "the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). Although this inquiry must be thorough, the standard of review is narrow and highly deferential, *Overton Park*, 401 U.S. at 416; the agency's decision is "entitled to a presumption of regularity," *id.* at 415; and a court cannot substitute its judgment for that of the agency, *id.* at 416. *See NRDC v. SEC*, 606 F.2d 1031, 1048 (D.C. Cir. 1979), *Pozzie v. United States Department of Housing and Urban Development*, 48 F.3d 1026, 1029 (7th Cir. 1995) (standard of review is deferential, presuming validity of agency actions as long as the decision has a "rational basis"). Judicial review under the APA is narrow; it is not a *de novo* review.

A reviewing court should affirm the agency's decision as long as the administrative record demonstrates that the agency has reviewed and fairly weighed the relevant data and

articulated a rational connection between the facts found and the decision made. *Olenhouse*, 42

F.3d at 1574. The objective of the court's inquiry is "whether there has been a clear error of

judgment." *Overton Park*, 401 U.S. at 416. Under the APA, the Court may not substitute its

judgment for that of the Secretary. *Id.* Because the court's review is limited to the agency's

action, that review is based on the administrative record, the information available to the agency

decision maker at the time of the challenged action. 5 U.S.C. § 706; *Florida Power Light Co. v.

Lorion*, 470 U.S. 729, 743 (1985); *Camp v. Pitts,* 411 U.S. 138, 142 (1973); *Fund for Animals v.

Williams,* 245 F. Supp. 2d 49, 54-55 (D.D.C. 2003). The agency's weighing of the evidence

differently than that advocated by others does not make the decision arbitrary and capricious.

*United States v. Morgan,* 313 U.S. 409, 419 (1941) (the Secretary can attach a different

significance from the data).

The Department's decision in this case is owed substantial deference because it involves

matters of relations with Indian tribes over which the Department has been delegated substantial

authority. The Department has been delegated authority to manage Indian affairs and matters

arising out of Indian relations. 25 U.S.C. §§ 2, 9; 43 U.S.C. § 1457. The decisions challenged

here fall squarely within the subject matter that courts have found requires a large degree of

deference. *United States v. Holliday*, 70 U.S. 407 (1865), *United States v. Sandoval*, 231 U.S. 28

(1913).

Finally, the decisions here were made with formal proceedings, which further supports a

deferential review of the expert agency's determination. See *United States v. Mead Corp.*, 533

U.S. 218, 230 (2001) ("It is fair to assume generally that Congress contemplates administrative

action with the effect of law when it provides for a relatively formal administrative procedure

6

tending to foster the fairness and deliberation that should underlie a pronouncement of such force").

## SUMMARY OF ARGUMENT

The IBIA decision in *Rosales II* is not arbitrary and capricious or contrary to law.  In *Rosales II,* the plaintiffs appealed the agency's purported lack of response to a letter they wrote dated August 28, 1996.  That letter objected to the proposed Secretarial election to amend the Tribe's constitution.  The IBIA's decision that the agency had responded to plaintiffs by holding the election is not arbitrary and capricious.  Further, as determined by IBIA, neither Walter Rosales nor Karen Toggery were entitled to vote in that election, nor to challenge it, nor had done so within the regulatory time periods.  As such, they were not persons whose interest are adversely affected by the holding of the election.  The IBIA dismissed their appeal.

The administrative decision in *Rosales III* held that the challenge to a 1997 tribal election is moot.  This IBIA decision is not arbitrary and capricious, and, in any event, is superceded by the decision in *Rosales IV.*  The decision in *Rosales IV* upheld the 2001 tribal election of officers because no evidence was submitted that the election violated the amended constitution.  This IBIA decision withstands judicial review and is not arbitrary and capricious or contrary to law.

## ARGUMENT

Listed as a plaintiff in this district court proceeding is the "Jamul Indian Village," based on the individual plaintiffs' contention that the three IBIA decisions are arbitrary and capricious and that they themselves are the leaders of the Tribe.  Because this assertion assumes the merits of the litigation, any reference to plaintiffs in this brief is limited to the individual plaintiffs.  It is the position of the defendants that the "Jamul Indian Village" is not before this court.  Of note,

the "Jamul Indian Village" was not an appellant in any of these three IBIA proceedings.

AR 2271, AR 1287, AR 0970.[1/]

### A.   BACKGROUND: ORGANIZATION OF JAMUL INDIAN VILLAGE AND OTHER FINAL JUDICIAL AND ADMINISTRATIVE DECISIONS INVOLVING THESE PLAINTIFFS.

### 1.   Organization of Jamul Indian Village

The Jamul Indian Village was organized in 1981 under the Indian Reorganization Act

(IRA), 25 U.S.C. §§ 461-479, and is included in the list of Federally Recognized Tribes, 68 *Fed.*

*Reg.* 68180, 68181 (Dec. 5, 2003).  The tribe was organized as a community of half-bloods in

1981 after land was purchased for them as a reservation under the IRA.  25 U.S.C. § 479,

*Rosales v. Sacramento Area Director,* 32 IBIA 158, 159 (1998), (*Rosales I*).  Twenty three

individuals were eligible to vote to organize the Tribe.  AR 2317.  These 23 persons are

members of the Jamul Indian Village (Plaintiffs' Memorandum of Points and Authorities in

Support of Motion for Summary Judgment, at 6, hereafter Plfs' MSJ).  Plaintiffs are not among

these 23 individuals.

The Indian Reorganization Act, 25 U.S.C. § 476 (1988), and federal regulations govern

the procedure to amend tribal constitutions adopted under the IRA, such as that of the Jamul

---

[1/]The Jamul Indian Village's recognized leadership has not sought to join this litigation as a party.  Indeed the Jamul Indian Village with its recognized leadership took positions aligned with the Bureau of Indian Affairs before the IBIA.  *See* AR-0292, 1240, 1263, 2256.  The Plaintiffs purport to bring this action on behalf of the Village, under 28 U.S.C. § 1362, as they allege in their Complaint, but cannot do sot.  *See Jamul Indian Village v. Hunter,* Civil No. 95-0351-R (S.D. Cal.), slip op. dated September 9, 1996 at 20, attached as Exhibit A.  ("Jane Dumas is the only plaintiff in this case.  *See* Order filed June 22, 1995.  As such this action is not brought by 'any Indian tribe.'  Moreover, Dumas' faction does not represent a 'governing body recognized by the Secretary of the Interior.'  As such, Section 1362, cannot provide jurisdiction in this Court in the present action filed by Dumas." *Id.*).  The individual plaintiffs are not recognized by the Secretary as the governing body of the Jamul Indian Village.

Indian Village. 25 C.F.R. Part 81, *Tribal Reorganization Under a Federal Statute*.[2] An election

to amend an IRA constitution is a Secretarial election, a federal - not tribal - election. *Cheyenne*

*River Sioux Tribe. v. Andrus*, 566 F. 2d 1085 (8th Cir. 1977), *cert. denied* 439 U.S. 820 (1978);

*Thomas v. United States*, 189 F.3d 662, 667 (7th Cir. 1999); 25 C.F.R. §§ 81.1(s), 81.2. Under

these regulations, members of the tribe must register to vote in the Secretarial election, 25 C.F.R.

§§ 81.6(d), 81.11, 81.13, and challenges to the results of the election must be filed by qualified

voters within a prescribed period of time, 25 C.F.R. § 81.22.

    2.    *Rosales v. United States,* (S.D. Calif), regarding the Tribe's reservation

    In 2001, plaintiffs Walter Rosales and Karen Toggery and others, filed a complaint

alleging that they were entitled to an allotment on the reservation. The federal district for the

Southern District of California, in an unreported decision, *Rosales v. United States*, Civil No. 01-

951, slip op. filed February 14, 2002, attached as Exhibit B, held that their claim for a trust

patent was not ripe, and in the alternative, that the IRA did not provide for the issuance of a fee

patent to Indians. The district court held also that the language of the 1978 deed clearly

conveyed the parcel in trust for the benefit of the Jamul Indian Village as a whole, not for

specific individual Indians. The district court denied plaintiffs' motion for reconsideration,

noting that it had ruled earlier that the parcel is held in trust for the *tribe* as a whole, not for

petitioners as individuals. *Rosales v. United States*, Civil No. 01-951, slip op. at 3, filed April

22, 2002, attached as Exhibit C. On appeal, the Ninth Circuit Court of Appeals, also in an

unpublished decision, held that the Tribe was an indispensable party under Fed. R. Civ. Pro. 19

---

[2]Part 81 was last revised in 1981. To the extent the regulations are inconsistent with the 1988
amendments to the IRA, the statute controls.

to the action and could not be joined because it enjoys sovereign immunity from suit, and

dismissed the case. *Rosales v. United States,* 73 Fed. Appx. 913, 2003 U.S. App. LEXIS 16467

(2003), *cert. denied,* 124 S.Ct. 1657 (2004), attached as Exhibit D.  For the same reasons stated

in the district court and Ninth Circuit decisions, plaintiffs are precluded here from arguing that

the property was taken in trust for the specific occupants rather than the tribe as a whole.  Plfs

MSJ at 4.

> 3.    *Rosales I* - **not challenged by plaintiffs and the statute of limitations**
>       **precludes any challenge**

In *Rosales v. Sacramento Area Director,* 32 IBIA 158 (1998), (*Rosales I),* these same

plaintiffs were among those who challenged various actions and inactions of the Sacramento

Area Director, BIA, relating to a leadership dispute of the Jamul Indian Village arising from

tribal elections in 1994 and 1995. *Id.* at 158.  Plaintiffs did not seek judicial review of this IBIA

decision and thus facts material to its holding are binding on them.  *Rosales I* held in part that

there was no evidence presented that the original 23 members of the Jamul Indian Village ever

admitted new members in accordance with its constitution, and that Walter J. Rosales and Karen

Toggery were not among the original 23 members. *Id.* at 166.

*Rosales I* found that the tribal election dispute could not be resolved without first

addressing tribal membership. *Id.* at 162.  As provided in the decision, at 166:

> A determination of who is a tribal member must, however, precede any
> determination of who is a tribal leader.  Without knowing who is a tribal member,
> neither the Village nor the Department is in a position to know whether a tribal
> election was conducted in accordance with the constitution; i.e., whether only
> tribal members voted in that election . . . and whether only tribal members were
> elected to office.

The IBIA found that neither faction demonstrated that voting in its elections was restricted to tribal members, or that only tribal members were elected to tribal office. The IBIA found also that "[n]o party . . . has submitted any evidence that the original 23 members of the Village ever admitted new members in accordance with Article III, section 1, of the Village's constitution . . . . If the original 23 members have, in fact admitted new members, they have the responsibility to show that such action was taken in accordance with the constitution and to provide BIA with an up-to-date list of tribal members." *Id.* at 166.[3]  The IBIA, therefore, reinstated the leaders elected in the last prior undisputed election, finding that it could not determine, based on the evidence presented, if either faction before it was validly elected by the membership. *Id.* at 168.

The IBIA, in its April, 1998, ruling, requested the Area Director to assist the Village's actual members in addressing their membership and leadership problems. *Id.* at 168.  The BIA responded by completing a genealogy study on the original 23 members of the Tribe.[4]  Also, in 1996, prior to the filing of the Notice of Appeal in *Rosales I*, the BIA held an election on a proposed amendment to the membership provision in the Tribe's constitution.  Prior to holding

_____

[3]The 1981 Constitution of the Jamul Indian Village, AR 2366 - 2376, approved by the Department of the Interior, provides in Article III, "Membership", Section 1 that "[t]he members of the Jamul Indian Village shall consist of those persons who file applications for membership with and are found qualified by the executive committee" who meet certain qualifications. AR 2366. Article III, Section 3 provides that "[t]he governing body shall adopt an enrollment ordinance, subject to the approval of the Secretary of the Interior, governing . . . the enrollment of new members. . . " AR 2367.

[4]A genealogy study dated May 5, 1998, completed after the decision in *Rosales I*, reviewed the ancestry of these 23 persons and determined that all 23 possessed ½ degree or more California Indian blood, the required blood quantum for organization as a community of half-bloods under 25 U.S.C. § 479. AR 1801. This study addressed the IBIA concern that the BIA never actually made and/or verified blood quantum determinations of these 23 individuals. 32 IBIA at 162.

11

the election, the BIA addressed membership issues. The BIA determined that no enrollment ordinance had been submitted to the BIA for approval as required by the Tribe's constitution and that any enrollment of new members was therefore invalid.[5] In holding this Secretarial election the BIA, therefore, relied on the representations of the original 23 members who were then alive (15) and who attended and voted at the General Council meeting requesting the Secretarial election. AR 1707, AR 2265. Also, the BIA permitted only the surviving original members to register and vote in the election. AR 2257. These BIA decisions in conducting the election were consistent with the subsequent holding in *Rosales I* that no party showed that the 23 original members ever admitted new members in accordance with their constitution.

*Rosales I* also discussed the 1994 amendments to the IRA that provide that the Department shall make no distinctions among recognized tribes. 25 U.S.C. § 476 (f) & (g). The IBIA noted that this amendment precluded the distinction previously made between "historic" and "created" tribes, and put tribes on an equal footing. The IBIA found that the Tribe has all of the same rights and authorities as every other recognized Indian tribe to define its membership criteria. 32 IBIA at 165-166.

---

[5]As explained by subsequent letter dated October 10, 1996, BIA Sacramento Area Office to Attorney Webb, regarding certain 1994 and 1995 elections, AR 2335 at 2337:

> Both parties have submitted documents referring to several enrollment ordinances which were purportedly adopted; however, both Agency and Area Office records show that no ordinance or a formal request had been submitted requesting review and approval as required by Article III-MEMBERSHIP Section 3. Because of this, it is the Bureau's position that any enrollment adopted by either side is invalid because it lacks Bureau approval. We must then look to the list of the original members who voted to adopt the Jamul Village Tribal Constitution on May 9, 1981.

Plaintiffs do not challenge *Rosales I* and the statute of limitations has run on the April 1998 decision, precluding any such challenge. *See,* Plaintiffs' Motion to Augment the Record, at 3 ("The complaint does not seek direct review of Judge Lynn's April 22, 1998 decision") and Complaint (Prayer for Relief in Complaint does not request any relief concerning *Rosales I*).

**B.    THE IBIA DECISION IN *ROSALES II* IS NOT ARBITRARY AND CAPRICIOUS.**

The BIA had responded to the letter objecting to the scheduled holding of the secretarial election. Further, plaintiffs were not qualified voters in that election.

**1.    Summary of *Rosales II***

On July 10, 1997, plaintiffs Walter Rosales and Karen Toggery and others appealed to IBIA the alleged failure of the BIA "to render a decision on APPELLANTS' August 28, 1996 [letter] object[ing]" to the scheduled Secretarial election to amend the Jamul Constitution, or to set a date to decide the objection. AR 2272. The Secretarial election was held on August 31, 1996, as scheduled, and Walter Rosales and Karen Toggery appealed to the IBIA approximately 10 months later. On July 29, 1999, the IBIA dismissed the challenge to the BIA's alleged failure to render a decision, finding that the holding of the election was a response to the letter. 34 IBIA 50 (1999), AR 1353.

The IBIA decision addressed the appellants' argument that the BIA had not responded to the letter dated August 28, 1996, filed by Attorney Webb, on behalf of unnamed clients, in which objections were raised concerning the proposed Secretarial election. The IBIA quoted from the letter that "If [the Superintendent] or any agent of the U.S. persists . . . in holding the . . . 'election', my clients will have no alternative but to pursue their rights against such action . . . " 34 IBIA at 52. The IBIA found that the operative language of the letter was that "if the election

13

was held, Appellants would take action." The Board concluded that the only decision BIA was required to make in response to the August 28, 1996, letter was whether it would hold the Secretarial election despite the objections raised in the letter," *id.* at 52, and that the holding of the election was "an adequate response." *Id.* at 53.

The IBIA also rejected the argument that the pre-election letter was a timely appeal from the results of the Secretarial election. Under 25 C.F.R. § 81.22, "any qualified voter" within three days "following the posting of the results," may file a challenge *"together with substantiating evidence."*

First, the IBIA reasonably discounted the letter based on its timing - how a letter written *before* the election could be a challenge to the *results* of the election. ("Putting aside the practical question of how one can challenge the results of an election that has not yet been held . . . " AR 1356)

Second, the IBIA found that there was no evidence in the record as to who "the clients" referenced in the letter were. Thus it was not possible to determine if those "clients" were "qualified voters." 34 IBIA at 53.

Third, the IBIA, "for the purposes of this discussion only," assumed that the letter was authorized by some of all of the appellants before the IBIA. *Id.* The IBIA noted that the administrative record showed that only original members were allowed to register to vote, and that none of the plaintiffs was a surviving original member. The IBIA then found that none of the appellants was a qualified voter - and thus, the letter was not an appropriate challenge, irrespective of its timing, as only qualified voters had rights under the regulations to challenge an election. 25 C.F.R. § 81.22. *Id.* at 53-54.

14

Finally, the IBIA rejected appellants' argument that all of the living original members (15) were "qualified voters," noting that the regulations provide that eligible members of the Tribe must register to vote in the Secretarial election. *Id.* at 53, 25 C.F.R. §§ 81.6(d), 81.11, 81.13. The IBIA observed, nonetheless, that none of the appellants, which included Walter Rosales and Karen Toggery, was one of the 15 living original voters, *id.,* and thus the question of having to register was not an issue that impacted them. The IBIA concluded that neither Walter Rosales nor Karen Toggery were persons whose interests are adversely affected by the holding of the election. 25 C.F.R. § 2.8.

The IBIA determined that "the August 28, 1996, letter did not require a response from BIA beyond a decision as to whether or not to hold the Secretarial election, and that there was no valid challenge to the Secretarial election under 25 C.F.R. § 81.22." 34 IBIA at 54.

Nearly 4 years later, plaintiffs now challenge the dismissal of their appeal as arbitrary and capricious and not otherwise in accordance with law. Under the APA, plaintiffs here can only challenge IBIA's dismissal of their appeal concerning BIA's alleged failure to respond to their letter - the agency action under review. They cannot seek review *de novo* review of the BIA's holding of the election.

### 2. Plaintiffs' Appeal to IBIA Concerned an Alleged Failure of the BIA to Respond to a Letter.

Plaintiffs' characterized their appeal in their brief before the IBIA. That brief informs this court of the issues decided by IBIA that are subject to review:

Docket No. 98-9-A is not an appeal, *per se,* of the Deputy Commissioner's purported October 15, 1996 "approval" of the invalid August 31, 1996 "Secretarial election." Rather, it is an appeal of the preceding failure of the Sacramento Area Director to rule upon Appellants' August 28, 1996 challenge to

15

the illegal "Secretarial election" then being staged by the So. Cal. Regional
Superintendents, **before** the invalid "Secretarial election" was held . . .

AR 2218. Plaintiffs' premise is that their writing an objection to the election in which they could

not vote was sufficient to prevent the holding of the election, and that the holding of the election

was not a response to their letter. Their premise is without foundation. IBIA's dismissal of their

action was not arbitrary and capricious or contrary to law.

The IBIA decision in *Rosales II* held that the BIA had responded to the letter objecting to

the future holding of the election by holding the election as scheduled. The IBIA decision held

also that Walter Rosales and Karen Toggery were not "qualified voters" and had not filed a

challenge to the results of the election as required by the regulations. The IBIA decision is fully

supported by its record, and plaintiffs point to no evidence in the record that indicates that the

IBIA decision is arbitrary and capricious.

Plaintiffs provide no legitimate argument that the BIA was required to provide a written

decision to their letter objecting to the holding of the Secretarial election to amend the Jamul

Village's IRA constitution, and that until such a response was provided, that the BIA could not

hold the election. The only argument plaintiffs appear to make is that since their challenge to the

certain elections of tribal officers in 1994 and 1995 (*Rosales I*) was pending before IBIA, the

BIA was without jurisdiction to act on a request for a Secretarial election to amend the Tribe's

constitution. Plfs MSJ at 16. Although an appeal to IBIA may prevent the specific decision that

is appealed from being final or effective, 43 C.F.R. § 4.21, there is no authority that provides that

such an appeal prevents the BIA from acting on other unrelated matters concerning the Tribe.

Although plaintiffs cite *Hammerberg v. Acting Portland Area Director,* 24 IBIA 78 (1993), for

support, that case held merely that once an appeal was filed, the BIA loses jurisdiction over the

16

particular matter except to participate as a party in the appeal. *Hammerberg* does not stand for

the proposition that the BIA loses jurisdiction over unrelated matters.[9] Further, *Hammerberg*

was an Indian Financing Act case and did not concern membership or leadership issues as

alleged by plaintiffs. Plfs MSJ at 17. Thus, the appeal of elections of tribal officers was not an

impediment to BIA proceeding with the Secretarial election to amend the Tribe's constitution.

The absurdity of plaintiffs position - that the Secretarial election could not be held

without a direct response to their letter - is clear. Plaintiffs were not even entitled to vote in that

election. In short, plaintiffs were not persons adversely impacted by the agency decision to hold

the election, 25 C.F.R. § 2.8, and had no standing to delay the Secretarial election in which they

had no right to participate.

### 3. Walter Rosales and Karen Toggery Have No Interest Adversely Affected by the Holding of the Secretarial Election.

Walter Rosales and Karen Toggery did not allege before the IBIA in *Rosales II* that they

were entitled to vote in the Secretarial election. Nor do they so allege here. They cite no

evidence in the administrative record that they were entitled to vote in the Secretarial election, or

to register to vote in that election. They are not original members of the Tribe. AR 2317.

Although they disagreed that the 15 living original members had to register to vote, they did not

challenge that the registration was limited to those 15 living original members, a class in which

they do not belong.

---

[9]Resolving who was elected an officer of the Tribe does not impact the vote of the General
Council to have a Secretarial election. As discussed below, a quorum of original members of the
Tribe voted to have a Secretarial election, and, as held by IBIA in *Rosales I*, there was no
evidence that any persons other than those 23 were members of the Tribe.

Further, plaintiffs do not allege, nor do they cite any document in the administrative record that they attempted to register to vote in the Secretarial election and were denied that opportunity. Plaintiffs cite no evidence that they filed an eligibility dispute with the election board, 25 C.F.R. § 81.13, through which the board, prior to the election, could determine if they were entitled to vote. There is no evidence that plaintiffs exhausted their regulatory remedies and procedures.

Plaintiffs cite no evidence in the administrative record before the BIA or IBIA in *Rosales II* that they applied for and were found admitted as members of the Tribe under an ordinance adopted in accordance with the Tribe's constitution, Art. III. Section 1. AR 2366. Plaintiffs cite no evidence in this administrative record that the original 23 members submitted an enrollment ordinance to the BIA for approval as required by the Tribe's constitution or that it admitted new members. In fact, evidence in the administrative record confirms that no enrollment ordinance was submitted to the agency: "both Agency and Area Office records show that no ordinance or a formal request had been submitted requesting review and approval as required by Article III-MEMBERSHIP Section 3." AR 2337. Nor was such evidence provided in *Rosales I.* 32 IBIA at 166. Indeed, the IBIA in *Rosales I* found that only the original 23 were valid members and Walter Rosales and Karen Toggery did not appeal that decision. Plaintiffs here have no right or standing to challenge an election in which they were not entitled to participate.[2]

_____

[2]Plaintiffs allege before this court that they "subsequently" submitted evidence to the BIA and the IBIA that a majority of the surviving original 23 "admitted new members." Plfs MSJ at 10. They cite AR0330-0360 - documents submitted in the year 2000, in the administrative record in *Rosales IV*, subsequent to the IBIA decisions in *Rosales I, II,* and *III*. Since judicial review is limited to review of the record in existence at the time of the decision, *Overton Park*, these

Finally, plaintiffs cite no challenge with substantiating evidence that was filed with the election board within the regulatory three day period, 25 C.F.R. § 81.22, after the election was held. Nor do plaintiffs allege that any evidence in the administrative record of *Rosales II* that was ignored by the IBIA in ruling in *Rosales II*.

Plaintiffs, in short, are not "persons whose interests are adversely affected, or whose ability to protect such interests is impeded by the failure of an official to act on a request" objecting to the Secretarial election, within the meaning of 25 C.F.R. § 2.8. A pending appeal in another matter *(Rosales I)* does not preclude other BIA action. Nor does such an appeal give appellants standing to prevent the BIA from holding a Secretarial election in which they have no right to participate. Because plaintiffs were not entitled to vote in the election, they have no right to challenge it. Plaintiffs have suffered no injury in fact and the IBIA dismissal of their claim was not arbitrary and capricious. The IBIA decision in *Rosales II* dismissing their appeal, therefore, withstands judicial review.

### 4. Additional Argument Raised by Plaintiffs Concerning the Secretarial Election.

Plaintiffs in their briefs challenge the procedures leading to the holding of the Secretarial election, including some issues not raised before the IBIA. They have no standing to do so here. Judicial review is limited to review of the IBIA decision that dismissed their challenge because

---

documents have no impact in the review of *Rosales II*. Further, although these documents include a purported 1994 enrollment ordinance, there is no evidence that the ordinance was provided to the BIA for approval in accordance with the Tribe's constitution, Art. III, Sec. 3. AR 2367. In fact, the administrative record includes a document that the ordinance was not submitted to BIA. AR 2337. Finally, plaintiffs do not argue here or before the IBIA that they were entitled to vote in the Secretarial election and/or were denied that opportunity. They do not dispute that only those surviving original 23 members were eligible to register to vote on the constitutional amendment.

they were not persons adversely impacted by any agency action. It is a review based on the administrative record. We respond to these arguments here based on the administrative record in *Rosales II.*

> **a.    The Secretarial election was requested by a majority of a quorum of qualified voters.**

Plaintiffs allege that the Jamul Indian Village had not requested a Secretarial election, nor was there a petition requesting the election. Plfs MSJ at 17. They base their challenge on their argument that the BIA could not determine the proper quorum of qualified and registered voters. Plfs MSJ at 18.

The administrative record documents that on November 4, 1995, the tribal council of the Jamul Indian Village requested the Secretary call an election to amend its constitution. Those attending the meeting included original members, as well as others. There was, however, a quorum of 30% of the 15 surviving original members, and they voted unanimously on Resolution 95:47 requesting a Secretarial election to amend their constitution. AR 1707 (listing by name the 5 original members constituting a quorum and voting unanimously to hold a Secretarial election), AR 1446 (Resolution 95.47 passed unanimously), AR 1697 (regarding vote at meeting on Resolution), AR 1444 (listing of the fifteen then living members).[9] The IBIA so

---

[9]The Secretary of the Interior shall authorize the calling of an election to amend an IRA constitution "when requested pursuant to the amendment article" of the constitution. 25 C.F.R. § 81.5(d). Article IV provides that the general council is composed of all qualified voters of the Village who are 18 years of age or older. AR 2367. Article XI provides that a quorum consists of 30% of the qualified voters. AR 2372. Article XVI of the Jamul Village's constitution provides that a request to amend the constitution can be made by the general council *or* upon receipt of a petition signed by 30% of the qualified voters. AR 2374. Plaintiffs argue that there is "no evidence in the record that a lawful majority of qualified members" requested the Secretarial election. Plfs MSJ at 18, 19. Plaintiffs ignore AR 1707 that lists the members forming the quorum and their unanimous vote. Plaintiffs also apply the wrong standard. The

held. 34 IBIA 50, 51 (1998). Plaintiffs did not allege before IBIA in *Rosales II*, nor do they

now cite evidence in that record, that there were other members eligible to request this election.

Only the 15 survivors of the original 23 members were allowed to register and participate

in the election and plaintiffs cite no evidence in the administrative record that non-members

registered or voted in the Secretarial election.[9] Indeed, plaintiffs concede that all 15 are

members of the Tribe. Plfs MSJ at 10. The administrative record also includes declarations

from nine of the twelve survivors that they did not support Rosales and Toggery's appeal before

the IBIA. AR 1422, 1435-1443.

The BIA limited the voters to the survivors of the original 23 members because it had

concluded, as explained by letter dated October 10, 1996, regarding certain 1994 and 1995

elections, AR 2335 at 2337, that no enrollment ordinance had been submitted to the BIA or

approved by BIA as required by the Tribe's constitution, and that there was no evidence that

those original 23 ever admitted new members in accord with the constitution. Therefore, only

original members who voted to adopt the Jamul Village Tribal Constitution on May 9, 1981, (15

still living original members) were entitled to register to vote in the election. This conclusion is

---

constitution requires only a majority vote of the general council when a quorum is present, not a
majority vote of all members. Further, it is clear that non-members attending that meeting are
not to be counted in determining a majority vote. Plfs MSJ at 8.

[9]Plaintiffs alleged in their letter to BIA before the Secretarial election that none of the 7 who
voted were eligible to vote because they did not reside on the reservation. AR 2275. Plaintiffs
appear to have abandoned this argument before IBIA and instead argued that all 15 persons were
eligible to vote in the Secretarial election, an argument reiterated here. Plfs MSJ at 10. Since
plaintiffs cite no evidence in the administrative record, or here, that they were entitled to vote in
the Secretarial election, they have no standing to raise any issues concerning the voters'
eligibility. Nor did they do so within the regulatory procedures either before the election with
the election board, 25 C.F.R. § 81.13, or after the election within 3 days with substantiating
evidence. 25 C.F.R. § 81.22

consistent with the subsequent decision in *Rosales I* that only the original 23 persons were members of the Tribe, a decision not challenged by plaintiffs. 32 IBIA at 166. Contrary to plaintiffs' allegations, Plfs MSJ at 17,19, the BIA could determine that a lawful majority requested the Secretarial election, and protected their rights.

>    **b.    Plaintiffs have no standing to challenge that the timing of the Secretarial election rendered it void.**

Under the IRA, the Secretary shall call and hold an election within 90 days of receipt of a tribal request for election to ratify an amendment to its constitution. 25 U.S.C. § 476(c)(1)(B). Plaintiffs argue that the Secretarial election was not held within 90 days of the request for the election, and thus is void. Plfs MSJ at 21. This court should reject this argument for numerous reasons.

First, this argument was not raised before IBIA and thus is not properly before this court. Under ordinary principles of administrative law a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency. *See United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 36-37 (1952); *Unemployment Compensation Comm'n of Alaska v. Aragon,* 329 U.S. 143, 155 (1946); *Hormel v. Helvering,* 312 U.S. 552, 556-557 (1941); see also 2 K. Davis & R. Pierce, Administrative Law Treatise § 15.8, pp. 341-344 (3d ed.1994).[19] The judicially-imposed issue exhaustion requirement – which is analogized "to the rule that appellate courts will not consider arguments not raised before trial courts," *Sims v.*

---

[19] The Supreme Court explained: "[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts. ... [C]ourts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *L.A. Tucker Truck Lines, supra,* at 37.

*Apfel,* 530 U.S. 103, 108-09 (2000), applies to administrative proceedings that are similar to traditional litigation – that is, whether the proceeding before the administrative agency is sufficiently "adversarial," as opposed to "inquisitorial." *Sims,* 530 U.S. at 109-110; *see Osborne v. Babbitt,* 61 F.3d 810, 814 (10th Cir. 1995) (argument not made in BIA probate appeal at agency waived). The IBIA proceedings are adversarial, conducted on the record. *See generally,* 43 C.F.R. §§ 4.1, 4.20-31, 4.310-318. The BIA is represented by government counsel and appellants are represented by their attorneys before the Board. 43 C.F.R. § 4.3.

Second, plaintiffs have no standing to raise this issue as they were not entitled to vote in the election. As to the Constitutional requirements for standing, the Supreme Court in *Defenders of Wildlife v. Lujan,* 504 U.S. 555 (1992) reiterated that a plaintiff seeking to invoke a federal court's jurisdiction must establish: (1) that it has suffered an "injury in fact," which is concrete and particularized, and actual or imminent, not conjectural or hypothetical," 504 U.S. at 560; (2) that its injury is fairly traceable to the challenged action of the defendant, *id.,* and (3) that it is "'likely' as opposed to merely 'speculative'" that the plaintiff's injury will be "'redressed by a favorable decision,'" *Lujan,* 504 U.S. at 561. These three elements constitute the "irreducible minimum" required by Article III of the Constitution. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472 (1982).

Plaintiffs, however, cannot satisfy any of the three requirements. Here, there is no injury in fact because plaintiffs were not entitled to vote in the election, and thus any delay in holding the election did not impact them. Since they had no injury, it is not traceable to defendants. To the extent they allege "injury" because the Tribe's constitution was amended, that "injury" is traceable to the voters, not the defendants. Also, it is not likely that the injury is redressable

here. The only remedy available under the APA is remand to the agency, and as discussed next,

the 90 day time period does not create a remedy for a non-qualified voter.

Failure to adhere to time periods in holding an election does not void an election, but

instead provides rights to the qualified voters to compel action by the BIA to hold an election.

As stated in *Coyote Valley Band of Pomo Indians v. United States,* 639 F. Supp. 165, 173 (E.D.

Cal. 1986), prior to the 1988 amendment to the IRA that imposed a time period, "the Secretary

has a mandatory duty to call elections" upon a request from an eligible tribe and could not delay

the election indefinitely. The court noted that the regulations provide that the Secretary shall

authorize the calling of an election upon the request from the tribal government, 25 C.F.R.

§ 81.5(a). The court found that the use of the word "shall" imposes a nondiscretionary duty on

the Secretary to call elections and comports with the language in 25 U.S.C. § 476. *Id.* at 174-

75.[1/] Contrary to plaintiffs arguments, the statute does not provide that the BIA is "statutorily

required to await a fresh request before proceeding to stage such an election" as alleged by

plaintiffs. Plfs MSJ at 21. Such an argument conflicts with the reasoning and ruling in *Coyote*

*Valley.*

If anything, the IRA provides the opposite result of that argued here by plaintiffs. The

IRA provides that if the Secretary does not approve or disapprove amendments within 45 days

from holding the election, that the "Secretary's approval shall be considered as given." 25 U.S.C.

§ 476(d)(2). Further, the district court in *Thomas v. United States,* 141 F. Supp.2d 1185, 1199

(W.D. Wis. 2001), following remand from the Seventh Circuit on Fed.R.Civ.P. 19 issues, 189

_____

[1/]Subsequently, Congress amended the IRA to include a timetable for calling an election - thus
permitting a mandamus action to compel the calling of it.

F.3d 662 (7th Cir. 1999), *cert. denied* 121 S.Ct. 33 (2000), found that the BIA could not disapprove the amendments outside the 45 day period, even though the Secretary found a fundamental flaw in the election after the election results had been approved.

Plaintiffs here seek to have this court remand the approval of the amendments, approved in 1996, to the Department for disapproval outside the 45 day period. Of note, plaintiffs cite no case law to support their argument that not holding the election within 90 days would void the subsequent election and approval. Further, this issue of reversal of the approval specifically was not presented before the IBIA in *Rosales II*, AR 2218. Finally, plaintiffs have no standing here to challenge the results of an election in which they were not entitled to vote.

Finally, general election law disfavors voiding an election based on a procedural technicality where the will of the voters is express. In general, if there is substantial compliance with the statutes regulating elections, then the election is valid. And, where an election reflects the will of the voters, courts are disinclined to set such election aside because of a departure from a statutory provision as to the time of holding it. Rather, courts are willing to treat statutory provision pertaining to the time of holding an election as directory, so as to authorize or permit the election to be held at a later date, where the person or body charged with the duty of calling or holding the election has failed or refused to do so. *Chicago, Milwaukee, St. Paul & Pacific Railroad Co., v. Fallon County*, 28 P.2d 462, 463-464 (Sup. Ct. Montana, 1933), 26 Am. Jur. 2d. § 319.

For the foregoing reasons, plaintiffs should fail in their present attempt to have an election in which they could not vote, which was held outside a 90 day time period, set aside.

      **c.**      **Plaintiffs have no standing to argue that all 15 persons were eligible to vote in the Secretarial election.**

Plaintiffs argue also that the 15 persons did not have to register to vote in the Secretarial

election and that the BIA violated the IRA and the National Voter Registration Act, 42 U.S.C.

§ 1973gg-6, by requiring the 15 to register to vote in the Secretarial election. Plfs MSJ at 22.

Plaintiffs also argue that the vote was insufficient to pass the amendment. Plfs MSJ at 26-28.

Plaintiffs erroneously equate members of an Indian tribe with "qualified voters" in a

Secretarial election. They disagree with the regulatory requirement that members must register

to vote in the election and argue that this requirement is an unlawful removal of voters from a

voters list. Plaintiffs have no standing to make this argument that at best could be raised by the

15 living members. Of note, nine of the twelve survivors did not support plaintiffs before the

IBIA in *Rosales II.* AR 1422, 1435-1443. Walter Rosales and Karen Toggery did not allege

before the IBIA that they were entitled to vote in the Secretarial election or that they were denied

the opportunity to register. They therefore lack standing to raise this issue before this court. .

### d. The election was valid.

Assuming arguendo, that plaintiffs had standing, their argument nevertheless fails on its

merits. Secretarial elections are federal elections, *Thomas,* 189 F.3d at 667; *Cheyenne River*

*Sioux*, 566 F.2d at 1088, and are governed by the IRA and its implementing regulations. The

regulations provide that after receiving a proper request for a Secretarial election, the

"authorizing officer" of the BIA calls the election, 25 C.F.R. § 81.1(c). For a reorganized tribe

to amend its constitution, only members "who have duly registered shall be entitled to vote." 25

C.F.R. § 81.6(d). "Registration" is "the act whereby persons, who are eligible to vote, become

entitled or qualified to cast ballots" in the Secretarial election by having their names placed on

the list of persons who will be permitted to vote. 25 C.F.R. § 81.1(o). In other words, tribal

26

members must register with the election board in order to be "qualified" to vote in the federal

election. Only registered persons are entitled to vote in the federal election, and the sufficiency

of the vote is based upon the number of registered voters who vote, provided a certain

percentage does so. 25 C.F.R. § 81.11(a).

These regulations and their interpretation are entitled to deference. *Chevron, U.S.A., Inc.*

*v. Natural Resources Defense Council,* 467 U.S. 837, 842-43 (1984) ("[C]onsiderable weight

should be accorded to an executive department's construction of a statutory scheme it is

entrusted to administer."), *Coyote Valley,* 639 F. Supp. at 174 (providing great deference to the

Part 81 regulations), *Shakopee Mdewakanton Sioux Community v. Babbitt,* 107 F.3d 667, 671 (8th

Cir. 1997) (providing controlling weight to the Secretary's interpretation of its regulations).

Plaintiffs rely on *Thomas.* Plfs MSJ at 23. Of note, the same registration requirements

were used in *Thomas,* where the 3,659 voting-eligible members of the tribe were told of the need

to register, and 1,130 members did. At the election, 650 votes were cast, and both amendments

passed, with votes of 542-105 and 373 to 274. 141 F. Supp. at 1188, 1189. The court upheld

these results under the IRA.[12] This holding is contrary to the argument of plaintiffs here that

51% of the 15 members of the tribe had to adopt the amendments.

Plaintiffs also rely on *Shakopee Mdewakanton Sioux Community v. Babbitt,* 107 F.3d 667

(8th Cir. 1997). There, the Eighth Circuit upheld the decision of the Secretary disapproving the

_____

[12]The registration process is the creation of a voter roll for the Secretarial election. It is not the removal of persons from an existing federal voter list. It is the same process used in 1981 in reorganizing the Jamul Indian Village, *compare* AR 2314-16 (petition) with AR 2317 (list of registered voters). Nor do plaintiffs have standing to raise this issue when they themselves were not among the original 15, and they were neither entitled to vote in the prior 1981 Secretarial election, nor removed from any voter list.

results of the Secretarial election within the 45 time period, where the Secretary could not

determine if the correct persons voted in the election, and could not determine that there was

harmless error.[13]  AR 2237.  The Secretary's decision was in response to challenges, with

substantiating evidence, filed within the regulatory 3 day time period, 25 C.F.R. § 81.22.  In

addition, challenges to the posted list of registered voters were filed before the election board

before the election was held.  25 C.F.R. § 81.13.  No similar challenges were filed by plaintiffs

here.  AR 2233 (distinguishing election at Shakopee from that at Jamul);  AR 2235-2244

(Assistant Secretary's decision letter in Shakopee).

The election results on the Jamul constitutional amendment conformed to the amendment

article of the Tribe's 1981 constitution.  Eight of the 15 eligible members registered and became

"qualified voters" "entitled" to vote (25 C.F.R. 81.1(o)); 7 voted in the election which was more

than 51% of those "entitled" to vote, and the vote was unanimous.  AR 1449.  The constitution

as amended was approved on October 15, 1996.[14]  AR 1450.  *Rosales II*, 34 IBIA 50, at 51.

The IBIA decision in Rosales II, holding that plaintiffs' "August 28, 1996, letter did not

require a response from BIA beyond a decision as to whether or not to hold the Secretarial

election, and that there was no valid challenge to the Secretarial election under 25 C.F.R.

§ 81.22" is not arbitrary and capricious, or contrary to law.  Plaintiffs' arguments to the contrary

are without support.

---

[13]Of note, even if Walter Rosales and Karen Toggery challenged the election results with the
regulatory time period and alleged that they had been denied the opportunity to register to vote,
it would have been harmless error.  The vote would have changed from 7-0 to 7-2, assuming
plaintiffs would have voted against the amendment.

[14]The amended constitution is located at AR 0543-0553, *Rosales IV*.

**B.    THE IBIA DECISION IN *ROSALES III* IS NOT ARBITRARY OR CAPRICIOUS.**

In *Rosales v. Sacramento Area Director,* 34 IBIA 125 (1999), (*Rosales III*), the IBIA

dismissed as moot plaintiffs' challenge to the BIA decision recognizing the results of a 1997

tribal election of officers.  The IBIA reasoned that since the BIA's approval of a subsequent

1999 the tribal election for officers had not been challenged or appealed, appellants challenge to

the prior 1997 election was moot, citing IBIA precedent.  Appellants filed a request for

reconsideration, alleging that the 1999 election was challenged, and the IBIA took the request for

reconsideration under advisement.  AR 1075-56.  The IBIA in *Rosales IV* denied the motion for

reconsideration, letting stand the dismissal of the challenge to the 1997 election as moot, after

finding that the 2001 election of tribal officers was a valid election.  Plaintiffs make no specific

arguments challenging the reasoning in *Rosales III* that subsequent valid elections moot out

challenges to prior elections.  Therefore, the decision in *Rosales III* is not arbitrary and

capricious.

**C.    THE IBIA DECISION IN *ROSALES IV* IS NOT ARBITRARY OR CAPRICIOUS.**

In *Rosales v. Pacific Regional Director*, 39 IBIA 12 (2003), (*Rosales IV*), the IBIA

reviewed the BIA's decision upholding a 2001 tribal election of officers.  The IBIA noted that

the results of the Secretarial election to amend the Tribe's IRA constitution were final with the

decision of *Rosales II* on July 29, 1999, and that no evidence was presented that the 2001 tribal

election was conducted in violation of the amended constitution.  The IBIA upheld the approval

of the 2001 election.  The IBIA then denied the motion to reconsider *Rosales III* and found that

the challenges to the prior elections in 1997 and 1999 were moot.

The IBIA in *Rosales IV* recognized that a lasting resolution of the issues raised in the series of appeals could occur only with a resolution of the underlying membership questions previously identified in *Rosales I* and requested a report from the BIA Regional Director, and accepted comments from plaintiffs on it. 39 IBIA at 13-14, AR 0035-0040 (status report). The IBIA noted that the genealogy report confirmed that all 23 original members met the requirements of the Tribe's 1981 constitution, *id.* at 14, and noted that the only voters in the Secretarial election at issue in *Rosales II* were original members. *Id.* at 15. The IBIA noted that it had rejected appellants argument that the Tribe could not amend its constitution's ½ blood requirement for membership in *Rosales I*, a decision not challenged by plaintiffs. *Id.* at 15. The decision then rejected appellants' argument that the BIA had not addressed the membership issues raised in *Rosales I*.

The IBIA then noted that most of appellants' remaining arguments were based on their contention that the 1996 Secretarial election was invalid. 39 IBIA at 15. The IBIA noted that the decision in *Rosales II* was final for the Department on July 29, 1999, and the fact that it was decided on procedural grounds rather than substantive grounds "does not enable Appellants to continue to assert their substantive arguments." *Id.* "The bottom line . . . is that Appellants failed successfully to challenge the 1996 Secretarial election, and the Village's Constitution was amended to allow membership with a 1/4-degree blood quantum." *Id.* The IBIA found that the 2001 tribal election was held after the constitutional amendment was adopted and that appellants "failed to show that the 2001 election was not conducted in accordance with the Constitution[]". *Id.* The IBIA held that they did not carry their burden of proving that the BIA committed any reversible error in recognizing the 2001 tribal election results. *Id.* The IBIA therefore found the

2001 tribal election valid, and that it mooted out challenges to the prior 1997 and 1999 tribal

elections. *Id.* at 16.

Plaintiffs argue before this court that *Rosales IV* is arbitrary and capricious because the

Tribe's constitution was not lawfully amended: "Plaintiffs have consistently claimed that, since

April 22, 1998, there has never been a lawfully called, or lawfully conducted, Secretarial election

to amend the original constitution . . ." Plfs MSJ at 30.   However, as briefed above, the

August 31, 1996, Secretarial election was valid and was never challenged by a qualified voter.

Therefore, plaintiffs' argument fails.

Finally, plaintiffs argue also that the BIA did not comply with *Rosales I*'s request to

assist the Village's members in addressing their membership and leadership problems.   Plfs MSJ

at 31.   The IBIA in *Rosales IV,* however, rejected this contention, noting that the genealogy

report addressed the issues raised in *Rosales I.*[19]

Plaintiffs cite no evidence in the administrative record of *Rosales IV* and make no viable

argument that the IBIA decision in *Rosales IV* is arbitrary and capricious.

**CONCLUSION**

---

[19]In short, having verified that all 23 were valid members, it was confirmed that the subsequent
votes to amend the constitution were made by legitimate members. Also, as delineated above,
Walter Rosales and Karen Toggery have never challenged that persons other than the surviving
original members were entitled to vote in that election and never alleged that they tried to
register to vote and/or were denied the right to vote in that election. *See also supra* fn.7 above,
that no evidence is in the record that the 1994 enrollment ordinance was ever presented to the
BIA in accord with the Tribe's constitution.

31

For the foregoing reasons, the IBIA decisions in Rosales II, III, and IV are not arbitrary and capricious or contrary to law and judgment should be entered dismissing plaintiffs' action with prejudice, and denying plaintiffs' motion for summary judgment.


Dated June 14, 2004                     Respectfully submitted,

                                        THOMAS L. SANSONETTI
                                        Assistant Attorney General


                              By:     Electronically Signed
                                        EDWARD J. PASSARELLI  VA Bar # 16212
                                        Senior Counsel
                                        General Litigation Section
                                        Environment & Natural Resources Division
                                        U.S. Department of Justice
                                        P.O. Box 663
                                        Washington, D.C. 20004
                                        Telephone: (202) 305-0468
                                        Fax:       (202) 305-0506

                                        Attorney for Defendants



Of Counsel:
Barbara N. Coen, DC #966374
U.S. Department of the Interior
Division of Indian Affairs
Room 6456, 1840 C Street N.W.
Washington, D.C. 20240
202-208-6526

# EXHIBIT O

# CONSTITUTION
# OF THE
# JAMUL INDIAN VILLAGE
# SAN DIEGO COUNTY
# JAMUL, CALIFORNIA

## PREAMBLE

We, the members of the Jamul Indian Village, in order to form a better community government, to establish a formal organization, to promote our common welfare, and to secure the privileges and powers provided by the Indian Reorganization Act of June 18, 1934 (48 Stat. 984) do hereby ordain and establish this constitution and bylaws.

## ARTICLE 1 - NAME

The name of this tribal entity shall be the Jamul Indian Village, hereinafter referred to as the "village".

## ARTICLE 2 - TERRITORY

The jurisdiction of Jamul Indian Village shall extend to all lands now within the confines of the Jamul Indian Village and to such lands as may hereafter be added thereto.

## ARTICLE 3 - MEMBERSHIP

Section 1.    The members of the Jamul Indian Village shall consist of those persons who file applications for membership with and are found qualified by the Executive Committee under one of the following categories:

(a)    Persons of 1/4 or more degree of California Indian Blood who filed as Jamul Indians and were listed on the September 21, 1968 Judgment Roll of Certain Indians of California.

(b)    Persons of 1/4 or more degree of California Indian Blood who resided in the Jamul Indian Village, Jamul, California, at the time of the adoption of the original Jamul constitution.

(c)    Persons of 1/4 or more degree of total California Indian Blood whose ancestors meet the requirements of Sections 1(a) or 1(b) regardless of whether the ancestors are living or deceased.

(d)    Persons who have been adopted by the village in accordance with an adoption ordinance, provided they are not less that 1/4 degree Indian blood.

(e)    Lineal descendants of members, provided the descendent possesses 1/4 degree of Indian blood.

Section 2.    No persons shall be a member of the Jamul Indian Village if he:

(a)    Has been allotted on another reservation or on the public domain.

(b)    Is officially enrolled with or has received a land use assignment or payments by reason of membership in another tribe, band, rancheria or village.    Land or money received through inheritance shall not be a bar to enrollment as a member of the Jamul Village.

(c)    Has relinquished in writing his membership in the Jamul Indian Village.

(d)    Is less than one-fourth (1/4) degree Indian blood.

Section 3.    The governing body shall adopt an enrollment ordinance governing the loss of membership and the enrollment of new members and prescribe rules and procedures by which the membership roll shall be prepared and thereafter kept current.

## ARTICLE 4 - GOVERNING BODY

Section 1.    The governing body of the Jamul Indian Village shall be the General Council composed of all qualified voters of the village who are eighteen (18) years of age or older.    All actions of the General Council shall be determined by majority vote of the membership present at a duly called General Council meeting, provided that a quorum is present.

Section 2.    The General Council shall elect from its members, by secret ballot, an Executive Committee consisting of a Chairman, Vice-Chairman, and three (3) committee members who shall hold office for two (2) years or until their successors are duly elected and installed.    The Executive Committee shall select a Secretary-Treasurer to assist them in the administration of tribal affairs.    The Secretary-Treasurer may or may not be a member of the Jamul Indian Village, but shall not be entitled to vote as an officer.

Section 3.    The General Council may appoint or elect such other committees as are deemed necessary or the Chairman may be delegated the authority to appoint such committees if in the opinion of the General Council it becomes necessary.

## ARTICLE 5 - ELECTIONS

Section 1.    The officers of the Executive Committee in office at the time of approval of this constitution by the Secretary of the Interior or his authorized representative shall continue in office until their successors are duly elected and installed in office.    The first regular election of officers under this constitution shall be held when the terms of the current officer holders expire.    Thereafter, elections shall be every two years.    Regular elections of officers shall be conducted at the Jamul Tribal Hall, or as directed by election ordinance.

<u>Section 2.</u>    The election ordinance shall include, but not be limited to, provisions for a fair election, secret balloting, nomination of candidates, absentee balloting and procedures for handling protests and resolving election disputes.  Provisions shall also be included regarding the conduct of recall and referendum elections and a uniform procedure for submitting petitions.  Elections to amend this constitution shall be conducted in accordance with Article 16 of this constitution.

<u>Section 3.</u>    All enrolled members of Jamul Village who are eighteen (18) years of age or older shall be entitled to vote in tribal elections.

<u>Section 4.</u>    A candidate for a position on the Executive Committee must be a qualified voter of Jamul Village eighteen (18) years of age or older.  No person who has been convicted of a felony within the previous seven years, or within the last year preceding has been convicted of a crime involving dishonesty shall be eligible to hold Office on the Executive Committee.

<u>Section 5.</u>    All elections of tribal officers shall be by secret ballot.

<u>Section 6.</u>    The time, place and manner of nominations shall be specified in the election ordinance adopted pursuant to Section 2 of this article.

## ARTICLE 6 - REMOVAL, RECALL AND FORFEITURE

<u>Section 1.</u>    Removal For Cause:  Not more than forty-five (45) days after receipt of a petition signed by thirty-five percent (35%) of the qualified voters requesting the removal from office of an elected official, a quorum of the Executive Committee shall call a special General Council meeting to hear the charges against the official.  The petition must set forth the specific reasons for which removal is sought.  Such General Council meeting shall be held not less than ten (10) days nor more than forty-five (45) days of the date that a valid petition for removal action is filed with the Executive Committee.  It shall at the same time notify the accused in writing of the charges against him/her and of the date, hour and place of the General Council meeting at which time he may appear and answer those charges.  After the accused has had full opportunity to be heard by the General Council, a secret ballot vote for or against removal shall be conducted.  The decision of a majority of those present and voting shall govern, provided that at least thirty percent (30%) of those eligible to vote shall vote.  If the official is found guilty by such vote, his/her office shall be automatically vacated and the General Council shall proceed to nominate candidates and elect a replacement official who shall serve the unexpired term of office.

<u>Section 2.</u>    Recall:  Upon receipt of a petition signed by at least thirty-five percent (35%) of the qualified voters requesting the recall of any member of the Executive Committee, a quorum of the Executive Committee shall call a special General Council meeting within forty-five (45) days of receipt of the petition.  Such General Council meeting shall be held not less than ten (10) days nor more than forty-five (45) days of the date that a valid petition is filed with the Executive Committee.  The General Council shall vote by secret ballot whether to recall the member or members named in the petition.  The decision of a majority of those present and voting shall govern, provided that at

- 3 -

least thirty percent (30%) of those eligible to vote shall vote. Once an individual has been subjected to recall proceedings, he or she shall not again be subject to such action during the balance of his or her term of office. No cause is required for recall action.

Section 3.    Forfeiture: If any officer shall die, resign, be removed or recalled from office, permanently leave the community, or shall be found guilty in any Federal or State Court of a felony while in office or of a crime involving dishonesty, that office shall automatically be declared vacant.

## ARTICLE 7 - VACANCIES

Except as provided in Article 6, Section 1, any office which has been vacated, shall be filled by election of the General Council at its next meeting and such replacement shall serve the unexpired term of office.

## ARTICLE 8 - POWERS

Section 1.    General Council Powers: The General Council of the Jamul Indian Village shall exercise the following powers subject to any limitations imposed upon such powers by Federal law and the Constitution of the United States:

(a)    To negotiate with Federal, State, and local governments;

(b)    To retain legal counsel, the choice of counsel and the fixing of fees to be subject to the approval of the Secretary of the Interior or his authorized representative so long as such approval is required by law;

(c)    To prevent the sale, disposition, lease or encumbrance of tribal lands, interests in land or other tribal assets without the consent of the village;

(d)    To advise the Secretary of the Interior with regard to all appropriation estimates for Federal projects for the benefit of the Jamul Indian Village prior to the submission of such estimates to the Office of Management and Budget and to Congress;

(e)    To establish ordinances governing the conduct of tribal members; providing for the maintenance of law and order and the administration of justice by establishing a tribal court and defining its powers and duties subject to the approval of the Secretary of the Interior where such approval is required by law;

(f)    To establish or join such housing and other authorities as are necessary to promote the welfare of the village;

(g)    To promote and protect the peace, health, morals, education, and general welfare of the village and its members;

- 4 -

(h)     To administer tribal assets and manage all economic affairs of the village;

(i)     To borrow money from any source whatsoever without limit as to amount, and on such terms and conditions and for such consideration and periods of time as the General Council shall determine; to use all funds thus obtained to promote the welfare and betterment of the village and its members; to finance tribal enterprises; or to lend money thus borrowed;

(j)     To adopt any ordinances and resolutions necessary or incident to the exercise of any of the foregoing powers and duties;

(k)     To levy and collect taxes and raise revenue to meet the needs of the tribe or to support tribal government operations;

(l)     To cultivate and preserve native arts and crafts, culture, and ceremonials;

(m)     To establish ordinances, subject to the approval by the Secretary of the Interior, providing for the manner of making, holding, and revoking of assignments of village lands or interest therein, and to make leases of village lands in accordance with applicable laws.

Section 2.     Executive Committee Powers: The Executive Committee shall have the following powers, but shall not commit the Jamul Indian Village to an contract, lease or other transaction unless it is authorized in advance by a duly enacted ordinance or resolution of the General Council:

(a)     To carry out all ordinances, resolutions or other enactments of the General Council;

(b)     To represent the Jamul Indian Village in all negotiations with Federal, State and local government and advise the General Council of the results of all such negotiations.

Section 3.     Any rights or powers heretofore vested in the Jamul Indian Village, but not expressly referred to in this constitution, shall not be lost by their omission but may be exercised by the adoption of appropriate amendments to this constitution.

## ARTICLE 9 - TRIBAL ENACTMENTS

Section 1.     Ordinances: All final decisions on matters of general and permanent interest to members of the community shall be embodied in ordinances, such as an enrollment or an election ordinance. Such enactments shall be available for inspection by members of the General Council during normal office hours.

Section 2.     Resolutions and Motions: All final decisions on matters of short term or one time interest where a formal expression is needed shall be embodied in resolutions. Other decisions of a temporary nature or relating to particular individuals, officials, or committees shall be put in the

- 5 -

form of motions and noted in the minutes and shall be available for inspection by members of the General Council during normal office hours.

Section 3.    All ordinances and resolutions shall be dated and numbered and shall include a certification showing the presence of a quorum and the number of members voting for or against the proposed enactment.

Section 4.    No enactment of the Jamul General Council shall have any validity or effect in the absence of a quorum of the membership thereof at a legally called session.

Section 5.    Approval of Tribal Enactments.  Any resolution or ordinance which by the terms of this constitution or Federal law requires the approval of the Secretary of the Interior must be sent to the local Bureau Superintendent following its enactment.  The enactment shall become effective when it is approved by the Secretary's authorized representative, or when deemed approved by the Secretary by operation of law.

## ARTICLE 10 - BILL OF RIGHTS

Section 1.    All members of the community shall enjoy without hindrance, freedom of worship, conscience, speech, press, assembly and association.

Section 2.    This constitution shall not in any way alter, abridge, or otherwise jeopardize the rights and privileges of the members of the community as citizens of the State of California or the United States.

Section 3.    The individual property rights of any member of the Jamul Community shall not be altered, abridged or otherwise affected by the provisions of this constitution.

Section 4.    Jamul Indian Village members shall have the right to review all tribal records, including financial records, at any reasonable time in accordance with procedures established by the Executive Committee.

Section 5.    In accordance with Title II of the Indian Civil Rights Act of 1968 (82 Stat. 77), the Jamul Community in exercising its powers of self-government shall not:

(a)    Make or enforce any law prohibiting the full exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;

(b)    Violate the right of the people to be secure in their persons, houses, papers and effects against unreasonable search and seizure, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;

- 6 -

(c)      Subject any person for the same offenses to be twice put in jeopardy;

(d)      Compel any person in any criminal case to be a witness against himself;

(e)      Take any private property for a public use without just compensation;

(f)      Deny to any person in a criminal proceeding the right to a speedy trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, at his own expense, to have the assistance of counsel for his defense;

(g)      Require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one (1) year or a fine of $5,000 or both;

(h)      Deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of laws;

(i)      Pass any bill of attainder or ex post facto law;

(j)      Deny to an person accused of an offense punishable by imprisonment the right, upon request, to a tribal by jury of not less than six (6) persons.

## ARTICLE 11 - MEETINGS

<u>Section 1.</u>      Regular meetings of the General Council shall be held on the third (3rd) Saturday of each month at a place designated by the Executive Committee.

<u>Section 2.</u>      Special meetings may be called at any time by the Chairman and shall be called by him upon the written request of the majority of the Executive Committee or upon the written request of twenty-five percent (25%) of the General Council provided that at least ten (10) days written notice shall be given in advance of the meeting in each instance.

<u>Section 3.</u>      Twenty percent (20%) of the qualified voters shall constitute a quorum at all meetings of the General Council.  Notices of all General Council meetings shall be given in writing at least ten (10) days in advance of the meeting.

<u>Section 4.</u>      Regular meetings of the Executive Committee shall be called by the Chairman or, in his absence, by the Vice-Chairman when deemed necessary.

<u>Section 5.</u>      Special meetings of the Executive Committee may be called by the Chairman at his discretion, and shall be called by him upon written request of three (3) members of the Executive Committee.

Section 6.    Three (3) members of the Executive Committee shall constitute a quorum for the conduct of its business.

## ARTICLE 12 - DUTIES OF OFFICERS

Section 1.    The Chairman shall preside at all meetings of the General Council and of the Executive Committee. The Chairman shall also be the chief executive officer of the village and exercise any authority delegated to him by the General Council, such as to execute on behalf of the village all contracts, leases or other documents approved by the General Council. When neither the General Council nor the Executive Committee are in session the Chairman shall be the official representative of the village. The Chairman shall vote only in the case of a tie vote in either the General Council or Executive Committee meeting. The Chairman shall also have the power to delegate his duties.

Section 2.    The Vice-Chairman, in the absence of the Chairman, shall have the power and authority of the Chairman and may, if authorized by the Chairman, assist the Chairman in the performance of his duties.

Section 3.    The Secretary-Treasurer shall keep the minutes of both the General Council and Executive Committee meetings. The Secretary-Treasurer shall certify the enactment of all ordinances or resolutions of both the General Council and Executive Committee. The Secretary-Treasurer shall attend to the giving of all notices required by this document. The Secretary-Treasurer shall have care and custody of all valuables for the village and deposit all money in an approved depository. The Secretary-Treasurer shall disburse all funds as ordered by the General Council by check to be co-signed by the Chairman. The Secretary-Treasurer shall maintain all financial accounts, receipts and records which shall be available for inspection by officers of the General Council. All financial records of the village shall be audited as may be directed by the General Council.

The Secretary-Treasurer shall notify by mail all members of the coming meetings or any special meetings at least ten (10) days prior to their occurrence. The Secretary-Treasurer will also be expected to give a financial report at each General Council meeting. All financial records shall be available for inspection by any member of the community through appointment according to procedures established by the Executive Committee. At the expiration of the term of office, all the records and papers in the possession of the Secretary-Treasurer shall be turned over to the successor or the Executive Committee.

## ARTICLE 13 - OATH OF OFFICE

Section 1.    Each officer, elected or appointed hereunder, shall take an oath of office prior to assuming the duties thereof, by which oath he shall pledge himself to support and defend the Constitution of the United States and this Constitution. Oath:

I, _____ do solemnly swear that I support and defend the Constitution of the United States against all enemies; that I will carry out, faithfully and impartially, the

- 8 -

duties of my office to the best of my ability; that I will promote and protect the best interests of my village in accordance with the Constitution of the Jamul Indian Village.

## ARTICLE 14 - ORDER OF BUSINESS

Section 1.    The following order of business is hereby established for all meetings:

(1)    Call to order by the Chairman.
(2)    Ascertainment of a quorum.
(3)    Reading of the minutes of the last meeting.
(4)    Approval of last meeting's minutes.
(5)    Treasurer's Report.
(6)    Other Reports.
(7)    Unfinished business.
(8)    New Business.
(9)    Adjournment.

## ARTICLE 15 - SEVERABILITY

If any provision of this Constitution shall, in the future, be declared invalid by a court of competent jurisdiction, the invalid provision shall be severed and the remaining provisions shall continue in full force and effect.

## ARTICLE 16 - AMENDMENTS

Section 1.    This Constitution may be amended by a majority vote of the qualified voters of the Jamul Village voting in an election called for that purpose by the Secretary of the Interior or his authorized representative, provided that at least fifty-one percent (51%) of the those entitled to vote shall vote in such election. The amendment shall become effective when approved by the Secretary of the Interior or his duly authorized representative, or when deemed approved by operation of law.

Section 2.    If shall be the duty of the Secretary of the Interior or his authorized representative to call an election on any proposed amendment at the request of the General Council or upon receipt of a petition signed by at least thirty percent (30%) of the qualified voters of the Jamul Village.

## ARTICLE 17 - ADOPTION

Section 1.    This Constitution when adopted by a majority vote of the qualified voters of the Jamul Village, voting at an election called for that purpose by the Secretary of the Interior or his authorized representative in which at least fifty-one percent (51%) of those entitled to vote shall vote. It shall be submitted to the Secretary of the Interior for his approval, and shall become effective from the date of Secretarial approval, or when deemed approved by operation of law.

- 9 -

## CERTIFICATE OF RESULTS OF ELECTION

Pursuant to a Secretarial election authorized by the Deputy Commissioner of Indian Affairs, on _____Aug. 31, 1996_____, the Constitution of the Jamul Indian Village, San Diego County, Jamul California, was submitted to the qualified voters of the Jamul Indian Village, and on _____Aug. 31, 1956_____, was duly adopted/rejected by a vote of ___7___ (number) for, and ___∅___ (number) against, and ___∅___ (number) cast ballots found separated or mutilated, in an election in which at least fifty-one (51) percent of the ___8___ (number) entitled to vote cast their ballots in accordance with Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), as amended.


_____
Chairman, Election Board


_____
Election Board Member


_____
Election Board Member


Date: 8/31/96

## CERTIFICATE OF APPROVAL

I, __**Hilda A. Manuel**_____, Deputy Commissioner of Indian Affairs, by virtue of the authority granted to the Secretary of the Interior by the Act of June 18, 1934 (48 Stat. 984), as amended, and delegated to me by 230 D.M. 2.4, do hereby approve the Constitution of the Jamul Indian Village, San Diego County, Jamul, California. This Constitution is effective as of this date; PROVIDED, That nothing in this approval shall be construed as authorizing any action under this document that would be contrary to Federal law.

**Hilda A. Manuel**

**Deputy Commissioner of Indian Affairs**

Washington, D.C.

Date: **OCT 1 5 1996**

- 11 -

# EXHIBIT P

1   EUGENE MADRIGAL (Cal Bar No. 90429)
    LAW OFFICE OF EUGENE R. MADRIGAL
2   28581 Old Town Front Street, Ste. 208
    Temecula, CA  92590
3   Telephone:  (951) 695-7080
    Facsimile:  (951) 695-7081
4
    SKIP DUROCHER (*to be admitted pro hac vice*)
5   DORSEY & WHITNEY LLP
    50 South Sixth Street, Suite 1500
6   Minneapolis, MN 55402-1498
    Telephone:  (612) 340-2600
7   Facsimile:  (612) 340-2868
8   KENT J. SCHMIDT (Cal Bar No. 195969)
    DORSEY & WHITNEY LLP
9   38 Technology Drive
    Irvine, CA 92618
10  Telephone:  (949) 932-3600
    Facsimile:  (949) 932-3601
11
    Attorneys for Plaintiff
12
    JAMUL INDIAN VILLAGE
13

14

        **JAMUL INDIAN VILLAGE TRIBAL COURT**
15
        **INTERTRIBAL COURT OF SOUTHERN CALIFORNIA**
16

17

18  JAMUL INDIAN VILLAGE,              Case No.: Jamul 07-01-01

19      Plaintiffs,                    **ORDER AND DEFAULT JUDGMENT**

20      vs.

21  WALTER ROSALES, KAREN TOGGERY,
    LOUIS AHYULE GOMEZ, DOES 1 through
22  20, inclusive,

23      Defendants.

24

25

26

27

28

                    ORDER AND DEFAULT JUDGMENT-1

1    Before the Court is the Jamul Indian Village's Motion for Default Judgment against the

2    Defendants, Walter Rosales, Karen Toggery, and Louis Ahyule Gomez. Because the Defendants

3    have failed to serve and file an Answer in this action in accordance with the Court rules and this

4    Court's order, the Court will and hereby does enter a default judgment against each Defendant.

5    On January 16, 2007, the Jamul Indian Village filed a Complaint for Eviction and

6    Exclusion against the Defendants, Walter Rosales, Karen Toggery, and Louis Ahyule Gomez. On

7    January 22, 2006, counsel for the Defendants filed a special appearance in which he argued on

8    behalf of the Defendants that this Court does not have jurisdiction over this eviction and

9    exclusion action. On January 24, 2007, the Court issued an Order to Show Cause, requiring the

10    Defendants to appear at a hearing on February 1, 2007 at which time they would be required to

11    show cause as to why the Court did not have jurisdiction to hear this matter. At the request of

12    counsel for the Defendants, the Court moved the hearing date to February 2, 2007, and a hearing

13    was held at that time. During the hearing, counsel for Defendants was given an opportunity to

14    present evidence and argument as to why the Court lacked jurisdiction to hear the eviction and

15    exclusion action. At the conclusion of the hearing, this Court ruled that it has jurisdiction over

16    this eviction and exclusion matter. See Hearing Tr. at 59-60; Jamul Tribal Court Order After

17    Hearing Findings, at 4-5. The Court ordered the Defendants to serve and file an Answer to the

18    Complaint no later than February 8, 2007. Id. at 68; Order After Hearing Findings at 6. The

19    Defendants have not filed an Answer with this Court, nor have they served an Answer on the

20    Tribe.

21    Rule 7.1.01 of the Jamul Tribal Court/Intertribal Court of Southern California Rules of

22    Civil Procedure for Eviction and Exclusion Actions provides that the plaintiff may move for a

23    default judgment "[i]f the defendant in an eviction and exclusion action fails to plead or otherwise

24    defend the action within the time allowed by these rules." The Rules allow for five days to

25    answer a Complaint. See Jamul Eviction and Exclusion Rule 2.3.01. In addition, at the

26    jurisdictional hearing, the Court specifically instructed the Defendants that they must file their

27    Answer no later than February 8, 2007. See Hearing Tr. at 68. The Defendants have not filed an

28    Answer.

1        The Jamul Indian Village filed its Motion for Default Judgment on February 9, 2007.  On

2    February 14, 2007, Defendants filed a "Special Appearance to Oppose Motion for Default

3    Judgment."  In the special appearance, the Defendants continue to contest the jurisdiction of this

4    Court.  The Defendants make the same arguments that they made in their January 22, 2006,

5    special appearance.  However, the Court has already rejected these arguments and determined that

6    it has jurisdiction over this matter, following a hearing.  See Order After Hearing Findings at 4-5.

7    Because the Defendants failed to file an Answer in this case by February 8, 2007, as ordered by

8    the Court, and because they have failed to provide any substantive response to Plaintiffs' Motion

9    for Default Judgment, that Motion is granted.  Judgment is hereby entered in favor of the

10   Plaintiffs, the Jamul Indian Village, for possession of the premises currently occupied by the

11   Defendants.

12       The Defendants are ordered to vacate the Reservation not more than five days from the

13   date of this Order.  If the Defendants have not left the Reservation within five days, the Plaintiffs

14   may take all necessary action to have them removed, including enlisting the assistance of law

15   enforcement to assist with the removal of the Defendants and their personal property from the

16   Reservation.  The Plaintiffs are ordered to store the Defendants' personal property in a safe place

17   for at least fourteen days, during which time the Defendants may claim the property.  If the

18   Defendants' personal property includes any vehicles, the Plaintiffs are ordered to store the

19   vehicles in a safe place for thirty days.  The Defendants are ordered to pay for the storage costs of

20   their personal property and vehicles, as required by Jamul Eviction and Exclusion Rule 5.2.03.

21       Pursuant to Jamul Indian Village Ordinance No. 2007-01, this Judgment is final and is not

22   subject to appeal.  This Court will retain jurisdiction over this matter for as long as necessary to

23   enforce this Judgment and to hear any related issues.

24                 IT IS SO ORDERED.

25

26                 Chief Judge Anthony J. Brandenburg.
                   Jamul Indian Village Tribal Court
27
28                 February 16, 2007

ORDER AND DEFAULT JUDGMENT-3

EXHIBIT Q

1  Patrick D. Webb, Esq., State Bar No. 82857
   **WEBB & CAREY**
2  401 B Street, Suite 306
   San Diego, Calif. 92101
3  (619) 236-1650

4  Attorneys for Plaintiffs

5

6

7

8

   **UNITED STATES DISTRICT COURT**

   **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

9  WALTER ROSALES, MARIE              )   Case No. '01 CV 0951 IEG (JAH)
10 TOGGERY, and KAREN TOGGERY        )
                                      )   **COMPLAINT FOR DECLARATORY**
11          Plaintiffs,               )   **AND INJUNCTIVE RELIEF**
                                      )
12 vs.                                )   **AND DEMAND FOR JURY**
                                      )
13                                    )
                                      )
14                                    )
   UNITED STATES OF AMERICA, and its  )
15 divisions, including but not limited to, the )
   DEPARTMENT OF THE INTERIOR, the    )
16 BUREAU OF INDIAN AFFAIRS, the      )
   NATIONAL INDIAN GAMING            )
17 COMMISSION, and DOES 1-20,         )
                                      )
18          Defendants.               )
                                      )

19

   Plaintiffs allege upon information and belief as follows:

20                          **PARTIES**

21      1. Plaintiffs, WALTER ROSALES, MARIE TOGGERY, KAREN TOGGERY, are

22 Indian residents of San Diego County, with half or more degree of California Indian blood, and

23 are enrolled members of the JAMUL INDIAN VILLAGE (hereinafter JAMUL), a tribal

24 governmental entity of Kumeyaay Indians, recognized by Congress, governed by a Constitution

25 adopted on May 9, 1981, pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. 461 et

26 seq., and located in Jamul, California.

27

28

2. The Defendants are the UNITED STATES OF AMERICA, and its divisions, including, but not limited to, the DEPARTMENT OF THE INTERIOR, the BUREAU OF INDIAN AFFAIRS, and the NATIONAL INDIAN GAMING COMMISSION.

3. Defendants Does 1 through 20, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiffs at this time. When the true names and capacities of said defendants are ascertained by Plaintiffs, Plaintiffs will seek leave to amend this complaint to insert their true names and capacities. Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named defendants is responsible in some measure for the actions, events and damages herein alleged, and are the agents of each of the defendants.

4. Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendants, and each of them, were the agent, employee and/or joint venturer of their co-defendants, and were acting within the course and scope of such agency, employment and/or joint venture and with the permission and consent of their co-defendants and defendants. Each reference to one defendant is also a reference to each and every other defendant. Plaintiffs are informed and believe and thereon allege that the defendants, and each of them, conspired with each other, to engage in acts in furtherance of a conspiracy to wrongfully and illegally violate the Plaintiffs' property rights, rendering each of the defendants jointly and severally liable for all resulting and irreparable damage to Plaintiffs.

**RELATED ACTIONS**

5. WALTER ROSALES, MARIE TOGGERY, KAREN TOGGERY, are also appellants, along with fellow JAMUL members, Jane Dumas, Joe Comacho, Gerald Mesa and Robert M. Mesa, in a pending administrative appeal before the Interior Board of Indian Appeals in Case No. IBIA 00-28-A. There the Plaintiffs seek to set aside the Pacific Regional Director and the So. California Agency Superintendent of the Bureau of Indian Affairs' failure to follow Chief Judge Kathryn Lynn's April 22, 1998 decision as to the membership and leadership of the Jamul Indian Village. The April 22, 1998 decision of the IBIA recognized Jane Dumas as the Vice-chairperson

1    of the village, and directed the Pacific Regional Director and the So. Cal. Agency Superintendent

2    to "assist the Village's actual members in addressing their membership and leadership problems

3    in light of this" Board's prior determinations. 32 IBIA 167-68.

4        6. The IBIA also found on October 26, 1996, in Case No. 97-7-A,  that it is a violation of

5    the IBIA's prior rulings for the Regional Director or the Agency Superintendent to recognize

6    subsequent purported election results of the Jamul Indian Village, until the membership dispute

7    has been resolved; "once an appeal is filed with the [IBIA], the BIA loses jurisdiction over the

8    matter except to participate in the appeal as a party. See Hammerberg v. Acting Portland Area

9    Director 24 IBIA 78 (1993)."

10       7. Therefore, since the remand of what the IBIA describes as "the membership and

11   leadership"dispute has not reached a final decision, even yet, the only government of the Jamul

12   Indian Village that has been lawfully recognized by the highest ranking member of the U.S.

13   government and the Department of Interior is that elected by the Jamul Indian Village General

14   Council in 1992, where IBIA appellant Jane Dumas is Vice-Chairperson.

15       8. WALTER ROSALES, MARIE TOGGERY, Jane Dumas, the estate of Val Mesa, Joe

16   Comacho, Bernice Mesa, Vivian Flores, Leslie A. Mesa, Gerald Mesa, Robert M. Mesa, and

17   William Mesa, and the Jamul Indian Village, through its duly elected chairperson, WALTER

18   ROSALES, are also Plaintiffs before the U.S. Court of Federal Claims, Case No. 98-860-L. This

19   action seeks damages against the U.S. government for breach of contract, breach of fiduciary

20   duty, breach of trust, interference with contract and prospective economic advantage, taking,

21   accounting, and violations of civil rights. The action was stayed on April 19, 2000, pending the

22   outcome of the IBIA Case No. 00-28-A.  Tribal Judge KAREN TOGGERY is not a plaintiff in

23   the Court of Claims action, since the government's failure to give her Tribal court judgment full

24   faith and credit against certain residents and non-residents of the Village remains at issue in that

25   case.

26

27

28

**JURISDICTION**

9. Jurisdiction is alleged pursuant to 28 U.S.C. 1331, federal question, 28 U.S.C. 1346, United States as a defendant, 28 U.S.C. 1361, mandamus, 28 U.S.C. 2201, declaratory judgments, 28 U.S.C. 1353, claims for allotments, 25 U.S.C. 345, actions for allotments, 25 U.S.C. 335, extension of provisions to allotments, 25 U.S.C. 348, trust allotments and contracts touching the same, 25 U.S.C. 465, Indian Reorganization Act land acquisitions, 18 U.S.C. 1151, claims arising in Indian country, and 25 U.S.C. 81, contracts with Indians.

**GENERAL ALLEGATIONS**

10. On September 26, 1912, J.D. Spreckel's Coronado Beach Company deeded 2.21 acres of land in Jamul, California, to the Roman Catholic Bishop of Monterey and Los Angeles, a corporate in sole of the State of California, "to be used for the purposes of an Indian graveyard and approach thereto." A true and correct copy of that deed is attached hereto as Exhibit A.

11. From their birth, the Plaintiffs' families were occupants by sufferance, in possession of certain private property, contiguous to that Indian graveyard in Jamul, California, which private property was owned by the Lawrence and Donald Daley families, and the Catholic Diocese.

12. During the latter part of the 1970's the Plaintiffs and their families negotiated a gift of that certain property of which they were in possession from the Daley families and the Catholic Diocese. The Daley families agreed to convey title to the land then occupied by the Plaintiffs to the UNITED STATES in trust for the explicit benefit of those half-blood Jamul Indians then occupying the property. The Daley families specifically agreed to this form of conveyance in order to provide a place for the Plaintiffs and their families to live in perpetuity, protected by the UNITED STATES as a trustee against all forms of alienation, trespass and infringement.

13. On December 27, 1978, Lawrence and Donald Daley, recorded a grant deed of parcel 597-080-01, consisting of approximately 4.66 acres, to "the United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate." A true and correct copy of that deed is attached hereto as Exhibit B.

-4-

14. This deed was recorded nearly three years before the Constitution of the Jamul Indian Village was adopted, and three years before the Congress of the United States recognized the creation of the Jamul Indian Village under the Indian Reorganization Act of 1934. This deed was accepted by the UNITED STATES on December 21, 1978, pursuant to Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465. The Plaintiffs thereby became entitled to this allotment of land under Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465, and the General Allotment Act of 1887, as amended in 1894, 25 U.S.C. 345.

15. On May 9, 1981, Plaintiff WALTER ROSALES, certified on behalf of the election board, that sixteen of twenty three registered voters adopted the Jamul Indian Village constitution. The UNITED STATES acknowledged the adoption of the constitution on July 7, 1981, and the Congress of the UNITED STATES recognized the Jamul Indian Village by publication in the Federal Register on November 24, 1982.   When the Jamul Indian Village was created on May 9, 1981, under the terms of the Indian Reorganization Act of 1934, it was a landless governmental entity.  To date, the UNITED STATES has not set aside or created an Indian reservation for the Jamul Indian Village.

16. Subsequently, the Catholic Diocese agreed to provide certain land to the Jamul Indian Village for the purpose of maintaining the road and utilities to the Indian graveyard, provided for by the original Coronado Beach Company deed to the Catholic Diocese.

17. On July 27, 1982, the Roman Catholic Bishop of San Diego, successor to the Roman Catholic Bishop of Monterey and Los Angeles, a corporation sole, recorded a grant deed of parcel 597-080-02, consisting of approximately 1.372 acres, to "the United States of America in trust for the Jamul Indian Village." A true and correct copy of that deed is attached hereto as Exhibit C. Excepted therefrom was that portion of the Coronado Beach Company land grant, consisting of the approximately .838 acre Indian graveyard, to which the Catholic Diocese retains title. The grantor also explicitly reserved "to himself and his successors or assigns an easement for (1) utility service lines and (2) ingress and egress over the existing well-traveled road," which

1   extends the entire length of the 1.372 acres from California State Highway 94 to the Indian
2   graveyard.

3       18.  On February 5, 2001, the UNITED STATES took action, and first published notice,
4   denying Plaintiffs' entitlement and excluding them from their allotment of land in parcel 597-
5   080-01.

6       19.  The Defendants denial of Plaintiffs' entitlement and exclusion from their allotment
7   of land has caused the Plaintiffs severe property damage, consequential damages, physical and
8   bodily injury, including severe emotional distress, all in excess of the jurisdictional limit of this
9   court, subject to proof at trial. These acts have unduly interfered with the Plaintiffs' rights to the
10  quiet enjoyment of their allotment of land, and interfered with the Plaintiffs' civil rights to due
11  process and equal protection of the laws.

12      20.  Plaintiffs have been greatly and irreparably damaged by reason of Defendants'
13  infringement and violation of their property and civil rights, and unless Defendants are enjoined
14  by this court, they will continue their violation of Plaintiffs' property and civil rights, further
15  irreparably harming the Plaintiffs.

16      21.  As a result of the wrongful conduct of the defendants as herein alleged, Plaintiffs are
17  entitled to a temporary, preliminary and permanent injunction to prevent great and irreparable
18  injury resulting from the infringement and violation of their property and civil rights, from the
19  likelihood that Defendants will be unable to respond in damages, and from the difficulty or
20  impossibility to ascertain the exact amount of personal bodily injury and property damage
21  Plaintiffs have sustained, and will in the future sustain. These ongoing and continuing injuries
22  sustained by Plaintiffs cannot be fully compensated in damages and Plaintiffs are without an
23  adequate remedy at law without the imposition of the requested equitable injunctive relief.

24                          **FIRST CLAIM FOR RELIEF**

25          (Declaratory and Injunctive Relief for Denial of Entitlement to Allotment)

26      22.  Plaintiffs incorporate by reference paragraphs 1 through 21 of this complaint as
27  though fully set forth herein.

28

-6-

23. Plaintiffs are entitled to an allotment of parcel 597-080-01, under the Indian Reorganization Act of 1934, and the General Allotment Act of 1887.

24. Defendants have denied the Plaintiffs' their entitlement and excluded them from their allotment of land in parcel 597-080-01.

25. An actual controversy has arisen and now exists between Plaintiffs and Defendants regarding their respective rights, duties and obligations in that Plaintiffs contend that Defendants are liable to Plaintiffs for the statutory, contractual, and tortious deprivations of their property and civil rights alleged herein, and defendants deny such liability to Plaintiffs.

26. Plaintiffs desire a judicial determination of the respective rights of Plaintiffs and Defendants.

27. Such a declaration is necessary and appropriate at this time so that the parties may ascertain their rights and duties with respect to each other.

28. Plaintiffs have been greatly and irreparably damaged by reason of said Defendant's statutory, contractual, and tortious deprivations of Plaintiffs' property and civil rights alleged herein, and unless Defendants are enjoined by this court, they will continue the violation of Plaintiffs' rights further irreparably harming the Plaintiffs.

29. As a result of the wrongful conduct of said defendants as herein alleged, Plaintiffs are entitled to a temporary, preliminary and permanent injunction to prevent great and irreparable injury resulting from the infringement and violation of their property and civil rights, from the likelihood that Defendants will be unable to respond in damages, and from the difficulty or impossibility to ascertain the exact amount of personal bodily injury and property damage Plaintiffs have, and will in the future, sustain. These ongoing and continuing injuries sustained by Plaintiffs cannot be fully compensated in damages and Plaintiffs are without an adequate remedy at law without the imposition of the requested equitable injunctive relief.

**WHEREFORE** Plaintiffs pray for judgment as follows:

1. That the court declare that Plaintiffs became entitled to the allotment of parcel 597-080-01, pursuant to Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465,

1  upon the December 27, 1978 recordation of the grant deed by Lawrence and Donald Daley to

2  "the United States of America in trust for such Jamul Indians of one-half degree or more Indian

3  blood as the Secretary of the Interior may designate."

4      2.    That Defendants, and their officers, agents, servants, employees and attorneys and

5  all persons in active concert with them, or any of them, be compelled to issue to Plaintiffs a trust

6  patent for parcel 597-080-01;

7      3.    That Defendants, and their officers, agents, servants, employees and attorneys and

8  all persons in active concert with them, or any of them, be temporarily, preliminarily and

9  permanently enjoined from further denying their entitlement to the allotment of parcel 597-080-

10  01;

11      4.    That Defendants, and their officers, agents, servants, employees and attorneys and

12  all persons in active concert with them, or any of them, be temporarily, preliminarily and

13  permanently enjoined from further excluding the Plaintiffs from their allotment of parcel 597-

14  080-01;

15      5.    That the court declare that the Defendants are liable for money damages for

16  deprivation of the use and benefit by Plaintiffs of the allotted parcel 597-080-01;

17      6    That Plaintiffs be awarded their reasonable attorneys' fees, costs, and expenses in

18  this action; and

19      7.    That Plaintiffs be awarded such other and further relief as this court may deem

20  just and proper.

21  **JURY DEMAND**

22      Plaintiffs hereby demand trial by jury.

23  Dated: May 28, 2001        **WEBB & CAREY**

24

25

26  Patrick D. Webb, Attorneys for Plaintiffs
WALTER ROSALES, MARIE TOGGERY and
KAREN TOGGERY

27

28

-8-

Legal Tabs Co. 1-800-322-3022

Recycled  Stock # EXA-5-B

# DEED
# SEPTEMBER 26, 1912

On this first day of September A.D. 1912 before me Lou B Mathews
a Notary Public in and for said County, residing therein, duly
commissioned and sworn, personally appeared Ed H Fitch, person-
ally known to me to be the person described in and whose name is
subscribed to the within instrument as the attorney in fact of
Charles B Gould, and acknowledged to me that he subscribed
the name of Charles B Gould, thereto as principal, and his
own name as attorney in fact.

In witness whereof I have hereunto set my hand and affix-
ed my official seal the day and year in this Certificate first above
written.

Lou B Mathews
Notary Public in and for the County of
San Diego, State of California

Recorded at request of R C Sparks (S. D. Welder) Sep 26. 1912 at 15
Min. past 10 o'clock A.M.

John F. Ferry County Recorder
Fee $1.90            by  M. Conrad Levy    Deputy Recorder

COMPARED
Harold T. Angier

Coronado Beach Company, a corporation of the City of San Diego
County of San Diego, State of California,
For and in consideration of the sum of One Dollar, Does Hereby Grant
to The Roman Catholic Bishop of Monterey and Los Angeles, a corporat-
ion sole, of the State of California, to be used for the purpose of
an Indian graveyard and approach thereto, All that Real Prop-
erty situated in the County of San Diego, State of California, bounded
and described as follows:

Commencing at a point on the north boundary line of the Rancho
Jamul distant 648.5 feet east from the Rancho Jamul corner
No 16; thence east along said north boundary line 1383.0 feet to
a point on the westerly line of County Road; Thence South 48° 18' east
aing said westerly line of County Road 362 feet to a point; thence
west 597.7 feet to a point; thence south 58.0 feet to a point; thence
south 86° 48' west 707½ feet to a point; thence south 45° 30' west 88.5
feet to a point; thence south 59.9 feet to a point; thence west 87.2
feet to a point; thence north 237.0 feet to the point of beginning;
containing 5.21 acres.

To have and to hold the above granted and described premises
unto the said Grantee, his successors and assigns forever, for the
purposes above specified.

In Witness whereof, said corporation has caused this deed
to be signed by its Vice President, and Secretary and its corporate
seal to be affixed hereto this 11th day of July 1912.

Coronado Beach Company

Photographed By T. FADER, Deputy Recorder

*...impressive of ...... and Harry L. Paine ...... Secretary*

State of California } ss
County of San Diego }

On this 11th day of July, in the year one thousand nine hundred and twelve before me, Fred G. Whitehead, a Notary Public in and for said County, personally appeared W. Clayton known to me to be the Vice President, and Harry L. Paine, known to me to be the Secretary of the Corporation that executed the within instrument, known to me to be the persons who executed the within instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the same.

Fred G. Whitehead
Notary Public in and for the County of San Diego, State of California

Recorded at Request of Father E. LaPointe, Sep 24, 1912, at 30 Min. Past 10 o'clock A.M.

Fee $2.90    COMPARED    Harold I. Angier    John H. Ferry    County Recorder
By Harold Angier   Deputy Recorder

---

This Indenture made this 27th day of August 1912, between Chase & Ludington, a Corporation, duly organized existing and doing business under and by virtue of the laws of the State of California and having its principal place of business at the City of San Diego, County of San Diego, State of California, the party of the first part, and L. May Faber party of the second part, witnesseth:—

That said party of the first part, pursuant to a resolution duly passed at a meeting of its Board of Directors held at their office on August 27th, 1912, and of record in Minute Book No 1 at page 89 et seq, for and in consideration of Ten ($10.00) Dollars, gold coin of the United States of America to it in hand paid by said party of the second part, the receipt whereof is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto the said party of the second part, her heirs and assigns forever, subject however to the County and State taxes of 1912 and the covenants and conditions hereinafter named, all that certain real property situate in the City of San Diego, County of San Diego, State of California, bounded and described as follows, to-wit:

Lots Nine (9) and Seventy-three (73) of La Jolla Park, according to map thereof No 352, filed in the office of the...

Recycled    Stock # EXA-5-B

# DEED
# DECEMBER 27, 1978

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO

Name: Bureau of Indian Affairs
Street: Southern California Agency
Address: 5750 Division Street, Suite 201
City & State: Riverside, California 92506

FILE/PAGE NO.
BOOK 1978
RECORDED REQUEST OF
GRANTEE

DEC 27  1 49 PM '78

OFFICIAL RECORDS
RECORDER
SAN DIEGO COUNTY, CALIF.

SURVEY
MONUMENT
PRESERVATION
USI&P FEE
$10.00

$5.00

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TAX ROLL PARCEL NO. 597-080-01

# GRANT DEED

DOCUMENTARY TRANSFER TAX $_____-0-_____
_____ COMPUTED ON FULL VALUE OF PROPERTY CONVEYED,
_____ OR COMPUTED ON FULL VALUE LESS LIENS AND
ENCUMBRANCES REMAINING AT TIME OF SALE.
_William W. Daniels, Deputy Area Off._
Signature of Declarant or Agent determining tax, Firm Name
Bureau of Indian Affairs

THIS INDENTURE, made the _____ day of _____ 19____

BETWEEN  Donald L. Daley and Lawrence A. Daley

, the parties of the first part

and The United States of America in trust for such Jamul Indians of one-half degree
or more Indian blood as the Secretary of the Interior may designate
, the parties, of the second part,

WITNESSETH: That the said part ies _____ of the first part, ~~for and in consideration of the sum of~~ ~~~~

~~party of the first part, for and in consideration of~~ ~~~~

~~of the second part the receipt whereof is hereby acknowledged~~ do_____ by these presents, GRANT
_____ for a valuable consideration _____ unto the said parties of the second part,
and to their _____ heirs and assigns forever, all that certain lot ~~piece~~ or
parcel _____ of land, situate, lying and being in the _____, County of
San Diego _____ and State of California _____ and bounded and particularly described
as follows, to-wit:  SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

ACCEPTANCE OF CONVEYANCE BY THE UNITED STATES IS TO BE ATTACHED
HERETO AS EXHIBIT "B" AND RECORDED WITH THIS DEED.
THIS CONVEYANCE IS MADE IN ACCORDANCE WITH SECTIONS 5 AND 19 OF
THE INDIAN REORGANIZATION ACT OF JUNE 18, 1934 (48 Stat. 985 and
988; 25 U.S.C. 465 and 479) AND MADE SUBJECT TO EASEMENTS AND
RIGHTS-OF-WAY OF RECORD IN FAVOR OF THE PUBLIC OR THIRD PARTIES.

TOGETHER with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and
reversions, remainder and remainders, rents, issues and profits thereof.

TO HAVE AND TO HOLD, all and singular the said premises, together with the appurtenances, unto the said part ies of the second part,
and to their _____ heirs and assigns forever.

IN WITNESS WHEREOF, the said parties of the first part ha ve hereunto set their _____ hand
and seal s _____ the day and year first above written.

_____
_____
X _Signed Lawrence A. Daley_
X _Donald L. Daley_
Donald L. Daley and Lawrence A. Daley

STATE OF CALIFORNIA,
County of  San Diego } SS.

On December 12, 1978 _____, before me, the undersigned, a Notary Public in and for said
State, personally appeared _____ Lawrence A. Daley and Donald L. Daley _____

_____

known to me to be the person s whose name s are subscribed to the within instrument and acknowledged that they _____
executed the same.
WITNESS my hand and official seal.

[Notary Seal:
OFFICIAL SEAL
L. D. ARTHUR
NOTARY PUBLIC
PRINCIPAL OFFICE IN
SAN DIEGO COUNTY
My Commission Expires April 9, 1982]

_L. D. Arthur_
Notary Public in and for said State.

Title Order No._____

Escrow or Loan No._____

MAIL TAX
STATEMENTS TO _____
NAME _____ ADDRESS _____ ZIP

'78-554587

DEED—GRANT—WELCOTTS FORM 770
REV. 2-70

This standard form covers most usual problems in the field indicated. Before you sign, read it
and make changes proper to your transaction. Consult a lawyer if you doubt the form's fitness.

All that portion of Rancho Jamul, in the County of San Diego, State of California, according to L.S. Map thereof No. 430, filed in the Office of the Recorder of said San Diego County, May 28, 1931, more particularly described as follows:

Beginning at corner R.J. 16 as shown on said L.S. Map No. 430; thence along the Northerly line of said Rancho Jamul S. 88°42'00" E., 529.24 feet (record N. 88°42' W., 530.52 feet) to the Westerly line of that certain parcel of land noted Indian Cemetery on said L.S. Map No. 430; thence along said Westerly line S. 01°20'53" W., 239.66 feet (record N. 01°18' E., 239.0 feet) to the Southwest corner of said Indian Cemetery; thence along the Southerly line of said Indian Cemetery S. 88°39'07" E., 83.55 feet (N. 88°42' W., 83.5 feet) to the TRUE POINT OF BEGINNING; thence continuing along said Southerly line as follows: N. 01°20'53" E., 59.94 feet (record S. 01°18' W., 59.9 feet); N. 44°50'53" E., 88.55 feet (record S. 44°48' W., 88.5 feet); N. 87°54'53" E., 665.17 feet (record S. 87°52' W., 664.77 feet); N. 01°20'53" E., 58.04 feet (record S. 01°18' W., 58.0 feet); S. 88°42'00" E., 598.46 feet to the Southwesterly line of Campo Road said point being on a 555.59 foot radius curve concave Southwesterly, a radial line from said points bears S. 47°16'18" W.; thence Southeasterly along the arc of said curve, through a central angle of 03°29'08" a distance of 33.80 feet; thence leaving said Southwesterly line N. 88°42'00" W., 338.54 feet; thence S. 21°58'02" E., 257.03 feet; thence N. 86°48'26" W., 721.24 feet; thence N. 86°21'37" W., 388.78 feet to the TRUE POINT OF BEGINNING, said described land consisting of 4.66 acres, more or less.

EXHIBIT "A" TO DEED FROM DONALD L. DALEY AND LAWRENCE A. DALEY DATED DECEMBER 12, 1978.

'78-554597



# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### BUREAU OF INDIAN AFFAIRS
#### Sacramento Area Office
2800 Cottage Way
Sacramento, California 95825

ACCEPTANCE OF CONVEYANCE

The United States of America, acting through the undersigned, an

authorized representative of the Secretary of the Interior, does

hereby accept the conveyance made by Donald L. Daley and Lawrence

A. Daley in that certain Grant Deed dated December 12, 1978.

Said Grant Deed, with this Acceptance of Conveyance attached, shall

be recorded in the Official Records of San Diego County,

California.


Date: __DEC 21 1978__                    _Charles L. Taylor Jr._
                                         ACTING   Area Director

                                Pursuant to the authority delegated
                                by 230 DM 1, 10 BIAM 2 (39 F.R.
                                32166) and 10 BIAM 3.1 (34 F.R.
                                637).


State of California )
                    ) SS.
County of Sacramento)

On this _21st_ day of _December_, _1978_, before me, the undersigned,

a Notary Public in and for said State, personally appeared _____

_Charles L. Taylor Jr._, known to me to be the person

whose name is subscribed to the within Acceptance of Conveyance and

acknowledged to me that he executed the same for the United States

of America.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this date.

                                [Notary Seal: CARMEN G. FACIO
                                NOTARY PUBLIC
                                My Commission Expires August 10, 1981]

EXHIBIT "B" TO DEED FROM
DONALD L. DALEY AND
LAWRENCE A. DALEY DATED            _Carmen G. Facio_
DECEMBER 12, 1978.

_____, before me, the undersigned, a notary public in and for said
State, personally appeared _____ Lawrence A. Daley and Donald L. Daley

known to me to be the person s whose names are subscribed to the within instrument and acknowledged that ____ they
executed the same.
WITNESS my hand and official seal.

                                [Notary Seal: L. D. ARTHUR
                                NOTARY PUBLIC
                                SAN DIEGO COUNTY
                                My Commission Expires April 9, 1982]

                                _L. D. Arthur_
Title Order No. _____   Notary Public in and for said State.

                                Escrow or Loan No. _____

MAIL TAX
STATEMENTS TO _____
              NAME              ADDRESS              ZIP

78-554597

DEED—GRANT—WOLCOTTS FORM 778
REV 2-70
This standard form covers most usual problems in the field indicated. Before you sign, read it, fill in all blanks,
and make changes proper to your transaction. Consult a lawyer if you doubt the form's fitness for your purpose.

Legal Tabs Co. 1-800-322-3022

Recycled    Stock # EXA-5-B

**EXHIBIT  C**

# DEED
# JULY 27, 1982

TAX ROLL PARCEL NO.

597-080-02  Code Area #79019

DOCUMENTARY TRANSFER TAX $ 0

GRANT DEED



TAX SIGNATURE

I, The Roman Catholic Bishop of San Diego, hereby grant to the United States of America in trust for the Jamul Indian Village all that land situated in the County of San Diego, California, more particularly described as follows:

All that portion of Rancho Jamul described in Deed to the Roman Catholic Bishop of Monterey and Los Angeles recorded September 12, 1912 in Book 567, Page 332, in the Office of the County Recorder of San Diego County, California; EXCEPTING THEREFROM a piece of land described as follows:  Commencing at Rancho Jamul Corner No. 16; thence N. 88°42' E., 739.37 feet to the true point of beginning as shown on Record of Survey Map No. 8138, filed December 2, 1976 in the Office of said County Recorder; thence S. 1°18' W., 111.77'; thence S. 87°55'38" W., 65.81'; thence S. 44°51'28" W., 88.60'; thence S. 1°19'25" W., 59.80'; thence N. 88°41'06" W., 83.66'; thence N. 1°24'08" E., 239.63'; thence N. 88°42' E., 210 feet to the True Point of Beginning, containing 0.838 acre, more or less. The parcel granted to the Jamul Indian Village contains 1.372 acres, more or less.

The grantor reserves to himself and his successors and assigns an easement for (1) utility service lines and (2) ingress and egress over the existing well-traveled road, or over any road that subsequently is built to replace the existing one.

IN WITNESS WHEREOF, The Roman Catholic Bishop of San Diego, grantor, herein have hereunto affixed his name this 25th day of May, 1982.

82-229256



RECORDED IN
OFFICIAL RECORDS
OF SAN DIEGO COUNTY, CA.

1982 JUL 27  AM 9 41

VERA L. LYLE
COUNTY RECORDER

ROMAN CATHOLIC BISHOP OF SAN DIEGO
a corporation sole,

RF  4
MG
TXPD  10
UF         Incumbent

STATE OF CALIFORNIA  )
                     ) ss.
COUNTY OF SAN DIEGO  )

On this 25th day of May, 1982, before me Ch. Guittard, a Notary Public in and for said County and State, personally appeared LEO T. MAHER, known to me to the Roman Catholic Bishop of San Diego and to be the Incumbent of the corporation sole that executed the within instrument and acknowledged to me that said corporation sole executed the same.

WITNESS my hand and official seal.

Notary Public in and for said County
and State

OFFICIAL SEAL
C.H. GUITTARD
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
SAN DIEGO COUNTY
My Commission Expires Aug. 27, 1984

ACCEPTANCE OF CONVEYANCE BY THE UNITED STATES IS TO BE ATTACHED HERETO AS EXHIBIT "A" AND RECORDED WITH THIS DEED.  THIS CONVEYANCE IS MADE IN ACCORDANCE WITH SECTIONS 5 and 19 OF THE INDIAN REORGANIZATION ACT OF JUNE 18, 1934 (48 Stat. 985 and 988; 25 U.S.C. 465 and 479).

N∘ 229256

82-229256



53

TAX ROLL PARCEL NO.

54

IN REPLY REFER TO:



**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
BUREAU OF INDIAN AFFAIRS
SOUTHERN CALIFORNIA AGENCY
5750 DIVISION STREET, SUITE 201
RIVERSIDE, CALIFORNIA 92506-3286

ACCEPTANCE OF CONVEYANCE

The United States of America, acting through the undersigned, an
authorized representative of the Secretary of the Interior, in accordance
with Sections 5 and 19 of the Indian Reorganization Act of June 18, 1934
(48 Stat. 985 and 988; 25 U.S.C. 465 and 479), does hereby accept the
conveyance made by The Roman Catholic Bishop of San Diego in that certain
Grant Deed dated May 25, 1982.

Said Grant Deed, with this Acceptance of Conveyance attached, shall be
recorded in the Official Records of San Deigo, California.

Date:  July 2, 1982

Acting Superintendent
Pursuant to the authority
delegated by 230 DM 1, 10 BIAM 2
(39 F.R. 32166) and 10 BIAM 3.1
(34 F.R. 637), and Sacramento
Area Office Redelegation Order 1
(43 F.R. 30131).

STATE OF CALIFORNIA)
              ) SS.
COUNTY OF RIVERSIDE)

On this 2nd day of July, 1982, before me, the undersigned, a Notary
Public in and for said State, personally appeared Frank L. Haggerty,
Jr., known to me to be the person whose name is subscribed to the
within Acceptance of Conveyance and acknowledged to me that he
executed the same for the United States of America.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this
date.

Notary Public in and for said State

EXHIBIT "A" TO DEED FROM
THE ROMAN CATHOLIC BISHOP
OF SAN DIEGO DATED May 25,
1982.

Return to:
RECORDING REQUESTED BY
MAIL TAX STATEMENT TO:
(Please print name & address)

OFFICIAL SEAL
ARLENE J. LACY
NOTARY PUBLIC
RIVERSIDE CO., CALIF.
My commission expires 10-27-83

DEPARTMENT OF THE INTERIOR
5750 DIVISION ST., SUITE 201
RIVERSIDE                  CA 92506

My Commission Expires Aug. 27, 1984

No. 229256

82-

ACCEPTANCE OF CONVEYANCE BY THE UNITED STATES IS TO BE ATTACHED HERETO
AS EXHIBIT "A" AND RECORDED WITH THIS DEED.  THIS CONVEYANCE IS MADE IN
ACCORDANCE WITH SECTIONS 5 and 19 OF THE INDIAN REORGANIZATION ACT OF
JUNE 18, 1934 (48 Stat. 985 and 988; 25 U.S.C. 465 and 479).

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

01 MAY 30 PM 2: 26

Walter Rosales Marie Toggery
Karen Toggery

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

## DEFENDANTS

United States of America

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Patrick D. Webb 82857
Webb & Carey
401 B 306 San Diego CA 92101 619-236-1650

ATTORNEYS (IF KNOWN)

'01 CV 0951 IEG (JAH)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 2 U.S. Government
Defendant

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                    AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.   NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury — Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes<br>☒ 890 Other Statutory Actions<br>25 USC 345 |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

25:0640 (§§§)

Declaratory and injunctive relief under 28 USC 1353 and 25 USC 345

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE
5-29-01

SIGNATURE OF ATTORNEY OF RECORD
Pat D. Webb