**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WALTER J. ROSALES, ESTATE OF HELEN CUERO, ESTATE OF DEAN ROSALES, P.O. Box 85, Jamul, California, 91935<br><br>KAREN TOGGERY, ESTATE OF MARIE TOGGERY, ESTATE OF MATTHEW TOGGERY, P.O. Box 375, Jamul, California, 91935<br><br>JAMUL INDIAN VILLAGE, a federally recognized Indian tribe, P.O. Box 612 Jamul, California, 91935<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, by and through DIRK KEMPTHORNE, in his official capacity,<br><br>BUREAU OF INDIAN AFFAIRS, by and through Assistant Secretary of Indian Affairs, JAMES E. CASON.<br><br>Defendants. | ) | **CASE NUMBER:** 1:07-cv-00162<br><br>**JUDGE:** Judge Rosemary M. Collyer<br><br>**DECK TYPE:** Tribal Rights<br><br>**DATE STAMP:** |

**DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. PLAINTIFFS FAIL TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS . . . . . . . . . . 2

A. Plaintiffs have Failed to Establish a Waiver of Sovereign Immunity . . . . . . . . . . 2

B. Plaintiffs Cannot Succeed On the Merits of Their NAGPRA Claims . . . . . . . . . . 4

1. Parcels 04 and 05 Are "Tribal Land" As Defined Under NAGPRA . . . . . . . . . . 4

2. Plaintiffs Cannot Succeed on the Merits of Their Claims for Parcels 04 and 05 Because They Fail to Identify Any Obligation or Requirement for Defendants to Act Under NAGPRA . . . . . . . . . . 12

a. In the Event of an Inadvertent Discovery on Parcels 04 or 05, NAGPRA Sets Forth the Steps Be Taken by the Tribe . . . . . . . . . . 12

b. NAGPRA Provides for the Ownership and Control of Human Remains and Cultural Items, Not the Land from Which They Are Excavated or Removed . . . . . . . . . . 15

C. Plaintiffs Cannot Succeed on Their Claims of Beneficial Ownership of Parcel 04 In the Absence of the Tribe . . . . . . . . . . 19

1. Plaintiffs Are Precluded from Arguing Beneficial Ownership In the Absence of the Tribe - A Necessary and Indispensable Party . . . . . . . . . . 19

2. Plaintiffs Cannot Avoid Issue Preclusion by Claiming to Bring the Present Action on Behalf of the Tribe . . . . . . . . . . 20

D. Plaintiffs' Trespass Claim Must Fail . . . . . . . . . . 21

II. THE BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST FAVORS DENYING PRELIMINARY INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**INTRODUCTION**

Defendants United States of America, Department of the Interior, Dirk Kempthorne, Secretary, Department of Interior, Bureau of Indian affairs, and James E. Cason,[1] respectfully submit this sur-reply memorandum in opposition to Plaintiffs' Motion for Preliminary Injunction. (Doc. 4). In Plaintiffs' Memorandum of Points and Authorities in Reply to Opposition to Motion for Preliminary Injunction ("Pl. Reply") (Doc. 12), Plaintiffs make a number of assertions they had not previously raised in their memorandum of law in support of the motion for a preliminary injunction or in their Complaint (Doc. 1). Specifically, Plaintiffs assert – for the first time – that their Complaint is based in part on the Federal Tort Claims Act ("FTCA"). Plaintiffs also raise new assertions pursuant to the Native American Grave Protection and Repatriation Act ("NAGPRA"). Further, Plaintiffs make new assertions in an attempt to avoid issue preclusion with regard to the beneficial ownership of the land.

Plaintiffs are attempting to use NAGPRA as a way to control the land at issue in this case. However, NAGPRA does not provide them with such power, and further, Defendants have no authority to take any of the actions demanded by Plaintiffs, as Parcels 04 and 05 are tribal, and not federal, land. Additionally, as there have not been any inadvertent discoveries, the provisions of NAGPRA have not been triggered. Therefore, Plaintiffs cannot succeed on the merits of their claims under NAGPRA. Nor can Plaintiffs litigate the merits of their claims regarding beneficial ownership of the land in the absence of the federally recognized Tribe, as held by the Ninth Circuit, and thus their claims regarding trespass, which necessarily depend on

---

[1] James E. Cason is not the Assistant Secretary of Indian Affairs. Rather, he is the Associate Deputy Secretary of the U.S. Department of the Interior.

their alleged status as the beneficial owners of the land, must fail.

Plaintiffs assert they are primarily requesting prohibitory injunctive relief. Pl. Reply at 3-4. However, as they are asking this Court to direct Defendants to take certain actions, actions which are not required or permitted under any regulatory scheme identified by Plaintiffs, they are most certainly asking for mandatory injunctive relief, or in the alternative, are requesting a writ of mandamus, as Plaintiffs acknowledge in their reply memorandum. *See* Pl. Reply at 4, n.4.

**ARGUMENT**

**I. PLAINTIFFS FAIL TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS**

**A. Plaintiffs have Failed to Establish a Waiver of Sovereign Immunity**

As a sovereign, the United States is immune from suit except when it consents to be sued. *See Lehman v. Nakshian*, 453 U.S. 156 (1981); *United States v. Testan*, 424 U.S. 392 (1976); *United States v. Sherwood*, 312 U.S. 584, 586 (1941). As this Court correctly recognized during oral argument, the United States cannot be sued under California state law in this case because there has not been any waiver of sovereign immunity under California state law. See Transcript, attached hereto as Exhibit J, at 4-5. Despite this, Plaintiffs continue to erroneously assert that NAGPRA contains a waiver of sovereign immunity. Pl. Reply at 2. However, 25 U.S.C. § 3009 contains no such waiver. Plaintiffs have previously pointed to 25 U.S.C. § 3009(5), which states that nothing in NAGPRA shall be construed to "limit the application of any State or Federal law *pertaining to theft or stolen property*." (Emphasis added). This does not serve as a waiver of sovereign immunity as against the United States, just as 25 U.S.C. § 3013, which grants the district courts jurisdiction over NAGPRA claims, does not serve as a waiver of sovereign

immunity as against the United States. Further, Plaintiffs have not made any allegations of theft or stolen property in their Complaint and therefore, 25 U.S.C. § 3009(5) is not implicated.

Plaintiffs also seek, for the first time, to avoid the lack of waiver of sovereign immunity by claiming that the United States has waived its sovereign immunity under California law under the FTCA. *See* Pl. Reply at 2. This argument fails for several reasons. First, Plaintiffs do not cite the FTCA as a grounds for jurisdiction, *see* Compl. ¶ 8, or even mention the FTCA in the Complaint.

Second, Plaintiffs fail to allege that they have followed the necessary procedures to bring a claim under the FTCA. The FTCA requires a claimant "first [to] present[] the claim to the appropriate Federal agency." 28 U.S.C. § 2675(a). Failure to comply with § 2675(a) leaves "the district court . . . without subject matter jurisdiction." *Price v. United States*, 81 F.3d 520, 521 (5th Cir. 1996); *accord Price v. United States*, 69 F.3d 46, 54 (5th Cir. 1995). Here, Plaintiffs did not file such a tort claim and therefore have not satisfied the statutory prerequisite for bringing any tort claim against the United States, "the only proper party defendant in an FTCA action." *Kennedy v. United States Postal Serv.*, 145 F.3d 1077, 1078 (9th Cir. 1998); 28 U.S.C. § 2675. As "[t]he claim requirement of [28 U.S.C.] section 2675 is jurisdictional in nature and may not be waived," Plaintiffs' California state law claims must be dismissed. *Burns v. United States*, 764 F.2d 722, 724 (9th Cir. 1985); *see also McNeil v. United States*, 508 U.S. 106, 111-13 (1993). Finally, any non-monetary claims under California state law plainly cannot be premised on the FTCA because the FTCA's only remedy is money damages. *See Talbert v.*

*United States*, 932 F.2d 1064, 1065-66 (4th Cir. 1991).[2]

As there has been no clear and express waiver of suffered immunity, any claims brought by Plaintiffs pursuant to California state law must be disregarded by this Court.

**B. Plaintiffs Cannot Succeed On the Merits of Their NAGPRA Claims**

**1. Parcels 04 and 05 Are "Tribal Land" As Defined Under NAGPRA**

Plaintiffs assert, incorrectly, that Parcels 04 and 05 are federal land for the purposes of NAGPRA. *See* Pl. Reply at 3, n.2; 10-19. While it is true that both parcels are held by the United States in trust for the federally recognized Tribe, *see* Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Def. Opp.") at 7 (Doc. 7), that fact does not make the parcels "federal land" for the purposes of NAGPRA, as Plaintiffs allege. Rather, such land is "tribal land," which is includes, *inter alia*, "all lands within the exterior boundaries of any Indian reservation." 25 U.S.C. § 3001(15)(A).[3]

As NAGPRA does not define the term "Indian reservation," the term must be construed in accordance with its usual meaning. *See Field v. Mans*, 516 U.S. 59, 69 (1995) (where Congress uses terms that have accumulated settled meaning under common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established

---

[2] Plaintiffs' assertion that they "have not here sued for damages," Pl. Reply at 8, n.8, contradicts their argument that the FTCA provides jurisdiction for their suit.

[3] Tribal land also includes "all dependent Indian communities." 25 U.S.C. § 3001(15)(B). Plaintiffs assert that no dependent Indian community was ever created here. *See* Pl. Reply at 3, n.2. However, Plaintiffs have previously argued in the district court in the Southern District of California that they were entitled to a declaration of beneficial ownership of Parcel 04 as members of a "dependent Indian community," under the Indian Reorganization Act of 1934 ("IRA"), pursuant to 25 U.S.C. §§ 465, 483. *See* Notice of Motion and Motion for New Trial, Relief from Judgment and Request for Oral Argument, February 22, 2002, at 6, attached hereto as Exhibit L.

meaning of the terms); *Moskal v. United States*, 498 U.S. 103, 108, 114 (1990) (words used must be given their ordinary meaning unless otherwise defined); *McDermott Int'l Inc. v. Wilander*, 498 U.S. 337, 342 (unless there is a contrary indication, a court must assume that when a statute uses a term of art, Congress intended it to have its established meaning); *Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("rule of statutory construction is that if Congress intends for legislation to change an interpretation of a judicially created concept, it makes that intent specific"); *Morissette v. United States*, 342 U.S. 246, 263 (1952)("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.  In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as departure from them.").

Originally, the term "Indian reservation" referred to any land reserved from an Indian cession to the federal government.  *See United States v. Winans*, 198 U.S. 371, 378 (1905).  The definition evolved to include land set aside under federal protection, whether by executive order or otherwise, for the "residence of tribal Indians, regardless of origin."  *See generally* F. Cohen, Handbook of Federal Indian Law at 189 (2005 Ed.) ("During the 1850s, the modern meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence or use of tribal Indians, regardless of origin. . . . The use of the term 'reservation' from public land soon merged with the treaty use of the word to form a single definition describing federally protected Indian tribal lands without depending on any particular source.  This definition of the

term 'reservation' has since been generally used and accepted.") (citations omitted).

The meaning given by the courts to the term "reservation" as used in 18 U.S.C. § 1151, which defines "Indian country," is also instructive. "Indian country" is defined as:

> (a) *all land within the limits of any Indian reservation under the jurisdiction of the United States Government*, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. As the Supreme Court has stated, "Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States." *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993); *see also Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 453 n.2 (1995) (using term "informal reservation"); *United States v. Roberts*, 185 F.3d 1125, 1133 ("we believe that both dependent Indian communities and reservations, whether formal or informal, continue to exist under 18 USC § 1151 and Supreme Court jurisprudence").

In turn, the term "reservation" has also been interpreted broadly by the Supreme Court to include lands that have not formally been designated reservations, but that are held in trust by the United States for the use and benefit of an Indian tribe. *See, e.g., Sac & Fox Nation*, 508 U.S. at 123; *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 511 (1991) (tribal trust land "is 'validly set apart' and thus qualifies as a reservation for tribal immunity purposes"); *United States v. John*, 437 U.S. 634, 649 (1978) (lands declared by Congress to be held in trust by the Federal Government for the benefit of the Mississippi

Choctaw Indians were "reservation" for purposes of section 1151(a)); *see also United States v. Azure*, 801 F.2d 336, 339 (8th Cir. 1986) (land held in trust by United States for Indian tribe, "although not within the boundaries of the Turtle Mountain Reservation, can be classified as a de facto reservation, at least for purposes of federal criminal jurisdiction").

Further, as the Supreme Court stated in *Minnesota v. Hitchcock*, 185 U.S. 373 (1902), "in order to create a reservation, *it is not necessary that there should be a formal cession or a formal act setting apart a particular tract*. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes." *Hitchcock*, 185 U.S. at 390 (emphasis added); *see also Azure*, 801 F.2d at 338 ("It is well established that the actions of the federal government in its treatment of Indian land can create a de facto reservation, even though the reservation was not created by a specific treaty, statute, or executive order."); *Sac & Fox Tribe of the Mississippi in Iowa v. Licklider*, 576 F.2d 145, 149-50 (8th Cir. 1978) (same). The Bureau of Indian Affairs' land acquisition regulations define "reservation" as "that area of land over which the tribe is recognized by the United States as having governmental jurisdiction." 25 C.F.R. § 151.2(f).

In California the definition of what constitutes a "reservation" is even more unique. In 1864 Congress "authorized the President to 'set apart' no more than four tracts for Indian reservations in California." *Mattz*, 412 U.S. at 493-94. The four reservations were the Round Valley, the Mission, the Hoopa Valley, and the Tule River. However, the boundaries of the reservations were continually changed and the Mission Reservation, in its final form, consists of no less than 19 different and noncontiguous tracts. *See id.* at 493, n.15, 494; *cf. Jicarilla Apache Tribe v. State of New Mexico*, 742 F. Supp. 1487, (D. New Mexico 1990) (finding that a similar

prohibition enacted in 1918 for New Mexico did not serve to limit the Secretary of the Interior's powers to accept conveyances of land and proclaim reservations under 25 U.S.C. §§ 465 and 467 (Sections 5 and 7 of the IRA)).

Like the Mission tracts, "rancheria" is yet another term used to describe Indian land in California, yet it is well established that rancherias are "for all practical purposes" reservations. *See* Solicitor's Opinion, M-28958 (April 26, 1939); 1 *Op. Sol. On Indian Affairs* 891 (U.S.D.I. 1979) ("They [the rancherias] are, for all practical purposes, small reservations."); *see also Governing Council of Pinoleville Indian Community v. Mendocino County*, 684 F. Supp. 1042, 1043, n.1 (N.D. Calif. 1988) ("[r]ancherias are numerous small Indian reservations or communities in California, the lands for which were purchased by the Government (with Congressional authorization)"), quoting *Duncan v. United States*, 667 F.2d 36, 38, 41 (Ct. Cl. 1981) (also finding Congress clearly contemplated a rancheria would "have the same general status as reservation lands"); *Table Bluff Band of Indians v. Andrus*, 532 F. Supp. 255 (N.D. Calif. 1981); *Duncan v. Andrus*, 517 F. Supp. 1 (N.D. Calif., 1977).

Similarly, the term "reservation" in NAGPRA should not be narrowly interpreted. NAGPRA draws a distinction between federal land and tribal land for the purposes of determining various responsibilities upon an inadvertent discovery or an intentional excavation, and not a distinction between types of tribal land. As Plaintiffs themselves have noted in their reply memorandum, Pl. Reply at 18, n.18, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Hagen v. Utah*, 510 U.S. 399, 436 (1994) (internal citations and quotation marks omitted). Indian tribes should be given the right to control over their own land whenever possible, rather than putting such authority in the

hands of a federal land manager, as Plaintiffs would have the Court do here.

Plaintiffs' reliance on the distinction drawn between Sections 5 and 7 of the IRA, 25 U.S.C. §§ 465, 467, *see* Pl. Reply at 3, n.2, is unavailing.  First, the existence of an informal reservation is not inconsistent with the Secretary's separate authority under 25 U.S.C. § 467 to declare reservations.  As the Supreme Court stated in *John*, the land in question in that case "were declared by Congress to be held in trust by the Federal Government for the benefit of the Mississippi Choctaw Indians who were at that time under federal supervision.  There is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a 'reservation,' at least for the purposes of federal criminal jurisdiction at that particular time."  *John*, 437 U.S. at 649.  As *John* suggests, "there seems to be no basis for distinguishing" between actual reservations under 25 U.S.C. § 467 and land taken into trust under 25 U.S.C. § 465.  *See* F. Cohen, at 191, n.413.[4/]  Instead, "the authority to proclaim trust

---

[4/] In support of their argument, Plaintiffs cite to the 1982 edition of F. Cohen's Handbook of Federal Indian Law, which was subsequently updated in 2005.  The footnote and the referring text cited by Plaintiffs was significantly altered in the 2005 edition.  The 1982 edition states in the text that "Otherwise, the Indian Country status of trust lands located outside reservation boundaries is uncertain."  *See* 1982 edition at 45.  In contrast, the 2005 edition states, "The Supreme Court has also held that tribal trust land is the equivalent of a reservation and thus Indian Country."  *See* 2005 edition at 191.  The updated footnote in the 2005 edition cites to *Potawatomi Indian Tribe*, 498 U.S. at 511 and *John*, 437 U.S. at 648-49.  Further, Plaintiffs neglect to include the full text of footnote 158 on page 45 of the 1982 edition, which states:

> As *John* suggests, however, there seems to be no basis for distinguishing such purchases if actually used for tribal residence under federal supervision from the dependent Indian community at issue in *United States v. McGowan*, 302 U.S. 535 (1938).  437 U.S. at 648.  The Supreme Court in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973), held that land leased to a tribe under section 5 [of the IRA] for purely commercial uses was outside the tribe's reservation for purposes of a state gross receipts tax on the enterprise.  The opinion did not refer to the Indian country statute, however.  In *Cheyenne-Araphao Tribes v. Oklahoma*, 618 F.2d 665 (10th Cir. 1980), the court held that tribal trust land was a "reservation"

land to be a reservation appears to be a holdover from the era prior to the enactment of the Indian country definition when statutes like the Major Crimes Act applied only to reservations." *Id.*

Additionally, in this case, the land was acquired for half-blood Jamul Indians for the purpose of organizing as a tribe under Section 16 of the IRA, 25 U.S.C. § 476.[5]  *See Rosales v. Sacramento Area Director*, 34 IBIA 50 (1999); *Rosales v. Sacramento Area Director*, 32 IBIA 158, 159 (1998).  Under 25 U.S.C. § 476, "any Indian tribe shall have the right to organize." "Indian tribe" is defined as, *inter alia*, "Indians residing on one reservation."  25 U.S.C. § 479. Thus, the only authority for the Secretary of Interior to organize a group of Indian descendants as a tribe, absent a final determination that the group is entitled to be acknowledged as an Indian tribe pursuant to the Department of Interior's acknowledgment regulations, 25 C.F.R. part 83, is the authority under 25 U.S.C. § 476 to reorganize the adult residents of a reservation.  Since the Jamul Indian Village was organized as adult Indians residing on a reservation under the authority of the IRA, the land is a reservation under Federal law.

---

within the meaning of 18 U.S.C. § 1151(a).

[5] Section 16 of the IRA originally provided: "Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, *or of the adult Indians residing on such reservation*, as the case may be, at a special election authorized by the Secretary of the Interior under such rules and regulations as he may prescribe."  (Emphasis added); *see also* Amended Rules and Regulations for the Holding of Elections under the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), 55 I.D. 355, at ¶ 2 (attached hereto as Exhibit K); Solicitor's Opinion, February 8, 1937, 1 *Op. Sol. on Indian Affairs* 724 (U.S.D.I. 1979) (finding that because the St. Criox Indians could not be recognized as a band, "the title to the land purchases being made. . . should be taken for the St. Croix Chippewa Indians of one half blood or more who may be designated by the Secretary of the Interior until such time as they organize under section 16 of the [IRA] and then for the benefit of such organization.").

Plaintiffs' reliance on *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250 (10th Cir. 2001), is equally unavailing. First, as the D.C. Circuit recognized, that case was rebuked by Congress almost immediately after it was issued, pursuant to the Department of the Interior and Related Agencies Appropriations Act, 115 Stat. 414 (Nov. 5, 2001), Pub. L. No. 107-63 § 134 (2001), which clarified that the Secretary of the Interior has the authority to determine if specific land is a reservation under the Indian Gaming Regulatory Act ("IGRA"), which that case was decided under. *See City of Roseville v. Norton*, 348 F.3d 1020, 1029 (D.C. Cir. 2003). Further, Plaintiffs' assertion that *Sac & Fox Nation of Missouri* stands for the proposition that the government acquisition of land in trust does not a create a reservation finds no support on the cited page. *See Sac & Fox Nation of Missouri*, 240 F.3d at 1257. Although the court did find in that case that land reserved for use as a cemetery was not a reservation for the purposes of the IGRA, and thus could not be used for a casino, *id.* at 1267, this case is distinguishable from the case at bar.

In *Sac & Fox Nation of Missouri*, the court found that Congress had envisioned in IGRA that each tribe would have only one reservation for gaming purpose. *Id.* at 1267. Because the tribe there had more than one tract of land and such tracts were not contiguous, the court found that a cemetery was not a reservation for the purposes of the IGRA because "the reservation was made strictly for purposes of preserving the tract's status as a burial ground" and had never been used for purposes of residence. *Id.* Although in reaching its ultimate conclusion, the court addressed a distinction between a "reservation" and land held in trust, it appears the primary basis for the court's decision was based on the non-residential status of the land. *Id.* That distinction is not present here, as the land in question has been used for residential purposes, as

evidenced by Plaintiffs' Complaint. *See, e.g.*, Comp. ¶¶ 13-15.

Nor does *Wisconsin v. Stockbridge-Munsee Community*, 67 F. Supp. 2d 990 (E.D. Wis. 1999), or *Peters v. Pauma School District of San Diego County*, 91 Cal. App. 792 (1928), provide any support for Plaintiffs' arguments. In *Stockbridge-Munsee Community*, 67 F. Supp. 2d at 1003, a proclamation was issued, but Plaintiffs point to no ruling by the district court that such a proclamation must be issued for there to be a reservation, and as the Supreme Court stated in *Hitchcock*, "in order to create a reservation, *it is not necessary that there should be a formal cession or a formal act setting apart a particular tract*." 185 U.S. at 390 (emphasis added); *see also Azure*, 801 F.2d at 338; *Sac & Fox Tribe of the Mississippi in Iowa*, 576 F.2d at 149-50. Finally, *Peters*, 91 Cal. App. 792 (1928) (Plaintiffs mistakenly cite to this as 91 Cal. App. 2d 792), is a California state court decision, that was in apparent contradiction of the Supreme Court's holding in *Hitchcock*.

Based on the foregoing, Parcels 04 and 05 are "tribal land" as defined under NAGPRA.

**2. Plaintiffs Cannot Succeed on the Merits of Their Claims for Parcels 04 and 05 Because They Fail to Identify Any Obligation or Requirement for Defendants to Act Under NAGPRA**

**a. In the Event of an Inadvertent Discovery on Parcels 04 or 05, NAGPRA Sets Forth the Steps Be Taken by the Tribe**

NAGPRA and its regulations set forth the procedures to be followed in the event of an inadvertent discovery or an intentional excavation. However, the procedures differ depending on whether the inadvertent discovery or excavation occurs on federal or tribal land. Plaintiffs spend a great deal of time in their reply memorandum walking through the responsibilities of the federal government in the event of an inadvertent discovery on *federal* land. Pl. Reply at 12-16 (citing, for example, 43 C.F.R. §§ 10.4(d) and 10.5, both of which apply in the event of an

inadvertent discovery on federal land).  However, as explained above, Parcels 04 and 05[6] are

*tribal* land for the purposes of NAGPRA, and NAGPRA does not assign the government any

responsibilities if there is an inadvertent discovery on tribal land.[7]  Rather, it sets forth the steps

the Indian tribe or responsible Indian tribe official may take.  *See* 25 U.S.C. § 3002(d) ("Any

person who knows, or has reason to know, that such person has discovered Native American

cultural items on. . . tribal lands after November 16, 1990, shall notify, in writing. . . the

appropriate Indian tribe or native Hawaiian organization with respect to tribal lands. . . ."); 43

C.F.R. § 10.3(c)(4) (setting forth the appropriate steps an Indian tribe may take in the event it

receives notice of a planned activity or otherwise becomes aware of a planned activity that may

result in the excavation of human remains or cultural items on tribal lands); 43 C.F.R. § 10.4(e)

(setting forth the steps the responsible Indian tribe official may take following receipt of written

confirmation of an inadvertent discovery on tribal lands).[8]

Plaintiffs' reliance on *Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 83 F. Supp.

2d 1047 (D.S.D. 2000) ("*Yankton Sioux I*"),  *Yankton Sioux Tribe v. U.S. Army Corps of*

---

[6] NAGPRA does not apply to Parcel 06, which is neither federal nor tribal land.

[7] Further, Plaintiffs' reliance on 43 C.F.R. § 10.10, Pl. Reply at 16, is misplaced, as this regulation concerns the repatriation of human remains and cultural objects in museums and federal collections under Section 7 of NAGPRA.  These requirements do not apply when there is a claim brought pursuant to Section 3 of NAGPRA, as Plaintiffs have done here.

[8] While 43 C.F.R. § 10.4(e)(iii) and § 10.3(c)(4)(i) do point back to § 10.3(b), which requires compliance with the Archaeological Resources Protection Act (ARPA) in the event of an excavation or removal of human remains and cultural items, in this case it is the Tribe and their contractor who would be required to comply with ARPA, including obtaining a permit, if necessary, under 25 C.F.R. part 262.  *See* 25 C.F.R. § 262.4(c).  It is not the United States' responsibility to ensure that the Tribe's contractor applies for a permit, if such a permit is necessary.

*Engineers*, 209 F. Supp. 2d 1008 (D.S.D. 2002) ("*Yankton Sioux II*"), *Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 258 F. Supp. 2d 1027 (D.S.D. 2003) ("*Yankton Sioux III*") and *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860 (D. Ariz. 2003), to support their argument that Defendants have any responsibilities in the event of an inadvertent discovery should be similarly disregarded, as those cases were brought concerning inadvertent discoveries on *federal* lands. *See* Def. Opp. at 13, 21; *Yankton Sioux II*, 209 F. Supp. 2d. at 1017-18; *Yankton Sioux III*, 258 F. Supp. 2d at 1028. In contrast, this case concerns the activities of a federally recognized Tribe on tribal land. Thus, while there are steps that must be taken by the Tribe in the event of an inadvertent discovery under 43 C.F.R. § 10.4(e), those steps would be taken by the responsible Indian tribe official in the event of an inadvertent discovery on Parcels 04 or 05, Plaintiffs' recitation of a federal agency official responsibilities on federal land notwithstanding.[9] *See* Pl. Reply at 12.

Further, none of NAGPRA's steps have yet been triggered, as there has not been any inadvertent discoveries.[10] Plaintiffs incorrectly state that Defendants have conceded there has been an inadvertent discovery on Parcels 04, 05 and 06. *See* Pl. Reply 10-11. Defendants have

---

[9] Additionally, as stated in the Federal Register notice announcing the final regulations for NAGPRA, in discussing the responsibilities of tribes where there is an inadvertent discovery on tribal lands, "[r]equiring a Federal agency to act as intermediary between the person inadvertently discovering human remains, funerary objects, sacred objects, or objects of cultural patrimony and the Indian tribe on whose land the human remains, funerary objects, sacred objects, or objects of cultural patrimony have been discovered inadvertently is counter to the goal of the statute, as expressed in the legislative history, of facilitating direct dialogue." 60 F.R. 62134, 62145 (Dec. 4, 1995).

[10] Therefore, even if the Court were to find that Parcels 04 and 05 are federal land, Defendants' responsibilities under NAGPRA have not been triggered, and thus no violations could have occurred.

made no such concession, and indeed they cannot, as there have not been any inadvertent discoveries of which Defendants are aware. Plaintiffs are apparently operating under the mistaken assumption that if they inform Defendants of the alleged presence of human remains and cultural items, this somehow qualifies as an inadvertent discovery under NAGPRA. That is simply not the case. NAGPRA's provisions for inadvertent discoveries are intended to apply only after the item has actually been discovered or excavated. *See* Def. Opp. at 16-18; *see also Hawk v. Danforth*, 2006 U.S. Dist. LEXIS 58104 at *4 (E.D. Wis. 2006) (NAGPRA "applies only to remains or artifacts that are 'excavated or discovered' – not to remains that may still be buried"). Plaintiffs are attempting to jump ahead in time by assuming that: (1) there has actually been an inadvertent discovery; (2) grading activities have already commenced and were not stopped by the Tribe upon an inadvertent discovery; and (3) Plaintiffs were not given first preference as lineal descendents with regards to human remains and associated funerary objects over which they may have a claim. *See* Pl. Reply at 10-16. Yet Plaintiffs point to no proof of such events.

**b. NAGPRA Provides for the Ownership and Control of Human Remains and Cultural Items, Not the Land from Which They Are Excavated or Removed**

Further, Plaintiffs' assertions that NAGPRA gives them control, as lineal descendents, over the use of the land in which human remains or associated funerary objects are excavated or removed is simply incorrect, as this Court recognized during oral argument, *see* Ex. J at 15-16, and as Defendants have explained in their memorandum in opposition to the motion for a preliminary injunction. *See* Def. Opp. at 19-22. In addition, as the legislative history of NAGPRA makes clear, NAGPRA was not intended to be a land managment statute. Prior to

NAGPRA's enactment, the Senate Committee stated that it "does not intend this section to operate as a bar to the development of Federal or tribal lands on which human remains or objects are found. Nor does the Committee intend this section to significantly interrupt or impair development activities on Federal or tribal lands." S. Rep. 101-473 at 11 (1990). Further, as Senator McCain, one of NAGPRA's proponents, stated:

> [T]here is nothing in this bill that would result in a permanent interruption of development activity on Federal lands. . . . [NAGPRA] is not intended as a bar to the development of Federal or tribal lands on which cultural items are found. Nor is this bill intended to significantly interrupt or impair development activities on Federal or tribal lands.

136 Cong. Rec. S17173-02 (October 26, 1990).[11]

Plaintiffs also assert, incorrectly, Defendants owe them a duty based on Defendants' trust responsibilities. *See* Pl. Mem at 18-19. However, as Defendants have previously stated, and as discussed below in Section D, while it is true that the United States acts in a fiduciary capacity in its dealings with Indian tribal property, the D.C. Circuit has stated that "it is also true that the government fiduciary responsibilities necessarily depend on the substantive laws creating these obligations." *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) (internal citations omitted). Thus "an Indian tribe cannot force the government to take specific action

---

[11] Plaintiffs cite to a draft agreement that was provided to Plaintiffs by Defendants, governing potential inadvertent discoveries due to maintenance and stabilization activities and preliminary archaeological investigations at the Statue of Liberty National Monument. Pl. Reply at 17, n. 16; Ex. E. Although the draft agreement does state that the preferred treatment in that case would be to leave any discovered human remains or cultural items *in situ*, NAGPRA does not require such actions. *See* Def. Opp. at 19-20. Such voluntary agreements are, of course, not prohibited, as NAGPRA specifically states that it is not intended to limit to the authority of a federal agency to enter into "any other agreement with the consent of the culturally affiliated tribe or organization as to the disposition of, or control over, items covered by this Act." 25 U.S.C. § 3009(1)(B). However, Plaintiffs are incorrect when the state that such a plan in this case would be *required* under NAGPRA. *See* Pl. Reply at 17, n.16.

unless a treaty, statute or agreement imposes, expressly or by implication, that duty." *Id.* Here, Plaintiffs have pointed to no such authority under NAGPRA directing Defendants to take the actions demanded by Plaintiffs. Further, Plaintiffs reliance on *Yankton Sioux I, II* and *II* to show that injunctive relief is warranted in this case is misplaced. *See* Pl. Reply at 17-19.

As Defendants have previously explained, *Yankton Sioux I* does not stand for the proposition that human remains and cultural items must be preserved "in-place" under NAGPRA. *See* Def. Opp. at 21-22. Similarly, neither *Yankton Sioux II* or *Yankton Sioux III* provide any support for Plaintiffs' contention that a permanent injunction should be issued in this case. *See* Pl. Reply at 19. In fact, in *Yankton Sioux III*, which involved inadvertent discoveries at the North Point Public Recreation Area, the court specifically recognized that "[a]lthough plaintiffs understandably do not want the . . .dirt. . . disturbed in any way, *the regulations implementing NAGPRA do not permanently prohibit inadvertent discoverers from conducting construction activities in the area where Native American cultural items are inadvertently discovered*. *See* 43 C.F.R. § 10.1 et seq." *Yankton Sioux III*, 258 F. Supp. 2d at 1033 (emphasis supplied).[12/] Thus, the Court did not order a permanent injunction in either *Yankton Sioux II* or *Yankton Sioux III*. Rather, it issued a preliminary injunction in *Yankton Sioux II*, 209 F. Supp. 2d

[12/] The land at issue in that case had been transferred by the Federal government to the State of South Dakota. However, this was done pursuant to an agreement whereby the Corps retained authority, jurisdiction and approval under, *inter alia*, NAGPRA, and thus the court found the land was federal land for the purposes of NAGPRA. *Yanton Sioux II*, 209 F. Supp. 2d at 1018. The court further found that despite the tribe's allegations that it had repeatedly informed the Corps that the area contained burial grounds, the inadvertent discovery provisions of NAGPRA applied. *Id.* at 1019.

at 1026-27, which was partially dissolved in *Yankton Sioux III*, 258 F. Supp. 2d at 1035-36.[13] However, in none of the cases cited by Plaintiffs was it ever alleged that tribal land was involved and all of the alleged violations and allegations of irreparable injury to the human remains and cultural items discovered were a result of activities on federal land, thus implicating federal defendants. In contrast, here, there can be no violations (or subsequent irreparable injury) because there have not been any inadvertent discoveries, and further, any potential violations would necessarily have to be found as against the Tribe, as Parcels 04 and 05 are tribal land.

Finally, Plaintiffs' suggestion that the court in *Yankton Sioux I* granted the Tribe an indefinite amount of time to perform its ceremonies and gather its dead, *see* Pl. Reply at 13, is incorrect. While the court there recognized it was the best way to respect the Tribe's members, the court directly followed up on that statement by acknowledging that "[h]owever, the Act and regulations require that other interests be considered as well. . . . While it would be preferable to require the Corps to maintain the Lake's water level until it accomplishes these duties, the Act allows the Corps to resume the activity which caused the discovery within 30 days after certification." *Yankton Sioux I*, 83 F. Supp. 2d at 1058.

As Parcels 04 and 05 are tribal land, NAGPRA's provisions are applicable to the Tribe, and not Defendants. Further, as there had been no inadvertent discoveries, the provisions of NAGPRA have not been triggered. Therefore, Plaintiffs are not entitled to either preliminary or

[13] Nor does it appear that a permanent injunction was ever granted. *See Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 396 F. Supp. 2d 1087, 1089 (D.S.D. 2005) (noting that "[f]ollowing several Court hearings and the appointment of a Special Master, the NAGPRA claims [brought with regard to White Swan (*Yankton Sioux I*) and North Point Recreation Area (*Yankton Sioux II and II*)] were resolved. . . .").

permanent injunctive relief under NAGPRA.[14]

**C. Plaintiffs Cannot Succeed on Their Claims of Beneficial Ownership of Parcel 04 In the Absence of the Tribe**

**1. Plaintiffs Are Precluded from Arguing Beneficial Ownership In the Absence of the Tribe - A Necessary and Indispensable Party**

As set forth in Defendants opposition memorandum, the issue of beneficial ownership of Parcel 04 has already been litigated in an action filed in the Southern District of California. Def. Opp. at 23. There, these same Plaintiffs filed an action against the United States claiming that they as individuals – and not the federally recognized Tribe – were the beneficial owners of Parcel 04. Def. Opp., Ex. B. The Ninth Circuit affirmed the dismissal of the case on the grounds that the federally recognized Tribe, who also claim ownership of Parcel 04, are a necessary and indispensable party. *See Rosales*, 73 Fed. Appx. at 914-15, 2003 WL 21920015 (unpublished), Def. Opp., Ex. C. Thus, contrary to Plaintiffs' assertions, the issue of whether the federally

[14] Plaintiffs further suggest that the United States should somehow seek to enjoin the actions of the federally recognized Tribe pending the action before Judge Kessler in *Rosales v. United States*, 03cv1117. *See* Pl. Reply at 4-5. This suggestion is without merit. Plaintiffs have continued to challenge Tribal elections and a variety of Tribal leadership decisions, in several lawsuits. *See* Def. Opp. at 1, n.4. But Plaintiffs do not – and cannot – allege that they have obtained a stay of an election or decision in any of these lawsuits. *See, e.g.*, 5 U.S.C. § (stating that an agency "may postpone the effective date of action taken by it, pending judicial review"); 43 C.F.R. § 4.312 ("Unless otherwise stated in the decision, rulings by the Board [of Indian Appeals] are final for the Department and must be given immediate effect."). Nor do the cases cited support Plaintiffs' erroneous proposition. *See* Pl. Reply at 4-5. *Hammerberg v. Portland Area Director, Bureau of Indian Affairs*, 24 IBIA 78, 78 (1993), *United Auburn Indian Community v. Sacramento Area Director*, 24 IBIA 33, 38-39 (1993), and *Cherokee Nation of Oklahoma, Chickasaw Nation and Choctaw Nation of Oklahoma v. Muskogee Area Director, Bureau of Indian Affairs*, 22 IBIA 240, 244 (1992), all discuss the power of the Area Director or others within the Bureau of Indian Affairs to take subsequent actions during an appeal of an agency action to the Board of Indian Appeals, not the effect of a decision by the Board of Indian Appeals during an appeal of the decision to the district court.

recognized tribe is an indispensable party was fully litigated in the Ninth Circuit. *See* Exhibit M at 26 (Plaintiffs' Reply Brief to the Ninth Circuit, arguing that the federally recognized tribe was not a necessary or indispensable party). The Ninth Circuit rejected Plaintiffs' argument. *See* Def. Opp. at 23-25. Therefore, this Court cannot consider any of the arguments raised by Plaintiffs in the instant case which implicate the beneficial ownership of the land.[15]

**2. Plaintiffs Cannot Avoid Issue Preclusion by Claiming to Bring the Present Action on Behalf of the Tribe**

Plaintiffs attempt to avoid the bar of issue preclusion by claiming to bring the present action on behalf of the Tribe. *See* Pl. Reply at 6. This attempt cannot succeed. As an initial matter, it is the federally recognized Tribe that has a conflicting claim of ownership that would be impaired if Plaintiffs were determined to be the beneficial owners of Parcel 04.[16] And therefore it is the federally recognized Tribe – not Plaintiffs – that were determined to be a necessary and indispensable party. *See* Def. Opp., Ex. C.

Moreover, Plaintiffs are not authorized to bring an action on behalf of the federally recognized Tribe. As set forth in Defendants Opposition brief, Plaintiffs – who are not the recognized leaders of the Tribe – have no standing to bring an action on behalf of the Tribe. *See* Def. Opp. at 30. The BIA has recognized Leon Acebedo as Chairman of the Tribe, through June 16, 2007. *See* Def. Opp., Ex. A. As the Supreme Court has held, this recognition by the

[15] Further, Plaintiffs have not exhausted their tribal administrative remedies, nor to Plaintiffs allege they have done so. *See* Pl. Reply at 7-8. Plaintiffs argument that they are not required to do so are unavailing for the reasons discussed in Defendants' opposition memorandum. *See* Def. Opp. at 25-27.

[16] As the Court alluded to at the February 16, 2007 hearing, Plaintiffs do not have a conflict with themselves. *See* Transcript, Ex. J at 39-41.

executive branch requires courts to do the same. *See United States v. Holliday*, 70 U.S. 407, 419 (1865) ("[I]t is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.") (*cited with approval* in *United States v. Sandoval*, 231 U.S. 28, 47 (1913)). The D.C. Circuit has also recognized that the Department of Interior (and hence, the BIA) has special expertise in the determination of acknowledgment of Indian tribes. *James v. U.S. Department of Health and Human Services*, 824 F.2d 1132, 1138-1139 (D.C. Cir. 1987). Accordingly, Plaintiffs are not authorized to bring an action on behalf of the Tribe and Plaintiffs efforts to avoid issue preclusion must fail.[17/]

**D. Plaintiffs' Trespass Claim Must Fail**

As set forth in Defendants' Opposition, even if the Court were to look past the fact that Plaintiffs are barred from asserting beneficial ownership, Plaintiffs' trespass claim is still without merit. Plaintiffs ask this Court to issue an injunction to "prevent trespass on Plaintiffs' beneficial ownership interests." Pl. Reply at 24-27. This argument – and all authority upon which Plaintiffs rely – is premised on the assertion that Plaintiffs are the beneficial owners of Parcel 04. *Id.* As set forth above, Plaintiffs cannot succeed on their beneficial ownership claim and therefore Plaintiffs' trespass claim must fail as well. But even if Plaintiffs were authorized to bring this action on behalf of the Tribe or were found to be the beneficial owners of the land, the trespass claim would still fail.

Again, Plaintiffs do not assert that the alleged trespass will be committed by the United

[17/] It is worth noting that Plaintiffs previously attempted to bring a similar action on behalf of the Tribe and it was rejected. *See* Def. Opp., Ex. D at 1-2.

States. Plaintiffs are therefore asking this Court to find that the United States is liable for trespass or other land deprivation wrongs committed by third parties. This, despite the fact that the Tribes have the power to bring actions on their own. To so find would make Defendants a guarantor and insurer on behalf of the Tribe. Plaintiffs continue to make this argument in their reply brief, but still do not cite any authority for this proposition. Pl. Reply at 20-21.[18/]

As set forth in Defendants' Opposition, the Supreme Court has repeatedly refused to make the United States an insurer on behalf of a tribe. *See Creek Nation v. United States,* 318 U.S. 629, 640 (1943) ("we are unable to find in the words of the treaties or statutes upon which this action rests any such prodigal assumption by the government of other people's liabilities as that for which the petitioners contend here"); *Nez Perce v. United States,* 95 Ct. Cl. 1, 7 (1941) ("prodigal assumption" of liability cannot be assumed).

Plaintiffs' assertion that the United States' trust responsibility requires the United States to prevent trespass by third parties is without merit. Reply at 20-21. Enforceable governmental trust obligations must be anchored by statute or regulation. *See United States v. Mitchell*, 445 U.S. 535 (1980) ("*Mitchell I"*) and *United States v. Mitchell*, 463 U.S. 206, 217-18 (1983) ("*Mitchell II*"), (General Allotment Act created a "bare trust", i.e., a limited trust relationship which did not impose on the government any fiduciary management duties). The Court in *Mitchell II* stressed that any other statutes or regulations that might establish a fiduciary relationship would "define the contours of the United States' fiduciary responsibilit[y]." 463 U.S.

---

[18/] *Comanche Nation v. United States*, 393 F. Supp. 2d 1196 (W.D. Okla. 2005), was not a trespass action. It did not address an attempt to compel the United States to enforce a claim against a third party, but instead challenged a specific BIA decision. *Keechi v. United States,* 604 F. Supp. 267 (D.D.C. 1984), is similarly inapposite. There, an Individual Indian Money ("IIM") account holder brought an action to enforce a spendthrift trust.

at 224.

*Creek Nation*, 318 U.S. at 638-640 is also instructive. There, the Supreme Court refused to hold the United States liable for the failure to file suits that would have protected tribal property interests. Rather than a mandatory duty, the Court found the decision as to "when to institute legal proceedings" as one in which wide "discretion would seldom be more necessary..." *Id.* at 639. The argument that the general trust relationship and general language in treaties, under even generous rules of construction, can premise a mandatory duty to assert claims was rejected by the Supreme Court. *Id.*

Similarly, in *Shoshone-Bannock*, the Tribes sought to compel the United States to take action on their behalf, specifically to sue others on behalf of the tribe regarding water rights claims. 56 F.3d at 1480. The D.C. Circuit, citing *Heckler v. Chaney*, 470 U.S. 821 (1985), found that the Attorney General's refusal to assert the Tribes' claims "was presumptively within her discretion." *Id.* at 1481. The Circuit also addressed the question of the United States' fiduciary responsibility to the Tribes, holding that "an Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty. 'Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one only.'" *Id*. at 1482 (internal citations omitted).

Thus, even if Plaintiffs were found to be the beneficial owners of Parcel 04, or authorized to bring this action on behalf of the Tribe, they could not show that the United States has an obligation to prevent trespass by third parties. Accordingly, Plaintiffs cannot succeed on their trespass claim.

## II. THE BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST FAVORS DENYING PRELIMINARY INJUNCTIVE RELIEF

Plaintiffs' assertion that Defendants have proffered no harm beyond the passage of time, Pl. Reply at 7-8, is simply not correct. Plaintiffs have requested a mandatory injunction, which does not serve the traditional function of preserving the *status quo*, but rather alters it by commanding some positive act. Def. Opp. at 10-11. An applicant for injunctive relief carries a particularly heavy burden where, as here, the result of an injunction would be to impede the orderly administration of a governmental responsibility intended to serve the public interest. *Yakus v. United States*, 321 U.S. 414, 440 (1944). They do so when such decisions or either outside of any statutory scheme authorizing such actions, or relate to matters that are traditionally committed to the discretion of the government's officials. *See Heckler*, 470 U.S. at 831. It plainly is not in the United States' or the public's interest to affirmatively require actions not directed or authorized by statute and disrupt the orderly administration of a statutory scheme that carefully balances federal and tribal interests and sovereignty.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

March 5, 2007.

Respectfully submitted,

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
SAMANTHA KLEIN
ALEX KRIEGSMAN
Trial Attorneys
United States Department of Justice
Environment and Natural Resources Division

By: /s/ Samantha Klein
Samantha Klein
Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0474
Facsimile: (202) 305-0506

By: /s/ Alex Kriegsman
Alex Kriegsman
Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-3022
Facsimile: (202) 305-0506

Of Counsel:
Tobias Halvarson, Attorney-Advisor
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
Tel: (202) 208-6930
Facsimile: (202) 219-1791

Barbara Coen, Attorney-Advisor
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
Tel: (202) 208-6060
Facsimile: (202) 219-1791

ATTORNEYS FOR DEFENDANTS

# Exhibit J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WALTER ROSALES, ET AL., : Civil Action No. 07-162
:
Plaintiff :
:
v. : February 16, 2007
:
UNITED STATES OF AMERICA, : 3:00 p.m.
ET AL, :
Defendants :
. . . . . . . . . . . . . . . . . : . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: PATRICK D. WEBB, ESQUIRE
WEBB & CAREY, P.C.
401 B Street
Suite 306
San Diego, CA. 92101
(619) 236-1283

LOUIS G. SMITH, ESQUIRE
AARON SNOW, ESQUIRE
BOIES, SCHILLER & FLEXNER, LLP
5301 Wisconsin Avenue, NW
Washington, D.C. 20015
(202) 237-2727

For the Defendants: SAMANTHA KLEIN, ESQUIRE
ALEX KRIEGSMAN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES
601 D Street, NW
Washington, D.C. 20004
(202) 305-0474

Court Reporter: REBECCA STONESTREET, RPR, CRR
Official Court Reporter
Room 6415, U.S. Courthouse
Washington, D.C. 20001
(202) 354-3249

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

Page 2

PROCEEDINGS

COURTROOM DEPUTY: Civil action 07-162, Walter Rosales, et al. versus United States of America, et al. For the plaintiff, Pat Webb and Louis Smith, for the defense, Samantha Klein and Alex Kriegsman.

THE COURT: Good afternoon, everybody.

MR. WEBB: Good afternoon, Your Honor.

THE COURT: I have on my sheet that Pat Webb and Louis Smith are here representing the plaintiffs, but there are three people. So there must be somebody with another name.

MR. WEBB: That's correct, Your Honor. Aaron Snow is also from the Boies Schiller firm, and he's with us. His application to this bar is pending at the moment.

THE COURT: Okay. Well, Mr. Snow, welcome.

All right. Mr. Webb, you're the one who wants a preliminary injunction, so why don't you go first, sir?

MR. WEBB: Thank you, Your Honor. By way of a procedural issue first, Your Honor, Patrick Webb appearing on behalf of the plaintiffs. I believe we have a pro hac vice application, and Louis Smith was here as an admitted member of the bar to speak to that issue if you need to have that done on the record. Your clerk had asked me about that to make sure that I was listed on the docket, and apparently I'm not until Your Honor grants the pro hac vice application.

THE COURT: But it's already been filed?

Page 3

MR. WEBB: Yes, we filed it, Your Honor. But forgive me, I don't know your protocol about that. In some of the courts I've appeared in front of --

THE COURT: Well, normally, if the filing is consistent with local rules, then I would normally just grant it on ECF. I don't know, have you seen it? I haven't noted it. It's there.

Well, then, I'll grant it. Thank you very much. Does that mean you didn't have to come?

MR. SMITH: No, no, I'm happy to be here.

THE COURT: All right. Mr. Webb, go ahead.

MR. WEBB: Thank you, Your Honor. Let me begin by saying that the plaintiffs are here today, and we really appreciate the opportunity to be heard on such short notice.

Because we're here on short notice in the sense that the full briefing time for the motion for preliminary injunction has not expired yet, we would like the opportunity, before Your Honor makes any final rulings on the preliminary injunction, to allow yourself the opportunity to review our reply brief, which would not be due under the federal rules 5 and 6 until February 26th. But because we asked for a hearing before February 23rd for a bunch of practical reasons, it's hard for us, obviously, to get the reply brief done in the normal course that we would have.

And Your Honor needs to know that I've only seen the opposition. It was very courteously given to me before I got on

Page 4

the plane yesterday, so at about 11 o'clock, when I left for the airport, I could start reading it around noon yesterday.

The other thing that I think that we should begin with here today is that the plaintiffs are here seeking mostly a prohibitory injunction, and, in a minor sense, a mandatory injunction. And we'll talk, I hope, about the differences between those.

The government's opposition seems to focus on this as if it was entirely mandatory injunctive relief that we are seeking. It's really the reverse. It's mostly a prohibitory type of injunction to prevent the government from allowing grading to occur and other things that would cause desecration, mutilation, or disinterment of Native American human remains and funerary objects on the property in question.

THE COURT: Okay. Well, let's narrow the argument a little bit, though. You do agree, don't you, that you can't sue the federal government, and your defendants are the federal government, under California law?

MR. WEBB: As a general proposition, Your Honor, I would tend to agree with you. In this specific instance, there is a savings clause in the federal NAGPRA, or Native American Graves Protection and Repatriation Act, at I believe it's 25 U.S.C. Section 3009, I believe. And it's also in the CFRs at 43 CFR 10.15, setting out the saving provisions, that nothing in the federal statute is to limit any other state law that would

Page 5

provide our clients remedy for the personal injury due to the desecration, mutilation --

THE COURT: I'm sure that's true. But nonetheless, you're talking about the United States. You're not talking about suing anybody else for desecration, which you would be able to do under state law, you're talking about suing the sovereign. And you can't sue the United States under California law. You just can't. They haven't waived their sovereign immunity. It hasn't waived its sovereign immunity, excuse me.

So I think you've got to stick to the federal statute and see if you can put your case into the federal statute, but I don't think you can sue the federal government based on the state law.

MR. WEBB: As a general proposition, I agree, Your Honor. I think in this specific instance, there are overlays, if you will, or additional rights that our clients have obtained by virtue of the existence of the California version of the Native American Grave Protection Act, that when enforced under the federal statute through that savings clause, still require the government to protect our client's personal injury rights against all comers, if you will, that might do damage to their family's human remains and funerary objects.

THE COURT: Well, why don't we address where you find the obligation for the federal government, either that -- you sued the DOI and the BIA. Right?

2 (Pages 2 to 5)

United States District Court
For the District of Columbia

kingreporter2@verizon.net
202-354-3249

Rebecca Stonestreet, RPR, CRR
Official Court Reporter

Page 6

MR. WEBB: That's correct, Your Honor.

THE COURT: Okay. Where you find the affirmative obligation for the United States to step in to prevent the Indian tribe from constructing a casino. I guess that's what's about to happen.

MR. WEBB: Well, what we're really trying to do, whether it's the construction of a casino or any other activity on the property where the human remains have been interred, it's really a combination of the protection of the rights of our clients to make sure their family members are not disinterred from where they were placed.

THE COURT: Right.

MR. WEBB: And the federal statute really provides the framework, and then the Code of Federal Regulations, of course, fill in the gaps that are provided in the statute, as in all situations where there's a good set of regs. And here we have what I think is a very detailed set of regs in the 17 sections of the Native American Grave Protection Act's regulations.

If I might, Your Honor, the duties, if you will - and I think that's what Your Honor is focusing on - really show up at 43 CFR 10.3 and 10.4. And as the government's papers note, there's a difference between intentional archaeological excavation under 10.3 and inadvertent discoveries under 10.4.

The protections and the duties are set out under 10.3, and then referred back to in 10.4, so that essentially the same

Page 7

set of obligations apply whether it's in an intentional excavation or removal of the remains, or an inadvertent discovery.

Then, moving on through the set of regulations, there are additional obligations that the government picks up, no matter whether it's an intentional excavation or an inadvertent discovery, to consult with the lineal descendants of those remains. And let me point out that this is different than a lot of the cases that arose originally.

The statute talks about museums, it exempts the Smithsonian, it talks about a lot of archeological issues. We're talking about something much more recent in time. We're talking about Walter Rosales' baby brother, who died in the late '40s, we're talking about his mom, who passed away in 1995, and his son, who passed away last year.

With regard to Karen Toggery, we're talking about her mom, who passed away in '95 or '96, I forget the exact year, and her son, who passed away a couple of years ago, where they have personal knowledge that those family members' human remains and their funerary objects are interred on the property in question. We'll talk about the three different parcels in a moment.

We also know, because of the declarations of both Walter and Karen, with their personal knowledge of at least 20 other Native Americans whose either their human remains or their funerary objects have been placed on this property as part of

Page 8

the culture of how they deal with the passing of their family members and forebearers --

THE COURT: Okay. But let's go back to the CFRs that you just cited. 10.3, that speaks to intentional archaeological disturbance. Now, this isn't an intentional archaeological disturbance that's contemplated at all.

MR. WEBB: Let me answer that by saying I disagree, Your Honor. I think it is an intentional one, now that we have put the government on notice that there are Native American human remains --

THE COURT: Wait a minute. It's the word "archaeological." It might be an intentional disturbance, but it's not an intentional archaeological disturbance. What does archaeological mean to you in this context?

MR. WEBB: I believe the statute refers to anything that would -- in other words, there's nothing in the definitional section 10.2 that limits archaeological to something that has to be of antiquity. And in fact, in the Yankton Sioux trilogy of cases - I believe it's in Yankton Sioux - where there is a discussion that it doesn't have to be of any certain age or antiquity before the Native American human remains will fall within the protection. It is as if by virtue of being Native American, you fit within anyone's study of archaeology, if you will, and thus, there is no special limitation that there has to be some ancient nature to this.

Page 9

THE COURT: I'm not talking about ancient as opposed to recent, I'm talking about the nature of the intent. It has to be intentional archaeological. And so an intent to grade for purposes of -- I'll just take it out of this set of circumstances and give you a hypothesis. An intent to grade for purposes of putting up a car wash, would that be an intentional archaeological disturbance?

MR. WEBB: If they were intending to dig up Native American human remains where they wanted to put the car wash, I think it falls within this definition.

THE COURT: Oh, they wouldn't be intending to dig up anything, they would only be intending to grade. They might inadvertently, under 10.4 -- when they're grading, inadvertently encounter the remains of deceased Indians, in which event 10.4 would apply.

MR. WEBB: I agree. And I want to get to 10.4 in just a moment. But I want to answer Your Honor's concerns about 10.3 so that you understand what our argument is about why we think there is an intentional nature to this.

If I might, Your Honor in the San Carlos Apache case that was cited by both sides, the section that the government cites to is merely the section in which the district of Arizona concludes that the ARPA definition of archaeological intentional removal, will not apply.

However, the district judge in the San Carlos case goes

3 (Pages 6 to 9)

United States District Court
For the District of Columbia
kingreporter2@verizon.net
202-354-3249
Rebecca Stonestreet, RPR, CRR
Official Court Reporter

on to say that NAGPRA is different than ARPA. And in the NAGPRA section 10.3, there is no limitation that it had to be just archaeological if there was at 10.3(b), the specific requirements, quote, "These regulations permit the intentional excavation of human remains, funerary objects, sacred objects, or objects of cultural patrimony from federal or tribal lands only if," and then there's four requirements.

Before we talk about the four requirements, preface, if you will, to those four requirements says nothing about it being archaeological.

The title of the section 10.3 is the only place where the word "archaeological" appears. It is adopted pursuant to the reference to the archaeological nature of Native American human remains in the statute, the series that starts at 25 U.S.C. 3000, but there's no limitation in these regulations that it has to be archaeological.

And the San Carlos case goes on essentially to say, there would have been a violation of NAGPRA in that case if you could prove that there was knowledge that there were actually Native American remains at the location, where in that case the raising or lowering of the river was going to take place.

Here, because we've now put the government on notice of at least 20 people who are Native Americans, and their remains or their funerary objects are at this property, whether it's a car wash or a casino, it doesn't matter. If you're coming in

with an intent to grade, that's an intent to excavate human remains. Excavate doesn't mean you have to cart them away, it merely means you have to touch the dirt where they have been interred.

Now, in Walter's mom's case, and in, I'm trying to think -- in Walter's mom's case, I know for sure she was cremated and her remains were interred by spreading the ashes on the property around all of the buildings on the piece, the 04 parcel, as the government refers to it, where the houses are. That is part of their culture.

The funerary objects are things of her personal possessions, some of her hair, some of her fingernails, things like that that are buried separate and apart from, and taken from her, I should say, before the cremation takes place.

Under both the California statute and the federal statute, the location of those things is a very confidential, sensitive matter. If Your Honor needs to, our clients are prepared to identify more specifically, but because this is still a public hearing, let me just say that they are on that property around the buildings.

It is our view that there is no way that you can allow any kind of grading on that property, once you've had cremated human remains interred in that manner, without disinterring them and changing the manner in which the family and the tribe and the culture wants to maintain them. And that's what you have in

the declaration of both Walter and Karen, is that they would like to have their family's remains left in place the way they were put there pursuant to their culture, long before this became an issue this year.

I think that answers the question about 10.3. Let's move to 10.4. The government says, based upon a declaration that they found from the leader of the other faction, Mr. Acebedo, that they purportedly did some kind of environmental archaeological review in 1998, and their Mr. Baksh, I think is how his name is pronounced, did not find any sign of human remains.

But there's no indication that Mr. Baksh ever talked to the people that lived there, particularly our clients, Walter Rosales or Karen Toggery, to find out what the most recent history particularly had been, let alone the history of the other 20 individuals that they had personal knowledge about. Hence, Mr. Baksh apparently merely looked at the property and did not think he saw anything.

That's not enough. That doesn't meet the government's burden to say this is not an inadvertent discovery. If anything, it makes it fall within an inadvertent discovery for the government to say, well, we didn't have any knowledge that there were human remains there until Mr. Webb's clients came forward and said, wait, we know some family members who are interred there.

So either way, it's now an intentional excavation if they go forward, because everybody is put on notice that there are actual native remains, which puts us into the Yankton trilogy cases and not the San Carlos example --

THE COURT: I hate to say anything, but ashes that are spread are not interred.

MR. WEBB: I'm sorry, Your Honor. I was concerned about that myself, and I went further in the definitional sections, and the definition, if I might - let me see if I can find that quickly here, Your Honor - means any manner of interment, as I recall.

THE COURT: Any manner of interment?

MR. WEBB: Which includes being placed on, above, or in the dirt. That's the language I'm looking for.

Yes, it's actually in the definitional section of the statute itself, at 3001, section one: Burial site, quote, "means any natural or prepared physical location, whether originally below, on, or above the surface of the earth into which, as a part of the death rite or ceremony of a culture, individual human remains are deposited." And clearly the spreading of ashes fits that definition.

We were outlining for Your Honor the duties, and under 10.4, if there is an inadvertent discovery, which apparently the government admits if in fact there are human remains there, this would be inadvertent because there would be no knowledge until

Page 14

our clients came forward to put them on notice, they would then still have the requirements under 10.3 of the four requirements as to what the government is supposed to do.

So going back to 10.3's requirements, the objects can only be excavated or removed after a permit is obtained like the permit you would get under ARPA, but it's now going to be a permit under NAGPRA. And the deputy commissioner of Indian Affairs here in Washington is the one that has to issue that permit. The deputy commissioner is to get the consent of the appropriate tribe, and obviously there's an issue in this case, as Your Honor is probably well aware, as to who the tribe is, and that that's pending before Judge Kessler. The deputy commissioner is also to determine the disposition of the objects consistent with the custody requirements of 10.6.

Now, the custody requirements of 10.6, just as in the statute itself, are very specific that the lineal descendant has ownership and control of the human remains and associated funerary objects. No one else. Which is why our individual clients' rights are the ones that are to be protected here.

And finally, once they get the consent of the lineal descendant as to the disposition, then the federal agency, the fourth requirement, is that they must maintain proof of that consent. Now, that set of four requirements applies both to intentional excavations and intentional discoveries.

Section C in the procedures, to meet those four

Page 15

requirements - this is Section C at 10.3 - outlines a lot of musts that the federal agency must do. They must notify in writing the tribe they believe is related to the human remains, the federal agency must notify any present day Indian tribe that is reasonably believed likely to have a cultural relationship to the remains, the notice must be in writing, the notice must also propose a time and place for meetings or consultations to consider the activity that's proposed on the property, the federal agency's proposed treatment of any human remains, funerary objects, et cetera, that may be excavated, and the proposed disposition of any excavated human remains.

The disposition, as Your Honor has seen from the declarations of Mr. Rosales and Ms. Toggery - that is, that they want to have happen as lineal descendants - is to have the remains remain in place.

THE COURT: Well, they don't want any disposition.

MR. WEBB: That is a disposition, Your Honor.

THE COURT: Well, you can read it that way. The way that I would read this in the normal way would be that this is a procedure so that everybody has notice and everybody has an opportunity to participate in what are we going to do with the fact that any construction or other activity is going to take place, and then the activity can proceed.

MR. WEBB: That's why I think the regulations are so specific about custody under 10.6, that once the federal agency

Page 16

is put on notice that property for which the government holds title, as in this case, for whoever the beneficial owners end up being, because it's federal land and the agency is now put on notice that land they have some control over has human remains on it, you then have to go to 10.6 to determine who gets custody of those remains.

Now, the government wants to point out, well, that doesn't mean you get land use controls. That's really not the issue. We're here to protect the remains.

THE COURT: No, no, no, that really is the issue. But okay. We're going at it in a very specific way, but that really is the issue.

MR. WEBB: Long before anybody proposed building a casino on this site, my clients stepped forward to assert their rights 12 years ago, Your Honor. And so I'm trying to point out there's a long history here that precedes what's about to happen now.

And so though you're seeing me for the first time, seeing our clients' claims for the first time because somebody wants to build a casino there, long before that was an issue, my clients were trying to protect the property on which they live and in which their families have been interred for a long, long time. That's why we gave some history in the complaint itself outlining how long the families have been doing this there, since Pejopica (ph) was the last governor of Baja, California,

Page 17

and since this was in Mexican hands in those days.

In addition to the "must" sections of 10.3, in 10.4 the government still has further obligations under the section, once there is an inadvertent discovery, as the government seems to admit this would be, not knowing about these human remains until we brought it to their attention. Under the C provision of 10.4, titled "Ceasing Activity," quote, the regulation states: "If the inadvertent discovery occurred in connection with an ongoing activity on federal or tribal land, the person, in addition to providing the notice described above, the person must stop the activity in the area of the inadvertent discovery and make a reasonable effort to protect the human remains, funerary objects," et cetera.

Under Section D, the protection requirements are set out even further. There in Section D-1, "The responsible federal agency official must take immediate steps, if necessary, to further secure and protect inadvertently discovered human remains, funerary objects," et cetera, "as appropriate, including stabilization or covering."

Now, that is what the Court in the Yankton Sioux trilogy used to require the government to do more than just affect the level of the lake. They also had to allow sufficient time for the meetings that we've been discussing, the notice requirements, for everybody to get together to decide what to do with the human remains. And in the final of the trilogy, a

5 (Pages 14 to 17)

United States District Court
For the District of Columbia
kingreporter2@verizon.net
202-354-3249
Rebecca Stonestreet, RPR, CRR
Official Court Reporter

permanent injunction for a portion of the property was ultimately left in place.

So we started with a preliminary injunction in Yankton 1, and it became a permanent injunction by Yankton 3, under this section requiring the regulation to secure and protect the remains, including stabilization and covering.

We believe under this code section -- I'm sorry, this regulation, that it is very similar to California's most recent amendment which we cited in the moving papers that requires the lineal descendant to express whether they want the remains left in place or not.

And since the federal regulation gives the custody of these remains to the lineal descendant, because in most of the cases when these statutes were first put in place, we didn't know who the lineal descendants may or may not be, it was remains that were 10,000 years old. And there's still a fight as to which tribe may or may not have some relationship to the Kennewick man. That's not our set of facts.

In this situation we have families who know directly that their immediate predecessor generation and their successor generation, mothers and sons, are interred at this location and fall within the definitional sections of these regulations. And since the lineal descendant gets the custody under these regs, the lineal descendant has the right to say they don't want them moved, they want them left in place.

THE COURT: I'm not sure of that. I follow where you would be coming from under California law on that point, but custody and the right to say "you can't move them" are two different things. It seems to me that custody means you get control, physical and legal control over the remains, but it doesn't mean that you get to insist they stay where they are.

MR. WEBB: It doesn't necessarily mean that, is Your Honor's point?

THE COURT: Doesn't necessarily mean that. I'm not making a ruling, I'm just commenting on your argument. Why don't we let the defendants speak a little bit. Okay?

MR. WEBB: All right, Your Honor. I would like to come back to that point, if you don't mind.

MS. KLEIN: Good afternoon, Your Honor.

THE COURT: Good afternoon, Ms. Klein.

MS. KLEIN: I'm just going to go right to the NAGPRA claim, because as this Court has recognized -- I'm going to proceed right to the NAGPRA claims. As this Court has correctly recognized, California state law did not apply.

Plaintiffs are alleging violations of NAGPRA, but what Section 3 of NAGPRA -- and NAGPRA actually contains three different sections. Section 4 deals with illegal trafficking of cultural items, and Section 7 deals with museums, and neither of those are pertinent to this case. We're looking at Section 3, which as this Court has correctly recognized, deals with the

ownership or control of cultural items, not of the land itself.

And this Court has stated, what plaintiffs are attempting to do is use NAGPRA to control what happens with the land ultimately, and NAGPRA doesn't provide those kinds of remedies.

Now, first, as an initial matter, the activity in question that we're looking at here is construction undertaken solely by the tribe and authorized solely by the tribe. The federal government has no role in the construction that this tribe is undertaking.

And in addition, the land that we're looking at here is actually tribal land rather than federal land. And so some of the provisions that plaintiffs are citing to actually don't apply, because the regulations separate out requirements of what needs to be done if discoveries are found on federal land, versus if they're inadvertent discoveries on tribal land.

THE COURT: Tribal land, even though the United States holds tribal land as trustee?

MS. KLEIN: Yes. NAGPRA has two different -- for purposes of NAGPRA specifically, there are two different types of land that NAGPRA applies to; there's federal land and then there's tribal land. And in this case we're dealing with tribal land.

THE COURT: Federal land is your normal, average, run-of-the-mill, truly owned by the federal government and used

by everyone?

MS. KLEIN: Yeah. And actually, if you look at 25 U.S.C. Section 3001.5, there's a definition of federal land. And the definition of tribal land falls under Subsection 15.

THE COURT: Okay. Thank you.

MS. KLEIN: So although the plaintiffs are talking about all of the responsibilities that the federal government has, in this case the federal government doesn't have any responsibilities. The tribe is undertaking the construction on its own land, and the government doesn't have any right to step in and tell them that they can't undertake this construction because the plaintiffs are saying that they want these remains to be preserved in place.

What NAGPRA applies to is the ownership and control of the items themselves, it doesn't apply to the ownership and control of the land in which they are found. And that's essentially what plaintiffs are trying to get at, as you're correctly recognizing.

THE COURT: So all the regulations that were cited by Mr. Webb about meetings and notices and things from the assistant deputy commissioner or whatever, those relate only to intentional or inadvertent activities on federal land?

MS. KLEIN: Well, I'll back up for a second. For NAGPRA, there are intentional excavations and there are inadvertent discoveries.

Page 22

THE COURT: Right.

MS. KLEIN: This is not an intentional excavation. There is no intent. The intent is to construct a casino, the intent is not to dig up items. And Yankton Sioux, the first case that they cite to, actually states that -- I'm sorry. Actually, it's San Carlos actually states that where you're dealing with an activity that is undertaken for purposes other than the intentional excavation, it doesn't fall under the intentional excavation provisions of NAGPRA.

What we're dealing with here are inadvertent discoveries, and both San Carlos and Yankton Sioux found that this would fall under inadvertent discovery.

THE COURT: Okay. So let's say that they're inadvertent discoveries because the part of the Indian tribe, without addressing who's in the Indian tribe at the moment, the part of the Indian tribe that wants to do some construction in this area now knows that the plaintiffs think that there are human remains there, and so they have inadvertently discovered that their plan for construction may interfere with human remains?

MS. KLEIN: Well, the inadvertent discovery doesn't actually occur until there's an actual inadvertent discovery. And as plaintiffs have said, there are not specific places that they're pointing to and saying, right over here.

And in that case -- and again, though, the obligation

Page 23

is on the tribe who is doing the construction. That's what we keep having to come back to. The United States doesn't have any role in this construction, and they don't have any responsibilities under NAGPRA, which is only triggered once there is an inadvertent discovery or an intent to do an intentional excavation, which is not the case here.

THE COURT: Okay. Now, let's back up a second. I'm sorry.

MS. KLEIN: No. It's a very complicated statute.

THE COURT: Well, it is and it isn't. First you think it is, and then you think, no, no it, it's very clear; then you think it's not so clear. And you sort of go back and forth like that.

All right. So since this is tribal land and the federal government isn't constructing or approving or anything, and the intent of the activity is not to excavate remains but to grade for purposes of building a casino, you would argue that the inadvertent discovery section applies. But it can't apply until somebody makes a discovery?

MS. KLEIN: Yes, Your Honor.

THE COURT: And what do we do about remains that were cremated and scattered on the ground?

MS. KLEIN: Well, NAGPRA speaks to human remains, and presumably these need to be some kind of recognizable human remains in order for it to be discovered or to be excavated.

Page 24

And once remains are discovered or excavated, then lineal descendants for human remains and associated funerary objects are given the first priority in terms of custody of those remains themselves, but again, not of the land.

If all we're talking about are ashes here, if you play out what plaintiffs are arguing, again, that gets them to somehow then they get to control the land, which NAGPRA does not have as its intent. When there's an inadvertent discovery, there's a 30-day cessation of activity. After 30 days, as long as it's lawful, you then continue these things.

And all the tribe would have to do is apply for an ARPA permit, if they need to do that in order to continue with the activities. NAGPRA is not intended to stop projects, as plaintiffs here are trying to get the Court to order us to somehow get the tribe to stop.

THE COURT: Now, you don't actually -- "you" being the federal government, you don't actually have control over the tribe or a way to require it to stop or proceed or slow down or turn right or left or whatever, do you?

MS. KLEIN: No, Your Honor, we don't, as the federal government.

THE COURT: It seems to me there's not a connecting link there. Is that right?

MS. KLEIN: That's exactly right, Your Honor.

THE COURT: Okay. Thank you.

Page 25

MS. KLEIN: Thank you.

THE COURT: Mr. Webb, where is the connecting link?

MR. WEBB: Let's talk about that, Your Honor. In answering Your Honor's question about the connecting link, let me go back to where we paused a moment ago about, I think the phrase was "not necessarily to maintain these remains in place."

THE COURT: Uh-huh.

MR. WEBB: The link is in the regulations, framed by the statute, obviously, that imposes duties upon the government, contrary to what Ms. Klein is talking about. Those duties, we were going through the list between 10.3 and 10.4, and the custody requirements of 10.6. They're very specific that activity is to cease on the property, not just for 30 days. It starts with a 30-day hiatus so that everybody, as Your Honor said, gets together to figure out what to do about this. But just as the last of the Yankton trilogy finds, if there's no way to mitigate the placement of the remains and there's no way to properly protect the cultural sensitivity of what's been deposited there under the definition of a burial site, then the lineal descendant has the right to have its custody of those remains protected in place.

An example would be the proposed inadvertent discovery plan for the Statue of Liberty. It uses the words -- instead of the California statute, "in place," under the federal NAGPRA, this plan was proposed and run through the national manager

7 (Pages 22 to 25)

United States District Court
For the District of Columbia
kingreporter2@verizon.net
202-354-3249
Rebecca Stonestreet, RPR, CRR
Official Court Reporter

that's referred to in these regulations for NAGPRA that sits over at the National Park Service, believe it or not, part of the Department of Interior, and they prepare these plans in consultation with the tribes and the individual Native Americans that are involved.

The current one that's proposed for the Statue of Liberty gives the kind of protection that I'm talking about that exists under the California statute to have the parties leave -- meaning the federal agency who is maintaining the Statue of Liberty, they want to do some foundational work there. If remains are found inadvertently there, they must be left in place under that provision we were just going through, where they have to cover it and stabilize it.

Now, to me, stabilizing and covering the deposition -- the deposit of the ashes means you can't go stir that up. This is not a building site, it is a ceremonial site where, in their culture, their forebearers are allowed to remain. And really, Your Honor, my clients, particularly Walter, have been about this for 12 years trying to maintain this protection.

If it means, because we're talking inadvertence here, that concomitantly it means there's going to be some kind of land use control, that's what this regulation says. It says you will cease activity. And it's not just for 30 days. Because under the 30-day provision, you can only -- let me see if I can find this. There's a section here that says, when you can

resume -- yeah, resumption of activity, and that's in 10.4(D), the Federal Land Section 2, resumption of activity. Quote, "The activity that resulted in the inadvertent discovery may resume 30 days after certification by the notified agency of receipt of the written confirmation of notification of inadvertent discovery, if the resumption of the activity is otherwise lawful."

So that means you've got to meet all the other requirements. And if the custody requirement allows the lineal descendant to properly have those remains stabilized and covered, it means you can't uncover them. You can't keep going.

And that's really what Yankton 3 does, ultimately. Not with the whole property, because they got everybody together to figure out exactly where the buildings and the excavation would take place, and they parceled out where the protection would be permanent, and that's all our clients are asking.

So I return to necessarily not in place. Maybe Your Honor hasn't come to the conclusion about what that means yet. But that's why we're here, that's why we need a trial, that's why we need an injunction in place to maintain the status quo, so that you can carefully hear both sides present the evidence, just like in the trilogy of Yankton Sioux cases, to see exactly what we're talking about.

THE COURT: Okay. And let me just ask you one more question, which is, Ms. Klein makes a strong comparison - or

distinction, excuse me - between land that is tribal land and land that is federal land, and says that the regulations apply differently depending on what land it is. And that since this is tribal land and it is a tribal construction that's wanting to be done, that there's no interposition between the federal government and the tribe.

MR. WEBB: Let me answer that, Your Honor. First of all, there's three parcels that we're dealing with, and you need to understand what's on each of the --

THE COURT: One of them belongs to the bishop --

MR. WEBB: Correct.

THE COURT: -- and two of them belong to somebody. They're tribal lands.

MR. WEBB: I disagree, Your Honor. Parcel 04 is property, the grant deed reads, "to the United States in trust for Jumal Indians of half-blood or more degree of Indian blood, as the Secretary of Interior shall designate." That grant deed was dated 1978.

This tribe was not recognized, it did not exist in 1978. It comes into existence in 1981, three years later.

THE COURT: Didn't you lose that case in California?

MR. WEBB: No, Your Honor. Let me explain that. And I'm glad that everybody on the other side put the orders in front of you so you can carefully go back and look at it. And I brought a copy of the complaint in case you need to see that.

I've not yet submitted it. In our reply papers, I will include it.

Here's what happened in that case: We already were back here in front of the court of claims, which is now with Judge Damich. I forget which judge we started with. We started here in 1998 in Washington. In 2003, we were still finishing the appeals of who the members and who the proper leaders of this tribe are inside BIA. In '03, when they make their final decision at IBIA over on Wilson in Arlington, we then have the right to come to District Court. We did, and we're now sitting in front of Judge Kessler with cross motions for summary judgment. Mr. Kriegsman is on that case. It's been pending for a long time because of the tobacco litigation.

But until that case is decided, it's unfair for the government to say that my clients aren't members of this tribe, and that my client, Walter, is not the chairman of this tribe. We are still seeking to have that established. We believe that through the secretary and its designated lower agents out there in the Riverside office, illegally allowed other members and nonmembers of this tribe to get together, amend their constitution, and let quarter-bloods start to vote.

If we're right that that was not a lawful amendment, which we are very certain that it is not, then they've swelled the ranks with nonmembers, and everything that flows after that, including the eviction ordinance, they're trying to go to this

intertribal court, all of that goes away. And the tribal court that my client set up in 1995 that already has a default judgment against a number of the individuals of the other faction will be entitled to full faith and credit, and will have a final resolution of who the tribe is and who the members are.

Until that happens, those issues are pending. And that's why we need an injunction right now. Because in the interim, if you will, the government is ending up favoring one faction against another faction until we get a final resolution of that issue. So that's one of the practical reasons why we're here seeking an injunction.

Now, to get to this link that you're looking for, we looked at having to litigate cross country, obviously. Those decisions, from the Administrative Procedure Act perspective, properly come before Judge Kessler out here because the decisions are made here, because the land, as the government points out in its papers here, is in California.

In the interim, in '01, I believe, I filed the action seeking a trust patent. That's a recordable document in any of the counties of the country like a grant deed. We believe we were still entitled to one of those from the General Allotment Act left over from the homesteading statutes of the 1880s. Judge Gonzales disagreed; entered a summary judgment, not a dismissal. It was a 12(b)(6) and a 56 motion. She only granted the 56 part, did not grant the 12(b)(6).

Ninth Circuit affirms dismissal, not summary judgment. And it is our understanding, particularly here in the DC Circuit, that collateral estoppel or issue preclusion that the government seeks here doesn't apply, because what Judge Gonzales determined of an alleged factual nature, the quote that they put in their papers from her order no longer has force and effect, because all the Ninth Circuit did was affirm dismissal for not having the tribe as an indispensable party.

Now, I need to remind you, Your Honor - and you have lots to look at here, I know - but the court of claims case and the case in front of Judge Kessler my clients have filed in the name of the tribe and in their individual capacities, because we're seeking to litigate the fact that our clients are the lawfully elected leadership of that tribe.

Since we were already back here on the tribal issue, if you will, what we merely sought to have done in the case in front of Judge Gonzales was to get that piece of paper, a trust patent, issued. It's very clear when Your Honor goes through the order that the government attached as an exhibit here, I think it's Exhibit B to their opposition, that even Judge Gonzales got confused between the difference between a fee patent document and a trust patent document. She ultimately concludes we're not entitled to a fee patent document, and grants the motion for summary judgment. We never sought a fee patent. That was the change between the 1880s and the

Roosevelt Administration's 1934 Indian Reorganization Act that said we're not going to issue fee patents to individual Indians anymore. We were merely seeking trust patent relief.

I went back on a motion for reconsideration to try and explain that difference, and that's when the Court, not the government and not me, found that Coast Indian Community case. And it appeared to me that the judge was searching for a way in which she could infer what that original 1978 grand deed meant, and she was looking for something that said it could be inferred to go to a tribe. And she pointed to the Coast Indian Community case as the answer.

The problem is, and what I perceive, is the Ninth Circuit realized that was not correct. And that's still my position, is that that's not correct.

What the Coast Indian Community case says is that a community of Indians never recognized as a tribe, like many of the western tribes, they were disbursed to the four corners of the winds at the end of the 19th century there, and the Indian Reorganization Act allowed them to get back together and reorganize, adopt a constitution, and become a recognized entity if they chose. But in Coast Indian Community, much like in our individual Indian situation for more than 100 years, they never organized as a tribe.

So when the local rancher, the Daley family, granted this property to the United States in 1978, under what the

finding of the court of claims in the Coast Indian Community case says, when that grant deed language is used to a certain group of Indians as the Secretary of the Interior shall designate, it can only be inferred to mean the individual Indians. Because there was no recognized tribe.

The government points out in a footnote, they want to know why we cited the solicitor's opinions. They're very telling, because in the litigation with the government in San Diego, they didn't produce those, though we asked. I found them by accident searching something at the University of Oklahoma, that has a pretty good Indian law library, and I tripped over those solicitor's memos.

From the '40s through the '50s, there were specific instructions, if you will, that went out to five or six tribes, and those memos are then reprinted for all the regional BIA offices to say, if you're going to take property under the Indian Reorganization Act as opposed to the Homestead Act into trust for certain Indians that are not yet part of a recognized tribe, here's the language to use.

And when it says "as designated by the Secretary of Interior," it means those individual Indians are the beneficial owners until such time as the Indians themselves decide to get together, reorganize under the IRA statute, and become federally recognized.

And then you have to go one more step that's never

Page 34

happened in our case, and that is that tribe, then, has to reapply to the government to have a new grant deed prepared that transfers the property from the United States in trust for the certain Indians, to the United States in trust for the named tribe. And that's never happened.

The exhibit that we have submitted to you, I believe it is Exhibit E, is when we did the Freedom of Information Act request, we asked what is the, what do they call this, the governmental operations department at BIA, for their documents, and they say they have no record of the 1978 trust parcel ever being known as the Jamul Indian Village, which is the name of the recognized entity that didn't exist for three years afterwards.

So the long and short of this is, I had a specific remedy under the old Homestead Act statutes for an allotment to be determined and an issuance of a trust patent document to be recorded. Judge Gonzales denied that, said the policies have changed. Since her decision, the Bush Administration actually has a memo that goes out now in the BIA that says, we're not going to have any more trust patents either.

So we are not seeking a trust patent, and the denial of the trust patent does not prevent our clients, as a community of unorganized Indians in 1978, from applying, just as the Coast Indian Community did in Northern California, to come out here both to the court of claims both for money damages, and to come

Page 35

to this court for injunctive relief to protect our rights as beneficial owners of the property.

Now, this is a lot to --

THE COURT: Judge Kessler has that case. Right?

MR. WEBB: Judge Kessler has the membership and leadership case. Unfortunately, Your Honor, because the court of claims can't grant the relief we seek here, the injunctive relief, we have to come and initiate a separate federal lawsuit, which is why we have the second cause of action before you here.

THE COURT: Okay.

MR. WEBB: Now, this is a lot to absorb for any of us. It's taken me a long time to figure this out. There is no -- I wouldn't be here if I thought Judge Gonzales' decision was collateral estoppel on any of these issues. It is a separate and different opinion. The Ninth Circuit opinion only affirms dismissal for the reason we didn't name the tribe in that case. Because in that case you only seek it in the name of the individuals who are the beneficial owners, and the tribe wasn't.

The case in front of you, the tribe is a plaintiff, and thus the government doesn't get to make its argument that the tribe is not here. It is here. But, of course, Your Honor will have to await to make a final ruling about that until Judge Kessler determines who the legitimate tribe is. We believe it will be us. That's why we need an injunction in the meantime to maintain the status quo.

Page 36

THE COURT: So you want an injunction to maintain the status quo until Judge Kessler decides who the tribe is?

MR. WEBB: On the tribal issue for the second cause of action, that's correct. Under the first cause of action, the individual Indians have the right to protect their debt.

THE COURT: Okay. I'll tell you what. I'll look forward to your reply, since you want to file one. I thought you really, really needed to be in court before the 23rd, which is why we set this now, because I thought something dramatic was going to happen on the 23rd that you needed to enjoin.

MR. WEBB: If I might, Your Honor, let me explain what that's all about. We do need some kind of relief. Perhaps I did not file for a temporary restraining order, but I may have to reapply or something.

Let me explain what the issue is. The government's papers make reference to this intertribal court of Southern California. It sits in Escondido, it's about 45 minutes north of where the property is involved. It was a consortium type court created under a combination of state grants and federal grants to help Native Americans create courts.

But because it's a consortium court, it only exists like the American Arbitration Association, or, out in California, the Judicial Arbitration and Mediation Service. If two sides consent to go before it, it has jurisdiction to decide

Page 37

things, just like a lot of our alternative dispute resolution means. Originally it was to deal with child abuse, family disputes among the tribal members.

Recently, like within the last three months, the other faction, and what government they believe they have created, applied to this Escondido entity and said, we would like to have you be our court. That flies in the face of 12 years ago, in 1995, our side, if you will, who believes it's the legitimate elected leadership, created its own tribal court, and has already got a default judgment against several of the members of the other faction.

We're seeking full faith and credit both in the state court system and in the federal court system, just to cover our bases among all recognized courts. Because obviously we need a badge and a gun to go out to enforce that, if you will, and the sheriff's office, under a public law 280 state like California is, we have to have one of the recognized courts issue a ruling to enforce any kind of tribal court order.

Now, that's the background. Right now that intertribal court is seeking to have a trial on the 23rd to evict our clients and kick them off the property. The second cause of action here, if I'm right about their beneficial ownership rights in the property, means the other faction has no right to kick anybody off the property.

We don't know if that intertribal court can issue an

10 (Pages 34 to 37)

United States District Court
For the District of Columbia
kingreporter2@verizon.net
202-354-3249
Rebecca Stonestreet, RPR, CRR
Official Court Reporter

order that any sheriff or law enforcement officer of a recognized non-Indian government will enforce. But if it were to attempt to do that, we wanted the assistance of this Court to be able to point the sheriff to one of the recognized courts to say, wait a minute, until we get to the end of the decision as to who the tribe is, whether it lawfully created this eviction process, whether it lawfully went to the intertribal court, or whether the prior Jumal tribal court is the legitimate tribal court, all that needs to be resolved before somebody is kicked out of their house.

So again, that's why I asked for the hearing before the 23rd. I still would like the opportunity to brief things. If I need to, I'll brief them before the 23rd, but you're going to have a lot to look at among all of this.

So that's the quandary we're in, Your Honor.

THE COURT: All right. Well, I can give you until the 26th, because although I've spent time on this, I'm certainly not as familiar with it as you are.

So in your reply I think that you need to focus specifically on the points made by Ms. Klein; that is, that this is not federal land, it's Indian land, and it's the Indians', whoever the tribe happens to be. And that perhaps, if you think that it's because of the contest between those two parties that this is up in the air and your faction deserves court assistance, perhaps that belongs before Judge Kessler. I don't

know.

Anyway --

MR. WEBB: We didn't either, Your Honor. We thought we had to file a separate action, which is why we're here.

THE COURT: Yeah, but it's related. I would have thought that -- I mean, since she's got to figure this stuff out. But anyway, I have it, so I'm not going to do anything about that.

But I would suggest that you address the issue of tribal land and you address the issue of whether NAGPRA can actually give your clients control of the property, the real estate, as opposed to the cultural items and funerary objects and human remains.

And by this I mean that the answer to who actually controls the real estate may have to be found in the resolution before Judge Kessler and not under NAGPRA. I mean, you may be putting too much water in a small bucket.

MR. WEBB: I understand that analogy, but here's why I don't think Judge Kessler has those issues teed up in front of her: She has a 2500-page administrative record on the issue of membership and leadership. The property issues were not briefed there.

THE COURT: But if the membership and leadership is resolved in the way that you argue, then the property issues are resolved as well.

MR. WEBB: I'm not sure that I understand that. I'll study that some more, Your Honor.

THE COURT: If your folks are in charge, then the property issues are resolved.

MR. WEBB: As a practical matter, I agree with you.

THE COURT: As a practical matter.

MR. WEBB: As a legal matter, there's this whole issue of --

THE COURT: As a legal matter, it's an entirely different issue. I agree with you. But as a practical matter, if your folks are in charge, then guess what? They're not going to kick themselves off their property. That's all I mean.

I mean, the issue of whether or not the grant was to an individual set of Indians or to a tribe or whatever, that would not be resolved.

MR. WEBB: And just the way this whole dispute has gone for 12 years, I worry about leaving any courtroom where I got in without that being resolved. That's why we're -- I'm sorry, Your Honor. That's why we're here again.

THE COURT: Believe me, I understand that. But in your reply brief, address whether or not this particular statute is the vehicle to allow that litigation.

MR. WEBB: Yes, Your Honor.

THE COURT: That's my concern, that it may need to happen, but I'm not sure that this statute is the vehicle for

it. Okay?

MR. WEBB: I understand the question, Your Honor. Thank you.

THE COURT: Thank you very much.

MR. KRIEGSMAN: Your Honor, I have a question. Is the Court planning to have a hearing after plaintiffs file a reply brief? Because if not, I would like the opportunity to respond to some of the points that Mr. Webb made today.

THE COURT: Well, I wouldn't normally. I would consider, you know, an opening brief, a response, and a reply. If you think that there are new things in the reply to which you feel the need to make a response, then just file a request for a surreply.

MR. KRIEGSMAN: Okay. Thank you, Your Honor.

THE COURT: I certainly wouldn't say you couldn't file a surreply today, because I don't have the reply.

MR. KRIEGSMAN: Thanks, Your Honor.

And the Court indicated there would also be a hearing on the motion to transfer. Did you want to hear that as well, Your Honor?

MR. WEBB: If I might, Your Honor, we didn't have a chance to oppose that yet, either, and the time for that --

THE COURT: Why don't we brief that one first. Okay? Because since I'm going to get a reply on the PI to begin with, we can finish the briefing on the motion to transfer as well.

Okay? And if it seems appropriate to have more oral argument because you've raised all these wonderfully new issues, we can schedule that, too.

MR. WEBB: Thank you, Your Honor.

THE COURT: We were just trying to hurry to get this done before the 23rd.

MR. WEBB: We appreciate that, Your Honor.

THE COURT: Thank you. Thank you everybody for your briefs and your time.

(Proceedings adjourned at 4:20 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Rebecca Stonestreet, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

____________________________ ________
SIGNATURE OF COURT REPORTER DATE

# Exhibit K

The making and perfection of a forest homestead entry for 86 acres under the Act of June 11, 1906, *supra*, did not exhaust the claimant's right to entry under that law. He could have made an additional entry in the forest under the Act of April 28, 1904 (33 Stat. 527). *Lee S. Miller*, A-17806. And he could have made an additional entry under said act for land outside of the forest. *Milton L. Hinds* (49 L. D. 263). If, after perfecting his forest homestead for less than 160 acres, he was qualified to make another entry for land outside the forest under said act, he was also qualified to make an additional entry outside of the forest under section 6 of the act of March 2, 1889 (25 Stat. 854). Being qualified, under the *Makela* decision (46 L. D. 509) he had the right to make an original stock-raising homestead entry for approximately 560 acres. The Act of March 4, 1923 (42 Stat. 1445), which provides for additional entries within 20 miles of a forest homestead entry, has no application here. That act provides for additional entries under the stock-raising homestead laws for lands outside of national forests additional to unperfected or perfected homestead entries for lands within national forests upon which the claimant resides. Said act is not exclusive and does not prohibit the making of original stock-raising homestead entries based upon the additional homestead rights provided for in the cited acts of 1904 and 1889.

The decision appealed from is *Reversed.*

---

## AMENDED RULES AND REGULATIONS FOR THE HOLDING OF ELECTIONS UNDER THE INDIAN REORGANIZATION ACT OF JUNE 18, 1934 (48 STAT. 984)

DEPARTMENT OF THE INTERIOR,
BUREAU OF INDIAN AFFAIRS,
*Washington, D. C., October 18, 1935.*

### ELECTIONS ON THE ADOPTION OF CONSTITUTIONS AND CONSTITUTIONAL AMENDMENTS

Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), reads in part as follows:

Any Indian Tribe, or tribes, residing on the same reservation shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws when ratified as aforesaid and approved by the Secretary of the Interior shall be revocable by an election open to the same voters and conducted in the same manner as herein-

above provided. Amendments to the constitution and bylaws may be ratified and approved by the Secretary in the same manner as the original constitution and bylaws.

By the Act of June 15, 1935 (49 Stat. 378), section 16 has been modified. Said act provides that:

In any election heretofore or hereafter held under the Act of June 18, 1934 (48 Stat. 984), on the question of excluding a reservation from the application of the said Act or the question of adopting a constitution and bylaws or amendments thereto or on the question of ratifying a charter, the vote of a majority of those actually voting shall be necessary and sufficient to effectuate such exclusion, adoption, or ratification. *Provided, however,* That in each instance the total vote cast shall be not less than 30 per centum of those entitled to vote.

In accordance with the foregoing acts, and with the Solicitor's opinion (M-27810), approved December 13, 1934, on twelve questions of construction raised by the Act of June 18, 1934, the following rules and regulations are hereby prescribed for the holding of elections under section 16 of said act:

1. The Department will cooperate with and offer its advice and assistance to any authorized tribal council or representative committee of an Indian tribe or tribes, or of the adult Indians residing on a particular reservation, in the drafting of a constitution and by-laws. An election on the adoption of such constitution and by-laws will be called by the Secretary of the Interior, upon request by the tribal council or any authorized representative committee, or upon a petition signed by at least one-third of the adult members of the tribe where such a council or committee does not exist, or fails to request such election.

2. Constitutions and by-laws may be adopted by a traditionally recognized Indian tribe or tribes residing on the same reservation, or by the adult Indians residing on a reservation as such. The Indian Reorganization Act contemplates two distinct and alternative types of a tribal organization. In the first place, it authorizes the members of a tribe (or of a group of tribes located upon the same reservation) to organize as a tribe without regard to any requirements of residence. In the second place, this section authorizes the residents of a single reservation (who may be considered a tribe for purposes of organization under section 19) to organize without regard to past tribal affiliation.

3. When the members of an Indian tribe or tribes residing on the same reservation shall vote in an election on a proposed constitution and by-laws, the following rules shall determine the eligibility of voters in such election:

(a) Any member of the tribe or tribes shall be entitled to vote, regardless of whether or not he is a resident of the reservation at the time of such election.

(b) Descendants of members, although not enrolled as members of the tribe, or tribes, shall be entitled to vote, if recognized as members of the tribe or tribes. Any person omitted from the tribal rolls, through accident or mistake, shall likewise be entitled to vote, if recognized as a member of the tribe or tribes.

(c) No person not a member of the tribe or tribes shall be entitled to vote.

(d) No person who has abandoned his tribal membership shall be entitled to vote, even though he may be enrolled as a member.

(e) Non-resident members may vote by absentee ballot. A ballot will be sent upon request to each such member in sufficient time to permit him to execute and return same on or before the date of the election. The ballot must be sworn to before a notary public or other official authorized to administer oaths, and must be returned in a sealed envelope marked on the outside, "Non-resident Ballot." Proper records shall be kept of all such ballots sent out, to whom mailed, date of mailing, addresses of the voters, and of all such ballots returned, from whom received, and time of receipt. Absentee ballots shall not be counted until all other ballots are counted, and no ballot received after the polls have closed shall be counted.

4. When the adult Indians residing on a reservation shall vote in an election on a proposed constitution and by-laws, the following rules shall determine the eligibility of voters in such election:

(a) Any Indian residing on the reservation shall be entitled to vote, regardless of his membership in any tribe.

(b) No person shall be entitled to vote unless he is a resident of the reservation, but no person shall be deprived of the right to vote by reason of his temporary absence from the reservation.

(c) In elections conducted under this section absentee voting shall be permitted in the manner prescribed in section 3 (e) of these rules and regulations.

5. No person shall be entitled to vote in any election on the adoption of a proposed constitution and by-laws unless he has reached the age of 21 years.

6. There shall be an Election Board, consisting of the Superintendent of the reservation and representatives of an authorized council or committee of the Indians, whose duty it shall be to conduct the election and to enforce and execute these rules and regulations.

7. The Election Board shall compile a list of voters, which shall be posted at the agency office and at various other public places throughout the reservation at least 10 days prior to the election. Copies of such lists arranged according to voting districts shall also be made for the purpose of checking off each name as his or her ballot is cast, and of determining, in the event of any question, the right of any individual to vote. Each district shall be supplied with a list of those voters who will cast their ballot within that district.

8. The Election Board shall determine any claim as to the right of any person not listed to vote, as well as any challenge to the right to vote of any person who is listed, and the findings of such

Board shall be final. The Election Board shall fix a date, not less than five days before the election, at which time all complaints will be heard and passed upon.

9. Not less than twenty (20), nor more than sixty (60), days' notice shall be given of the calling of an election, unless a shorter notice is requested by those authorized to request an election under Section 1 of these rules and regulations. Where an election is called upon less than 20 days' notice the time allowed absentee voters for the return of absentee ballots shall be extended beyond the date of balloting so as to afford such absentee voters a sufficient opportunity to register their votes.

10. Posters in the English, Indian, or other appropriate languages, in the discretion of the Superintendent, shall be distributed among the Indians, notifying them of the election, and shall be posted at the agency office and at various other public places throughout the reservation. Absentee members shall be notified by circular of the calling of the election, and shall receive instructions as to the proper manner of voting therein.

11. Official ballots for the election will be furnished by the Commissioner of Indian Affairs. These ballots should be counted on receipt thereof and should be carefully guarded at all times.

12. Mimeographed copies of the proposed constitution and by-laws shall be distributed to every eligible voter requesting same prior to the election.

13. Voting districts shall be delimited throughout the reservation by the Election Board. A polling place shall be designated for each district, the choice of which shall be based upon the needs and convenience of the Indians. In all cases, unless there are strong reasons to the contrary, the regular voting places where elections are usually held shall be the polling places for the election. Places where State and county elections, in which the Indians participate, are usually held, may be chosen as polling places for the election. Where possible, voting equipment should be borrowed from the local authorities.

14. The polls shall remain open from 8:00 A. M. to 6:00 P. M., unless different hours are agreed to in advance, and the Indians are notified thereof.

15. The Election Board shall appoint a judge, clerk, and teller for each district. The duties of these officials shall be to see that the name of each person voting is on the approved list, that his name is checked off as his ballot is cast, and that the ballot is individually executed. It shall be the further duty of these officials at the close of the polls to count the ballots, return them to the boxes, lock and mark the boxes, and on the evening of the election day

turn over the certified election returns of the district, the ballot boxes, a list of those voting, and all unused ballots, to the Superintendent. Throughout the voting the ballot boxes shall be kept locked, and after the voting shall be opened only long enough to permit the counting of the votes.

16. Interpreters may be provided to explain the execution of the ballot to such Indians as may need instruction. Assistance may be provided for those unable to execute their own ballots, but all necessary precautions shall be taken to insure that the voter is not influenced in casting his ballot.

17. There shall be no electioneering within 200 feet of the voting place while the polls are open.

18. The Election Board shall canvass the returns from the various voting districts, and shall certify the result of the election to the Office of Indian Affairs. The result of the election shall be posted at the agency office and at other public places on the reservation for the information of the Indians. A telegraphic report should be made to the Indian Office immediately after the result of the election is determined. Ballots and other election materials should be kept by the Superintendent and should be placed under lock and key for one year in the event of any protest or order for recount.

19. Election on the adoption of amendments to an approved constitution and by-laws shall be called as provided in said constitution and by-laws, and shall be conducted in the manner prescribed in these rules and regulations, except where modified in said constitution and by-laws as to voting districts, eligibility of voters, and the manner of holding election.

## Elections for the Ratification of Charters of Incorporation

Section 17 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), reads in part as follows:

> The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe; *Provided*, That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. * * *

20. Elections on the ratification of a charter of incorporation issued to any organized tribe by the Secretary of the Interior, pursuant to section 17 of the Indian Reorganization Act, shall be conducted in the manner prescribed in these rules and regulations, except as modified by sections 21, 22, 23 hereafter. No tribe may incorporate until it has adopted a constitution and by-laws, approved in accordance with section 16 of the Indian Reorganization Act.

21. The following rules shall determine the eligibility of the signers on any petition for a charter:

(*a*) When the members of a tribe, or tribes, residing on a reservation, have organized under a constitution and by-laws, any member of the tribe, or tribes, may sign such petition.

(*b*) When the adult Indians residing on a reservation have organized under a constitution and by-laws, any person entitled to vote on the adoption of such constitution and by-laws may sign such petition. (See section 4).

22. It shall be the duty of the Superintendent, together with a committee representing the Indians organized under the constitution and by-laws, to check the petition as to whether those who sign are eligible to do so within the language of the act and these regulations.

23. In any election on the ratification of a charter of incorporation, the following rules shall determine the eligibility of voters in such election:

(*a*) When the members of a tribe, or tribes, residing on a reservation, have organized under a constitution and by-laws, any resident member of the tribe or tribes may vote in such election. No person shall be deprived of his right to vote by reason of his temporary absence from the reservation.

(*b*) When the adult Indians residing on a reservation have organized under a constitution and by-laws, any person entitled to vote on the adoption of said constitution and by-laws shall be entitled to vote on the ratification of the charter. (See section 4.)

JOHN COLLIER, *Commissioner.*

Approved:

HAROLD L. ICKES,
*Secretary.*

---

## TAYLOR GRAZING ACT, SEC. 7—EXECUTIVE ORDERS OF NOVEMBER 26, 1934, AND MAY 20, 1935

[Instructions][1]

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D. C., October 19, 1935.*

THE COMMISSIONER OF THE GENERAL LAND OFFICE:

Reference is made to your letter of October 11, requesting instructions as to whether the Executive order of November 26, 1934, as amended by Executive order of May 20, 1935, bars the allowance

[1] See Executive Order of January 14, 1936.

# Exhibit L



8 0511003 30
RECEIVED
SAN DIEGO, CA
11 27 AM '02
CIVIL DIVISION
U.S. ATTORNEY
DEPT. OF JUSTICE
PJS
CALENDAR
DOCKETS
SECY
ATTY

Patrick D. Webb, Esq., State Bar No. 82857
**WEBB & CAREY**
401 B Street, Suite 306
San Diego, Calif. 92101
(619) 236-1650

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

WALTER ROSALES, MARIE TOGGERY, and KAREN TOGGERY

Plaintiffs,

vs.

UNITED STATES OF AMERICA, and its divisions, including but not limited to, the DEPARTMENT OF THE INTERIOR, the BUREAU OF INDIAN AFFAIRS, the NATIONAL INDIAN GAMING COMMISSION, and DOES 1-20,

Defendants.

Case No. 01 CV 0951 IEG (JAH)

**NOTICE OF MOTION AND MOTION FOR NEW TRIAL, RELIEF FROM JUDGMENT and REQUEST FOR ORAL ARGUMENT**

Date: April 8, 2002
Time: 10:30 a.m.
Ctrm: 13

(Honorable Irma E. Gonzalez)

**Oral Argument Requested**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiffs, WALTER ROSALES, MARIE TOGGERY, and KAREN TOGGERY, hereby move for a new trial, and relief from judgment, pursuant to Federal Rules of Civil Procedure Rules 59(a) and 60(b). This motion is based upon the reasons set forth in the attached memorandum of points and authorities in support of this motion for new trial and relief from judgment, and supported by all of the pleadings and memoranda on file with the court with regard to Plaintiffs' opposition to the Defendants' motions to dismiss, for judgment on the pleadings, and summary judgment, resulting in the Court's order of February 13, 2002.

The Court's February 13, 2002 order ("Order") granting the Government summary judgment, contains three errors at law, upon which Plaintiffs move for new trial and relief from judgment under the grounds set forth in F.R.C.P. Rule 59(a) and 60(b).

First, whether denominated an allotment under the General Allotment Act of 1887 or not, Plaintiffs remain entitled to declaratory relief as to their individual property rights in the "dependent Indian community" residing upon Parcel 597-080-01. Second, the Secretary of Interior never "recognized" any Indian tribe in Jamul, California in 1978; and Third, whether there was any Indian tribe in Jamul, that could have lawfully been recognized by the Secretary of Interior, when the Government accepted the 1978 Daley grant deed, is a genuine issue of material fact, precluding summary judgment.

**PLEASE TAKE NOTICE** that the hearing of these motions will take place on April 8, 2002, at 10:30 a.m., or as soon thereafter as counsel can be heard, in the Courtroom of the Honorable Irma E. Gonzalez, Dept. 13, in the above entitled Court at 940 Front Street, San Diego, California.

**PLEASE TAKE FURTHER NOTICE** that Plaintiffs hereby request oral argument of their motion for new trial, pursuant to Local Rule 7.1.d.1.

Dated: February 22, 2002 **WEBB & CAREY**

By: [signature]
PATRICK D. WEBB, ESQ.
Attorneys Appearing for Plaintiffs

Patrick D. Webb, Esq., State Bar No. 82857
**WEBB & CAREY**
401 B Street, Suite 306
San Diego, Calif. 92101
(619) 236-1650

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WALTER ROSALES, MARIE TOGGERY, and KAREN TOGGERY<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, and its divisions, including but not limited to, the DEPARTMENT OF THE INTERIOR, the BUREAU OF INDIAN AFFAIRS, the NATIONAL INDIAN GAMING COMMISSION, and DOES 1-20,<br><br>Defendants. | Case No. 01 CV 0951 IEG (JAH)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR NEW TRIAL AND RELIEF FROM JUDGMENT**<br><br>**Oral Argument Requested**<br><br>Date: April 8, 2002<br>Time: 10:30 a.m.<br>Ctrm: 13<br><br>(Honorable Irma E. Gonzalez) |

The Plaintiffs, WALTER ROSALES, MARIE TOGGERY, and KAREN TOGGERY, through their counsel, respectfully submit the following memorandum of points and authorities in support of their motion for new trial and relief from judgment.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . 2

II. A NEW TRIAL AND RELIEF FROM JUDGMENT IS GRANTED UPON ERRORS AT LAW TO PREVENT SUBSTANTIAL PREJUDICE AND A MISCARRIAGE OF JUSTICE . . . . . . . . . . 2

III. DENIAL OF DECLARATORY RELIEF IS AN ERROR AT LAW . . . . . . . . . . 3

IV. THE SECRETARY OF INTERIOR NEVER RECOGNIZED ANY INDIAN TRIBE IN JAMUL IN 1978 . . . . . . . . . . 10

V. SUMMARY JUDGMENT CANNOT BE GRANTED WHERE THERE IS A GENUINE ISSUE OF MATERIAL FACT, AS TO WHETHER THERE WAS A RECOGNIZED TRIBE, WHEN THE 1978 GRANT DEED WAS ACCEPTED BY THE GOVERNMENT. . . . . . . . . . . 13

VI. CONCLUSION . . . . . . . . . . 15

## TABLE OF AUTHORITIES

Alaska v. Native Village of Venetie Tribal Government
(1998) 522 U.S. 520 . . . . . . . . . . 6, 7

Alaska v. Native Village of Venetie
(9th Cir. 1988) 856 F.2d 1384 . . . . . . . . . . 8, 14

Anderson v. Genuine Parts Co., Inc.
(8th Cir. 1997) 128 F.3d 1267 . . . . . . . . . . 3

Bogosian v. Mercedes-Benz of No. America, Inc.
(1st Cir. 1997) 104 F.3d 472 . . . . . . . . . . 3

Cashner v. Freedom Stores, Inc.,
(10th Cir. 1996) 98 F.3d 572 . . . . . . . . . . 3

Chase v. McMasters,
573 F.2d 1011 (8th Cir. 1978), cert. denied, 439 U.S. 965 (1978) . . . . . . . . . . 4

City of Tacoma v. Andrus
(D.D.C. 1978) 457 F. Supp. 342 . . . . . . . . . . 4

Donnelly v. U.S.
(1913) 228 U.S. 243 . . . . . . . . . . 6

Kingvision Pay-Per-View Ltd. v. Lake Alice Bar
(9th Cir. 1999) 168 F.3d 347 . . . . . . . . . . 3

Klonoski v. Mahlab
(1st Cir. 1998) 156 F.3d 255 . . . . . . . . . . 3

Landes Const. Co., Inc. v. Royal Bank of Canada
(9th Cir. 1987) 833 F.2d 1365 . . . . . . . . . . 2, 3

Native Village of Tyonek v. Puckett
(9th Cir. 1992) 957 F.2d 631 . . . . . . . . . . 8, 14

Native Village of Venetie IRA Council v. Alaska
(9th Cir. 1991) 944 F.2d 548 . . . . . . . . . . 14

Oglala Sioux Tribe of Pine Ridge Indian Reservation v. Hallett
(8th Cir. 1983) 708 F.2d 326 . . . . . . . . . . 4

Price v. Hawaii
(9th Cir. 1985) 764 F.2d 623 . . . . . . . . . . . . . . . . 8, 13, 14

Ruvalcaba v. City of Los Angeles
(9th Cir. 1995) 64 F.3d 1323 . . . . . . . . . . . . . . . . 3

Santa Maria v. Metro-North Commuter R.R.
(2nd Cir. 1996) 81 F.3d 265 . . . . . . . . . . . . . . . . 3

Smith v. Transworld Drilling Co.
(5th Cir. 1985) 773 F.2d 610 . . . . . . . . . . . . . . . . 2

United States. v. McGowan
(1938) 302 U.S. 535 . . . . . . . . . . . . . . . . 6, 7

United States v. Pelican
(1914) 232 U.S. 442 . . . . . . . . . . . . . . . . 6, 7

United States v. Universal Mgt. Services, Inc., Corp.
(6th Cir. 1999) 191 F.3d 750 . . . . . . . . . . . . . . . . 3

Wisconsin v. Stockbridge-Munsee Community
(E.D. Wis. 1999) 67 F.Supp. 2d 990 . . . . . . . . . . . . . . . . 4

Wyatt v. Interstate Ocean & Transp. Co.
(4th Cir. 1980) 623 F.2d 888 . . . . . . . . . . . . . . . . 3

Yapp v. Excel Corp.
(10th Cir. 1999) 186 F.3d 1222 . . . . . . . . . . . . . . . . 3

Statutes & Rules & Regulations

25 U.S.C. 335 . . . . . . . . . . . . . . . . 5, 7

25 U.S.C. 348 . . . . . . . . . . . . . . . . 4, 5, 6

25 U.S.C. 349 . . . . . . . . . . . . . . . . 4

25 U.S.C. 372 . . . . . . . . . . . . . . . . 6

25 U.S.C. 373 . . . . . . . . . . . . . . . . 6

25 U.S.C. 392 . . . . . . . . . . . . . . . . 6

25 U.S.C. 462 . . . . . 5

25 U.S.C. 465 . . . . . 3, 4, 5, 6, 7, 8, 10, 13

25 U.S.C. 479 . . . . . 9, 10

25 U.S.C. 479a . . . . . 11

25 U.S.C. 479a(2) . . . . . 11

25 U.S.C. 483 . . . . . 3, 4, 5, 6, 8, 13

F.R.C.P. Rule 59(a) . . . . . 2

F.R.C.P. Rule 60(b) . . . . . 2, 3

25 C.F.R. 83 . . . . . 11, 14

25 C.F.R. 83.3(c) . . . . . 10, 14

25 C.F.R. 83.7 . . . . . 8, 10, 11, 13

25 C.F.R. 83.7(a) . . . . . 8, 13

25 C.F.R. 83.7(b) . . . . . 14

25 C.F.R. 83.7(c) . . . . . 14

**Miscellaneous**

60 Federal Register9250 . . . . . 11

Felix S. Cohen's Handbook of Federal Indian Law (DOI 1982) Ch. 1, Sec. D3c, pp. 40-41. . . . . . 5, 7

Felix S. Cohen's Handbook of Federal Indian Law (DOI 1982) Ch. 11, Sec. B3, p. 615-16. . . . . . 4, 5-6

## I.    INTRODUCTION

Plaintiffs are entitled to a new trial and relief from judgment, because Parcel 597-080-01 was accepted by the Government in trust for a group of individual "Jamul Indians of one-half degree or more Indian blood," to which the Plaintiffs belong. This group of individual Indians was an unrecognized "dependent Indian community," then residing on Parcel 597-080-01. Most importantly, this group of individual Indians, of which the Plaintiffs are only a part, **was not**, and **could not have been**, "recognized" as a "tribe" in 1978, when the Government accepted Parcel 597-080-01 in trust for "Jamul Indians of one-half degree or more Indian blood."

The Court's February 13, 2002 order ("Order") granting the Government summary judgment, contains three errors at law. First, whether denominated an allotment under the General Allotment Act of 1887 or not, Plaintiffs remain entitled to declaratory relief as to their individual property rights in the "dependent Indian community" residing upon Parcel 597-080-01. Second, the Secretary of Interior never "recognized" any Indian tribe in Jamul, California in 1978; and Third, whether there was any Indian tribe in Jamul, that could have lawfully been recognized by the Secretary of Interior, when the Government accepted the 1978 Daley grant deed, is a genuine issue of material fact, precluding summary judgment.

## II.    A NEW TRIAL AND RELIEF FROM JUDGMENT IS GRANTED UPON ERRORS AT LAW TO PREVENT SUBSTANTIAL PREJUDICE AND A MISCARRIAGE OF JUSTICE

A new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law"; and, after a nonjury trial, for any reasons for which courts of equity grant rehearings. F.R.C.P. Rule 59(a). Relief from a final judgment, order, or proceeding, may be granted upon such terms as are just, and for any reason justifying relief from the operation of the judgment. F.R.C.P. Rule 60(b).

The court does not presume that the verdict is correct; nor need it view the evidence in the light most favorable to the party in whose favor the verdict was rendered. Landes Const. Co., Inc. v. Royal Bank of Canada, (9th Cir. 1987) 833 F.2d 1365, 1371; Smith v. Transworld Drilling Co. (5th Cir. 1985) 773 F.2d 610, 613.

A new trial motion is granted on the ground of error of law occurring during the trial. Ruvalcaba v. City of Los Angeles (9th Cir. 1995) 64 F.3d 1323, 1328--ruling "substantially prejudiced" moving party; Klonoski v. Mahlab (1st Cir. 1998) 156 F.3d 255, 276. The error of law may consist of evidentiary rulings that "affected the substantial rights of any party sufficient to warrant a new trial." Anderson v. Genuine Parts Co., Inc. (8th Cir. 1997) 128 F.3d 1267, 1270.

A new trial should also be granted where the verdict is against the clear weight of the evidence. Landes Const. Co., Inc. v. Royal Bank of Canada (9th Cir. 1987) 833 F.2d 1365, 1371; Bogosian v. Mercedes-Benz of No. America, Inc. (1st Cir. 1997) 104 F.3d 472, 482; Santa Maria v. Metro-North Commuter R.R. (2nd Cir. 1996) 81 F.3d 265, 273.

Indeed, a trial judge has a duty to set aside a verdict even though it is supported by substantial evidence, if the judge "is of the opinion that the verdict is against the clear weight of evidence, or is based upon evidence which ...will result in a miscarriage of justice . . ." Wyatt v. Interstate Ocean & Transp. Co. (4th Cir. 1980) 623 F.2d 888, 891-892.

Relief from judicial errors of fact or law, in final judgments, orders or proceedings may also be granted under Rule 60(b). Cashner v. Freedom Stores, Inc., (10th Cir. 1996) 98 F.3d 572, 578; Kingvision Pay-Per-View Ltd. v. Lake Alice Bar (9th Cir. 1999) 168 F.3d 347, 350; Yapp v. Excel Corp. (10th Cir. 1999) 186 F.3d 1222, 1231. A district court may also grant Rule 60(b) relief from a final judgment for "any other reason justifying relief from the judgment." FRCP Rule 60(b)(6); United States v. Universal Mgt. Services, Inc., Corp. (6th Cir. 1999) 191 F.3d 750, 757.

## III. DENIAL OF DECLARATORY RELIEF IS AN ERROR AT LAW

Whether Plaintiffs are ultimately determined to have received an allotment under the General Allotment Act of 1887, or not, Plaintiffs remain entitled to declaratory relief as to their individual property rights in Parcel 597-080-01. It appears from the Court's February 13, 2002 order, that the Court misapprehends the relief that Plaintiffs seek. The only patent prayed for is one of trust, under the continuing authority conferred on the Government by the General Allotment Act of 1887, 25 U.S.C. 348, **and** the Indian Reorganization Act of 1934, 25 U.S.C. 465 and 483. Complaint page 8, lines 5-6.

In fact, the court's present February 13, 2002, ruling, did not expressly rule upon Plaintiffs' prayer for issuance of a trust patent under 25 U.S.C. 348, nor did it declare the Plaintiffs' rights, as individual members of the "dependent Indian community" residing upon the property in 1978, pursuant to the "approval of the conveyance" by the Secretary, under 25 U.S.C. 465 and 483.

Contrary to the Court's statement, at Order 13:2-3, the Indian Reorganization Act itself, as amended, provides for the issuance of "fee patents" **and** "approval of conveyances," "with respect to lands or interests in lands held by individual Indians under ...section 465... of this title." 25 U.S.C. 483; Oglala Sioux Tribe of Pine Ridge Indian Reservation v. Hallett (8th Cir. 1983) 708 F.2d 326, 330-31.

Here, the Plaintiffs seek a declaration of their rights under 25 U.S.C. 465, just as the courts granted in Chase v McMasters (8th Cir. 1978) 573 F.2d 1011, and City of Tacoma v. Andrus (D.D.C. 1978) 457 F. Supp. 342. As held in Chase: "Chase's claim that she was denied rights under 25 U.S.C. 465 states a claim... that New Town impermissively impaired and burdened a right granted under federal law to a tribal Indian." Id., at 1017-1019. "The Indian Reorganization Act of 1934... authorizes the Secretary of the Interior to acquire land for Indians. Under 25 U.S.C. 465, title to such lands is taken by the United States in trust for the Indian..." Id., at 1014.

Such a declaration of Plaintiffs' individual property rights is generically referred to as an "allotment," a term of art in Indian law, whether these property rights are acquired by a trust patent under the General Allotment Act of 1887, 25 U.S.C. 348, or a fee patent under the General Allotment Act of 1887, 25 U.S.C. 349, or acquired by gifted grant deed to the Government in trust for the benefit of specifically identified individual Indians, under 25 U.S.C. 465 and 483. See, Felix S. Cohen's Handbook of Federal Indian Law (DOI 1982) Ch. 11, Sec. B3, pp. 615-616; see also, Wisconsin v. Stockbridge-Munsee Community (E.D. Wis. 1999) 67 F.Supp. 2d 990, 998, fn 3, citing Cohen's Handbook; Excerpts attached, Supp. NOL Ex. I. Since the Secretary "approved the conveyance" upon acceptance of the Daley grant deed in 1978, as

specifically provided for in the Indian Reorganization Act of 1934, 25 U.S.C. 465 and 483, Plaintiffs remain entitled to a declaration of the bundle of rights they received upon approval of that conveyance by the Secretary.

Contrary to the Court's apparent assumption, the Plaintiffs do not seek the issuance of a fee patent.[1] Lest there be any remaining confusion, Plaintiffs do not seek to hold fee simple title, and certainly do not seek to change the trust status (or the tax exempt status) of the parcel. They merely wish to enforce their rights to have the Government hold title in trust for the express benefit of "Jamul Indians of one-half degree or more Indian blood," who were residing on the property in 1978 when the Government's accepted the Daley grant deed.

Moreover, contrary to the Court's Order 13:17-18, the Plaintiffs have never claimed that Parcel 597-080-01 was "conveyed in trust to the United States solely for the benefit of the individual Plaintiffs." The Plaintiffs do not seek to enforce rights that only they, as Plaintiffs in this action, possess. Rather, since the Plaintiffs are tenants in common with all of the individual Indians who were the "dependent Indian community" of "Jamul Indians of one-half degree or more Indian blood" that were residing upon Parcel 597-080-01 in 1978, the Plaintiffs seek to enforce the shared rights of all of the 1978 tenants in common, which rights each individual tenant may severally prosecute as an individual tenant in common.

Either type of allotment [trust or fee] may come to be beneficially owned by more than one Indian as cotenants by devise, descent, or conveyance." Felix S. Cohen's Handbook of

---

[1] Contrary to the Court's footnote 3, Order 13:25-28, Plaintiffs' citation to 25 U.S.C. 348, does not request the issuance of a fee patent. Since Congress has now indefinitely extended the trust period of any section 348 trust allotment, 25 U.S.C. 462, a fee patent is no longer issued after 25 years. Plaintiffs are immediately entitled to issuance of a trust patent upon acceptance of the grant deed by the Government in trust for their individual benefit. Hence, the recent discovery of the failure to issue the Plaintiffs a trust patent under 348 remains a ripe claim.

As noted in the Government's Handbook, fee patent cases remain precedents for the treatment of trust allotments, since "The status of such [trust] lands in indistinguishable from any other allotments and they should be treated alike. See 25 U.S.C. 335.""Congress has specified that trust purchased parcels are subject to the General Allotment Act. 25 U.S.C. 335." Felix S. Cohen's Handbook of Federal Indian Law (DOI 1982) Ch. 1, Sec. D3c, pp. 40-41, citing for e.g., 25 U.S.C. 335.

Federal Indian Law (DOI 1982) Ch. 11, Sec. B3, pp. 615-616, citing 25 U.S.C. 372, 373, 392. Plaintiffs therefore seek a declaration as to each of their cotenant's individual rights to have the Government hold title to Parcel 597-080-01 in trust for the individual benefit of **all** of the "Jamul Indians of one-half degree or more Indian blood," as the Secretary of the Interior has already designated by accepting the Daley grant deed on behalf of all of the individuals then residing on the Parcel in 1978.

As set forth most recently by the Supreme Court in Alaska v. Native Village of Venetie Tribal Government (1998) 522 U.S. 520, 530, there are three recognized forms of Indian country: (1) Indian reservations,[2] Donnelly v. U.S. (1913) 228 U.S. 243, 269; (2) "dependent Indian communities within the borders of the United States," U.S. v. McGowan (1938) 302 U.S. 535, 538-39; and (3) allotments, U.S. v. Pelican (1914) 232 U.S. 442, 449. Whether the court ultimately determines that the Plaintiffs did, in fact, receive a trust allotment under the General Allotment Act of 1887, 25 U.S.C. 348, or not, the Plaintiffs remain entitled to a declaration that the Government holds title to Parcel 597-080-01, in trust for their individual benefit, as members of a "dependent Indian community," under the Indian Reorganization Act of 1934, pursuant to 25 U.S.C. 465 and 483.

As the Supreme Court held in Alaska v. Native Village of Venetie Tribal Government, "We now hold that ["dependent Indian communities"] refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements--first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." Alaska, 522 U.S. at 527. Hence, even if the Court were to continue to find that the Plaintiffs had not received an "allotment"under the General

---

[2] As set forth in Plaintiffs' prior memoranda, and undisputed by the weight of the evidence from the Government's own records, there is no treaty, Act of Congress or executive order creating a reservation for any group of Indians in Jamul.

Allotment Act of 1887 upon the Government's acceptance of the Daley grant deed,[3] the Government most assuredly acquired title to the land in trust for the Plaintiffs' individual benefit, as members of a "dependent Indian community," that is neither a reservation nor an allotment.

"In United States v. McGowan, we held that the Reno Indian Colony in Reno, Nevada was Indian country even though it was not a reservation. 302 U.S. at 539. We reasoned that, like Indian reservations generally, the Colony had been "validly set apart for the use of the Indians...under the superintendence of the Government." Ibid. (Quoting United States v. Pelican, supra, at 449) (emphasis deleted). We noted that the Federal Government had created the Colony by purchasing the land with "funds appropriated by Congress" and that the Federal Government held the Colony's land in trust for the benefit of the Indians residing there. 302 U.S. at 537, and n. 4. We also emphasized that the Federal Government possessed the authority to enact "regulations and protective laws respecting the [Colony's] territory," id., at 539, which it had exercised in retaining title to the land and permitting the Indians to live there...we noted that the law was an example of the protections that Congress had extended to all "dependent Indian communities" within the territory of the United States." Alaska, supra, 522 U.S. at 530-31.

Justice Black further found in United States v. McGowan, that "[t]he Reno Indian Colony is composed of several hundred Indians residing on a tract of 28.38 acres of land owned by the United States and purchased out of funds appropriated by Congress in 1917 and 1926. The purpose of Congress in creating this colony was to provide lands for needy Indians scattered over the State of Nevada, and to equip and supervise these Indians in establishing a permanent settlement." 302 U.S. 535, 537 (footnotes omitted).

---

[3] This finding the Plaintiffs strenuously urge the Court to vacate. When the Government acquired the Daley gift in 1978, it was accepted under 25 U.S.C. 465, and automatically acquired the same status as any other trust allotment, and "should be treated alike." "The status of such [trust] lands in indistinguishable from any other allotments and they should be treated alike. See 25 U.S.C. 335.""Congress has specified that trust purchased parcels are subject to the General Allotment Act. 25 U.S.C. 335." Felix S. Cohen's Handbook of Federal Indian Law (DOI 1982) Ch. 1, Sec. D3c, pp. 40-41, citing for e.g., 25 U.S.C. 335.

Here, the Government has judicially admitted that it accepted the Daley grant deed "for such Jamul Indians of one-half degree or more Indian blood, as the Secretary of the Interior may designate," for the same purpose of establishing a permanent settlement for the individuals identified in the grant deed. Plaintiffs' Supp. NOL Ex. C. The acceptance of that deed entitles the Plaintiffs, who are Jamul Indians of one-half degree or more Indian blood, to a declaration of their rights as members of the "dependent Indian community" then residing on Parcel 597-080-01.

As defined by the Supreme Court in Alaska, such an "association, organization, corporation or group," constituting a "dependent Indian community," does not constitute a "recognized tribe," and its members continue to have individual rights as members of the "dependent Indian community" that are subject to declaration by the court under the Indian Reorganization Act of 1934, 25 U.S.C. 465 and 483. This is particularly true, where, as here, the Government has taken title to the land in trust for the benefit of individual Indians specifically identified by degree of Indian blood.

"To allow any group of persons to "bootstrap" themselves into formal "tribal" status— simply because they are all members of a larger aboriginal ethnic body would be to ignore the concept of "tribe" as a distinct sovereignty set apart by historical and ethnological boundaries." Price v. Hawaii (9th Cir. 1985) 764 F.2d 623, 627. As noted in Alaska v. Native Village of Venetie (9th Cir. 1988) 856 F.2d 1384, 1388, "not all Indian communities are considered tribes and therefore sovereign powers. The community in this case may not be sovereign. Until that uncertainty is resolved, amici's contention is premature."" ...[W]hether the inhabitants constitute a tribe for legal purposes, ...is another complex factual question."

The Ninth Circuit has identified a number of grounds upon which to determine whether the Secretary of Interior has "recognized a tribe:" (1) federal statutes or treaties recognize the tribe; (2) organization under the IRA or recognition under 25 C.F.R. 83.7; and (3) historical recognition on a "substantially continuous basis since 1900," as defined in 25 C.F.R. 83.7(a). Price v. Hawaii (9th Cir. 1985) 764 F.2d 623, 627; see also Native Village of Tyonek v. Puckett (9th Cir. 1992) 957 F.2d 631, 634-35 (requiring express factual findings from the district court,

before the court of appeal may review this "complex factual question"). None of these grounds were possessed by this group of individuals constituting the "dependent Indian community" of "Jamul Indians of one-half degree or more Indian blood" at the time of the acceptance of the grant deed in 1978. In fact, the Government has judicially admitted the fact that the group of individual "Jamul Indians of one-half degree or more Indian blood" residing as a "dependent Indian community" on Parcel 597-080-01 in 1978, had not been, and could not be, "recognized" by the Secretary of the Interior as a "tribe" in 1978. See Section IV immediately below.

Here, the court appears to have prematurely and impermissibly concluded that the group of individual Indians for whom the Government was acting in 1978 by accepting the grant deed, were somehow transmogrified into a formal "tribe" by the Secretary's acceptance of the deed. Order 13:19-14:15. Contrary to the Court's footnote 3, the 1978 deed's language **did not** "designate the Tribe,""as beneficiaries of parcel number 597-080-01." Order 13:28.

Nor does the deed's reference to 25 U.S.C. 479, "refer to the Jamul Tribe." Order 14:1-2. Section 479's definition of "Indian" "shall further include all other **persons** of one-half or more Indian blood," specifically because there are many individual Indians, who, like Plaintiffs in 1978, were not members of any "recognized" Indian tribe. 25 U.S.C. 479 (emphasis added). Even the Government concedes that one of the very purposes of the Indian Reorganization Act of 1934, was to allow individual Indians who were not members of any "recognized" tribe, to individually acquire trust land, whether or not they ever were subsequently "recognized" as a "created tribe" under the IRA. See, Plaintiffs' Supp. Req. For Jud. Not. NOL Ex. C, p. 3.

As will be seen below the Secretary never "recognized" any Indian tribe in Jamul as of 1978, and the very question as to whether the "dependent Indian community" of "Jamul Indians of one-half degree or more Indian blood," could have been recognized as a tribe in 1978 is a triable issue of material fact, which the court cannot decide upon the Government's motion for summary judgment.

## IV. THE SECRETARY OF INTERIOR NEVER RECOGNIZED ANY INDIAN TRIBE IN JAMUL IN 1978

Not only did the Secretary of the Interior fail to recognize any Indian tribe in Jamul in 1978--the Secretary could not have recognized such a tribe in 1978, since he specifically found that such a tribe did not exist, until it was "created" on July 7, 1981.

The Government admits that there are no federal statutes or treaties recognizing an Indian tribe in Jamul. Hence, Congress has never recognized any Indian tribe in Jamul. The Government also admits that as of the acceptance of the Daley grant deed in 1978 the group of individual Indians residing on Parcel 597-080-01 had not organized under the Indian Reorganization Act of 1934. In fact, the Government has also admitted that this group did not meet the requirements for Secretarial "recognition" under 25 C.F.R. 83.7, as of 1978. These regulations specifically exclude from tribal status "associations, organizations, corporations or groups of any character, formed in recent times." 25 C.F.R. 83.3(c).

As stated by the Bureau of Indian Affairs, Carol Bacon, Director of the Office of Tribal Services, on July 1, 1993:

> The Commissioner [of Indian Affairs] found [on November 7, 1975] that while those individuals at Jamul of one-half degree or more Indian blood do not now constitute a federally recognized entity and do not possess a land base, they are entitled to services provided by the Bureau to individual Indians pursuant to Section 19 of the IRA [25 U.S.C. 479]. The Commissioner further held that should these Jamul half-bloods secure, in trust status, the tract of land on which they reside they would be eligible to organize as a community of adult Indians of one-half degree or more Indian blood under Section 16 of the IRA...(emphasis in original)
>
> The Jamul Indians lived on one acre of private land and on land deeded to the Diocese of San Diego as an Indian cemetery. On June 28, 1979, the United States acquired from Bertha A. and Maria A. Daley a portion of the land known as "Rancho Jamul" which it took "in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate."...The United States accepted these conveyances of land in accordance with the authority contained in Sections 5 and 19 of the Indian Reorganization Act of 1934 [25 U.S.C. 465, and 479 respectively]...

> The Constitution of the Jamul Indian Village was approved by the Deputy Assistant Secretary-Indian Affairs on July 7, 1981. In approving the IRA Constitution, the Village was authorized to exercise those self-governing powers that have been delegated by Congress or that the Secretary permits it to exercise. A number of "tribes" have been created, from communities of adult Indians, or expressly authorized by Congress under provisions of the IRA and other Federal statutes. For example, some IRA entities availed themselves of the opportunity to adopt an IRA constitution and are considered to be IRA "tribes." However, they are composed of remnants of tribes who were gathered onto trust land. Those persons had no historical existence as self-governing units. They now possess only those powers set forth in their IRA constitution. They are not an inherent sovereign. Rather, that entity is a created tribe exercising delegated powers of self-government. Such is the case with Jamul Indian Village. Plaintiffs' Supp. NOL Ex. C., page 2-3.

Moreover, contrary to the Court's Order 14:3-5, 25 U.S.C. 479a(2) does not "authorize" the Secretary of the Interior to "recognize" Indian tribes, rather it "defines" the term "Indian tribe" to "mean[] any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe." This statute was not adopted until 1994, and does not govern the facts of this case. As the Department of Interior and the BIA admit in their notice in the Federal Register: "Inclusion on the [Secretary's section 479a] list does not resolve the scope of powers of any particular tribe over land..." 60 F.R. 9250, 9251, Plaintiffs' Supp. Req. Jud. Not. NOL Ex. B, page 3.

The Government concedes in silence that as of 1978 the Secretary of the Interior **had not** "acknowledged" any tribe to exist in Jamul. See, Plaintiffs' Supp. Req. For Jud. Not. NOL Ex. C, p. 3-4. Even if the 1994 section 479a were to apply in 1978, the Secretary of the Interior's duties under section 479a are limited to publishing in the Federal Register the list of tribes formally "recognized" by Congress, or by the BIA under the regulations set forth at 25 C.F.R. 83.7. The Government concedes that neither form of "recognition" had been made for any group of Indians in Jamul in 1978.

"You will recall that prior to 1980, the Jamul Indian Village was not a federally recognized tribal entity.""It was pointed out that acknowledgment of existence as an Indian tribe and of existence as a half-blood community are two different things. In order for the Secretary to acknowledge the Jamul community as a tribe under 25 CFR 83, previously 25 CFR 54, it would have to submit a detailed petition and undergo a lengthy process of consideration. Several years

would have been required to complete this... The Commissioner found that while those individuals at Jamul of one-half degree or more Indian blood do not now constitute a federally recognized entity and do not posses a land base, they are entitled to services provided by the Bureau to individual Indians pursuant to Section 19 of the IRA." Plaintiffs' Supp NOL Ex. C, page 2 (emphasis in original).

Nor does "the 1978 letter from the United States Department of the Interior, attached to defendants' reply as Exhibit L," "show[] that parcel number 597-080-01 was taken into trust for the benefit of the Jamul Tribe." Order 14:8-10. This letter is absolutely consistent with the great weight of evidence in the Carol Bacon letter, and the Carmen Facio memo, Plaintiffs' Orig NOL Ex. A, and Supp. NOL Ex. C, that there were 11 of 13 individual Indian half-bloods residing in Jamul for whom the Government was accepting the Daley grant deed in trust. As noted in Plaintiffs' prior papers, and undisputed by the Government, this letter is mere evidence of a "proposal" to "establish" a reservation, which was never adopted by Congress or executed by the BIA. It certainly is not evidence of any, then existing "acknowledgment," or any prior "recognition," of any "tribe" in Jamul. In fact, this letter further confirms that no "tribe" had then been "recognized" in Jamul.

Hence, as of 1978, there was no "tribe" in Jamul for the Secretary to "recognize," by acceptance of the Daley grant deed "in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary may designate." Just as Ms. Bacon describes, the Jamul Indian Village was allowed to organize as a created "tribe" on July 7, 1981, from a "community of adult Indians," who were "remnants of tribes gathered onto trust land," beneficially owned by these individual adult Indians, and held in trust for them by the Government. "Those persons had no historical existence as self-governing units," and thus cannot have been "recognized" by the Secretary as a "tribe" in 1978. Before the "tribe" could be "organized under the IRA," and then "recognized" by the Secretary, the individual members of the "dependent Indian community" residing on Parcel 597-080-01 had to have the Government acquire the land "in trust" for their individual benefit, or according to the BIA, they would not have qualified to "organize" or be

"recognized" as a "tribe" under the IRA and the BIA's regulations adopted pursuant thereto. Plaintiffs' Supp. NOL Ex. C, page 2.

This case therefore requires a declaration of the rights of the individual members of this "dependent Indian community" residing on Parcel 597-080-01, at the time the land was granted to the United States "in trust" for their express individual benefit in 1978, and before the time they were subsequently allowed to "organize," and be formally "recognized" as a "tribe," in 1981.

Most importantly, the Government has admitted, and judicial notice can be taken of the fact that, there is no subsequent grant deed by the United States of Parcel 597-080-01 to the "tribe" subsequently "organized" and "recognized" under the IRA, as the Jamul Indian Village. In fact, the Government has admitted in response to Plaintiffs' FOIA requests, that the 4.66 acres of Parcel 597-080-01 has never been known as the Jamul Indian Village. Carmen Facio of the Pacific Southwest Region of the BIA states to Nancy Pierskalla and George Skibine of the BIA Indian Gaming Management Staff, on May 9, 2000, "I have no record of the 1978 trust parcel being known as the Jamul Indian Village." Plaintiffs' Original Req. For Judicial Notice, Ex. A.

At a minimum, the Plaintiffs are entitled to a further declaration of their rights from this Court, as cotenants with the other 1978 residents of the Parcel, that the Government holds title "in trust" for their individual benefit, until such time as the Government meets the requirements of the Indian Reorganization Act of 1934, and the Secretary of the Interior either "removes the restrictions against alienation," or "approves a conveyance," of this Parcel "under the provisions of section... 465," pursuant to 25 U.S.C. 483.

## V. SUMMARY JUDGMENT CANNOT BE GRANTED WHERE THERE IS A GENUINE ISSUE OF MATERIAL FACT, AS TO WHETHER THERE WAS A RECOGNIZED TRIBE, WHEN THE 1978 GRANT DEED WAS ACCEPTED BY THE GOVERNMENT.

As noted above, the Ninth Circuit has identified a number of grounds upon which to determine the factual question as to whether the Secretary of Interior has "recognized a tribe:" (1) federal statutes or treaties recognize the tribe; (2) organization under the IRA or recognition under 25 C.F.R. 83.7; and (3) historical recognition on a "substantially continuous basis since 1900," as defined in 25 C.F.R. 83.7(a). Price v. Hawaii (9th Cir. 1985) 764 F.2d 623, 627; see

also Native Village of Tyonek v. Puckett (9th Cir. 1992) 957 F.2d 631, 634-35.

The Ninth Circuit has also repeatedly determined that whether a group of individual Indians in a "dependent Indian community" constitute a "recognizable" tribe is a genuine issue of material fact, that requires express factual findings from the district court, before the court of appeal may review this "complex factual question". Native Village of Tyonek v. Puckett (9th Cir. 1992) 957 F.2d 631, 634-35; Alaska v. Native Village of Venetie (9th Cir. 1988) 856 F.2d 1384, 1391; Native Village of Venetie IRA Council v. Alaska (9th Cir. 1991) 944 F.2d 548, 559, fn. 14.

"[W]hether an Indian community is Indian country is quite factually dependent. It is also dependent on whether the inhabitants constitute a tribe for legal purposes, which, as we discussed earlier, is another complex factual question." Alaska v. Native Village of Venetie (9th Cir. 1988) 856 F.2d 1384, 1391. "Whether the Native Village of Venetie was a "tribe" worthy of sovereign recognition was a question of fact to be answered by the district court." Native Village of Venetie IRA Council v. Alaska (9th Cir. 1991) 944 F.2d 548, 559, fn. 14.

As noted in Price v. Hawaii (9th Cir. 1985) 764 F.2d 623, 627-8, the federal regulations governing Secretarial recognition of an Indian tribe and eligibility for federal benefits, immunities and privileges, 25 C.F.R. 83 et seq., require a factual administrative agency determination as to the following factors: (1) historical continuity, having "been identified from historical times until the present on a substantially continuous basis, as "American Indian," or "aboriginal,' 25 C.F.R. 83.7(a), which expressly excludes "associations, organizations, corporations, or groups of any character, formed in recent times, 25 C.F.R. 83.3(c); (2) longstanding tribal political authority, whether "the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present," 25 C.F.R. 83.7(c); and (3) whether "a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area." 25 C.F.R. 83.7(b).

Here, the Court's February 13, 2002 Order makes none of the required express factual findings as to whether the group of individual "Jamul Indians of one-half degree or more Indian

blood," then residing on Parcel 597-080-01, possessed any of these factors in 1978. Nor is the Court authorized to make such a factual determination upon the Government's motion for summary judgment, in light of the great weight of the Government's own records, demonstrating that the Secretary never "recognized" any tribe in Jamul in 1978. Plaintiffs' Orig. NOL Ex. A, and Supp. NOL Ex. C.

At a bare minimum, Plaintiffs are entitled to a new trial as to the Court's premature and impermissible conclusion, Order 14:9-10, that "parcel 597-080-01 was taken into trust for the benefit of the Jamul Tribe, rather than for the individual plaintiffs." Whether there was a "tribe" lawfully subject to "recognition" by the Secretary of Interior at the time the grant deed was accepted in 1978, "in trust for Jamul Indians of one-half degree Indian blood," simply has not been determined, and cannot be determined, as a matter of law. Therefore, based upon the admitted evidence and judicially noticed evidence before the court, whether Parcel 597-080-01 was taken "in trust" for the benefit of all of the individual "Jamul Indians of one-half degree or more Indian blood," including the Plaintiffs, or whether it was taken "in trust" for the benefit of a "tribe," remains a genuine issue of material fact, and Plaintiffs are therefore entitled to a new trial.

## VI. CONCLUSION

First, Plaintiffs remain entitled to declaratory relief as to their individual property rights in the "dependent Indian community" residing upon Parcel 597-080-01, whether they are determined to have already received an "allotment" under the General Allotment Act of 1887, or not.

Second, the Secretary of Interior never "recognized" any Indian tribe in Jamul, California, in 1978.

Third, whether there was any Indian tribe in Jamul, that could have lawfully been recognized by the Secretary of Interior, at the time the Government accepted the 1978 Daley grant deed, remains a genuine issue of material fact, precluding summary judgment.

For all of these reasons, the Court's February 13, 2002 Order granting the Government summary judgment, should be vacated, and the Plaintiffs should be granted a new trial.

Dated: February 22, 2002

**WEBB & CAREY**

By: [signature]
PATRICK D. WEBB, ESQ.
Attorneys Appearing for Plaintiffs

# DECLARATION OF SERVICE

I, the undersigned, certify as follows:

I am a citizen of the United States, a resident of the County of San Diego, State of California, over the age of eighteen years, and not a party to the within action.

I am employed by **WEBB & CAREY**, 401 B STREET SUITE 306, San Diego, California 92101.

On March 11, 2002, I will have served the following:

**NOTICE OF MOTION AND MOTION FOR NEW TRIAL, RELIEF FROM JUDGMENT and REQUEST FOR ORAL ARGUMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR NEW TRIAL AND RELIEF FROM JUDGMENT; PLAINTIFFS' NOTICE OF LODGMENT IN SUPPORT OF MOTION FOR NEW TRIAL AND RELIEF FROM JUDGMENT**

upon the parties interested in said action by delivering a true copy thereof, enclosed in a sealed envelope to the addresses as follows:

Peter J. Sholl, Esq. #147799
Assistant U.S. Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on February 22, 2002, at San Diego, California.

Patrick D. Webb

# Exhibit M

**Case No. 02-55800**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

WALTER ROSALES; MARIE TOGGERY; KAREN TOGGERY, ) Case No. **02-55800**

Appellants, )

vs. )

UNITED STATES OF AMERICA, and its divisions, including but not limited to, the DEPARTMENT OF THE INTERIOR, the BUREAU OF INDIAN AFFAIRS, the NATIONAL INDIAN GAMING COMMISSION, )

Appellees. )

2003 FEB 24 PM 4: 24

Appeal from the U.S. District Court for the Southern District of California
Case No. 01 CV 0951 IEG
The Honorable Irma E. Gonzalez

**APPELLANTS' REPLY BRIEF**

**WEBB & CAREY**
Patrick D. Webb (82857)
401 B Street, Suite 306
San Diego, California 92101
Tel (619) 236-1650
Fax (619) 236-1283
Attorneys Appearing for Appellants

**Case No. 02-55800**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| WALTER ROSALES; MARIE TOGGERY; KAREN TOGGERY,<br><br>Appellants,<br><br>vs.<br><br>UNITED STATES OF AMERICA, and its divisions, including but not limited to, the DEPARTMENT OF THE INTERIOR, the BUREAU OF INDIAN AFFAIRS, the NATIONAL INDIAN GAMING COMMISSION,<br><br>Appellees. | Case No. **02-55800** |

Appeal from the U.S. District Court for the Southern District of California
Case No. 01 CV 0951 IEG
The Honorable Irma E. Gonzalez

**APPELLANTS' REPLY BRIEF**

**WEBB & CAREY**
Patrick D. Webb (82857)
401 B Street, Suite 306
San Diego, California 92101
Tel (619) 236-1650
Fax (619) 236-1283
Attorneys Appearing for Appellants

## TABLE OF CONTENTS

I. INTRODUCTION AND JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. APPELLANTS ARE DESIGNATED BENEFICIARIES OF TRUST ALLOTMENTS IN PARCEL 597-080-01. . . . . . . . . . . . . . . . . . . . . . . . . 4

III. NEITHER SOVEREIGN IMMUNITY, NOR ANY STATUTE OF LIMITATIONS, BAR APPELLANTS' CLAIMS . . . . . . . . . . . . . . . . . . . . 16

A. The Quiet Title Act, 28 U.S.C. 2409a(a), does not apply here. . . . . 16

B. The Government waived sovereign immunity, under 25 U.S.C. 345. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C. There is no sovereign immunity for claims for declaratory relief under the APA, 5 U.S.C. 702, and damages under the Tucker Acts, 28 U.S.C. 1363 and 1491. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D. Appellants' claims are not barred by any statute of limitations . . . . 21

IV. THE JAMUL INDIAN VILLAGE IS NOT A NECESSARY OR INDISPENSABLE PARTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## Cases

Antoine v. U.S.
(8th Cir. 1981) 637 F.2d 1177 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Arenas v. U.S.
(1944) 322 U.S. 419 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Artichoke Joe's v. Norton
(E.D. Cal. 2002) 216 F. Supp. 1084 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Block v. North Dakota
(1983) 461 U.S. 273 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cedars-Sinai Medical Center v. Qui Tam Relator
(9th Cir. 1997) 125 F.3d 765 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cermak v. Babbitt
(Fed. Cir. 2000) 234 F.3d 1356 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Chase v. McMasters
(8th Cir. 1978) 573 F.2d 1011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Christensen v. U.S.
(D. Nev. 1983) 575 F. Supp. 735 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Citizen Band Potawatomi Indian Tribe of Okla. v. Collier
(10th Cir. 1994) 17 F.3d 1292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

City of Tacoma v. Andrus
(D.D.C. 1978) 457 F. Supp. 342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Coast Indian Community v. U.S. ("Coast")
(Fed. Cl. 1977) 550 F2d 639 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Cobell v. Norton
(D.C. Cir. 2001) 240 F.3d 1081 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Dunbar Corp. V. Lindsey
(4th Cir. 1990) 905 F.2d 754 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Florida Dep't of Bus. Regul. V. U.S. Dep't of the Interior
(11th Cir. 1985) 768 F.2d 1248 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Gerard v. U.S.
(9th Cir. 1948) 167 F.2d 951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Hy-Yu-Tse-Mil-Kin v. Smith
(1902) 119 F. 114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

Kansas v. Norton
(10th Cir. 2001) 249 F.3d 1213 . . . . . . . . . . . . . . . . . 3, 17,18, 24, 26, 28, 29

Kescoli v. Babbitt
(9th Cir. 1996) 101 F.3d 1304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Kinscherff v. U.S.
(10th Cir. 1978) 586 F.2d 159 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Malone v. BIA
(9th Cir. 1994) 38 F.3d 433 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

MacDonald v. Means
(9th Cir. 2002) 309 F.3d 530 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Maynor v. Morton,
(D.C. Cir. 1975) 509 F.2d 1254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Navajo Tribe of Indians v. New Mexico
(10th Cir. 1987) 809 F.2d 1455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Pit River Association v. U.S. ("Pit River")
(9th Cir. 1994) 30 F.3d 1088 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Price v. Hawaii
(9th Cir. 1985) 764 F2d 623 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.
(10th Cir. 1996) 94 F.3d 1407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Sac & Fox Nation v. Norton
(10th Cir.2001) 240 F.3d 1250 . . . . . . . . . . . . . . . . . . . . . . 23, 24, 26, 28, 30

Southwest Center for Biological Diversity v. Babbitt
(9th Cir. 1998) 150 F.3d 1152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

U.S. v. Arenas
(9th Cir. 1947) 158 F.2d 730 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19

U.S. v. Assiniboine Tribe
(1970) 428 F.2d 1324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 11, 24

U.S. v. Celestine
(1909) 215 U.S. 278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. v. Clarke
(1980) 445 U.S. 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. v. Clarke
(9th Cir. 1976) 529 F.2d 984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

U.S. v. Hemmer
(1916) 241 U.S. 379 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Jackson,
(1930) 280 U.S. 183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. v. Mitchell
(1983) 463 U.S. 206 . . . . . . . . . . 1, 20

U.S. v. Mottaz
(1986) 476 U.S. 834 . . . . . . . . . . 18

U.S. v. Pierce
(9th Cir. 1956) 235 F.2d 885 . . . . . . . . . . 13

U.S. v. State Tax Comm.
(5th Cir.1976) 535 F.2d 300 . . . . . . . . . . 4, 8, 10

U.S. v. Washington
(9th Cir. 1956) 233 F.2d 811 . . . . . . . . . . 12

U.S. v. Wilson
(9th Cir. 1989) 881 F.2d 596 . . . . . . . . . . 20

Vieux v. East Bay Reg. Park Dist.
(9th Cir. 1990) 906 F2d 1330 . . . . . . . . . . 17

Washington v. Daley
(9th Cir. 1999) 173 F.3d 1158 . . . . . . . . . . 28

Wisconsin v. Stockbridge-Munsee Community
(E.D. Wis. 1999) 67 F.Supp. 2d 990 . . . . . . . . . . 13, 24

YellowstoneCounty v. Pease
(9th Cir. 1996) 96 F.3d 1169 . . . . . . . . . . 26, 27

Zaslow v. Kroenert (1946) 29 Cal.2d 541 . . . . . . . . . . 5

**Federal Statutes, Regulations and Rules**

5 U.S.C. 702 . . . . . . . . . . 2, 13, 20

25 U.S.C. 334 . . . . . . . . . . 14

25 U.S.C. 335 . . . . . . . . . . 13, 14

25 U.S.C. 336 . . . . . . . . . . 14

25 U.S.C. 345 . . . . . . . . . . 2, 18, 19, 21, 26, 30

25 U.S.C. 348 . . . . . . . . . . 14, 19

25 U.S.C. 465 . . . . . . . . . . 4, 7, 13, 14, 18, 19, 24, 27, 30

25 U.S.C. 467 . . . . . . . . . . 24

25 U.S.C. 469 . . . . . . . . . . 23

25 U.S.C. 476 . . . . . . . . . . 2, 7, 11, 23

25 U.S.C. 476(f) . . . . . . . . . . 2

25 U.S.C. 476(g) . . . . . . . . . . 2

25 U.S.C. 479 . . . . . . . . . . 5, 24

28 U.S.C. 158 . . . . . . . . . . 2

28 U.S.C. 1291 . . . . . . . . . . 2

28 U.S.C. 1331 . . . . . . . . . . 2

28 U.S.C. 1346 . . . . . . . . . . 2, 20

28 U.S.C. 1353 . . . . . . . . . . 2, 18, 19, 20

28 U.S.C. 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

28 U.S.C. 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. 2409a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

43 U.S.C. 150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25 C.F.R. 83.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

F.R.C.P. Rule 19(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

F.R.C.P. Rule 19(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**California Statutes**

Cal. Civil Code 685 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cal. Civil Code 686 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Miscellaneous**

32 IBIA 166 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

60 Fed. Reg. 9250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cohen, Handbook of Federal Indian Law
(DOI 1982) p.v. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cohen, Handbook of Federal Indian Law
(DOI 1982) Ch. 1, Sec. B2e, p.15-16. . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Cohen, Handbook of Federal Indian Law
(DOI 1982) Ch. 1, at 34-35, n. 14. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cohen, Handbook of Federal Indian Law
(DOI 1982) Ch. 1, Sec. D3c, p. 40-41 . . . . . . . . . . . . . . . . . . . . . . . . 14

Cohen, Handbook of Federal Indian Law
(DOI 1982) Ch. 11, B3, pp. 615-6 . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13, 14

Cohen, Handbook of Federal Indian Law
(DOI 1982) Ch. 11, Sec. B6, p.627 . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Cohen, Handbook of Federal Indian Law
(DOI 1982) Ch. 11, Sec. B3, p. 617-18 . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cohen, Handbook of Federal Indian Law
(DOI 1982) Ch. 11, Sec. B6, p. 628 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1 Opinions of the Solicitor of the DOI Relating to Infiand Affairs 1917-74
Memos. Sol. Int., 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 9, 11

1 Opinions of the Solicitor of the DOI Relating to Infiand Affairs 1917-74
Memos. Sol. Int., 724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9, 11

1 Opinions of the Solicitor of the DOI Relating to Infiand Affairs 1917-74
Memos. Sol. Int., 747 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9, 11

1 Opinions of the Solicitor of the DOI Relating to Infiand Affairs 1917-74
Memos. Sol. Int., 1479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9, 11

The Rights of Indians and Tribes (ACLU 1992) p. 19 . . . . . . . . . . . . . . . . . . . . 24

## I. INTRODUCTION AND JURISDICTION

The Government's historical treatment of individual Indians is notorious for its imprecision and lack of attention to detail. Equally notorious is the Government's breach of its fiduciary duty to protect individual Indians' designated allotments of trust property. See for e.g., U.S. v. Mitchell (1983) 463 U.S. 206, and Cobell v. Norton, (D.C. Cir. 2001) 240 F.3d 1081.

As Felix Cohen, IBIA Chairman under President Roosevelt, and the primary draftsman of the Indian Reorganization Act, "IRA," warned in 1953:

> "Like the miner's canary, the Indian marks the shifts from fresh air to poison gas in our political atmosphere; and our treatment of Indians, even more than our treatment of other minorities, reflects the rise and fall in our democratic faith..." Handbook of Federal Indian Law ("Handbook")(DOI 1982) p. v.

Particularly in these times of great challenge to our distinctly American freedoms, the Government should be made wary of overlooking the individual Indian's allotment as the designated beneficiary of a trust land acquisition, lest our democratic faith fail these indigenous Americans.

Here, the Government's imprecision and lack of attention to detail has caused the denial of the very existence of the individual Indian Appellants' allotments, as the designated beneficiaries of Parcel 597-080-01. The Government's answering brief virtually abandons the erroneous District Court orders. Instead, without filing a cross-

appeal, the Government attempts to salvage summary judgment by re-arguing jurisdictional and immunity claims the District Court denied below.

Contrary to the Government's belated assertions, Congress eliminated sovereign immunity for the Government's denial of the existence of the Appellants' original trust allotments. 25 U.S.C. 345. Moreover, since the subsequently created[1] "tribe" was never designated as the beneficiary of, nor was it granted "jurisdiction" over, Parcel 597-08-01, the subsequently created "tribe" is not a necessary or indispensable party to this action.

Jurisdiction should not be disputed.[2] Appellants' claims arise under 28 U.S.C. 1331, federal question, 28 U.S.C. 1353 and 25 U.S.C. 345, claims for allotments, 28 U.S.C. 1346 and 1491, Tucker Act damage claims against the U.S., and 28 U.S.C. 2201 and 5 U.S.C. 702, declaratory relief under the APA. ER 12.

---

[1]Contrary to the Government's footnote, Answering Brief ("AB"), 11, fn. 4, the distinction between the "recognition" of a "created" tribe and a "historic" tribe under the IRA, has not been eliminated. 25 U.S.C. 476; 25 C.F.R. 83.7; Price v. Hawaii (9th Cir. 1985) 764 F2d 623. Congress has only removed the distinction in the benefits available to both types of tribes, once recognized. 25 U.S.C. 476 (f) and (g). ER 300-01.

[2]Appellants' reference to 28 U.S.C. 158, AOB 2, was inadvertent; 28 U.S.C. 1291, provides for appeals from final decisions of the district court.

Contrary to the Government's assertion, AB 12, Rosales v. U.S. Fed. Cl. No. 98-869-L, was stayed, not dismissed, pending IBIA 99-4-A, 00-28-A and 02-47-A.

Also contrary to the Government's assertion, AB 41, fn 16, the National Indian Gaming Commission (NIGC) cannot be dismissed from this action because it is the "cooperating agency" charged (along with the Bureau of Indian Affairs) with enforcing the designated individual Indian beneficiaries' trust allotments in Parcel 597-080-01, and equally responsible for the Government's February 5, 2001 Notice of Land Acquisition Application denying the existence of those allotments. See for e.g., Kansas v. Norton (10th Cir. 2001) 249 F.3d 1213, 1228, concluding that the NIGC cannot be dismissed where its actions, as alleged here, "fail to meet statutory, procedural or constitutional requirements, or are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

## II. APPELLANTS ARE DESIGNATED BENEFICIARIES OF TRUST ALLOTMENTS IN PARCEL 597-080-01.

Timing, as they say, can be everything. The underlying summary judgment should be reversed, because the Appellants are among the individual "Jamul Indians of one-half degree or more Indian blood" that were designated in 1978 as the beneficiaries of the trust allotment of Parcel 597-080-01, under 25 U.S.C. 465. Since the Government concedes that there was no recognized tribe of Jamul Indians in 1978, AB 49, this is the only possible designation of beneficiaries permitted as a matter of law, as held in Coast Indian Community v. U.S. ("Coast") (Fed. Cl. 1977) 550 F.2d 639, 651, n32; U.S. v. State Tax Comm. (5th Cir.1976) 535 F.2d 300, 304.

The Government fails to cite any evidence before the District Court that the subsequently created "tribe," known as the "Jamul Indian Village," was ever designated as the beneficiary of the Parcel. AB 47-50. At best, the Government argues such designation should be circumstantially inferred. In fact, the only evidence before the District Court, was that the Secretary of the Interior designated the individual "Jamul Indians of one-half or more Indian blood" to be the beneficiaries of the Parcel, by allowing them to reside upon the trust land for 25 years, just as in Coast, 550 F.2d at 651, n32. ER 9-26; 177; 283-289; 293-303.

Appellants agree with the Government that, "it was for the very purpose of enabling the Jamul Indians to organize and be recognized as a tribe that the United States acquired the Parcel in trust." AB 49. Appellants also agree that once the individual Indians were designated trust beneficiaries in 1978, they qualified to organize under the IRA, 25 U.S.C. 479, by virtue of then residing on "the same," impliedly created "reservation." U.S. v. Assiniboine Tribe (1970) 428 F.2d 1324, 1329-30.

However, impliedly creating a "reservation" for individual Indians' residence does not create, nor recognize, a "tribe." The Government concedes that the "tribe" was not created, nor recognized, until 1981. AB 49; ER 312. Organizing and recognizing a tribe under the IRA does not transfer the designation of the individual beneficiaries to the subsequently created "tribe."

The Government concedes that all individual designated beneficiaries are cotenants in the trust land held by the U.S. Handbook of Federal Indian Law (DOI 1982) Ch. 11, B3, pp. 615-16. ER 330-31. Cotenants have equal rights to possession of the property, and no single cotenant has the right to exclude any other cotenant from the property. Cal. Civil Code 685-86; Zaslow v. Kroenert (1946) 29 Cal.2d 541, 548. Therefore, all of the individual cotenants must consent to any transfer of their individual beneficiaries' designation to a subsequently recognized "tribe," before the

subsequently recognized "tribe" may lawfully be designated as the beneficiary and acquire "jurisdiction" over the Parcel. Id.

Here, it is no wonder that the "Jamul Indians of one-half degree or more Indian blood" have never consented to transfer their designation to any subsequently created "tribe," since the IBIA found non-members participating in the tribal government, perhaps from the time the entity was first recognized. 32 IBIA 166. ER 301.

Nor has the Government ever transferred the original individual Indian beneficiaries' designated allotments to any subsequently created "tribe." Such a transfer of designated beneficiaries must still be accomplished the old-fashioned way, by recording a grant deed. Coast, 550 F.2d at 651, n32; Mem. Sol. Int., reprinted in 1 Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-74 ("Mem. Sol. Int.") at 668, 724, 747, and 1479.[3]

As a matter of law, the Government is estopped by its own Solicitor's memoranda to deny that Parcel 597-080-01 is held in trust for the designated individual Indian beneficiaries, since the Government concedes that the "Jamul Indians of one-half degree or more Indian blood," were not recognized as a tribe in

---

[3] Despite their obvious relevance and the Government's reliance upon these memoranda, AB 44-6, they were not introduced to the trial court. Appellants request judicial notice of these memoranda, which are filed herewith, as found at http://thorpe.ou.edu/solicitor.html.

1978. Memos. Sol. Int., at 668, 724, 747, and 1479. Here, there was no consent by the individual Indian co-tenants, and the Government never recorded a subsequent grant deed, transferring the individual Indian beneficiaries' designation to the subsequently recognized "tribe."

The Government's memos admit that such trust acquisitions cannot be made for a "tribe" that does not yet exist. For example, the Solicitor's memos to the Mississippi Choctaws and the St. Croix Chippewas specifically proscribe that a grant deed could not "designate" an un-recognized "tribe" as the beneficiary of trust land, since "[a] further examination reveals that this designation is incorrect because there is in fact no existing tribe of Indians in Mississippi known as the Choctaw Tribe." Mem. Sol. Int., at 668.

Solicitor Margold describes how the grant deed should have been prepared for the Mississippi Choctaws:

> "The United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior, until such time as the Choctaw Indians of Mississippi shall be organized as an Indian tribe pursuant to the act of June 18, 1934 (48 Stat. 984), and then in trust for such organized tribe." Mem. Sol. Int., at 668 (emphasis added).

Solicitor Margold also concluded that the Choctaw deed would have to be amended and re-recorded to complete the designation to any subsequently recognized tribe, otherwise the property would be held in trust for the individual Indians, and not a tribe, as found in Coast, 550 F.2d at 651:

> "In all of those cases where the title papers have already been returned to the field, instructions should be given to the field agents to have the deeds corrected before they are recorded. In that case where the deed has already been recorded and accepted, it will be necessary to secure a new deed. The necessary corrections will be made in the other cases which are now pending in this office. The error discussed herein arises perhaps out of unusual circumstances, but its one that might have been avoided." Mem. Sol. Int., at 668.

In U.S. v. State Tax Comm. (5th Cir. 1976) 535 F.2d 300, 304, the Court of Appeal held that the absence of the words "then in trust for such organized tribe" in a relief act designating individual Choctaw beneficiaries meant that "only those individuals designated by the Secretary of the Interior were to have the benefit of this" designation, since "[n]either a tribe nor a reservation is mentioned." (emphasis added.)

Here, the grant deed does not contain the words proscribed by the Solicitor, "until such time as they organize." ER 21. Nor does it state: "and then in trust for such organized tribe." Hence, there was no transfer of the designation of the individual Indian beneficiaries to any subsequently recognized tribe.

It seems clear that the Government's imprecision and lack of attention to detail has produced the current denial of the existence of Appellants' allotments in Parcel 597-080-01. Even if the Government had wanted to designate the subsequently created "tribe" as the beneficiary of the Parcel, the Government is now estopped by its own Solicitor's memoranda to deny that it failed to follow its own published procedure for recording such a subsequent designation in an amended grant deed.

The Solicitor proscribed the same procedure for designating individual Indian beneficiaries in the grant deeds for the St. Croix Chippewas in 1937. Mem. Sol. Int., at 725. Similarly, in 1937, the Nahma and Beaver Indians could not be recognized as tribes, without trust land being acquired for designated individual Indians, under 25 U.S.C. 476. Mem. Sol. Int., at 748. Ten years later, the Nooksack Indians could not be recognized as a "tribe, or tribes, residing on the same reservation," because "the Nooksack Indians hold no tribal land," "no reservation has ever been set apart for them by treaty, act of Congress, or Executive order," and "no lands appear to have been purchased for them pursuant to the IRA." Mem. Sol. Int., at 1480.

The Government's Handbook explains the significant distinction between (1) taking land into trust for "individual" Indians to allow them to become a recognized tribe under the IRA, and (2) recognizing a "tribe" under the IRA, and then having the Secretary take land in trust for the "tribe:"

"Persons of one-half or more Indian blood...but not residing on a reservation cannot organize under the IRA, but are nevertheless eligible to enjoy some of its provisions. e.g., Maynor v. Morton, 509 F.2d 1254 (D.C. Cir. 1975). One provision of the IRA gives the Secretary discretionary authority to accept or purchase land in trust for Indians included within its provisions. 25 U.S.C. 465. The Solicitor has held that the Secretary may exercise this authority for all individuals of one-half or more Indian blood. Once these ***individuals become the beneficiaries of land held in trust*** they can organize themselves as a government and, as a "reservation" tribe or band, become eligible for organization under the IRA. Fn 86... This approach has also been used for the Quartz Valley Indians, Duckwater Shoshone Indians, Yomba Shoshone Indians, Port Gamble Band of Clallam Indians, and Sokaogan Chippewa Indians (Mole Lake Band)...In other cases nonreservation tribes have become eligible for organization under the IRA by first being recognized as a tribe under the Act and then having the Secretary take land in trust for the tribe. Handbook. Ch.1, Sec. B2e, pp.15-16 (emphasis added, fn. omitted).

The Government is therefore estopped to deny, that without a formal designation of a subsequently created tribe, as in Pit River Association v. U.S. ("Pit River") (9th Cir. 1994) 30 F.3d 1088, 1093, the "only possible" designation that may be "inferred," as a matter of law, is that Parcel 597-080-01 was taken in trust for the "individual" "Jamul Indians of one-half degree or more Indian blood," as was held in Coast, 550 F.2d at 651, n32; U.S. v. State Tax Comm., 535 F2d. at 304.

Appellants agree that where trust land was accepted for the benefit of designated individual Indians under 25 U.S.C. 465, a "reservation" is created by implication. U.S. v. Assiniboine Tribe (Fed. Cl. 1970) 428 F.2d 1324, 1329-30.

"...governmental conduct and acquiescence were deemed sufficient to amount to their designation in law as [occupants of the Blackfoot Reservation], entitling them to live on and share in the benefits of the reservation." Coast 550 F.2d at 644, n.6.

This then allows the previously un-organized individual Indians, not then living on a formally declared reservation, and not then belonging to a recognized tribe, to become "recognized" as a "tribe"under the IRA. 25 U.S.C. 476. Mem. Sol. Int., at 668; Coast, at 644, citing U.S. v. Assiniboine Tribe (1970) 428 F.2d 1324, 1328-30.

However, the Solicitor's memoranda confirm that the original designation of individual beneficiaries is not automatically transferred upon the subsequent "recognition" of a "tribe." Appellants also agree that the Secretary could have formally transferred the individual beneficiaries' designation to the subsequently created "tribe," as was done in Pit River, 30 F.3d at 1093.

However, that didn't happen here. "Recognition" of a tribal government, is not "designation" of a beneficial interest in trust land. Just as in Coast, there was no subsequent designation of a "tribe." The grant deed was never amended, and no other beneficiaries were ever designated, other than the individual Indians, who were permitted to live on the property for the last 25 years.

Contrary to the Government's assertion, AB 50, Pit River does not hold that recognition of a previously non-existent tribe transfers the individual Indian beneficiaries' designation to the subsequently recognized "tribe." There, the Pit River Association of individual Indians was found to have been the designated beneficiary of the trust land in 1938, until the Secretary formally designated the subsequently recognized tribe to be the beneficiary of the Ranch in 1977. Pit River, 30 F.3d at 1092-93.

Hence, even in Pit River, a formal designation of the subsequently recognized tribe was still required to divest the individual Pit River Indians of their designation as individual beneficiaries. "The Secretary initiated designation proceedings before an Administrative Law Judge," and "[o]n December 3, 1987, the Secretary approved the new constitution and designated the Council as the governing body of the Pit River Indian Tribe, beneficiary of the Ranch." Pit River, 30 F.3d at 1093.

The Government concedes without comment in its brief that federal Indian law has consistently treated trust acquisitions under 25 U.S.C. 465 as original "allotments." The word "allotment" is often not found in the recorded title documents that create such individual Indian trust allotments, or even in the cases that enforce the generic "allotment." U.S. v. Hemmer (1916) 241 U.S. 379; U.S. v. Washington (9th Cir. 1956) 233 F.2d 811, 817; Handbook (DOI 1982) Ch. 11, Sec. B6, p. 628; see

also for example, Chase v. McMasters (8th Cir. 1978) 573 F.2d 1011, 1016-17; City of Tacoma v. Andrus (D.D.C. 1978) 457 F.Supp. 342; which enforced individual Indians' right to certain allotments, without referring to the rights enforced as "allotments," just as the formally denominated "allotments" were enforced in U.S. v. Clarke (9th Cir. 1976) 529 F.2d 984, 986; Arenas v. U.S. (1944) 322 U.S. 419, 432; U.S. v. Arenas (9th Cir. 1947) 158 F.2d 730, 746-47, and 749; Gerard v. U.S. (9th Cir. 1948) 167 F.2d 951, 952; U.S. v. Pierce (9th Cir. 1956) 235 F.2d 885, 888-91; Antoine v. U.S. (8th Cir. 1981) 637 F.2d 1177, 1181-82; Christensen v. U.S. (D. Nev. 1983) 575 F. Supp. 735, 737-38; which follow Hy-Yu-Tse-Mil-Kin v. Smith (1902) 119 F. 114, 115, affirmed, 194 U.S. 401 (1904).

The Government cites no authority to the contrary, ignores its own treatise, and ignores 25 U.S.C. 335, which imposes the General Allotment Act on all subsequent trust acquisitions under 25 U.S.C. 465. Handbook (DOI 1982) Ch. 11, Sec. B3, p. 617-18, citing United States v. Jackson, 280 U.S. 183 (1930). ER 332-33.

The Government does not deny that its own Handbook treats "allotment" as a "term of art in Indian law," for the class of property rights "beneficially owned by more than one Indian as co-tenants by devise, descent, or conveyance," under 25 U.S.C. 465. Handbook., Ch. 11, Sec. B3, pp. 615-616. ER 330-31. See also, Wisconsin v. Stockbridge-Munsee Community (E.D. Wis. 1999) 67 F.Supp. 2d 990,

998, fn 3. "Statutes still in effect permit Indians to obtain allotments out of federal land. The General Allotment Act provides that nonreservation Indians settling on unappropriated federal lands are entitled to have the lands allotted to them under the same terms as reservation allotments. 25 U.S.C. 334." Handbook., Ch. 11, Sec. B6, p. 627 (fn. omitted). ER 334.

The Government also ignores its own citation of Chase v. McMasters, 573 F.2d 1011 (8th Cir. 1978), cert. denied, 439 U.S. 965 (1978), and City of Tacoma v. Andrus, 457 F. Supp. 342 (D.D.C. 1978), for the proposition that: "since 1934 [trust land acquisition for individual Indians] has been done pursuant to provisions of the IRA, 25 U.S.C. 465," and "[t]he status of such lands is indistinguishable from any other allotments and they should be treated alike. See 25 U.S.C. 335." Handbook Ch. 1, Sec. D3c, p. 40-41, fns. 118-19. ER 320-1.

Since the General Allotment Act applies to all subsequent trust acquisitions under 25 U.S.C. 465, such trust allotments include all U.S. "common holdings" referenced by the Government at AB 27, including the "public domain" gifted by private parties. Handbook, Ch. 11 B3, pp.615-16. ER 330-31. As Justice Blackmun found in U.S.v. Clarke (1980) 445 U.S. 253, 260, trust allotments under 25 U.S.C. 348 are acquired when the Indian's homestead "separated the land from the public domain." U.S. v. Clarke (9th Cir. 1976) 529 F.2d 984, 986. Hence, Parcel 597-080-

01, was separated from the "public domain," after the U.S. took title, and held in trust for those individual Jamul Indians that were designated in the deed, and allowed to reside there for the last 25 years.

Here, the Government fails to acknowledge that the Secretary did not initiate any designation proceedings before the IBIA. Moreover, the grant deed was never amended, as called for in the Solicitor's own published memoranda, to designate the subsequently recognized "tribe" as the beneficiary of Parcel 597-080-01. The Government also concedes in silence that its own review of the history of the land acquisition for Jamul found that the Government has "no record of the 1978 trust parcel [597-080-01] being known as the "Jamul Indian Village." ER 177.

Hence, Parcel 597-080-01 was never within the "jurisdiction" of the "Jamul Indian Village" constitution. ER 410. Moreover, the Government's memo, ER 177, also confirms that the Parcel was never added to the "jurisdiction" of the "Jamul Indian Village," under the provision in Art. II for "such other lands as may hereafter be added thereto." ER 410. Thus, the Government's own records admit, contrary to its unsupported assertion in its brief, AB 25, that neither the deed, nor any subsequent Governmental "designation" or amended deed, ever granted "jurisdiction" over Parcel 597-080-01 to the subsequently recognized "tribe."[4]

---

[4] See also section III, D, below.

Therefore, since the Government concedes there was no "tribe" in Jamul when the Secretary accepted the grant deed, as a matter of law and estoppel, the Secretary could not have taken the land in trust for a non-existent tribe. Rather, the only possible designation that may be inferred, as a matter of law, is that Parcel 597-080-01 is held in trust for the designated individual "Jamul Indians of one-half degree or more Indian blood." Coast, 550 F.2 at 651, n32. For all of these reasons, the erroneous summary judgment should be reversed, as a matter of law, since the Appellants remain designated individual Indian beneficiaries of their original trust allotments in Parcel 597-080-01.

## III. NEITHER SOVEREIGN IMMUNITY, NOR ANY STATUTE OF LIMITATIONS, BAR APPELLANTS' CLAIMS

### A. The Quiet Title Act, 28 U.S.C. 2409a(a), does not apply here.

The District Court refused to find that the Quiet Title Act ("QTA"), 28 U.S.C. 2409a(a), barred Appellants' claims in this case, despite the Government's erroneous insistence. ER 115, fn. 18, 247, fn. 3, and 336-350, and 449-457.

Appellants do not seek to quiet title, nor make any claim against title to Parcel 597-080-01. ER 247, fn. 3. The United States holds title in trust for the individual "Jamul Indians of one-half degree or more Indian blood," as designated by the Secretary when they were allowed to reside on the trust land for the last 25 years.

Coast 550 F.2d at 651, n 32.

Even under Block v. North Dakota (1983) 461 U.S. 273, 286, there must still be a challenge to title for the QTA to apply. Vieux v. East Bay Reg. Park Dist. (9th Cir. 1990) 906 F2d 1330, 1336, cited by the Government, AB 48; Kansas v. Norton (10th Cir. 2001) 249 F.3d 1213, 1224-5; and Kinscherff v. U.S. (10th Cir. 1978) 586 F.2d 159, 160.

"Thus, only disputes pertaining to the United States' ownership of real property fall within the parameters of the QTA." Kansas, at 1224. "Any challenge to a non-ownership interest in real property is not precluded by the QTA." Dunbar Corp. V. Lindsey (4th Cir. 1990) 905 F.2d 754, 759. Navajo Tribe of Indians v. New Mexico (10th Cir. 1987) 809 F.2d 1455, 1475 held that "adjudicating reservation boundaries [as with this impliedly created reservation] is conceptually quite distinct from adjudicating title to the same lands."

The Government cites no authority for its assertion that Appellants' claim to an allotment, as designated beneficiaries, seeks to adjudicate title, and is therefore barred by the QTA. AB 20. As set forth in the cases cited in section B immediately following, no individual Indian would have been allowed to enforce the right to an allotment, as a designated beneficiary of trust land, if the QTA barred such claims "for an allotment" under federal law. Congress specifically provided for such claims

in both 25 U.S.C. 345 and 28 U.S.C. 1353. "Because the action does not seek to quiet title to the tract, the QTA does not apply." Kansas, 249 F.3d at 1225.

**B. The Government waived sovereign immunity under 25 U.S.C. 345.**

The Government concedes that it has waived sovereign immunity for Appellants' claims "for allotments," pursuant to 25 U.S.C. 345. AB 26. "[S]ection 345 involves a waiver of federal immunity,...that section authorizes and provides governmental consent for... actions for allotments." U.S. v. Mottaz (1986) 476 U.S. 834, 846.

The District Court recognized the distinction between claims against title and the Appellants' claims "for allotment," and refused to dismiss Appellants' claims under the QTA. ER 115, fn. 18, 247, fn. 3, and 336-350, and 449-457. Appellants seek to enforce the original right to their allotments under 25 U.S.C. 345 and 465, which were first denied when the Government published the February 5, 2001 Notice of Land Acquisition Application. Appellants do not merely make a claim "in relation to," AB 29, their allotments. Mottaz, at 845-6.

Just as in Coast, 550 F.2d 639, the Government allowed Appellants to occupy, reside upon, and use their allotments in Parcel 597-080-01, for 23 years without denying the existence of their allotments. Then without warning, the Government published the February 5, 2001 Notice, denying for the first time the existence of the

allotments, and calling for the razing of the Appellants' homes. ER 83-97. Appellants' families have resided on this land for nearly a century: the first 75 years at the sufferance of the private landowners, and then for 25 years after the Government allotted the trust land for their designated individual benefit in 1978.

The Appellants' "right" to enforce their original allotments under section 345, was acquired "under law" by virtue of the Government's trust acquisition under 25 U.S.C. 465.[5] The fact that the Secretary exercised discretion to acquire the trust land under 25 U.S.C. 465, is irrelevant. Once the land was accepted into trust, upon recording of the deed, the Appellants' "right" to their allotments was no longer discretionary. The Government fails to deny that issuance of trust patents for the Appellants' allotments is a ministerial act which the Secretary has no discretion to refuse to perform. "[T]he Secretary of the Interior, ...shall cause patents to issue therefor in the name of the allottees, ...in trust for the sole use and benefit of the Indian to whom such allotment shall have been made..." 25 U.S.C. 348; U.S. v. Arenas (9th Cir. 1947) 158 F.2d 730, 746-7; U.S. v. Clarke (9th Cir. 1976) 529 F.2d

---

[5] AB 28 citation of Florida Dep't of Bus. Regul. V. U.S. Dep't of the Interior, (11th Cir. 1985) 768 F.2d 1248, is inapposite, since it involves "the uninhibited discretion" of the Secretary to accept land in trust, and does not involve individual allotments. Similarly, Cermak v. Babbitt (Fed. Cir. 2000) 234 F.3d 1356, does not involve trust land acquisition under 25 U.S.C. 465, but a limited act for certain Mdewakanton Sioux, which does not create an allotment.

984, 986, following Hy-Yu-Tse-Mil-Kin v. Smith (1902) 119 F. 114, 115, affirmed, 194 U.S. 401 (1904). See section II, ante at 12-13.

Thus, 25 U.S.C. 345 waived sovereign immunity for the Appellants' claims for their original allotments, as designated beneficiaries of Parcel 597-080-01.

**C. There is no sovereign immunity for claims for declaratory relief under the APA, 5 U.S.C. 702, and damages under the Tucker Acts, 28 U.S.C. 1346 and 1491.**

The Government has also waived sovereign immunity for the Appellants' claims for declaratory relief under the APA, 5 U.S.C. 702 . Pit River 30 F.3d at 1098, n5; finding no sovereign immunity in non-monetary actions for declaratory, injunctive, and mandamus relief against the United States, citing U.S. v. Mitchell, 463 U.S. 206, 227 n.32 (1983).

Moreover, Coast, exemplifies the Government's waiver of sovereign immunity under the Tucker Acts, 28 U.S.C. 1346 and 1491, for damages caused by the breach of the Government's fiduciary duty as trustee for the designated individual Indian beneficiaries of Parcel 597-080-01. Coast, 550 F.2d at 649, followed in U.S. v. Wilson (9th Cir. 1989) 881 F.2d 596, 599; U.S. v. Mitchell (1983) 463 U.S. 206; and Cermak v. Babbitt (Fed. Cir. 2000) 234 F.3d 1356, 1361.

**D. Appellants' claims are not barred by any statute of limitations**

The Government concedes that it waived any statute of limitations defense by failing to raise it below. AB 30, fn 3; Cedars-Sinai Medical Center v. Qui Tam Relator (9th Cir. 1997) 125 F.3d 765, 770.

Contrary to the Government's assertion on appeal, AB 24-26, there is no evidence in the record that the Appellants had any notice that the Government denied the existence of their original allotment as the designated beneficiaries of Parcel 597-080-01, until the February 5, 2001 Notice of Land Acquisition Application was published in the Federal Register. ER 83. Hence, the May 30, 2001 filing of this action, was well within the six year statute of limitations under 25 U.S.C. 345.

Similarly, there is no evidence in the record that the Appellants "should have known" that the Government would deny the original existence of their allotments, as designated beneficiaries of Parcel 597-080-01, before the February 5, 2001 Notice was published.

As noted in Section II, ante at 15, the constitution of the Jamul Indian Village does not list, describe, or otherwise denominate Parcel 597-080-01 within its declared "jurisdiction." ER 410. The Government concedes it has "no record of the 1978 trust parcel being known as the 'Jamul Indian Village.'" ER 177. This memo confirms that Parcel 597-080-01 was never added to the "jurisdiction" of the "Jamul Indian

Village," contrary to the Government's assertions at AB 25 and 48. Similarly, the "listing"of the "Jamul Indian Village," as a "recognized" tribe in the Federal Register, contains no notice that the "tribe" was ever designated as the beneficiary of Parcel 597-080-01. 60 F.R. 9250, ER 266. Thus, the Government's own records admit that neither the deed, nor any subsequent Governmental "designation" or amended deed, ever granted "jurisdiction" over Parcel 597-080-01 to the subsequently recognized "tribe.

Moreover, the Government concedes that it subsequently accepted the 1.37 acre Parcel, 597-080-*02*, including the easement for the road between SR 94 and the Indian cemetery, for the "Jamul Indian Village," pursuant to Art. II of the constitution, which provides for "such other lands as may hereafter be added thereto," after formal recognition of the "tribe" in 1981. ER 177 and 25. However, contrary to the Government's mistaken rendition of the facts, AB 11 and 25, fn 10, the Indian cemetery remains owned by the Catholic Diocese, and like Parcel 597-080-01, was never "within" the "jurisdiction" of the Village constitution. ER 177 and 25. Hence, the Government is simply wrong to assert that the "declaration" of "jurisdiction" in the Jamul constitution "included" Parcel 597-080-01, "within the confines of the Jamul Indian Village." AB 25.

The Government is also wrong to suggest that the tribal government was not landless upon adoption of its constitution in 1981. Many tribal governments remain landless after recognition by the Government. Malone v. BIA (9th Cir. 1994) 38 F.3d 433, 436; Artichoke Joe's v. Norton (E.D. Cal. 2002) 216 F. Supp. 1084, 1097.

There is no requirement in the IRA, that the recognized tribal government have "jurisdiction"over any land. 25 U.S.C. 476. The fact that 25 U.S.C. 469 requires "half-blood" Indians to "reside on the same reservation," to be recognized as a "tribe," does not mean that the subsequently created "tribe" was granted "jurisdiction" over Parcel 597-080-01. Nor does it mean that the "tribe" was subsequently "designated" as the beneficiary of the individual Indians' trust land. Rather, here, land was acquired for individual Indians, which impliedly created a "reservation," upon which they were allowed to "reside," while they decided whether to subsequently organize as a tribe.

As noted in Section II, such a "reservation" may be implied from the allotted designation of trust land to individual Indian beneficiaries, as in this case. U.S. v. Assiniboine Tribe (Fed. Cl. 1970) 428 F.2d 1324, 1328-30. However, the creation of an implied "reservation" for the "residence" of individual Indians, does not create governmental "jurisdiction" over individual Indian trust land within the implied reservation. Sac & Fox Nation v. Norton (10th Cir.2001) 240 F.3d 1250, 1257;

Kansas v. Norton (10th Cir. 2001) 249 F.3d 1213, 1229-31; Wisconsin v. Stockbridge-Munsee Community (E.D. Wis. 1999) 67 F. Supp. 2d 990, 1003-4 (which the Government fails to acknowledge, let alone distinguish).

The term "reservation," like "allotment,"is a term of art in Indian law, and can be implied, even where there has been no formal executive order, treaty, or act of Congress.[6] Assiniboine, 428 F.2d 1328-30. "An Indian reservation is land that has been set aside by the federal government for the use, possession, and benefit of an Indian tribe ***or group of Indians***. The Rights of Indians and Tribes (ACLU 1992) p. 19. "During the 1850's the modern meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence of tribal Indians, regardless of origin. By 1885 this meaning was firmly established in law." Handbook., at 34-35, n. 14.

"An Indian tribe's jurisdiction derives from the will of Congress," Kansas, 249 F.3d at 1231, and Congress never granted "jurisdiction" over Parcel 597-080-01 to the subsequently recognized "Jamul Indian Village." In fact, many "reservations" are made up of trust land allotments to individual Indians, over which no recognized

---

[6] No formal Jamul reservation was ever created by executive order, treaty or act of Congress. E.R. 258-9; AOB 26. Parcel 597-080-01 was accepted pursuant to 25 U.S.C. 465 and 479, and not 467. Moreover, Congress eliminated the creation of formal "reservations" by executive order in 1919. 43 U.S.C. 150.

"tribe"exercises governmental jurisdiction. The BIA's website states categorically: "Approximately 56.2 million acres of land are held in trust by the United States for various Indian Tribes ***and individuals***. Much of this is reservation land." (emphasis added) ER 311.

In U.S. v. Celestine (1909) 215 U.S. 278, the Supreme Court found that the term "reservation" is used in public land law to describe a tract that Congress had reserved from sale, and specifically held that the issuance of an individual Indian's land patent did not sever the allotted parcel from a "reservation," since all tracts within the boundaries of a reservation remain a part of the reservation until separated therefrom by act of Congress.

Here, the Government offers no evidence that recognition of half-blood Indians residing on the same impliedly created reservation creates governmental "jurisdiction" over the extent of the individual trust allotments. In fact, the Government's recognition of the "tribe," known as the "Jamul Indian Village," merely means that the individual "Jamul Indians of one-half degree or more Indian blood" were residing on the same "reserved" parcel of land, which was held in trust to provide homes for the designated "individual Indians." ER 284.

Thus, the Government has failed to demonstrate that the Appellants "knew" or "should have known" the Government would deny the existence of the Appellants'

individual trust allotments, prior to February 5, 2001, and therefore the Appellants' claims are not barred by the statute of limitations in 25 U.S.C. 345.

## IV.  THE JAMUL INDIAN VILLAGE IS NOT A NECESSARY OR INDISPENSABLE PARTY

The District Court refused to find the "Jamul Indian Village" a necessary or indispensable party, despite the Government's urging. ER 115, 336-350 and 449-57. Not only is the tribe not a "necessary" party to this action, since it has never been designated as the beneficiary of Parcel 597-080-01, any alleged "interest" has been adequately represented by the Government.

This Court undertakes a two-pronged analysis to determine whether a non-party is "necessary" under F.R.C.P. Rule 19(a). "First, we determine whether "complete relief" is possible among those already parties to the suit... whether success in the litigation can afford the plaintiffs the relief for which they have prayed.'... Second, we decide whether the non-party has a 'legally protected interest in the suit.'" Yellowstone County v. Pease (9th Cir. 1996) 96 F.3d 1169, 1172.

Here, the Appellants will obtain "complete declaratory relief," without the necessity of adding the tribe. As noted in Sac and Fox, 240 F.3d at 1258, and Kansas, 249 F.3d at 1226, "In concluding the Wyandotte Tribe was not a necessary party under Rule 19(a), we first reasoned that complete relief could be accorded the parties

to the lawsuit: 'Because plaintiffs' action focuses solely on the propriety of the Secretary's determinations, the absence of the Wyandotte Tribe does not prevent the plaintiffs from receiving their requested declaratory relief.'"

Moreover, the Government has failed to establish that any "tribe" has a "legally protected interest" in Parcel 597-080-01. Yellowstone, supra; Citizen Band Potawatomi Indian Tribe of Okla. v. Collier (10th Cir. 1994) 17 F.3d 1292, 1294; Macdonald v. Means (9th Cir. 2002) 309 F.3d 530, 541.

In Potawatomi the 10th Circuit found that the BIA could grant trusts of land to individual Absentee-Shawnee Indians within the Potawatomi reservation, under 25 U.S.C. 465. The Potawatomis sued the BIA to prevent the grant of such trust allotments. The 10 th Circuit reversed dismissal for failure to join the Absentee-Shawnees, finding that the Government had failed to show that the Absentee-Shawnees had a "legally protected interest," since the Absentee-Shawnees had not acquired any "undivided trust or restricted interest" in the land.

There, just as in this case, the alleged "interest" "[was] merely an expectation of the Absentee-Shawnee tribe...This expectation is not a legally protected interest for purposes of ...necessary party analysis. Until the BIA actually approves an individual Absentee-Shawnee application, this 'interest' is inchoate." 17 F.3d at 1294.

Similarly, here, until the BIA amends the grant deed to transfer the present designation of the individual Jamul Indian beneficiaries, to the subsequently recognized "tribe," the Government has failed to prove that the subsequently created "tribe" is a necessary or indispensable party to this action.[7]

As found in Sac and Fox, 240 F.3d at 1259, Kansas, 249 F.3d at 1226-7, and Washington v. Daley (9th Cir. 1999) 173 F.3d 1158, 1167-68, "inasmuch as the Secretary and the tribes had virtually identical interests,... the United States could therefore adequately represent the tribes." "[T]he Tribes are not necessary parties because their interest can be adequately represented by the federal defendants. 'The United States can adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe.'" Washington v. Daley (9th Cir. 1999) 173 F.3d 1158, 1167. There is no conflict arising from the federal government's potentially inconsistent responsibilities under its trust obligations, where there is "no argument the United States would not or could not make on the [tribe's] behalf," and there is "no 'necessary element' the [tribe] alone could present." Southwest Center for Biological Diversity v. Babbitt (9th Cir. 1998) 150 F.3d 1152,

---

[7] This also explains why Pit River is not controlling in this case. In Pit River, there was a later formal designation of the subsequently recognized "tribe."30 F.3d at 1093. Here, the Government concedes in silence that there has been no amended deed, nor any formal designation of the subsequently recognized "tribe."

1153-4. Moreover, here, there can be no competing interests, because the Government concedes the "tribe" did not exist when the Appellants' designated interest was originally recorded in the deed.

> "Thus, the absence of the Miami Tribe does not prevent the State from obtaining its requested relief or an adequate judgment. Nor do we believe the absence of the Tribe is likely to subject the parties to this action to multiple or inconsistent obligations..." Kansas , 249 F.3d at 1226-7.

A "tribe" that did not exist in 1978 simply cannot be found to have acquired a "legally protected interest" in Parcel 597-080-01 when the grant deed was recorded. Moreover, the Government has submitted no evidence that any amendment to the grant deed was ever recorded, transferring the individual Indian beneficiaries' designation to the subsequently created "tribe," after its recognition in 1981. "In the absence of evidence showing the nature of the Absentee-Shawnee tribe's interest in Potawatomi land, the BIA failed to sustain its burden with respect to its motion..." Potawatomi, supra, at 1294.

"Finally, and perhaps most important, there does not appear to be any alternative forum in which plaintiffs' claims can be heard,...See Kescoli v. Babbitt, 101 F.3d 1304, 1311 (9th Cir. 1996) (noting that a court should be "extra cautious" before dismissing an action pursuant to Rule 19(b) if no alternative forum exists); Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr., (10th Cir. 1996) 94 F.3d 1407,

1413 (noting that 'the absence of an alternative forum would weigh heavily, if not conclusively against dismissal')." Sac and Fox, 240 F.3d at 1260.

## V. CONCLUSION

The District Court's summary judgment in favor of the Government should be reversed, as a matter of law, since there is, at a minimum, a triable issue of material fact as to whether the Appellants remain entitled to their trust allotments as the designated beneficiaries of Parcel 597-080-01, under 25 U.S.C. 465.

Congress eliminated sovereign immunity for claims for allotments under 25 U.S.C. 345. Since the subsequently recognized "tribe" was never a "designated" beneficiary of the Parcel, the "tribe" is not a necessary or indispensable party, and Appellants' claims were brought within the six-year statute of limitations.

For all of these reasons, the trial court's February 14, 2002 order, granting Appellees' motion for summary judgment, and the April 22, 2002 order, denying Appellants' motion for new trial and relief from judgment, should be reversed.

Dated: February 6, 2003

**WEBB & CAREY**

Patrick D. Webb
Attorneys for Appellants

**CERTIFICATION OF COMPLIANCE TO FED. R. APP. 32(A)(7)(c) AND CIRCUIT RULE 32-1 FOR CASE NUMBER 01-55745**

I certify that: (check appropriate option(s))

1. Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit rule 32-1, the attached opening/answering/reply/cross-appeal brief is

☐ Proportionately spaced, has a typeface of 14 points or more and contains 6938 words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words)

February 6, 2003

Signature of Attorney

Law Offices
Webb & Carey
A Professional Corporation
401 B Street, Suite 306
San Diego, California 92101
(619) 236-1650
FAX(619) 236-1283

January 21, 2003

Katherine J. Barton, Esq.
Attorney, Appellate Section
Environment & Natural Resources Division
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026

United States Court of Appeals
for the Ninth Circuit
95 Seventh Street
San Francisco, CA

Re: Rosles et al. v. United States et al.
U.S. Ninth Circuit Court of Appeals Case No. 02-55800

Dear Ms. Barton and the Clerk's Office:

Following our telephone message, the clerk's office at the Court of Appeal granted our request for a 14 day extension of time to file our reply brief in the above referenced matter.

Accordingly, the Rosales' Reply Brief is now due February 7, 2003.

Thank you in anticipation of your courtesy and cooperation in this regard.

Very truly yours,

Patrick D. Webb
**WEBB & CAREY**

**DECLARATION OF SERVICE**

I, the undersigned, certify as follows:

I am a citizen of the United States, a resident of the County of San Diego, State of California, over the age of eighteen years, and not a party to the within action.

I am employed by **WEBB & CAREY**, 401 B STREET SUITE 306, San Diego, California 92101.

On February 7, 2003, I served the following:

**APPELLANTS' REPLY BRIEF AND REQUEST FOR JUDICIAL NOTICE**

upon the parties interested in said action by depositing in the U.S. mail, a true copy thereof, enclosed in a sealed envelope to the addresses as follows:

Peter J. Sholl, Esq. #147799
Assistant U.S. Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893

Katherine J. Barton, Esq.
Mark R. Haag
Environment & Natural Resources Div.
Department of Justice Room 8918
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 7, 2003, at San Diego, California.

Patrick D. Webb